UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION
* * * * * * * * * * * * * * * * * * *
ERIE MOORE, JR., TAMARA GREEN
AND TIFFANY ROBINSON

VERSUS                          CIVIL ACTION NO. 3:16-CV-01007
                                JUDGE ROBERT G. JAMES
                                MAGISTRATE JUDGE KAREN L. HAYES
LaSALLE CORRECTIONS, INC.,
ET AL.
        CONSOLIDATED FOR DISCOVERY PURPOSES ONLY WITH:
LARA J. WHITE

VERSUS                          CIVIL ACTION NO. 3:16-CV-011405
                                JUDGE ROBERT G. JAMES
                                MAGISTRATE JUDGE KAREN L. HAYES
LaSALLE CORRECTIONS, INC.,
ET AL.

* * * * * * * * * * * * * * * * * * *

DEPOSITION OF

CAPTAIN GERALD DAMONE HARDWELL, JR.

August 28, 2017

* * * * * * * * * * * * * * * * * *

Taken At Office Of:

Duke Copeland Court Reporters
111 Hudson Lane, Suite A
Monroe, Louisiana 71201

* * * * * * * * * * * * * * * * * *

Reported By:

MARGARET ANN COPELAND
CERTIFIED COURT REPORTER
CERTIFICATE NO. 92160
PARISH OF OUACHITA
STATE OF LOUISIANA

2

APPEARANCES:

        FOR ERIE MOORE, JR., TAMARA GREEN AND
        TIFFANY ROBINSON:

        MR. NELSON W. CAMERON
        ATTORNEY AT LAW
        675 Jordan Street
        Shreveport, Louisiana 71101

        FOR LaSALLE MANAGEMENT, ET AL:

        PROVOSTY, SADLER, deLAUNAY,
        FIORENZA & SOBEL
        Post Office Box 1791
        Alexandria, Louisiana 71309-1791
        appearing herein by and through
        Mr. H. Bradford Calvit

        FOR LaKAYE HAMILTON:

        MR. W. MARK McKEE
        ATTORNEY AT LAW
        Post Office Box 1628
        Columbia, Louisiana 71418

        FOR LARA J. WHITE AND FAMILY:

        MR. PATRICK R. JACKSON
        MR. DAVID B. NOLES
        ATTORNEYS AT LAW
        4442 Viking Drive, #100
        Bossier City, Louisiana 71111

3

1  Via Telephone:    FOR CITY OF MONROE:
2
3
4                    MS. NANCI SUMMERSGILL
5                    MONROE CITY ATTORNEY
6                    Post Office Box 123
7                    Monroe, Louisiana 71210-0123
8
9
10
11
12
13  ALSO PRESENT:        Erie Moore, Jr.
14                      Tiffany René Robinson
15                      Catherine Moore
16                      Tamara Green
17                      Ray Hanson, Warden
18                      Roy Brown
19                      Danielle Walker

4

1              INDEX OF EXHIBITS
2                          Page No.
3  1 - Counseling Form . . . . . . . . . . . . . .   14
4  2 - Administrative Hearing Request. . . . . . .   16
5  3 - On The Job Training Checklist . . . . . . .   18
6  4 - 1/30/13 Training Attendance Log . . . . . .   20
7  5 - 2/11/15 Training Attendance Log . . . . . .   21
8  6 - 3/3/15 Training Attendance Log. . . . . . .   21
9  7 - Richwood Correctional Center P&P #135 . . .   22
10  8 - Administrative Lockdown Roster. . . . . . .   31
11  9 - Drawing . . . . . . . . . . . . . . . . . . .   84
12  10 - Drawing. . . . . . . . . . . . . . . . . .   133
13  11 - Richwood Correctional Center P&P #182. . . .   139
14  12 - Photograph . . . . . . . . . . . . . . . . .   142
15  13 - Photograph . . . . . . . . . . . . . . . . .   143
16  14 - Photograph . . . . . . . . . . . . . . . . .   144
17  15 - Chain of Command . . . . . . . . . . . . . .   169
18  16 - Log Sheets . . . . . . . . . . . . . . . . .   293
19  17 - Richwood Correctional Center P&P #165. . . .   294

1  (Pages 1 to 4)

Duke Copeland Court Reporting
(318)387-2889

EXHIBIT 8

5

1           STIPULATIONS

2     It is stipulated and agreed between counsel that this

3  deposition of CAPTAIN GERALD DAMONE HARDWELL, JR., is taken

4  pursuant to Notice by counsel Eric Moore, Jr., Tamara Green

5  and Tiffany Robinson, and may be used for all purposes

6  permitted by the Federal Rules of Civil Procedure. All

7  objections, except as to the form of the question and

8  responsiveness of the answer, are reserved until such time as

9  the deposition is offered and introduced into evidence.

10        * * * * * * * * * * * * * * * * * * *

11     The witness, CAPTAIN GERALD DAMONE HARDWELL, JR., was

12  advised of his right to read and sign this deposition, and he

13  elected to exercise that right.

6

1     CAPTAIN GERALD DAMONE HARDWELL, JR., being first duly
2  sworn, testified as follows:
3        * * * * * * * * * * * * * * * * * * *
4          MR. CAMERON: Mr. Hardwell, my name is Nelson
5     Cameron, and I represent the family of Eric
6     Moore, Sr., in this case.
7          WITNESS: Uh-huh (yes).
8          MR. CAMERON: And I'm going to be asking you a
9     series of questions--
10         WITNESS: Okay.
11         MR. CAMERON: --about your background and what
12     you know or may not know about the case. If I
13     ask you a question and you don't understand
14     what it is I'm trying to ask you just ask me
15     to repeat, rephrase the question or explain it
16     to where you feel comfortable in responding
17     under oath. Okay?
18         WITNESS: Okay.
19         MR. CAMERON: You do understand--
20         MR. CALVIT: You're going to need speak up.
21     I'm sorry. You need to speak up.
22         WITNESS: Okay.
23         MR. CALVIT: She's recording this--
24         WITNESS: I do--
25         MR. CALVIT: --and everyone needs to be able

7

1          to hear you.
2          WITNESS: Okay.
3          MR. CAMERON: Right. You understand that
4          you're testifying here as though you are in a
5          court of law?
6          WITNESS: Yes, sir.
7          MR. CAMERON: I ask that you--all your
8          responses be verbal. You know, uh-huhs and
9          un-huhs and nods of head that we use in every
10         day conversation--
11         WITNESS: Okay.
12         MR. CAMERON: --won't translate here. Okay?
13         WITNESS: I understand.
14         MR. CAMERON: All right. And, also, I ask you
15         to allow me to finish my question before you
16         begin to answer it.
17         WITNESS: Yes, sir.
18         MR. CAMERON: All right. That way we're not
19         talking on top of each other, and plus you get
20         the opportunity to fully understand what the
21         question is. Okay?
22         WITNESS: Yes, sir.
23         MR. CAMERON: If you do respond to a question
24         I have to assume that you understood the
25         question. Is that fair enough?

8

1          WITNESS: Yes, sir.
2          MR. CAMERON: All right.
3     EXAMINATION BY MR. CAMERON:
4     Q  Well, the first thing I need for you to do is to
5  tell me your first--your full legal name.
6     A  Gerald Damone Hardwell, Jr.
7     Q  Okay. And you are currently employed at Richwood
8  Correctional Center?
9     A  Yes, sir.
10    Q  And what is your job title?
11    A  I'm a captain, shift captain, of security.
12    Q  What are your duties as shift captain?
13    A  Dealing with restraints, make sure we have the
14  proper number of restraints, as far as radio inventory, and
15  also dealing with hygiene and et cetera.
16    Q  Okay.
17    A  And also--also dealing with shifts.
18    Q  What do you mean, "dealing with shifts"? What does
19  that mean?
20    A  Making sure every shift is properly staffed.
21    Q  Do you also have responsibil- --any responsibility
22  as far as housing inmates, as far as their classification and
23  things like that?
24    A  No, sir.
25    Q  Do you have any authority to place an inmate in a

2  (Pages 5 to 8)

Gerald Hardwell
August 28, 2017

9

1  lockdown cell?
2      A   Yes, sir.
3      Q   Tell me about that authority.
4      A   Just dealing with rule violations or certain-- If
5  any inmate has violated a rule, you know, we'll place them in
6  lockdown, two inmates per lockdown.
7                  MR. CALVIT:  When you say lockdown what do you
8          mean?
9      A   Administrate segregation.
10     Q   Okay.
11                 MR. CAMERON:  Let me-- I'll--
12                 MR. CALVIT:  Sure.
13                 MR. CAMERON:  I understand, but let me ask the
14         questions.
15                 MR. CALVIT:  Okay.
16     Q   Now, are there cells that are called subject
17  management cells?
18     A   Special-- We have special management cells.
19     Q   Special management.  Okay.  And do you have any
20  authority to fill those?
21     A   Yes, sir.
22     Q   How many special management cells are there at
23  Richwood?
24     A   We have two.
25     Q   Are they-- Are they limited to any particular kind

10

1  of inmate?
2      A   No, sir.
3      Q   And what I mean by that, you-- I know there are--
4  At Richwood Correctional Center you have DOC inmates and you
5  have city inmates.  Is that correct?
6      A   Yes, sir.
7      Q   Any other kind of inmates?
8      A   No, sir.
9      Q   A city inmate or a DOC inmate could be placed in
10  the special management cell?
11     A   Yes, sir.
12     Q   What's the difference between a special management
13  cell and a lockdown cell?
14     A   Special management deals with if we have any--find
15  the offender a suicidal offender or-- You know, then we
16  have-- When we have city guys come in, you know, if they--
17  any type of drug--if they're still on any type of drugs when
18  they come in, so we have a room and we'll place them up in
19  there.
20     Q   Uh-huh (yes).  And the special management cells are
21  one-person cells?
22     A   Yes, sir.
23     Q   And the lockdown cells are two-person?
24     A   Two.  Two per cell.
25     Q   Okay.  When did you become a captain?

11

1      A   January.
2      Q   Of this year?
3      A   Yes, sir.
4      Q   And what was your rank before you were a captain?
5      A   Lieutenant.
6      Q   When did you become a lieutenant?
7      A   '17.  Be around about February of 2015.
8      Q   And what--what was your rank before lieutenant?
9      A   Sergeant.  Work release sergeant.
10     Q   Okay.  And when was it you became a sergeant?
11     A   That was back in 20- --late 2010.
12     Q   Okay.  And what was your rank before sergeant?
13     A   CO.
14     Q   When did you become a CO?
15     A   When I transferred from Winnfield in 2009.
16     Q   How do your duties differ as captain than when they
17  were--when you were a lieutenant?
18     A   I lot more responsibilities.
19     Q   In what way?
20     A   Just managing the shifts, completing inventory on
21  different items such as radios, restraints.
22     Q   And when did you first become employed at Winn?
23     A   At Winn?  2009.  Around-- I want to say it was
24  June 6th.
25     Q   What was your last rank there?

12

1      A   CO.
2      Q   Why did you transfer from Winn to--
3      A   I moved.
4      Q   --Richwood?
5      A   Moved.
6      Q   Moved your home?
7      A   Uh-huh (yes).
8                  MR. CALVIT:  That's a yes or a no?
9                  WITNESS:  Yes, sir.
10                 MR. CALVIT:  Thank you.
11     Q   While at Winn did you have any kind of disciplinary
12  issues?
13     A   No, sir.
14     Q   What kind of training did you receive through--
15  What training did you receive through Winn?
16     A   Oh, the four--the four-week training.
17     Q   Where did that take place?
18     A   Winnfield Correctional Center.  It was back when it
19  was CCA.
20     Q   All right.  And while at Richwood Correctional
21  Center have you ever been subject to discipline?
22     A   For once being late, and that was it.
23     Q   And let me show you something here that might
24  refresh your memory.  This is RCC/Hardwell 95, and ask you if
25  you recognize that?

3  (Pages 9 to 12)

|  | 13 |
|---|---|

1  (WITNESS PERUSES DOCUMENT.)
2      A  Okay. I remember this.
3      Q  All right.
4      A  Okay.
5      Q  So you got--you got wrote up for not reporting a
6  violation of an employee rule which force was used on a
7  Monroe City inmate?
8      A  Yes, sir.
9      Q  All right. Tell me what happened there.
10     A  When I was working down there-- I just had started
11  and one guy, he had got into it with an inmate or whatever
12  and I had left them back there, but I didn't know the whole
13  altercation went on. All I know, they was arguing.
14     Q  Uh-huh (yes).
15     A  And so that's the only thing I can remember.
16     Q  Who was arguing?
17     A  At the time I want to say it's Antonio Taylor.
18     Q  And who was the other person involved?
19     A  I don't recall the inmate.
20     Q  Okay. What happened to the inmate?
21     A  All I-- All I can recall is that evening when I
22  came back they say he had pushed him.
23     Q  Uh-huh (yes). Saying the--the guard had pushed--
24     A  Yes.
25     Q  --Taylor--I mean, had pushed the inmate?

|  | 15 |
|---|---|

1      Q  All right. I'm going to show you RCC/Hardwell 40,
2  and ask if you can recognize that document.
3  (WITNESS PERUSES DOCUMENT.)
4      A  Yes, sir.
5      Q  And is that an administrative hearing that you
6  requested in connection with your DWI?
7      A  Yes, sir.
8      Q  Were you convicted of DWI?
9      A  Uh-huh (yes).
10         MR. CALVIT:  You need to say yes or no.
11     Q  Yes?
12     A  Yes, sir.
13         MR. CALVIT:  Thank you.
14     Q  Uh-huh (yes). And when is it you were convicted?
15     A  I'd say about a year ago. A year, a year and a
16  half ago.
17     Q  Uh-huh (yes). Any other arrests?
18     A  No, sir.
19     Q  You're sure?
20     A  Positive.
21     Q  Uh-huh (yes). Okay.
22         COURT REPORTER:  Is this an exhibit?
23         MR. CAMERON:  Huh? Oh, I'm sorry. It's the
24         next one.
25         COURT REPORTER:  So this is "Exhibit 2"?

|  | 14 |
|---|---|

1      A  Yes, sir.
2      Q  All right. What discipline is this? I mean, is
3  this just like a verbal documentation of a reprimand?
4      A  It is a verbal counseling.
5      Q  All right.
6         MR. CAMERON:  And I'll mark and identify this
7         as "Exhibit 1."
8      Q  I'm going to go through some of your personnel
9  matters here. This is RCC/Hardwell 47. Do you recognize
10  this as being a personnel action form where you were made
11  acting lieutenant?
12         MR. CALVIT:  Take a look at it. He's asking
13         you if you recognize the form.
14  (WITNESS PERUSES DOCUMENT.)
15     A  No, sir.
16     Q  Okay. Don't recognize it. Would you agree that
17  the date you became acting lieutenant was around January
18  25th, 2015?
19     A  Yes, sir.
20     Q  Okay. Have you ever been arrested?
21     A  No, sir.
22     Q  Uh-huh (yes).
23     A  Oh, yes, sir. Yes, sir. I'm sorry. Yes, sir.
24     Q  All right. Tell me about that.
25     A  I was out of town driving. A DWI.

|  | 16 |
|---|---|

1         MR. CAMERON:  Yes. "Exhibit 2" will be the
2         Administrative Hearing Request.
3         COURT REPORTER:  Okay.
4         MR. CALVIT:  What's the page on that, again?
5         RCC what?
6         MR. CAMERON:  40. RCC/Hardwell 40.
7      Q  Have you ever given a deposition before?
8      A  No, sir.
9      Q  Never testified in court?
10     A  No, sir.
11     Q  Have you ever been to court?
12     A  Other than that certain situation right there,
13  that's it.
14     Q  Here-- And here's something I found in your file.
15  It's RCC/Hardwell 33. I would ask if you know anything about
16  that?
17  (WITNESS PERUSES DOCUMENT.)
18     A  You've got it as--
19         MR. CALVIT:  He's asking if you know anything
20         about that.
21     A  I'll say I can't recall it, but-- Because we've
22  got to go to court for different guys when we have inmates
23  that get transferred.
24     Q  And do you recognize the name Keylon Deshaun
25  Howard?

Gerald Hardwell
August 28, 2017

17

1    A   No, sir.  I can't recall the name.
2    Q   So your hire date at RCC was June 7, 2010?
3    A   Yes, sir.
4    Q   Okay.  Are you about six five (6'5")?
5    A   Yes, sir.
6    Q   What's your weight?
7    A   Right now I'm two--I mean, three thirteen (313).
8    Q   Three thirteen (313)?
9    A   Yes, sir.
10   Q   What was your approximate weight back in October--
11   A   Two--
12   Q   --2015?
13       MR. CALVIT:  Let him finish the question.
14       WITNESS:  Oh, I'm sorry.
15   A   2015?
16   Q   Yeah.
17   A   Oh, I would say around about two eighty-five (285).
18   Q   Okay.  You-- While at RCC did you attend training?
19   A   No, sir.
20   Q   You never had any training at RCC?
21   A   No, sir.
22   Q   The only thing you ever got was at Winn
23   Correctional?
24   A   Yes, sir.
25   Q   Have you provided training to other officers?

18

1    A   You mean-- Would you state that again?
2    Q   Have you trained other--like correctional officers?
3    A   No, sir.
4    Q   I'm going to show you something that's
5    RCC/Hardwell 23 to 26.  I just ask if you recognize that?
6    (WITNESS PERUSES DOCUMENT.)
7    A   Yeah.  I recognize this form.
8    Q   What is that?
9    A   It's a OJT form.  I--
10       MR. CALVIT:  Go ahead.  Tell him.
11   A   A five-day training of OJT officers when we first
12   get hired on at Richwood Correctional Center.
13   Q   All right.
14       MR. CAMERON:  I'll mark this OJT program
15       checklist as-- "Exhibit 3"?
16       COURT REPORTER:  Yes, sir.
17       MR. CALVIT:  May I see that for a moment?
18       MR. CAMERON:  I'm sorry?
19       MR. CALVIT:  May I see that for a moment?
20       MR. CAMERON:  Sure.
21   (PROFFERS DOCUMENT.)
22       MR. CALVIT:  So that's-- 23 through 26 is
23       "Exhibit 3"?
24       MR. CAMERON:  Correct.
25       MR. CALVIT:  Okay.  Thank you.

19

1        MR. CAMERON:  Uh-huh (yes).
2    Q   This one happens to be for Sergeant Reginald
3    Williams, and can you tell me over what period of time you
4    conducted the training for Reginald Williams?
5    A   No, sir.  He was training me.
6    Q   Oh, he's training you?
7    A   Yeah.  Yes, sir.
8    Q   Oh, okay.
9    A   He was training me.
10   Q   All right.  So you did receive some training--
11   A   Yes, sir.
12   Q   --at Richwood?
13   A   Yes, sir; yes, sir.  He was training me.
14   Q   All right.  And you-- Can you-- Is your signature
15   on this document?
16       MR. CALVIT:  Last page.
17   A   Yeah.  Yes, sir.  He-- He was training me.
18   Q   All right.  So you--you learned about the count
19   procedures.  Right?
20   A   Yes, sir.
21   Q   And you learned about the radio procedures?
22   A   Yes, sir.
23   Q   And they went through all of this?  I mean, so he
24   went over every one of these items with you that's on
25   "Exhibit 3"?

20

1    A   Yes, sir.
2    Q   And I'll show you another document here.  It's a
3    Training Attendance Log for suicide watch.  See if you can
4    identify your name on your document.
5    (WITNESS PERUSES DOCUMENT.)
6    A   Yes, sir.
7    Q   All right.
8        MR. CAMERON:  And this is a document that's
9        dated January 30, 2013.  It's a suicide watch
10       policy #182.  And I'll mark and identify it as
11       "Exhibit--
12       COURT REPORTER:  "4."
13       MR. CAMERON:  --4."
14   Q   Do you recall who it is that provided this
15   training?
16   A   No, sir.  I can't recall.
17   Q   I'll show you another training form here.  This is
18   RCC/Hardwell 11, and it's dated February 11, 2015.  Did I
19   read through it--
20   A   Yes, sir.
21   Q   All right.  And who provided the training on this--
22   on this particular--the PREA Act?
23   A   I can't recall, sir.
24   Q   It says "Assistant Warden, Antonio Turner."  Did he
25   ever provide some training?

5  (Pages 17 to 20)

21

```
1      A  Yes, sir.
2            COURT REPORTER: "Exhibit 5"?
3            MR. CAMERON: Yes. Is that-- No.
4      Q  All right. One more Training Attendance Log, and
5  this is for use of force dated March 3rd, 2015. I ask you if
6  you can identify that, see your name on that?
7      A  Yes, sir.
8      Q  And who was the--the instructor on that course?
9      A  Warden Aultman.
10     Q  Well, I see a different name down at the bottom.
11     A  Oh.
12     Q  It looks like it says Turner to me. I-- Does that
13  say Turner or does it say Ault- --
14     A  It's Turner. It's Turner.
15     Q  Okay. So Antonio Turner provided you training on
16  use of force?
17     A  Yes, sir.
18     Q  Was he a good instructor?
19     A  Yes, sir.
20     Q  Okay. All right.
21           COURT REPORTER: "Exhibit 6."
22           MR. CAMERON: "6." Okay.
23     Q  I'm going to show you a document that's RCC 257
24  through 259. I ask you if you can identify that?
25           MR. CALVIT: Take your time and read through
```

22

```
1       it.
2   (WITNESS PERUSES DOCUMENT.)
3       A  Uh-huh (yes).
4       Q  All right. Does that appear to be the use of force
5   policy?
6       A  Yes, sir.
7       Q  All right.
8            MR. CAMERON: Mark that as "7."
9            COURT REPORTER: Okay. Yes, sir.
10      Q  And have--
11           MR. CALVIT: What are the pages, sir?
12           MR. CAMERON: I'm sorry?
13           MR. CALVIT: What are the pages?
14           MR. CAMERON: It's going to be 257 through
15      259.
16           MR. CALVIT: Okay. And that's just straight
17      RCC. Right?
18           MR. CAMERON: Yeah. It is.
19           MR. CALVIT: Okay.
20           MR. CAMERON: It is.
21      Q  I just want to point one part out to you and see--
22  Do you recall being trained at--where it says here on the top
23  of that third page, "Whenever possible force shall not be
24  used against mentally ill or mentally retarded offenders
25  before appropriate medical or mental health personnel can be
```

23

```
1   called to the scene"?
2       A  I can't recall.
3       Q  You don't recall if you were ever trained in that
4   or not?
5       A  I can't recall that.
6       Q  Have you ever had instance where you had a
7   situation where you might be using force against someone who
8   is mentally ill or mentally retarded?
9       A  No, sir.
10      Q  Before you began working at Winn Correctional
11  Center what kind of employment did you have?
12      A  I was going to school.
13      Q  All right. Where were you going--
14      A  I just graduated in 2009.
15      Q  All right.
16      A  Winnfield Senior High School.
17      Q  Uh-huh (yes). So the only work you've ever had is
18  in the correctional field?
19      A  Uh-huh (yes). Yes, sir.
20      Q  Okay. Have you ever attended any other formal
21  education besides high school?
22      A  No, sir.
23      Q  Have you ever filed a lawsuit before?
24      A  No, sir.
25      Q  Has anyone besides--outside of this lawsuit ever
```

24

```
1   named you as a party defendant in a lawsuit?
2       A  Not that I can recall. No, sir.
3       Q  Okay. Have you ever filed a claim like for
4   unemployment or workers' compensation?
5       A  No, sir.
6       Q  Have you-- Since you left high school and began
7   working in the correctional field have you ever left your job
8   for any extended period of time?
9       A  No, sir.
10      Q  As your-- As the lieutenant like you were back in
11  October--
12      A  Yes, sir.
13      Q  --of 2015, what type of documentation did you
14  maintain?
15      A  Far as making sure three buildings paperwork was
16  straight, sir. Going over my shift sergeant's lockdown logs.
17      Q  All right. Have you ever heard anything called a
18  twenty-four-hour movement sheet?
19      A  Yes, sir.
20      Q  What is that?
21      A  That's a sheet-- Well, like--like any movements
22  you might have through the day or night. Say, for instance,
23  if a prisoner comes from the dorm and goes to the lockdown
24  cell, or we have some that's getting shipped out or anything.
25      Q  What kind of information is on this
```

6   (Pages 21 to 24)

Gerald Hardwell

August 28, 2017

|  | 25 |  | 27 |
|---|---|---|---|
| 1 | twenty-four-hour movement sheet? | 1 | A  Yes, sir. |
| 2 | A  Basically, just their name and what dorm they're | 2 | Q  And that's kept at booking, you say? |
| 3 | coming from, along with their DOC number. | 3 | A  Yes, sir. |
| 4 | Q  Okay.  There's no reason for the movement put on | 4 | Q  Okay.  Any other books, logs, sheets like that that |
| 5 | there? | 5 | might record movement or where the inmate is, anything like |
| 6 | A  Not unless they're going to lockdown. | 6 | that? |
| 7 | Q  Okay.  All right.  Is there such a thing called | 7 | A  Just a log book. |
| 8 | hourly counts? | 8 | Q  All right. |
| 9 | A  Yes, sir. | 9 | A  Yes, sir. |
| 10 | Q  And how are they recorded? | 10 | Q  All right.  Okay.  I'm going to show you a series |
| 11 | Through the count room, main control. | 11 | of documents.  This is RCC 240 through 247.  And see if you |
| 12 | Q  All right.  Is there a log of some sort that are | 12 | can identify those for me, please. |
| 13 | maintained on the count? | 13 | (WITNESS PERUSES DOCUMENT.) |
| 14 | A  Count sheet. | 14 | A  Yes, sir. |
| 15 | Q  Count sheet? | 15 | Q  These are all Administrative Lockdown Rosters from |
| 16 | A  Yes, sir. | 16 | Richwood Correctional Center? |
| 17 | Q  And this count sheet has a tabulation of all the | 17 | A  Yes, sir. |
| 18 | inmates and where they're located? | 18 | Q  And you agree that the dates on these are from |
| 19 | A  Yes, sir. | 19 | October the 10th through October 15th? |
| 20 | Q  Is there something else called bed books? | 20 | A  I mean, I can't recall those dates, but that's a |
| 21 | A  Yes, sir. | 21 | lockdown--or a administrative cell roster. |
| 22 | Q  What is a bed book? | 22 | Q  These appear to be accurate-- |
| 23 | A  How we keep track of everybody we have. | 23 | A  Yes, sir. |
| 24 | Q  And explain that to me. | 24 | Q  --records of-- |
| 25 | A  Far as inmates being in the dorm go through-- Like | 25 | A  Of the-- |

|  | 26 |  | 28 |
|---|---|---|---|
| 1 | everybody-- They should be in their racks anyway, sir.  Have | 1 | Q  --the Richwood Correctional Center? |
| 2 | their IDs out on their bed and when--when the officer or | 2 | A  Yes, sir. |
| 3 | whoever is working that dorm that night, they go through | 3 | Q  All right.  One thing I wanted to ask you about, I |
| 4 | there and get what bed they--the bed number they're in and | 4 | noticed that there's, you know, several columns here and |
| 5 | complete that sheet and turn it in to booking. | 5 | we've got a date time in,-- |
| 6 | Q  Okay.  And this sheet is kept in like a looseleaf | 6 | A  Uh-huh (yes).  Yes, sir. |
| 7 | notebook of some sort, or-- | 7 | Q  --and there's--there's a date time out.  But in all |
| 8 | A  Oh, no, sir. | 8 | these records I don't see any--any recordation of when the |
| 9 | Q  Okay. | 9 | person is out.  Is there another form that shows that? |
| 10 | A  We go get them from booking. | 10 | A  No, sir.  I'm guessing whoever is working at the |
| 11 | Q  Okay.  So where-- Okay.  Each bed has a sheet.  Is | 11 | control room,-- |
| 12 | that-- Am I following you right or not? | 12 | Q  Uh-huh (yes). |
| 13 | A  No. | 13 | A  --I can't speak for them.  I don't even know what |
| 14 | Q  Okay. | 14 | they might have been doing, but the time and date is supposed |
| 15 | A  What I'm saying with the sheets, you've got one | 15 | to goes in there. |
| 16 | sheet, one form. | 16 | Q  Can you tell me if the subject--I believe the term |
| 17 | Q  Uh-huh (yes). | 17 | you used, the sub- --the--for the cell, the subject |
| 18 | A  Okay.  You've got your bed numbers. | 18 | management cell. |
| 19 | Q  Uh-huh (yes). | 19 | A  Special management. |
| 20 | A  Okay.  You go to each of those beds and make sure | 20 | Q  Yeah.  Special management cell.  Can you tell me if |
| 21 | that correct inmate is in that bed. | 21 | they were empty or full from October-- |
| 22 | Q  Uh-huh (yes). | 22 | A  ·I can't recall. |
| 23 | A  You know, a visual check of each inmate. | 23 | Q  --12, 13 or 14? |
| 24 | Q  Okay.  Okay.  But there is some kind of physical | 24 | MR. CALVIT:  Let me him ask the question-- |
| 25 | record of a certain inmate being in a certain bed? | 25 | WITNESS:  Okay. |

7  (Pages 25 to 28)

| 29 | 31 |
|---|---|
| 1      MR. CALVIT: --before you volunteer. | 1  individual is allowed to stay in the special man- -- |
| 2      WITNESS: Okay; okay. | 2    A  SM-1? |
| 3    Q  Can you-- Can you tell if the special management | 3    Q  Yes.  · |
| 4  cells were available or empty at any time October 12 or 13? | 4    A  Oh, I'm sorry. I'm sorry. |
| 5    A  I can't recall, sir. | 5    Q  Yeah. |
| 6    Q  Well, can you look at these logs and tell me | 6    A  They have to see the nurse or the doctor first. |
| 7  whether they were available or not? | 7    Q  Right. And does a nurse or-- So they're looked at |
| 8  (WITNESS PERUSES DOCUMENT.) | 8  every day to determine whether they should still remain in |
| 9    A  No, sir. They were not. | 9  the cell or not? |
| 10    Q  Okay. Well, tell me how you know they were not | 10    A  I mean, depends on when the doctor comes or--or if |
| 11  available? | 11  he lets them go. |
| 12    A  They had Devon Young. He was in SM-1. Patrick | 12      MR. CAMERON: Okay. I'll mark these logs as |
| 13  Copstantin [sic], he was in SM-2. | 13  "#8." |
| 14      MR. CALVIT: Do you want to spell that last | 14    Q  When an individual who is arrested by Monroe Police |
| 15  name? I mean, can you read it off and just | 15  Department is booked into Richwood do they go through some |
| 16  spell it,-- | 16  kind of intake process? |
| 17      WITNESS: Okay. I can try. | 17    A  Yes, sir. |
| 18      MR. CALVIT: --if that's okay? | 18    Q  And describe that to me. |
| 19    A  C-O-P-S-T-A-N-T-I-N [sic]. Do you want me to spell | 19    A  Well, do you want it from back then or now? |
| 20  it again? | 20    Q  In October of 2015. |
| 21    Q  No. I'm-- I'm fine. | 21    A  I'm thinking the whole process is when they come in |
| 22    A  Okay. | 22  they get fingerprinted. They come in and get fingerprinted. |
| 23    Q  As long the court-- | 23    Q  Uh-huh (yes). |
| 24    A  And for the 10/11/15 you also Devon Young in SM-1 | 24    A  You know, they--they--they have a series of |
| 25  and Patrick Copstantin [sic] in SM-2. And on 10/14/15 you | 25  questions, you know, are they on any type of drugs, HIV, |

| 30 | 32 |
|---|---|
| 1  had Patrick Copstantin [sic] in SM-1 and Devon Young in SM-2. | 1  any--any kind of question that's asked. |
| 2  And on 10/15/15 you had Patrick Copstantin [sic] in SM-1 and | 2    Q  And the answers would be recorded someplace? |
| 3  Devon Young in SM-2. | 3    A  Huh? |
| 4    Q  Do you have any personal recollection of those two | 4    Q  Are the answers recorded? |
| 5  individuals? | 5    A  Yes, sir. It's recorded on the computer. |
| 6    A  No, sir. | 6    Q  On the what? |
| 7    Q  From looking at the administrative log can you tell | 7    A  On the computer, on our booking system. |
| 8  me who it is that authorized those two individuals to occupy | 8    Q  Okay. Any questions that you are aware of that are |
| 9  those cells? | 9  asked about if the person has thought about harming |
| 10    A  Let me see that again. | 10  themselves or wanting to commit suicide or anything such as |
| 11    Q  Sure. | 11  that? |
| 12  (PROFFERS DOCUMENT.) | 12    A  Yes, sir. If-- If you have one come in like that, |
| 13    A  On Devon Young it was Lieutenant Levine and Patrick | 13  then I'll call and notify my duty officer. |
| 14  Copstantin [sic] it was myself, Lieutenant Hardwell. | 14      MR. CALVIT: Answer the question asked. He's |
| 15    Q  All right. Do you know-- Is there any paperwork | 15  asking about-- You can modify it or explain |
| 16  that goes along with you placing someone the sub- --in the | 16  it. |
| 17  special management cell? | 17      WITNESS: Okay. |
| 18    A  Maybe if they're on suicide watch, sir. | 18      MR. CALVIT: He's asking in the form-- |
| 19    Q  Well, okay. | 19      WITNESS: Okay. |
| 20    A  But I can't recall those names. | 20    Q  And-- |
| 21    Q  So if there is someone on suicide watch what kind | 21      MR. CALVIT: --is there something. |
| 22  of paperwork would there-- | 22    Q  Well, I'm just asking in any--any way is the newly |
| 23    A  Well, the suicide watch log. | 23  booked individual from MPD, Monroe Police Department, are |
| 24    Q  Okay. All right. And is there-- What is the-- | 24  they asked any questions about mental health or suicide or |
| 25  Is there any rule, regulation about how long it is an | 25  anything such as that? |

Duke Copeland Court Reporting
(318)387-2889

Gerald Hardwell
August 28, 2017

---

33

1   A  Yes, sir.
2   Q  And do you know what it is they're asked?
3   A  I don't know all of those questions.
4   Q  All right.  It's a set--set number of questions?
5   A  Yes, sir.
6   Q  Okay.  And let's say the individual makes an
7   assertion that they've thought about harming themselves or
8   dying or something such as that.
9   A  Uh-huh (yes).
10  Q  Is that information--  Would that be related to you
11  as the lieutenant on duty?
12  A  Yes, sir.
13  Q  And you would take that and what would you do with
14  that information?
15  A  I--  Basically, I would just make a report of
16  everything.
17  Q  Uh-huh (yes).
18  A  And I'll contact my duty officer.
19  Q  Okay.  Let's say an individual arrested by Monroe
20  Police Department is brought in and the officer indicates--
21  A  Uh-huh (yes).
22  Q  --to the booking officer that this gentleman has
23  indicated--he has some idea he wants to die.
24  A  Uh-huh (yes).
25  Q  What--  What do y'all do with that kind of

---

34

1   information?
2   A  Just basically the only thing we can do is record
3   it, you know.
4   Q  Well, do you--  Do you--  As the shift lieutenant
5   do you evaluate the information as to where to put that
6   person?
7   A  Evaluate the information.  I mean, I can't say that
8   he is suicidal.  I'm not a doctor.
9   Q  Uh-huh (yes).
10  A  So the only thing I can do is try to protect for
11  his--from his self and place in a cell by his self.
12  Q  All right.  And that's--  And that's why when an
13  individual states something about wanting to hurt themselves
14  or wanting to die you can't make a credibility determination
15  on that,--
16  A  Yes.
17  Q  --whether it's authenticate or not.  Right?
18  A  Yes, sir; yes, sir.
19  Q  You have to take every threat seriously?
20  A  Yes, sir.
21  Q  Now, in the case where you've got an individual who
22  says they want to hurt themselves and you've decided, "Well,
23  I need to put them in a cell by themself," but both of your
24  special management cells are occupied,--
25  A  Yes, sir.

---

35

1   Q  --what do you do at that point?
2   A  Call my duty officer.  Or if the nurse is on, maybe
3   we can get them down there, you know, because it is an
4   emergency.  You know, we need that cell, you know.
5   Q  So you get them down where?
6   A  To the nurse's station.
7   Q  Oh, okay.
8   A  Or maybe the doctor might be down there and I--
9   Q  Uh-huh (yes).  That's--  That's--  What--  What
10  time do nurses and doctors come on duty?
11  A  The doctor comes maybe three times a week.
12  Q  What three days are those?
13  A  I want to say Monday, Wednesday and Fridays.
14  Q  And about what time does he--  Does he come at the
15  same time each day?
16  A  At different times.
17  Q  What times are you talking about?
18  A  It just all depends.  I'm--  I'm not there in the--
19  I'm always moving around.  So--
20  Q  All right.  And how about the nurse?  When does the
21  nurse come on duty?
22  A  Monday through Friday, 8:00 to 4:00.
23  Q  If a doctor or nurse is not available for you to
24  consult with and you have an individual who's made a threat
25  of some sort--

---

36

1   A  Yes, sir.
2   Q  --and your special management cells are occupied,
3   what do you do then?
4   A  Okay.  I'll call my duty officer and see if he can
5   give me the go-ahead and release two of them out of lockdown.
6   That way he can be placed in a cell where a camera is, sir.
7   Q  Uh-huh (yes).  And it's important that the--this
8   inmate be placed in that cell alone?
9   A  Yes, sir.
10  Q  And why is it important that the inmate be placed
11  in a cell alone?
12  A  That way he can't harm nobody else.
13  Q  All right.  Now, is there--
14  (OFF RECORD INTERRUPTION.)
15      MR. CAMERON:  Excuse me.  Sorry.
16  Q  How many--  Are the lockdown cells and
17  administrative segregation cells the same thing?
18  A  Yes, sir.
19  Q  And how many--  How many lockdown cells are there
20  at Richwood?
21  A  We've got twelve cells.
22  Q  Twelve lockdown--
23  A  I mean, thirteen.  Thirteen.
24  Q  Thirteen.  Okay.  And do all those lockdown cells
25  have video surveillance inside of them?

---

9   (Pages 33 to 36)

Gerald Hardwell
August 28, 2017

37

1      A   Not all of them.
2      Q   Which ones have video surveillance?
3      A   Lockdown 5, 6, 7, Richwood holding cell.
4      Q   All right. Okay. And I assume that the two
5   special management cells--
6      A   Yeah. The vision--
7      Q   --have video?
8      A   Vision.
9          MR. CALVIT:  Let him finish the question, sir.
10         WITNESS:  Okay.
11     Q   Yeah. So just for the record, the special
12   management cells have video surveillance, as well?
13     A   Uh-huh (yes).
14         MR. CALVIT:  Yes--
15     Q   Is that correct?
16         MR. CALVIT:  Yes or no?
17     A   Yes, sir; yes, sir.
18         Now, the-- Which control room would be the one
19   where you could see into lockdown cell 7?
20     A   Man- -- Cell 7? 5 and 6 control.
21     Q   All right. And what other lockdown cells could you
22   see from control 5 and 6?
23     A   Lockdown 5-- I mean, lockdown 5, 6, Richwood
24   holding cell.
25         COURT REPORTER:  Are you saying Richwood

38

1          holding cell?
2          WITNESS:  Yes, ma'am.
3          COURT REPORTER:  Thank you.
4      Q   How many individuals can be in the Richwood holding
5   cell?
6      A   Two.
7      Q   Okay. And as far as what-- And the other control
8   room is 3 and 4?
9      A   Yes, sir.
10     Q   And which cells can you see in 3 and 4?
11     A   None of those, sir.
12     Q   You can't see any lockdown cells?
13     A   No, sir.
14     Q   Any of the special management cells?
15     A   Special management cells, they are viewed by the
16   officers in there. We have a window. You can see directly
17   right into that cell.
18     Q   Oh. And where can you view it from?
19     A   SM-1, you can view it from 5 and 6 control, and
20   SM-2 main control.
21     Q   All right. Now, looking at the-- Looking at the
22   Administrative Lockdown Roster, "Exhibit 8," can you find for
23   me anywhere on there where lockdown 13 is mentioned?
24     A   We don't have a lockdown 13. It's just thirteen
25   cells total.

39

1      Q   Okay; okay.
2      A   We don't--
3      Q   Twelve lockdown and then Richwood holding?
4      A   We have-- Yes, sir.
5      Q   Okay. Got you. You-- And I think we've already
6   covered this, but I just want to make sure. You can place
7   either a DOC inmate or a city arrest inmate in any of these
8   lockdown or special management cells?
9      A   Yes, sir.
10     Q   Are there suicide resistant cells for the DOC
11   inmates that's separate and apart from the special management
12   cells?
13     A   No, sir. They use the same cells.
14     Q   Okay. Do you belong to any correctional officer
15   associations of any kind?
16     A   No, sir.
17     Q   Have you ever been certified by any agency, like
18   the American Correctional Association, anybody like that?
19     A   No, sir.
20     Q   Have you ever heard of the American Correctional
21   Association?
22     A   No, sir.
23     Q   Are you POST certified?
24     A   Yes, sir.
25     Q   When did you become POST certified?

40

1      A   Back in 2009.
2      Q   Was that after the four-week class?
3      A   Yes, sir.
4      Q   Do you hold any other licenses or certificates
5   other than this POST certificate?
6      A   Yes, sir.
7      Q   What do you hold?
8      A   CPR instructor.
9      Q   When did you become a CPR instructor?
10     A   I'd say--say about four weeks ago.
11     Q   Uh-huh (yes). Any other certificates?
12     A   No, sir.
13     Q   Going back to the use of force policy, what types
14   of, I guess, weapons, for lack of a better word, would you
15   have on you while you're on duty that you could use as force?
16     A   Just a chemical agent.
17     Q   Do you ever-- You don't ever carry a baton or a
18   PR-24 or anything like that?
19     A   No, sir.
20     Q   What type of-- Have you received any defensive
21   tactics training?
22     A   Yes, sir. Back in 2009.
23     Q   Okay. Did you learn takedown methods?
24     A   Yes, sir.
25     Q   What are-- What are the most common takedown

10  (Pages 37 to 40)

Gerald Hardwell
August 28, 2017

| | 41 |
|---|---|
| 1 | methods that you--that you know? |
| 2 | A   Basically, just a leg sweep. |
| 3 | Q   All right.  What about-- Did you get taught the |
| 4 | arm bar takedown? |
| 5 | A   Yes, sir. |
| 6 | Q   Any other kind of takedown methods? |
| 7 | A   Not that I can think of. |
| 8 | Q   Do you recall who it is that trained you in |
| 9 | defensive tactics? |
| 10 | A   No, I can't, sir. |
| 11 | Q   That was at Winn? |
| 12 | A   Yes, sir. |
| 13 | Q   Okay.  While at RCC have you--and that's Richwood |
| 14 | Correction Center--have you received any other kind of |
| 15 | defensive tactics training? |
| 16 | A   No, sir. |
| 17 | Q   What did you do to help prepare yourself for |
| 18 | today's testimony? |
| 19 | A   Oh, well, I just kind of read over some notes that |
| 20 | I had. |
| 21 | Q   Okay.  What kind of notes did you have? |
| 22 | A   Notes that--that happened during the incident. |
| 23 | Q   Okay.  Are these handwritten notes? |
| 24 | A   Reports. |
| 25 | Q   Reports?  Okay.  These are the ones that were typed |

| | 42 |
|---|---|
| 1 | up? |
| 2 | A   Yes, sir. |
| 3 | Q   And the ones that you and others signed? |
| 4 | A   Yes, sir. |
| 5 | Q   When did you read those? |
| 6 | A   Friday, Thursday. |
| 7 | Q   Okay.  And you got-- Did you have an opportunity |
| 8 | to visit with your attorney? |
| 9 | A   Yes, sir. |
| 10 | Q   All right.  Did you review any videos? |
| 11 | A   Yes, sir. |
| 12 | Q   All right.  And it's of the incident in question? |
| 13 | A   Yes, sir. |
| 14 | Q   And how about any--the audio recordings?  Have you |
| 15 | listened to any of those? |
| 16 | A   Yes, sir. |
| 17 | Q   And that's of your statement you're talking about? |
| 18 | A   Yes, sir. |
| 19 | Q   The reports that are--that are typed up, did you |
| 20 | handwrite any of those first before they were typed? |
| 21 | A   No, sir. |
| 22 | Q   Did you type the reports yourself? |
| 23 | A   Only mines. |
| 24 | Q   Right. |
| 25 | A   Yes, sir. |

| | 43 |
|---|---|
| 1 | Q   Your report.  Okay.  Anything else that you looked |
| 2 | at or reviewed in preparation for this deposition today? |
| 3 | A   No, sir.  That's basically it. |
| 4 | Q   Have you spoken to anyone outside of your attorney, |
| 5 | like Regional Curley or Mr. Williams, any of those folks that |
| 6 | were there at the cell? |
| 7 | A   No, sir. |
| 8 | Q   Did you-- Before you started working at Richwood |
| 9 | Correctional Center did you know anybody who worked here-- |
| 10 | that worked there at the correctional center? |
| 11 | A   Yes, sir. |
| 12 | Q   Who did you know? |
| 13 | A   LaQuencia Hardwell. |
| 14 | Q   And how is that-- How do you know that person? |
| 15 | A   My mom. |
| 16 | Q   Okay.  All right.  Anybody else? |
| 17 | A   That's it. |
| 18 | Q   Since beginning to work at Ridgewood--Richwood |
| 19 | Correctional Center have you developed friendships with any |
| 20 | of the employees that goes out beyond the premises? |
| 21 | A   No, sir.  Strictly business. |
| 22 | Q   So if the-- Let's see.  Officer Curley, you don't |
| 23 | socialize with him any-- |
| 24 | A   Un-huh (no). |
| 25 | Q   --outside the business hours-- |

| | 44 |
|---|---|
| 1 | A   Un-huh (no). |
| 2 | MR. CALVIT:  You need to say or no. |
| 3 | Q   --or anything like that? |
| 4 | A   No, sir. |
| 5 | Q   And how about Roy Brown?  You don't socialize with |
| 6 | him anywhere outside the premises? |
| 7 | A   No, sir. |
| 8 | Q   And how about Jeremy Runner?  Do you socialize with |
| 9 | him any outside the premises? |
| 10 | A   No, sir. |
| 11 | Q   Okay.  All right.  I've got-- See what else I've |
| 12 | got here.  Going back to when a Monroe P.D. arrestee is |
| 13 | brought in to be booked and you have some idea that that |
| 14 | arrestee might want to hurt themselves. |
| 15 | A   Yes, sir. |
| 16 | Q   When is it that that arrestee is seen by a nurse or |
| 17 | a doctor? |
| 18 | A   That following morning.  Depending on if I'm |
| 19 | working night or day. |
| 20 | Q   Have you seen any documentation that shows that |
| 21 | Erie Moore, Sr., was screened for any mental health issues or |
| 22 | suicide? |
| 23 | A   No, sir. |
| 24 | Q   Have you looked at his intake information? |
| 25 | A   Yes, sir. |

11   (Pages 41 to 44)

45

1     Q    Okay. Is there-- Do you know if there's some
2  reason why there might not be any kind of intake information
3  about Erie Moore, Sr., regarding suicide or mental health?
4     A    No, sir.
5     Q    Now, we--we've gone through some training rosters
6  and things like that. Is-- Is this all the training you
7  think that you've received at RCC, or is there something else
8  that I'm missing?
9     A    Basically, yes, sir, that's it. When our training
10 month comes around, though, we have training in February.
11         MR. CALVIT: Tell him-- Say that again.
12    A    When our training month comes around in February.
13    Q    Okay. Tell me what happens in February.
14    A    We go over PREA, use of force training every year
15 in February. And also CPR.
16    Q    Okay. Now, how long does this training last?
17    A    All week.
18    Q    So you get forty hours of training on PREA, use of
19 force and CPR?
20    A    Yes, sir.
21    Q    Do you receive some written material in connection
22 with that?
23    A    What you mean, like written material?
24    Q    Well, it would be a pamphlet or a booklet or a
25 handout,--

46

1     A    Yes, sir.
2     Q    --something like that. And do you maintain a copy
3  of that?
4     A    Yes, sir.
5     Q    Who is providing the training for that forty hours
6  in a week?
7     A    Warden Aultman. He's over the use of force.
8     Q    Do you maintain copies of these handouts or hand--
9  whatever it is you get during the training?
10    A    No, sir.
11    Q    You just throw it away?
12    A    I don't throw away. I have my-- I have my own
13 personal manual in my office.
14    Q    Oh. And where did that manual come from?
15    A    Richwood Correctional Center.
16    Q    I'm sorry?
17    A    Richwood Correctional Center.
18    Q    Oh, I see. So any of the material you receive in
19 the--in the updates in February you don't--you just don't
20 maintain that?
21    A    Yeah. I keep it in my office. At least I try to.
22 But like I say, I be moving around all the time.
23    Q    Uh-huh (yes). And in this forty hours in February,
24 is that attended by all correctional officers, lieutenants
25 and sergeants and captains?

47

1     A    Yes, sir.
2     Q    And do you have any memory now-- Let's say
3  February 2017 who is it that was doing the use of force
4  training?
5     A    Warden Turner.
6     Q    Okay. Do y'all have anything there at Richwood for
7  cell extraction?
8     A    Yes, sir.
9     Q    And what format is that done in the training we're
10 talking--
11    A    By form [sic] what you mean?
12    Q    Well, is it kind of a classroom type thing or is it
13 hands-on?
14    A    All-- All-- All in use of force.
15    Q    All--
16    A    In our use of force training.
17    Q    Okay. When is the first time you believe it is you
18 saw Erie Moore, Sr.?
19    A    When he came to Richwood. Not that day, but that--
20 that evening.
21    Q    Okay. Tell me the circumstances under which you--
22 you first came in contact with him.
23    A    At first he was just hollering out the cell all the
24 time, you know.
25    Q    Okay. About what time of day was this?

48

1     A    It was more or like-- Around about 7:00. I was on
2  my way to work release.
3     Q    Is this on the Monday, the 12th? Is that what
4  you're talking about?
5     A    Maybe. I think it is. I think it is. I'm not for
6  sure.
7     Q    Uh-huh (yes). But, anyway, that's his first day--
8  first day there at RCC?
9     A    Yes, sir.
10    Q    All right. Did you hear what--hear what he was
11 hollering?
12    A    "I'm Erie Moore," you know. "I'm a f-ing guy," you
13 know.
14    Q    Okay. And what cell was he in at this point in
15 time?
16    A    Lockdown 7.
17    Q    And do you have any-- Were you on duty when Erie
18 Moore was first booked in?
19    A    No, sir.
20    Q    If he was booked in at 7:45 p.m. on October the
21 12th, you would not have been on duty then?
22    A    No, sir. I think I was coming off of that weekend.
23    Q    What would your-- What time would you have gotten
24 off?
25    A    At the-- I was on nights still, so I come in at 6

49

1  o'clock in the eveningtime.
2  Q  Okay.  So if he had--if he had been booked in at
3  7:45 that morning you would not have been on duty then?
4  A  Oh, no, sir.  I wouldn't have been there.
5  Q  Okay.  And do you know-- Do you have any-- And I
6  think I might have already asked you and I apologize.  Do you
7  have any ideas of what he was in lockdown 7?
8  A  They say he was--you know, didn't want to cooperate
9  with nothing.
10  Q  And who told you that?
11  A  Lieutenant Loring.
12  Q  When did he tell you that?
13  A  At the end of his shift.
14  Q  Okay.  So you would have relieved him?
15  A  Yes, sir.  That eveningtime.
16  Q  All right.  Did he give you any more detail about
17  him not wanting to cooperate, what--what that meant?
18  A  No.  Just he was being aggressive, you know, with
19  them.  Didn't want to be booked in.
20  Q  Did he describe what--what he meant by aggressive?
21  A  Didn't want to just cooperate with any questions,
22  and I guess he couldn't really just understand what they was
23  asking him down in booking, you know.
24  Q  Oh.  Did he seem to be confused or something?
25  A  I don't-- I couldn't say.  I wasn't down there.

50

1  Q  Uh-huh (yes).  You're saying that Loring told you
2  that Erie Moore, Sr., couldn't understand what they were
3  wanting--
4  A  Yeah.
5  Q  --in booking?
6  A  Yeah.  That's just what he was telling me.  Yes,
7  sir.
8  Q  All right.  Did Loring tell you that Erie Moore,
9  Sr., was in the general population for a period of time, or
10  that he went straight from booking to--to a lockdown?
11  A  I think he said he went from booking to a lockdown.
12  Q  Okay.  And you heard some hollering.  Anything else
13  from lockdown 7 with Erie?
14  A  Beating on the door.
15  Q  All right.  And anything else?
16  A  That's basically it.
17  Q  Did Erie Moore, Sr., at this point in time say
18  anything about himself, how he was doing or anything about
19  his--
20  A  No, sir.
21  Q  --emotional well-being?
22      MR. CALVIT:  Let him finish the question.
23      WITNESS:  Oh, I'm sorry.
24  Q  Did you try talking to him?
25  A  Yes, sir.  I talked to him.

51

1  Q  Okay.
2  A  He have his-- I'm sorry.
3  Q  Go ahead.
4  A  He-- He'll have his moments.  He'll start up and
5  then he'll talk to you like a normal person, I guess,
6  whenever he came down or whatever.
7  Q  Uh-huh (yes).  Did he reveal anything about himself
8  to you?
9  A  Told me he used to work at the paper mill, you
10  know.
11  Q  All right.  Did he seem to be pretty normal at that
12  point in time when he was talking about the paper mill?
13  A  Yes, sir.
14      COURT REPORTER:  Nanci Summersgill just called
15      and she wants to join in by telephone.
16      MR. CAMERON:  Oh.
17      COURT REPORTER:  So can we go off record just
18      so we can hook that up or--
19      MR. CAMERON:  Yeah.  We--
20  (OFF RECORD.)
21  EXAMINATION BY MR. CAMERON, continuing:
22  Q  So just for the record, I mean, you didn't see
23  October 12th and 13th--
24  A  No, sir.
25  Q  --"Exhibit 8"?

52

1  A  No.
2  Q  Okay.  Now, what I want to show you is RCC 94, and
3  it's on this fancy iPad.  And do you see that, October the
4  12th?
5  A  Yes, sir.
6      MR. CALVIT:  Do you want to hold it or can you
7      see it from there?
8  Q  Can-- Oh, here.
9      MR. JACKSON:  He can hold it.
10      MR. CAMERON:  Yeah.
11      MR. CALVIT:  Yeah.
12      MR. JACKSON:  I can show him how to work it if
13      he needs--
14      WITNESS:  Okay.
15      MR. CAMERON:  Yeah.  Okay.
16  A  Yeah.  I see the 12th.
17  Q  All right.  Now, looking at RCC 94, October the
18  12th, 2015, do you see that the special management cell is
19  occupied?
20  A  No, sir.
21  Q  It is not occupied.  Right?
22  A  No, sir.
23  Q  You mean yes, sir, it's not occupied?
24  A  Yes, sir.  It's not.
25  Q  Okay.  All right.

Gerald Hardwell
August 28, 2017

---

53

```
 1    A  Okay.
 2    Q  Let me scroll here to the next page, and this is
 3  RCC 95, and the date at the top is October the 13th,--
 4    A  Yes, sir.
 5    Q  --2015.
 6    A  Okay.
 7    Q  And, again, the same question about the special
 8  management cell, whether it is occupied or not occupied.
 9    A  Okay.
10         MR. CALVIT:  Can I go to the 96, too?
11         MR. CAMERON:  Yeah.  Well, yeah.  We cam--
12         MR. CALVIT:  Take your time on that.
13         MR. CAMERON:  Yeah.  Right.
14    A  Okay.  Devon Young,--
15    Q  Yeah.
16    A  --he's--
17         MR. JACKSON:  And I'll quit talking.
18    Q  Go ahead.
19         WITNESS:  Can you see?
20         MR. CAMERON:  Yeah.  It's-- I don't care.
21         It's you that needs to see it.
22         WITNESS:  Okay; okay; okay.
23         MR. CALVIT:  They won't let me testify under
24         oath.
25         WITNESS:  Okay.
```

---

54

```
 1    A  Devon--
 2         MR. CAMERON:  Wouldn't be good, anyway.
 3    A  Devon Young, he's in SM-1.
 4    Q  Okay.  Devon Young is in SM-1?
 5    A  Yes, sir.
 6    Q  All right.
 7         MR. CALVIT:  And what was that date?
 8         MR. CAMERON:  October the 13th.
 9         WITNESS:  The 13th.
10         MR. CALVIT:  Thank you.
11    Q  Okay.  So SM-2 is unoccupied?
12    A  Yes, sir.
13    Q  All right.
14         MR. JACKSON:  That's-- That's--
15         MR. CAMERON:  Okay.
16         MR. JACKSON:  That's all--
17         MR. CAMERON:  All right.
18         MR. JACKSON:  --that are missing.
19         MR. CAMERON:  Okay.  Thank you.
20    Q  Okay.  Going back to this first time you had a
21  contact with Erie Moore, Sr., besides telling you about the
22  paper mill, did he tell you this is the first he's ever been
23  in jail?
24    A  No.  Not that I can recall.
25    Q  All right.  Did he tell--talk about his family any?
```

---

55

```
 1    A  No, sir.
 2    Q  Any other personal matters that he might have told
 3  you about the first time you--you saw him?
 4    A  No, sir.
 5    Q  How many-- So on this evening when he--when Eric
 6  Moore, Sr., is in LD 7, and you say he's hollering and
 7  beating on the door and having some other moments where he's
 8  talking about--
 9    A  Uh-huh (yes).
10    Q  --himself, how many--how many contacts did you have
11  with him?
12    A  I probably had two or three of them with him.  You
13  know, just to tell him to stop beating on the door.
14    Q  Uh-huh (yes).  And he's in lockdown 7 by himself at
15  this point.  Right?
16    A  Yes, sir.
17    Q  Did you have to take any action against Mr. Moore
18  at this point in time?
19    A  Oh, that last time maybe I had stayed up there and
20  talked to him for a little while, you know.  that's when he
21  went on about the paper mill.
22    Q  Uh-huh (yes).
23    A  And he calmed down, you know, and went to sleep.
24    Q  Uh-huh (yes).  At this point in time you did not
25  have to use any kind of pepper spray, chemical spray or
```

---

56

```
 1  anything like that.  Right?
 2    A  No, sir.
 3    Q  And did it appear-- When you are speaking to him,
 4  you're speaking through the portal in the door?
 5    A  A flap on the door.
 6    Q  Right.  Okay.
 7    A  Yeah.
 8    Q  And were you able to visualize his face?
 9    A  Uh-huh (yes).  Yes, sir.
10    Q  Did he appear to have any kind of injury to his
11  face?
12    A  Before I know he had a-- As far as I could see he
13  had a knot on top of his head.  That was it.
14    Q  All right.  And where was this knot at?
15    A  I want to say--
16    Q  Which--
17    A  --on the top of his right--right side.  I'm not for
18  sure.
19    Q  And do you know-- Did he ever relate to you how it
20  is he got this knot on his head?
21    A  No, sir.
22    Q  Did you see Mr. Moore at this point in time
23  bleeding?
24    A  No, sir.
25    Q  Did he have any kind of cuts on his face?
```

Gerald Hardwell
August 28, 2017

57

1     A   No, sir.
2     Q   Did he have any bruises that you could see?
3     A   None other than that knot. That's it.
4     Q   All right. So Mr. Moore went to sleep and you had
5   no further contact with him that night. Correct?
6     A   Un-huh (no). I didn't have any more problems out
7   of him.
8     Q   Okay. When was the next time you had contact with
9   Mr. Moore?
10    A   That next-- I want to say the next day.
11    Q   About what time of day was this?
12    A   I can't-- I can't recall what time of day it was.
13    Q   And were you working the same shift, 6 a.m. to-- I
14  mean, 6 p.m. to 6 a.m.?
15    A   Yes, sir.
16    Q   So you came on duty at 6 p.m.?
17    A   Yes, sir.
18    Q   Okay. When you came on duty I guess relieved
19  Loring again?
20    A   Yes, sir.
21    Q   Did Loring tell you anything about Mr. Moore?
22    A   I'm thinking he said he had to spray him, but I
23  can't recall. You know, I'm think he said he had to spray
24  him.
25    Q   Okay. When y'all-- When you do these shift

58

1   changes,--
2     A   Yes, sir.
3     Q   --are there any kind of memos done as to what is
4   transmitted from one shift to the next shift?
5     A   I try to come in a little bit early, around about
6   5:20, 5:30, that he can brief me what happened that day.
7     Q   All right. But is there a shift change memo, shift
8   change log?
9     A   Yeah. We'll have mem- --certain memos in our boxes
10  up front.
11        MR. CALVIT: I think-- I'm sorry. Go ahead.
12        WITNESS: Okay.
13    Q   Is there any--any kind of documentation as to what
14  information is transmitted like from Loring to you?
15    A   No, sir.
16    Q   All right. What kind of information is--you know,
17  is transmitted in writing?
18    A   In writing? Other than the--the UORs and word--
19  word of mouth, you know.
20    Q   Going back to that first time, that first contact
21  with Mr. Moore, how was he dressed?
22    A   Had his pedestrian clothes on.
23    Q   Do you know why it was he was in the jail?
24    A   No, sir. I didn't.
25    Q   Is there any routine associated with individuals

59

1   who are in jail because of alleged disturbing the peace by,
2   you know, profane language?
3     A   Can you say that in a different way?
4     Q   Well, I just wondered if there's any-- Well, you
5   would agree with me that disturbing the peace is a--
6     A   Okay.
7     Q   --fairly minor offense?
8     A   Yes, sir.
9     Q   Do y'all have any kind of practice or routine with
10  these individuals who have been arrested for a minor offense
11  in order to maybe transmit them out of the jail and get them
12  back out?
13    A   Only if they have bonded out. That's it.
14    Q   Uh-huh (yes). Does the jail attempt to ROR an
15  individual who's disturbing the peace?
16    A   Yes, sir. No, sir. I'm going to say no now.
17    Q   All right. You know what ROR is. Right?
18    A   Yes, sir.
19    Q   Okay. Well, going back, you--you've relieved
20  Loring the next day--
21    A   Yes, sir.
22    Q   --after your first visit with Moore.
23    A   Yes, sir.
24    Q   And he tells you that--you think, you're not clear,
25  though, that he had to spray him?

60

1     A   Yes, sir.
2     Q   Did he explain any of the circumstances of that?
3     A   Just-- He'd just been cutting up the day and just
4   keep an eye on him.
5     Q   Yeah. Okay. And was-- Mr. Moore, at this point
6   in time, was he still in lockdown 7?
7     A   Yes, sir.
8     Q   Did you visit with him any?
9     A   Maybe once or twice during the night, and more
10  likely during breakfast time.
11    Q   Okay. Tell me about the--the visits during--during
12  the night.
13    A   During the night? If he's kicking on the door or
14  anything I try to go talk to him and calm him down. He'll
15  stop and then just get to talking, you know. "I'm a boy from
16  Mer Rouge and I used to work at the paper mill." And he'll
17  get on--sit on the toilet and get to hollering and stuff
18  again and I'll just tell him to chill out, you know.
19    Q   Now, is this the first night he's there you're
20  talking about?
21    A   Yes, sir.
22    Q   Okay. So after he went to sleep and he seemed
23  pretty calm,--
24    A   Yes, sir.
25    Q   --later that night he kicked on the door some more

61

1   is what you're telling me?
2      A   Yeah. And early in the morning.
3      Q   All right. Was he trying to get somebody's
4   attention?
5      A   I mean, I don't know. You know, different people,
6   they say they'll come and stop by the cell and, you know, try
7   to talk to him. But, you know,--
8      Q   Uh-huh (yes). Okay. Then you had some more
9   contact with him during breakfast?
10     A   Yeah. Just making sure he was all right. That was
11  it.
12     Q   During this time at night and during the breakfast
13  did you observe any other injuries to him other than what you
14  said was this knot on the head?
15     A   No, sir.
16     Q   Describe this knot for me, please.
17     A   About the size of a egg, you know.
18     Q   And it was--it was noticeable?
19     A   Yes, sir.
20     Q   Okay. Now, would you agree with me that Mr. Moore
21  had--if he had any hair, it was very short?
22     A   No, sir. He was bald-headed.
23     Q   Bald-headed?
24     A   Yes, sir.
25     Q   Okay. There are different size eggs, you know.

62

1      A   I know. Yeah.
2      Q   What-- Can you give it to me in terms of--
3      A   I'd say a chicken--
4      Q   --a coin size?
5      A   Maybe-- Maybe a chicken egg, you know.
6      Q   Yeah. Like a quarter or a half dollar?
7      A   Half a dollar.
8      Q   Half dollar? All right. And it was raised?
9      A   Yes, sir.
10     Q   All right.
11     A   Far as I could see.
12     Q   Yeah. Did you ever learn how he got that knot?
13     A   No, sir.
14     Q   Okay. So after breakfast you--you go home. Right?
15     A   Yes, sir.
16     Q   Loring relieves you?
17     A   Yes, sir.
18     Q   And then you come back the next--
19     A   That eveningtime.
20     Q   That eveningtime at 6 p.m. Right?
21     A   Yes, sir.
22     Q   Okay. So this is on-- I believe this would be on
23  the 13th, on Tuesday. That sound right to you?
24     A   Yes, sir.
25     Q   All right. Okay. What was the first contact you

63

1   had with Erie Moore then?
2      A   I didn't have one with him until-- When-- Talking
3   about the day the incident happened, was it on that Tuesday?
4      Q   Uh-huh (yes).
5      A   Okay. I didn't have any contact with him that day
6   until I got down to walk. I was letting the on- --the
7   ongoing shift out the door.
8      Q   Uh-huh (yes). And what contact did you have with
9   Erie Moore at that point?
10     A   It was later on that--that night when we had to
11  pull him because the sheriff's department was the way to get
12  them.
13     Q   All right. And the reason he was being pulled out
14  of the cell, lockdown 7, was so he could be questioned by the
15  sheriff's office?
16     A   No. They was going to take them next-door to the
17  sheriff office.
18     Q   Oh, they were going to process him through--
19     A   Yes, sir.
20     Q   --Ouachita Parish Correctional Center?
21     A   Yes, sir.
22     Q   Okay. And he was inside the lockdown cell 7 and he
23  was standing at that point in time, was he not, when you
24  entered?
25     A   Yes, sir.

64

1      Q   And he had his back to you?
2      A   No. He was sitting on the bed at first, then I
3   went in there, you know, along with a couple of my officers.
4   I was the first, though.
5      Q   Uh-huh (yes).
6      A   I asked him, you know, "Come on. Come on out of
7   here, Moore. Turn around," you know, our procedures. You
8   know, he told me-- F'd me, to get out the cell, you know,
9   and then he kind of got up and tried to charge us. So I just
10  closed the door.
11     Q   All right. Now, you say-- Did he actually take a
12  step towards you?
13     A   I can't recall, but I know he got up real quick.
14     Q   Did-- When you were in there the first time and
15  you say he charged at you, did he have his fist raised?
16     A   He had them balled up.
17     Q   All right. And what was he saying at the point in
18  time he had them balled up?
19     A   Just fuck--F y'all.
20     Q   How close is it you got to Mr. Moore when he--
21     A   Something like--
22     Q   --had his fist balled up?
23     A   Probably about seven feet, seven to five feet.
24        MR. CALVIT: You're not saying seventy-five
25     feet?

65

1          WITNESS: Un-huh (no). Seven or five feet.
2          MR. CALVIT: Okay. Thank you.
3      Q  All right. I mean, he never got any closer than
4  that five feet, actually?
5      A  No, sir.
6      Q  And you're--you're the one who closed the distance
7  with him. He didn't close any distance with you. Right?
8      A  Yes, sir.
9      Q  All right. And at that point, is that--you sprayed
10 him with some Mace. Is that right?
11     A  That's-- Yes, sir.
12     Q  Is that what it's called, Mace? Or what--
13     A  Yes, sir.
14     Q  Okay.
15     A  Chemical spray.
16     Q  All right. And where is it did you sprayed him?
17     A  Facial area.
18     Q  Did you get any on his--the rest of his body, his
19 clothes or anything like that?
20     A  Like I say, no lower than the neck area.
21     Q  Okay. Then-- Is that-- And that point in time
22 you exited the cell?
23     A  Yes, sir.
24     Q  And who was with you at that point in time when you
25 first entered the cell and Maced Mr. Moore?

66

1      A  Myself, Sergeant Williams, CO Runner--Jeremy
2  Runner, Reginald Curley.
3      Q  Did you enter the cell first?
4      A  Yes, sir.
5      Q  Did any of these other individuals, Williams,
6  Runner or Curley, did they enter the cell?
7      A  Williams, he was right behind me. Runner and
8  Curley, they stayed at the door.
9      Q  And then did you-- Once you exited the cell after
10 Macing Mr. Moore what did you do at that point in time?
11     A  Went and got some gas masks.
12     Q  And why did you get gas masks?
13     A  You know, because it was pretty strong in there,
14 you know.
15     Q  The chemical spray was?
16     A  Uh-huh (yes).
17         MR. CALVIT: That's a yes or a no?
18     Q  Yes?
19     A  Yes, sir. Sorry.
20         MR. CALVIT: Thank you.
21     Q  So how much chemical spray did you--
22     A  A one-second burst. I'm sorry.
23     Q  Okay. So you did a one-second burst. And let me
24 ask you this. The chemical spray, what kind of container is
25 it in?

67

1      A  It's in a-- It's a vial about this big
2  (demonstrating).
3      Q  All right. And back then in October 2015 were
4  these vials measured in any--any way?
5      A  By measuring--?
6      Q  Weighing, that kind of thing.
7      A  Not that I can recall.
8      Q  Is there-- And there's no data recorded on the--on
9  the spray bottle that would tell us, "Yes, he did just spray
10 it one second"?
11     A  Un-huh (no). No other than a UOR.
12     Q  Uh-huh (yes). And that's the--that's the offense
13 report that you write?
14     A  Yes, sir.
15     Q  What distance can you spray them with this tube
16 that you're talking about?
17     A  Maybe between five and ten feet, you know.
18     Q  And is it an aerosol or is it you've got to push
19 down on it to force the spray out?
20     A  It's a push-down.
21     Q  Is it a pump or is it an aerosol?
22     A  No. Not a pump, but a-- I'll say it's an aerosol
23 then.
24     Q  Okay. And this particular tube or cannister that
25 you had,--

68

1      A  Yes, sir.
2      Q  --is it one that's assigned to you only and you're
3  the only one that uses it?
4      A  Myself and Lieutenant Loring.
5      Q  Uh-huh (yes).
6      A  Kind of it stays at the building--excuse me--stays
7  at the building.
8      Q  Who is the-- Do you know who the manufacturer is
9  of the--of the spray?
10     A  No, sir. I don't.
11     Q  And this particular cannister that you used on
12 October the 13th, 2015, when you Maced Mr. Moore, is that
13 cannister still around?
14     A  Not that I know of, sir.
15     Q  Do you know how those canisters are disposed of?
16     A  No, sir.
17     Q  When you sprayed Mr. Moore describe his reaction to
18 it.
19     A  At first he was like it wasn't doing nothing to
20 him, so that's kind of where we left out, you know.
21     Q  All right. Now, once--once you exited the cell you
22 said you and went and got gas masks. Who all got the gas
23 masks?
24     A  Myself, Lieutenant Williams, and that's the only
25 ones I can remember right now.

Gerald Hardwell
August 28, 2017

69

1  Q  All right. So you donned the gas masks and
2  returned to the cell? Is that--
3  A  Sir?
4  Q  So you donned the gas masks and then--
5  A  Yes, sir.
6  Q  --returned to the cell. Right?
7  A  Yes, sir.
8  Q  All right. And then you immediately entered the
9  cell?
10  A  No. We had got a--had a plan, you know. CO Runner
11  opened the door, Curley stayed out there on the hall, I was
12  the first one to run in, Reginald Williams was behind me.
13  And while he was--had his back turned, I went in and grabbed
14  him and moved him from the cell and placed him on the ground.
15  Q  All right. So when you went into the cell the
16  second time,--
17  A  Uh-huh (yes). Yes, sir.
18  Q  --Mr.--
19      MR. CALVIT: That's okay.
20  Q  --Mr. Moore had his back to you?
21  A  Yes, sir.
22  Q  And explain to me why he wasn't handcuffed while he
23  was standing.
24  A  I mean, no-- Pretty big dude, you know, strong--
25  Q  Uh-huh (yes).

70

1  A  --and everything. So we had to use the necessary
2  force.
3  Q  Did y'all consider handcuffing him in the cell?
4  A  No, sir.
5  Q  Does that happen from time to time, that inmates
6  are handcuffed inside of a cell?
7  A  On- -- Only if they comply.
8  Q  Yeah. And by compliance you mean what?
9  A  Like when we give them a direct verbal order, get
10  on your knees, face the wall, put your hands behind your
11  back.
12  Q  Uh-huh (yes). There's never a time when an inmate
13  is standing back to you and you say, "Put your hands behind
14  your back. I'm going to handcuff you"?
15  A  Uh--
16  Q  You don't do that?
17  A  Yes, sir.
18  Q  Is that a--an accepted procedure to do for an
19  inmate who's standing, to tell them to put their hands behind
20  their back?
21  A  I mean, not if they're in a cell.
22  Q  Uh-huh (yes).
23  A  I mean, the inside of a cell we've got to protect
24  them, as well as us.
25  Q  All right. So inside of a cell how is the

71

1  procedure for handcuffing?
2  A  Face the wall, get on your knees, put your hands
3  behind your back.
4  Q  Uh-huh (yes). And where did you learn that at?
5  A  CCA.
6  Q  And inside of a cell you've never seen it where an
7  inmate is standing with their back to you and you say, "Put
8  your hands behind your back. I'm going to handcuff you"?
9  A  Sir?
10  Q  You've never seen a inmate in a cell, back to the
11  officer, the officer say, "Put your hands behind your back.
12  I'm handcuffing you"?
13  A  Only if they cooperate. If they don't cooperate,
14  you know, failing to comply.
15  Q  All right. When you entered the cell this time
16  with Mr. Moore, you had the mask--the gas mask on.
17  A  Uh-huh (yes). Yes, sir. Sorry.
18  Q  Did you tell Mr. Moore to put his hands behind his
19  back?
20  A  No, sir. After those first several direct verbal
21  orders we had to use necessary force.
22  Q  How much time lapsed between the time you exited
23  the cell after spraying Mr. Moore and the time that you
24  entered the second time?
25  A  I'd say no more than seven minutes, maybe.

72

1  Q  All right. And it happens sometimes, doesn't it,
2  after you spray an inmate that they decide, "Well, I'm going
3  to comply"?
4  A  Yes, sir.
5  Q  All right. But you did not give Mr. Moore an
6  opportunity on the second time to--to determine whether he
7  was going to comply or not, did you?
8  A  Yes, sir. I told--
9  Q  Okay. Tell me about that.
10  A  I told him to turn around and get on the floor. He
11  just still was standing there.
12  Q  Uh-huh (yes). Did he have any reaction to--to your
13  command to turn around and get on the floor?
14  A  No, sir.
15  Q  I mean, a verbal reaction or a physical reaction?
16  A  No, sir.
17  Q  Just nothing?
18  A  Yeah. Just standing there with his fists balled
19  up.
20  Q  He didn't have his arms and hands draped over the
21  top of the bunk, standing, kind of leaning against the bunk?
22  A  Not that I can remember.
23  Q  You understand there's a video of--
24  A  Yeah.
25  Q  --your entry--

18  (Pages 69 to 72)

Gerald Hardwell
August 28, 2017

73

1    A  Yes, sir.
2    Q  --that shows all that. Right?
3    A  Yes, sir.
4    Q  And you've seen that video. Right?
5    A  Yes, sir.
6    Q  And there is--there is no audio recording. Right?
7    A  No, sir.
8    Q  And you as a correctional officer at Richwood, you
9    don't have any kind of audio recording on your body?
10   A  No, sir.
11   Q  No body cams?
12   A  No, sir.
13   Q  Has that ever been suggested, that there be audio,
14   shoulder mikes or audio on the correctional officer's body
15   or--or any kind of body cam?
16   A  No, sir.
17   Q  So-- And you-- Let's see, you've donned the gas
18   mask, you go in the second time. How many times do you give
19   this command, "Turn around, get on the floor"?
20   A  Three to five times.
21   Q  You're sure you were able to give it three or five
22   times in the period of time from the time you exited--entered
23   the cell till the time you grabbed hold of him?
24   A  Yes, sir.
25   Q  Okay. And if you--if you gave it one time, you

74

1    gave it three to five times?
2    A  No, sir. Gave it a few times. I know I did.
3    Q  And you-- When you went in you grabbed him around
4    the waist. Right?
5    A  Yes, sir.
6    Q  With both of your arms?
7    A  Yes, sir.
8    Q  And you carried him out?
9    A  Yes, sir.
10   Q  And you threw him down on the floor?
11   A  I placed him on the ground.
12   Q  When you say "placed," what are--what are you
13   talking about there? You just kind of gently put him down?
14   A  I don't say I slammed him, but I placed him on the
15   ground firmly.
16   Q  You used as much strength as you could to do that?
17   A  No, sir. Kind of catch me and his weight.
18   Q  Did-- So when you're--when you're carrying him
19   from inside the cell out into the hallway,--
20   A  Uh-huh (yes). Yes, sir.
21   Q  --what is--what is he doing?
22   A  Still squirming around.
23   Q  You say he's still squirming. Was he squirming
24   before?
25   A  Yes, sir.

75

1    Q  Okay. And describe this squirming for me a little
2    bit more.
3    A  Kind of resisting.
4    Q  All right. But what degree of squirming are we
5    talking about?
6    A  Just fully resisting, you know.
7    Q  Was he pushing his hands against you or your face
8    or anything like that?
9    A  Oh,-- Oh, nothing--nothing like that. No, sir.
10   Q  And he wasn't trying to slap you or hit you or
11   anything?
12   A  No, sir.
13   Q  Was he kicking?
14   A  Not that I can recall. No, sir.
15   Q  Okay; okay. We're going to back up a minute.
16   A  Okay.
17   Q  Okay. When you went in to do the chemical spray,--
18   A  Okay.
19   Q  --okay, that's the first time you entered in this
20   episode we're talking about. Did you notice any kind of
21   injury to Mr. Moore's face or head at that point in time?
22   A  No, sir. Nothing but that--that knot.
23   Q  The knot was still there?
24   A  Yes, sir.
25   Q  Had he received any treatment for that knot?

76

1    A  I don't know. He was-- When he came in all I seen
2    was that on his booking picture. That was it.
3    Q  Did Mr. Moore complain about the knot?
4    A  Not that I can recall, he didn't.
5    Q  Okay. So this second time you're in there, the
6    time you did the chemical spray, did you see any cuts on
7    Mr. Moore's face?
8    A  No, sir.
9    Q  See any-- Was he bleeding any?
10   A  No, sir.
11   Q  Outside of this alleged knot did he have any kind
12   of bruising or anything like that?
13   A  No, sir.
14   Q  Any abrasions on his face?
15   A  No, sir.
16   Q  When you go in to the chemical spray how is
17   Mr. Moore dressed?
18   A  Still in his pedestrian clothes.
19   Q  Did he have a top on?
20   A  No, sir.
21   Q  Did you notice any kind of injury, bruising, cuts,
22   anything like that to his top of his body?
23   A  No, sir.
24   Q  How about on his back? Did you notice anything on
25   his back?

19  (Pages 73 to 76)

77

1     A   No, sir.
2     Q   How about on his hands, hands or wrists, arms, did
3   you notice any kind of cuts, bruises scrapes, anything like
4   that?
5     A   No, sir.
6     Q   Now, the second time you go in there he's got his
7   back to you, you grab him around the waist and you take him
8   outside. What part of his body lands on the floor first?
9     A   I'd say his right side.
10    Q   Talking about his shoulder?
11    A   Yes, sir.
12    Q   Any part of his head make contact with the floor?
13    A   Not far as I could see, it didn't.
14    Q   Did-- During the time that you had grabbed
15  Mr. Moore from behind and were carrying him outside the cell
16  did he say anything to you?
17    A   Not that I can recall, he didn't.
18    Q   Did he-- Was he conscious?
19    A   Yes, sir. He was conscious.
20    Q   Okay. All right. And he was obviously conscious
21  when you sprayed him with the spray. Right?
22    A   Yes, sir.
23    Q   All right. So his shoulder, you say, hit the--the
24  hallway floor first?
25    A   Yes, sir.

78

1     Q   And you think it was his--the right shoulder?
2     A   Yes, sir.
3     Q   Okay. What other parts of his body made contact
4   with the floor at that time?
5     A   I'd say his right side.
6     Q   Did he say anything as he landed?
7     A   No. He still was resisting.
8     Q   In what way was he resisting?
9     A   Wouldn't-- Did want to let us cuff him.
10    Q   And how did he-- Okay. Tell me about that. He--
11    A   Just couldn't no normal one person put restraints
12  on him. I had to get one right arm to bring to the back and
13  Jeremy Runner had to get the other arm so we can handcuff
14  him, and somebody had to apply restrains on him.
15    Q   Okay. The restraint you're talking on the leg?
16    A   Un-huh (no). On the arms.
17    Q   On the arms? Okay; okay. Now, we've got handcuffs
18  around the wrists. Right?
19    A   Yes, sir.
20    Q   And then the restrains, where are they located at?
21    A   Three (3) and 4 control.
22    Q   I know. But on the body, where do you--where do
23  you apply them?
24    A   Behind his back, on his wrists.
25    Q   Okay. Is that-- Okay. You're taking him down to

79

1   the--to the hallway floor because you've got to roll him onto
2   his--onto his abdomen?
3     A   Yes, sir.
4     Q   And then you--y'all take his arms, place them
5   behind his back and put handcuffs, what we ordinarily know,--
6     A   Yes, sir.
7     Q   --what we see a police officer with.
8     A   Yes, sir.
9     Q   Handcuffs behind his back. Okay. Then the
10  restraints, where are they placed at at that point?
11    A   Which restraints?
12    Q   Okay. Restraints and handcuffs are the same thing?
13    A   Yeah. Yes, sir.
14    Q   Okay. All right. And once you put the handcuffs
15  on him, on Mr. Moore, and he's flat down on the hallway
16  floor, does he say anything?
17    A   Just-- He started cussing.
18    Q   Uh-huh (yes).
19    A   He went from--
20    Q   Anything in particular you recall he's cussing?
21    A   He'll-- He'll say, "Y'all mother F'ers," and
22  then he'll go back to the state where he apologizing, you
23  know.
24    Q   Uh-huh (yes). Okay. And is-- And while he's now
25  flat on the floor with the handcuffs behind his back is he

80

1   moving or attempting to move?
2     A   Yes, sir. He's moving.
3     Q   Well, tell me about that.
4     A   Just rocking back--back and forth.
5     Q   Now, the only-- The reason that he's being taken
6   out is so he can be processed, right,--
7     A   Yes.
8     Q   --through Ouachita Parish?
9     A   Yes, sir.
10    Q   And before he's handcuffed had he voice any kind of
11  threat?
12    A   Just telling, "Y'all mother F'ers, don't come in
13  here."
14    Q   Any other threats that you consider--or at least
15  what you consider to be threats?
16    A   Un-huh (no). No, sir.
17    Q   Did-- Before being handcuffed did Erie Moore
18  strike anyone?
19    A   No, sir.
20    Q   Did he throw anything at anyone?
21    A   No, sir.
22    Q   And how long is he on the hallway floor with the
23  handcuffs behind his back?
24    A   I can't recall, but pretty much till Ouachita
25  Parish got there.

20   (Pages 77 to 80)

81

1   Q   And you're talking about the deputies?
2   A   Yes, sir.
3   Q   There were some EMTs who came, as well. Right?
4   A   No. That was earlier, during the day.
5   Q   All right. Okay. That was for--
6   A   Vernon.
7   Q   --Vernon White?
8   A   Yes, sir.
9   Q   Okay. Where did-- Okay. So he's-- Mr. Moore is
10  lying facedown, handcuffed behind his back, and then there's
11  an attempt to move him. Right?
12  A   Yes, sir.
13  Q   And who--who's trying to move him?
14  A   From what I've seen on the video it was Jeremy
15  Runner.
16  Q   And yourself?
17  A   No.
18  Q   Oh, okay.
19  A   Lieutenant Williams.
20  Q   Okay.
21  A   Wait a minute; wait a minute.
22  Q   And where were they going to taking him to?
23  A   Taking him to the foyer so when the car comes in
24  they can just come in right in there and get them.
25  Q   All right. Now, I noticed one of the two gentlemen

82

1   dropped Mr. Moore down onto the floor. Right?
2   A   Yes, sir. On the video.
3   Q   All right. And Mr. Moore's head hit the floor?
4   A   Yes, sir.
5   Q   Did you hear that?
6   A   I seen it.
7   Q   You've seen it? Did you--
8   A   Or you're talking about did I hear him fall?
9   Q   Right. Uh-huh (yes).
10  A   Oh, no, sir. No, sir.
11  Q   Did you hear the head hit the floor?
12  A   I heard about it, but, you know, I didn't--
13  Q   You weren't there when it happened?
14  A   No, sir. I was going up the hall.
15  Q   Okay. You say you went up the hall.
16  A   Yes, sir.
17  Q   To do what?
18  A   Meet the warden there.
19  Q   What was he doing there?
20  A   You know, any time we have some emergency like
21  that, something serious, they come up there.
22  Q   All right.
23  A   And it was duty warden that we--
24  Q   And which warden was this?
25  A   Aultman.

83

1   Q   Okay. And we'll get back to that in just a minute.
2   And so you did not actually witness the deputy dropping
3   Mr. Moore to where his head hit the floor?
4   A   Which deputy?
5   Q   The two that were carrying--
6   A   Okay. No, sir. I didn't witness.
7   Q   Okay. I mean correctional officer.
8   A   Okay; Okay.
9   Q   I meant correctional officer.
10  A   I just--
11  Q   I stand corrected. So you didn't see the
12  correctional officers attempt to carry Mr. Moore?
13  A   No, sir. By the time they was picking him up, I
14  was heading up the hall.
15  Q   I want you to-- If you could, I want you to draw
16  me a little diagram of where LD 7 is and the pathway to the
17  foyer where they were taking him to where the deputies would
18  be.
19          MR. CALVIT: Can we go off the record while
20          he's doing that?
21          MR. CAMERON: Yes; yes.
22  (OFF RECORD - MR. ROY BROWN ENTERS DEPOSITION.)
23          MR. CALVIT: This is Mr. Roy Brown.
24          MR. CAMERON: Okay.
25  (OFF RECORD.)

84

1   EXAMINATION BY MR. CAMERON, continuing:
2   Q   Captain Hardwell, you have drawn a--an exhibit for
3   me?
4   A   Yes, sir.
5   Q   A map, a diagram.
6   A   Yes, sir.
7   Q   And I know it's not to scale.
8   A   Yes, sir.
9          MR. CAMERON: That is "Exhibit 9."
10  Q   Can you explain what this is?
11  A   It's a diagram of B Hall of lockdown 7 door, where
12  lockdown 7 cell and Richwood holding cell is the cell door
13  that lead to B Hall. And when you come out lockdown cell 7
14  door you take a right, go through that door and that will be
15  the foyer.
16  Q   Okay. If you would draw an X on the approximate
17  location of Mr. Moore's body at the time that he was
18  handcuffed.
19  (WITNESS COMPLIES.)
20  Q   And the-- Okay. Thank you.
21  A   Okay.
22  Q   The direction that the two correctional officers
23  would have been taking Mr. Moore would have been through the
24  door-- You don't have to draw on the--
25  A   Okay.

21  (Pages 81 to 84)

85

1    Q  --diagram. But through the doors?
2    A  Yes, sir.
3    Q  And then the-- You said this foyer.
4    A  Yes, sir.
5    Q  Is that the sally port? Is that the same thing
6    as--
7    A  No, sir. It's the--kind of a big interlock before
8    you enter booking.
9    Q  Okay. Did you see the two correctional officers
10   take Mr. Moore through those doors into the foyer?
11   A  I can't recall, but I think I did. I'm not for
12   sure.
13   Q  Did you ever see Mr. Moore again?
14   A  Yes, sir.
15   Q  All right. Where did you see him next?
16   A  Down in the foyer. He was conscious.
17   Q  All right.
18   A  Kept stating that he was sorry.
19   Q  And what position was he in at that point in time?
20   A  At that time he was on his knees.
21   Q  All right. And he was still handcuffed?
22   A  Yes, sir.
23   Q  And who else was present at the time you saw him on
24   his knees, he was conscious and saying he was sorry?
25   A  Well, the first time it was Reginald Curley.

86

1    Q  All right. And who-- Who else then?
2    A  I can't-- I can't recall who else it was.
3    Q  Where was-- And was-- Do you recall if Williams
4    was back in there or not?
5    A  I can't recall if he was back there or not.
6    Q  All right. So did you see the Ouachita Parish
7    deputies come?
8    A  Yeah. Yes, sir.
9    Q  All right. And at the point in time the Ouachita
10   Parish deputies came who was present?
11   A  I, myself, CO Runner.
12   Q  All right.
13   A  Lieutenant Williams-- I mean, Sergeant Williams.
14   He's lieutenant now.
15   Q  And where--where did the deputies make first
16   contact with Moore?
17   A  Down in that cell--in the foyer.
18   Q  And was that Deputy Murphy and Wells?
19   A  I didn't-- I can't recall getting their names.
20   Q  All right. How long were you with Mr. Moore when
21   you say he was in the foyer conscious and saying he was
22   sorry?
23   A  Maybe two to three minutes.
24   Q  And at that point in time did you see him with any
25   cuts on his head?

87

1    A  No, sir.
2    Q  Was he bleeding any?
3    A  No, sir.
4    Q  Was he bleeding from the lip?
5    A  No, sir.
6    Q  Did he have any cuts, scrapes, bruises on his
7    hands, wrists or arms?
8    A  No, sir.
9    Q  Did-- Mr. Moore during this time he was in the
10   foyer before the deputies arrived,--
11   A  Yes, sir.
12   Q  --did he say anything else besides he was sorry?
13   A  He just saying that repeatedly.
14   Q  Okay. And was--was he always on his knees at this
15   point in time in the foyer?
16   A  He'll sit down on his bottom, that was it.
17   Q  He sat on his bottom?
18   A  Yes, sir.
19   Q  And how was he dressed at this time?
20   A  Jeans-- Jean shorts, no shirt.
21   Q  Did it ever seem to you that he was asleep?
22   A  When the deputies came and got him, he was snoring.
23   Q  When the deputies came he was snoring?
24   A  Yes, sir.
25   Q  Okay. So at what point in time as he went from

88

1    saying he's sorry repeatedly to snoring?
2    A  I can't recall. I was-- I was moving around.
3    Q  Did he like pass out?
4    A  No. He didn't pass out. He just like a normal
5    person, just went to sleep.
6    Q  Okay. So when you first got in the foyer--
7    A  Uh-huh (yes).
8    Q  --he's on his knees. Right?
9    A  Yes, sir.
10   Q  And then he went to sit on his bottom?
11   A  Yes, sir.
12   Q  And when he sits on his bottom is he sitting up
13   against the wall?
14   A  No, sir. Then we eventually let him lay down, you
15   know.
16   Q  Okay. So he went from on his knees, get on his--
17   and he got on his bottom,--
18   A  Yes, sir.
19   Q  --and then he just laid down?
20   A  Yes, sir.
21   Q  Is he asking-- Did he ask permission to do these
22   things before he does them?
23   A  We kind of just--just let him just relax until the
24   deputies got there.
25   Q  At any point in time when he was in the foyer does

22  (Pages 85 to 88)

Gerald Hardwell

August 28, 2017

|   | 89 |
|---|---|
| 1 | his head make contact with the floor or the wall? |
| 2 | A Not that I can recall, it doesn't. |
| 3 | Q Did any individual strike him or hit or anything |
| 4 | like that? |
| 5 | A Not that I could see. |
| 6 | Q Did you ever see anybody strike Mr. Moore? |
| 7 | A No, sir. |
| 8 | Q Did you ever see Jeremy Runner hit him in the head? |
| 9 | A No, sir. |
| 10 | Q Did you see anybody kick him? |
| 11 | A No, sir. |
| 12 | Q Did you see-- Besides holding--getting ahold of |
| 13 | Mr. Moore somewhere on his body, did you see anybody make |
| 14 | physical contact with Mr. Moore? |
| 15 | A No, sir. |
| 16 | Q And you don't believe that when you carried |
| 17 | Mr. Moore out of the cell that second time and, as you say, |
| 18 | placed him on the floor, that his head didn't make contact |
| 19 | with the floor? |
| 20 | A No, sir. |
| 21 | Q Now, how do you know that? |
| 22 | A Watched the video real close. |
| 23 | Q All right. You couldn't tell that from actually-- |
| 24 | A Yes, sir. |
| 25 | MR. CALVIT: Listen to the question. |

|   | 90 |
|---|---|
| 1 | Q Wait. Let me-- Let me finish my question. |
| 2 | A I'm sorry; I'm sorry. |
| 3 | MR. CALVIT: It's important. |
| 4 | Q You couldn't tell whether his head made contact |
| 5 | other than from the video? |
| 6 | A Yes, sir. |
| 7 | Q And when you were actually taking Mr. Moore out of |
| 8 | the cell and putting him on the floor you didn't--you weren't |
| 9 | able to tell whether his head the floor. Right? |
| 10 | A No, sir. I wasn't. |
| 11 | Q When-- When you put Mr. Moore--after you took him |
| 12 | out of the cell and forced him onto the floor, could you hear |
| 13 | his body making contact with the floor? |
| 14 | A Far as him just being on the floor. Yes, sir. |
| 15 | Q Did he make any kind of guttural response to being |
| 16 | forced onto the floor? |
| 17 | A No, sir. |
| 18 | Q Did you ever hear Mr. Moore moan, cry or make any |
| 19 | kind of sound as though he was in pain? |
| 20 | A No, sir. |
| 21 | Q When you're going to the foyer and you hear |
| 22 | Mr. Moore, you say he's snoring. Right? |
| 23 | A Yes, sir. |
| 24 | Q And how loud was that? |
| 25 | A It was pretty loud, like a grown big-size guy, you |

|   | 91 |
|---|---|
| 1 | know. |
| 2 | Q Uh-huh (yes). Did you attempt to wake him? |
| 3 | A Yeah. When we-- When the deputies came we woke |
| 4 | him up. |
| 5 | Q He woke up? |
| 6 | A Yes, sir. |
| 7 | Q Okay. Tell me what kind of reaction you got from |
| 8 | him when you woke him up. |
| 9 | A I mean, his eyes just broke wide open and they was |
| 10 | red. |
| 11 | Q What kind of condition were his eyes in? |
| 12 | A Huh? I-- I couldn't tell you what kind of |
| 13 | condition. I'm not a doctor, you know. But all I know, he-- |
| 14 | he woke up. |
| 15 | Q Okay. Did he say anything? |
| 16 | A Not that I can recall, he didn't. |
| 17 | Q Were his eyes-- Were his eyes following you or |
| 18 | looking at you,-- |
| 19 | A Yes, sir. He-- |
| 20 | Q --looking around? |
| 21 | MR. CALVIT: Let him finish the question. |
| 22 | WITNESS: Oh, I'm sorry. |
| 23 | MR. CAMERON: Go ahead. |
| 24 | MR. CALVIT: He asked two or three different |
| 25 | questions. |

|   | 92 |
|---|---|
| 1 | WITNESS: Okay. |
| 2 | MR. CAMERON: Yeah, I did. Let me-- I'll |
| 3 | rephrase. |
| 4 | WITNESS: Okay. |
| 5 | Q When he-- When Mr. Moore woke up and his eyes |
| 6 | opened did he appear to you to be focusing on you or |
| 7 | something else? |
| 8 | A Just all around. |
| 9 | Q So he looked around? |
| 10 | A Yes, sir. |
| 11 | Q Could you tell if his eyes were bloodshot, anything |
| 12 | such as that? |
| 13 | A No, I couldn't. |
| 14 | Q Did you notice anything about his pupils, whether |
| 15 | they were dilated or real small? |
| 16 | A No, sir. Not that I know of. |
| 17 | Q Okay. So when he-- Does his-- When he wakes up |
| 18 | and his eyes are open does he move any other parts of his |
| 19 | body? |
| 20 | A Other than his whole body, he just-- No. Like any |
| 21 | other person would in some restraints. |
| 22 | Q Uh-huh (yes). Was he trying to--to sit up or |
| 23 | anything like that? |
| 24 | A I mean, I-- I couldn't tell you. I mean, you |
| 25 | know, he's-- |

23  (Pages 89 to 92)

Gerald Hardwell
August 28, 2017

---

93

1    Q   What--
2    A   --just moving, you know.
3    Q   Right. Did he move his legs?
4    A   Yes, sir.
5    Q   And tell me about that, about the moving the legs.
6  Is he-- How much did he move them?
7    A   He moved good, quite a bit, you know. Everybody
8  was trying to, you know, pick him up and place him a OPSO
9  car.
10   Q   All right. Once Mr. Moore woke up did you hear him
11 speak?
12   A   Yeah. Stated, "I'm--" Kept saying, "I'm sorry."
13   Q   About how many times do you think he said, "I'm
14 sorry," after he woke up?
15   A   Well, probably three times.
16   Q   Did you say anything back to him?
17   A   Did I say anything back?
18   Q   Right.
19   A   No, sir.
20   Q   Did anybody-- Did you hear anybody say anything to
21 Mr. Moore while he's say, "I'm sorry," after he woke up?
22   A   Not that I recall.
23   Q   Describe this room, the foyer.
24   A   Just when you're exiting off of B hall there's a
25 hall that leads you to our store walk and--there's a foyer

---

94

1  that just leads to our store walk and out to the sally port,
2  and the other door leads to the work release building.
3    Q   What size room is it?
4    A   I couldn't tell you the size. You know, I'll say
5  about the size of six regular closets, you know.
6    Q   Six closets?
7    A   Yeah.
8    Q   Are there any windows in this room?
9    A   Yes, sir.
10   Q   How many windows are there?
11   A   Three.
12   Q   What's-- And what size windows are they?
13   A   I don't know what size windows.
14   Q   Are they-- Are the windows up high on the wall or
15 they cover--
16   A   No. They're in-- They're inside the door.
17   Q   Okay. So no windows to the outside?
18   A   Yeah. Two windows to the outside, and you got one
19 window that leads--you can see straight up the hall.
20   Q   All right. And we're not talking about the hall.
21 I'm talking about outside of the building. Any windows to
22 the outside of the building?
23   A   Oh, no, sir. Not like that.
24   Q   Is there any furniture or anything in this room,
25 any kind of fixtures of any kind, besides a light?

---

95

1    A   No, sir.
2    Q   How many-- Well, nevermind. I'll rephrase. Did
3  you see Mr. Moore walk after he woke up?
4    A   No, sir.
5    Q   So when he woke up who is it that's attempting to
6  help him up?
7    A   Myself and maybe two or three of those deputies and
8  Reginald Curley and Lieutenant Williams.
9    Q   All at the same time?
10   A   Yes, sir.
11   Q   And as he's being helped up by y'all are his eyes
12 still--
13   A   Yes, sir.
14       MR. CALVIT: Wait--
15       WITNESS: Oh, I'm sorry. I'm sorry.
16       MR. CAMERON: Yeah. I'll rephrase.
17       WITNESS: Just--
18   Q   As you're helping him up does he appear to be
19 alert?
20   A   Yes, sir.
21   Q   And his eyes are open?
22   A   Yes, sir.
23   Q   Does-- Can you feel him doing anything, maybe
24 putting pressure on you or pressure on someone else, holding
25 on, anything like that?

---

96

1    A   No, sir.
2        MR. CALVIT: That was a no?
3        WITNESS: No, sir.
4        MR. CALVIT: Thank you.
5    Q   And as y'all are helping him up, he's still
6  handcuffed behind his back. Right?
7    A   Sir?
8    Q   As you're helping him up, he's still handcuffed
9  behind his back?
10   A   Yes, sir.
11   Q   Did you notice him moving his hands or arms any as
12 you're helping him up?
13   A   Not that I recall.
14   Q   Okay. Once he is-- Is he helped all the way up?
15 Is he ever up on his own?
16   A   No, sir.
17   Q   So if you had let go of him, he would have just
18 crumped back down to the floor?
19   A   I-- I couldn't tell you if he did, whether he
20 wouldn't.
21   Q   Uh-huh (yes).
22   A   But not that I know of.
23   Q   Well, when he was helped up were his feet ever flat
24 on the floor to where he was supporting himself?
25   A   No, sir. The only-- Just for this-- The only

---

24  (Pages 93 to 96)

Gerald Hardwell

August 28, 2017

97

1 thing was, that he helped place him in the OPSO vehicle. We
2 never did stand him up.
3    Q   Okay. Put him a wheelchair?
4    A   Sir?
5    Q   Did you say you put him in a wheelchair or
6 something?
7    A   No, sir. We helped him in the OPSO vehicle. We
8 placed in a cruiser.
9         MR. CALVIT: OPSO vehicle.
10   Q   Okay. So how do you get from the foyer to the
11 vehicle?
12   A   We carried him.
13   Q   Okay. Did you have to go through a door?
14   A   Yes, sir.
15   Q   All right. And are you carrying-- When you carry
16 how is he being carried?
17   A   By those six officers.
18   Q   And what parts of his body are being handled by the
19 six officers?
20   A   All I know, I had his tight right--top right arm.
21   Q   Uh-huh (yes). Was he being dragged?
22   A   No, sir.
23   Q   Were his feet off the floor when he was being
24 carried?
25   A   Yes, sir.

98

1    Q   Was he being carried parallel, you know, body up
2 off the floor and--
3    A   Parallel.
4    Q   He was?
5    A   Yes, sir.
6    Q   When did y'all figure you had to lift him up
7 entirely off the floor to carry him to the vehicle?
8    A   Maybe because he was refusing to walk, you know. I
9 don't know.
10   Q   Uh-huh (yes). Y'all made that decision inside the
11 foyer that you had to lift him up--
12   A   Yes, sir.
13   Q   --off the floor and carry him like that?
14        MR. CALVIT: Remember, let him finish.
15        WITNESS: Oh, I'm sorry. I'm sorry.
16        MR. CALVIT: Just let him finish.
17        WITNESS: I'm sorry.
18        MR. CALVIT: You know where he's going and he
19 knows where he's going.
20        WITNESS: Yeah; yeah.
21        MR. CALVIT: But when she goes to type this
22 up--
23        MR. CAMERON: Right.
24        MR. CALVIT: --it could get confusing.
25        WITNESS: Okay; okay.

99

1         MR. CAMERON: Right.
2    Q   So he was lifted up off-- Mr. Moore was lifted up
3 off the floor inside the foyer. Is that cor-- To carry
4 him to the car?
5    A   Yes, sir.
6    Q   Okay. Between-- While he-- While Mr. Moore is
7 being carried from the foyer to the OPSO vehicle, does he say
8 anything?
9    A   Not that I recall, he didn't.
10   Q   Did he have-- Was he alert? Have his eyes open, I
11 mean?
12   A   Yes, sir.
13   Q   The entire time till the time you were taking him
14 to the car?
15   A   Yes, sir.
16   Q   Did you assist in placing him inside the car?
17   A   We got-- We got him to the car and the deputies,
18 they put--placed him in there.
19   Q   Yeah.
20   A   I just kind of held him and the other deputy went
21 on the other side and pulled him in.
22   Q   Well, at the point in time when you handed
23 Mr. Moore over to the deputies, at that point in time did you
24 notice him bleeding any?
25   A   No, sir.

100

1    Q   Can you say affirmatively he was not bleeding at
2 that time?
3    A   He wasn't.
4    Q   Was Mr. Moore bleeding anywhere on his head or
5 face?
6    A   No, sir.
7    Q   Did you see any type of injuries, whether it's
8 scratches, bruises, abrasions anywhere on his arms or
9 anywhere on arms--hands, arms or wrists?
10   A   No, sir.
11   Q   Did you see any kind of injuries like bruises,
12 scratches, abrasions anywhere on his head other than this--
13 maybe this knot you had talked about?
14   A   Un-huh (no). No, sir.
15   Q   Did you still see the knot at that time?
16   A   Yes, sir.
17   Q   Did you wait until the deputy's vehicle left before
18 you reentered the facility?
19   A   I can't recall I did, but I'm thinking I did watch
20 them go out the sally port.
21   Q   When did the-- Tell me, did the deputies make any
22 kind of remarks about Mr. Moore's condition?
23   A   No, sir. They didn't.
24 (MS. DANIELLE WALKER ENTERS DEPOSITION.)
25        MR. CALVIT: This is Ms. Danielle Walker.

25  (Pages 97 to 100)

Gerald Hardwell
August 28, 2017

---

101

1           MR. CAMERON: Okay. All right.
2      Q   Did the deputies ask about his condition?
3      A   Not that I recall, he didn't.
4      Q   When the deputies arrived to--in the foyer, saw
5   Mr. Moore for the first time, were you the highest ranking
6   Richwood officer there?
7      A   I can't recall if I was.
8      Q   I mean, you--were you the point of contact for the
9   deputies?
10     A   Yes, sir.
11     Q   What did-- What is it that you told the deputies
12  about Mr. Moore?
13     A   Just that, you know, we had a crime scene, you
14  know. Had beaten one inmate inside the cell, and that this
15  inmate had been taken to Conway and later on had died.
16     Q   Did the deputies attempt any kind of communication
17  with Mr. Moore?
18     A   Yeah. They asked him to get up, see if he can
19  walk.
20     Q   And what kind of reaction did Mr. Moore have?
21     A   He didn't want to get up. He just kept rolling
22  around on the floor.
23     Q   He was rolling around?
24     A   Well, not rolling, but, you know, squirming.
25     Q   Okay. At the point in time the deputies asked him

---

102

1   to get up and walk or tell him to get up and walk, what is
2   his--what is Moore's position?
3      A   I think he was-- I want to say he was laying on
4   his left side.
5      Q   And when you saw him squirming, is he rolling or
6   not? Or is it--
7      A   Just moving around.
8      Q   Just moving. You don't know whether he was
9   intentionally not getting up or not. Right?
10     A   Yes-- No, sir. I don't.
11     Q   When the-- When Mr. Moore was placed in the patrol
12  car, the Ouachita Parish car, was that the last time you saw
13  him?
14     A   Yes, sir.
15     Q   Now, earlier that same day did you have some
16  knowledge that there was another inmate in lockdown 7, Vernon
17  White?
18     A   Yes, sir.
19     Q   And what knowledge do you have of why he was in
20  lockdown 7?
21     A   Vernon White had had a fight that prior night, that
22  previous night, on my shift with another offender in the
23  cell, when he was in the Richwood holding cell. And after I
24  went back and reviewed the camera, the one inmate, he was
25  just standing at the door. You just Vernon White just hurry

---

103

1   up and jump out his rack and just start punching on the
2   guy,--
3      Q   Uh-huh (yes).
4      A   --you know.
5      Q   This Richwood holding cell, how many individuals
6   can be housed in there?
7      A   Two.
8      Q   Okay. Do you know why-- Was-- Vernon White, he
9   was in the holding cell?
10     A   Yes, sir.
11     Q   And this other fellow, Darren [sic], he was in that
12  cell, too?
13     A   Yes, sir.
14     Q   Do you know why they were in that cell?
15     A   No, sir. I don't.
16     Q   All right. So you see this on the video. What
17  action do you take as a result of that?
18     A   Well, actually, I was down there on the hall and I
19  radioed for some backup to come so we was able to remove
20  Vernon out of the cell.
21     Q   All right. And then you decided-- Are you the one
22  that decided to put--
23     A   Yes, sir.
24     Q   --Vernon White in the same cell--
25           MR. CALVIT: Let him finish.

---

104

1           WITNESS: Oh, I'm sorry. I'm sorry.
2      Q   --with Mr. Moore in lockdown 7?
3      A   Yes, sir.
4      Q   And tell me every reason why you did that.
5      A   Because at the time Moore, he wasn't--you know, he
6   was behaving. He was calm. You know, he wasn't beating on
7   the door like I told you. You know, he have his moments.
8      Q   Uh-huh (yes).
9      A   After that time he--he wasn't make any noise. He
10  was just like a regular person, you know.
11     Q   What kind of injuries did Darren [sic] sustain as a
12  result of the assault by Vernon White?
13     A   None that I can see. You know, he seen a nurse the
14  previous--the following morning.
15     Q   Did Darren [sic] go to the hospital?
16     A   No, sir. He seen the nurse.
17     Q   How about Vernon White? Do you have any knowledge
18  of him going to the hospital?
19     A   No.
20     Q   I mean-- I'm talking about-- Let me rephrase the
21  question. Before this incident with Darren [sic], okay,
22  before that assault, do you know if Vernon White had been to
23  the hospital?
24     A   No, sir. I don't.
25     Q   Okay. So going back to every reason why you put

---

26  (Pages 101 to 104)

Gerald Hardwell
August 28, 2017

105

1    Vernon White in the cell with Moore. You said Moore is calm.
2    What other reason?
3        A    Just to separate them two, Darren [sic] and White.
4        Q    Now, weren't there some other cells available to
5    put Vernon White in?
6        A    Not that I can recall that night. No.
7        Q    Uh-huh (yes). Were the-- Okay. Would you ever
8    put someone like that in a special management cell?
9        A    Someone like who?
10       Q    Vernon White.
11       A    I mean, depending on how volatile he's acting, you
12   know.
13       Q    Uh-huh (yes). Well, tell me-- Okay. When you--
14   You take-- You took Vernon White out of the cell,--
15       A    Yes, sir.
16       Q    --the Richwood holding cell?
17       A    Yes, sir.
18       Q    Tell me about how that happened.
19       A    Well, basically I called for backup and, you know,
20   we was able-- The guy had--was able to pin Vernon White down
21   by the door and beat on the door at the same time. So I was
22   waiting on backup to come and that's when we was able to
23   place him--remove him from the cell.
24       Q    Did Vernon White come out of the cell voluntarily?
25       A    You could tell something was kind of, you know,

106

1    wrong with him. But at the same time he--we kind of had to
2    grab him, you know.
3        Q    He was not cooperative, was he?
4        A    No, he wasn't.
5        Q    Okay. Did he resist?
6        A    Yes, sir.
7        Q    Did you have to spray him?
8        A    Not that I recall. I don't.
9        Q    And tell me a little bit more about Vernon White's
10   resistance coming out of the Richwood holding cell.
11       A    Just grabbing him, you know, trying to place
12   restraints on him, you know. I mean, it happened so fast,
13   you know.
14       Q    How did you get the restraints on him?
15       A    I can't recall if I placed them or one of my
16   officers did.
17       Q    Was Vernon White on the ground or was he standing
18   up when the restraints were placed on him?
19       A    He-- He was on the ground.
20       Q    And how did he get down on the ground?
21       A    He was already on the ground.
22       Q    Okay. Why was he on the ground?
23       A    Huh?
24       Q    Why-- Do you know why--
25       A    The--

107

1        Q    --he was on the ground?
2        A    The other inmate had him pinned down by the door.
3    So basically-- Well, we had to pull him out the cell.
4        Q    Uh-huh (yes). So-- But it was your conclusion,
5    though, that Vernon White was the one who initiated the
6    assault?
7        A    Yes, sir. He was.
8        Q    But then it looked like Darren [sic] was getting
9    the better of it later? Is that what happened?
10       A    Yeah. Kind of/sort of.
11       Q    Okay. What injuries, if any, did Vernon White
12   sustain in the Richwood holding cell?
13       A    Nothing that I could see.
14       Q    Was he taken to the infirmary or to see a nurse or
15   anything like that?
16       A    He seen the nurse that following morning.
17       Q    And do you recall what--what he had--why he saw the
18   nurse? I mean, what injuries he had?
19       A    No, sir. I can't recall.
20       Q    All right. Would it have been appropriate to place
21   Vernon White in one of the special management cells at this
22   time?
23       A    If we had one opened it would have been.
24       Q    There would have been nothing to prevent you from
25   doing that?

108

1        A    No, sir.
2        Q    Okay. Once you put Vernon White in lockdown 7 did
3    you have anymore contact with him in that cell?
4        A    Who? Vernon White?
5        Q    Yes.
6        A    No, sir. I didn't have a problem out of neither
7    one of them.
8            MR. CALVIT:  He said contract. He didn't say
9            problem.
10           WITNESS:  Contact?
11           MR. CAMERON:  Yes. Uh-huh (yes).
12           WITNESS:  No.
13           MR. CALVIT:  I apologize.
14           MR. CAMERON:  That's okay.
15           WITNESS:  I'm sorry; I'm sorry; I'm sorry.
16           MR. CAMERON:  Yeah. Contact. I would have
17           followed up.
18       A    No, sir; no, sir.
19       Q    All right. So once you put Vernon White in
20   lockdown 7 it wasn't until the next day, the evening when you
21   went in to get Moore out of lockdown 7 that you went into
22   lockdown 7?
23       A    When the incident happened. That was it.
24       Q    Okay. The incident you're referring to is what?
25       A    What happened that following day when Vernon White

27  (Pages 105 to 108)

| 109 | 111 |
|---|---|
| 1 had to go to the hospital. | 1 kind of an altercation between--a physical altercation, I'm |
| 2  Q  Okay. So you went in and did you pull Vernon White | 2 talking about a fight, between Vernon White and Erie Moore, |
| 3 out of that cell? | 3 Sr.? |
| 4  A  No, sir. I still was in admin. I was en route to | 4  A  Yes, sir. |
| 5 the incident, though. | 5  Q  What-- What did you see that you thought looked |
| 6  Q  All right. When you got to the incident what was | 6 like a fight? |
| 7 happening? | 7  A  Maybe when-- I mean, when Erie Moore just put his |
| 8  A  When I got down on B hall they had pulled him out | 8 hands around his throat and, you know, he looked like he was |
| 9 on the hall and myself and the nurse, we had rolled him on | 9 going to punch him, but he didn't. |
| 10 his side. | 10  Q  Uh-huh (yes). Did you see any video where Vernon |
| 11  Q  Was he speaking any at that point in time? | 11 White made any kind of physical contact or strike on Erie |
| 12  A  Sir? | 12 Moore, Sr.? |
| 13  Q  Did he speak any, Vernon White? | 13  A  No, sir. |
| 14  A  No, sir. He just was moving around. | 14  Q  Do you have any knowledge from any source whether |
| 15  Q  Okay. He was just making some moaning sounds? | 15 Vernon White in some way injured Erie Moore, Sr.? |
| 16  A  Yes, sir. Spitting out blood. | 16  A  No, sir. I don't. |
| 17  Q  All right. The-- And sometime after this is when | 17  Q  Uh-huh (yes). Do you have any children? |
| 18 the EMTs arrived? | 18  A  Yes, sir. |
| 19  A  Yes, sir. | 19  Q  How many children do you have? |
| 20  Q  What comments, if any, did they make about the | 20  A  Just one. |
| 21 condition of Vernon White? | 21  Q  What's the age? |
| 22  A  None that I can remember. | 22  A  Five. |
| 23  Q  All right. And what injuries did you see that | 23  Q  Are you married? |
| 24 Vernon White had apparently sustained when he was out in the | 24  A  No, sir. |
| 25 hallway? | 25  Q  Do you support the child? |

| 110 | 112 |
|---|---|
| 1  A  Like he had a couple of teeth missing. | 1  A  Yes, sir. |
| 2  Q  Okay. Do you know if those teeth were missing from | 2  Q  I asked you earlier if you've ever filed any kind |
| 3 something that happened inside lockdown 7? | 3 of lawsuits or anything like that. Have you ever filed a |
| 4  A  No, sir. | 4 bankruptcy? |
| 5  Q  Did they ever find the teeth? | 5  A  No, sir. |
| 6  A  No, sir. | 6  Q  Have you ever been married? |
| 7  Q  You were aware of anybody finding any teeth inside | 7  A  No, sir. |
| 8 lockdown cell 7? | 8  Q  Have you ever signed an affidavit? That's a |
| 9  A  No, sir. We didn't find any teeth. | 9 written sworn statement. We're doing an oral sworn statement |
| 10  Q  All right. Any other injuries that you could | 10 here. |
| 11 visually see of Vernon White? | 11  A  No, sir. Not that I recall, I didn't. |
| 12  A  Maybe behind the head. | 12  Q  Who do you consider to be your closest friend |
| 13  Q  Okay. Why do you say maybe? | 13 outside your family? |
| 14  A  Because it's-- I think the-- I can't recall if | 14  A  Savion Sanders. |
| 15 the nurse say he might have injury behind his head or what. | 15    COURT REPORTER: Sorry? |
| 16  Q  Okay. But it's nothing that you saw? | 16    WITNESS: Savion Sanders. |
| 17  A  Yeah. Nothing I saw. | 17    COURT REPORTER: Can you spell it, please? |
| 18  Q  Okay. Anything that you saw that you-- | 18    WITNESS: S-A-V-I-O-N. |
| 19  A  All I could-- All I saw was his teeth. | 19  Q  Uh-huh (yes). And how do you know that person? |
| 20  Q  Okay. | 20  A  A childhood friend. |
| 21  A  Yes. He had some missing teeth. | 21  Q  Uh-huh (yes). And where does he live at? |
| 22  Q  And just for the record, did you witness any kind | 22  A  Winnfield. |
| 23 of altercation between Vernon White and Erie Moore, Sr.? | 23  Q  That's where you were born and raised, in Winn- -- |
| 24  A  No, sir. | 24  A  Yes, sir. I was born in Ruston. |
| 25  Q  Have you seen any kind of video recording of any | 25  Q  Born in Ruston, raised in Winnfield? |

28  (Pages 109 to 112)

Gerald Hardwell
August 28, 2017

113

1    A   Winnfield and Sumter, South Carolina.
2    Q   Okay. What does San- -- Have you talked to
3  Sanders about this any?
4    A   No, sir.
5    Q   Have you discussed any of the facts of this case
6  with anyone outside of Richwood Correctional Center and your
7  attorney?
8    A   No, sir.
9    Q   Do you belong to any-- Outside of a church, do you
10 belong to any social organizations?
11   A   No, sir.
12   Q   Do you have any hobbies?
13   A   Basketball.
14   Q   All right. I noticed that you've been--gotten some
15 annual evaluations. In 2014 you were rated fair in
16 commitment to policy, but in 2015 you advanced to good. Do
17 you have any idea why that happened?
18   A   No, sir. I don't.
19   Q   Okay. Have you had to go through any refresher
20 training?
21   A   No, sir.
22   Q   Now, you were issued a cell phone by the--by
23 Richwood. Right?
24   A   Yes, sir.
25   Q   What kind of cell phone is that?

114

1    A   A iPhone.
2    Q   Okay. Back in October 2015 did you have a
3  company-issued iPhone?
4    A   No, sir.
5    Q   What did you have at that point in time?
6    A   We had a flip phone.
7    Q   Flip phone. When did you start getting the
8  iPhones?
9    A   When I got promoted to captain.
10   Q   Oh. And what type of flip phone was this that you
11 had?
12   A   I want to say a Samsung.
13   Q   Can you take pictures with it?
14   A   Yes, sir. That one we could.
15   Q   Did you take any pictures of this--anything to do
16 with Vernon White or Erie Moore, Jr. [sic]?
17   A   Un-huh (no). Not that I can recall, I didn't.
18   Q   Did you use that cell phone any to communicate with
19 anyone about anything to do with Erie Moore, Sr.?
20   A   No, sir.
21   Q   How about with Vernon White?
22   A   No, sir.
23   Q   When you were on duty, I'm talking about October
24 2015, when you were a lieutenant--
25   A   Yes

115

1    Q   --did you have any kind of a radio of any kind that
2  you used to communicate?
3    A   Yes, sir.
4    Q   Is there a dispatcher on that--on that frequency?
5    A   Not that I know of.
6    Q   You-- Are you aware if anyone monitors that
7  frequency?
8    A   No, sir. I'm not.
9    Q   Are you aware if there's--if the frequency is
10 recorded?
11   A   No, sir.
12   Q   And on-- You did use the radio during the course
13 of the events concerning Vernon White and Erie Moore, Sr.
14 Right?
15   A   Yes, sir.
16   Q   And you used it for what?
17   A   To call main control to alert EMT.
18   Q   Any other reason you used--
19   A   I mean, AMR. I'm sorry.
20   Q   All right. Any other reason?
21   A   That's it.
22   Q   The-- The flip phone, Samsung, that you used, do
23 you know the name of the provider?
24   A   No, sir. I don't.
25   Q   Are you able to send text messages with the flip

116

1  phone?
2    A   No, sir.
3    Q   Did you have your own personal cell phone?
4    A   No, sir.
5    Q   In October 2015 you did not have a personal cell
6  phone?
7    A   I didn't have it in the jail with me, but I had
8  one.
9    · Q   Did you ever use that personal cell phone to
10 communicate with anyone regarding anything to do about Erie
11 Moore, Sr., or Vernon White?
12   A   No, sir.
13   Q   And at one point-- Now, going back to the incident
14 in question you said you left the scene when Erie Moore was
15 being carried away and you went to see Aultman, I believe.
16   A   Yes, sir.
17   Q   Tell me what happened with that.
18   A   I can't recall the whole discussion, but I think I
19 was going to admin to just kind of brief him on what was
20 going on.
21   Q   How long were you away to brief him?
22   A   No longer than about fifteen minutes, maybe even
23 ten.
24   Q   So there was a period of time where Mr. Moore would
25 have been in the foyer with Runner and Curley and--

29  (Pages 113 to 116)

117

1    A  Yes, sir.
2    Q  And let me finish.
3    A  Oh, I'm sorry. I'm sorry.
4    Q  Let me just rephrase it. During the time you were
5  with Aultman, Moore would have been in the foyer. Right?
6    A  Yes, sir.
7    Q  And who would have been with him in the foyer while
8  you were with Aultman?
9    A  The last-- I had left Curley in charge to watch
10  over him.
11   Q  All right. And who else would have been present
12  besides Curley?
13   A  That I wouldn't know of. I was up front.
14   Q  All right. Did you later learn that someone was in
15  the foyer with Moore while you were with Aultman besides
16  Curley?
17   A  No, sir. I didn't.
18   Q  What about Runner? Do you know if he was in the
19  foyer?
20   A  Only when we was trying to place him in the car.
21   Q  When you returned to the foyer after talking to
22  Aultman, who--who was present in the foyer with Moore?
23   A  I know myself and Sergeant Williams.
24   Q  Curley wasn't there?
25   A  I can't recall, sir.

118

1    Q  Did you-- Did you and Aultman review any kind of
2  video of any kind when you're--when you meet with him when he
3  comes in?
4    A  Not at that moment.
5    Q  Who else was present when you and Aultman spoke?
6    A  Just him.
7    Q  And where were y'all at at the time?
8    A  Just admin.
9    Q  And that's just like a little office of some sort?
10   A  When you first come into Richwood, administration.
11   Q  Uh-huh (yes). He give you any instructions?
12   A  Far as when everything was over with just to clean
13  the cell out after any investigators left.
14   Q  Now, did y'all understand that it was alleged that
15  a murder had taken place inside lockdown 7?
16   A  Yes, sir.
17   Q  And that was-- That's a crime scene, isn't it?
18   A  Yes, sir.
19   Q  Okay. Why would-- Did he explain-- Did Aultman
20  explain why there should be--that cell should be cleaned?
21   A  Not at that moment, he didn't.
22   Q  Did you question that?
23   A  No, sir.
24   Q  Did you give instructions to someone to clean the
25  cell?

119

1    A  Yes, sir.
2    Q  And how was the cell cleaned?
3    A  Basically, bleach. And we have chemicals,
4  disinfectants in our chemical room.
5    Q  Uh-huh (yes). Now, there was something else
6  removed from the cell, wasn't it? A blanket of some sort?
7    A  Yes, sir.
8    Q  What was done with that blanket?
9    A  I can't recall what was done with it. All I know,
10  it was removed from the cell.
11   Q  All right. Anything else? Any other objects on
12  the blanket? It could be a pillow, a piece of clothing,
13  anything like that.
14   A  He had defecated on there.
15   Q  Uh-huh (yes). But as far as any kind of object or
16  thing, manmade thing?
17   A  No, sir.
18   Q  Now, in that cell there is, as you've already told
19  us, a--a camera. Right?
20   A  Yes, sir.
21   Q  And is there a blind spot inside the cell? From
22  the camera, I'm talking about.
23   A  Under the camera.
24   Q  Yeah. Is that-- And that's the only blind spot in
25  the cell?

120

1    A  Yes, sir.
2    Q  Is that-- About how much room under the camera
3  is--is part of the blind spot?
4    A  I wouldn't-- I wouldn't know.
5    Q  Could an individual stand underneath the camera and
6  not be seen?
7    A  You'll see partial of his body, you could.
8    Q  Do you know if there's ever been any-- Let me
9  rephrase. Is that pretty well known among the staff, there's
10  a blind spot underneath camera?
11   A  Not unless you just--just standing there for a
12  period of time. But--
13   Q  Okay. My question is a little bit different. I
14  mean is it well known to the staff--
15   A  Oh.
16   Q  --that there is a blind spot in lockdown 7?
17   A  No, sir. It's not.
18   Q  Really? Y'all didn't know there's a blind spot in
19  lockdown 7 underneath--
20   A  I mean,--
21   Q  --the camera?
22   A  I mean, we have off- --different officers. You
23  know, new officers come. You know, they--
24   Q  Uh-huh (yes).
25   A  You don't learn-- I mean, you don't know until you

30  (Pages 117 to 120)

Gerald Hardwell
August 28, 2017

121

1  learn about the spot,--
2     Q  Uh-huh (yes).
3     A  --you know.
4     Q  Well, individuals who-- Let me back up here. Have
5  you ever monitored, been someone who watches and monitors
6  the--the cameras?
7     A  Have I ever monitored?
8     Q  Right.
9     A  Just sat--sat there and just watch somebody?
10    Q  Right.
11    A  I mean, yes, sir, I have.
12    Q  All right. And I'm talking in the--the control
13  room where you have the--the different screens.
14    A  Yes, sir.
15    Q  All right. And what occasions would you do that?
16    A  Saying myself just sitting in there watching them?
17    Q  Right.
18    A  Oh, that was a long time. It was back in 2010. I
19  was just a CO.
20    Q  Okay. So that was your assignment at the time?
21    A  Yes, sir.
22    Q  Okay.
23    A  I mean, it wasn't my assignment. Just only if we
24  was--if that was my drop for the night, you know.
25    Q  Uh-huh (yes). All right. Well, were you-- You

122

1  were aware then that there was blinds spots in the--in the
2  cell?
3     A  No, sir. I wasn't. I was not.
4     Q  All right. Nobody had told you that there are
5  blind spots in the cell?
6     A  No, sir.
7     Q  All right. I understand in the special management
8  cells there's a window that you can look directly into the
9  cells.
10    A  Yes, sir. You can see directly in there.
11    Q  And there's no blind spots there. Right?
12    A  No, sir.
13    Q  During the time that you've had--you had contact
14  with Mr. Moore how many times did you use chemical spray on
15  him?
16    A  I'll say once or twice.
17    Q  Did you ever take him to the shower, decontaminate
18  him, that kind of thing?
19    A  He was actually asked if he wanted to shower, but
20  he refused.
21    Q  And which time was that?
22    A  Each and every time.
23    Q  So before you grabbed him from behind and pulled
24  him out and threw him on the floor you asked him if he wanted
25  to be decontaminated then?

123

1     A  No, sir. I didn't.
2     Q  Going back to the cleaning of the cell, do you know
3  if there's any kind of written policy at Richwood
4  Correctional Center about preserving crime scenes?
5     A  No. That I don't know of. No, sir.
6     Q  Were you ever present when Mr. Moore was tended to
7  by a nurse?
8     A  No, sir. I wasn't.
9     Q  When Mr.-- Do you know what time it was Mr. Moore
10  was placed in the Ouachita Parish patrol car there at
11  Richwood?
12    A  No, sir. I don't.
13    Q  Do you-- Do you know what time it is that the
14  deputies were called to come pick up Mr. Moore?
15    A  No, sir. I don't.
16    Q  Would you agree it was about 7:00, a little after
17  7 o'clock when you took Mr. Moore out of his cell?
18    A  I can't recall, but--
19    Q  Okay. If your report indicates that at 7:37 you
20  received a phone call from Sirmon [sic] informing that Vernon
21  White had just been pronounced deceased, it had been sometime
22  a little bit after that that you took Mr. Moore out of the
23  cell?
24    A  Okay. Yes, sir.
25    Q  And if the record shows that Mr. Moore was

124

1  transported to Ouachita Parish Correctional Center
2  approximately 9 p.m.,--
3     A  Yes, sir.
4     Q  --I'm just trying to figure out where all Mr. Moore
5  was from that approximate 7:30 to 9 p.m. time period.
6     A  7:30 he came out the cell, you said? I'm--
7     Q  Approximately.
8     A  Okay. Approximately 7:30.
9     Q  So is it your understanding that Mr. Moore was
10  outside lockdown 7 for an hour to an hour and a half before
11  he was transported by the deputies?
12    A  Yes, sir.
13    Q  And how long was he in the foyer?
14    A  From about that time till Ouachita Parish got
15  there.
16    Q  So he spent the vast majority of the time outside
17  of lockdown 7 after being taken out in the foyer?
18    A  Yes, sir.
19    Q  Is there any kind of video recording in the foyer?
20    A  No, sir.
21    Q  Is that well known, that there's no video in the
22  foyer?
23    A  No, sir.
24    Q  Did you know there was no camera video in the
25  foyer?

Duke Copeland Court Reporting
(318)387-2889

125

1   A  Yes, sir. I did.
2   Q  Is there video or a camera out in the area where
3   the deputies placed Mr. Moore into the vehicle?
4           MR. CALVIT:  You're asking if there's a video
5           or is there a camera?
6           MR. CAMERON:  Camera. A camera.
7   A  Yes, sir.
8   Q  Would it be--
9   A  Camera in that back sally port. It is. Yes, sir.
10  Q  I mean, if we had all the video that could possibly
11  be available from any camera there at Richwood, should we
12  find some kind of recording of him being placed into the
13  deputy's vehicle?
14  A  Yes, sir.
15  Q  As a lieutenant back in October of 2015 you never
16  did carry any kind of impact weapon other than the chemical
17  spray?
18  A  Yes, sir. That's it.
19  Q  Have you ever-- Had you ever heard that Erie--
20  someone reported that Erie Moore, Sr., had so much pepper
21  spray and this pants were like drenched in pepper spray?
22  A  No, sir.
23  Q  Is there a--some kind of limit to--to the amount of
24  pepper spray that you can use on an individual?
25  A  Not that I recall.

126

1   Q  Have you-- Have you been trained in any--in the
2   constitutional rights of inmates?
3   A  Well, meaning--?  What you mean by that?
4   Q  Well, do-- Have you ever heard of the 8th
5   amendment?
6   A  No, sir.
7   Q  Okay. That's an amendment in the United State
8   Constitution that prohibits cruel and unusual punishment.
9   Have you-- You've heard of that or not?
10  A  Yeah. I heard of that.
11  Q  Okay.
12          MR. CALVIT:  I'm sorry. You have or have not?
13          WITNESS:  Cruel and unusual-- Yes, sir.
14          MR. CAMERON:  He's heard of that.
15          MR. CALVIT:  Okay.
16          MR. CAMERON:  Yeah.
17  Q  Have you attended any training either at Richwood
18  or Winn Correctional Center about the constitutional rights
19  of inmates?
20  A  No, sir.
21  Q  Have you ever heard of a term called excessive
22  force?
23  A  Yes. I heard of it.
24  Q  Have you ever been trained anything about it?
25  A  Yes, sir.

127

1   Q  And what-- Tell me what kind of training you
2   received in that--that area.
3   A  In February, when we have our use of force
4   training.
5   Q  Uh-huh (yes). Now, as far as pepper spray, have
6   you ever been trained that use X number of discharges, leave
7   the situation alone, come back to it, anything such as that?
8   A  Yes, sir. That's when I came back the first time
9   when I had sprayed him and we had took him out the cell.
10  Q  Right. Well, just kind of go through with me, you
11  know,-- Let me rephrase one more time. I'm sorry. You
12  never have been trained, though, that there's a limit to the
13  number of times you can spray someone?
14  A  No, sir.
15  Q  Have you ever been trained that there are certain
16  areas of the body to avoid--
17  A  Yes, sir.
18  Q  --with the spray? Okay. What areas are those?
19  A  Below the waist.
20  Q  And what's the problem with below the waist?
21  Talking about the genitals?
22  A  Yes, sir.
23  Q  Okay. Just the spray will irritate the genitals--
24  A  Yes, sir.
25  Q  --pretty badly?

128

1   A  Yes, sir.
2   Q  All right. Any other areas of the body to be
3   avoided?
4   A  Not that I think, that I know of. No, sir.
5   Q  And you understand, don't you, and tell me if you
6   don't, that there are legal limits on the amount of force
7   that a correctional officer can use on an inmate?
8   A  Yes, sir.
9   Q  And the amount of force that you're allowed to use
10  on an inmate is just only that amount that's necessary to
11  overcome resistance?
12  A  Yes, sir.
13  Q  Now, you've been trained that if a inmate provides
14  just passive resistance that you can use the spray on them?
15  A  By passive-- What you mean by passive?
16  Q  Well, passive would be not physical. Just like,
17  say, you tell them to sit down and they don't sit down.
18  A  Okay.
19  Q  So that's what I mean by passive.
20  A  Okay.
21  Q  So have you been trained you can use the spray
22  for--with passive resistance?
23  A  No. No, sir.
24  Q  Do any of the guards or correctional officers that
25  are at Richwood have a Taser?

32  (Pages 125 to 128)

129

1    A  No, sir.
2    Q  Are there any other weapons on the premises besides
3  the spray?
4    A  I mean, far as trans- -- Our transportation
5  officers have those .38s.  That's it.
6    Q  All right.  Did you ever go into the foyer-- When
7  Mr. Moore was there, you know, waiting for the deputies, did
8  you ever believe that he was faking being asleep?
9    A  At times I did.
10    Q  Why is that?
11    A  Because he-- Because one moment--one minute he up,
12  you know, then another minute then he just out.  And he up
13  again talking, then he out.
14    Q  Umph.  I see.  Out of the percentage of time that
15  Mr. Moore was in the foyer how much of that time is it that
16  you think he was asleep or appeared to be asleep?
17    A  Five minutes, maybe.
18    Q  Just five minutes?
19    A  Yes, sir.  Maybe five minutes.
20    Q  And was that the last five minutes that he was in
21  there?  Because that would have been when the deputies came.
22    A  Probably be kind of in the middle between--in the--
23  in between.
24    Q  Okay.  Now, when the deputies came wasn't he--
25  didn't he appear to be asleep at that point in time, too?

130

1    A  No, sir.  He was up because they--we was trying to
2  get him to stand up.  I think that's when he was just looking
3  around.
4    Q  Going back out into the hallway, before he's taken
5  into the foyer,--
6    A  Okay.
7    Q  --did Mr. Moore appear to be asleep out there any?
8    A  When we first removed him from the cell?
9    Q  Yes.
10    A  Yes, sir.  He was up.
11    Q  Okay.  Now, well,-- Now, you may have
12  misunderstood me.  When Mr. Moore was first taken out of the
13  cell--
14    A  Okay.
15    Q  --and you force him onto the floor,--
16    A  Okay.
17    Q  --handcuff him, before he's taken to the foyer,--
18    A  Okay.
19    Q  --during that time did he ever appear to be asleep?
20    A  No, sir.
21    Q  So, now, Mr.-- Okay.  During the time Mr. Moore is
22  in the foyer, you're saying maybe only five minutes he
23  appears to be asleep.  Right?
24    A  Yes, sir.
25    Q  How-- How long is it you believe he was on his

131

1  knees?
2    A  Not long.
3    Q  A couple of minutes?
4    A  Yes, sir.  No more than about seven minutes, if
5  that.
6    Q  All right.  And the rest of the time-- Okay.  Then
7  you said one time he was on his bottom.
8    A  Yes, sir.
9    Q  And how long was he on his bottom?
10    A  That I can't recall because I was--I was moving
11  around, back and forth.
12    Q  Once you entered the foyer--
13    A  Okay.
14    Q  --did you leave the foyer before the deputies
15  arrived?
16    A  Did I leave?  No, sir.  I kind of stayed down--hung
17 · around because I knew they was about to get ready to pull in.
18    Q  All right.  Okay.  So Mr. Moore in the foyer, five
19  minutes asleep, seven minutes on his knees, approximately.
20    A  Yes, sir.
21    Q  And how long on his bottom?
22    A  I can't recall how long he was on his bottom.
23    Q  I mean, are we talking about a long time or just--
24    A  Yeah.  To the point he just-- When we-- He went
25  ahead and laid down on his side.

132

1    Q  Okay.  So would you say it was just a matter of a
2  few minutes he was on his bottom?
3    A  Yes, sir.
4    Q  Then he lays over on his side and that's the
5  position he's in for the majority of the time?
6    A  Yes, sir.
7    Q  Does he switch sides any?
8    A  Not that I know of, he don't.
9    Q  Let's get a--a picture of the foyer.  You know, we
10  did-- We did a diagram earlier and we marked it as "Exhibit
11  9" of the B hall when you got a little part of the foyer.  And
12  before we go any further, though, I'd like for you to sign
13  "#9" and date it today's date.
14  (WITNESS COMPLIES.)
15          MR. CALVIT:  While he's drawing the next one
16       can we take a break and let him draw it?
17          MR. CAMERON:  Yes.
18          MR. CALVIT TO WITNESS:  If you need to take a
19       break,--
20          MR. CAMERON:  Yeah.
21          MR. CALVIT:  --let us know.
22          WITNESS:  Okay.
23  (OFF RECORD - MR. DUAN ROSENTHAL ENTERS DEPOSITION.)
24  EXAMINATION BY MR. CAMERON, continuing:
25    Q  All right.  Captain Hardwell, during our break you

33  (Pages 129 to 132)

133

1  drew a diagram of the foyer area, did you not?
2      A  Yes, sir.
3      Q  And the one I'm going to enter as "Exhibit 10,"
4  that is the diagram you drew?
5      A  Yes, sir.
6      Q  All right.  Is another word for the--this area, the
7  four corners?
8      A  (Negative nod.)
9      Q  No?  There's not another--
10     A  The foyer.  Since I've been there it's been the
11 foyer.
12     Q  Foyer?  Okay.
13     A  Yes, sir.
14     Q  All right.  And if you would for me--  Now, while
15 you're--you are in the foyer with Mr. Moore, would you draw a
16 little stick diagram, if you would, where Mr. Moore was lying
17 at at the time?
18 (WITNESS COMPLIES.)
19     Q  And that's an X?
20     A  Yes, sir.
21     Q  All right.  And which--which direction was his head
22 pointing and which--
23     A  Right there.
24     Q  Okay.  And I need to get that point.
25     A  All right.

134

1  (WITNESS COMPLIES.)
2      Q  All right.  And if you would sign that and date it,
3  please.
4  (WITNESS COMPLIES.)
5      Q  And is the--the direction that you came into the
6  foyer?  Is it from this--the hall door,--
7      A  Uh-huh (yes).
8      Q  --B hall door?
9      A  Yes, sir.  From B hall.
10     Q  Okay.  Now, you say back during this time you
11 weighed two eighty-five (285) and you were about six foot
12 five (6'5").
13     A  Yes, sir.
14     Q  Do you do any kind of weightlifting?
15     A  Yes, sir.
16     Q  How much could you bench press?
17     A  I mean, right now I work out with two twenty-five
18 (225).
19     Q  All right.  Well, back during October of 2015 were
20 you doing about that same amount?
21     A  No, sir.  Probably around about maybe one eighty
22 (180), just working out.  One--  A hundred and eighty (180).
23     Q  A hundred and eighty (180)?  All right.  All right.
24 Have you ever been involved in anything at the Richwood
25 Correctional Center like internal--internal affairs

135

1  investigation, anything such as that?
2      A  No, sir.
3      Q  Do you know if there was any internal investigation
4  done at Richwood regarding the injuries of Vernon White?
5      A  No, sir.
6      Q  Are you aware of any internal investigation done at
7  Richwood regarding any injuries sustained by Erie Moore, Sr.?
8      A  No, sir.
9      Q  Okay.  Do they have--  At Richwood do they have any
10 kind of like a stretcher available for--to put people on who
11 are injured and can't ambulate, that kind of thing?
12     A  Yes, sir.
13     Q  Is that something that's maintained at Richwood or
14 is that something that comes with the ambulance or--
15     A  Maintained at Richwood.
16     Q  And where are they kept at?
17     A  Nurse's station.
18     Q  All right.  How about any wheelchair or anything
19 like that?
20     A  Yes, sir.
21     Q  They have those, as well?
22     A  Yes, sir.
23     Q  And who--who has to authorize the use of the
24 stretcher?
25     A  Just depending on what type of emergency it is.

136

1      Q  Well, say for taking Eric Moore out of the--the B
2  hall into the foyer, who would have to authorize that?
3      A  At the time I would.
4      Q  Okay.  And how about the--the wheelchair?  Would
5  that be you, as well?
6      A  Yes, sir.
7      Q  Did you consider you--  Was the stretcher and/or
8  the wheelchair available for use at the time Erie Moore was
9  handcuffed facedown on B hall floor?
10     A  I mean, not at the time because of all--what was
11 going on.
12     Q  What do you mean?
13     A  You can't lay nobody on a stretcher with handcuffs
14 behind their back.
15     Q  All right.
16     A  And so--
17     Q  All I'm asking is--is the--
18     A  Oh.
19     Q  Was the stretcher--
20        MR. CALVIT:  Just answer the question asked.
21        WITNESS:  Oh, okay.  Okay.
22     Q  Yeah.  Was the stretcher or the wheelchair--
23 wheelchair available to be used when--
24     A  Yes, sir.
25     Q  --Erie Moore was on the floor?

34  (Pages 133 to 136)

137

1   A  Yes, sir.
2         MR. CALVIT:  Thanks.
3   Q  And would there be-- Would it be inappropriate to
4   use the stretcher or wheelchair on Erie Moore?
5   A  No, sir.
6   Q  Is there any-- Was there any policy or practice
7   that would have prohibited the use of the stretcher or
8   wheelchair for Erie Moore after he was extracted from the
9   cell?
10  A  What you mean by that?
11  Q  Well, is there some reason that you wouldn't use
12  it?
13  A  Like I said, the only thing would be his restraints
14  behind his back, you know.
15  Q  Uh-huh (yes).
16  A  And we don't have the type of stretcher like the
17  ambulance use.
18  ·Q  Uh-huh (yes).
19  A  We don't-- We don't have those there.
20  Q  What kind of stretchers do you have?
21  A  Straight flat board stretcher.
22  Q  You have to-- Do you have to manually carry them?
23  A  Yes, sir.
24  Q  Not-- Not wheels on them?
25  A  No, sir.

138

1   Q  Have you ever been taught from a medical standpoint
2   that if an individual has a head injury you should put them
3   on a backboard?
4   A  No, sir.
5   Q  Have you been trained any about when you should be
6   using a stretcher or wheelchair in connection with an inmate?
7   A  No, sir.
8   Q  At 7 p.m. at night on a weekday are there any
9   medical personnel present at the facility?
10  A  What time again?
11  Q  About 7 p.m. on a weekday night.
12  A  Weekday night?  No, sir.
13  Q  And if you have a medical emergency what are you
14  supposed to do?
15  A  Call my duty officer.  But if it's an emergency
16  such as that, you know,--
17  Q  Uh-huh (yes).
18  A  --we go ahead and try to get them to the hospital
19  or call AMR.  Yes, sir.
20  Q  And who is the duty officer this particular night
21  in October 2015?
22  A  I couldn't-- I can't recall who was the duty
23  officer.
24  Q  What rank is a duty officer?
25  A  Warden or anything above the major or--

139

1   (OFF RECORD COMMENTS.)
2         MR. CAMERON:  I'm labeling this "Exhibit #11."
3         It is RCC 271 through 282.
4   Q  I ask if you recognize this exhibit?  It's
5   entitled--
6   A  Suicide.  Yeah.
7   Q  --Suicide Prevention Policy.
8   (WITNESS PERUSES DOCUMENT.)
9         MR. JACKSON:  What are those numbers again?
10        MR. CAMERON:  Let's see.
11        COURT REPORTER:  RCC 282.
12        MR. CALVIT:  271.
13        COURT REPORTER:  271.
14        MR. CALVIT:  RCC 271 through 275, I think.
15        MR. JACKSON:  Thank you.
16        MR. CAMERON:  No.  It goes further than that.
17        COURT REPORTER:  282.
18        WITNESS:  282.
19        MR. CAMERON:  It's like two eighty something.
20        MR. CALVIT:  282?  Sorry.  Is this going to be
21        "11"?
22        MR. CAMERON:  "11."  Yes.
23        MR. CALVIT:  That prior diagram was "10"?
24        MR. CAMERON:  Yes.
25        MR. CALVIT:  Okay.  You described "10" as the

140

1         foyer area?
2         MR. CAMERON:  Yes.
3         MR. CALVIT:  Okay.
4   Q  Get a chance to review the exhibit?
5   A  Yes, sir.
6   Q  Are you-- Have you been trained in this--this
7   policy?
8   A  Yes, sir.
9   Q  Are you familiar with the policy?
10  A  Yes, sir.
11  Q  One question I've got is the first page under
12  procedure, screening and assessment, it states, "Initial
13  screening of suicide risk will occur at all inter and intra
14  system transfers at the time of admission by a mental health
15  professional or by mental health trained personnel."  The
16  question I've got for you, at--say, at night on a weekday is
17  there a mental health professional or mental health trained
18  person on duty in booking to--to screen?
19  A  No, sir.
20  Q  Do you know what it means when it says all inter
21  or--and intra system transfers?
22  A  That's the city and DOCs.
23  Q  Okay.  So that applies to all of the inmates?
24  A  Yes, sir.
25  Q  At what point in time, say, during your typical

Gerald Hardwell
August 28, 2017

141

1  week there at Richwood would there be a mental health
2  professional or mental health trained person?
3      A   Well, we have staff over there in Substance Abuse
4  Building.
5      Q   And I'm sorry. Where at?
6      A   We have counselors over there in Substance Abuse
7  Building--
8      Q   Okay.
9      A   --that deal with mental health. Work from 8:00 to
10  4:00. They--
11      Q   Do they assist in screening inmates?
12      A   Yes, sir. Sometimes.
13      Q   Who-- Who is the person in charge over there of
14  that area?
15      A   I'll say Dr. Hanser.
16      Q   And he's-- Dr. Hanser works a forty-hour week as
17  far as you know there?
18      A   Far as I know, sir.
19      Q   Yeah. Do you know how many counselors there are
20  under his supervision?
21      A   I want to say two.
22      Q   What is the doctor's first name?
23      A   I don't know his first name.
24      Q   All right. I want to talk a little bit about
25  this--the knot you say you saw. Where exactly on the head

142

1  was--was the knot?
2      A   It was on the top of his head. I guess on the
3  right side.
4      Q   All right. Did this knot change size any?
5      A   No, sir.
6      Q   When a individual is booked into Richwood are their
7  injuries noted on any kind of a sheet, recorded anywhere?
8      A   Yes, sir.
9      Q   Have you ever done intake at Richwood?
10      A   Far as the booking system?
11      Q   Yes, sir.
12      A   Oh, no, sir.
13      Q   All right. But you're familiar with how it's done?
14      A   Yes, sir.
15      Q   And on what piece of paper or what document is that
16  injury or the apparent injuries noted?
17      A   It'll be noted on the nurse's files, on the nurse's
18  notes once they get--when they come in and see the nurse.
19      Q   All right. So if an individual is booked into
20  Richwood at night when no nurse is on duty, the nurse will
21  examine that person the next day?
22      A   Yes, sir.
23      Q   All right. I'm going to show you some photographs.
24          MR. CAMERON: I'll mark this first one as
25          "12."

143

1      Q   Now, do you recognize that as a photograph of Erie
2  Moore, Sr.?
3      A   Yes, sir.
4      Q   During the time that you had contact with Erie
5  Moore, Sr., did you see him with any of the blood that is
6  shown on him in this photograph?
7      A   No, sir.
8      Q   Let me show you another one I'll mark as "13." And
9  do you recognize that as a photograph of Erie Moore, Sr.?
10      A   Yes, sir.
11      Q   During the times you had contact with Erie Moore,
12  Sr., did you see the injury to his forehead where it looks
13  like there's an abrasion or a cut?
14      A   No, sir.
15      Q   Okay. Do you-- On this photograph do you see
16  the--the knot that you were referring to?
17      A   Yes, sir. Right here (indicating).
18      Q   Okay. It's a raised area towards the middle?
19      A   Yes, sir.
20      Q   And you're sure that's not part of his--the natural
21  head? I mean, he has some kind of unusual shape on his head.
22      A   I'm not for sure, sir.
23      Q   Okay. You notice on his head it's kind of--it has
24  a ripple on it.
25      A   Yes.

144

1      Q   There's a rippling effect, looks like.
2      A   Yes, sir.
3      Q   All right. You're sure the knot that you saw just
4  wasn't part of that ripple?
5      A   I doubt that.
6      Q   Okay. I'm going to show you "Exhibit 14."
7      A   Okay.
8      Q   Do you recognize that as being a photograph of Erie
9  Moore, Sr.?
10      A   Yes, sir.
11      Q   Did you notice the--the blood that's shown on that
12  photograph on the top of his head and on the side of his head
13  when you had contact with him?
14      A   No, sir.
15      Q   Is it your testimony that you never saw Mr. Moore
16  bleed?
17      A   No, sir. I never seen him bleed.
18      Q   And he did not-- He wasn't bleeding in your
19  presence?
20      A   No, sir.
21      Q   If he had been bleeding in your presence what
22  action, if any, would you have taken?
23      A   I would have made sure I notified the duty officer.
24      Q   Okay.
25          MR. CALVIT: Are you attaching this?

36  (Pages 141 to 144)

Gerald Hardwell

August 28, 2017

145

1    MR. CAMERON: Yes, I am. I've-- I've already
2    marked them.
3    MR. CALVIT: Okay; okay. Well, I understand
4    that.
5    COURT REPORTER: "Exhibit 14."
6    MR. CAMERON: Yeah. "12," "13" and "14."
7    Okay. Well, I'm going to--
8    MR. CALVIT: Are those-- Are those page
9    numbered or--
10   MR. CAMERON: No. They're not Bates stamped.
11   MR. CALVIT: Okay.
12   MR. CAMERON: No.
13   MR. CALVIT: Okay.
14   MR. CAMERON: And these are the ones from the
15   Ouachita Parish Sheriff's Office.
16   MR. CALVIT: Sure. I just wanted to make sure
17   that-- So it's not been previously marked or
18   identified?
19   MR. CAMERON: Un-huh (no).
20   MR. CALVIT: Okay.
21   MR. CAMERON: Well, I'm at a point where I'm
22   going to tender. Do you want to switch?
23   MR. McKEE: Go ahead.
24   MR. JACKSON: Good afternoon, Captain. My
25   name is Patrick Jackson. I represent the

146

1    White family in this lawsuit. I'm going to
2    try to do my--
3    MR. CALVIT: Do you want to moved them--
4    COURT REPORTER: Hang on a minute. Let's--
5    MR. CAMERON: Do you want to come down here
6    or--
7    MR. JACKSON: Well, sure.
8    COURT REPORTER: Yeah. That will be great.
9    Okay. I have all the mikes down there.
10   (OFF RECORD COMMENTS.)
11   MR. JACKSON: Captain Hardwell, as I said, my
12   name is Patrick Jackson. I represent the
13   White family in this lawsuit. I'm going to do
14   my best not to cover old ground, but I do need
15   to ask some specific questions in areas that
16   he's already discussed with you--
17   WITNESS: Yes, sir.
18   MR. JACKSON: --to make sure that we're clear.
19   EXAMINATION BY MR. JACKSON:
20   Q   You worked at-- Or you've worked for RCC for about
21   seven years. Is that right?
22   A   Yes, sir.
23   Q   Okay. I found a letter in your personnel file that
24   recently in 2015 you were asking to be made full-time
25   lieutenant. You were acting at one point. Is that right?

147

1    A   Yes, sir.
2    Q   Okay. I just want to make sure that this kind of
3    covers your experience. In the letter you say, "I have
4    almost five years--" This was written on January 23rd of
5    2015.
6    MR. CALVIT: Is it paginated?
7    MR. JACKSON: It is. It is RCC/Hardwell 46.
8    MR. CALVIT: Thank you.
9    Q   "I have almost five years of experience in every
10   area of the compound. I have worked booking, main building,
11   hall officer, substance abuse sergeant, work release
12   sergeant." Is that accurate?
13   A   Yes, sir.
14   Q   Okay. So earlier you told Mr. Nelson--or
15   Mr. Cameron you had not worked booking, but in this letter it
16   says you worked booking. Help me understand that.
17   A   You've got two types of booking dealing with the
18   computer system.
19   Q   Okay.
20   A   I was booking officer, the male officer.
21   Q   Tell me what you understood to be your
22   responsibilities as a booking officer when you worked them?
23   A   Just dealing with intakes, MPD, DOC intakes.
24   Q   Okay. Walk me through a complete intake as you
25   understand it--

148

1    A   Okay.
2    Q   --under RCC policies while you were the booking
3    officer.
4    A   Okay. Then first one get on the shift get in and
5    count your dorms. Depending on if you have any intakes down
6    there, I get briefed from my day shift hall officer--I mean,
7    day shift booking officer, see have those guys been stripped
8    searched or have they been put in the system or what. But if
9    not, make sure I get them in the restroom, drug test them,
10   conduct a visual body search, make sure I do an inventory on
11   their--on all their property.
12   Q   Okay. Anything else?
13   A   Make sure I get their--their state-issued mattress,
14   a blanket, two sheets, towels, soap, toothbrush, toothpaste.
15   Q   Okay.
16   A   Okay. Then I get with my shift--
17   Q   What about uniforms?
18   A   Oh, yes, sir. To get two uniforms.
19   Q   Two uniforms?
20   A   Yes, sir.
21   Q   Okay. Anything else?
22   A   That's it; that's it.
23   Q   Okay. Are-- So in this letter you also tell the
24   warden, assistant warden, and Major Tubbs that you're very
25   familiar with RCC policy. Is that true?

37   (Pages 145 to 148)

149

1    A  Yes, sir.
2    Q  Okay. So tell me what RCC policy says about--
3  during this booking process about medical screening.
4    A  Medical screening? That's usually on Mondays when
5  I--the intake comes in.
6    Q  Okay.
7    A  The inmates, they're briefed on PREA, Prison Rape
8  Elimination Act.
9    Q  Okay. Anything else?
10   A  Basically just the first things told you, drug
11  tested and--
12   Q  Okay.
13   A  --seen by medical and then we house them.
14   Q  So your understanding of the RCC policy for medical
15  screening is that they briefed on PREA and drug tested?
16   A  Yes, sir.
17   Q  Anything else?
18   A  Nothing-- Nothing I can think of.
19   Q  Are the inmates to be medically screened
20  themselves?
21   A  No, sir. By-- Seen by the nurse.
22   Q  So they're not to be medically screened or they are
23  to be medically screened by the nurse?
24   A  They are to be medically screened by the nurse.
25   Q  Okay. And when is that supposed to occur according

150

1  to policy?
2    A  Soon as they get in.
3    Q  Okay. In your preparation for this deposition
4  today did you have an opportunity to review the records on
5  intake and booking for Mr. Erie White--or Mr. Erie Moore?
6    A  No, sir.
7    Q  Okay. Did you review any of the documents with
8  regard to Mr. Vernon White?
9    A  No, sir.
10   Q  Okay. Do you remember giving a statement to the
11  Ouachita Parish Sheriff's Office shortly after the death of
12  Mr. White and Mr. Moore?
13   A  Yes, sir.
14   Q  Okay. Did you seek to tell the truth that day?
15   A  Yes, sir.
16   Q  All right. Do you remember anything that you told
17  the officers about how many Mr. Moore had been acting while
18  he was a resident at RCC?
19   A  I mean, nothing out of usual. But he was kind of
20  wild at first when he came, but he seemed to calm down at
21  times. If a point--a period of time he'll be relaxed and
22  something just ticks him off, I don't--I don't know.
23   Q  Okay. You had an opportunity to review your
24  statement?
25   A  Yes, sir.

151

1    Q  Okay. And do you remember what you told the--the
2  deputies when they were investigating the murder of
3  Mr. White?
4    A  Yes, sir.
5    Q  Okay. What did you tell them?
6    A  That-- Far as telling them about who? Vernon
7  White or--
8    Q  About Erie-- Mr. Erie Moore.
9    A  That he--at he would just--moments he would just
10  get up, stir up, and then he'll calm down, you know.
11   Q  Okay. Do you remember ever telling them that he
12  calmed down?
13   A  Yes, sir.
14   Q  Okay. Let me see if I can play this for you, Mr.--
15  Mr. Hardwell. It won't take but a second. Just a second.
16  See if this will work. I don't know if it will. We'll try.
17  All right. So--
18  (PLAYING TAPE RECORDING.)
19   Q  Is that your voice?
20   A  Uh-huh (yes).
21       MR. CALVIT:  You need to say yes or no.
22   A  Yes, sir.
23   Q  Okay.
24       MR. CALVIT:  Thank you.
25   Q  Okay. So does that refresh your memory?

152

1    A  Yes, sir.
2    Q  Okay. So would it have been fair to say your
3  memory was fresher and--and knew what happened the day that
4  you were interviewed by Ouachita or is it fresher today?
5    A  It'll be fresher when Ouachita and--
6    Q  Okay. So is it fair to say that your description
7  of Mr. Moore was that he never calmed down?
8    A  Yes, sir. That's-- That's right.
9    Q  Okay. All right. Do you know why Mr. Moore was a
10  resident at RCC in October of 2015 before you stormed in with
11  other RCC employees and discovered Vernon White lying on the
12  ground and in some form of injury? Do you know how many
13  times--
14       MR. CALVIT:  Object to the form of the
15       question. Compound.
16   Q  --Mr. Moore had been Maced at the facility?
17   A  You said did I know he had been Maced?
18   Q  Yes, sir. Do you know how many times while in
19  RCC's care Mr. Moore had been Maced?
20   A  No, sir. I don't.
21   Q  Okay. Are you aware that Mr. Moore had been placed
22  in lockdown cell #7 directly from booking?
23   A  No, sir.
24   Q  Okay. You testified earlier today that you
25  understood Mr. Moore had had a problem with the major. Is

38   (Pages 149 to 152)

153

1  that correct?
2     A  Yes, sir.
3     Q  All right. Tell me about that.
4     A  Well, really, I can't say--speak on that because I
5  got that from Loring. That's--
6     Q  Okay. What did Loring tell you?
7     A  Just that when he came in he just was a handful and
8  he didn't want to cooperate.
9     Q  Did you have an opportunity at any time, either
10  then or today, to review Mr. Moore's booking records, his--
11  his intake record?
12     A  Yes, sir. I looked over--
13         MR. CALVIT: Asked and answered.
14            (To witness): But go ahead.
15         WITNESS: Okay.
16     Q  Go ahead and tell me if you know.
17     A  Just looked over it and I seen none of the charges
18  would--would they be put on there.
19     Q  Okay. Do you know if--if Mr. Moore was Maced upon
20  booking?
21     A  No, sir. I don't.
22     Q  Okay. Did you see his booking photo?
23     A  Yes, sir.
24     Q  Okay. Do you see he's squinching his eyes?
25         MR. CALVIT: Well, you just changed the page.

154

1         MR. JACKSON: Oh, sorry. Let's see. We'll
2         get it up here big for you.
3     Q  RCC 1, do you see-- Is that Mr. Moore's
4  photograph?
5     A  Yes, sir.
6         MR. CAMERON: Let me see.
7     Q  You see it's a Richwood intake form?
8     A  Yes.
9     Q  Do you see that?
10     A  Yes, sir.
11     Q  Okay. Does it look like in his booking at least
12  he's got his eyes closed,--
13     A  Yes, sir.
14     Q  --his mouth closed?
15         MR. CALVIT: Why don't you pull it-- You've
16         just got the top of his forehead.
17         MR. JACKSON: Sorry.
18     Q  Can you see that?
19     A  Yes, sir.
20     Q  Do you know whether he was Maced upon entry to the
21  facility?
22     A  No, sir. I don't.
23     Q  Do you know if that's why he wasn't issued two
24  uniforms and sent directly to lockdown cell #7?
25     A  No, sir. I don't.

155

1     Q  Okay. When you came on shift the night of the 12th
2  what kind of handoff did you do with-- Were you on D team or
3  B team?
4     A  I was on D team.
5     Q  Okay. What handoff did you do with the preceding
6  team?
7         By that-- What you mean by that?
8     Q  Well, did you talk to the other lieutenant in
9  charge?
10     A  Yes, sir.
11     Q  Okay. And what did he tell you about the day's
12  events involving the unit you were about to take over?
13     A  He just-- Basically, he just was talking about
14  Erie Moore and--
15     Q  What did he tell you about Mr. Moore?
16     A  Just--
17         MR. CAMERON: Now, we're talking about October
18         the 12th?
19         MR. JACKSON: Yes.
20         MR. CAMERON: Okay.
21     A  Just saying just keep a close eye on him and that
22  they weren't able to book him in because he came in acting
23  volatile.
24     Q  Okay. Did you happen to see his intake form, all
25  the questions that were asked of him?

156

1     A  No, sir.
2     Q  Okay. Do you know if he participated in any of
3  that process?
4     A  No, sir. I don't.
5     Q  Okay. Tell me what types of-- So you worked in--
6  in booking when you were a CO. Correct?
7     A  Yes, sir.
8     Q  All right. What do you understand the purpose of
9  booking? Why are you talking to inmates and finding out
10  about them?
11     A  Well, I don't have-- I don't ask them all the
12  questions. The booking officer, she does.
13     Q  Okay. Have you ever acted as a booking officer?
14     A  No, sir.
15     Q  Do you know the policies-- Or do you have any
16  booking officers that work under you now as a Captain?
17     A  Yes, sir.
18     Q  Okay. Is it your responsibility to know the
19  policies that apply to all of your subordinates?
20     A  No, sir.
21     Q  It's not?
22     A  Booking lieutenants.
23     Q  Okay. So lieutenants work for you?
24     A  Yes, sir.
25     Q  And lieutenants are supposed to know what your

39  (Pages 153 to 156)

157

```
 1  subordinates are to do, but not you?
 2     A  Yes, sir.
 3     Q  Okay.  Is that RCC policy, for your subordinates to
 4  know the policy, but not the superiors?
 5     A  I couldn't recall if I do.
 6     Q  Have you received any training on any of the
 7  policies at RCC other than what you've told us about?
 8     A  Basically whatever I told y'all.
 9     Q  Okay.  You talked about training month February.
10     A  Yes, sir.
11     Q  Is that correct?
12     A  Uh-huh (yes).
13     Q  And you told us that y'all would take forty hours.
14  Is that right?
15     A  Yes, sir.
16     Q  Okay.  Tell me how that works.
17     A  Basically it's just a yearly training dealing with
18  PREA, use of force, and also suicide prevention.
19     Q  Okay.  Is it in a classroom setting?
20     A  Yes, sir.
21     Q  Okay.  Where do y'all go--
22     A  Multi- --
23     Q  --physically?
24     A  The multipurpose building.
25     Q  Multipurpose building.  Are you paid to attend that
```

158

```
 1  training?
 2     A  Sir?
 3     Q  Are you paid to attend that training?
 4     A  No, sir.
 5     Q  You attend the training for free?
 6     A  Most areas are through administration.
 7     Q  I don't understand.  Help me.  You're either paid
 8  or you're not.
 9     A  I'm-- I mean, we are getting paid to go.  So--
10     Q  Okay.  So you do get paid to train?
11     A  Yes, sir.
12     Q  Okay.  And do they have a separate training week
13  for you to come in and train, or are you also required to do
14  your daily shift while you're in that forty fours of
15  training?
16     A  A separate training week.
17     Q  Okay.  Training week.  So y'all have a schedule of
18  just training where the entire shift goes to forty hours of
19  training week?
20     A  Yes, sir.
21     Q  Okay.  And how do y'all work the--the work
22  requirements to get the entire facility-- Do you have
23  multiple forty week--forty-hour week training events?
24     A  Whenever somebody--it's time for somebody to go to
25  training.  You know, because everybody don't have to go right
```

159

```
 1  then and there.  It's-- It's just a certain week whenever
 2  they're training.  When it's time for their training, when
 3  their two years have run out, their one year or two years
 4  runs out, it's time for them to go back to training.
 5     Q  Okay.  Tell me about the one year and two years.
 6     A  Well,-- Well, the two years, they've got to go
 7  during that week to get recertified for their CPR training.
 8     Q  Okay.  And who does that training for you?
 9     A  Back then it was Captain Tommy Foreman.
10     Q  And when you say "back then," what do you mean?
11     A  While he was here.
12     Q  Okay.
13     A  He's no longer employed there.
14     Q  And when y'all go to training do y'all have sign-in
15  sheets?
16     A  Yes, sir.
17     Q  Okay.  And do you sign in for every class that you
18  attend?
19     A  Yes, sir.
20     Q  Okay.  And is there ever a time that you go to
21  training where there isn't a sign-in sheet?
22     A  No, sir.  Not to my knowledge.
23     Q  Okay.  Did you have an opportunity to look at your
24  personal personnel file before you came today?
25     A  No, sir.
```

160

```
 1     Q  Okay.  Did you have training in February 2017?
 2     A  No-- Yes, sir; yes, sir.  I did.
 3     Q  You did?  Okay.  What training did you receive?
 4     A  Use of force.
 5     Q  Okay.  Who did that for you?
 6     A  Warden Turner.
 7     Q  Okay.  How long did that class last?
 8     A  I'd say around about two--almost three hours.
 9     Q  Three hours?  Okay.  Do you remember when you did
10  it?
11     A  No, sir.  I don't.
12     Q  Okay.  Was it in February of 2017?
13     A  Yes, sir.
14     Q  How many people were in your class?
15     A  I couldn't-- I couldn't tell you that.
16     Q  Were you by yourself?
17     A  No, sir.  I wasn't.
18     Q  Okay.  Did you have to arrange for training for
19  your subordinates?
20     A  No, sir.
21     Q  Okay.  Are you still on-- As a captain are you
22  still assigned to a team?
23     A  I'm five days a week now.
24     Q  Okay.  So you have to ensure that those
25  subordinates under you receive training.  Correct?
```

40  (Pages 157 to 160)

Gerald Hardwell
August 28, 2017

161

1    A   Yes, sir.
2    Q   So who's in charge of ensuring that every man or
3    woman on a shift goes to required training?
4    A   Myself, along with the major.
5    Q   Okay.
6        MR. CALVIT:  Did he say-- I'm sorry.  What
7        kind of major?
8        COURT REPORTER:  "Myself, along with--with the
9        major."
10       MR. CALVIT:  Along with?  Okay.  I'm-- Thank
11       you.
12   Q   Okay.  So you attended a three-hour course sometime
13   in February of 2017?
14   A   Yes, sir.
15   Q   What other courses in the rest of the thirty-seven
16   hours that you trained in February you told us about did you
17   attend?
18   A   We have the use of force.
19   Q   Okay.  You told us about that.
20   A   Okay.  And you've got your POST training class.
21   Q   Okay.  POST training class.
22   A   Yes, sir.
23   Q   Tell me about that.
24   A   That's for the new hires.
25   Q   Okay.  So is it your understanding that in your

162

1    forty hours that's done every February that POST is going to
2    be providing new hires--
3    A   Yes, sir.
4    Q   --that forty hours of training?
5    A   Yes, sir.
6    Q   Okay.  So POST is Peace Officer Standards and
7    Training?
8    A   Yes, sir.
9    Q   Okay.  And did you attend the POST certified
10   academy?
11   A   Yeah.  Back when it was CCA.  Yes, sir.
12   Q   Okay.  So who does your POST training now for RCC?
13   A   Right now I-- Not that I know of.  Nobody.  Well,
14   we have somebody, but they're not at RCC.
15   Q   Okay.  So let's just talk about the forty hours of
16   training that RCC provides you.
17   A   Okay.
18   Q   All right.  So other than the three-hour course for
19   use of force what other training did you attend?
20   A   I attended suicide prevention.
21   Q   Okay.  How long did that class last?
22   A   I'd say about four hours.
23   Q   Okay.  All right.  So we've got thirty-- We've got
24   seven hours.
25   A   Okay.

163

1    Q   Now, about the other thirty-three?
2    A   Okay.  But on that POST training, that lasts all
3    day for those--those people that are--
4    Q   Okay.
5        MR. CALVIT:  He's talking about you.
6        WITNESS:  Oh, me?
7        MR. CALVIT:  Don't worry about anyone else--
8        WITNESS:  Okay.
9        MR. JACKSON:  Yes, sir.
10       MR. CALVIT:  --right now.  I'm sorry.  Am I
11       misconstruing--
12       MR. JACKSON:  No.  That's fine.
13       WITNESS:  Okay.
14       MR. CALVIT:  Yeah.
15       WITNESS:  Okay.
16   A   And for me?
17   Q   Yes, sir.
18   A   Got the suicide, got the use of force.
19   Q   And you told us about PREA.  Is that another one?
20   A   Yeah.  About PREA.
21   Q   Okay.
22   A   Yeah.  PREA--
23   Q   How long does that class last?
24   A   PREA is also four hours.
25   Q   Okay.  So now we're to twenty-nine hours.  What's--

164

1    A   Yes, sir.
2    Q   What's-- Where's the other twenty-nine hours?
3    A   I mean, those are the only classes I had to take,
4    you know.
5    Q   Okay.  So you took forty hours of training and
6    those--
7    A   Yes, sir.  That--
8    Q   You have those--those classes?
9        MR. CALVIT:  Just listen to his question.
10       WITNESS:  Okay.
11   Q   All right.  So what I'm trying to understand is,
12   one, did you have any sign-in sheet or did you have sign-in
13   sheets for all those classes you attended?
14   A   Yeah.
15   Q   Is that--
16   A   Yes, sir.
17   Q   Okay.  And you did;--
18   A   Yes, sir.
19   Q   --is that correct?  Okay.  And more than you were
20   in that class on those days.  Right?
21   A   Yes, sir.
22   Q   Okay.  Sometime this year, in February of 2017.  Is
23   that true?
24   A   Yes, sir.
25   Q   Okay.  And you told us about all the classes that

41  (Pages 161 to 164)

Gerald Hardwell
August 28, 2017

165

1  you attended. Did you attend any other training--
2      A   No.
3      Q   --in February of 2017?
4      A   That's it.
5      Q   Okay. So it sounds like it's about eleven hours of
6  training.
7      A   Okay.
8      Q   Does that sound about right?
9      A   Yes, sir.
10     Q   Okay. Now, how do you go about ensuring that your
11 subordinates receive that same training?
12     A   Got-- That's on up, from the major on up.
13     Q   So the major's responsibility is to ensure that
14 everyone is trained?
15     A   Yes, sir. We just notify everybody.
16     Q   Okay. So in looking through your personnel record
17 I can only find one sign-in sheet in 2015 and--in February,
18 and one sign-in sheet in March of 2015. None for 2016, none
19 for 2017, none for 2014. Do you-- Would those just be
20 missing or do they exist? Can you help me understand that?
21     A   I mean, I couldn't tell you because I'm not in
22 administration.
23     Q   Okay. But you signed a sheet?
24     A   Yes, sir.
25     Q   All right. And if I don't have them, then

166

1  administration has them?
2      A   Yes, sir.
3      Q   Okay. But you're sure you did training in 2017
4  and--
5      A   Yes.
6      Q   --2016--
7      A   Yes, sir.
8      Q   --and 2014?
9      A   Yes, sir.
10     Q   Okay. And that would be reflected on your payroll?
11     A   Yes, sir.
12     Q   All right. So when you do training on those eleven
13 hours, if it's a three-hour or four-hour block, do you take
14 off that day and just go to training or are you working half
15 a day and half a day of training?
16     A   Say that again.
17     Q   So you told us about classes that were three and
18 four hours. Are they stacked together where you just go to
19 training and get that eleven hours knocked out, or are you
20 getting a three-hour class today, a four-hour class in two
21 weeks?
22     A   More than likely it would be on the day that I'm
23 off.
24     Q   Okay. So do you get paid overtime?
25     A   Right now? As of right now?

167

1      Q   Well, I'm saying when you come--
2      A   Oh.
3      Q   --in for training.
4      A   No, sir. I'm on salary.
5      Q   Okay. So what about when you were a CO?
6      A   Overtime.
7      Q   Okay. So in 2016 were you a lieutenant?
8      A   Yes, sir.
9      Q   Were you on salary?
10     A   Yes, sir.
11     Q   Okay. So you didn't get paid any extra to go to--
12     A   No, sir.
13     Q   Okay. And your subordinates the same?
14     A   For COs?
15     Q   Right.
16     A   COs and sergeants. Yes, sir.
17     Q   And how do you code them for roll call whenever
18 they come in for training only?
19     A   What you mean, "code them"?
20     Q   Okay. So I've seen throughout your personnel file
21 a lot of times where you were written up for not making roll
22 call. Tell me what that is?
23     A   When you're coming to work late.
24     Q   Okay.
25     A   Or just late for roll call on that morning.

168

1      Q   So when you send subordinates to training are they
2  attached to a training department or do you still have to
3  ensure that they're there on time?
4      A   Still have to ensure that they're on time.
5      Q   Okay. So do you conduct a roll call even if
6  they're going to training?
7      A   As of right now-- I didn't, but you know, whoever
8  was doing training back then, they did it.
9      Q   Okay. So in 2017 who was doing training for RCC
10 that you attended other than the warden that you told me
11 about?
12     A   I'm going to say it was Major Tubbs at that time.
13     Q   Okay. All right. Other than the eleven hours of
14 training that--that you've told me about, and then the POST
15 certification training for corrections officers that your
16 office doesn't provide, but somebody provides,--
17     A   Yes, sir.
18     Q   --what other training do you do?
19     A   That's basically it.
20     Q   Okay. With regard to your subordinates as a
21 captain, do you have the power to hire and fire?
22     A   No, sir.
23     Q   Okay. Do you have the power to write up?
24     A   Yes, sir.
25     Q   Do you have the power to discipline?

42  (Pages 165 to 168)

Gerald Hardwell

August 28, 2017

169

1     A   As it-- Just explain what you mean by
2   "discipline."
3     Q   Well, I noticed a number of opportunities RCC, when
4   they're disciplining employees, will deduct pay or give
5   people time off.  Do you have that authority as a captain?
6     A   No, sir.
7     Q   All right. I'm going to hand you a piece of paper,
8   Captain.  And I want you to as best you can draw me the
9   organizational chart for your chain of command that existed
10  in 2015, starting from the warden and working down to where
11  you were as lieutenant in-- In team B, is it?
12    A   I was on D team.
13    Q   On team D. okay?
14    A   Uh-huh (yes); uh-huh (yes).
15  (WITNESS COMPLIES.)
16            MR. CALVIT:  Are you saying Delta?
17            MR. JACKSON:  Delta.
18            MR. CALVIT:  Thank you.
19            MR. JACKSON:  I'm going to mark this as
20            "Exhibit 15."  Make sure we--
21            MR. CALVIT:  May I see it, please?
22            MR. JACKSON:  Yes, sir.
23    Q   Okay. So let me make sure I-- Let me make sure I
24  understand.  So at the top you have Warden Hanson?
25    A   Yes, sir.

170

1     Q   Okay.  And then is Warden Turner an assistant
2   warden or is he the warden?
3     A   Assistant warden.
4     Q   Okay.  And Aultman is an assistant warden?
5     A   Yes, sir.
6     Q   Okay.  So they are subordinate to Warden Hanson?
7     A   Yes, sir.
8     Q   Okay.  At that time.  And so we're saying this was
9   in effect in October of 2015.  Correct?
10    A   Yes, sir.
11    Q   All right.  And then under those three gentlemen
12  you have Major Tubbs.
13    A   Yes, sir.
14    Q   And help me if you can.  What did Major Tubbs do
15  for the organization?
16    A   You say what he does?
17    Q   Say again?
18    A   What--
19            MR. CALVIT:  I think he was asking in 2015.
20    A   Oh, what he do?
21    Q   Yeah. 2015. Yeah.
22    A   Back then hire.  Hire and fire.
23    Q   Okay. So was-- Warden Hanson, Warden Turner,
24  Warden Aultman, were they just weekday guys?  They worked a
25  salary, forty hours a week, or were they there on the shift

171

1   work, as well?
2     A   I mean, it all depends on the day the week they
3   guys are--
4     Q   Okay. So, I mean, unless some--there was a
5   problem, those gentlemen were there forty hours a week during
6   the week?
7     A   Yes, sir.
8     Q   Okay.  What about Major Tubbs?  Was he a weekday
9   guy?
10    A   Yes, sir.
11    Q   Okay. Captain Coleman and Captain Farmer [sic],
12  what roles did those individuals serve at RCC?
13    A   Captain Coleman, he was over, I want to say, A and
14  C team.  And Foreman, he was over B and--B and D team.
15    Q   Okay.  Were those-- Were those gentlemen there on
16  the shift?
17    A   Yes, sir.
18    Q   Okay. So they were twenty- -- One of those guys
19  were twenty-four/seven (24/7)?
20    A   Yes ,sir.
21    Q   All right. Shift lieutenants.
22    A   Yes, sir.
23    Q   What was their responsibility?
24    A   Maintain and running the shift.
25    Q   All right. So were they there for--to ensure roll

172

1   call?
2     A   Yes, sir.
3     Q   Okay. Now, who managed booking and intake and
4   those things?
5     A   Booking officers.
6     Q   Okay. So would that fall within the shift
7   lieutenants?
8     A   Yes, sir.
9     Q   All right. So if somebody was booked during one of
10  their shifts, those booking officers would work for that
11  shift lieutenant?
12    A   Yes, sir.
13    Q   And a shift lieutenant would either work for
14  Captain Coleman or Captain Farmer [sic]?
15    A   Yes, sir.
16    Q   All right. And are those two captains reporting to
17  Major Tubbs or are they reporting to one of the assistant
18  wardens?
19    A   Major Tubbs.
20    Q   All right. And then Major Tubbs would report to
21  the assistant wardens?
22    A   Yes, sir.
23    Q   All right. The shift sergeant.  So many shift
24  lieutenants were on each shift?
25    A   You've one lieutenant per shift.

43  (Pages 169 to 172)

173

1   Q   Okay. And what about sergeants?
2   A   You have three sergeants per shift.
3   Q   Per shift. Okay. Corporals?
4   A   Just all depends who made corporal.
5   Q   All right.
6   A   But we also have one corporal per shift, though.
7   Q   And then COs. How many per shift?
8   A   We have maybe thirteen COs.
9   Q   Okay.
10  A   Yes, sir.
11  Q   Per shift?
12  A   Depend on-- Day shift, run day shift with twenty.
13  Night shift, run night shift with eighteen.
14  Q   Okay. What do you call essential personnel? Have
15  you ever heard that term used at RCC?
16  A   No, sir. What you mean by "essential"?
17  Q   Okay. Have you ever filled out any documents for
18  RCC, some of the required documents that identify certain
19  positions on a shift as essential and other positions as
20  nonessential?
21  A   Essential.
22  Q   Have you ever heard that term?
23  A   No, sir.
24  Q   Okay. So as a shift lieutenant on team D how many
25  individuals did you need to do your job everyday?

174

1   A   I need seventeen.
2   Q   Seventeen?
3   A   Including myself would be eighteen.
4   Q   Okay. And how do you come up with that number?
5   A   That's Richwood policy.
6   Q   Okay. So if one shift had, say, eighteen essential
7   personnel--
8   A   Yes, sir.
9   Q   --and another shift covering the same area had
10  twenty, what would be the difference? Just day and night
11  shifts?
12  A   Yes, sir.
13  Q   Okay. So you know what I'm talking about now--
14  A   Yes, sir.
15  Q   --when I say seventeen or eighteen?
16  A   Yes, sir.
17  Q   Do you know on the date of October 12th how many
18  people you had at your disposal?
19  A   I can't recall how many I had.
20  Q   Okay. Do you know if you were shorthanded?
21  A   No, sir. I don't think I was.
22  Q   Okay. Do you know if you had reported to anyone
23  that you were shorthanded that day?
24  A   No, sir.
25  Q   Okay. And if your-- If the documents reflect you

175

1   only had sixteen essential personnel on that day, would that
2   have been a normal situation if you needed seventeen, plus
3   yourself making eighteen, or do you know?
4   A   No. I don't know.
5   Q   Okay. What happens for a shift lieutenant when
6   they're shorthanded? What do you do to remedy that
7   situation?
8   A   Shorthanded? If I know I'm going shorthanded--
9   Well, how many are we talking we short?
10  Q   Well, that's what I'm asking you. So how many--
11  A   Okay.
12  Q   --do you have to have in order to run your shift in
13  October of 2015?
14  A   Had to have eighteen.
15  Q   Okay. So if you didn't have eighteen what were you
16  to do?
17  A   Try to call and get somebody in to come work.
18  Q   Okay. Do you know if on the day that--on October
19  12th, 2015, if you had to make any such calls?
20  A   I can't recall.
21  Q   Okay. Would you have filled out any paperwork had
22  you made a request for additional support on that day?
23  A   Yes, sir. Overtime sheet.
24  Q   Okay. So if there's no overtime sheet and no other
25  documents reflecting any requests by you, would it be fair to

176

1   assume that you felt you had enough personnel on the ground
2   that day to do your job?
3   A   Yes, sir.
4   Q   Okay. Do you have-- With regard to Mr. Moore,
5   you've told me about--or we heard what you said to the--the
6   sheriff's deputies around his interaction at RCC. Are you
7   aware of him having any other--any other inmates in lockdown
8   cell #7 with him other than Vernon White?
9   A   Not that I can recall, I don't.
10  Q   Okay. Have you ever heard the name Roosevelt
11  Brooks?
12  A   No, sir.
13  Q   Okay. Do you know whether or not Mr. Moore had an
14  altercation with Mr. Brooks about twenty-four hours before
15  his first altercation with Mr. White?
16  A   Not that I know of.
17  Q   Okay. Do you know if he was gassed as a result of
18  that?
19  A   No, sir. I don't know.
20  Q   Do you know-- Do you know if Mr. Brooks was
21  removed from lockdown cell #7 as a result of Mr. Moore's
22  behavior?
23  A   No, sir.
24  Q   Okay. Now,--
25      MR. CAMERON: Are we talking gas or are we

44   (Pages 173 to 176)

177

```
1        talking Mace?
2            MR. JACKSON: Maced.
3            MR. CAMERON: Okay.
4    Q   Yeah. When I say gassed, I mean Maced.
5    A   Okay.
6    Q   Okay. So you're not aware of that?
7    A   No, sir.
8    Q   Okay. Were you involved in-- Did you know that
9    Mr. White and Mr. Moore had two altercations?
10   A   Not in-- Talking about the day the incident
11   happened?
12   Q   Yes, sir.
13   A   Not until they investigated that film. That was
14   it.
15   Q   Okay. Did you ever learn that some RCC employees
16   had to intervene between Mr. Moore and Mr. White and had to
17   gas Mr. Moore earlier that day around 7:00 in the morning,
18   6:00 in the morning?
19   A   No, sir.
20   Q   Okay. Did you ever become aware of that?
21   A   No, sir.
22   Q   Okay. Did you ever speak to any of your
23   subordinates about why they would have placed Mr. Moore and
24   Mr. White back in a cell together after that occurred?
25   A   Oh, no, sir.
```

178

```
1    Q   Okay. Did you ever do any internal review with
2    your subordinates about what went on in your shift that day?
3    A   Talking about the night shift?
4    Q   Yes, sir.
5    A   That would be that next roll call day, you know.
6    But pretty much everybody kind of knew what went on.
7            MR. CALVIT: Just answer the question.
8    A   No, sir. I don't know.
9            MR. CALVIT: He asked you a specific question.
10           WITNESS: Okay.
11           MR. CALVIT: Answer that.
12   Q   So did you have any kind of-- We call it in the
13   military after-action review. Did you meet with your
14   personnel or with your seniors to discuss what went right,
15   what went wrong or anything about the--
16   A   Yes, sir.
17   Q   Tell me about that.
18   A   Like far as the--you know, just the warden and
19   them, you know. Just to make sure we got all the stuff
20   together, you know, and our reports, gather all of our
21   reports. That way we can get them turned in.
22   Q   Okay. Tell me what your typical order of march is
23   on filling out incident reports with inmates. Do you do it
24   at the end of the shift, do you do it during the shift? How
25   do you normally do it?
```

179

```
1    A   I try to do it during the shift, soon as we get
2    everything calmed down.
3    Q   Okay. And tell me what kind of recordkeeping
4    system were using in October of 2015 at RCC.
5    A   UORs.
6    Q   Okay. And does it require you as the individual
7    user to log into it to type out forms?
8    A   Yes, sir.
9    Q   Okay. And does it date stamp those--those entries?
10   A   Date stamp? What you mean by that?
11   Q   That means-- So do you have to log in to get to a
12   particular form?
13   A   Yes, sir.
14   Q   Okay. And when you fill it out a lot of forms are
15   hand signed and hand dated and timed. Is there some
16   electronic recordkeeping system that--that shows when you sat
17   down to draft those documents?
18   A   Yes, sir.
19   Q   Okay. Do you recall when you sat down to fill out
20   documents related to the White and Moore investigation? Was
21   it the night that everybody left or was it the next day? Or
22   tell me how that went.
23   A   Right after Ouachita Parish had left.
24   Q   Okay.
25   A   That night.
```

180

```
1    Q   All right. So I want to make sure I understand.
2    You went through a time line with Mr. Cameron about when
3    Mr. Moore was moved into the foyer and y'all were waiting on
4    Ouachita Parish. Ouachita Parish actually came to RCC twice.
5    Is that correct?
6    A   The only time I seen them was that first time, when
7    they came and picked up Mr. Moore.
8    Q   Okay. So there was a group from the Ouachita
9    Parish Sheriff's Office coming to transport Mr. Moore to
10   another facility. Correct?
11   A   Yes, sir. Take him next-door to they--to they
12   office.
13   Q   Okay. And then there was a set of investigators
14   from Ouachita Parish that came--
15   A   Yes, sir.
16   Q   --to the facility. Right?
17   A   Yes, sir.
18   Q   And those folks were not working together?
19   A   No, sir.
20   Q   Okay. Did you have an opportunity to speak with
21   those transport sheriff's deputies about Mr. Moore?
22   A   They didn't-- Somewhat. Yes, sir. I had a chance
23   to speak with them.
24   Q   Okay. Did you give a statement to them?
25   A   No, sir.
```

45  (Pages 177 to 180)

181

```
 1   Q   Okay.  Did you see them when they first arrived?
 2   A   Which ones?  The first ones?
 3   Q   The ones that were going to transport Mr. Moore.
 4   A   Yes, sir.
 5   Q   Okay.  And do you recall what they told you about
 6  being willing to transport Mr. Moore?
 7   A   No, sir.  I can't.
 8   Q   Okay.  Do you recall seeing any paper-- Or do you
 9  recall any incident where they refused to transport Mr.--
10  Mr. Moore because of his medical condition?
11   A   No, sir.
12   Q   Do you know if they asked that he be taken to a
13  medical facility instead of coming to their facility?
14   A   No, sir.  I don't.
15   Q   Okay.  So when you interacted with them tell me all
16  that you remember about your discussions with the Ouachita
17  Parish Sheriff's Office about transporting Mr. Moore from RCC
18  to another facility.
19   A   I want to say when they first came back there they
20  placed they own restraints on him and, you know, they tried
21  to get him to stand up and he--he wouldn't.  So, you know, we
22  assisted them with placing him in the car.
23          MR. CAMERON:  Object to the response.  But go
24      ahead.
25   Q   And-- And do you recall whether or not Mr. Moore
```

182

```
 1  ever was conscious in any way in front of the Ouachita Parish
 2  Sheriff's deputies?
 3   A   Yes, sir.  I do.
 4   Q   Okay.  And was he or was he not?
 5   A   He was.
 6   Q   Okay.  If their communication were to say
 7  differently what would you say about that?
 8   A   Far as they saying that he wasn't--if they saying
 9  he wasn't?
10   Q   That's correct.
11   A   That would be a lie.
12   Q   Okay.  So you don't recall there being any
13  discussion between you and the transporting officers that
14  they weren't going to take him anywhere because of his
15  medical condition, and that he needed to be seen by medical
16  personnel immediately?
17   A   No, sir.  I can't recall that.
18   Q   You don't recall that?
19   A   No, I can't.
20   Q   All right.  All right.  In your position as shift
21  lieutenant of--of D, did you have the ability to write
22  individuals up?
23   A   For--
24   Q   For--
25          MR. CALVIT:  Object to the form of the
```

183

```
 1      questions.
 2          MR. JACKSON:  Sure.
 3          MR. CALVIT:  Employees or inmates or both?
 4   Q   I'm talking about employees.
 5   A   Yes, sir.
 6   Q   Okay.  Did you have the ability to seek their
 7  termination?
 8   A   No, sir.
 9   Q   Okay.  What about did RCC have any kind of
10  progressive discipline policy at that time?  What I mean by
11  that is if you're written up one, two, three, four times or
12  the type of offenses are in a category of major or minor you
13  get automatically terminated.  Was there any kind of
14  progressive discipline policy that you're aware of?
15   A   Yes, sir.
16   Q   Tell me about that.
17   A   Just as far as if you go outside that policy, you
18  know, just certain termination, you know.
19   Q   So what-- As a shift lieutenant what tools were
20  available to you to ensure that your subordinates did what
21  you asked them do and follow RCC policy?
22   A   What-- What you mean by "tools"?
23   Q   Well, you have the ability to write them up.
24  Correct?
25   A   Yes, sir.
```

184

```
 1   Q   Okay.  You have the ability to verbal counsel them.
 2  Right?
 3   A   Okay.
 4   Q   Is that--
 5          MR. CALVIT:  You need to say yes or no.
 6   A   Yes, sir.
 7   Q   Okay.  Did you have the ability to speak to your
 8  supervisor about their performance?
 9   A   I can't recall.
10          MR. CALVIT:  He's not asking if you did.
11      WITNESS:  Okay; okay.
12          MR. CALVIT:  He's asking if you believed you
13      could or you had the ability to.
14   A   Yes, sir.
15   Q   And could you seek their termination if you felt
16  like they weren't complying with RCC policies and guidelines?
17   A   No, sir.
18   Q   Okay.  Could you have asked your supervisor to
19  terminate them for failure to follow guidelines and policies?
20   A   Yes, sir.
21   Q   Okay.  As a shift lieutenant did you ever write
22  anyone up?
23   A   Yes, sir.
24   Q   Okay.  And for what types of infractions?
25   A   Not being on they drop.
```

46  (Pages 181 to 184)

185

1   Q  Not being on their drop?
2   A  Yes, sir.
3   Q  Tell me what that means.
4   A  When you're supposed on be A hall and you're down
5   in booking.
6   Q  Okay. So they're out of position?
7   A  Yes, sir.
8   Q  So not doing their job?
9   A  Yes, sir.
10  Q  All right. What else?
11  A  Depending on how many times they've been late for
12  work.
13  Q  Okay. So late for work. What else?
14  A  Bringing in contraband.
15  Q  Did you ever witness that or discover that?
16  A  Yes, sir.
17  Q  Okay. In what regard?
18  A  What you mean by that?
19  Q  Who did you catch and when did you catch them and
20  what--what were they bringing in?
21  A  It was two phones, and I can't-- I don't remember
22  her name.
23  Q  Did she get fired?
24  A  Yes, sir.
25  Q  Did you tell on her?

187

1   A  I mean, nothing to my knowledge. I-- I mean, I--
2   I didn't have anything to do with--
3       MR. CALVIT: He's asking what--what somebody
4       told you. It's okay. You can say that.
5       WITNESS: Oh. Okay.
6   A  Loring had told me about it.
7   Q  Okay. What did Loring tell you?
8   A  Just that they had got terminated.
9   Q  Do you know if Loring was offered the opportunity
10  to resign as opposed to being terminated?
11  A  No, I don't. No, sir.
12  Q  What did he say he got terminated for?
13  A  The incident that happened down in that foyer.
14  Q  And what did he tell you was the incident?
15  A  Supposedly some guys had got Maced.
16  Q  Did he say it happened or it didn't happen?
17  A  He say it didn't happen.
18  Q  Okay. Did he tell you he filled out documents to
19  that effect, that it did not happen?
20  A  No, sir. He didn't.
21  Q  Okay. What else did he tell you?
22  A  That's mainly it.
23  Q  Okay. What else besides mainly? Do you remember
24  any other specifics of anything he told you about why he got
25  terminated?

186

1   A  Huh? Sir?
2   Q  Did you tell on her?
3   A  Yes, sir.
4   Q  Okay. You don't remember her name?
5   A  No, sir. I don't.
6   Q  Okay. Were you aware of the Rosenthal and the
7   Loring event in 2016?
8   A  Yes, sir.
9   Q  Tell me about that.
10  A  Well, I wasn't present at the time, but, you
11  know,--
12  Q  What do you understand happened?
13  A  All I heard was guys had got Maced.
14  Q  Okay. Did you hear about certain employees at RCC
15  attempting to cover up--
16  A  No, sir.
17  Q  --that fact? You never heard that?
18  A  No, sir.
19  Q  Okay. Did you hear that they falsified documents
20  related to that?
21  A  No, sir.
22  Q  Okay. Why do you understand they got fired?
23  A  I guess the investigation that-- I don't-- I
24  didn't have anything to do with that.
25  Q  Okay. What do-- What do you understand occurred?

188

1   A  No, sir.
2   Q  Okay. Did you speak to Rosenthal about it?
3   A  No, sir.
4   Q  Okay. Do you know Rosenthal outside of work?
5   A  Yes, sir.
6   Q  Okay. Where do you see him?
7   A  Well, it's been a minute. Only time I used to see
8   him was when he worked on my car. That was it. One time.
9   Q  Did he work on your car for you?
10  A  Yes, sir.
11  Q  Okay. How long ago was that?
12  A  About four years ago.
13  Q  As a result of the Rosenthal/Loring issue and the
14  termination were certain policies at RCC taken or changed
15  with regard to the use of Mace?
16  A  Yes, sir.
17  Q  Okay. Tell me about the change.
18  A  Keep-- Make sure we keep the Mace up there in the
19  armory.
20  Q  Okay. Prior to this event in 2016 the shift
21  lieutenants had Mace on them at all times. Right?
22  A  Yes, sir.
23  Q  Okay. Who else besides the shift lieutenants had
24  Mace prior to 2016?
25  A  The sergeants.

47  (Pages. 185 to 188)

Gerald Hardwell
August 28, 2017

189

1   Q   Okay. As a shift lieutenant then and as a captain
2   now, I'm talking about 2015 time frame, what documentation
3   was required of your subordinates when you utilized Mace?
4   A   When we had to use it?
5   Q   Yes, sir.
6   A   It had to be a UOR done, along with a--
7   Q   A UR?
8   A   UOR done.
9   Q   Okay. And that's an unusual occurrence report?
10  A   Yes, sir.
11  Q   All right. What else?
12  A   A disciplinary form.
13  Q   Okay. And that's an internal inmate document.
14  Correct?
15  A   Yes. Yes, sir.
16  Q   Okay. And-- All right. A disciplinary form.
17  What else?
18  A   And they go see the nurse. They get reviewed by
19  the nurse.
20  Q   So a med---
21      MR. CALVIT:  When you say "they," who are you
22      speaking of?
23      WITNESS:  I mean-- I'm saying the inmate get
24      a review by--
25      MR. CALVIT:  Sorry about that.

190

1       MR. JACKSON:  That's okay.
2       WITNESS:  I'm sorry.
3   Q   So there's a medical document created;--
4   A   Yes, sir.
5   Q   --correct? So a--an unusual occurrence report, a
6   disciplinary report and a medical document?
7   A   Yes, sir.
8   Q   What else?
9   A   And a-- And a use of force form.
10  Q   Use of force. So that's for each and every time
11  Mace is used on an inmate there should be at least four
12  documents created?
13  A   Yes, sir.
14  Q   Okay. Who does the unusual occurrence report go
15  to?
16  A   Goes towards the major.
17  Q   Okay. And how much time does RCC policy give the
18  shift lieutenant or the sergeant-- So I assume-- Let me ask
19  this. Who is responsible to complete the UR--UOR form?
20  A   The lieutenant.
21  Q   Okay. How much time does policy give you at RCC in
22  2015 to complete the--the UOR form?
23  A   Seventy-two hours.
24  Q   Seventy-two hours. And it goes to the major?
25  A   Yes, sir.

191

1   Q   All right. Then the disciplinary report,--
2   A   Yes.
3   Q   --who completes that?
4   A   The lieutenant.
5   Q   Okay. So the lieutenant conducts the witness
6   interviews. If the lieutenant didn't spray the Mace--
7   A   Yes, sir.
8   Q   --and it was the sergeant, he would conduct the
9   interviews of the sergeant. Correct?
10  A   What you mean by that?
11  Q   So if the sergeant used the--the Mace,--
12  A   Okay.
13  Q   The lieutenant did not. Okay?
14  A   Okay.
15  Q   So I'm assuming if the lieutenant has to fill out
16  the disciplinary form, he has to find out what happened.
17  A   No, sir. That sergeant is going to write that
18  disciplinary,--
19  Q   Okay.
20  A   --type his own disciplinary.
21  Q   All right. So is it fair to say then the forms are
22  required to be completed by the person who actually used the
23  Mace?
24  A   Yes, sir.
25  Q   Okay. So how much time does the--the sergeant or

192

1   the lieutenant have to fill out the disciplinary form?
2   A   Disciplinary? It's really done right then and
3   there.
4   Q   Okay. So after he sprays--
5   A   Yes.
6   Q   --the person,--
7   A   Yes, sir.
8   Q   --and--and--
9   A   Get them sent--
10      MR. CALVIT:  Let him finish the question.
11      WITNESS:  Oh.
12  Q   --and controls the scene, then he immediately goes
13  and fills out the disciplinary form?
14  A   Say that again.
15  Q   So after the Mace is deployed and the scene is
16  controlled,--
17  A   Yes, sir.
18  Q   --then the sergeant and lieutenant goes immediately
19  then to fill out the disciplinary form?
20  A   Yes, sir.
21  Q   And does he go to a computer terminal to do that?
22  A   Yes, sir.
23  Q   And logs in with his own individual identifier, I
24  assume.
25  A   Yes, sir.

48   (Pages 189 to 192)

193

1    Q   Okay. So it should be time stamped when they did
2    that. Correct?
3    A   Yes, sir.
4    Q   Okay. And they fill out the form. And do they
5    print it or email it or how is it--how is it transmitted to
6    the whomever needs to see it?
7    A   It's printed.
8    Q   Okay. And it's signed and dated. Is that true?
9    A   Yes, sir.
10   Q   Okay. And then who does the disciplinary form go
11   to?
12   A   All of us put together it together and this--the
13   whole pack is going to go to the major.
14   Q   Okay. So if the unusual occurrence report has to
15   be done within seventy-two hours and the disciplinary form is
16   done immediately, is it fair to say then the whole packet is
17   going to go to the major within seventy-two hours?
18   A   Yes, sir.
19   Q   All right. So after you've deployed the Mace and
20   sent the person to medical, okay, is--is it the shift
21   lieutenant's responsibility to collect up that medical
22   document from the nurse or does the nurse just create the
23   medical document and leave it for someone else to see at a
24   later time?
25   A   Shift lieutenants.

194

1    Q   Okay. So you're going to get a copy of that
2    medical form?
3    A   Yes, sir.
4    Q   All right. And it goes in the packet that in
5    seventy-two hours has to be presented to the major?
6    A   Yes, sir.
7    Q   All right. And then the use of force document.
8    Tell me about that.
9    A   Well, that's just something the major has to go and
10   do his own paperwork dealing with your report and-- Because
11   we don't really-- We don't do the use of force forms. That
12   goes--comes from the major.
13   Q   Okay. So the major is--is producing this use of
14   force form. Do you see it as a shift lieutenant, or where
15   does that use of force from go to?
16   A   It goes-- He puts it in your packet and-- Because
17   he--he types it up his self and he puts it in the packet and
18   he sends it up front at the-- Well, the report is served and
19   everything.
20   Q   What do you mean by that, it's being served?
21   A   Being served. It may have been read as a
22   disciplinary rule violation.
23   Q   Okay. So this packet is assembled for the benefit
24   of what body? So the use of force form, the unusual
25   occurrence reform--report, the disciplinary form and the

195

1    medical form, you say--
2    A   Yes, sir.
3    Q   --that's made into a packet.
4    A   Yes, sir.
5    Q   And who is that packet going to?
6    A   Going to the front, administration.
7    Q   Okay. And after that point you don't know what the
8    purpose of it is?
9    A   Yes, sir. It's-- And then disciplinary court will
10   be held on it.
11   Q   Okay. So all of that information is assembled for
12   the purpose of inmate discipline?
13   A   Yes, sir.
14   Q   Okay. And I assume that is done for the purpose of
15   following the inmate discipline handbook that y'all
16   distribute. Correct?
17   A   Yes, sir.
18   Q   All right. So when you were a booking officer back
19   when you were a CO, the policy that I received from RCC says
20   that an inmate is given a handbook. Is that accurate? Or
21   they sign for a handbook?
22   A   Yes, sir.
23   Q   All right. So where does that inmate keep that
24   handbook?
25   A   I mean, we--we issue them to them. Whatever they

196

1    do with them, I--I have no clue.
2    Q   Okay. Outside of the cell does the inmate have--
3    and in then their property vault where they keep--you keep
4    all their personal items when they're booked, is there some
5    other cubbyhole or a locker or some other place where they're
6    able to keep their information and important papers, or does
7    it stay in the cell with them?
8    A   Well, really, it stays in the property room, along
9    with they other property.
10   Q   Okay. So after they're booked and given a copy of
11   the--the handbook that tells them all the rules and
12   regulations of the facility, it's taken from them and then
13   put in their property?
14   A   No, sir.
15   Q   Okay. Well, tell me what they do with that
16   handbook.
17   A   I'm just-- Depending on if they going to general
18   population, they keep their handbook with them. They go in
19   the dorm with it.
20   Q   Okay.
21   A   Now, if they commit a rule violation inside the
22   dorm, we pack all they property up, take they property to the
23   property room and it'll be in there with the rest of they
24   property.
25   Q   Okay. So let's assume they don't go into general

49   (Pages 193 to 196)

197

1  population, they're in one of these thirteen lockdown cells
2  that you have.
3      A  Okay. Okay. They-- They keep that with them.
4      Q  Okay. And you've looked at all the photographs of
5  the lockdown cell #7. Correct?
6      A  Most--
7      Q  Did-- Did you see them?
8      A  I think most of them. Yes, sir.
9      Q  And you were there when both Mr. Moore and
10 Mr. White were taken out. Correct?
11     A  Yes, sir.
12     Q  Do you remember seeing any papers of any type?
13     A  No, sir.
14     Q  Okay. Do you know if they were ever given any kind
15 of handbook?
16     A  No, sir. I don't.
17     Q  Okay. But that would be the normal booking
18 procedure,--
19     A  Yes, sir.
20     Q  --to give them a copy of the handbook. Now,
21 earlier you were talking about the time line of events of--of
22 when Mr. Moore and Mr. White came to be in the cell together.
23 Do you remember that?
24     A  Yes, sir.
25     Q  Okay. And you were talking about how you had been

198

1  involved in the investigation between Mr. White and another
2  inmate that ultimately caused Mr. White to be put in lockdown
3  cell #7. Right? Do you--
4      A  Yes, sir.
5      Q  --remember that? Okay. And you were the officer
6  that investigated that particular event. Correct?
7      A  Yes, sir.
8      Q  All right. So do you recall looking at video
9  sometime on October 12th or 11th of the fight between
10 Mr. White and that other inmate that caused him to be put in
11 lockdown cell #7?
12     A  Yes, sir.
13     Q  Okay. So there is, in fact, such video?
14     A  I mean, it was back then. Yes, sir.
15     Q  Okay. So if I had requested video of any and all
16 of these events, you would believe that there was at least at
17 some time video between this fight that you personally
18 watched. Correct?
19     A  Yes, sir.
20     Q  Okay. And where did you go to view that video?
21     A  5 and 6 control.
22     Q  5 and 6 control.
23        COURT REPORTER: What was that one more-- 5
24     and 6 patrol?
25        WITNESS: Control.

199

1      Q  Okay. And 5 and 6 control, is that a room with
2  monitors?
3      A  Yes, sir.
4      Q  Okay. Describe that for me if you can.
5      A  It's a control room. You've got unit 5 on the
6  right and unit 6 on the left. Then you've got your--got your
7  two monitors at the top--
8      Q  Okay.
9      A  --that has video surveillance of lockdown cells 5,
10 6, 7 and Richwood holding cell, and also A and B hall, and
11 also the kitchen.
12     Q  Okay. And is it-- So the lieutenants are able to
13 go into 5 and 6 control room and ask the operator that's
14 there at the desk to rewind certain footage so you can see
15 what went down?
16     A  No, sir. We do that.
17     Q  Okay. Tell me how you do that.
18     A  We have a password.
19     Q  Okay. So you enter your personal password into a
20 computer system that allows you to go into a particular video
21 stream and view it?
22     A  Well, I wouldn't say it's a personal password, but
23 yes, sir.
24     Q  Okay. So more than one person has that same
25 password?

200

1      A  No. It's only lieutenants and above.
2      Q  Okay. And so there's probably some recordkeeping
3  of when people go in and enter the password and see those
4  videos. Correct?
5      A  No, sir.
6      Q  Okay. You think there's any record of that?
7      A  No, sir.
8      Q  All right. And when you went in there-- So what
9  caused you to go and look at the video between Mr. White and
10 this other inmate? Did you not believe one of them and you
11 wanted to prove one of them--
12     A  Yes, sir.
13     Q  --right or wrong?
14     A  Prove one of them right or wrong.
15     Q  Okay. And so you went and watched it and what did
16 you do?
17     A  Observed Vernon White jumping out of bed and just
18 going and start punching on that other guy.
19     Q  Was his name Erin Daniels?
20     A  I can't recall his name.
21     Q  Okay. Do you remember when it happened?
22     A  It was earlier that--the beginning of that shift,
23 but I'm not good with that exact time.
24        MR. CALVIT: I'm sorry. I'm confused about
25     which day and which shift.

50  (Pages 197 to 200)

201

1    Q   So that's what I'm asking, if you know.
2    A   Yeah. Not that one I don't know of.
3    Q   So we know that occurred before he and Mr. Moore
4    had their second altercation where you went into the cell and
5    extracted him. Right?
6    A   That's correct.
7         MR. CALVIT: Object to the form of the
8         question. It's compound.
9         MR. JACKSON: Okay.
10   Q   So let me just ask it this way. You're aware prior
11   to Mr. White's death, okay, and his death was when you
12   stormed the cell and--on the 13th with Mr. Moore and
13   Mr. White.
14   A   Okay.
15   Q   You recall that date. Right?
16   A   (Affirmative nod.)
17   Q   So sometime before that--
18   A   Yeah.
19   Q   --you testified that you witnessed Mr. White get
20   involved in an altercation with some other inmate which
21   caused you to go to 5 and 6, review the tape, find out that
22   White was the aggressor, went back and got White and put him
23   in lockdown cell #7.
24   A   Yes, sir.
25   Q   Is that correct?

202

1    A   Yes, sir.
2    Q   All right. So do you recall, was that a day, was
3    that an hour, was that a shift before he was dead?
4    A   Before White was dead?
5    Q   Yes.
6    A   That was a day.
7    Q   A day. Okay. Now, when you're in a situation
8    where you have problem inmates is there any RCC policy that
9    kind of gives you some guidance on where you should place
10   those inmates other than the--other than the suicide policy
11   that you've told us about?
12        MR. CALVIT: You're speaking of written policy
13        as you--
14        MR. JACKSON: Yes, sir.
15        MR. CALVIT: --referenced earlier?
16   A   No, sir.
17   Q   Okay. What I'm trying to understand and I want you
18   to help me understand is if you have thirteen lockdown cells
19   and some of them are empty, what causes you to place two
20   inmates together as opposed to separating them? Go through
21   that with me.
22   A   Because Richwood holding cell and lockdown 7 cell,
23   those are our main city--city lockdown cells.
24   Q   Okay. Main city lockdown cells. What does that
25   mean?

203

1    A   Those are only used--two cells we use far as city.
2    Q   Okay. So that's #7 and--
3    A   Yes, sir. And Richwood holding cell.
4    Q   --Richwood holding cell. All right. So you have
5    thirteen lockdown cells. Is that correct?
6    A   Yes, sir.
7    Q   All right. And two of them you dedicate to Monroe
8    city personnel?
9    A   Yes, sir.
10   Q   Okay. And other than the administrative
11   designation what is the difference, say, between lockdown
12   cell #7 and 8 or 5?
13        MR. CALVIT: You're talking about the physical
14        difference?
15   Q   The physical differences.
16   A   No camera.
17   Q   Okay. There's no camera in any of the other
18   lockdown cells--
19   A   No.
20   Q   --except for 7?
21   A   Yes, sir. I mean, it-- And 5, 6, 7 and Richwood
22   holding cell.
23   Q   Okay. So lockdown cell #5?
24   A   Yeah. 6.
25   Q   Okay.

204

1    A   7.
2    Q   7.
3    A   Richwood holding cell.
4    Q   Those are the only ones with cameras?
5    A   Yes, sir.
6    Q   Okay. All right. So the other lockdown cells--
7    So 1, 2, 3, 4, 8, 9, 10 and the special holding units 1 and
8    2 and then the Richwood holding cells. So those others,
9    other than 5, 6, 7 and Richwood holding cell, have no
10   cameras?
11   A   No, sir. But the SM-1 and SM-2, you can see
12   directly in that cell.
13   Q   Okay. Are they glass fronts? Is that why you can
14   see in them?
15   A   Yes, sir.
16   Q   Okay. Can you ever put a Monroe city employ---or
17   Monroe city arrestee in SM-1 or 2 by policy?
18   A   Yes, sir.
19   Q   Okay. So is there some kind of written policy that
20   designates only these two cells, 7 and RWHC, as Monroe?
21   A   Not that I can recall.
22   Q   Okay. Where did you learn that?
23   A   Just people training me.
24   Q   Okay. So they told you you're not supposed to put
25   Monroe people in other cells?

51   (Pages 201 to 204)

|     | 205 |
| --- | --- |
| 1 | A  Yes. Yes, sir. |
| 2 | Q  Okay. So from time to time since you've been there |
| 3 | seven years have you known Monroe arrestees to go in other |
| 4 | cells other than 7 and RWHC from time to time? |
| 5 | A  Go into the other cells now? |
| 6 | Q  No, sir. What I'm asking is-- So you can-- We |
| 7 | can start on any time frame, but while you've been there, |
| 8 | okay,-- |
| 9 | A  Okay. |
| 10 | Q  --while you've been there have you known any Monroe |
| 11 | arrestees to go in any cells other than #7 and RWHC for a |
| 12 | lockdown? |
| 13 | A  Yes, sir. |
| 14 | Q  Okay. What other cells have they been put in? |
| 15 | A  5, 6-- 5, 6 and SM-1 and SM-2. |
| 16 | Q  Okay. So when you told me that they placed |
| 17 | Mr. Moore in 7 because he was a Monroe detainee, was there |
| 18 | some other special reason that Mr. White was also placed in 7 |
| 19 | with him when there were other cells available-- |
| 20 | A  No. |
| 21 | Q  --other than this RCC policy that's not written |
| 22 | anywhere that says you're supposed to put Monroe detainees in |
| 23 | 7 and RWHC? |
| 24 | A  No, sir. |
| 25 | Q  Okay. Was there any discussion with you as the |

|     | 207 |
| --- | --- |
| 1 | Q  Mr. White. |
| 2 | A  Yes, sir. |
| 3 | Q  Okay. So nobody else made that decision but you? |
| 4 | A  Yes, sir. |
| 5 | Q  Okay. And did you take the time to review any of |
| 6 | Mr. Moore's history before you made that determination? |
| 7 | A  No, sir. |
| 8 | Q  And you, in fact, were aware that there were other |
| 9 | lockdown cells available and empty when you placed Mr. White |
| 10 | in there with him. Is that true? |
| 11 | A  Yes, sir. |
| 12 | Q  Okay. |
| 13 |      MR. CALVIT:  Was that a "yes, sir"? |
| 14 |      WITNESS:  Yes, sir. |
| 15 |      MR. CALVIT:  Thank you. |
| 16 | Q  Okay. |
| 17 |      MR. CALVIT:  I don't want to break up your |
| 18 |      cadence,-- |
| 19 |      MR. JACKSON:  Huh? No. |
| 20 |      MR. CALVIT:  --but-- |
| 21 |      MR. JACKSON:  If y'all want to take a break, |
| 22 |      let's please do. |
| 23 |      MR. CALVIT:  Yeah; yeah. And it's some-- |
| 24 |      Yeah. Let's go off the record. |
| 25 | (OFF RECORD - MR. ROY BROWN EXITS DEPOSITION.) |

|     | 206 |
| --- | --- |
| 1 | shift lieutenant about the history Mr. Moore had had up to |
| 2 | the point when you placed Mr. White in that cell with him? |
| 3 | A  No, sir. |
| 4 | Q  Okay. Did you seek out any information about |
| 5 | Mr. Moore prior to him coming to RCC? |
| 6 | A  No, sir. |
| 7 | Q  Okay. Did you ever learn that Mr. Moore had had a |
| 8 | run-in with state police prior to coming to RCC before his |
| 9 | arrest? |
| 10 | A  No, sir. |
| 11 | Q  Did you ever learn that Mr. Moore came to have a |
| 12 | run-in at a donut shop and tried to commit suicide by a cop? |
| 13 | A  No, sir. |
| 14 | Q  Okay. Did you know before you put Mr. White in the |
| 15 | cell with him in 7 that another inmate had already had to be |
| 16 | taken out of that cell because of Mr. Moore's violent |
| 17 | behavior? |
| 18 | A  No, sir. I didn't. |
| 19 | Q  Okay. Did you seek out any of that information as |
| 20 | the shift lieutenant? |
| 21 | A  No, sir. I didn't. |
| 22 | Q  And was it, in fact, your decision and your |
| 23 | decision alone to place Mr. White in lockdown cell #7 after |
| 24 | he got into the run-in with Erin Daniels? |
| 25 | A  And who got into it with Erin Dan- -- |

|     | 208 |
| --- | --- |
| 1 | EXAMINATION BY MR. JACKSON, continuing: |
| 2 | Q  Captain, you were telling me earlier about how |
| 3 | from time to time those lockdown cells that have been |
| 4 | designated for DOC also from time to time have held Monroe |
| 5 | city detainees. Is that correct? |
| 6 | A  Yes, sir. |
| 7 | Q  Okay. Has there been a change of policy or has it |
| 8 | been that way since you've been working that area for the |
| 9 | last seven years? |
| 10 | A  No, sir. By saying a change of policy, what you |
| 11 | mean by that? |
| 12 | Q  So what I'm asking is, was there ever a time when |
| 13 | never were Monroe city employ- --or detainees placed in cells |
| 14 | other than #7 and Richwood holding cell and now they're able |
| 15 | to go into any of the lockdown cells, or has it always been |
| 16 | that Monroe city employ- --or city detainees could go into |
| 17 | any of the lockdown cells? |
| 18 | A  Yes, sir. |
| 19 |      MR. CALVIT:  Object to the form of the |
| 20 |      question. |
| 21 |      WITNESS:  Uh-huh (yes). |
| 22 |      MR. CALVIT:  It's compound. |
| 23 |      MR. JACKSON:  Okay. Bad question |
| 24 |      WITNESS:  Uh-huh (yes); uh-huh (yes). |
| 25 | Q  So for the last seven years it's fair to say that |

52  (Pages 205 to 208)

Gerald Hardwell
August 28, 2017

209

1  Monroe arrestees could go into any of the lockdown cells. Is
2  that true?
3      A  Yes, sir.
4      Q  Okay. So there has not been any change of policy
5  since you've been working there?
6      A  No, sir.
7      Q  All right. Have you ever had inmates come to RCC
8  that were so bad, so sick, so difficult to deal with that you
9  sent them back to the arresting agency or back to DOC or to
10 some other facility that could better manage their behavior?
11         MR. CALVIT:  Object to the form of the
12         question. It's compound and vague.
13         MR. JACKSON:  Sure.
14     Q  Answer if you can.
15     A  I don't know.
16         MR. CALVIT:  He's asking you personally. Do
17         you recall any of that?
18     A  Yes, sir.
19     Q  Okay. Tell me about that.
20     A  Depending on what kind of inmate you're talking
21 about. Are we talking about a city or DOC inmate?
22     Q  Just describe for me the--the situations that
23 you've seen as an officer there for the last seven years when
24 this type of occurrence could occur.
25     A  Okay. Now, when I was an officer, I used to see if

210

1  they--if MPD bring a inmate in and, you know, he's just to
2  the point he--he too--he's really too sickly, you know,
3  lieutenants, I would see them, you know, and tell them that
4  we can't accept them like that, you know.
5      Q  Okay. And what do they do?
6      A  They send them back with that Monroe Police
7  Department officer.
8      Q  Okay. Do y'all have any cells that you use for
9  folks with mental health problems?
10     A  Yes, sir.
11     Q  What are those?
12     A  SM-1 and SM-2 cell.
13     Q  Okay. When you get an inmate that would qualify to
14 go in one of those cells but they're full, what do you do?
15         MR. CALVIT:  Objection. Calls for
16         speculation, lack of personal knowledge, no
17         foundation.
18     A  That all depend on the duty officer.
19     Q  Okay. So when inmates come in is it normal that
20 they bypass medical intake, or would that be the exception?
21     A  That be exception if they come in in the nighttime.
22     Q  Okay. So if--if an inmate comes in at nighttime
23 would you expect the next business day for that inmate to be
24 medically evaluated?
25     A  Yes, sir.

211

1      Q  Okay. Can you describe how that might not occur on
2  a particular inmate?
3      A  Maybe the lieutenant forget, you know. I don't--
4  I don't know. All I can do is pass the information on.
5      Q  Okay. So when an inmate is booked into RCC at
6  night is there some kind of qualitative or quantitative
7  assurance that the lieutenants do the next morning when the
8  nurse arrives to say, "We got the following two, five, seven
9  inmates overnight. They need to be screened"? How does that
10 process work?
11     A  I don't-- I'm not for sure. I never was a day
12 shift lieutenant.
13     Q  Okay. So what--what shift did you normally work?
14     A  6 p.m. to 6 a.m.
15     Q  All right. What time do the nurses get there?
16     A  They get there around--depending on if you've got
17 shift nurses. The shift nurse, she'll get around about--
18 about regular time, about 6 a.m.
19     Q  Okay. So typically while you're there, there is no
20 nurse. Is that right?
21     A  No, sir.
22     Q  Okay. Do you ever-- Did you ever serve on any
23 shift other than the D shift?
24     A  Yes, sir.
25     Q  Okay. Do you remember writing a--a handwritten

212

1  letter to the warden of the facility asking to be taken off
2  of one shift and placed on another because those folks on the
3  shift you were working weren't doing their job?
4      A  Not that I can recall.
5      Q  You don't recall doing that?
6      A  No, sir.
7      Q  Okay. Do you recall making a request to your
8  supervisors to change shifts?
9      A  I-- I can't recall. Not sure.
10     Q  Did you ever work the day shift?
11     A  Yes, sir.
12     Q  Okay. And tell me about-- What was your rank when
13 you worked the day shift?
14     A  A CO. Then I got promoted to a work release
15 sergeant.
16     Q  Okay. What were the duties of a work release
17 sergeant?
18     A  Getting inmates to work and from, strip searching
19 them when they're getting in from work.
20     Q  Okay. Did you ever have any inter- --interaction
21 with medical?
22     A  Far as when they came to pill call. Yes, sir.
23     Q  Okay. What's pill call?
24     A  When the nurse come pass out meds.
25     Q  Okay. And any other interaction?

53  (Pages 209 to 212)

213

1   A   No, sir.
2   Q   Okay. You-- You don't recall having some blowup
3   or some kind of disagreement with your shift supervisor such
4   that it re- --that it instigated you to write a letter to the
5   administration about that particular shift and your desire to
6   get off of it?
7   A   No, sir.
8   Q   Okay. I'll find it. Here we go. Do you-- Is
9   this your handwriting, sir?
10           MR. CALVIT:  Is there a page on that?
11           MR. JACKSON:  Yeah.  It's 80.
12           MR. CALVIT:  RCC?
13           MR. JACKSON:  RCC/Hardwell 80.
14   Q   Take a look at that, sir.
15   (WITNESS PERUSES DOCUMENT - OFF RECORD COMMENTS.)
16   Q   Do you remember writing that?
17   A   Yes, sir.
18   Q   What was that about? Do you know?
19   A   That was years ago. I think we had an acting
20   sergeant and, you know, I was the only one on the hall and he
21   just was-- You know, I was doing everything, you know.
22           MR. CALVIT:  I'm sorry.  What did you say?
23           WITNESS:  I was doing everything.
24   Q   Okay. You didn't feel like your teammates were
25   helping out?

214

1   A   Yeah. No, sir.
2   Q   Okay. So what I'm trying to find out is as a shift
3   lieutenant from the 6 p. to 6 a. it would have been routine
4   practice for inmates to come in during that period of time.
5   Correct? New inmates brought into your shift?
6   A   Yeah; yeah. City intake. Yes, sir.
7   Q   Okay. So that would have been a routine part of
8   your--your practice. Correct?
9   A   Yes, sir.
10   Q   All right. So what policy did RCC have in place to
11   capture those inmates that came in when medical wasn't there
12   to ensure that medical got--got to screen those inmates for
13   purposes of classification and booking?
14   A   I'm not sure.
15   Q   Okay. And so when you spoke with your replacement
16   at 6 a.m. from the 6 p.m. shift,--
17   A   Uh-huh (yes).
18   Q   --did you include all new inmates in that handoff
19   that you gave to the next lieutenant?
20   A   Usually it'd be in our pack when we turned our pack
21   at the end of--end of our shift.
22   Q   Okay. What's a pack?
23   A   A shift pack.
24   Q   Tell me what that entails.
25   A   Substance Abuse Building paperwork, main building

215

1   paperwork and work release building paperwork.
2   Q   Okay. So tell me what the lockdown paperwork would
3   be in the handoff from one lieutenant to the other.
4   A   It wouldn't be-- You wouldn't hand that off to
5   another lieutenant.
6   Q   Okay. Who would you hand it off to?
7   A   You'll hand that off to the major.
8   Q   Okay. So tell me what would be in that packet that
9   would describe the lockdown cells.
10   A   Your-- Your cell sheets, who's in--who's in the
11   cell and the cell bed book--sheet, also.
12   Q   Would it include any dialogue?
13   (OFF RECORD INTERRUPTION.)
14   EXAMINATION BY MR. JACKSON, continuing:
15   Q   Mr. Hardwell, in this packet that you would hand
16   off as the shift lieutenant to the major, it would include
17   some information about the lockdown cells.  Correct?
18   A   Yes, sir.
19   Q   All right. Would it include any events that
20   occurred with the inmates, specifically a use of force event
21   that would have occurred in lockdown cell #7 with any of the
22   particular residents of those cells?
23   A   Only a rule violation.
24   Q   Okay. So if-- In your handoff paperwork to the
25   major, if you had to use Mace on an inmate would you notify

216

1   the major of that event in that handoff paperwork?
2   A   Yes, sir. With the UOR.
3   Q   Okay. All right. And then when you came to work
4   the next night did the major give you some kind of handoff
5   packet so you would know what you're walking into for that
6   shift?
7   A   No, sir.
8   Q   Okay. How did you learn as the oncoming lieutenant
9   the number of inmates, the quality of inmates and the problem
10   inmates on your shift?
11   A   Basically, the day shift lieutenant and main
12   control.
13   Q   Okay. So you didn't have any kind of debriefing
14   with the--the previous lieutenant about what had happened in
15   their twelve-hour shift?
16   A   Yeah. The lieutenant.
17   Q   Okay.
18   A   The previous lieutenant.
19   Q   So when you came on on October the 12th,--
20   A   Okay.
21   Q   --2015, did you receive any kind of briefing about
22   the--the Macing of Mr. Moore earlier that morning?
23   A   I didn't know it. No.  He didn't tell me about he
24   had to Mace him that morning,
25   Q   Okay. Did-- Was Jeremy Runner on your shift?

54   (Pages 213 to 216)

Gerald Hardwell
August 28, 2017

217

1    A   Yes, sir.
2    Q   Okay. Had you had any communications with Jeremy
3  that day as y'all came on about his concerns with regard to
4  Mr. Moore?
5    A   No, sir.
6    Q   Okay. Did you speak with Ms. Weaver?
7    A   No, sir.
8    Q   Okay. Did you ever tell Ms. Weaver she needed to
9  watch Mr. Moore?
10   A   No, sir. I don't know who Ms. Weaver is.
11   Q   Okay. Danielle-- I'm sorry. Not Ms. Weaver.
12       MR. CALVIT: Walker.
13   Q   Ms. Walker.
14   A   No, sir.
15   Q   Okay. Never talked to Ms. Walker about Mr. Moore
16  or Mr. White?
17   A   No, sir.
18   Q   Do you know who you took over for that night on
19  October 12th?
20       MR. CALVIT: You keep jumping back and forth.
21       If-- If--
22   Q   So you took over at 6 p.m. on October 12, 2015.
23  Correct?
24   A   Yes, sir.
25       MR. CALVIT: Were you just speaking of October

218

1        15th a minute ago?
2        MR. JACKSON: I'm sorry. Not October 15th.
3        October 12th.
4        MR. CALVIT: I-- I apologize. I--
5        MR. JACKSON: I'm talking about 2015, October
6        12th. If I--
7        MR. CALVIT: Thank you.
8        MR. JACKSON: If I crossed over, that's what
9        I'm talking about, October 12th, 2015.
10   Q   You came on at 6 p.m. Correct?
11   A   Yes, sir.
12   Q   Okay. Who--
13       MR. CALVIT: Is that the date of the incident
14       or the day before?
15       MR. JACKSON: Yes, sir.
16       MR. CALVIT: Okay.
17       (To witness): Whatever the date is, the
18       day of the incident is what he's talking about
19       now.
20       WITNESS: Okay.
21       MR. CALVIT: Is that-- Is that a fair
22       statement?
23       MR. JACKSON: Yes.
24       MR. CALVIT: Okay.
25       WITNESS: Okay.

219

1    Q   Who did you take over for? Do you know?
2    A   Lieutenant Loring.
3    Q   Do you recall-- You told us earlier in your
4  deposition that you would try to get there early to talk to
5  the shift lieutenant. Did that occur that day?
6    A   Yes, sir. We always try to get there early, get
7  your--
8        MR. CALVIT: He's asking if you remember it
9        that day--
10       WITNESS: Oh.
11       MR. CALVIT: --and you're testifying about
12       standard operating procedures.
13       WITNESS: Oh, just standard operating
14       procedures?
15   Q   Okay. Do you remember any information you received
16  from Lieutenant Loring on October 12, 2015, about the events
17  of October 12th earlier in that shift that day?
18   A   No, sir.
19   Q   Okay. Did Lieutenant Loring make you aware that he
20  had had to gas Mr. Moore earlier that day?
21   A   No, sir.
22   Q   Or that Mr.--Mr. Moore had been gassed in lockdown
23  7?
24       MR. CAMERON: I just object to the form.
25       That's all.

220

1        MR. CALVIT: Yeah. And you're still
2        consistent with your--
3        MR. CAMERON: It was the 13th.
4        MR. JACKSON: I'm sorry.
5        MR. CALVIT: --definition--
6        MR. JACKSON: The 13th.
7        MR. CALVIT: --your definition of gas equals
8        Mace?
9        MR. JACKSON: Yeah.
10       MR. CALVIT: Okay. Thank you.
11       MR. JACKSON: Okay. So we're going to clear
12       up this today. Sorry.
13       MR. CAMERON: All right.
14   Q   October 13th, 2015, you took over at 6 p.m.
15  Correct?
16   A   Yes, sir.
17   Q   All right. Do you remember any specific
18  conversation with Lieutenant Loring on October 13, 2015, when
19  you took over?
20   A   No, sir. I don't.
21   Q   Okay. Do you know whether or not you received any
22  information about an earlier Macing event of Mr. Moore on
23  that day?
24   A   No, sir.
25   Q   Okay. The day before you had placed Mr. White in

55  (Pages 217 to 220)

221

1 the cell with Mr. Moore. Is that correct? On the 12th,
2 after he had been in an event with Erin Daniels?
3     A  Yes, sir.
4     Q  Okay. So do you recall what time in the morning
5 you did that?
6     A  Placed-- Placed Vernon White outside the cell?
7     Q  No. In the cell with Mr.--with Mr. Moore.
8     A  That was that evening.
9     Q  Okay. It was the evening of the 12th?
10     A  Yes, sir.
11           MR. CALVIT:  He worked 6 p. to 6 a.
12           MR. JACKSON:  Right.
13     Q  So you came in on the 12th--
14     A  Right.
15     Q  --6 p. to 6 a.,--
16     A  Uh-huh (yes).
17     Q  --and then you came back on the 13th 6 p. to 6 a.?
18     A  Yes, sir.
19     Q  Is that right?
20     A  Yes, sir.
21     Q  Okay. So what time did you place Mr. White into
22 lockdown cell #7 with Mr. Moore on the 12th?
23     A  It had to have been between 7:00 and 9 o'clock.
24     Q  Okay. Were you aware that Mr. Moore had had
25 another inmate removed from lockdown cell #7 because of

222

1 Mr. Moore's behavior?
2     A  No, sir.
3           MR. CAMERON:  Object to the form. It assumes
4           facts not in--
5     Q  Okay. Would that information have been available
6 to you had you looked for it?
7     A  No, sir.
8     Q  Okay. So you would not have any information about
9 any of the previous shifts when you come onboard about what
10 had happened in the previous shifts with inmates?
11     A  Only-- Only word of mouth.
12     Q  Okay. So was the major the-- I guess if--if the
13 two shift lieutenants are in charge of those lockdown cells,
14 is the major responsible to inform the two about what's
15 happening?
16     A  No, sir.
17     Q  Who is-- Whose job is it?
18     A  The two lieutenants.
19     Q  Okay. Is there any kind of standard procedure
20 written anywhere about what you're to cover in your--your
21 handoff between the lieutenants from shift one to shift two,
22 or shift B to shift D?
23     A  Not-- Not that I can recall.
24     Q  Okay. What-- What information did you like to
25 know about?

223

1     A  Did we have anybody come in or has everybody been
2 fed, and do we have anybody at the hospital.
3     Q  Okay. What's the purpose of asking, "Did we have
4 anyone come in?"
5     A  See if I have any intakes down there booking.
6     Q  Okay. For DOC inmates that are troublesome or have
7 some other issue, you're able to reject them and send them
8 back to their--someplace else?
9     A  No, sir.
10     Q  Okay. Tell me what you do with--with problematic
11 DOC inmates.
12     A  House them in a lockdown cell.
13     Q  Okay. And with regard to Monroe, you have the
14 ability to send them away?
15     A  Yes, sir.
16     Q  Okay. And you've seen that happen?
17     A  Yes, sir.
18     Q  All right. Have-- Have you ever seen any
19 temporary beds used at RCC?
20     A  Temporary? What you mean?
21     Q  Yes. So the capacity of the facility is around
22 eleven hundred (1,100). Is that right?
23     A  Yes; sir. Eleven twenty-seven (1,127).
24     Q  Okay. Have you ever seen it go beyond the eleven
25 twenty-seven (1,127)?

224

1     A  Not since I've been there.
2     Q  Okay. What about in the lockdown cells? What is
3 your current-- Or what was the--the policy in 2015 about the
4 number of inmates that could be held in each lockdown cell?
5     A  Two per cell.
6     Q  Two per cell? Have you ever seen three?
7     A  Once or twice.
8     Q  Okay. What-- What are the circumstances that
9 occur when you have more than two individuals in a lockdown
10 cell?
11     A  Maybe we had a--you know, a compound shakedown that
12 day.
13     Q  Okay. And--
14     A  Yes, sir.
15     Q  And so follow me through that. You have a compound
16 shakedown. What happens that causes somebody to end up three
17 to a lockdown cell?
18     A  You might find contraband on them.
19     Q  Okay. And as punishment they would go to a
20 lockdown cell?
21     A  Yes, sir.
22     Q  And then there wouldn't be enough to just have two,
23 so you have to stack them in there with three?
24     A  Yes, sir.
25     Q  All right. Any other circumstance you can think

56  (Pages 221 to 224)

Gerald Hardwell
August 28, 2017

225

1   of?
2   A   No, sir.
3   Q   So during the day shift how many medical personnel
4   are on duty at RCC?
5   A   During the day shift?  Three.
6   Q   Okay.  And at night are there any?
7   A   None.
8   Q   Okay.  And what time does night-- Is it the same
9   for them, 6 a. to 6 p.?
10  A   What's that?
11  Q   For medical.  Or do they work a different shift,
12  8:00 to 5:00?
13  A   Yeah.  Got one head nurse.  She works 8:00 to 4:00.
14  Q   Okay.
15  A   Then you've got the other two nurses.  They work
16  6:00 to 6:00.
17  Q   But just during the day shift?
18  A   Yes, sir.
19  Q   And then it's 911 thereafter?
20  A   Yes, sir.
21  Q   Okay.  Do you recall when you went into the cell
22  with Mr. Moore and Mr. White if any medical personnel were at
23  the facility at that time?
24  A   Yes, sir.
25  Q   Okay.  Who was there?

226

1   A   Mr. Williams.
2   Q   Okay.  Anybody else that you can think of?
3   A   No.  That's it.
4   Q   Okay.  Were there any COs or--or sergeants or
5   lieutenants that were also cross-trained as LPNs?
6   A   No, sir.
7   Q   Okay.  Was there a female on the scene before the
8   ambulance company arrived?
9   A   Not that I can recall.
10  Q   Okay.  So if there's any documents that would
11  support that there were two LPNs on site before the ambulance
12  arrived, do you know anything about that?
13  A   No, sir.
14  Q   Okay.  And other than Mr. Williams, you don't
15  recall any other nursing personnel being there--
16  A   No, sir.
17  Q   --to tend to either Mr. Moore or--
18  A   No, sir.
19  Q   --or Mr. White.  Correct?
20  A   No, sir.
21  Q   All right.  Is this the first emergency situation,
22  the White/Moore issue, that you've had to deal with in a
23  lockdown cell?
24       MR. CALVIT:  Object to the form of the
25       question.  If you can define "emergency."

227

1        MR. JACKSON:  Yeah.  Sure.
2   Q   So were you the person that looked in or was that
3   Jeremy Runner that--that found Mr. White on the floor and him
4   being unresponsive, that ultimately caused y'all to go inside
5   the cell?
6   A   I'm thinking it was Jeremy Runner.
7   Q   Okay.  And he contacted you or somehow you got
8   contacted?
9   A   Yes, sir.
10  Q   Okay.  You were there before the cell doors opened?
11  A   No, sir.  I came kind of--
12       MR. CALVIT:  You're speaking of the Vernon
13       White door opening?
14       MR. JACKSON:  Yes.
15       MR. CALVIT:  Okay.
16  A   Yes, sir.  It was open.
17  Q   Okay.  It was open?
18  A   Yes, sir.
19  Q   Okay.  And did Mr. Runner have Mace with him?
20  A   I mean, I-- I-- I can't recall if he did or he
21  didn't.  But from--from the video I don't think he did.
22  Q   Okay.  Did-- Did he get Maced at that time?
23       MR. CALVIT:  "He" being who, please?
24  Q   Mr. Moore, when you went in?
25       MR. CAMERON:  Object to the form.

228

1        MR. CALVIT:  Yeah.
2        MR. JACKSON:  Okay.
3   Q   So do you know if Mr. Moore-- And the event I'm
4   talking about is the 13th, when y'all found Mr. White on the
5   floor and what we're here about today.  Okay?  So do you know
6   if Mr. Moore that--that last time was Maced when the cell
7   door was opened?
8        MR. CALVIT:  Object to the form of the
9        question.  "Last"--
10       MR. JACKSON:  Okay.
11  Q   So--
12       MR. CALVIT:  During-- During the Vernon White
13       portion--
14       MR. JACKSON:  Yes.
15       MR. CALVIT:  --or the Erie Moore extraction?
16  Q   So let me-- Let me just ask it this way.  When
17  that-- When that cell door is opened for the first time and
18  y'all found Mr. White on the ground and Mr. Moore doing what
19  he was doing, do you know if he was Maced?
20  A   Yes, sir.
21  Q   Okay.  Who-- Who Maced him?
22  A   Lieutenant Loring.
23  Q   Lieutenant Loring?
24  A   Yes, sir.
25  Q   So he was still there?

57  (Pages 225 to 228)

```
                                        229
 1    A  At that Vernon-- When we took Vernon White out the
 2  cell?
 3    Q  Yes.
 4    A  Yes, sir.
 5    Q  Okay. So was it--was it his time to be gone by
 6  then? I mean, what is he doing there?
 7    A  He still was finishing up his paperwork, I guess.
 8    Q  Okay.
 9       MR. CALVIT:  But he's asking you do you know.
10  If you're guessing, that's nonresponsive--
11       WITNESS:  Okay; okay.
12       MR. CALVIT:  --to his question.
13       WITNESS:  Okay.
14       MR. CALVIT:  So he asked you do you know.
15       WITNESS:  Okay.
16    A  No, sir. I don't.
17    Q  Okay. It was your shift?
18    A  Yes, sir.
19    Q  Okay. But he was still there?
20    A  Yes, sir.
21    Q  And he was the lieutenant from the previous shift?
22    A  Yes, sir.
23    Q  And why he was still there you don't know?
24    A  No, sir.
25    Q  But he was still there?
```

```
                                        231
 1  don't know the policy?
 2    A  No, sir.
 3    Q  Okay. So do you know how often-- Even if there
 4  isn't a written policy what do you expect your COs to do with
 5  regard to checking on inmates in the lockdown cells?
 6    A  You're going to learn your policy.
 7    Q  Okay. But you don't know it?
 8    A  (No response.)
 9    Q  You don't know the policy?
10    A  Far as-- Far as what?
11    Q  How often the COs are required to check on the
12  inmates--
13    A  No, sir.
14    Q  --in the lockdown cells. Okay. You said fifteen
15  to thirty minutes, every fifteen to thirty minutes.
16    A  Yes.
17    Q  Where does that come from?
18    A  Just from what I was taught when I first got there.
19    Q  Okay. And do you write it down somewhere that you
20  visually inspected the cell #5 and you saw inmates 1 and 2?
21  You write that down?
22    A  Shift sergeants do.
23    Q  Okay. And what document is that that visual
24  checking on inmates recorded on?
25    A  Lockdown check form.
```

```
                                        230
 1    A  Yes, sir.
 2    Q  Okay. And he--he Maced Mr. Moore?
 3    A  Yes, sir.
 4    Q  Okay. Did you have to fill out the--the lieutenant
 5  paperwork for the Macing?
 6    A  No, sir.
 7    Q  Did he fill it out?
 8    A  Yes, sir.
 9    Q  Okay. How often do the COs pursuant to RCC policy
10  have to do inmate checks on the lockdown cells?
11    A  You said how often?
12    Q  Yes.
13    A  Say fifteen, thirty minutes.
14    Q  Okay. Is there a policy?
15    A  I can't recall if it is, but I-- Yes.
16    Q  Okay.
17    A  Yeah.
18    Q  And what is the policy?
19    A  I can't recall it.
20    Q  Okay. So you're the captain now and you have
21  corrections officers that work for you. Correct?
22    A  Yes, sir.
23    Q  All right. And what do you expect them to do?
24    A  Learn the policy.
25    Q  Okay. And what is the policy, if you know? You
```

```
                                        232
 1    Q  Lockdown check form. Is there-- Is there one done
 2  for each shift, for each cell? How-- How does that work?
 3    A  Each shift.
 4    Q  Okay. Whose responsibility is it to do the
 5  lockdown check form?
 6    A  Whoever the lieutenant designates to do it. But
 7  usually the sergeant's job, shift sergeant.
 8    Q  Okay. Did you see any lockdown check forms when
 9  you were preparing for this deposition that occurred on
10  October 13th?
11    A  Not that I can recall.
12    Q  Okay. Do you have any idea why those lockdown
13  check forms wouldn't have been done under your supervision on
14  October 13, 2015?
15    A  Maybe because of the incident. I-- I don't know.
16    Q  Okay. What about October 12th? You worked the day
17  before. Correct?
18    A  Yes, sir.
19    Q  Do you know if any lockdown check forms were done
20  on the 12th?
21    A  Not-- I can't recall.
22    Q  Okay. Did you see any in your preparation for
23  today?
24    A  No, sir.
25    Q  Okay. Is that part of the packet that you turn in
```

58  (Pages 229 to 232)

233

1  at the end of the shift to the major?
2      A  Yes, sir.
3      Q  Okay.  So you would expect there to be a lockdown
4  check form for the days leading up to the 13th, but maybe the
5  13th didn't get done because of the events of the day?
6      A  Yes, sir.
7      Q  Okay.  But you didn't see any such documents when
8  you were preparing for this deposition?
9      A  No, sir.
10     Q  All right.  We were talking about emergencies in
11  the lockdown cells.  What kind of training is provided to the
12  COs, sergeants or lieutenants about what to do when you have
13  some kind of inmate emergency, whether it be medical or
14  otherwise?
15     A  I mean, I guess that's all in the POST training,
16  you know.
17     Q  So outside of POST training is there any internal
18  RCC training that they expect you to operate under with
19  regard to emergencies in the lockdown cells?
20     A  No, sir.
21         MR. CALVIT:  Say yes or no.
22     A  No.
23     Q  Outside of handcuffs, what other kinds of
24  restraints are available to you as a CO, sergeant or
25  lieutenant for problematic inmates?

234

1      A  Waists restraints.
2      Q  Anything else?
3      A  Leg irons.
4      Q  Okay.
5      A  Zip ties.
6      Q  Okay.
7      A  That's it.
8      Q  So zip ties, handcuffs.  Is that right?
9      A  Yes, sir.
10     Q  Okay.  Leg irons and waist restraints?
11     A  Yes, sir.
12     Q  Okay.  And-- All right.  So with regard to
13  handcuffs, does each CO have a pair available to them and
14  issued to them?
15     A  Yes, sir.
16     Q  Okay.  Zip ties.  Does each CO get those or are
17  those just readily available?
18     A  Available.
19     Q  Okay.  Do they check them out on each shift, or how
20  do they come to have them in their possession?
21     A  Only in an emergency.
22     Q  Okay.  So where do you go to get zip ties in an
23  emergency?
24     A  Booking.
25     Q  Booking?  Okay.  And who is the custodian of the

235

1  book- --of the zip ties?
2      A  No one.
3      Q  Okay.  You just go in there and they're in a box
4  and you pick them up?
5      A  Really, we just-- No; no.  Want me to explain to
6  you?
7      Q  Yes, sir.  Please.
8      A  Really, we just use those when we taking Monroe
9  city to court.  We don't use those for-- Far as on the
10  halls, we don't use those.
11     Q  Okay.  What-- What kinds of restraints to you use
12  inside the RCC facility?
13     A  Mechanical restraints.
14     Q  Okay.  So tell me what all mechanical restraints
15  you have.
16     A  Handcuffs.
17     Q  Anything else?
18     A  Leg irons.
19     Q  All right.  And where do you learn the RCC protocol
20  and policy on the use of handcuffs and leg--
21     A  POST training.
22     Q  POST training.  Okay.  When you put somebody in
23  handcuffs or leg irons are you required to fill out any kind
24  of forms?
25     A  No, sir.

236

1      Q  Okay.  You can-- A CO can do that at their own
2  discretion?
3      A  No, sir.
4      Q  Okay.  So who has the authority to issue the order
5  to handcuff or leg iron an inmate?
6      A  A lieutenant and a sergeant.
7      Q  Okay.  Is it your protocol to at least place that
8  in some of UOR when you do that to an inmate, or is that so
9  frequent it doesn't get put into documents?
10         MR. CALVIT:  Object to the form of the
11         question.  It's compound, speculation.
12     A  Repeat that question again.
13     Q  Sure.  So how often do you place-- Well, let me
14  just ask is it frequent that you use handcuffs and leg irons
15  in RCC?
16         MR. CALVIT:  Object to the form of the
17         question.  Calls for speculation.
18     Q  Do you use them from time to time at the facility,
19  handcuffs and leg irons?
20     A  Yes.
21     Q  Okay.  Do you use them on a daily basis?
22     A  Yes.
23     Q  Okay.  Would you say that there is some kind of
24  written policy at RCC on when you're authorized to use leg
25  irons and handcuffs?

237

1    A  I can't recall.
2    Q  Okay.  Do you train your subordinates on the
3  appropriate protocols on when to use leg irons and handcuffs?
4    A  Yes.
5    Q  Okay.  What is your training that you provide them?
6    A  Just the proper way to use--place restraints on an
7  offender.
8    Q  And you learned that at your POST training academy?
9    A  Yes, sir.
10   Q  And outside of the POST training academy RCC
11  doesn't provide any additional training on that other than
12  what you provide your subordinates?
13   A  Yes, sir.
14   Q  Do you have any cameras that-- I'll just represent
15  to you there's some documents in--in this information where
16  one of the supervisors is talking about looking at the camera
17  system in 5 and 6 control room.  Is there a camera monitor on
18  the--the person who's supposed to be monitoring the cameras?
19   A  Yes, sir.
20   Q  Okay.  Have you had or have you ever as a
21  lieutenant or a shift supervisor came to check the security
22  cameras on the monitor who's supposed to be monitoring to
23  check to see if they're doing their job?
24   A  No, sir.
25   Q  Okay.  Do you know if that's ever been done while

238

1  you've been there?
2    A  Not that I can recall.
3    Q  Do you recall-- Have you ever met Ms. Walker?
4    A  Yes, sir.
5    Q  Okay.  Do you-- Have you ever talked to her about
6  this case?
7    A  No, sir.
8    Q  Do you know anything about her involvement in--in
9  this particular case?
10   A  No, sir.
11      All right.  Do you know if anyone ever questioned
12  what she was doing the in control room 5 and 6 during the
13  events made the basis of this lawsuit?
14   A  No, sir
15   Q  Never heard any rumors scuttlebutts about what she
16  was doing in there?
17   A  No, sir.
18   Q  All right.  Do you know if anybody ever reviewed
19  the cameras that recorded her activities during the events
20  made the basis of this lawsuit?
21   A  No, sir.
22   Q  Okay.  On the D shift that you're in charge of, did
23  Ms. Walker work for you?
24   A  No, sir.
25   Q  Okay.  Who did she work for?

239

1    A  Lieutenant Loring.
2    Q  Lieutenant Loring.  And who was the person that did
3  that job for you?
4    A  I can't recall.
5    Q  Okay.  But you had somebody in her position that
6  monitored the cameras?
7    A  Yes, sir.
8    Q  Okay.  And what did you expect that person to do·
9  that was working for you?
10   A  Monitor her cameras and also monitor her dorms.
11   Q  Okay.  And if they see some activity on the camera
12  that causes them concern do they have vehicle, some ability
13  to contact and get help to try to address the situation?
14   A  Yes, sir.
15   Q  Okay.  How-- How do they do that?
16   A  Control on the radio.
17   Q  Okay.  Have you from to time in your seven years
18  working at RCC heard from the camera monitor operator?
19  What-- What is that position called?
20   A  3 and 4 control.
21   Q  3 and 4 control?
22   A  I meant, 5 and 6 control.  I'm sorry.
23   Q  5 and 6 control?
24   A  Yes, sir.
25   Q  That's-- That's the name of the position?

240

1    A  No, sir.  They-- 5 and 6 control operator.
2    Q  Okay.  So have you-- In your experience there in
3  the last seven years have you ever received a radio call or
4  some other communication from the 5 and 6 control operate
5  about a problem in a cell?
6    A  Yes, sir.
7    Q  Okay.  Tell me about that.
8    A  We had two guys fighting in lockdown 6.
9    Q  What happened?
10   A  That was years ago.  I couldn't-- I can't recall
11  that.  All I remember, they had a fight.
12   Q  Okay.  And so the 5 and 6 control operator
13  contacted the shift lieutenant so that something could be
14  done?
15   A  Yes, sir.
16   Q  All right.  Is that the only event that you recall
17  where a 5 and 6 control operator asked for help from the
18  shift to address a problem in a lockdown cell?
19   A  Yes, sir.
20   Q  Are you aware of the contract between the City of
21  Monroe and RCC?  Do you know anything about that?
22   A  No, sir.
23   Q  Do you know how many inmates the City of Monroe
24  pays RCC to house, or how many beds are available to the City
25  of Monroe for housing at RCC?

60  (Pages 237 to 240)

Gerald Hardwell
August 28, 2017

---

241

1   A   No, sir.
2   Q   Okay. Other than this oral understanding of the
3   two cells being available to Monroe detainees within the
4   thirteen lockdown cells, you worked in other areas of the--of
5   the prison. Correct?
6   A   Yes, sir.
7   Q   Do you know how many inmates typically RCC held for
8   Monroe and if they were segregated in one particular part of
9   the facility?
10  A   No, sir. I can't recall.
11  Q   All right. All right. Let me ask you a couple of
12  questions about these documents. Mr. Hardwell, do you
13  remember completing some forms after Mr. White and
14  Mr. Moore's death?
15  A   What type of form?
16  Q   Do you remember completing some unusual occurrence
17  reports?
18  A   Yes, sir. Mines.
19  Q   Okay. So do you-- Do you recall if it was done
20  the night of the 13th or do you know if it was done some
21  other time?
22  A   It was the same day.
23  Q   Same day. Okay.
24      MR. CALVIT: When you say "day," you mean your
25      shift?

---

242

1       WITNESS: Yeah. Same shift. I'm sorry.
2       MR. JACKSON: Same shift?
3       MR. CALVIT: Because it would have gone into
4       two different days.
5       MR. JACKSON: Right.
6       MR. CALVIT: Object to the form of the
7       question.
8   Q   So you came on at--at 6 p.m. on the 13th. Correct?
9   A   Yes, sir.
10  Q   All right. Do you know when all this went down
11  with Mr. Moore and Mr. White? And I'm talking about
12  ultimately discovering Mr. White was injured, you having to
13  storm into the cell. That's the event I'm talking about.
14  Was it right at the beginning of the shift on the 13th?
15  A   Yes, sir.
16  Q   Okay. And so if you got there a little bit early
17  do you remember what time it was that you got there?
18  A   No, sir. I don't.
19  Q   All right. I'm going to show you what's been
20  marked as RCC 3, and if you'll take a look at that and tell
21  me if that's the report that you filled out.
22  A   Okay.
23  (WITNESS PERUSES DOCUMENT.)
24      MR. CALVIT: I believe it's already been
25      introduced into evidence.

---

243

1       MR. CAMERON: What?
2       MR. CALVIT: His own UOR.
3       MR. CAMERON: I don't know if I marked it.
4       The-- I may have, but see if it's in the
5       stack over there.
6       MR. CALVIT: It's not? I thought he saw it
7       when--
8       MR. CAMERON: He may have seen it.
9       MR. CALVIT: Okay.
10      MR. CAMERON: Yeah.
11      MR. CALVIT TO WITNESS: Just take your time
12      and review it.
13      WITNESS: Okay.
14      MR. CALVIT: I'm sorry. I was trying to speed
15      things up--
16      WITNESS: Okay.
17      MR. CALVIT: --by referencing the earlier
18      exhibit, but that didn't work.
19  A   Here. There you go, sir.
20  Q   Is that it?
21  A   Yes, sir.
22  Q   Okay. So we know that the event occurred sometime
23  October 13th in and around the 6:00 to 7 p.m. time frame.
24  Does that sound about right?
25  A   No, sir.

---

244

1   Q   Okay. Tell me when it happened.
2   A   Basically, on the camera when--the whole incident
3   of Moore and White happened around about 5:00.
4   Q   Around about 5:00?
5   A   Yes, sir.
6   Q   Okay. Do y'all remember-- Do you remember what
7   time you entered the cell?
8   A   Okay. It was close to around about 6 o'clock.
9   Q   Okay. And after you got Mr. White out and got
10  Mr. Moore out when did you fill out these forms?
11  A   Right after OPSO had left.
12  Q   So that would have been thirty minutes, an hour,
13  two hours?
14  A   Yes, sir.
15  Q   A couple of hours after?
16  A   No. I wouldn't say a couple of hours.
17  Q   Hour?
18  A   Yeah. Maybe a hour.
19  Q   Okay. The reason I'm asking is because if you'll
20  look down at the bottom left on RCC 3 it appears to say that
21  you completed that on the 13th at 6 p.m.
22  A   Okay.
23  Q   And what I'm trying to understand is, are you
24  reflecting what time the events occurred and that's what
25  you're intending to tell by that handwritten data, or are you

---

61   (Pages 241 to 244)

245

1  saying that's when the documents were completed?
2      A   What time the event occurred.
3      Q   Okay.  So even though it says date and time when
4  completed,--
5      A   Yes, sir.
6      Q   --when I see a date and time down there on your
7  document what you're trying to say is that's when the events
8  went down?
9      A   Yes, sir.
10     Q   Okay.  I'm going to hand you what's previously been
11  marked as RCC 15.  Take a look at that and tell me if that's
12  a document you completed and if the same thing goes about the
13  time.
14     (WITNESS PERUSES DOCUMENT.)
15     A   That's what time we went in the cell.
16     Q   Okay.
17     A   7 o'clock.
18     Q   So 7 o'clock is the time you--you went into the
19  cell?
20     A   Yes, sir.
21     Q   So the events captured in RCC 15 you believe
22  occurred around 7 p.m. that night?
23     A   Yes, sir.
24     Q   All right.  Do you know who Shunta Presley is?
25     A   Shunta Presley.  She's no longer employed there.

246

1      Q   Okay.  Do you know what--what she did for RCC?
2      A   Worked main control.
3      Q   Do you know if she was there that night?
4      A   I can't recall.
5      Q   Okay.  Did you ever talk to her about this case?
6      A   No, sir.
7      Q   Okay.  Antonio Turner?
8      A   Yes, sir.
9      Q   Who's that?
10     A   Was our previous warden, assistant warden.
11     Q   Okay.  Do you know if he was there that night?
12     A   Not that I re- -- Not that I know of.
13     Q   Did you ever talk to him about this case?
14     A   No, sir.
15     Q   Do you know Kayla Blossom?  Blossman [sic] or--
16     A   Yes, sir.
17     Q   B-L-O-S-S-O-M.
18     A   Yes, sir.
19     Q   Who is that?
20     A   She-- She was in administration.  I rarely seen
21  her working at night.
22     Q   Okay.  Do you know anything about her, what she did
23  for RCC?
24     A   No, not really.  No, sir.
25     Q   Did you ever talk to her about this case?

247

1      A   No, sir.
2      Q   Okay.  Ryan Hor- --Horvath, H-O-R-V-A-T-H.
3      A   No, sir.
4      Q   Okay.  Never talked to him about that?
5      A   No.  I don't--can't recall that guy name.
6      Q   Okay.  Take a look at this RCC 18.  Tell me what
7  that document is.
8      (WITNESS PERUSES DOCUMENT.)
9      A   A use of force form.
10     Q   Okay.  And if you'll look down at the bottom, is
11  that your handwriting and your name?
12     A   Yes, sir.
13     Q   Okay.  That's a document you completed?
14     A   Yes, sir.
15     Q   All right.  All right.  RCC 22.
16     (WITNESS PERUSES DOCUMENT - OFF RECORD INTERRUPTION.)
17  EXAMINATION BY MR. JACKSON, continuing:
18     Q   Captain, earlier I was talking to you about the
19  essential positions that you have assigned to you, especially
20  on October 13, 2015, on your shift.  Okay?
21     A   Yes, sir.
22     Q   That's what I'm talking to you about.  And I want
23  to show you what's been previously marked as RCC 92.  Take a
24  look at this and tell me if that's a document you've seen
25  before.

248

1      (WITNESS PERUSES DOCUMENT.)
2      A   Yes, sir.
3      Q   Okay.
4          MR. CALVIT:  I'm sorry.  Did he say yes or no?
5          WITNESS:  Yes.
6          MR. JACKSON:  Yes.
7          COURT REPORTER:  Yes, sir.
8      Q   Can you tell me what that document is?
9          MR. CALVIT:  Go ahead.
10     A   It's a roll call roster.
11     Q   Okay.
12     A   We place the officers for the shift.
13     Q   You may need it because--
14     A   Okay.
15     Q   --I'm going to ask you some questions about.
16     A   All right.
17     Q   Okay.  So if you'll look down at the bottom there's
18  some handwritten annotations about essential employees.  Do
19  you see that?
20     A   Yes, sir.
21     Q   What is that portion of the document's purpose to
22  be?
23     A   How many-- My own officers I have.
24     Q   Okay.  And essential employees, what does that term
25  mean to you as a lieutenant shift supervisor?

62  (Pages 245 to 248)

Gerald Hardwell
August 28, 2017

249

1    A   Essential. I guess--
2    Q   And I don't want you to guess.
3    A   I mean,--
4    Q   You filled it out. Correct?
5    A   Yes, sir.
6    Q   Okay. And so what I'm trying to understand is you
7    were required to fill that out, I assume, by RCC?
8    A   Yes, sir.
9    Q   Okay. What is the purpose of that document, if you
10   know?
11   A   To tell me how many officers I have assigned to my
12   shift.
13   Q   Okay. And you see in the document up top there is
14   essential and nonessential personnel.
15   A   Okay.
16   Q   Is that correct?
17   A   Yes, sir.
18   Q   Okay. And how are you trained to complete that
19   document? What is the purpose of having essential versus
20   nonessential personnel? Tell me what that means.
21   A   Essential is going to be the officers that are
22   assigned to my shift. And I have-- At this time I had
23   eighteen positions, but I only had sixteen officers assigned
24   to my shift. So--
25   Q   Okay.

250

1    A   So I needed two officers to be assigned to my
2    shift.
3    Q   All right. And the way I read that, so under the
4    eighteen--under the essential employees there--there are
5    eighteen including yourself? Is that correct?
6    A   Yes, sir.
7    Q   And so am I to interpret that that you are short
8    two men? Or what am I-- What am I supposed to understand
9    the difference between eighteen and sixteen?
10   A   That I'm short two men.
11   Q   Okay. If you go through the list of essential
12   personnel count and make sure that there are sixteen names
13   there.
14   (WITNESS COMPLIES.)
15   Q   How many names do you come up with?
16   A   I'm counting it.
17       MR. CALVIT: Is his name on that list?
18       MR. JACKSON: Uh-huh (yes).
19       MR. CALVIT: Okay.
20   A   Seventeen.
21   Q   Okay. Do you see Mr. Runner?
22   A   Yes, sir.
23   Q   How many times is he on there?
24   A   He's on there twice
25   Q   Okay. So help me understand. Was that something

251

1    if you'd have been more than two shy would you have asked
2    somebody for assistance? I'm trying to understand how many
3    you needed to run your shift.
4    A   You need sixteen.
5    Q   Okay. So why does it say you have eighteen
6    essential employees?
7        MR. CALVIT: And if you don't know, you don't
8        know.
9    A   I don't.
10   Q   Okay. Were you given any training by RCC about
11   that?
12   A   As far as some. Yes, sir.
13   Q   Okay. And what did they tell you essential
14   employees means?
15   A   How many staff that are assigned to your shift.
16   Q   Okay. Now, go to the next page. Just flip it up
17   one more. Do you see the next one?
18   A   Yes, sir.
19   Q   Okay. Is that the next shift coming on?
20   A   Yes, sir.
21   Q   And how many essential employees does--does it
22   have?
23   A   Twenty.
24   Q   All right. What's the difference between that
25   shift and yours with regard to responsibilities?

252

1    A   You have zero staff vacancies.
2    Q   Okay.
3        MR. CALVIT: I'm sorry. Zero what?
4        WITNESS: Staff vacancies.
5    Q   So there--that shift is doing the same set of
6    responsibilities as your shift, or do they have additional
7    responsibilities that--
8    A   They have additional responsibilities.
9    Q   Okay. What additional responsibilities do they
10   have that you don't have?
11   A   A canteen officer.
12       COURT REPORTER: You said canteen?
13       WITNESS: Yes, ma'am.
14       COURT REPORTER: Okay. Thank you.
15   A   A back gate officer.
16   Q   Back gate officer?
17   A   Yes, sir.
18   Q   Okay.
19   A   A maintenance sergeant. A medication officer.
20   Q   Okay. So y'all don't do any medication, y'all
21   don't run the back gate, you don't run the canteen at night?
22   A   No, sir.
23   Q   Okay. So at--
24       MR. CALVIT: That was a compound question.
25       WITNESS: Oh.

63   (Pages 249 to 252)

Gerald Hardwell
August 28, 2017

253

1      MR. CALVIT:  Are you answering no, sir to
2   each one of those?
3      WITNESS:  Okay; okay.
4      MR. CALVIT:  Object to the form of the
5   question.  Calls-- It's a compound question.
6      WITNESS:  Okay.
7      MR. JACKSON:  Okay.
8   Q   So you've listed all the responsibilities they do
9   with twenty people that you're supposed to do with sixteen or
10  with eighteen?
11     A   Supposed to do with eighteen.
12     Q   Okay.
13     A   Okay.
14     Q   All right.  And as a shift supervisor had only
15  fourteen showed up that day,--
16     A   Yes, sir.
17     Q   --at what level would you call--or were given
18  authority to start calling in people for overtime to fill--
19  fill slots?
20     A   So you're looking for the number I needed or--
21     Q   Yes, sir.
22     A   Fifteen.
23     Q   Okay.  So if you went below fifteen then you had to
24  call a major or somebody to get permission to bring some
25  people in off for overtime?

254

1      A   Yes, sir.
2      Q   All right.  And is that written down somewhere or
3   is that just oral, you know you've got to have fifteen to get
4   it done?
5      A   It's written down somewhere.
6      Q   Okay.  Has it been-- Has it occurred in your time
7   as a shift lieutenant that you had fifteen only for a
8   particular shift?
9      A   Yes, sir.
10     Q   Okay.  Have you ever worked a shift with less than
11  fifteen?
12     A   Not that I can recall.
13     Q   Okay.  How often does it happen that you have to
14  call in folks for overtime?
15     A   Not often.
16     Q   Not often.  Okay.  So even though this says
17  essential staff, you have eighteen assigned, the bare minimum
18  you need to run that shift is fifteen?
19     A   Yes, sir.
20     Q   All right.  And to your knowledge you've never run
21  it with less than fifteen?
22     A   No, sir.
23     Q   Okay.  And you didn't work any shifts where there
24  were less than fifteen on a particular shift?
25     A   No.  No, sir.

255

1      Q   All right.  I'm going to show you as 10- --RCC 106
2   and 107.  Tell me if you've ever had a chance to look at this
3   document before.
4   (WITNESS PERUSES DOCUMENT.)
5      A   No, sir.
6      Q   Okay.  Do you-- Have you ever seen a form like
7   that?
8         MR. CALVIT:  May I?
9      A   Yes, sir.
10     Q   Okay.  When you were a booking officer did you use
11  forms like that?
12     A   No, sir.  Not myself.
13     Q   Okay.
14     A   Female booking officer.
15        MR. CAMERON:  Could you-- Could you pass it
16     over?
17        MR. JACKSON:  Sure.
18        MR. CAMERON:  Yeah.
19     Q   Okay.  Sir, I'm going to represent to you that this
20  RCC 106 and 107 is represented to be the inmate medical form
21  for Mr. Erie Moore when he arrived at the facility.  Is that
22  what you understand it to be?  Or you've not ever seen this
23  before.  Correct?
24     A   No, sir.
25     Q   Okay.  As the shift lieutenant is it incumbent upon

256

1   you to ever review documents like this to see what kind of
2   inmates you're supervising in the lockdown cells?
3      A   No, sir.
4      Q   Okay.  Do you ever seek out that information?
5      A   No, sir.
6      Q   All right.  Do you know what these asterisks mean
7   in response to these questions?
8      A   No, sir.
9      Q   Okay.  So you don't know why Mr. Moore's intake
10  would say that--or it appears to reflect that he wouldn't
11  answer any questions?
12     A   No, sir.
13     Q   All right.  Is that something that you've ever seen
14  before in your seven years working at RCC, that inmates won't
15  answer any questions of any RCC employees about their medical
16  condition?
17     A   No, sir.
18     Q   Never seen that before?
19     A   No, sir.
20     Q   Your time as a shift lieutenant at RCC, did you
21  ever become concerned about the mental health of any inmates
22  that you were supervising?
23     A   Yes, sir.
24     Q   What tools were available to you when you were so
25  concerned?

64  (Pages 253 to 256)

257

1         MR. CALVIT: When you say "tools," I object to
2         the form of the question. He may actually
3         think devices.
4         MR. JACKSON: Yeah.
5     Q   And what I-- What I mean is what actions could you
6   take as a supervising lieutenant when you were so concerned
7   about an inmate's mental health?
8     A   Just make sure my officers are doing the proper
9   paper- --the proper paperwork on them.
10    Q   Okay. Did you have the flexibility to call for a
11  medical screening?
12    A   No, sir.
13    Q   Had you ever called an inmate--I mean, an ambulance
14  for an inmate because of their behavior?
15    A   What type of behavior?
16    Q   Whatever behavior. Exhibiting some mental health
17  or some physical infirmity that caused you to seek medical
18  attention for them.
19    A   I mean, are they injured or-- Far as injured, yes,
20  sir.
21    Q   Okay. So for injuries you have?
22    A   Yes, sir.
23    Q   But for behavior you have not?
24    A   No, sir.
25    Q   All right. Did you ever have any interaction with

258

1   any employees of the City of Monroe?
2     A   No, sir.
3     Q   Outside of police officers that would book Monroe
4   detainees, did you ever see any Monroe em- --City of Monroe
5   employees that came to inspect RCC in any way?
6     A   No, sir.
7     Q   Okay. Did you ever have to make any reports or
8   parts of reports that ultimately were submitted to the mayor
9   of the City of Monroe or any other Monroe city employees?
10    A   No, sir.
11    Q   Okay. Were you ever asked-- Or have you ever
12  reviewed the City of Monroe contract--
13        MR. CALVIT: Asked and answered.
14    Q   --with regard to RCC?
15    A   No, sir.
16    Q   Okay. So you would not have participated in any
17  contractual notice that is to go to the City of Monroe's
18  mayor when certain events occur with Monroe arrestees?
19    A   No, sir.
20    Q   And you didn't supply any information that you were
21  told were going into such reports?
22    A   No, sir.
23    Q   After Ouachita Parish came and after Mr. White and
24  Mr. Moore were removed from the cell and after Assisted
25  Warden Aultman directed you to direct others to clean the

259

1   cells, was there any discussion about preserving the evidence
2   in that crime scene?
3     A   No, sir.
4     Q   Was there any effort by you or any of your
5   subordinates to photograph the interior of the cell?
6     A   I can't recall.
7     Q   Okay. Do you recall making any statements to any
8   investigators that you directed or were aware that an RCC
9   employee was directed to take photographs on an iPhone or a
10  cell phone prior to any cleanup activities occurring?
11    A   After or before the cleaning?
12    Q   Before the cleaning.
13    A   Yes, sir.
14    Q   Okay. Tell me about that.
15    A   At that time we didn't have a regular camera, you
16  know, so I know I had--had that phone on me that was handy,
17  so--
18    Q   Okay. What phone was that?
19    A   It was a Samsung flip phone.
20    Q   And you took photographs?
21    A   Yes, sir.
22    Q   Of the cell prior to it being cleaned?
23    A   Before it was cleaned.
24    Q   Yeah.
25    A   Yes.

260

1     Q   Before it was cleaned--
2     A   Yes, sir.
3     Q   --you took photographs on that Samsung flip phone?
4     A   Yes, sir.
5     Q   Okay. And where is that Samsung flip phone now?
6     A   I don't have it. I can't recall where it's at,
7   sir.
8     Q   How many photographs did you take?
9     A   Maybe four or five.
10    Q   Were you able to take that flip phone home or did
11  you have to leave it in the possession of RCC when you left--
12    A   Leave it in the--
13    Q   --after your shift?
14    A   I'm sorry.
15    Q   That's okay.
16    A   Leave it in the possession of RCC.
17    Q   Okay. The last you had that phone you turned it to
18  RCC?
19    A   Yes, sir.
20    Q   Okay. And so you didn't take it home, the phone?
21    A   No, sir.
22    Q   And you didn't sell it or destroy it or have
23  anything to do with getting rid of it?
24    A   No, sir.
25    Q   All right. As far as you know it's in the custody

65  (Pages 257 to 260)

Gerald Hardwell
August 28, 2017

261

1   and control of RCC?
2       A   Yes, sir.
3       Q   And it would have at least four or five photographs
4   that you took of the cell where Vernon White was killed prior
5   to any inmates cleaning it up at the instruction of Warden
6   Aultman?
7       A   Yes, sir.
8       Q   Have you seen those photographs?
9       A   No, sir.
10      Q   Okay.  Do you have any idea why or what the dispute
11  between Major Tubbs and Erie Moore was about when he was
12  booked into the facility?
13      A   No, sir.
14      Q   Okay.  What was Major Tubbs' role in this
15  investigation, if you know?
16      A   I don't.
17      Q   Okay.  Did you see him on site when all this was
18  going down with Mr. Moore and Mr. White?
19      A   No, sir.
20      Q   Okay.  Did you ever talk to him about your
21  involvement in this case?
22      A   Not that I can recall, I didn't.
23      Q   Okay.  But you never came to learn why Mr. Moore
24  was Maced upon booking and taken directly to lockdown cell #7
25  in street clothes?

262

1       A   No, sir.
2       Q   Okay.  At your disposal while at RCC did you have
3   access to NCIC to run background checks on inmates?
4       A   No, sir.
5       Q   Okay.  Did anyone at your facility have an NCIC
6   point?  Do you know what NCIC is?
7       A   No, sir.
8       Q   All right.  Are you-- Is there any computer tool
9   available at RCC to run background checks on inmates that are
10  within your custody?
11      A   No, sir.
12      Q   Okay.  So it's-- Well, let me ask you this.  Do
13  you know how RCC comes to learn the background of an inmate
14  when they're booked?
15      A   Yes, sir.
16      Q   Tell me how that happens.
17      A   Only through MPD.
18      Q   Okay.  Do they sometimes produce NCIC or background
19  reports on inmates when they book them?
20      A   No, sir.
21      Q   Okay.  How do you-- How do you get that--or that
22  information from Monroe PD?
23      A   Well, I don't get it directly, you know.
24      Q   Okay.
25      A   Only if they've got a detainer or hold on them.

263

1       Q   Okay.  What does that mean, a detainer or a hold?
2       A   If they have a warrant with OPSO.  Far as that
3   background, that's it.
4       Q   Okay.  So have you ever seen a background report on
5   inmates that are in your custody?
6       A   No, sir.
7       Q   So if there was an NCIC report in the RCC records
8   run a year and a month after Vernon White died, how do you
9   think it would have ended up in there?
10      A   I-- I-- I really don't know.
11      Q   Okay.  It's not anything you would have had
12  anything to do with?
13      A   No, sir.
14      Q   Okay.  Would it be normal for you to tell your
15  staff to colocate two problem inmates if you had empty
16  lockdown cells available to you?
17          MR. CALVIT:  Do you understand the question?
18          WITNESS:  No, I don't.
19      Q   If you have two problem inmates would it be your
20  normal protocol while working at RCC to place them in a same
21  lockdown cell if you have other empty lockdown cells
22  available to you?
23      A   No, sir.
24      Q   And why is that?
25      A   Because both of them being violent, you know.

264

1   Showing volatile actions, you know.
2       Q   So common sense would dictate--
3       A   Yeah.
4       Q   --separate them if you can?
5       A   Yeah.
6       Q   Okay.
7       A   But at that time they--they wasn't showing signs of
8   that.
9       Q   Okay.
10          MR. CALVIT:  Okay.  Are you finished?
11          MR. JACKSON:  Huh?
12          MR. CALVIT:  I need to take a break.
13          MR. JACKSON:  Yeah.  Let's take a break.
14  (OFF RECORD.)
15  EXAMINATION BY MR. JACKSON, continuing:
16      Q   Captain, I wanted to go back.  We talked about how
17  you'd been trained for checks on the inmates, to do it every
18  fifteen to thirty minutes.  Correct?
19      A   Yes, sir.
20      Q   Okay.  Tell me what you expect of your CO when they
21  do an inmate check.  What are they supposed to do in that
22  check process?
23      A   Look inside the cell.
24      Q   Okay.
25      A   Yes, sir.

66  (Pages 261 to 264)

265

1    Q   And what are they looking for?
2    A   To make sure both inmates inside the cell.
3    Q   Okay.  And what do you teach them to do when
4  they're doing an inmate check?
5    A   Look for those two bodies inside the cell.
6    Q   All right.  Is there some process that you train
7  them to do when you have a situation-- Because we know
8  lockdown cell #7 had one visual port.  Is that correct?  One
9  window.  Right?
10   A   Yes, sir.
11   Q   All right.  So you lift the flap up and you look in
12  this one glass window that has some expanded metal over it.
13  Right?
14   A   Yes, sir.
15   Q   What do you expect of your COs when they open that
16  up and there's two inmates in that facility--in that--in that
17  particular cell?
18   A   Be able to see both of those inmates.
19   Q   Okay.  And what are they trained to do when they
20  can't see both of those inmates?
21   A   If they can't see both of them call the shift
22  sergeant and explain to him what's going on and that way they
23  can breach the cell door, see what's going on.
24   Q   Okay.  So if you can't see both inmates when you do
25  a visual check what are RCC employees trained to do upon that

266

1  condition?
2    A   Call they supervisor.
3    Q   Okay.  And then what happens then if somebody is
4  blocking the view?  What do you do?  What are the first--
5  Your progressive interaction with the inmate, how does that
6  go?
7    A   You ask the inmate to step--give them seven or
8  eight verbal orders to step back away from the door.
9    Q   And if they refuse?
10   A   Call your supervisor.
11   Q   And-- Okay.  And then what happens next?
12   A   Brief the supervisor.  I can't speak for whatever
13  the next supervisor do, but ask them to give them a direct
14  verbal order to back up from the door.
15   Q   And if they refuse?
16   A   Call for some more backup and then breach the cell
17  door.
18   Q   Okay.  And the purpose of that is to do what?
19   A   Get a visual check on both of those inmates.
20   Q   Okay.  Did you ever come to learn what happened in
21  that 5:00 to 6 p.m. on October 13th, 2015, in the lockdown
22  cell #7?
23   A   No, sir.  I didn't.
24   Q   Did you ever come to speak with any of the COs that
25  were supposed to make these visual checks every fifteen to

267

1  thirty minutes?
2    A   No, sir.
3    Q   Do you know if they did?
4    A   No, sir.
5    Q   Okay.  What are the rules that COs are-- Tell me,
6  how is--how are meals distributed in the lockdown cells?
7    A   Through the tray hatch.
8    Q   So the inmates are going to take their meals inside
9  the lockdown cells?
10   A   Yes, sir.
11   Q   All right.  So who distributes the meals?
12   A   Shift sergeant.
13   Q   Okay.  So the shift sergeant, not an inmate, not a
14  trustee.  Correct?
15   A   Well, the inmates are going to deliver the trays,
16  you know, along with the shift sergeant.
17   Q   All right.  So tell me-- Describe how that process
18  works when you're the shift lieutenant.
19   A   The inmate has proper gloves on, hairnet, beard
20  net, the proper jumper for serving trays, issued lockdown
21  cell trays.
22   Q   Okay.  If there are two inmates in a cell is each
23  inmate supposed to get their own tray, or how does that work?
24   A   Each inmate--
25   Q   Is there any training on that?

268

1    A   Oh, I'm sorry.
2    Q   No.  That's okay.
3    A   Each inmate is supposed to get his own tray.
4    Q   All right.  How does that process of distribution
5  ensure that each inmate gets their own tray?
6    A   By visually seeing the inmate getting his own tray.
7    Q   Okay.  So is that a sergeant's responsibility?
8    A   Yes, sir.
9    Q   All right.  So the--the trustee inmate is handing
10  the physical tray to the lockdown inmate and the sergeant is
11  supposed to view that transaction occur?
12   A   Yes, sir.
13   Q   All right.  And if one inmate tries to take two
14  trays what happens?
15   A   I can't speak for another officer.
16   Q   Okay.  What would you do?
17   A   Tell the other inmate to get up and get his own
18  tray.
19   Q   Okay.  And is that a part of the check process?
20   A   I mean, you feeding lockdown chow, so I'll say
21  yeah, it is.
22   Q   Okay.  And is that recorded somewhere when these--
23  when these checks are done--
24   A   Yes, sir.
25   Q   --for mealtimes?

67  (Pages 265 to 268)

Gerald Hardwell

August 28, 2017

269

1    A  Yes, sir.
2    Q  Is that on that same lockdown check form?
3    A  No, sir. You record to main control.
4    Q  Main control.
5    A  Yes, sir.
6    Q  All right. So whose job is it to record that in
7    main control?
8    A  Main control room operator.
9    Q  Would that be 5 and 6 control room operator?
10   A  No, sir.
11   Q  Okay.
12   A  Main control operator.
13   Q  So there's a separate control operator?
14   A  Yes, sir.
15   Q  And what is that person's job?
16   A  Keep up with the counts, answer the phones.
17   Q  So when they pass out trays someone is radio back--
18   radioing back to the control room, "Inmate Erie Moore got his
19   tray"?
20   A  They're just radioing the start of chow, you know.
21   If he doesn't eat, it's recorded. I mean, it's-- You are
22   supposed to be typed up if a inmate refused to get his tray.
23   Q  Okay. So when trays are distributed--
24   A  Yes, sir.
25   Q  --if an inmate doesn't come and physically retrieve

270

1    his tray RCC policy would mandate a UOR be written about that
2    event?
3    A  Yes, sir.
4    Q  Okay. And, likewise, if one inmate takes both
5    trays and the other inmate is never seen, would that likewise
6    generate a UOR?
7    A  Yes, sir.
8    Q  All right. Did you see a UOR about that particular
9    condition in the White/Moore cell on October 13th?
10   A  Not that I recall.
11   Q  Okay. And in your preparation for today you didn't
12   see any such documents?
13   A  Yes, sir-- No, sir.
14   Q  Okay. Whose job would it have been to cause the
15   UOR to have been created?
16   A  Shift sergeant.
17   Q  All right. That worked for Lieutenant Loring or
18   that worked for the control room?
19   A  Lieutenant Loring.
20   Q  All right. Would there be a separate set of
21   documents in the control room annotating who got chow on that
22   day and who didn't?
23   A  No, sir.
24   Q  Okay. What kind of records would be in the control
25   room about chow in lockdown cell #7 on October 13th, 2015?

271

1    A  Only the shift sergeant calling on the radio saying
2    that he's feeding the lockdown chow.
3    Q  Okay. So there would be some record that somebody
4    that day radioed back to the control room that lockdown cell
5    #7 both got their trays if there's not a UOR about somebody
6    not getting a tray or an inmate taking two trays?
7    A  I'm not for sure.
8    Q  Okay.
9    A  I'm not for sure.
10           MR. JACKSON: Mark?
11           MR. McKEE: I've got a couple.
12           MR. JACKSON: I'm going to pass the witness.
13           MR. McKEE: Yeah. I ain't got but a couple.
14           (To witness): I appreciate your time, I
15       appreciate your patience. You've been doing a
16       great job. It's been a long day. Something
17       simple. You probably have already answered a
18       lot of these, but just to make sure we have a
19       complete record. Mark McKee. I represent
20       LaKaye Hamilton on this.
21   EXAMINATION BY MR. McKEE:
22   Q  We've got these cells. We've got thirteen--
23   thirteen cells, lockdown cells.
24   A  Yes, sir.
25   Q  You went through and you called them. One of

272

1    them--a couple of them are special management cells, two of
2    them?
3    A  Yes, sir.
4    Q  SM-1 is what you called it?
5    A  Yes, sir.
6    Q  SM-2, is that the code the facility uses?
7    A  Special management.
8    Q  Yeah. But that's what y'all use. Y'all use SM
9    when you're filling out any kind of reports or anything?
10   A  Yes, sir.
11   Q  SM-1 or SM-2?
12   A  Yes, sir.
13   Q  Can you tell us in SM-1 what's the maximum capacity
14   in it, normal maximum capacity?
15   A  One.
16   Q  One? Okay. Is there a time-- Is there other
17   times where maybe you'd have more than one like you talked
18   about when you did a roundup or something like that?
19   A  Maybe once or twice. That's it.
20   Q  That's not something real--happens with regularity.
21   Correct?
22   A  No, sir.
23   Q  Okay. What about SM-2?
24   A  No, sir. One.
25           MR. CALVIT: What are you asking him? Object

68  (Pages 269 to 272)

Gerald Hardwell

August 28, 2017

273

1        to the form of the question.

2        MR. McKEE: Yeah. I know.

3   Q   You know, what about SM-2 as far as maximum

4   capacity on the number? That was a bad question. I'm sorry.

5   A   Okay. One.

6   Q   One?

7   A   Yes, sir.

8   Q   Are those cells-- You said they were in close

9   proximity to the control room where they could see them?

10  A   Yes, sir.

11  Q   So are they constructed substantially similar as

12  far as how they're built--

13  A   Yes, sir.

14  Q   --where you can look into them?

15  A   Yes, sir.

16  Q   Got a window. What type of-- Explain that to me

17  again. I missed it a while ago.

18  A   What type-- What type--

19  Q   How it's built.

20  A   --of window?

21  Q   Yeah. How is it built where you can see in there?

22  A   It has two security windows--

23  Q   Okay.

24  A   --with a security wire inside the glass.

25  Q   Yeah. The--

275

1   that?

2   A   Richwood holding cell is like a regular lockdown

3   cell for city inmates that come in due to they intoxications

4   or--

5   Q   Yeah.

6   A   --just a aggressive inmate, place them in there.

7   Q   What's the capacity on it?

8   A   Two.

9   Q   Two? So they all-- They're all two, except for

10  the special management cells that have one and two?

11  A   Yes, sir.

12  Q   And with the special caveat you mentioned earlier

13  in your testimony that if you do a roundup maybe you'll

14  double bunk some of these cells with some--some inmates for--

15  Is that for a short period of time until you move them?

16  A   Yes, sir.

17  Q   Okay. All right. I just wanted to get--get clear

18  on that what the capacity was. And I won't go back through

19  all this business about how you can-- Would there be a-- My

20  question-- As far as knowing the numbers, my question would

21  be, would there be times whenever you have one person in some

22  of those other cells, do you--do you make special management

23  decisions to move some around to segregate others--other

24  inmates to make it work if you needed two problematic inmates

25  to be in separate cells?

274

1   A   And you can see directly in there.

2   Q   No-- No blind spots that you can in there?

3   A   No, sir.

4   Q   Okay. What about lockdown #1? What's the maximum

5   capacity on it?

6   A   Two.

7   Q   Two? Lockdown 2?

8   A   Two.

9   Q   Two? 3?

10  A   Two.

11  Q   Two? 4?

12  A   Two.

13  Q   Two? 5?

14  A   Two.

15  Q   6?

16  A   Two.

17  Q   Two? 7?

18  A   Two.

19  Q   Two? 8?

20  A   Two.

21  Q   9?

22  A   Two.

23  Q   Two? 10?

24  A   Two.

25  Q   And what about the Richwood holding cell? What is

276

1   A   No, sir.

2   Q   You wouldn't?

3   A   No, sir.

4   Q   We were looking at "Exhibit 8." I'm going to show

5   it to you again. This has got a bunch of these-- It's got a

6   bunch of--a bunch of inmates in different cells. Is that--

7   Is that-- Why do we have-- Then why do we have so many in

8   some of those lockdown cells? Like on page one, record

9   Richwood Correctional Center 240, "Exhibit 8," it's got

10  lockdown cells at the top. So my question would be why

11  there's so many in each cell if you only have two capacity?

12  A   I can't recall this. Maybe they had a--

13        MR. CALVIT: If you don't know--

14        WITNESS: Okay.

15        MR. CALVIT: Look, I'm sorry.. Answer his

16  question.

17        WITNESS: Okay.

18        MR. CALVIT: You're not obligated to guess.

19        WITNESS: Okay.

20        MR. CALVIT: So he asked you do you know.

21  A   No, sir.

22  Q   Okay. But the record does reflect--

23  (OFF RECORD INTERRUPTION.)

24  Q   But the record does reflect that you have more than

25  two in several of these cells, lockdown 2 has got three.

69   (Pages 273 to 276)

277

1  This document reflects three inmates in lockdown 2, 3--four
2  in lockdown 3, three in lockdown 4, three in lockdown 5 and
3  three in lockdown 6. Would that be accurate?
4      A  Yes, sir.
5      Q  Okay. But you don't have any personal knowledge as
6  to why--how that's--why that's so?
7      A  No, sir.
8      Q  Thank you.
9          MR. CAMERON:  Are you finished?
10         MR. McKEE:  Yeah; yeah.
11         MR. CAMERON:  Okay.
12  (OFF RECORD COMMENTS.)
13     Q  When-- When you prepared for the deposition I
14  think you indicated earlier that you did look at some of
15  the--some of your reports that you had prepared. Correct?
16     A  Yes, sir.
17     Q  Did you-- I think you also answered in the
18  affirmative you actually had the opportunity to look at--to
19  listen to your audio recording from Ouachita Correctional
20  Center?
21     A  Yes, sir.
22     Q  You remember that?
23     A  Yes, sir.
24     Q  When did you-- When did you listen to that
25  recording?

278

1      A  This past Wednesday.
2      Q  Past Wednesday?
3      A  Yes, sir.
4      Q  Do you recall being asked a question about--about
5  who was the--who was checking the lockdown cells that
6  afternoon?
7      A  Yes, sir.
8      Q  And what was your answer in that regard?
9      A  Jeremy Runner.
10     Q  Okay. And right after that you make the reference
11  that y'all were running short. What-- What-- What did that
12  mean?
13     A  We was-- I had two call-ins on my shift.
14     Q  So you were shorthanded?
15     A  Yes, sir.
16     Q  Okay. And I know Mr. Jackson went through some of
17  that, through some of those numbers a while ago, but based
18  upon your recall, based upon your personal knowledge right
19  now, what would that put your number at as far as personnel
20  that needed to be there that day?
21     A  Needed fifteen to be there.
22     Q  How many did you have?
23     A  I can't recall. I can't recall.
24     Q  Did you have less than fifteen?
25     A  I can't-- I can't recall, sir.

279

1      Q  But you were-- But you did tell the sheriff's
2  office you were running short in your statement?
3      A  Yes, sir.
4      Q  Okay. How often is it that you--that you see
5  someone come in for screening and they remain in their street
6  clothes for any length of time?
7      A  Not often.
8      Q  That's-- That's an unusual occurrence, isn't it?
9      A  Yes, sir.
10     Q  Would that be something that would merit a writeup,
11  a written report as far as that's concerned?
12     A  No, sir.
13     Q  Is there any specific policy about why you even as
14  a correctional facility want to take them out of their street
15  clothes?
16     A  Yes, sir. To house them in a jumper that we assign
17  to them.
18         MR. CALVIT:  He asked if there was a written
19         policy.
20         WITNESS:  Oh.
21     A  Oh, no, sir.
22         MR. CALVIT:  Thank you. Just answer--
23         WITNESS:  Sorry.
24         MR. CALVIT:  Listen, I know it's been a long
25         day.

280

1          MR. McKEE:  He's doing great.
2          MR. CALVIT:  Just answer the question.
3          MR. McKEE:  He's doing fine. I just wanted to
4          clean it up for you.
5          WITNESS:  Yes, sir.
6      Q  But is there-- Do you know if there's any kind--
7  What's the reasoning behind why you would want them in a
8  uniform jumpsuit like you--like you indicated?
9      A  Yes, sir.
10     Q  Why is that?
11     A  Tell them apart from city, DOC,--
12     Q  Okay.
13     A  --some abuse program inmates.
14     Q  Does it also assist you in making sure there's no
15  contraband that enters the facility?
16     A  Yes, sir.
17     Q  Do you have any idea or personal knowledge of why
18  he wasn't taken out and assigned a suit? And we're talking
19  about Mr. Erie Moore.
20     A  Yes, sir; yes, sir.
21     Q  Do you have any idea why he wasn't?
22     A  Not that I can think of. No, sir.
23     Q  What's the-- As the-- As lieutenant what's
24  the--what's the-- You took us through some of the--what goes
25  on as far as the chow is concerned. I mean, there's--there's

70  (Pages 277 to 280)

Gerald Hardwell
August 28, 2017

281

1  a sergeant involved as a general rule and an inmate that
2  assists with the food--food--you know, handing out food?
3      A  Yes, sir.
4      Q  How many inmates usually work that--that shift?
5      A  Far as passing out trays?
6      Q  Yes.
7      A  Just one.
8      Q  Is that something that's also documented in y'alls
9  records about what--what inmate will be doing that?
10     A  No, sir.
11     Q  How-- How does an inmate obtain that position?
12     A  A kitchen worker.
13     Q  Kitchen work? That's something they volunteer for
14  or is that something they give them as a--as a merit for good
15  behavior?
16     A  Yes, sir.
17     Q  Are they paid for doing that?
18     A  Yes, sir.
19     Q  They are? Well, then-- Well, shouldn't there be
20  records in that regard as far as who--who would have been
21  doing the--doing the chow that day, the inmate, if they were
22  paid?
23     A  No, sir.
24     Q  There's no-- Is there any way to track the
25  information as concerning who--who would be working that

282

1  afternoon when--on the--on the 13th when chow was sent out?
2      A  No, sir.
3      Q  Do you have any knowledge who was working that day
4  as the--as the inmate who passed out chow on the 13th?
5      A  No, sir.
6      Q  Do you have any knowledge or information about who
7  was the--who was the sergeant or correctional officer that
8  was working the afternoon of the 13th?
9      A  Yes, sir.
10     Q  Who would-- Who would that have been?
11     A  Hale.
12     Q  Okay. And who is Hale? What is his title and what
13  is--what is his duties?
14     A  I don't know his duties, but all I know, he was a
15  new CO. It was not my shift.
16     Q  Okay. I understand that.
17     A  Okay.
18     Q  And I appreciate that.
19     A  Okay.
20     Q  Do you have any information based upon--because you
21  are a lieutenant why he was at that spot and what he was--
22  what he was doing there--
23     A  No, sir.
24     Q  --if he's not a sergeant?
25     A  No, sir; no, sir.

283

1      Q  Okay. Because I think you testified earlier most
2  times sergeants do that as part of their duties, to be
3  involved as far as the chow is concerned?
4      A  Yes, sir.
5      Q  And that's because they like to check on the
6  inmates. Is that correct?
7      A  Yes, sir.
8      Q  Make sure they get their food?
9      A  Yes, sir.
10     Q  Make sure they take their food, because as you
11  testified earlier to Mr. Jackson's questioning, if they don't
12  take their food then that's something that is an unusual
13  occurrence and needs to be reported.
14     A  Yes, sir.
15     Q  Do you have any-- Has anybody-- Do you have any
16  knowledge that anybody else fills in for these positions
17  other than--other than sergeants?
18     A  No, sir.
19     Q  Do you have any information about how many times
20  Mr. Hale had done this?
21     A  No, sir.
22     Q  On the-- We talked about this earlier. What
23  about-- Who is over--in charge of supervising the control
24  room?
25     A  Shift lieutenant.

284

1      Q  Shift lieutenant?
2      A  Yes, sir.
3      Q  And who would--who would that have been on the
4  13th?
5      A  Day or night shift?
6      Q  Both. Give me both.
7      A  Lieutenant Loring on the days. And myself, I was
8  over the night shift.
9      Q  Okay. Who's-- Who's-- My question--first
10  question was who was in charge and responsible for overseeing
11  this person. My next question will be who's responsible for
12  training this person?
13     A  I can't recall who was working my shift that night.
14  And far as with Loring, I don't know would have been
15  supervising his control room operators or who trained her.
16  So--
17     Q  Is that something that falls upon the shift--
18     A  Sir?
19     Q  The lieutenant? Is that something that falls upon
20  the lieutenant to train? Is that something you do, or does
21  somebody else do it that's--
22     A  Shift lieutenant.
23     Q  Shift lieutenant?
24     A  Yes, sir.
25         MR. McKEE: I think that's all I have.

285

1        MR. CAMERON: Okay.  I have a few follow-up.
2        I'll try not to repeat.
3   REEXAMINATION BY MR. CAMERON:
4        Q   The first thing I want to know is who issues your
5   check?  Is it LaSalle or is it Richwood Correctional Center?
6        A   LaSalle Management.
7        Q   I see you've got a tattoo on your arm.  What does
8   that tattoo mean to you?
9        A   It's the name my grandmomma gave me.
10       Q   Okay.  Do you have any other tattoos?
11       A   Yes, sir.
12       Q   What tattoos do you have?
13       A   Jesus-- Jesus on this arm and-- And one of my
14   arm--
15       Q   Another Jesus?
16       A   Yeah.  Jesus right here (indicating).
17       Q   Oh, okay.  And--
18       A   And stars and a dove and basketball on this arm
19   (indicating).
20       Q   All right.  Any other tattoos?
21       A   No, sir.
22       Q   Okay.  When you prepared for your deposition and
23   you reviewed reports did you notice any missing?
24       A   Sir?
25       Q   Did you notice any of your reports missing?

287

1   better term.  Have you ever seen this kind of form before?
2        (WITNESS PERUSES DOCUMENT.)
3        A   No, sir.
4        Q   All right.  So you don't--you don't know how it's
5   filled out?
6        A   No, sir.  It's medical.
7        Q   Okay.  So you don't know where it states "means the
8   question not answered," it could be the question was never
9   asked?  I mean, you don't know the difference?
10       A   Oh, no, sir.
11       Q   Okay.  You don't know if that's an auto response?
12       A   No, sir.  I don't.
13       Q   Okay.  I'm going to show you a group of documents,
14   RCC 427 through RCC 434.  This-- I just want to know in
15   general are these logs of activity at RCC?
16       (WITNESS PERUSES DOCUMENT.)
17       MR. CALVIT:  I'm sorry.  427 through-- What
18   did you say?  434.
19       A   What did you say, sir?
20       Q   I said are those logs of activity occurring at
21   Richwood on October 13, 2015?
22       MR. CALVIT:  Just take your time.
23       MR. CAMERON:  I'm sorry.  I need to correct
24       the record.  I'm adding 435.  I didn't see the
25       number down there at first.  It was kind of

286

1        A   No, sir.
2        Q   All right.  Does Richwood Correctional Center have
3   a training officer, someone who coordinates all the training?
4        A   A training officer.  No, sir.
5        Q   The-- Going back to October 12th, October 13,
6   2015, would you as the shift lieutenant be the only person
7   who had a radio?  Would--
8        A   Sir?  Sir?
9        Q   Would you be the only one who carried a radio?
10       A   No, sir.  I wasn't.
11       Q   Who else carried a radio?
12       A   On-duty officers, I guess.  I'm-- I'm going to say
13   on-duty officers.
14       Q   Okay.  All the correctional officers had radios?
15       A   Yes, sir.  The ones who--that would come on the
16   shift.
17       Q   Okay.
18       A   Yes, sir.
19       Q   I mean, so if someone were to check into, say,
20   lockdown 7 and they weren't able visualize inside the cell,
21   they may be able to call the control room and have them
22   visualize the cell for them?
23       A   Yes, sir.
24       Q   I want to ask you a question about this RCC 106.
25   This is the Erie Moore intake questionnaire, for lack of a

288

1        covered up.
2        MR. CALVIT:  Sure.
3        (To witness):  Do you want to put that at
4        the end, I think?
5        WITNESS:  Yeah.
6        MR. CAMERON:  Right.
7        MR. CALVIT:  That's how it will go.
8        MR. CAMERON:  Yeah.
9        MR. CALVIT:  Just take your time and take a
10       look at it.
11       WITNESS:  All right.
12       MR. CALVIT:  And then whatever questions he
13       has after you review it, answer him.
14       WITNESS:  Okay.
15       (WITNESS PERUSES DOCUMENT.)
16       A   Yes, sir.  Far as my shift.
17       Q   All right.  None of those were your shift.  Right?
18       A   Just B team--
19       Q   Just that first one?
20       A   B team shift and the last two booking officers.
21       Q   Now, is it each shift has is own log?
22       A   Yes, sir.  But we log in the same log book.
23       Q   Is this log book bound?  Is it a bound log book or
24   is it looseleaf?  How--
25       A   It's bound.

72  (Pages 285 to 288)

|  | 289 |
|---|---|
| 1 | Q  Bound. And is there a-- So a log book for each of |
| 2 | the control rooms? |
| 3 | A  Yes, sir. |
| 4 | Q  And there's a log book for the booking room? |
| 5 | A  Yes, sir. |
| 6 | Q  Where else would there be log books? |
| 7 | A  The kitchen, substance abuse control, work release |
| 8 | control. |
| 9 | Q  What was the last one? |
| 10 | A  Work release control. |
| 11 | Q  Oh. Okay. |
| 12 | A  Yes, sir. |
| 13 | Q  And there's not one for the sally port or that area |
| 14 | there, huh? |
| 15 | A  Yes, sir. |
| 16 | Q  There is? |
| 17 | A  Yes, sir. |
| 18 | Q  One thing I want to ask you about is, there's a-- |
| 19 | On RCC 433 there's a count and I was wondering-- I just want |
| 20 | to make sure I understand. Where it has THC 965, is that |
| 21 | total head count? |
| 22 | A  Yes, sir. |
| 23 | Q  And then DOC. That gives us the number of DOC |
| 24 | prisoners, nine hundred and fifteen (915)? |
| 25 | A  Yes, sir. |

|  | 291 |
|---|---|
| 1 | WITNESS: Oh. |
| 2 | A  No, sir. |
| 3 | Q  Okay. Does someone on your shift do that? |
| 4 | A  Yes, sir. |
| 5 | Q  Who on your shift would have done that back in |
| 6 | October 2015? |
| 7 | A  Shift sergeant. |
| 8 | Q  And that would have been Jeremy Runner? |
| 9 | A  No, sir. |
| 10 | Q  Who would that have been? |
| 11 | A  Reginald Williams. |
| 12 | Q  All right. But you as a lieutenant looking at |
| 13 | RCC 433, how would you--how would you interpret that, this |
| 14 | entry here, this is S, whatever that thing is, /LD 4? |
| 15 | A  I-- I don't know because-- I don't know. |
| 16 | Q  All right. Looking at these entries here, we've |
| 17 | got 1-97. What would that mean? |
| 18 | A  I don't know, sir. |
| 19 | Q  Uh-huh (yes). And how about the A-99? Do you know |
| 20 | what that means? |
| 21 | A  I don't know. |
| 22 | Q  Are there-- There are dorms at RCC? |
| 23 | A  Yes, sir. |
| 24 | Q  And are the dorms numbered numerically or alpha? |
| 25 | A  Numbered. |

|  | 290 |
|---|---|
| 1 | Q  And the city prisoners being an even fifty (50). |
| 2 | Right? |
| 3 | A  Yes, sir. |
| 4 | Q  Okay. And then there's this one here, it's |
| 5 | SA/LD. What-- What is that? Or is the SM? |
| 6 | A  I wouldn't know. That was Lieutenant Loring's |
| 7 | shift. |
| 8 | Q  Yes, sir. Do you make an entry like this when you |
| 9 | do your head count? |
| 10 | A  I don't record nothing in no log books. |
| 11 | Q  Oh, you don't? |
| 12 | A  No, sir. |
| 13 | Q  As a lieutenant working back in October 2015 you |
| 14 | did not do head counts? |
| 15 | A  Yes, sir. We did head counts, but I don't write-- |
| 16 | Q  Oh. |
| 17 | A  --anything down up in there. That's the control |
| 18 | room operator job. |
| 19 | Q  Yeah. So when you make a report to the control-- |
| 20 | You make a report. Right? |
| 21 | A  Yes, sir. |
| 22 | Q  And do you make a report as to how many individuals |
| 23 | are in the special management and lockdown cells? |
| 24 | A  Yes, sir. Shift-- |
| 25 | MR. CALVIT: He's asking if you do. |

|  | 292 |
|---|---|
| 1 | Q  Numbers? |
| 2 | A  Yeah. |
| 3 | Q  Okay. Do these correspond to--to the dorm numbers, |
| 4 | RCC 1 through 7? |
| 5 | A  Yes, sir. |
| 6 | Q  Uh-huh (yes). Where were the females housed? |
| 7 | A  We don't have females. |
| 8 | Q  I'll just say I noticed it says one female here, |
| 9 | but I didn't know. There are no females at RCC? |
| 10 | A  Sir? |
| 11 | Q  There are no females at RCC? |
| 12 | A  No, sir. Unless they're getting booked in. |
| 13 | Q  When Sergeant Williams would make the head count, |
| 14 | does he report that to you? |
| 15 | A  Main control. |
| 16 | Q  But does he tell you anything about the head count? |
| 17 | A  Main control contacts me. |
| 18 | Q  Okay. And you're--you are aware at all times, are |
| 19 | you not, as to which lockdown cells and special management |
| 20 | cells are occupied and unoccupied? |
| 21 | A  Not all the time. |
| 22 | Q  Very easy for you to find out, though. Right? |
| 23 | A  Yes, sir. |
| 24 | Q  Okay. |
| 25 | MR. CAMERON: We'll mark these as "Exhibit" |

73  (Pages 289 to 292)

293

1      something.
2             COURT REPORTER: I'm sorry. "16." Okay.
3             MR. CAMERON: "16"? Okay.
4      Q  All right. Here's another document I'd like for
5  you to look at. This is R- --
6             MR. JACKSON: And that's the-- That's those
7      log sheets?
8             MR. CALVIT: Yeah.
9             MR. CAMERON: That's the log sheets--
10            MR. CALVIT: Right.
11            MR. CAMERON: --we just discussed.
12            COURT REPORTER: Log sheets.
13            MR. JACKSON: RCC 427 through 435.
14     Q  This is RCC 270, and I ask if you recognize that.
15  (WITNESS PERUSES DOCUMENT.)
16     A  Yes, sir.
17     Q  Okay. And is this the policy of Richwood
18  Correctional Center that requires each inmate who is
19  processed into Richwood to be examined medically?
20            MR. CALVIT: If you need to read it, go ahead
21            and read it again. It's been a long day.
22  (WITNESS PERUSES DOCUMENT.)
23     A  State your question again.
24     Q  This is a policy that's represented on RCC 270, the
25  policy that requires each inmate processed into Richwood to

294

1  be examined medication?
2      A  Just DOC inmates.
3      Q  Just DOC inmates?
4      A  Yes, sir.
5      Q  Not required for city inmates?
6      A  No, sir.
7      Q  Okay.
8             MR. CAMERON: We'll go ahead and mark this as
9      "17."
10            COURT REPORTER: Yes, sir.
11            MR. CAMERON: Okay.
12     Q  Now, are-- City inmates are required to be
13  medically examined?
14     A  If it's necessary.
15     Q  And who makes that determination?
16     A  Shift lieutenants.
17     Q  If you're short on a shift does that typically mean
18  you're going to have less oversight of the inmates?
19            MR. CALVIT: Object to the form of the
20            question. Calls for speculation.
21     A  No.
22     Q  Excuse me?
23     A  No.
24     Q  And why is that?
25     A  We still have our rover, you know.

295

1      Q  Your--
2      A  Our officer making rounds.
3      Q  Okay. So if you require X number of--of officers
4  to be on a shift what is it that is lacking when you're
5  short?
6      A  Lacking? What you mean by lacking?
7      Q  Well, what don't you get done if you don't have a
8  full shift?
9      A  We don't-- We don't do as much as the day shift
10  do.
11     Q  Okay. Well, I'm not really asking you that. But
12  what aren't you getting done on your shift if you don't have
13  a full complement?
14     A  Getting everything done at nighttime.
15     Q  Do the-- The officers make rounds among the cells.
16  Right?
17     A  Yes, sir.
18     Q  And if you're short on a shift by two, say two
19  inmates--I mean, two officers, does that--that means that
20  you're not able to make as many rounds?
21     A  No, sir.
22     Q  Okay. How are you able to make the same number of
23  rounds with fewer people?
24     A  Shift sergeant.
25     Q  And he's part of the complement, isn't he?

296

1      A  He-- He-- That shift sergeant is going to be
2  there.
3      Q  Is it the shift sergeant the only one making
4  rounds?
5      A  No, sir. We have another hall officer.
6      Q  So the shift off- --the shift sergeant would be,
7  what, in an office someplace, sitting in an office and not
8  doing--making rounds if you had a full complement?
9      A  I wouldn't know what he'll be doing, you know, but
10  he has his duties conducting cell inspection, conducting cell
11  checks and also cleaning out the lockdown cells.
12     Q  I think you had related at one time you had a--a
13  concern about one inmate having mental health issues due to
14  some injures. Was that-- Did I hear that right?
15     A  No, sir.
16     Q  Have you-- Do you recall there ever being an
17  inmate who was processed in that you had some concern about
18  their mental health?
19     A  No, sir.
20     Q  Has any representative of the City of Monroe ever
21  come to Richwood that you're aware of to do an inspection,
22  look at paperwork, anything such as that?
23     A  No, sir.
24     Q  Have you always worked the night shift?
25     A  No, sir.

74   (Pages 293 to 296)

297

1    Q  Since you became captain what shift are working?
2    A  Days.
3    Q  And you're in charge of the day shift now?
4    A  Along with my co-officer.
5    Q  Who is your co-officer?
6    A  Mark Otwell.
7    Q  The Samsung flip phone you took pictures with of
8  the cell, do you know if any of those pictures were ever
9  downloaded anywhere?
10   A  No, sir. I don't.
11   Q  Have you ever been present when any representative
12  from the Louisiana Department of Corrections has come to
13  Richwood for any--any type of inspection?
14   A  Yes, sir.
15   Q  Tell me about that.
16   A  When we have our yearly audit.
17   Q  Are you aware of any of those yearly audits been
18  any kind of criticism of the operations of Richwood?
19   A  No, sir.
20   Q  Are you aware after a yearly audit any policies or
21  practices changing?
22   A  No, sir.
23   Q  Is it accurate to say that-- Going back to Erie
24  Moore for a minute here in your--in the B hall October 13th.
25  You had just taken him out of the cell, thrown him onto the

298

1  floor. Did you see him taken into the foyer?
2    A  Yes.
3    Q  Tell me why is that it was required that he be
4  carried?
5    A  Why it was required he be carried?
6    Q  Right. Why did he have to be carried?
7    A  Refusing to walk.
8    Q  Okay. Tell me, was that a positive verbal refusal
9  to walk, "I'm not walking," or is this someone told him to
10  stand up and he wouldn't walk, or told him to get up and walk
11  and he wouldn't walk?
12   A  They told him to get up, he wouldn't walk.
13   Q  Did anybody, you know, check to see if this was
14  his--his choice not to walk or is this something that was
15  something medically wrong with him?
16        MR. CALVIT:  Did anyone check that?
17        MR. CAMERON:  Yeah.
18   A  No, sir.
19   Q  Did you call any kind of medical personnel to come
20  check on Mr. Moore?
21   A  No, sir.
22   Q  And-- And in the foyer, when y'all are in there
23  for the hour-plus in the foyer, anybody ever call for medical
24  assistance?
25   A  No, sir.

299

1    Q  And what time typically is it that you arrive at
2  work--you arrived at work in 2015 for your 6 p.m./6 a.m.
3  shift?
4    A  5:30, 5:40.
5    Q  What was your routine when you came to work?
6    A  Come in and see the--see if I have any call-ins.
7  And if I did, I'd try to get somebody on it--have main
8  control--instruct them to get somebody on it, see if they can
9  come in for me.
10   Q  Soon as you got there at 5:35 you actively started
11  working?
12   A  Sir?
13   Q  Soon as you got there at 5:35 are you telling me
14  you would actively start work?
15   A  Not far as physical work on the hall, but getting
16  my shift ready.
17   Q  And was there--  There is a roll call where all of
18  your shift is physical present and you take down the name and
19  things such as that?
20   A  Yes, sir.
21   Q  And in the roll calls are a--any kind of sharing of
22  information where you might have the previous shift
23  lieutenant come on and tell them what's been going on, that
24  kind of thing?
25        MR. CALVIT:  He's answered that question from

300

1        you--
2        MR. CAMERON:  Yeah; yeah.
3        MR. CALVIT:  --and from the gentleman--
4        MR. CAMERON:  Yeah.
5        MR. CALVIT:  --to your right.
6        MR. CAMERON:  Well, this is a little bit--
7        This is a little bit different.
8        MR. CALVIT:  Well,--
9        (To witness):  Has that question already
10       been asked and answered to your knowledge?
11       WITNESS:  Yeah.  A couple of time.
12       MR. CAMERON:  All right.
13   Q  Well, my question is--  I asked you if you shared
14  information one-on-one with the lieutenant. I'm asking if
15  the lieutenant would come in to roll call and provide
16  information to the group as a whole.
17   A  No.
18   Q  Okay. Is the only reason an individual would be
19  place in lockdown is for punishment?
20   A  Rule violation.
21   Q  All right. Well, you have to punish them--
22   A  I wouldn't to say-- I wouldn't to say--
23   Q  --for rule violation.
24   A  I wouldn't to say--say punishment, but rule
25  violation.

301

1   Q   All right. Would a individual be placed in
2   lockdown for protection?
3   A   Yes, sir.
4   Q   And that would be protection from another inmate or
5   protection from themselves. Correct?
6   A   Yes, sir.
7   Q   You had indicated earlier there may from time to
8   time be three persons put into a lockdown cell. My question
9   is would that be just a very short period of time, temporary,
10  or is that something that might happen on a more regular
11  prolonged basis?
12  A   Temporary.
13  Q   And how long is it that you're allowed to place
14  three into a lockdown cell?
15  A   Not long.
16  Q   Are we talking about an hour or two hours, three
17  hours, a day?
18  A   Not even a day. Enough to clear some--release some
19  inmates out.
20  Q   Are you aware of RCC ever refusing to process an
21  arrestee from Monroe Police Department?
22  A   No, sir.
23  Q   Do you have any other jobs besides working for RCC?
24  A   No, sir.
25  Q   In October 2015 did you have any other jobs?

302

1   A   No, sir.
2   Q   Did Jeremy Runner ever express to you that he had
3   some concerns about Erie Moore?
4   A   No, sir.
5   Q   When there's a-- The watch on-- Let me rephrase.
6   Every lockdown cell is watched, looked at, on a regular
7   basis? You said every fifteen to thirty minutes?
8   A   Yes, sir.
9   Q   Is there one person who is designated to do that
10  watch?
11  A   No.
12  Q   Okay. How-- How do y'all coordinate? How do you
13  know that someone looked at lockdown cell 7 fifteen minutes
14  before or thirty minutes before? How do you know that it
15  needs to be looked at again?
16  A.  Basically, the rover book. You know, he makes--he
17  makes rounds up and down A hall. That's just his duties for
18  the day.
19  Q   Who-- Who is it? Rover?
20  A   No. That's the position. But whoever the CO in
21  the position with--
22  Q   Right. So there's one designated rover--
23  A   On each--
24  Q   --on each shift?
25  A   Yes, sir.

303

1   Q   And that person, the rover, is the one who's
2   supposed to be looking at the lockdown cells every fifteen to
3   thirty minutes?
4   A   Yes, sir. And also making rounds in the dorms.
5   Q   Okay. And does he keep a-- He keeps a log of when
6   he looks at the--the cells?
7   A   Yes, sir.
8   Q   And is--are the log entries-- Okay. Let me
9   rephrase. Where is this log maintained at?
10  A   Lieutenant's office.
11  Q   And are the entries into the logs supposed--are
12  they made contemporaneous; that is, at the time that the
13  watch is made?
14  A   Yes, sir.
15  Q   And I believe you did answer this, but it's common
16  sense that you don't place two combative inmates in the same
17  lockdown cell?
18  A   Yes, sir.
19  Q   Yeah. And that would be something that you would
20  avoid doing. Correct?
21  A   Yes, sir.
22  Q   Is there a written classification policy as to how
23  inmates are classified when they're brought into RCC?
24  A   No, sir.
25  Q   Are all-- All Monroe Police Department arrestees,

304

1   they're all placed in the same dorm, are they not? Besides--
2   Unless they're put in a lockdown or something like that.
3   A   Yes, sir.
4   Q   How about DOC inmates? Do y'all classify them a
5   little bit differently? Do you have some, maybe, aggravated
6   crimes in one area and others in another area?
7   A   Classify? What you mean by that?
8   Q   Classified being that someone has looked at the
9   person's record and determined that they may be dangerous and
10  they're--is a nonviolent offender, something like that, and
11  perhaps--
12  A   Yes, sir.
13  Q   --they're put into a different dorm than the
14  others.
15  A   Yes, sir.
16  Q   But does that happen?
17  A   Sir?
18  Q   Does that happen?
19  A   Yes, sir.
20  Q   Have you ever been trained that suicide is the
21  leading cause of death in jail?
22  A   Yes, sir.
23  Q   And have you ever been trained that a person
24  actively suicidal should be watched constantly?
25  A   Yes, sir.

76   (Pages 301 to 304)

305

1  Q  Have you ever had a actively suicidal inmate--
2  A  No, sir.
3  Q  --on your shift?
4  A  I'm sorry. No, sir.
5  Q  Has anyone, to your knowledge, at RCC ever
6  committed suicide?
7  A  To my knowledge, no, sir.
8  Q  Has any inmate at RCC ever attempted suicide?
9  A  Yes.
10  Q  What-- How far did they get along?
11  A  I can't recall. I was off, sir.
12  Q  Were you on duty when it happened?
13  A  Sir?
14  Q  Were you on duty?
15  A  (No response.)
16  Q  Were you on duty at the time it happened?
17         MR. CALVIT: He just said he was off.
18  Q  Oh, you said you were off?
19  A  Yes, sir.
20  Q  I'm sorry. I didn't hear you. Have you ever
21  observed a correctional officer in your mind use too much
22  force on an inmate?
23  A  No, sir.
24  Q  Have you ever become aware of any correctional
25  officer falsifying documents?

306

1  A  No, sir.
2  Q  I believe you talked a little bit about an
3  after-action review after the death of Vernon White and
4  Mr. Moore. Let me rephrase. Were you aware of some
5  after-action review after Vernon White's death?
6  A  What you mean by that?
7  Q  That would be a review by your superiors of the
8  actions taken by you and your coworkers.
9  A  You mean as far as report writing?
10  Q  Report writing, maybe some extra training, maybe
11  some debriefing about the way things could have been better,
12  or that you did good, or what- --whatever the case might have
13  been.
14  A  Yes, sir.
15  Q  Okay. And that was after the Vernon White
16  situation?
17  A  Yes, sir.
18  Q  Who conducted that?
19  A  Dr. Hanser.
20  Q  Now, he was-- He did a--some counseling. Is that
21  what you're referring to?
22  A  Yes, sir.
23  Q  All right. I'm referring to policy, practices,
24  tactics--
25  A  Okay.

307

1  Q  --that you and your coworkers engaged in during the
2  episode,--
3  A  Okay.
4  Q  --during the time that Vernon White was in the cell
5  and then brought out and he eventually died. Did any of your
6  superiors review your actions?
7  A  Not--
8  Q  That's what I'm talking about.
9  A  Not--
10         MR. CALVIT:  With him?
11         MR. CAMERON:  Yes.
12         MR. CALVIT TO WITNESS:  With you.
13  Q  With you.
14  A  Not that I recall.
15  Q  Okay.
16  A  No, sir.
17  Q  If an individual comes into booking-- And forgive
18  me if I've already asked. I'm almost done. If an individual
19  comes into booking and does not complete booking, is that
20  individual screened, intake screening, as soon as practical?
21  A  I don't understand that question.
22  Q  All right. Every inmate or every person that
23  Monroe PD brings in, they go through an intake screening.
24  Right?
25  A  Yes, sir.

308

1  Q  But for whatever reason if a particular inmate is
2  being processed doesn't go through the inmate screening, goes
3  directly to lockdown, for example, is it the policy and
4  practice of Richwood that that individual would be screened
5  as soon as practical?
6         MR. CALVIT:  Later on.
7  A  Yes, sir.
8  Q  And, you know, when you had gone through your
9  training, you had gone through training regarding report
10  writing?
11  A  Yes, sir.
12  Q  And you've been taught to write all significant
13  details in your reports?
14  A  Yes, sir.
15  Q  And that's so that later on, like now, you can look
16  back at the reports and remember what happened. Right?
17  A  Yes, sir.
18  Q  Now, as far as Mr. Moore, it is accurate to say
19  that you did have some typical, normal conversations with
20  him, did you not?
21  A  Yes, sir.
22  Q  And he wasn't, I guess, combative the entire time
23  that he was in Richwood?
24  A  No, sir. He wasn't.
25  Q  He shared with you some of his personal history?

77  (Pages 305 to 308)

| 309 | 311 |
|---|---|
| 1   A  Yes, sir.<br>2   Q  I do want to ask you one other thing. Going back<br>3  to the foyer real quick, I think you indicated that there<br>4  were some times when Mr. Moore was--he was lying down on his<br>5  side and there were times when he raised up, raised to some<br>6  degree.<br>7   A  Yes, sir.<br>8   Q  Is that correct?<br>9   A  Sat all the way up.<br>10   Q  Sat all the way up and then went back down. Is<br>11  that accurate?<br>12   A  I mean, when he sat all the way up I didn't see him<br>13  go back down.<br>14   Q  Were there any times that Mr. Moore was in the<br>15  foyer lying down that he attempted to raise his head, but<br>16  not--you know, not rise to--to where he's sitting on his<br>17  behind?<br>18   A  No, sir.<br>19   Q  Did you ever see him try to raise and not able to<br>20  raise in the foyer?<br>21   A  I can't recall he did.<br>22        MR. CAMERON:  Okay. I'll tender. Anybody<br>23       else?<br>24       MR. McKEE:  One--<br>25       MR. CAMERON:  Okay. Yeah. | 1  deceased, though.<br>2  REEXAMINATION BY MR. CAMERON:<br>3   Q  Okay. How did that name come up originally?<br>4   A  I don't know. He just was talking--talking out of<br>5  his head, sir.<br>6   Q  And this was on the night shift, obviously?<br>7   A  Yes, sir.<br>8   Q  Was it after he had been Maced or anything like<br>9  that?<br>10   A  No. It was before that. I-- I can't recall if it<br>11  was before or after.<br>12   Q  All right.<br>13       MR. CAMERON:  Under Louisiana federal law you<br>14       have the right to read and sign your<br>15       deposition.<br>16       MR. CALVIT:  We're going to read and sign.<br>17       MR. CAMERON:  All right. Very good. Oh, I've<br>18       got one-- I've got one final thing.<br>19  REEXAMINATION BY MR. CAMERON:<br>20   Q  The questions that you did answer, you understood<br>21  them?<br>22   A  Yes, sir. Majority of them. Yes, sir.<br>23   Q  The majority of them?<br>24       MR. JACKSON:  Which ones didn't you answer--<br>25       MR. CAMERON:  Yeah.<br><br>26 |
| **310** | **312** |
| 1       MR. McKEE:  --small quick question because I<br>2       just want to-- Nothing-- Real basic.<br>3  REEXAMINATION BY MR. McKEE:<br>4   Q  Does-- Does Richwood do all the booking for Monroe<br>5  city now?<br>6   A  Yes, sir.<br>7   Q  Anything they pick up, y'all book for them unless<br>8  it's a felony?<br>9   A  Just-- Just depend. Yes, sir; yes, sir.<br>10   Q  If it's a felony it goes to OCC?<br>11   A  Yes, sir.<br>12       MR. McKEE:  That's all I've got. Thanks.<br>13       WITNESS:  Okay.<br>14       MR. CALVIT:  I've got one question--<br>15       MR. JACKSON:  Okay.<br>16       MR. CALVIT:  --to follow up.<br>17  EXAMINATION BY MR. CALVIT:<br>18   Q  He had mentioned-- Mr. Cameron had mentioned just<br>19  a minute ago about sharing his personal history. Do you<br>20  recall anything else Mr. Moore may have told you about<br>21  knowing anyone at the facility?<br>22   A  He mentioned somebody named Derrick Hammond, that<br>23  he used to work with him at the mill.<br>24       MR. CAMERON:  Uh-huh (yes).<br>25   A  Derrick Hammond, he used to work with us. Now he's<br>26 | 1       MR. JACKSON:  --understand?<br>2   Q  Well, let me put it like this. Did you have a--<br>3  Did you have a fair opportun- -- Did you have a fair<br>4  opportunity to understand the questions?<br>5   A  Yes, sir.<br>6   Q  Did you have a fair opportunity to answer the<br>7  questions?<br>8   A  Yes, sir.<br>9   Q  All right. Very good. Thank you.<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25                DEPOSITION CONCLUDED.<br>26 |

Duke Copeland Court Reporting
(318)387-2889

313

1   STATE OF LOUISIANA
2   PARISH OF OUACHITA
3
4       I, MARGARET ANN COPELAND, Certified Court Reporter in
5   and for the State of Louisiana, as the officer before whom
6   this testimony was taken, do hereby certify that CAPTAIN
7   GERALD DAMONE HARDWELL, JR., after having been duly sworn by
8   me upon authority of R.S. 37:2554, did testify as set forth
9   in the foregoing deposition, pages 1 through 312, at the
10  office of Duke Copeland Court Reporters, 111 Hudson Lane,
11  Suite A, Monroe, Louisiana 71201, on the 28th day of August,
12  2017, commencing at 9:10 a.m. and concluding at 5:06 p.m.;
13  that this testimony was reported by me in the electronic
14  reporting method, was prepared and transcribed under my
15  personal direction and supervision, and is a true and correct
16  transcript to the best of my ability and understanding; that
17  the transcript has been prepared in compliance with the
18  transcript format guidelines required by statute or by rules
19  of the board, that I have acted in compliance with the
20  prohibition on contractual relationships as defined by
21  Louisiana Code of Civil Procedure Article 1434, and in rules
22  and advisory opinions of the board; that I am not related to
23  counsel or to the parties herein nor am I otherwise
24  interested in the outcome of this matter.
25      This certification is valid only for a transcript
26  accompanied by my original signature and original seal on

314

1   this page.
2       Monroe, Louisiana, this 7th day of September, 2017.
3
4
5
6
7
8                   MARGARET ANN COPELAND, CCR
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Duke Copeland Court Reporting
(318)387-2889

Gerald Hardwell
August 28, 2017

Page 1

| A | | | | |
|---|---|---|---|---|
| **a--** 56:12 59:5 | 278:4 | 240:18 | 59:5 61:20 | **AMR** 115:19 |
| 67:1,22 189:6 | **about--or** 176:5 | **admin** 109:4 | 123:16 | 138:19 |
| 190:9 275:19 | **abrasion** 143:13 | 116:19 118:8 | **agreed** 5:2 | **and--** 32:20 98:2 |
| 276:12 289:1,18 | **abrasions** 76:14 | **Administrate** 9:9 | **ahead** 18:10 51:3 | 116:25 149:11 |
| 302:5 303:5 | 100:8,12 | **administration** | 53:18 58:11 | 152:5 155:14 |
| 312:2 | **abuse** 141:3,6 | 118:10 158:6 | 91:23 131:25 | 166:4 181:25 |
| **a--a** 119:19 132:9 | 147:11 214:25 | 165:22 166:1 | 138:18 145:23 | 189:16 194:10 |
| 211:25 296:12 | 280:13 289:7 | 195:6 213:5 | 153:14,16 | 194:16 203:2 |
| **a--an** 70:18 84:2 | **academy** 162:10 | 246:20 | 181:24 248:9 | 224:13 234:12 |
| 190:5 | 237:8,10 | **administrative** | 293:20 294:8 | 266:11 285:13 |
| **a--any** 299:21 | **accept** 210:4 | 4:4,10 15:5 16:2 | **ahold** 89:12 | 285:17 298:22 |
| **a--as** 281:14 | **accepted** 70:18 | 27:15,21 30:7 | **ain't** 271:13 | **and--and** 152:3 |
| **a--had** 69:10 | **access** 262:3 | 36:17 38:22 | **AL** 1:8,13 2:9 | **and--and--** 192:8 |
| **a--some** 125:23 | **accompanied** | 203:10 | **alert** 95:19 99:10 | **and--B** 171:14 |
| 306:20 | 313:26 | **admission** 140:14 | 115:17 | **and--in** 165:17 |
| **a--you** 224:11 | **accurate** 147:12 | **advanced** 113:16 | **Alexandra** 2:12 | **and--on** 201:12 |
| **A-99** 291:19 | 195:20 277:3 | **advised** 5:12 | **all--** 47:14,14,15 | **and--there's** |
| **a.m** 57:13,14 | 297:23 308:18 | **advisory** 313:22 | 54:16 275:9 | 93:25 |
| 211:14,18 | 309:11 | **aerosol** 67:18,21 | 303:25 | **and/or** 136:7 |
| 214:16 299:2 | **accurate--** 27:22 | 67:22 | **all--what** 136:10 | **ANN** 1:24 313:4 |
| 313:12 | **Act** 20:22 149:8 | **affairs** 134:25 | **alleged** 59:1 76:11 | 314:8 |
| **abdomen** 79:2 | **acted** 156:13 | **affidavit** 112:8 | 118:14 | **annotating** |
| **ability** 182:21 | 313:19 | **affirmative** | **allow** 7:15 | 270:21 |
| 183:6,23 184:1,7 | **acting** 14:11,17 | 201:16 277:18 | **allowed** 31:1 | **annotations** |
| 184:13 223:14 | 105:11 146:25 | **affirmatively** | 128:9 301:13 | 248:18 |
| 239:12 313:16 | 150:17 155:22 | 100:1 | **allows** 199:20 | **annual** 113:15 |
| **able** 6:25 56:8 | 213:19 | **after-action** | **alpha** 291:24 | **another--** 133:9 |
| 73:21 90:9 | **action** 1:6,11 | 178:13 306:3,5 | **also--also** 8:17 | **answer** 5:8 7:16 |
| 103:19 105:20 | 14:10 55:17 | **afternoon** 145:24 | **altercation** 13:13 | 32:14 136:20 |
| 105:22 115:25 | 103:17 144:22 | 278:6 282:1,8 | 110:23 111:1,1 | 178:7,11 209:14 |
| 155:22 196:6 | **actions** 257:5 | **age** 111:21 | 176:14,15 201:4 | 256:11,15 |
| 199:12 208:14 | 264:1 306:8 | **agency** 39:17 | 201:20 | 269:16 276:15 |
| 223:7 260:10 | 307:6 | 209:9 | **altercations** 177:9 | 278:8 280:2 |
| 265:18 286:20 | **actively** 299:10,14 | **agent** 40:16 | **ambulance** | 288:13 303:15 |
| 286:21 295:20 | 304:24 305:1 | **aggravated** 304:5 | 135:14 137:17 | 311:20 312:6 |
| 295:22 309:19 | **activities** 238:19 | **aggressive** 49:18 | 226:8,11 257:13 | **answer--** 279:22 |
| **able--** 105:20 | 259:10 | 49:20 275:6 | **ambulate** 135:11 | 311:24 |
| **about--** 32:15 | **activity** 239:11 | **aggressor** 201:22 | **amendment** 126:5 | **answered** 153:13 |
| 41:3 55:8 | 287:15,20 | **ago** 15:15,16 | 126:7 | 258:13 271:17 |
| 104:20 149:2 | **actually--** 89:23 | 40:10 188:11,12 | **American** 39:18 | 277:17 287:8 |
| 211:17 212:12 | **adding** 287:24 | 213:19 218:1 | 39:20 | 299:25 300:10 |
| 283:23 | **additional** 175:22 | 240:10 273:17 | **amount** 125:23 | **answering** 253:1 |
| **about--about** | 237:11 252:6,8,9 | 278:17 310:19 | 128:6,9,10 | **answers** 32:2,4 |
| | **address** 239:13 | **agree** 14:16 27:18 | 134:20 | **Antonio** 13:17 |

| | | | | |
|---|---|---|---|---|
| 20:24 21:15 | apply 78:14,23 | arrest 39:7 206:9 | 201:1 205:6 | 195:14 196:25 |
| 246:7 | 156:19 | arrested 14:20 | 208:12 209:16 | 249:7 |
| any-- 43:23 48:17 | appreciate 271:14 | 31:14 33:19 | 212:1 219:8 | assume-- 190:18 |
| 49:5 59:4 76:9 | 271:15 282:18 | 59:10 | 223:3 229:9 | assumes 222:3 |
| 113:9 120:8 | appropriate | arrestee 44:12,14 | 244:19 272:25 | assuming 191:15 |
| 137:6 283:15 | 22:25 107:20 | 44:16 204:17 | 290:25 295:11 | assurance 211:7 |
| any--any 28:8 | 237:3 | 301:21 | 300:14 . | asterisks 256:6 |
| 32:1,22 58:13 | approximate | arrestees 205:3,11 | asking-- 88:21 | at--.146:20 252:23 |
| 67:4 297:13 | 17:10 84:16 | 209:1 258:18 | asleep 87:21 | at--at 242:8 |
| any--find 10:14 | 124:5 | 303:25 | 129:8,16,16,25 | at--say 140:16 |
| any--in 126:1 | approximately | arresting 209:9 | 130:7,19,23 | at--to 277:18 |
| any--the 42:14 | 124:2,7,8 131:19 | arrests 15:17 | 131:19 | at--where 22:22 |
| anybody 39:18 | are-- 10:3 40:25 | arrive 299:1 | assault 104:12,22 | attached 168:2 |
| 43:9,16 89:6,10 | 148:23 163:3 | arrived 101:4 | 107:6 | attaching 144:25 |
| 89:13 93:20 | 171:3 267:5 | 109:18 131:15 | assembled 194:23 | attempt 59:14 |
| 110:7 223:1,2 | 294:12 | 181:1 226:8,12 | 195:11 | 81:11 83:12 |
| 226:2 238:18 | are--that 42:19 | 255:21 299:2 | assertion 33:7 | 91:2 101:16 |
| 283:16 298:13 | are--what 74:12 | arrived,-- 87:10 | assessment | attempted 305:8 |
| 298:23 309:22 | area 65:17,20 | arrives 211:8 | 140:12 | 309:15 |
| anybody-- 93:20 | 125:2 127:2 | Article 313:21 | assign 279:16 | attempting 80:1 |
| 283:15 | 133:1,6 140:1 | as-- 16:18 18:15 | assigned 68:2 | 95:5 186:15 |
| anymore 108:3 | 141:14 143:18 | 85:6 231:10 | 160:22 247:19 | attend 17:18 |
| anyway 26:1 48:7 | 147:10 174:9 | asked 32:1,9,14 | 249:11,22,23 | 157:25 158:3,5 |
| 54:2 | 208:8 289:13 | 32:24 33:2 49:6 | 250:1 251:15 | 159:18 161:17 |
| apart 39:11 | 304:6,6 | 64:6 91:24 | 254:17 280:18 | 162:9,19 165:1 |
| 280:11 | areas 127:16,18 | 101:18,25 112:2 | assignment | Attendance 4:6,7 |
| apologize 49:6 | 128:2 146:15 | 122:19,24 | 121:20,23 | 4:8 20:3 21:4 |
| 108:13 218:4 | 158:6 241:4 | 136:20 153:13 | assist 99:16 | attended 23:20 |
| apologizing 79:22 | arguing 13:13,16 | 155:25 178:9 | 141:11 280:14 | 46:24 126:17 |
| apparent 142:16 | arm 41:4 78:12,13 | 181:12 183:21 | assistance 251:2 | 161:12 162:20 |
| apparently | 97:20 285:7,13 | 184:18 229:14 | 298:24 | 164:13 165:1 |
| 109:24 | 285:18 | 240:17 251:1 | assistant 20:24 | 168:10 |
| appear 22:4 27:22 | arm-- 285:14 | 258:13 276:20 | 148:24 170:1,3,4 | attention 61:4 |
| 56:10 92:6 | armory 188:19 | 278:4 279:18 | 172:17,21 | 257:18 |
| 95:18 129:25 | arms 72:20 74:6 | 287:9 300:10,13 | 246:10 | attorney 2:5,18 |
| 130:7,19 | 77:2 78:16,17 | 307:18 | assisted 181:22 | 3:5 42:8 43:4 |
| appear-- 56:3 | 79:4 87:7 96:11 | asked-- 258:11 | 258:24 | 113:7 |
| APPEARANCES | 100:8,9 | asking 6:8 14:12 | assists 281:2 | ATTORNEYS |
| 2:1 | arms--hands | 16:19 32:15,18 | associated 58:25 | 2:25 |
| appeared 129:16 | 100:9 | 32:22 49:23 | Association 39:18 | audio 42:14 73:6 |
| appearing 2:13 | Around-- 11:23 | 125:4 136:17 | 39:21 | 73:9,13,14 |
| appears 130:23 | around--depen... | 146:24 170:19 | associations 39:15 | 277:19 |
| 244:20 256:10 | 211:16 | 175:10 184:10 | assume 7:24 37:4 | audit 297:16,20 |
| applies 140:23 | arrange 160:18 | 184:12 187:3 | 176:1 192:24 | audits 297:17 |

**August** 1:17
313:11
**Ault-** 21:13
**Aultman** 21:9
46:7 82:25
116:15 117:5,8
117:15,22 118:1
118:5,19 170:4
170:24 258:25
261:6
**authenticate**
34:17
**authority** 8:25 9:3
9:20 169:5
236:4 253:18
313:8
**authorize** 135:23
136:2
**authorized** 30:8
236:24
**auto** 287:11
**automatically**
183:13
**available** 29:4,7
29:11 35:23
105:4 125:11
135:10 136:8,23
183:20 207:9
222:5 233:24
234:13,17,18
240:24 241:3
256:24 262:9
263:16,22
**available--** 205:19
**avoid** 303:20
**avoid--** 127:16
**avoided** 128:3
**aware** 32:8 110:7
115:6,9 122:1
135:6 152:21
176:7 177:6,20
183:14 186:6
201:10 207:8
219:19 221:24

240:20 259:8
292:18 296:21
297:17,20
301:20 305:24
306:4

**B**

**B** 2:24 84:11,13
93:24 109:8
132:11 134:8,9
136:1,9 155:3
169:11 171:14
199:10 222:22
288:18,20
297:24
**B-L-O-S-S-O-M**
246:17
**back** 11:11 12:18
13:12,22 17:10
24:10 31:19
40:1,13,22 44:12
54:20 58:20
59:12,19 62:18
64:1 67:3 69:13
69:20 70:11,13
70:14,20 71:3,7
71:8,10,11,19
75:15 76:24,25
77:7 78:12,24
79:5,9,22,25
80:23 81:10
83:1 86:4,5
93:16,17 96:6,9
96:18 102:24
104:25 114:2
116:13 121:4,18
123:2 125:9,15
127:7,8 130:4
131:11 134:10
134:19 136:14
137:14 159:4,9
159:10 162:11
168:8 170:22
177:24 181:19

195:18 198:14
201:22 209:9,9
210:6 217:20
221:17 223:8
252:15,16,21
264:16 266:8,14
269:18 271:4
275:18 286:5
290:13 291:5
297:23 308:16
309:2,10,13
**back--** 269:17
**back--back** 80:4
**backboard** 138:3
**background** 6:11
262:3,9,13,18
263:3,4
**backup** 103:19
105:19,22
266:16
**bad** 208:23 209:8
273:4
**badly** 127:25
**bald-headed**
61:22,23
**balled** 64:16,18
64:22 72:18
**bankruptcy** 112:4
**bar** 41:4
**bare** 254:17
**based** 278:17,18
282:20
**basic** 310:2
**basically** 25:2
33:15 34:2 41:2
43:3 45:9 50:16
105:19 119:3
149:10 155:13
157:8,17 168:19
216:11 244:2
302:16
**basically--** 107:3
**basis** 236:21
238:13,20

301:11 302:7
**basketball** 113:13
285:18
**Bates** 145:10
**baton** 40:17
**be--** 125:8 137:3
215:4
**be--that** 118:20
**beard** 267:19
**beat** 105:21
**beaten** 101:14
**beating** 50:14
55:7,13 104:6
**because--** 248:13
291:15
**bed** 25:20,22 26:2
26:4,4,11,18,21
26:25 64:2
200:17 215:11
**beds** 26:20 223:19
240:24
**been--** 254:6
**been--gotten**
113:14
**began** 23:10 24:6
**beginning** 43:18
200:22 242:14
**behaving** 104:6
**behavior** 176:22
206:17 209:10
222:1 257:14,15
257:16,23
281:15
**believe** 28:16
47:17 62:22
89:16 116:15
129:8 130:25
198:16 200:10
242:24 245:21
303:15 306:2
**believed** 184:12
**belong** 39:14
113:9,10
**bench** 134:16

**benefit** 194:23
**Besides--** 304:1
**besides--outside**
23:25
**best** 146:14 169:8
313:16
**better** 40:14 107:9
209:10 287:1
306:11
**Between--** 99:6
**between--a** 111:1
**between--in**
129:22
**beyond** 43:20
223:24
**big** 67:1 69:24
85:7 154:2
**big-size** 90:25
**bit** 58:5 75:2 93:7
106:9 120:13
123:22 141:24
242:16 300:7
304:5 306:2
**bit--** 300:6
**blanket** 119:6,8
119:12 148:14
**bleach** 119:3
**bleed** 144:16,17
**bleeding** 56:23
76:9 87:2,4
99:24 100:1,4
144:18,21
**blind** 119:21,24
120:3,10,16,18
122:5,11 274:2
**blinds** 122:1
**block** 166:13
**blocking** 266:4
**blood** 109:16
143:5 144:11
**bloodshot** 92:11
**Blossman** 246:15
**Blossom** 246:15
**blowup** 213:2

| | | | | |
|---|---|---|---|---|
| **board** 137:21 | 234:24,25 | **broke** 91:9 | 167:22,25 168:5 | 37:16 44:2 |
| 313:19,22 | 255:10,14 | **Brooks** 176:11,14 | 172:1 173:14 | 45:11 50:22 |
| **bodies** 265:5 | 261:24 288:20 | 176:20 | 175:17 178:5,12 | 52:6,11 53:10,12 |
| **body** 65:18 73:9 | 289:4 307:19,19 | **brought** 33:20 | 212:22,23 240:3 | 53:23 54:7,10 |
| 73:11,14,15 | 310:4 | 44:13 214:5 | 248:10 253:24 | 58:11 64:24 |
| 76:22 77:8 78:3 | **booking--** 307:17 | 303:23 307:5 | 254:14 257:10 | 65:2 66:17,20 |
| 78:22 84:17 | **booklet** 45:24 | **Brown** 3:18 44:5 | 265:21 266:2,10 | 69:19 83:19,23 |
| 89:13 90:13 | **books** 25:20 27:4 | 83:22,23 207:25 | 266:16 286:21 | 89:25 90:3 |
| 92:19,20 97:18 | 289:6 290:10 | **bruises** 57:2 77:3 | 298:19,23 | 91:21,24 95:14 |
| 98:1 120:7 | **born** 112:23,24,25 | 87:6 100:8,11 | 299:17 300:15 | 96:2,4 97:9 |
| 127:16 128:2 | **Bossier** 2:26 | **bruising** 76:12,21 | **call--or** 253:17 | 98:14,16,18,21 |
| 148:10 194:24 | **bottle** 67:9 | **building** 68:7 | **call-ins** 278:13 | 98:24 100:25 |
| **bonded** 59:13 | **bottom** 21:10 | 94:2,21,22 141:4 | 299:6 | 103:25 108:8,13 |
| **book** 25:22 27:7 | 87:16,17 88:10 | 147:10 157:24 | **called** 9:16 23:1 | 125:4 126:12,15 |
| 155:22 258:3 | 88:12 131:7,9,21 | 157:25 214:25 | 24:17 25:7,20 | 132:15,18,21 |
| 262:19 288:22 | 131:22 132:2 | 214:25 215:1 | 51:14 65:12 | 136:20 137:2 |
| 288:23,23 289:1 | 244:20 247:10 | **Building--** 141:7 | 105:19 123:14 | 139:12,14,20,23 |
| 289:4 302:16 | 248:17 | **building--excuse** | 126:21 239:19 | 139:25 140:3 |
| 310:7 | **bottom,--** 88:17 | 68:6 | 257:13 271:25 | 144:25 145:3,8 |
| **book-** 235:1 | **bound** 288:23,23 | **buildings** 24:15 | 272:4 | 145:11,13,16,20 |
| **book--sheet** | 288:25 289:1 | **built** 273:19,21 | **calling** 253:18 | 146:3 147:6,8 |
| 215:11 | **box** 2:12,19 3:6 | **built--** 273:12 | 271:1 | 151:21,24 |
| **booked** 31:15 | 235:3 | **bunch** 276:5,6,6 | **calls** 175:19 | 152:14 153:13 |
| 32:23 44:13 | **boxes** 58:9 | **bunk** 72:21,21 | 210:15 236:17 | 153:25 154:15 |
| 48:18,20 49:2,19 | **boy** 60:15 | 275:14 | 294:20 299:21 | 161:6,10 163:5,7 |
| 142:6,19 172:9 | **Bradford** 2:13 | **burst** 66:22,23 | **Calls--** 253:5 | 163:10,14 164:9 |
| 196:4,10 211:5 | **breach** 265:23 | **business** 43:21,25 | **calm** 60:14 104:6 | 169:16,18,21 |
| 261:12 262:14 | 266:16 | 210:23 275:19 | 105:1 150:20 | 170:19 178:7,9 |
| 292:12 | **break** 132:16,25 | **but--** 16:21 | 151:10 | 178:11 182:25 |
| **booking** 26:5,10 | 207:17,21 | 120:12 123:18 | **calm,--** 60:23 | 183:3 184:5,10 |
| 27:2 32:7 33:22 | 264:12,13 | 207:20 | **calmed** 55:23 | 184:12 187:3 |
| 49:23 50:5,10,11 | **break,--** 132:19 | **by--** 149:21 | 151:12 152:7 | 189:21,25 |
| 76:2 85:8 | **breakfast** 60:10 | 189:24 | 179:2 | 192:10 200:24 |
| 140:18 142:10 | 61:9,12 62:14 | **bypass** 210:20 | **Calvit** 2:13 6:20 | 201:7 202:12,15 |
| 147:10,15,16,17 | **brief** 58:6 116:19 | | 6:23,25 9:7,12 | 203:13 207:13 |
| 147:20,22 148:2 | 116:21 266:12 | **C** | 9:15 12:8,10 | 207:15,17,20,23 |
| 148:7 149:3 | **briefed** 148:6 | **C** 171:14 | 14:12 15:10,13 | 208:19,22 |
| 150:5 152:22 | 149:7,15 | **C-O-P-S-T-A-N...** | 16:4,19 17:13 | 209:11,16 |
| 153:10,20,22 | **briefing** 216:21 | 29:19 | 18:10,17,19,22 | 210:15 213:10 |
| 154:11 156:6,9 | **bring** 78:12 210:1 | **cadence,--** 207:18 | 18:25 19:16 | 213:12,22 |
| 156:12,13,16,22 | 253:24 | **call** 32:13 35:2 | 21:25 22:11,13 | 217:12,20,25 |
| 172:3,5,10 185:5 | **bringing** 185:14 | 36:4 115:17 | 22:16,19 28:24 | 218:4,7,13,16,21 |
| 195:18 197:17 | 185:20 | 123:20 138:15 | 29:1,14,18 32:14 | 218:24 219:8,11 |
| 214:13 223:5 | **brings** 307:23 | 138:19 167:17 | 32:18,21 37:9,14 | 220:1,5,7,10 |

| | | | | |
|---|---|---|---|---|
| 221:11 226:24 | 6:5,8,11,19 7:3,7 | 185:21 278:25 | 99:3 125:16 | 90:8,12 101:14 |
| 227:12,15,23 | 7:12,14,18,23 | can-- 52:8 205:6 | 137:22 | 102:23,23 103:5 |
| 228:1,8,12,15 | 8:2,3 9:11,13 | 236:1 275:19 | carrying 74:18 | 103:9,12,14,20 |
| 229:9,12,14 | 14:6 15:23 16:1 | canisters 68:15 | 77:15 | 105:1,8,16,23,24 |
| 233:21 236:10 | 16:6 18:14,18,20 | cannister 67:24 | carrying-- 83:5 | 106:10 107:3,12 |
| 236:16 241:24 | 18:24 19:1 20:8 | 68:11,13 | 97:15 | 108:3 109:3 |
| 242:3,6,24 243:2 | 20:13 21:3,22 | canteen 252:11,12 | case 6:6,12 34:21 | 110:8 113:22,25 |
| 243:6,9,11,14,17 | 22:8,12,14,18,20 | 252:21 | 113:5 238:6,9 | 114:18 116:3,5,9 |
| 248:4,9 250:17 | 31:12 36:15 | capacity 223:21 | 246:5,13,25 | 118:13,20,25 |
| 250:19 251:7 | 51:16,19,21 | 272:13,14 273:4 | 261:21 306:12 | 119:2,6,10,18,21 |
| 252:3,24 253:1,4 | 52:10,15 53:11 | 274:5 275:7,18 | catch 74:17 | 119:25 122:2,5 |
| 255:8 257:1 | 53:13 54:2,8,15 | 276:11 | 185:19,19 | 123:2,17,23 |
| 258:13 263:17 | 54:17,19 83:21 | captain 1:16 5:3 | category 183:12 | 124:6 127:9 |
| 264:10,12 | 83:24 84:1,9 | 5:11 6:1 8:11,11 | Catherine 3:15 | 130:8 137:9 |
| 272:25 276:13 | 91:23 92:2 | 8:12 10:25 11:4 | cause 270:14 | 152:22 154:24 |
| 276:15,18,20 | 95:16 98:23 | 11:16 84:2 | 304:21 | 176:8,21 177:24 |
| 279:18,22,24 | 99:1 101:1 | 114:9 132:25 | caused 198:2,10 | 196:2,7 197:5,22 |
| 280:2 287:17,22 | 108:11,14,16 | 145:24 146:11 | 200:9 201:21 | 198:3,11 199:10 |
| 288:2,7,9,12 | 125:6 126:14,16 | 156:16 159:9 | 227:4 257:17 | 201:4,12,23 |
| 290:25 293:8,10 | 132:17,20,24 | 160:21 168:21 | causes 202:19 | 202:22,22 203:3 |
| 293:20 294:19 | 139:2,10,16,19 | 169:5,8 171:11 | 224:16 239:12 | 203:4,12,22,23 |
| 298:16 299:25 | 139:22,24 140:2 | 171:11,13 | caveat 275:12 | 204:3,9,12 206:2 |
| 300:3,5,8 305:17 | 142:24 145:1,6 | 172:14,14 189:1 | CCA 12:19 71:5 | 206:15,16,23 |
| 307:10,12 308:6 | 145:10,12,14,19 | 208:2 230:20 | 162:11 | 208:14 210:12 |
| 310:14,16,17 | 145:21 146:5 | 247:18 264:16 | CCR 314:8 | 215:10,11,11,21 |
| 311:16 | 147:15 154:6 | 297:1 313:6 | cell 9:1 10:10,13 | 221:1,6,7,22,25 |
| cam 73:15 | 155:17,20 | captains 46:25 | 10:13,24 24:24 | 223:12 224:4,5,6 |
| cam-- 53:11 | 176:25 177:3 | 172:16 | 27:21 28:17,18 | 224:10,17,20 |
| came-- 180:14 | 180:2 181:23 | capture 214:11 | 28:20 30:17 | 225:21 226:23 |
| camera 36:6 | 219:24 220:3,13 | captured 245:21 | 31:9 34:11,23 | 227:5,10 228:6 |
| 102:24 119:19 | 222:3 227:25 | car 81:23 93:9 | 35:4 36:6,8,11 | 228:17 229:2 |
| 119:22,23 120:2 | 243:1,3,8,10 | 99:4,14,16,17 | 37:3,19,20,24 | 231:20 232:2 |
| 120:5,10,21 | 255:15,18 277:9 | 102:12,12 | 38:1,5,17 43:6 | 240:5,18 242:13 |
| 124:24 125:2,5,6 | 277:11 285:1,3 | 117:20 123:10 | 47:7,23 48:14 | 244:7 245:15,19 |
| 125:6,9,11 | 287:23 288:6,8 | 181:22 188:8,9 | 52:18 53:8 61:6 | 258:24 259:5,10 |
| 203:16,17 | 292:25 293:3,9 | care 53:20 152:19 | 63:14,22 64:8 | 259:22 261:4,24 |
| 237:16,17 | 293:11 294:8,11 | Carolina 113:1 | 65:22,25 66:3,6 | 263:21 264:23 |
| 239:11,18 244:2 | 298:17 300:2,4,6 | carried 74:8 | 66:9 68:21 69:2 | 265:2,5,8,17,23 |
| 259:15 | 300:12 307:11 | 89:16 97:12,16 | 69:6,9,14,15 | 266:16,22 |
| cameras 121:6 | 309:22,25 | 97:24 98:1 99:7 | 70:3,6,21,23,25 | 267:21,22 270:9 |
| 204:4,10 237:14 | 310:18,24 311:2 | 116:15 286:9,11 | 71:6,10,15,23 | 270:25 271:4 |
| 237:18,22 | 311:13,17,19,25 | 298:4,5,6 | 73:23 74:19 | 274:25 275:2,3 |
| 238:19 239:6,10 | cams 73:11 | carry 40:17 83:12 | 77:15 84:12,13 | 276:11 286:20 |
| Cameron 2:5 6:4 | can't-- 57:12 86:2 | 97:15 98:7,13 | 84:12,13 89:17 | 286:22 296:10 |

Page 6

| | | | | |
|---|---|---|---|---|
| 296:10 297:8,25 | 23:11 27:16 | charged 64:15 | 224:25 | clear 59:24 |
| 301:8,14 302:6 | 28:1 43:9,10,19 | charges 153:17 | circumstances | 146:18 220:11 |
| 302:13 303:17 | 46:15,17 63:20 | chart 169:9 | 47:21 60:2 | 275:17 301:18 |
| 307:4 | 113:6 123:4 | check 26:23 | 224:8 | close 64:20 65:7 |
| cell-- 103:24 | 124:1 126:18 | 231:11,25 232:1 | city 2:26 3:1,5 | 89:22 155:21 |
| 130:13 | 134:25 276:9 | 232:5,8,13,19 | 10:5,9,16 13:7 | 244:8 273:8 |
| cell--in 86:17 | 277:20 285:5 | 233:4 234:19 | 39:7 140:22 | closed 64:10 65:6 |
| cell,-- 105:14 | 286:2 293:18 | 237:21,23 | 202:24 203:1,8 | 154:14 |
| cells 9:16,17,18,22 | Center--have | 264:21,22 265:4 | 204:16,17 208:5 | closed,-- 154:12 |
| 10:20,21,23 29:4 | 41:14 | 265:25 266:19 | 208:13,16,16 | closer 65:3 |
| 30:9 34:24 36:2 | certain 16:12 | 268:19 269:2 | 209:21 214:6 | closest 112:12 |
| 36:16,17,19,21 | 26:25,25 58:9 | 283:5 285:5 | 235:9 240:20,23 | closets 94:5,6 |
| 36:24 37:12,21 | 127:15 159:1 | 286:19 298:13 | 240:24 258:1,4,9 | clothes 58:22 |
| 38:10,12,14,15 | 173:18 183:18 | 298:16,20 | 258:9,12,17 | 65:19 76:18 |
| 38:25 39:8,10,12 | 186:14 188:14 | checking 231:5,24 | 275:3 280:11 | 261:25 279:6,15 |
| 39:13 105:4 | 199:14 258:18 | 278:5 | 290:1 294:5,12 | clothing 119:12 |
| 107:21 122:8,9 | certain-- 9:4 | checklist 4:5 | 296:20 310:5 | clue 196:1 |
| 197:1 199:9 | certificate 1:25 | 18:15 | city--city 202:23 | co-officer 297:4,5 |
| 202:18,23,24 | 40:5 | checks 230:10 | Civil 1:6,11 5:6 | code 167:17,19 |
| 203:1,5 204:8,20 | certificates 40:4 | 262:3,9 264:17 | 313:21 | 272:6 313:21 |
| 204:25 205:4,5 | 40:11 | 266:25 268:23 | claim 24:3 | coin 62:4 |
| 205:11,14,19 | certification | 296:11 | class 40:2 159:17 | Coleman 171:11 |
| 207:9 208:3,13 | 168:15 313:25 | chemical 40:16 | 160:7,14 161:20 | 171:13 172:14 |
| 208:15,17 209:1 | certified 1:25 | 55:25 65:15 | 161:21 162:21 | collect 193:21 |
| 210:8,14 215:9 | 39:17,23,25 | 66:15,21,24 | 163:23 164:20 | colocate 263:15 |
| 215:17,22 | 162:9 313:4 | 75:17 76:6,16 | 166:20,20 | Columbia 2:19 |
| 222:13 224:2 | certify 313:6 | 119:4 122:14 | classes 164:3,8,13 | columns 28:4 |
| 230:10 231:5,14 | cetera 8:15 | 125:16 | 164:25 166:17 | combative 303:16 |
| 233:11,19 241:3 | chain 4:17 169:9 | chemicals 119:3 | classification 8:22 | 308:22 |
| 241:4 256:2 | chance 140:4 | chicken 62:5 | 214:13 303:22 | come 10:16,18 |
| 259:1 263:16,21 | 180:22 255:2 | chicken-- 62:3 | classified 303:23 | 31:21,22 32:12 |
| 267:6,9 271:22 | change 58:7,8 | child 111:25 | 304:8 | 35:10,14,21 |
| 271:23,23 272:1 | 142:4 188:17 | childhood 112:20 | classify 304:4,7 | 46:14 48:25 |
| 275:10,14,22,25 | 208:7,10 209:4 | children 111:17 | classroom 47:12 | 58:5 61:6 62:18 |
| 276:6,8,10,25 | 212:8 | 111:19 | 157:19 | 64:6,6 80:12 |
| 278:5 290:23 | changed 153:25 | chill 60:18 | clean 118:12,24 | 81:24 82:21 |
| 292:19,20 | 188:14 | choice 298:14 | 258:25 280:4 | 84:13 86:7 |
| 295:15 296:11 | changes,-- 58:1 | chow 268:20 | cleaned 118:20 | 103:19 105:22 |
| 303:2,6 | changing 297:21 | 269:20 270:21 | 119:2 259:22,23 | 105:24 118:10 |
| cells-- 37:5 203:18 | charge 64:9 117:9 | 270:25 271:2 | cleaned-- 260:1 | 120:23 123:14 |
| 204:6 273:8 | 141:13 155:9 | 280:25 281:21 | cleaning 123:2 | 127:7 142:18 |
| center 4:9,13,19 | 161:2 222:13 | 282:1,4 283:3 | 259:11,12 261:5 | 146:5 158:13 |
| 8:8 10:4 12:18 | 238:22 283:23 | church 113:9 | 296:11 | 167:18 174:4 |
| 12:21 18:12 | 284:10 297:3 | circumstance | cleanup 259:10 | 175:17 209:7 |

| | | | | |
|---|---|---|---|---|
| 210:19,21 | 101:16 182:6 | **concerned** 256:21 | **Constitution** | 237:17 238:12 |
| 212:24 214:4 | 240:4 | 256:25 257:6 | 126:8 | 239:16,20,21,22 |
| 222:9 223:1,4 | **communications** | 279:11 280:25 | **constitutional** | 239:23 240:1,4 |
| 231:17 234:20 | 217:2 | 283:3 | 126:2,18 | 240:12,17 246:2 |
| 250:15 266:20 | **company** 226:8 | **concerning** | **constructed** | 261:1 269:3,4,7 |
| 266:24 269:25 | **company-issued** | 115:13 281:25 | 273:11 | 269:8,9,12,13,18 |
| 275:3 279:5 | 114:3 | **concerns** 217:3 | **consult** 35:24 | 270:18,21,24 |
| 286:15 296:21 | **compensation** | 302:3 | **contact** 33:18 | 271:4 273:9 |
| 297:12 298:19 | 24:4 | **CONCLUDED** | 47:22 54:21 | 283:23 284:15 |
| 299:6,9,23 | **complain** 76:3 | 312:25 | 57:5,8 58:20 | 286:21 289:2,7,8 |
| 300:15 311:3 | **complement** | **concluding** | 61:9 62:25 63:5 | 289:10 290:17 |
| **come--** 167:1 | 295:13,25 296:8 | 313:12 | 63:8 77:12 78:3 | 292:15,17 |
| **comes** 24:23 | **complete** 26:5 | **conclusion** 107:4 | 86:16 89:1,14,18 | **control--** 290:19 |
| 31:10 35:11 | 147:24 190:19 | **condition** 91:11 | 90:4,13 101:8 | **control--instruct** |
| 45:10,12 81:23 | 190:22 249:18 | 91:13 100:22 | 108:3,10,16 | 299:8 |
| 118:3 135:14 | 271:19 307:19 | 101:2 109:21 | 111:11 122:13 | **controlled,--** |
| 149:5 210:22 | **completed** 191:22 | 181:10 182:15 | 143:4,11 144:13 | 192:16 |
| 262:13 307:17 | 244:21 245:1,12 | 256:16 266:1 | 239:13 | **controls** 192:12 |
| 307:19 | 247:13 | 270:9 | **contacted** 227:7,8 | **conversation** |
| **comfortable** 6:16 | **completed,--** | **conduct** 148:10 | 240:13 | 220:18 |
| **coming** 25:3 | 245:4 | 168:5 191:8 | **contacts** 55:10 | **conversation--** |
| 48:22 106:10 | **completes** 191:3 | **conducted** 19:4 | 292:17 | 7:10 |
| 167:23 180:9 | **completing** 11:20 | 306:18 | **container** 66:24 | **conversations** |
| 181:13 206:5,8 | 241:13,16 | **conducting** | **contemporaneous** | 308:19 |
| 251:19 | **compliance** 70:8 | 296:10,10 | 303:12 | **convicted** 15:8,14 |
| **command** 4:17 | 313:17,19 | **conducts** 191:5 | **continuing** 51:21 | **Conway** 101:15 |
| 72:13 73:19 | **COMPLIES** | **confused** 49:24 | 84:1 132:24 | **cooperate** 49:8,17 |
| 169:9 | 84:19 132:14 | 200:24 | 208:1 215:14 | 49:21 71:13,13 |
| **commencing** | 133:18 134:1,4 | **confusing** 98:24 | 247:17 264:15 | 153:8 |
| 313:12 | 169:15 250:14 | **connection** 15:6 | **contraband** | **cooperative** 106:3 |
| **comments** 109:20 | **comply** 70:7 | 45:21 138:6 | 185:14 224:18 | **coordinate** 302:12 |
| 139:1 146:10 | 71:14 72:3,7 | **conscious** 77:18 | 280:15 | **coordinates** 286:3 |
| 213:15 277:12 | **complying** 184:16 | 77:19,20 85:15 | **contract** 108:8 | **cop** 206:12 |
| **commit** 32:10 | **compound** 147:10 | 85:24 86:21 | 240:20 | **Copeland** 1:20,24 |
| 196:21 206:12 | 152:15 201:8 | 182:1 | **contract--** 258:12 | 313:4,10 314:8 |
| **commitment** | 208:22 209:12 | **consider** 70:3 | **contractual** | **copies** 46:8 |
| 113:16 | 224:11,15 | 80:15 112:12 | 258:17 313:20 | **Copstantin** 29:13 |
| **committed** 305:6 | 236:11 252:24 | 136:7 | **control** 25:11 | 29:25 30:1,2,14 |
| **common** 40:25 | 253:5 | **consider--or** | 28:11 37:18,20 | **copy** 46:2 194:1 |
| 264:2 303:15 | **computer** 32:5,7 | 80:14 | 37:22 38:7,19,20 | 196:10 197:20 |
| **communicate** | 147:18 192:21 | **consistent** 220:2 | 78:21 115:17 | **cor--** 99:3 |
| 114:18 115:2 | 199:20 262:8 | **CONSOLIDAT...** | 121:12 198:21 | **corners** 133:7 |
| 116:10 | **concern** 239:12 | 1:9 | 198:22,25 199:1 | **corporal** 173:4,6 |
| **communication** | 296:13,17 | **constantly** 304:24 | 199:5,13 216:12 | **Corporals** 173:3 |

| | | | | |
|---|---|---|---|---|
| **correct** 10:5 18:24 | 305:21,24 | 112:17 139:11 | **current--** 224:3 | **DAVID** 2:24 |
| 26:21 37:15 | **corrections** 1:7,13 | 139:13,17 145:5 | **currently** 8:7 | **day** 7:10 24:22 |
| 57:5 153:1 | 168:15 230:21 | 146:4,8 161:8 | **cussing** 79:17,20 | 31:8 35:15 |
| 156:6 157:11 | 297:12 | 195:9 198:23 | **custodian** 234:25 | 44:19 47:19,25 |
| 160:25 164:19 | **correspond** 292:3 | 235:9 248:7 | **custody** 260:25 | 48:8 57:10,11,12 |
| 170:9 180:5,10 | **COs** 167:14,16 | 252:12,14 293:2 | 262:10 263:5 | 58:6 60:3 63:3,5 |
| 182:10 183:24 | 173:7,8 226:4 | 293:12 294:10 | **cut** 143:13 | 81:4 102:15 |
| 189:14 190:5 | 230:9 231:4,11 | 313:4,10 | **cuts** 56:25 76:6,21 | 108:20,25 |
| 191:9 193:2 | 233:12 265:15 | **court--** 29:23 | 77:3 86:25 87:6 | 142:21 148:6,7 |
| 195:16 197:5,10 | 266:24 267:5 | **cover** 146:14 | **cutting** 60:3 | 150:14 152:3 |
| 198:6,18 200:4 | **could--** 110:19 | 186:15 222:20 | | 163:3 166:14,15 |
| 201:6,25 203:5 | **couldn't--** 138:22 | **cover--** 94:15 | **D** | 166:15,22 171:2 |
| 208:5 214:5,8 | 160:15 240:10 | **covered** 39:6 | **D** 155:2,4 169:12 | 173:12,12 |
| 215:17 217:23 | **counsel** 5:2,4 | 288:1 | 169:13 171:14 | 174:10,23 175:1 |
| 218:10 220:15 | 184:1 313:23 | **covering** 174:9 | 173:24 182:21 | 175:18,22 176:2 |
| 221:1 226:19 | **counseling** 4:3 | **covers** 147:3 | 211:23 222:22 | 177:10,17 178:2 |
| 230:21 232:17 | 14:4 306:20 | **coworkers** 306:8 | 238:22 | 178:5 179:21 |
| 241:5 242:8 | **counselors** 141:6 | 307:1 | **daily** 158:14 | 200:25 202:2,6,7 |
| 249:4,16 250:5 | 141:19 | **CPR** 40:8,9 45:15 | 236:21 | 210:23 211:11 |
| 255:23 264:18 | **count** 19:18 25:11 | 45:19 159:7 | **Damone** 1:16 5:3 | 212:10,13 |
| 265:8 267:14 | 25:13,14,15,17 | **create** 193:22 | 5:11 6:1 8:6 | 216:11 217:3 |
| 272:21 277:15 | 148:5 250:12 | **created** 190:12 | 313:7 | 218:14,18 219:5 |
| 283:6 287:23 | 289:19,21 290:9 | 270:15 | **Dan-** 206:25 | 219:17,20 |
| 301:5 303:20 | 292:13,16 | **created;--** 190:3 | **dangerous** 304:9 | 220:23,25 |
| 309:8 313:15 | **counting** 250:16 | **credibility** 34:14 | **Danielle** 3:19 | 224:12 225:3,5 |
| **corrected** 83:11 | **counts** 25:8 | **crime** 101:13 | 100:24,25 | 225:17 232:16 |
| **Correction** 41:14 | 269:16 290:14 | 118:17 123:4 | **Danielle--** 217:11 | 233:5 241:22,23 |
| **correctional** 4:9 | 290:15 | 259:2 | **Daniels** 200:19 | 241:24 270:22 |
| 4:13,19 8:8 10:4 | **couple** 64:3 110:1 | **crimes** 304:6 | 206:24 221:2 | 271:4,16 278:20 |
| 12:18,20 17:23 | 131:3 241:11 | **criticism** 297:18 | **Darren** 103:11 | 279:25 281:21 |
| 18:2,12 23:10,18 | 244:15,16 | **cross-trained** | 104:11,15,21 | 282:3 284:5 |
| 24:7 27:16 28:1 | 271:11,13 272:1 | 226:5 | 105:3 107:8 | 293:21 295:9 |
| 39:14,18,20 43:9 | 300:11 | **crossed** 218:8 | **data** 67:8 244:25 | 297:3 301:17,18 |
| 43:10,19 46:15 | **course** 21:8 | **cruel** 126:8,13 | **date** 14:17 17:2 | 302:18 313:11 |
| 46:17,24 63:20 | 115:12 161:12 | **cruiser** 97:8 | 28:5,7,14 53:3 | 314:2 |
| 73:8,14 83:7,9 | 162:18 | **crumped** 96:18 | 54:7 132:13,13 | **day's** 155:11 |
| 83:12 84:22 | **courses** 161:15 | **cry** 90:18 | 134:2 174:17 | **day--** 48:7 59:20 |
| 85:9 113:6 | **court** 1:1,20,25 | **cubbyhole** 196:5 | 179:9,10 201:15 | 219:9 |
| 123:4 124:1 | 7:5 15:22,25 | **cuff** 78:9 | 218:13,17 245:3 | **day,--** 253:15 |
| 126:18 128:7,24 | 16:3,9,11,22 | **Curley** 43:5,22 | 245:6 | **days** 35:12 160:23 |
| 134:25 276:9 | 18:16 20:12 | 66:2,6,8 69:11 | **dated** 20:9,18 | 164:20 233:4 |
| 277:19 279:14 | 21:2,21 22:9 | 85:25 95:8 | 21:5 179:15 | 242:4 284:7 |
| 282:7 285:5 | 37:25 38:3 | 116:25 117:9,12 | 193:8 | 297:2 |
| 286:2,14 293:18 | 51:14,17 112:15 | 117:16,24 | **dates** 27:18,20 | **dead** 202:3,4 |

| | | | | |
|---|---|---|---|---|
| **deal** 141:9 209:8 | 63:11 168:2 | 209:22 211:1 | 197:7 216:25 | 189:12,16 190:6 |
| 226:22 | 210:7 297:12 | 215:9 267:17 | 227:22 | 191:1,16,20 |
| **dealing** 8:13,15 | 301:21 303:25 | **described** 139:25 | **did;--** 164:17 | 192:1,2,13,19 |
| 8:17,18 9:4 | **depend** 173:12 | **description** 152:6 | **didn't--** 82:12 | 193:10,15 |
| 147:17,23 | 210:18 310:9 | **Deshaun** 16:24 | 86:19 180:22 | 194:22,25 195:9 |
| 157:17 194:10 | **depending** 44:18 | **designated** 208:4 | **didn't--you** 90:8 | **disciplinary,--** |
| **deals** 10:14 | 105:11 135:25 | 302:9,22 | **die** 33:23 34:14 | 191:18 |
| **death** 150:11 | 148:5 185:11 | **designates** 204:20 | **died** 101:15 263:8 | **discipline** 12:21 |
| 201:11,11 | 196:17 209:20 | 232:6 | 307:5 | 14:2 168:25 |
| 241:14 304:21 | **depends** 31:10 | **designation** | **differ** 11:16 | 169:2 183:10,14 |
| 306:3,5 | 35:18 171:2 | 203:11 | **difference** 10:12 | 195:12,15 |
| **debriefing** 216:13 | 173:4 | **desire** 213:5 | 174:10 203:11 | **disciplining** 169:4 |
| 306:11 | **deployed** 192:15 | **desk** 199:14 | 203:14 250:9 | **discover** 185:15 |
| **deceased** 123:21 | 193:19 | **destroy** 260:22 | 251:24 287:9 | **discovered** 152:11 |
| 311:1 | **deposition** 1:15 | **detail** 49:16 | **differences** | **discovering** |
| **decide** 72:2 | 5:3,9,12 16:7 | **details** 308:13 | 203:15 | 242:12 |
| **decided** 34:22 | 43:2 83:22 | **detainee** 205:17 | **different** 11:21 | **DISCOVERY** 1:9 |
| 103:22 | 100:24 132:23 | **detainees** 205:22 | 16:22 21:10 | **discretion** 236:2 |
| **decided--** 103:21 | 150:3 207:25 | 208:5,13,16 | 35:16 59:3 61:5 | **discuss** 178:14 |
| **decision** 98:10 | 219:4 232:9 | 241:3 258:4 | 61:25 91:24 | **discussed** 113:5 |
| 206:22,23 207:3 | 233:8 277:13 | **detainer** 262:25 | 120:13,22 | 146:16 293:11 |
| **decisions** 275:23 | 285:22 311:15 | 263:1 | 121:13 225:11 | **discussion** 116:18 |
| **decontaminate** | 312:25 313:9 | **determination** | 242:4 276:6 | 182:13 205:25 |
| 122:17 | **deputies** 81:1 | 34:14 207:6 | 300:7 304:13 | 259:1 |
| **decontaminated** | 83:17 86:7,10,15 | 294:15 | **differently** 182:7 | **discussions** |
| 122:25 | 87:10,22,23 | **determine** 31:8 | 304:5 | 181:16 |
| **dedicate** 203:7 | 88:24 91:3 95:7 | 72:6 | **difficult** 209:8 | **disinfectants** |
| **deduct** 169:4 | 99:17,23 100:21 | **determined** 304:9 | **dilated** 92:15 | 119:4 |
| **defecated** 119:14 | 101:2,4,9,11,16 | **developed** 43:19 | **direct** 70:9 71:20 | **dispatcher** 115:4 |
| **defendant** 24:1 | 101:25 123:14 | **devices** 257:3 | 258:25 266:13 | **disposal** 174:18 |
| **defensive** 40:20 | 124:11 125:3 | **Devon** 29:12,24 | **directed** 258:25 | 262:2 |
| 41:9,15 | 129:7,21,24 | 30:1,3,13 53:14 | 259:8,9 | **disposed** 68:15 |
| **define** 226:25 | 131:14 151:2 | 54:3,4 | **direction** 84:22 | **dispute** 261:10 |
| **defined** 313:20 | 176:6 180:21 | **Devon--** 54:1 | 133:21 134:5 | **distance** 65:6,7 |
| **definition** 220:7 | 182:2 | **diagram** 83:16 | 313:15 | 67:15 |
| **definition--** 220:5 | **deputy** 83:2,4 | 84:5,11 85:1 | **directly** 38:16 | **distribute** 195:16 |
| **degree** 75:4 309:6 | 86:18 99:20 | 132:10 133:1,4 | 122:8,10 152:22 | **distributed** 267:6 |
| **deLAUNAY** 2:11 | **deputy's** 100:17 | 133:16 139:23 | 154:24 204:12 | **distributed--** |
| **deliver** 267:15 | 125:13 | **dialogue** 215:12 | 261:24 262:23 | 269:23 |
| **Delta** 169:16,17 | **Derrick** 310:22,25 | **dictate--** 264:2 | 274:1 308:3 | **distributes** 267:11 |
| **demonstrating** | **describe** 31:18 | **did--** 64:14 74:18 | **disagreement** | **distribution** 268:4 |
| 67:2 | 49:20 61:16 | 77:14 80:17 | 213:3 | **DISTRICT** 1:1,1 |
| **department** 31:15 | 68:17 75:1 | 81:9 87:9 | **discharges** 127:6 | **disturbing** 59:1,5 |
| 32:23 33:20 | 93:23 199:4 | 101:11 132:10 | **disciplinary** 12:11 | 59:15 |

| | | | | |
|---|---|---|---|---|
| **DIVISION** 1:2 | 150:7 173:17,18 | 55:13 56:4,5 | **Drive** 2:25 | 216:22 219:3,17 |
| **do--** 6:24 126:4 | 174:25 175:25 | 60:13,25 63:7 | **driving** 14:25 | 219:20 220:22 |
| 186:25 | 179:17,20 | 64:10 66:8 | **drop** 121:24 | 243:17 247:18 |
| **DOC** 10:4,9 25:3 | 186:19 187:18 | 69:11 84:11,12 | 184:25 185:1 | 275:12 277:14 |
| 39:7,10 147:23 | 190:12 226:10 | 84:14,14 94:2,16 | **dropped** 82:1 | 283:1,11,22 |
| 208:4 209:9,21 | 233:7 236:9 | 97:13 102:25 | **dropping** 83:2 | 301:7 |
| 223:6,11 289:23 | 237:15 241:12 | 104:7 105:21,21 | **drug** 148:9 149:10 | **early** 58:5 61:2 |
| 289:23 294:2,3 | 245:1 256:1 | 107:2 134:8 | 149:15 | 219:4,6 242:16 |
| 304:4 | 270:12,21 | 227:13 228:7,17 | **drug--if** 10:17 | **easy** 292:22 |
| **DOC,--** 280:11 | 287:13 305:25 | 265:23 266:8,14 | **drugs** 10:17 31:25 | **eat** 269:21 |
| **DOCs** 140:22 | **Does--** 95:23 | 266:17 | **DUAN** 132:23 | **education** 23:21 |
| **doctor** 31:6,10 | 310:4 | **door--** 84:24 | **dude** 69:24 | **effect** 144:1 170:9 |
| 34:8 35:8,11,23 | **does--does** 251:21 | **door,--** 134:6 | **due** 275:3 296:13 | 187:19 |
| 44:17 91:13 | **doing** 28:14 47:3 | **doors** 85:1,10 | **Duke** 1:20 313:10 | **effort** 259:4 |
| **doctor's** 141:22 | 50:18 68:19 | 227:10 | **duly** 6:1 313:7 | **egg** 61:17 62:5 |
| **doctors** 35:10 | 74:21 82:19 | **dorm** 24:23 25:2 | **During--** 228:12 | **eggs** 61:25 |
| **document** 13:1 | 83:20 95:23 | 25:25 26:3 | **during--during** | **eight** 266:8 |
| 14:14 15:2,3 | 107:25 112:9 | 196:19,22 292:3 | 60:11 | **eighteen** 173:13 |
| 16:17 18:6,21 | 134:20 168:8,9 | 304:1,13 | **duties** 8:12 11:16 | 174:3,6,15 175:3 |
| 19:15 20:2,4,5,8 | 185:8 212:3,5 | **dorms** 148:5 | 212:16 282:13 | 175:14,15 |
| 21:23 22:2 | 213:21,23 | 239:10 291:22 | 282:14 283:2 | 249:23 250:5,9 |
| 27:13 29:8 | 228:18,19 229:6 | 291:24 303:4 | 296:10 302:17 | 251:5 253:10,11 |
| 30:12 139:8 | 237:23 238:12 | **double** 275:14 | **duty** 32:13 33:11 | 254:17 |
| 142:15 189:13 | 238:16 252:5 | **doubt** 144:5 | 33:18 35:2,10,21 | **eighteen--under** |
| 190:3,6 193:22 | 257:8 265:4 | **dove** 285:18 | 36:4 40:15 | 250:4 |
| 193:23 194:7 | 271:15 280:1,3 | **down--hung** | 48:17,21 49:3 | **eighty** 134:21,22 |
| 213:15 231:23 | 281:9,17,21 | 131:16 | 57:16,18 82:23 | 134:23 139:19 |
| 242:23 245:7,12 | 282:22 296:9 | **downloaded** | 114:23 138:15 | **eighty-five** 17:17 |
| 245:14 247:7,8 | 303:20 | 297:9 | 138:20,22,24 | 134:11 |
| 247:13,16,24 | **doing--making** | **Dr** 141:15,16 | 140:18 142:20 | **either** 39:7 126:17 |
| 248:1,8 249:9,13 | 296:8 | 306:19 | 144:23 210:18 | 153:9 158:7 |
| 249:19 255:3,4 | **dollar** 62:6,7,8 | **draft** 179:17 | 225:4 305:12,14 | 172:13 226:17 |
| 277:1 287:2,16 | **don't--** 39:2 49:25 | **dragged** 97:21 | 305:16 | **elected** 5:13 |
| 288:15 293:4,15 | 137:19 186:23 | **draped** 72:20 | **DWI** 14:25 15:6,8 | **electronic** 179:16 |
| 293:22 | 211:3,11 295:9 | **draw** 83:15 84:16 | **dying** 33:8 | 313:13 |
| **document's** | **don't--can't** 247:5 | 84:24 132:16 | | **eleven** 165:5 |
| 248:21 | **don't--I** 150:22 | 133:15 169:8 | E | 166:12,19 |
| **documentation** | **don't--you** 46:19 | **drawing** 4:11,12 | **each--** 302:23 | 168:13 223:22 |
| 14:3 24:13 | 287:4 | 132:15 | **earlier** 81:4 | 223:23,24 |
| 44:20 58:13 | **done--** 268:23 | **drawn** 84:2 | 102:15 112:2 | **Elimination** 149:8 |
| 189:2 | **donned** 69:1,4 | **drenched** 125:21 | 132:10 147:14 | **else--** 163:7 |
| **documented** | 73:17 | **dressed** 58:21 | 152:24 177:17 | **em-** 258:4 |
| 281:8 | **donut** 206:12 | 76:17 87:19 | 197:21 200:22 | **email** 193:5 |
| **documents** 27:11 | **door** 50:14 55:7 | **drew** 133:1,4 | 202:15 208:2 | **emergencies** |

| | | | | |
|---|---|---|---|---|
| 233:10,19 | entered 63:24 | 206:24,25 221:2 | evidence 5:9 | 233:3,18 239:8 |
| emergency 35:4 | 65:25 69:8 | especially 247:19 | 242:25 259:1 | 264:20 265:15 |
| 82:20 135:25 | 71:15,24 75:19 | essential 173:14 | exact 200:23 | experience 147:3 |
| 138:13,15 | 131:12 244:7 | 173:16,19,21 | exactly 141:25 | 147:9 240:2 |
| 226:21,25 | enters 83:22 | 174:6 175:1 | EXAMINATION | explain 6:15 |
| 233:13 234:21 | 100:24 132:23 | 247:19 248:18 | 8:3 51:21 84:1 | 25:24 32:15 |
| 234:23 | 280:15 | 248:24 249:1,14 | 132:24 146:19 | 60:2 69:22 |
| emotional 50:21 | entire 99:13 | 249:19,21 250:4 | 208:1 215:14 | 84:10 118:20 |
| employ- 204:16 | 158:18,22 | 250:11 251:6,13 | 247:17 264:15 | 169:1 235:5 |
| 208:13,16 | 308:22 | 251:21 254:17 | 271:21 310:17 | 265:22 273:16 |
| employed 8:7 | entirely 98:7 | et 1:8,13 2:9 8:15 | examine 142:21 | explain-- 118:19 |
| 11:22 159:13 | entitled-- 139:5 | evaluate 34:5,7 | examined 293:19 | express 302:2 |
| 245:25 | entries 179:9 | evaluated 210:24 | 294:1,13 | extended 24:8 |
| employee 13:6 | 291:16 303:11 | evaluations | example 308:3 | extra 167:11 |
| 259:9 | entries-- 303:8 | 113:15 | exception 210:20 | 306:10 |
| employees 43:20 | entry 154:20 | evening 13:21 | 210:21 | extracted 137:8 |
| 152:11 169:4 | 290:8 291:14 | 47:20 55:5 | excessive 126:21 | 201:5 |
| 177:15 183:3,4 | entry-- 72:25 | 108:20 221:8,9 | Excuse 36:15 | extraction 47:7 |
| 186:14 248:18 | episode 75:20 | eveningtime 49:1 | 294:22 | 228:15 |
| 248:24 250:4 | episode,-- 307:2 | 49:15 62:19,20 | exercise 5:13 | eye 60:4 155:21 |
| 251:6,14,21 | equals 220:7 | event 186:7 | exhibit 14:7 15:22 | eyes 91:9,11,17 |
| 256:15 258:1,5,9 | Erie 1:4 2:3 3:13 | 188:20 198:6 | 15:25 16:1 | 92:5,11,18 95:11 |
| 265:25 | 5:4 6:5 44:21 | 215:20 216:1 | 18:15,23 19:25 | 95:21 99:10 |
| employment | 45:3 47:18 | 220:22 221:2 | 21:2,21 38:22 | 153:24 154:12 |
| 23:11 | 48:12,17 50:2,8 | 228:3 240:16 | 51:25 84:2,9 | eyes-- 91:17 |
| empty 28:21 29:4 | 50:13,17 54:21 | 242:13 243:22 | 132:10 133:3 | |
| 202:19 207:9 | 55:5 63:1,9 | 245:2 270:2 | 139:2,4 140:4 | F |
| 263:15,21 | 80:17 110:23 | events 115:13 | 144:6 145:5 | |
| EMT 115:17 | 111:2,7,11,15 | 155:12 158:23 | 169:20 243:18 | F'd 64:8 |
| EMTs 81:3 | 114:16,19 | 197:21 198:16 | 276:4,9 292:25 | F'ers 79:21 80:12 |
| 109:18 | 115:13 116:10 | 215:19 219:16 | Exhibit-- 20:11 | f-ing 48:12 |
| en 109:4 | 116:14 125:20 | 233:5 238:13,19 | Exhibiting 257:16 | face 56:8,11,25 |
| ended 263:9 | 135:7 136:1,8,25 | 244:24 245:7,21 | EXHIBITS 4:1 | 70:10 71:2 75:7 |
| engaged 307:1 | 137:4,8 143:1,4 | 258:18 | exist 165:20 | 75:21 76:7,14 |
| ensure 160:24 | 143:9,11 144:8 | eventually 88:14 | existed 169:9 | 100:5 |
| 165:13 168:3,4 | 150:5,5 151:8 | 307:5 | exited 65:22 66:9 | facedown 81:10 |
| 171:25 183:20 | 155:14 228:15 | ever-- 40:17 | 68:21 71:22 | 136:9 |
| 214:12 268:5 | 255:21 261:11 | 125:19 211:22 | exited--entered | Facial 65:17 |
| ensuring 161:2 | 269:18 280:19 | everybody 25:23 | 73:22 | facility 100:18 |
| 165:10 | 286:25 297:23 | 93:7 158:25 | exiting 93:24 | 138:9 152:16 |
| entails 214:24 | 302:3 | 165:15 178:6 | EXITS 207:25 | 154:21 180:10 |
| enter 66:3,6 85:8 | Erie-- 125:19 | 179:21 223:1 | expanded 265:12 | 180:16 181:13 |
| 133:3 199:19 | 151:8 | everybody-- 26:1 | expect 210:23 | 181:13,18 |
| 200:3 | Erin 200:19 | everyday 173:25 | 230:23 231:4 | 196:12 209:10 |
| | | | | 212:1 223:21 |

| | | | | |
|---|---|---|---|---|
| 236:18 241:9 | 273:3,12 275:20 | 303:2 | 277:9 | **fixtures** 94:25 |
| 255:21 261:12 | 278:19 279:11 | **fifty** 290:1 | **finishing** 229:7 | **flap** 56:5 265:11 |
| 262:5 272:6 | 280:25 281:5,20 | **fight** 102:21 111:2 | **FIORENZA** 2:11 | **flat** 79:15,25 |
| 279:14 280:15 | 283:3 284:14 | 111:6 198:9,17 | **fire** 168:21 170:22 | 96:23 137:21 |
| 310:21 | 288:16 299:15 | 240:11 | **fired** 185:23 | **flexibility** 257:10 |
| **facility--** 158:22 | 305:10 306:9 | **fighting** 240:8 | 186:22 | **flip** 114:6,7,10 |
| **facility--in** 265:16 | 308:18 | **figure** 98:6 124:4 | **firmly** 74:15 | 115:22,25 |
| **fact** 186:17 | **Farmer** 171:11 | **file** 16:14 146:23 | **first** 6:1 8:4 11:22 | 251:16 259:19 |
| 198:13 206:22 | 172:14 | 159:24 167:20 | 18:11 31:6 | 260:3,5,10 297:7 |
| 207:8 | **fast** 106:12 | **filed** 23:23 24:3 | 42:20 47:17,22 | **floor** 72:10,13 |
| **facts** 113:5 222:4 | **February** 11:7 | 112:2,3 | 47:23 48:7,8,18 | 73:19 74:10 |
| **failing** 71:14 | 20:18 45:10,12 | **files** 142:17 | 54:20,22 55:3 | 77:8,12,24 78:4 |
| **failure** 184:19 | 45:13,15 46:19 | **fill** 9:20 179:14,19 | 58:20,20 59:22 | 79:1,16,25 80:22 |
| **fair** 7:25 113:15 | 46:23 47:3 | 191:15 192:1,19 | 60:19 62:25 | 82:1,3,11 83:3 |
| 152:2,6 175:25 | 127:3 157:9 | 193:4 230:4,7 | 64:2,4,14 65:25 | 89:1,18,19 90:8 |
| 191:21 193:16 | 160:1,12 161:13 | 235:23 244:10 | 66:3 68:19 | 90:9,12,13,14,16 |
| 208:25 218:21 | 161:16 162:1 | 249:7 253:19 | 69:12 71:20 | 96:18,24 97:23 |
| 312:3,3,6 | 164:22 165:3,17 | **fill--** 253:18 | 75:19 77:8,24 | 98:2,7,13 99:3 |
| **fairly** 59:7 | **fed** 223:2 | **filled** 173:17 | 85:25 86:15 | 101:22 122:24 |
| **faking** 129:8 | **federal** 5:6 311:13 | 175:21 187:18 | 88:6 101:5 | 136:9,25 227:3 |
| **fall** 82:8 172:6 | **feeding** 268:20 | 242:21 249:4 | 118:10 127:8 | 228:5 298:1 |
| **falls** 284:17,19 | 271:2 | 287:5 | 130:8,12 140:11 | **floor,--** 130:15 |
| **falsified** 186:19 | **feel** 6:16 95:23 | **filling** 178:23 | 141:22,23 | **focusing** 92:6 |
| **falsifying** 305:25 | 213:24 | 272:9 | 142:24 148:4 | **folks** 43:5 180:18 |
| **familiar** 140:9 | **feet** 64:23,23,25 | **fills** 192:13 283:16 | 149:10 150:20 | 210:9 212:2 |
| 142:13 148:25 | 65:1,4 67:17 | **film** 177:13 | 176:15 180:6 | 254:14 |
| **family** 2:22 6:5 | 96:23 97:23 | **final** 311:18 | 181:1,2,19 | **follow** 183:21 |
| 54:25 112:13 | **fellow** 103:11 | **find** 38:22 110:5,9 | 226:21 228:17 | 184:19 224:15 |
| 146:1,13 | **felony** 310:8,10 | 125:12 165:17 | 231:18 285:4 | 310:16 |
| **fancy** 52:3 | **felt** 176:1 184:15 | 191:16 201:21 | 287:25 288:19 | **follow-up** 285:1 |
| **far** 8:14,22,22 | **female** 226:7 | 213:8 214:2 | **first--** 266:4 | **followed** 108:17 |
| 24:15 25:25 | 255:14 292:8 | 224:18 292:22 | **first--your** 8:5 | **following** 26:12 |
| 38:7 56:12 | **females** 292:6,7,9 | **finding** 110:7 | **fist** 64:15,22 | 44:18 91:17 |
| 62:11 77:13 | 292:11 | 156:9 | **fists** 72:18 | 104:14 107:16 |
| 90:14 118:12 | **fewer** 295:23 | **fine** 29:21 163:12 | **five** 17:4 64:23 | 108:25 195:15 |
| 119:15 127:5 | **field** 23:18 24:7 | 280:3 | 65:1,4 67:17 | 211:8 |
| 129:4 141:17,18 | **fifteen** 116:22 | **fingerprinted** | 73:20,21 74:1 | **follows** 6:2 |
| 142:10 151:6 | 230:13 231:14 | 31:22,22 | 111:22 129:17 | **food** 281:2 283:8 |
| 178:18 182:8 | 231:15 253:22 | **finish** 7:15 17:13 | 129:18,19,20 | 283:10,12 |
| 183:17 203:1 | 253:23 254:3,7 | 37:9 50:22 90:1 | 130:22 131:18 | **food--food--you** |
| 212:22 231:10 | 254:11,18,21,24 | 91:21 98:14,16 | 134:12 147:4,9 | 281:2 |
| 231:10 235:9 | 264:18 266:25 | 103:25 117:2 | 160:23 211:8 | **foot** 134:11 |
| 251:12 257:19 | 278:21,24 | 192:10 | 260:9 261:3 | **footage** 199:14 |
| 260:25 263:2 | 289:24 302:7,13 | **finished** 264:10 | **five-day** 18:11 | **for--** 81:5 182:23 |

| | | | | |
|---|---|---|---|---|
| 182:24 235:9 | 232:1,5 233:4 | 87:15 88:25 | **further** 57:5 | 190:21 197:20 |
| 275:14 | 236:10,16 | 90:21 93:23,25 | 132:12 139:16 | 216:4 266:13 |
| **for--to** 135:10 | 241:15 242:6 | 97:10 98:11 | | 281:14 284:6 |
| 171:25 | 247:9 253:4 | 99:3,7 101:4 | **G** | **given** 16:7 195:20 |
| **for--with** 128:22 | 255:6,20 257:2 | 116:25 117:5,7 | **G** 1:6,12 | 196:10 197:14 |
| **force** 13:6 21:5,16 | 269:2 273:1 | 117:15,19,21,22 | **gas** 66:11,12 | 251:10 253:17 |
| 22:4,23 23:7 | 287:1 294:19 | 124:13,17,19,22 | 68:22,22 69:1,4 | **gives** 202:9 |
| 40:13,15 45:14 | **form--** 32:18 | 124:25 129:15 | 71:16 73:17 | 289:23 |
| 45:19 46:7 47:3 | **formal** 23:20 | 130:22 131:14 | 176:25 177:17 | **giving** 150:10 |
| 47:14,16 67:19 | **format** 47:9 | 131:18 132:9,11 | 219:20 220:7 | **glass** 204:13 |
| 70:2 71:21 | 313:18 | 133:1,10,11,12 | **gassed** 176:17 | 265:12 273:24 |
| 126:22 127:3 | **forms** 179:7,14 | 133:15 134:6 | 177:4 219:22 | **gloves** 267:19 |
| 128:6,9 130:15 | 191:21 194:11 | 136:2 140:1 | **gate** 252:15,16,21 | **go** 14:8 16:22 |
| 157:18 160:4 | 232:8,13,19 | 180:3 187:13 | **gather** 178:20 | 18:10 25:25 |
| 161:18 162:19 | 235:24 241:13 | 298:1,22,23 | **general** 50:9 | 26:3,10,20 31:11 |
| 163:18 190:9,10 | 244:10 255:11 | 309:3,15,20 | 196:17,25 281:1 | 31:15 45:14 |
| 194:7,11,14,15 | **forth** 80:4 131:11 | **foyer--** 88:6 129:6 | 287:15 | 51:3,17 53:10,18 |
| 194:24 215:20 | 217:20 313:8 | 131:12 | **generate** 270:6 | 58:11 60:14 |
| 247:9 305:22 | **forty** 45:18 46:5 | **foyer,--** 130:5,17 | **genitals** 127:21 | 62:14 73:18 |
| **forced** 90:12,16 | 46:23 157:13 | **frame** 189:2 205:7 | **genitals--** 127:23 | 76:16 77:6 |
| **foregoing** 313:9 | 158:14,18,23 | 243:23 | **gentleman** 33:22 | 79:22 83:19 |
| **forehead** 143:12 | 162:1,4,15 164:5 | **free** 158:5 | **gentleman--** 300:3 | 84:14 91:23 |
| 154:16 | 170:25 171:5 | **frequency** 115:4,7 | **gentlemen** 81:25 | 96:17 97:13 |
| **Foreman** 159:9 | **forty-hour** 141:16 | 115:9 | 170:11 171:5,15 | 100:20 104:15 |
| 171:14 | **found** 16:14 | **frequent** 236:9,14 | **gently** 74:13 | 109:1 113:19 |
| **forget** 211:3 | 146:23 227:3 | **fresher** 152:3,4,5 | **Gerald** 1:16 5:3 | 127:10 129:6 |
| **forgive** 307:17 | 228:4,18 | **Friday** 35:22 42:6 | 5:11 6:1 8:6 | 132:12 138:18 |
| **form** 4:3 5:7 | **foundation** | **Fridays** 35:13 | 313:7 | 145:23 153:14 |
| 14:10,13 18:7,9 | 210:17 | **friend** 112:12,20 | **get--get** 275:17 | 153:16 158:9,24 |
| 20:17 26:16 | **four** 40:10 133:7 | **friendships** 43:19 | **get--when** 142:18 | 158:25 159:4,6 |
| 28:9 47:11 | 162:22 163:24 | **from--** 79:19 | **getting** 24:24 | 159:14,20 |
| 152:12,14 154:7 | 166:18 183:11 | **from--from** | 86:19 102:9 | 165:10 166:14 |
| 155:24 179:12 | 188:12 190:11 | 227:21 | 107:8 114:7 | 166:18 167:11 |
| 182:25 189:12 | 260:9 261:3 | **front** 58:10 | 158:9 166:20 | 181:23 183:17 |
| 189:16 190:9,19 | **four--the** 12:16 | 117:13 182:1 | 212:18,19 | 189:18 190:14 |
| 190:22 191:16 | **four-hour** 166:13 | 194:18 195:6 | 260:23 268:6 | 192:21 193:10 |
| 192:1,13,19 | 166:20 | **fronts** 204:13 | 271:6 292:12 | 193:13,17 194:9 |
| 193:4,10,15 | **four-week** 12:16 | **fuck--F** 64:19 | 295:12,14 | 194:15 196:18 |
| 194:2,14,24,25 | 40:2 | **full** 8:5 28:21 | 299:15 | 196:25 198:20 |
| 195:1 201:7 | **fours** 158:14 | 210:14 295:8,13 | **give** 36:5 49:16 | 199:13,20 200:3 |
| 208:19 209:11 | **fourteen** 253:15 | 296:8 | 62:2 70:9 72:5 | 200:9 201:21 |
| 219:24 222:3 | **foyer** 81:23 83:17 | **full-time** 146:24 | 73:18,21 118:11 | 202:20 205:3,5 |
| 226:24 227:25 | 84:15 85:3,10,16 | **fully** 7:20 75:6 | 118:24 169:4 | 205:11 207:24 |
| 228:8 231:25 | 86:17,21 87:10 | **furniture** 94:24 | 180:24 190:17 | 208:15,16 209:1 |

| | | | | |
|---|---|---|---|---|
| 210:14 213:8 | 169:19 175:8 | 152:12 176:1 | 283:20 | 79:5,9,12,14,25 |
| 223:24 224:19 | 181:3 182:14 | 228:18 | half 15:16 62:6,7 | 80:23 136:13 |
| 227:4 234:22 | 191:17 193:13 | group 180:8 | 62:8 124:10 | 233:23 234:8,13 |
| 235:3 243:19 | 193:17 194:1 | 287:13 300:16 | 166:14,15 | 235:16,20,23 |
| 248:9 250:11 | 195:5,6 196:17 | grown 90:25 | hall 69:11 82:14 | 236:14,19,25 |
| 251:16 258:17 | 200:18 220:11 | guard 13:23 | 82:15 83:14 | 237:3 |
| 264:16 266:6 | 231:6 242:19 | guards 128:24 | 84:11,13 93:24 | handed 99:22 |
| 275:18 288:7 | 245:10 248:15 | guess 40:14 49:22 | 93:25 94:19,20 | handful 153:7 |
| 293:20 294:8 | 249:21 255:1,19 | 51:5 57:18 | 103:18 109:8,9 | handing 268:9 |
| 307:23 308:2 | 258:21 261:18 | 142:2 186:23 | 132:11 134:6,8,9 | 281:2 |
| 309:13 | 265:22,23 267:8 | 222:12 229:7 | 136:2,9 147:11 | handled 97:18 |
| go-- 157:21 | 267:15 271:12 | 233:15 249:2 | 148:6 185:4 | handoff 155:2,5 |
| go-ahead 36:5 | 276:4 286:5,12 | 276:18 286:12 | 199:10 213:20 | 214:18 215:3,24 |
| goes 24:23 28:15 | 287:13 294:18 | 308:22 | 296:5 297:24 | 216:1,4 222:21 |
| 30:16 43:20 | 296:1 297:23 | guess-- 249:1 | 299:15 302:17 | handout,-- 45:25 |
| 98:21 139:16 | 299:23 309:2 | guessing 28:10 | halls 235:10 | handouts 46:8 |
| 158:18 161:3 | 311:16 | 229:10 | hallway 77:24 | hands 70:10,13,19 |
| 190:16,24 | going-- 23:13 | guidance 202:9 | 79:1,15 80:22 | 71:2,8,11,18 |
| 192:12,18 194:4 | good 21:18 54:2 | guidelines 184:16 | 109:25 130:4 | 72:20 75:7 77:2 |
| 245:12 280:24 | 93:7 113:16 | 184:19 313:18 | hallway,-- 74:19 | 77:2 87:7 96:11 |
| 308:2 310:10 | 145:24 200:23 | guttural 90:15 | Hamilton 2:16 | 111:8 |
| goes-- 194:16 | 281:14 306:12 | guy 13:11 48:12 | 271:20 | hands-on 47:13 |
| goes--comes | 311:17 312:9 | 90:25 105:20 | Hammond 310:22 | handwrite 42:20 |
| 194:12 | got-- 42:7 44:11 | 171:9 200:18 | 310:25 | handwriting |
| going 6:8,20 14:8 | 99:17 165:12 | 247:5 | hand 169:7 | 213:9 247:11 |
| 15:1 18:4 21:23 | got--got 214:12 | guy,-- 103:2 | 179:15,15 215:4 | handwritten |
| 22:14 23:12 | got--you 13:5 | guys 10:16 16:22 | 215:6,7,15 | 41:23 211:25 |
| 24:16 25:6 | gotten 48:23 | 148:7 170:24 | 245:10 | 244:25 248:18 |
| 27:10 40:13 | grab 77:7 106:2 | 171:3,18 186:13 | hand-- 46:8 | handy 259:16 |
| 44:12 54:20 | grabbed 69:13 | 187:15 240:8 | handbook 195:15 | Hang 146:4 |
| 58:20 59:16,19 | 73:23 74:3 | | 195:20,21,24 | Hanser 141:15,16 |
| 63:16,18 70:14 | 77:14 122:23 | **H** | 196:11,16,18 | 306:19 |
| 71:8 72:2,7 | grabbing 106:11 | H 2:13 | 197:15,20 | Hanson 3:17 |
| 75:15 81:22 | graduated 23:14 | H-O-R-V-A-T-H | handcuff 70:14 | 169:24 170:6,23 |
| 82:14 90:21 | grandmomma | 247:2 | 71:8 78:13 | happen 70:5 |
| 98:18,19 104:18 | 285:9 | had--had 259:16 | 130:17 236:5 | 155:24 187:16 |
| 104:25 111:9 | great 146:8 | had--if 49:2 61:21 | handcuffed 69:22 | 187:17,19 |
| 116:13,19,20 | 271:16 280:1 | had--was 105:20 | 70:6 80:10,17 | 223:16 254:13 |
| 123:2 130:4 | Green 1:4 2:3 | had--why 107:17 | 81:10 84:18 | 301:10 304:16 |
| 133:3 136:11 | 3:16 5:4 | had--you 122:13 | 85:21 96:6,8 | 304:18 |
| 139:20 142:23 | ground 69:14 | had,-- 67:25 | 136:9 | happened 13:9,20 |
| 144:6 145:7,22 | 74:11,15 106:17 | hair 61:21 | handcuffing 70:3 | 41:22 58:6 63:3 |
| 146:1,13 162:1 | 106:19,20,21,22 | hairnet 267:19 | 71:1,12 | 82:13 105:18 |
| 168:6,12 169:7 | 107:1 146:14 | Hale 282:11,12 | handcuffs 78:17 | 106:12 107:9 |

108:23,25 110:3
113:17 116:17
152:3 177:11
186:12 187:13
187:16 191:16
200:21 216:14
222:10 240:9
244:1,3 266:20
305:12,16
308:16
**happening** 109:7
222:15
**happens** 19:2
45:13 72:1
175:5 224:16
262:16 266:3,11
268:14
**Hardwell** 1:16 5:3
5:11 6:1,4 8:6
30:14 43:13
84:2 132:25
146:11 151:15
215:15 241:12
313:7
**harm** 36:12
**harming** 32:9
33:7
**hatch** 267:7
**have--** 10:16
22:10 39:4
99:10 135:9
156:11 176:4
196:2 223:18
249:22 276:7
**HAYES** 1:7,12
**he'll** 51:4,4,5
60:14,16 79:21
79:22 87:16
150:21 151:10
296:9
**He'll--** 79:21
**he's--** 53:16 81:9
92:25 141:16
**he--** 19:17 35:14

51:4 64:20
77:18 78:10,10
91:13,19 92:5,17
93:6 99:6
106:19 129:11
129:24 296:1,1
**he--at** 151:9
**he--he** 104:9
181:21 194:17
210:2 230:2
**he--we** 106:1
**he--when** 55:5
**head** 7:9 56:13,20
61:14 75:21
77:12 82:3,11
83:3 86:25 89:1
89:8,18 90:4,9
100:4,12 110:12
110:15 133:21
138:2 141:25
142:2 143:21,21
143:23 144:12
144:12 225:13
289:21 290:9,14
290:15 292:13
292:16 309:15
311:5
**heading** 83:14
**health** 22:25
32:24 44:21
45:3 140:14,15
140:17,17 141:1
141:2,9 210:9
256:21 257:7,16
296:13,18
**hear** 7:1 48:10
82:5,8,11 90:12
90:18,21 93:10
93:20 186:14,19
296:14 305:20
**heard** 24:17 39:20
50:12 82:12
125:19 126:4,9
126:10,14,21,23

173:15,22 176:5
176:10 186:13
186:17 238:15
239:18
**hearing** 4:4 15:5
16:2
**held** 99:20 195:10
208:4 224:4
241:7
**help** 41:17 95:6
147:16 158:7
165:20 170:14
202:18 239:13
240:17 250:25
**helped** 95:11
96:14,23 97:1,7
**helping** 95:18
96:5,8,12 213:25
**here--** 16:14 43:9
**high** 23:16,21
24:6 94:14
**highest** 101:5
**him--** 45:11
**him--remove**
105:23
**hire** 17:2 168:21
170:22,22
**hired** 18:12
**hires** 161:24
**hires--** 162:2
**his--** 50:19 51:2
88:16 92:17
153:10
**his--from** 34:11
**his--his** 298:14
**his--onto** 79:2
**his--the** 65:18
78:1 143:20
**his--what** 102:2
**history** 206:1
207:6 308:25
310:19
**hit** 75:10 77:23
82:3,11 83:3

89:3,8
**HIV** 31:25
**hobbies** 113:12
**hold** 40:4,7 52:6,9
73:23 262:25
263:1
**holding** 37:3,24
38:1,4 39:3
84:12 95:24
102:23 103:5,9
105:16 106:10
107:12 199:10
202:22 203:3,4
203:22 204:3,7,8
204:9 208:14
274:25 275:2
**holding--getting**
89:12
**hollering** 47:23
48:11 50:12
55:6 60:17
**home** 12:6 62:14
260:10,20
**hook** 51:18
**Hor-** 247:2
**Horvath** 247:2
**hospital** 104:15
104:18,23 109:1
138:18 223:2
**hour** 124:10,10
202:3 244:12,17
244:18 301:16
**hour-plus** 298:23
**hourly** 25:8
**hours** 45:18 46:5
46:23 157:13
158:18 160:8,9
161:16 162:1,4
162:15,22,24
163:24,25 164:2
164:5 165:5
166:13,18,19
168:13 170:25
171:5 176:14

190:23,24
193:15,17 194:5
244:13,15,16
301:16,17
**hours--** 43:25
**house** 149:13
223:12 240:24
279:16
**housed** 103:6
292:6
**housing** 8:22
240:25
**How--** 130:25
232:2 239:15
281:11 288:24
302:12
**Howard** 16:25
**Hudson** 1:21
313:10
**huh** 15:23 32:3
91:12 106:23
186:1 207:19
264:11 289:14
**hundred** 134:22
134:23 223:22
289:24
**hurry** 102:25
**hurt** 34:13,22
44:14
**hygiene** 8:15

---

I

**I'll--** 9:11
**I'm--** 29:21 35:18
93:12 124:6
158:9 161:10
286:12
**I've--** 145:1
**I--** 13:21 18:9
21:12 33:15
35:8 91:12
92:24 96:19
162:13 169:23
187:1,1 212:9

| | | | | |
|---|---|---|---|---|
| 218:4,4,6 227:20 | 187:13,14 | 215:17 219:15 | 206:15 209:20 | 263:15,19 |
| 227:20 230:15 | 218:13,18 | 220:22 222:5,8 | 209:21 210:1,13 | 264:17 265:2,16 |
| 232:15 250:8 | 232:15 244:2 | 222:24 237:15 | 210:22,23 211:2 | 265:18,20,24 |
| 257:5 263:10,10 | **include** 214:18 | 256:4 258:20 | 211:5 215:25 | 266:19 267:8,15 |
| 291:15 311:10 | 215:12,16,19 | 262:22 281:25 | 221:25 230:10 | 267:22 275:3,14 |
| **I--I** 196:1 | **including** 174:3 | 282:6,20 283:19 | 233:13 236:5,8 | 275:24,24 276:6 |
| **I--the** 149:5 | 250:5 | 299:22 300:14 | 255:20 257:14 | 277:1 280:13 |
| **idea** 33:23 44:13 | **incumbent** 255:25 | 300:16 | 262:13 264:21 | 281:4 283:6 |
| 113:17 232:12 | **INDEX** 4:1 | **information--** | 265:4 266:5,7 | 294:2,3,5,12,18 |
| 261:10 280:17 | **indicated** 277:14 | 33:10 | 267:13,19,23 | 301:19 303:16 |
| 280:21 | 280:8 301:7 | **informing** 123:20 | 268:3,5,6,9,10 | 303:23 304:4 |
| **ideas** 49:7 | 309:3 | **infractions** | 268:13,17 | **inmates--** 231:12 |
| **identified** 145:18 | **indicated--he** | 184:24 | 269:18,22,25 | **inmates--I** 295:19 |
| **identifier** 192:23 | 33:23 | **Initial** 140:12 | 270:4,5 271:6 | **inside** 36:25 63:22 |
| **identify** 14:6 20:4 | **indicates** 123:19 | **initiated** 107:5 | 275:6 281:1,9,11 | 70:6,23,25 71:6 |
| 20:10 21:6,24 | **indicates--** 33:20 | **injured** 111:15 | 281:21 282:4 | 74:19 94:16 |
| 27:12 173:18 | **indicating** 143:17 | 135:11 242:12 | 293:18,25 | 98:10 99:3,16 |
| **IDs** 26:2 | 285:16,19 | 257:19,19 | 296:13,17 301:4 | 101:14 110:3,7 |
| **if--** 32:12 215:24 | **individual** 31:1 | **injures** 296:14 | 305:8,22 307:22 | 118:15 119:21 |
| 217:21,21 | 31:14 32:23 | **injuries** 61:13 | 308:1,2 | 196:21 227:4 |
| **if--if** 153:19 | 33:6,19 34:13,21 | 100:7,11 104:11 | **inmate's** 257:7 | 235:12 264:23 |
| 210:22 222:12 | 35:24 59:15 | 107:11,18 | **inmate--** 267:24 | 265:2,5 267:8 |
| **ill** 22:24 23:8 | 89:3 120:5 | 109:23 110:10 | 305:1 | 273:24 286:20 |
| **immediately** 69:8 | 125:24 138:2 | 135:4,7 142:7,16 | **inmate--I** 257:13 | **inspect** 258:5 |
| 182:16 192:12 | 142:6,19 179:6 | 257:21 | **inmates** 8:22 9:6 | **inspected** 231:20 |
| 192:18 193:16 | 192:23 300:18 | **injury** 56:10 | 10:4,5,7 16:22 | **inspection** 296:10 |
| **impact** 125:16 | 301:1 307:17,18 | 75:21 76:21 | 25:18,25 39:11 | 296:21 297:13 |
| **important** 36:7,10 | 307:20 308:4 | 110:15 138:2 | 70:5 126:2,19 | **instance** 23:6 |
| 90:3 196:6 | **individuals** 30:5,8 | 142:16 143:12 | 140:23 141:11 | 24:22 |
| **in--** 94:16 156:5 | 38:4 58:25 | 152:12 | 149:7,19 156:9 | **instigated** 213:4 |
| 169:11 177:8,10 | 59:10 66:5 | **inmate** 8:25 9:5 | 176:7 178:23 | **instruction** 261:5 |
| 222:4 | 103:5 121:4 | 10:1,9,9 13:7,11 | 183:3 202:8,10 | **instructions** |
| **in--in** 237:15 | 171:12 173:25 | 13:19,20,25 | 202:20 209:7 | 118:11,24 |
| 238:8 | 182:22 224:9 | 26:21,23,25 27:5 | 210:19 211:9 | **instructor** 21:8,18 |
| **in--who's** 215:10 | 290:22 | 36:8,10 39:7,7 | 212:18 214:4,5 | 40:8,9 |
| **in,--** 28:5 | **infirmary** 107:14 | 70:12,19 71:7,10 | 214:11,12,18 | **intake** 31:16 |
| **inappropriate** | **infirmity** 257:17 | 72:2 101:14,15 | 215:20 216:9,9 | 44:24 45:2 |
| 137:3 | **inform** 222:14 | 102:16,24 107:2 | 216:10 222:10 | 142:9 147:24 |
| **incident** 41:22 | **information** | 128:7,10,13 | 223:6,11 224:4 | 149:5 150:5 |
| 42:12 63:3 | 24:25 33:14 | 138:6 189:13,23 | 231:5,20,24 | 153:11 154:7 |
| 104:21 108:23 | 34:1,5,7 44:24 | 190:11 195:12 | 233:25 240:23 | 155:24 172:3 |
| 108:24 109:5,6 | 45:2 58:14,16 | 195:15,20,23 | 241:7 256:2,14 | 210:20 214:6 |
| 116:13 177:10 | 195:11 196:6 | 196:2 198:2,10 | 256:21 261:5 | 256:9 286:25 |
| 178:23 181:9 | 206:4,19 211:4 | 200:10 201:20 | 262:3,9,19 263:5 | 307:20,23 |

| | | | | |
|---|---|---|---|---|
| **intakes** 147:23,23 | 118:13 180:13 | **it--** 20:19 102:6 | **JAMES** 1:6,12 | 120:11 |
| 148:5 223:5 | 259:8 | 147:25 154:15 | **January** 11:1 | **just--moments** |
| **intending** 244:25 | **involved** 13:18 | 169:1 199:12 | 14:17 20:9 | 151:9 |
| **intentionally** | 134:24 177:8 | 203:21 | 147:4 | |
| 102:9 | 198:1 201:20 | **it--have** 299:7 | **Jean** 87:20 | **K** |
| **inter** 140:13,20 | 281:1 283:3 | **it--how** 193:5 | **Jeans--** 87:20 | **KAREN** 1:7,12 |
| **inter-** 212:20 | **involvement** | **it--was** 229:5 | **Jeremy** 44:8 | **Kayla** 246:15 |
| **interacted** 181:15 | 238:8 261:21 | **it,--** 29:16 | 78:13 81:14 | **keep** 25:23 46:21 |
| **interaction** 176:6 | **involving** 155:12 | **items** 11:21 19:24 | 89:8 216:25 | 60:4 155:21 |
| 212:20,25 | **iPad** 52:3 | 196:4 | 217:2 227:3,6 | 188:18 195:23 |
| 257:25 266:5 | **iPhone** 114:1,3 | | 278:9 291:8 | 196:3,6,18 197:3 |
| **interested** 313:24 | 259:9 | **J** | 302:2 | 217:20 269:16 |
| **interior** 259:5 | **iPhones** 114:8 | **J** 1:10 2:22 | **Jesus** 285:13,15 | 303:5 |
| **interlock** 85:7 | **iron** 236:5 | **Jackson** 2:24 52:9 | 285:16 | **Keep--** 188:18 |
| **internal** 135:3,6 | **irons** 234:3,10 | 52:12 53:17,20 | **Jesus--** 285:13 | **keep--you** 196:3 |
| 178:1 189:13 | 235:18,23 | 54:14,16,18 | **job** 4:5 8:10 24:7 | **keeps** 303:5 |
| 233:17 | 236:14,19,25 | 139:9,15 145:24 | 173:25 176:2 | **kept** 26:6 27:2 |
| **internal--internal** | 237:3 | 145:25 146:7,11 | 185:8 212:3 | 85:18 93:12 |
| 134:25 | **irritate** 127:23 | 146:12,18,19 | 222:17 232:7 | 101:21 135:16 |
| **interpret** 250:7 | **is--** 45:6 79:24 | 147:7 154:1,17 | 237:23 239:3 | **Keylon** 16:24 |
| 291:13 | 96:14 205:6 | 155:19 163:9,12 | 269:6,15 270:14 | **kick** 89:10 |
| **INTERRUPTI...** | 222:17 300:13 | 169:17,19,22 | 271:16 290:18 | **kicked** 60:25 |
| 36:14 215:13 | **is--are** 303:8 | 177:2 183:2 | **jobs** 301:23,25 | **kicking** 60:13 |
| 247:16 276:23 | **is--how** 267:6 | 190:1 201:9 | **join** 51:15 | 75:13 |
| **intervene** 177:16 | **is--is** 120:3 136:17 | 202:14 207:19 | **Jordan** 2:6 | **killed** 261:4 |
| **interviewed** 152:4 | 193:20 194:13 | 207:21 208:1,23 | **Jr** 1:4,16 2:3 3:13 | **kind** 9:25 10:7 |
| **interviews** 191:6 | **is--there** 73:6 | 209:13 213:11 | 5:3,4,11 6:1 8:6 | 12:11,14 23:11 |
| 191:9 | **is--what** 74:21 | 213:13 215:14 | 114:16 313:7 | 24:25 26:24 |
| **intoxications** | 282:13 | 218:2,5,8,15,23 | **JUDGE** 1:6,7,12 | 30:21 31:16 |
| 275:3 | **is--you** 58:16 | 220:4,6,9,11 | 1:12 | 32:1 33:25 |
| **intra** 140:13,21 | **issue** 188:13 | 221:12 227:1,14 | **jump** 103:1 | 39:15 41:6,14,19 |
| **introduced** 5:9 | 195:25 223:7 | 228:2,10,14 | **jumper** 267:20 | 41:21 45:2 |
| 242:25 | 226:22 236:4 | 242:2,5 247:17 | 279:16 | 47:12 55:25 |
| **inventory** 8:14 | **issued** 113:22 | 248:6 250:18 | **jumping** 200:17 | 56:10,25 58:3,13 |
| 11:20 148:10 | 154:23 234:14 | 253:7 255:17 | 217:20 | 58:16 59:9 64:9 |
| **investigated** | 267:20 | 257:4 264:11,13 | **jumpsuit** 280:8 | 66:24 67:6 68:6 |
| 177:13 198:6 | **issues** 12:12 44:21 | 264:15 271:10 | **June** 11:24 17:2 | 68:20 72:21 |
| **investigating** | 285:4 296:13 | 271:12 278:16 | **just--** 60:3 79:17 | 73:9,15 74:13,17 |
| 151:2 | **it'd** 214:20 | 293:6,13 310:15 | 83:10 92:20 | 75:3,20 76:11,21 |
| **investigation** | **it'll** 142:17 152:5 | 311:24 312:1 | 95:17 131:23,24 | 77:3 80:10 |
| 135:1,3,6 179:20 | 196:23 | **Jackson's** 283:11 | 155:13,16 | 88:23 90:15,19 |
| 186:23 198:1 | **it's--** 53:20 110:14 | **jail** 54:23 58:23 | 196:17 235:5 | 91:7,11,12 94:25 |
| 261:15 | 159:1 195:9 | 59:1,11,14 116:7 | 310:9 | 94:25 99:20 |
| **investigators** | 262:12 269:21 | 304:21 | **just--just** 88:23 | 100:11,22 |

| | | | | |
|---|---|---|---|---|
| 101:16,20 | 100:13,15 | 123:9,13 124:24 | 259:16 260:25 | laid 88:19 131:25 |
| 104:11 105:25 | 141:25 142:1,4 | 128:4 129:7,12 | 261:15 262:6,13 | LaKAYE 2:16 |
| 106:1 107:10 | 143:16 144:3 | 132:8,9,21 135:3 | 262:23 263:10 | 271:20 |
| 110:22,25 111:1 | know 6:12,12 7:8 | 137:14 140:20 | 263:25 264:1 | landed 78:6 |
| 111:11 112:2 | 9:5 10:3,15,16 | 141:17,18,19,23 | 265:7 267:3,16 | lands 77:8 |
| 113:25 115:1,1 | 13:12,13 16:15 | 150:22 151:10 | 269:20 273:2,3 | Lane 1:21 313:10 |
| 116:19 118:1,2 | 16:19 26:23 | 151:16 152:9,12 | 276:20 278:16 | language 59:2 |
| 119:15 122:18 | 28:4,13 29:10 | 152:17,18 | 279:24 280:6 | lapsed 71:22 |
| 123:3 124:19 | 31:24,25 33:2,3 | 153:16,19 | 281:2 282:14,14 | LaQuencia 43:13 |
| 125:12,16,23 | 34:3 35:3,4,4 | 154:20,23 156:2 | 284:14 285:4 | LARA 1:10 2:22 |
| 127:1,10 129:22 | 41:1 43:9,12,14 | 156:15,18,25 | 287:4,7,9,11,14 | LaSALLE 1:7,13 |
| 131:16 134:14 | 45:1 47:24 | 157:4 158:25 | 290:6 291:15,15 | 2:9 285:5,6 |
| 135:10,11 | 48:12,13 49:8,18 | 162:13 164:4 | 291:18,19,21 | last-- 117:9 |
| 137:20 142:7 | 49:23 51:10 | 168:7 174:13,17 | 292:9 294:25 | Last"-- 228:9 |
| 143:21,23 147:2 | 55:13,20,23 | 174:20,22 175:3 | 296:9,9 297:8 | lasts 163:2 |
| 150:19 155:2 | 56:12 57:23 | 175:4,8,18 | 298:13 302:13 | late 11:11 12:22 |
| 161:7 178:6,12 | 58:16,19,23 59:2 | 176:13,16,17,19 | 302:14,16 308:8 | 167:23,25 |
| 179:3 183:9,13 | 59:17 60:15,18 | 176:20 177:8 | 309:16 311:4 | 185:11,13 |
| 197:14 202:9 | 61:5,5,6,17,25 | 178:5,8,18,19,20 | know-- 30:15 49:5 | law 2:5,18,25 7:5 |
| 204:19 209:20 | 62:1,5 64:3,6,7,8 | 181:12,20,21 | 56:19 176:20 | 311:13 |
| 211:6 213:3 | 64:8,13 66:13,14 | 183:18,18 187:9 | 276:13 | lawsuit 23:23,25 |
| 216:4,13,21 | 67:17 68:8,14,15 | 188:4 195:7 | know,-- 61:7 79:5 | 24:1 146:1,13 |
| 222:19 227:11 | 68:20 69:10,24 | 197:14 201:1,2,3 | 127:11 138:16 | 238:13,20 |
| 233:11,13 | 71:14 74:2 75:6 | 206:14 209:15 | 186:11 | lawsuits 112:3 |
| 235:23 236:23 | 76:1 78:22 | 210:1,2,3,4 | knowing 275:20 | lay 88:14 136:13 |
| 256:1 270:24 | 79:23 82:12,20 | 211:3,4 213:18 | 310:21 | laying 102:3 |
| 272:9 287:1,25 | 84:7 88:15 | 213:20,21,21 | knowledge 102:16 | lays 132:4 |
| 297:18 298:19 | 89:21 91:1,13,13 | 216:5,23 217:10 | 102:19 104:17 | LD 55:6 83:16 |
| 299:21,24 | 92:16,25 93:2,7 | 217:18 219:1 | 111:14 159:22 | 291:14 |
| kind-- 280:6 | 93:8 94:4,5,13 | 220:21 222:25 | 187:1 210:16 | lead 84:13 |
| kinds 233:23 | 96:22 97:20 | 224:11 226:12 | 254:20 277:5 | leading 233:4 |
| 235:11 | 98:1,8,9,18 | 228:3,5,19 229:9 | 278:18 280:17 | 304:21 |
| kitchen 199:11 | 101:13,14,24 | 229:14,23 | 282:3,6 283:16 | leads 93:25 94:1,2 |
| 281:12,13 289:7 | 102:8 103:4,8,14 | 230:25 231:1,3,7 | 300:10 305:5,7 | leads--you 94:19 |
| knees 70:10 71:2 | 104:5,6,7,10,13 | 231:9 232:15,19 | known 120:9,14 | leaning 72:21 |
| 85:20,24 87:14 | 104:22 105:12 | 233:16 237:25 | 124:21 205:3,10 | learn 40:23 62:12 |
| 88:8,16 131:1,19 | 105:19,25 106:2 | 238:8,11,18 | knows 98:19 | 71:4 117:14 |
| knew 131:17 | 106:11,12,13,24 | 240:21,23 241:7 | | 121:1 177:15 |
| 152:3 178:6 | 110:2 111:8 | 241:20 242:10 | L | 204:22 206:7,11 |
| knocked 166:19 | 112:19 115:5,23 | 243:3,22 245:24 | L 1:7,12 | 216:8 230:24 |
| knot 56:13,14,20 | 117:13,18,23 | 246:1,3,11,12,15 | labeling 139:2 | 231:6 235:19 |
| 57:3 61:14,16 | 119:9 120:4,8,18 | 246:22 249:10 | lack 40:14 210:16 | 261:23 262:13 |
| 62:12 75:22,23 | 120:23,23,25 | 251:7,8 254:3 | 286:25 | 266:20 |
| 75:25 76:3,11 | 121:3,24 123:2,5 | 256:6,9 259:16 | lacking 295:4,6,6 | learn-- 120:25 |

Duke Copeland Court Reporting
(318)387-2889

| | | | | |
|---|---|---|---|---|
| **learned** 19:18,21 | 167:7 169:11 | **light** 94:25 | 124:10,17 | 288:22,22,23,23 |
| 237:8 | 172:11,13,25 | **like--** 48:1 64:21 | 152:22 154:24 | 289:1,4,6 290:10 |
| **leave** 127:6 | 173:24 175:5 | **like--like** 24:21 | 176:7,21 197:1,5 | 293:7,9,12 303:5 |
| 131:14,16 | 182:21 183:19 | **likewise** 270:4,5 | 198:2,11 199:9 | 303:8,9 |
| 193:23 260:11 | 184:21 189:1 | **limit** 125:23 | 201:23 202:18 | **logs** 24:16 27:4 |
| 260:12,16 | 190:18,20 191:4 | 127:12 | 202:22,23,24 | 29:6 31:12 |
| **left** 13:12 24:6,7 | 191:5,6,13,15 | **limited** 9:25 | 203:5,11,18,23 | 192:23 287:15 |
| 68:20 100:17 | 192:1,18 194:14 | **limits** 128:6 | 204:6 205:12 | 287:20 303:11 |
| 102:4 116:14 | 206:1,20 211:3 | **line** 180:2 197:21 | 206:23 207:9 | **long** 29:23 30:25 |
| 117:9 118:13 | 211:12 214:3,19 | **lip** 87:4 | 208:3,15,17 | 45:16 80:22 |
| 179:21,23 199:6 | 215:3,5,16 216:8 | **list** 250:11,17 | 209:1 215:2,9,17 | 86:20 116:21 |
| 244:11,20 | 216:11,14,16,18 | **listed** 253:8 | 215:21 219:22 | 121:18 124:13 |
| **left--** 260:11 | 219:2,5,16,19 | **listen** 89:25 164:9 | 221:22,25 | 130:25 131:2,9 |
| **leg** 41:2 78:15 | 220:18 228:22 | 277:19,24 | 222:13 223:12 | 131:21,22,23 |
| 234:3,10 235:18 | 228:23 229:21 | 279:24 | 224:2,4,9,17,20 | 160:7 162:21 |
| 235:23 236:5,14 | 230:4 232:6 | **listened** 42:15 | 226:23 230:10 | 163:23 188:11 |
| 236:19,24 237:3 | 233:25 236:6 | **little** 55:20 58:5 | 231:5,14,25 | 271:16 279:24 |
| **leg--** 235:20 | 237:21 239:1,2 | 75:1 83:16 | 232:1,5,8,12,19 | 293:21 301:13 |
| **legal** 8:5 128:6 | 240:13 248:25 | 106:9 118:9 | 233:3,11,19 | 301:15 |
| **legs** 93:3,5 | 254:7 255:25 | 120:13 123:16 | 240:8,18 241:4 | **longer** 116:22 |
| **length** 279:6 | 256:20 257:6 | 123:22 132:11 | 256:2 261:24 | 159:13 245:25 |
| **let's** 33:6,19 43:22 | 267:18 270:17 | 133:16 141:24 | 263:16,21,21 | **look** 14:12 29:6 |
| 47:2 73:17 | 270:19 280:23 | 242:16 300:6,7 | 265:8 266:21 | 122:8 154:11 |
| 132:9 139:10 | 282:21 283:25 | 304:5 306:2 | 267:6,9,20 | 159:23 200:9 |
| 154:1 162:15 | 284:1,7,19,20,22 | **live** 112:21 | 268:10,20 269:2 | 213:14 242:20 |
| 196:25 207:22 | 284:23 286:6 | **located** 25:18 | 270:25 271:2,4 | 244:20 245:11 |
| 207:24 264:13 | 290:6,13 291:12 | 78:20 | 271:23 274:4,7 | 247:6,10,24 |
| **Let's--** 146:4 | 299:23 300:14 | **location** 84:17 | 275:2 276:8,10 | 248:17 255:2 |
| **letter** 146:23 | 300:15 | **lockdown** 4:10 | 276:25 277:1,2,2 | 264:23 265:5,11 |
| 147:3,15 148:23 | **lieutenant's** | 9:1,6,6,7 10:13 | 277:2,3 278:5 | 273:14 276:15 |
| 212:1 213:4 | 193:21 303:10 | 10:23 24:16,23 | 286:20 290:23 | 277:14,18 |
| **letting** 63:6 | **lieutenant--** | 25:6 27:15 36:5 | 292:19 296:11 | 288:10 293:5 |
| **level** 253:17 | 114:24 | 36:16,19,24 37:3 | 300:19 301:2,8 | 296:22 308:15 |
| **Levine** 30:13 | **lieutenants** 46:24 | 37:19,21,23,23 | 301:14 302:6,13 | **looked** 31:7 43:1 |
| **licenses** 40:4 | 156:22,23,25 | 38:12,22,23,24 | 303:2,17 304:2 | 44:24 92:9 |
| **lie** 182:11 | 171:21 172:7,24 | 39:3,8 48:16 | 308:3 | 107:8 111:5,8 |
| **lieutenant** 11:5,6 | 188:21,23 | 49:7 50:10,11,13 | **lockdown--** 36:22 | 153:12,17 197:4 |
| 11:8,17 14:11,17 | 193:25 199:12 | 55:14 60:6 | **lockdown--or** | 222:6 227:2 |
| 24:10 30:13,14 | 200:1 210:3 | 63:14,22 84:11 | 27:21 | 302:6,13,15 |
| 33:11 34:4 | 211:7 222:13,18 | 84:12,13 102:16 | **locker** 196:5 | 304:8 |
| 49:11 68:4,24 | 222:21 226:5 | 102:20 104:2 | **log** 4:6,7,8,18 20:3 | **looking** 30:7 |
| 81:19 86:13,14 | 233:12 294:16 | 108:2,20,21,22 | 21:4 25:12 27:7 | 38:21,21 52:17 |
| 95:8 125:15 | **lift** 98:6,11 265:11 | 110:3,8 118:15 | 30:7,23 58:8 | 91:18,20 130:2 |
| 146:25 155:8 | **lifted** 99:2,2 | 120:16,19 | 179:7,11 288:21 | 165:16 198:8 |

Page 20

| | | | | |
|---|---|---|---|---|
| 237:16 253:20 | **Mace—** 191:6 | 132:5 311:22,23 | 18:14 20:10 | 27:20 29:15 |
| 265:1 276:4 | **Mace,--** 191:11 | makes--he 302:16 | 22:8 31:12 | 31:10 34:7 |
| 291:12,16 303:2 | **Maced** 65:25 | making 8:20 | 142:24 143:8 | 36:23 37:23 |
| **looks** 21:12 | 68:12 152:16,17 | 24:15 61:10 | 169:19 271:10 | 45:23 47:11 |
| 143:12 144:1 | 152:19 153:19 | 90:13 109:15 | 271:19 292:25 | 51:22 52:23 |
| 303:6 | 154:20 177:2,4 | 167:21 175:3 | 294:8 297:6 | 57:14 61:5 65:3 |
| **looseleaf** 26:6 | 186:13 187:15 | 212:7 259:7 | **marked** 132:10 | 69:24 70:8,21,23 |
| 288:24 | 227:22 228:6,19 | 280:14 295:2 | 145:2,17 242:20 | 72:15 83:7 |
| **Loring** 49:11 50:1 | 228:21 230:2 | 296:3 303:4 | 243:3 245:11 | 86:13 91:9 |
| 50:8 57:19,21 | 261:24 311:8 | **male** 147:20 | 247:23 | 92:24,24 99:11 |
| 58:14 59:20 | **Macing** 66:10 | **man** 161:2 | **married** 111:23 | 101:8 105:11 |
| 62:16 68:4 | 216:22 220:22 | **man-** 31:1 37:20 | 112:6 | 106:12 107:18 |
| 153:5,6 186:7 | 230:5 | **manage** 209:10 | **mask** 71:16 73:18 | 111:7 115:19 |
| 187:6,7,9 219:2 | **MAGISTRATE** | **managed** 172:3 | **mask—the** 71:16 | 120:14,22,25 |
| 219:16,19 | 1:7,12 | **management** 2:9 | **masks** 66:11,12 | 121:11,23 |
| 220:18 228:22 | **main** 25:11 38:20 | 9:17,18,19,22 | 68:22,23 69:1,4 | 125:10 126:3 |
| 228:23 239:1,2 | 115:17 147:10 | 10:10,12,14,20 | **material** 45:21,23 | 128:15,19 129:4 |
| 270:17,19 284:7 | 202:23,24 | 28:18,19,20 29:3 | 46:18 | 131:23 134:17 |
| 284:14 | 214:25 216:11 | 30:17 34:24 | **matter** 132:1 | 136:10,12 |
| **Loring's** 290:6 | 246:2 269:3,4,7 | 36:2 37:5,12 | 313:24 | 137:10 143:21 |
| **lot** 11:18 167:21 | 269:8,12 292:15 | 38:14,15 39:8,11 | **matters** 14:9 55:5 | 150:19 155:7 |
| 179:14 271:18 | 292:17 299:7 | 52:18 53:8 | **mattress** 148:13 | 158:9 159:10 |
| **loud** 90:24,25 | **maintain** 24:14 | 105:8 107:21 | **maximum** 272:13 | 164:3 165:21 |
| **Louisiana** 1:1,21 | 46:2,8,20 171:24 | 122:7 272:1,7 | 272:14 273:3 | 167:19 169:1 |
| 1:26 2:6,12,19 | **maintained** 25:13 | 275:10,22 285:6 | 274:4 | 171:2,4 173:16 |
| 2:26 3:7 297:12 | 135:13,15 303:9 | 290:23 292:19 | **Maybe--** 62:5 | 177:4 179:10 |
| 311:13 313:1,5 | **maintenance** | **managing** 11:20 | **mayor** 258:8,18 | 183:10,22 |
| 313:11,21 314:2 | 252:19 | **mandate** 270:1 | **McKEE** 2:18 | 185:18 187:1,1 |
| **lower** 65:20 | **major** 138:25 | **manmade** 119:16 | 145:23 271:11 | 191:10 194:20 |
| **LPNs** 226:5,11 | 148:24 152:25 | **manual** 46:13,14 | 271:13,19,21 | 195:25 198:14 |
| **lying** 81:10 | 161:4,7,9 165:12 | **manually** 137:22 | 273:2 277:10 | 202:25 203:21 |
| 133:16 152:11 | 168:12 170:12 | **manufacturer** | 280:1,3 284:25 | 208:11 223:20 |
| 309:4,15 | 170:14 171:8 | 68:8 | 309:24 310:1,3 | 227:20 229:6 |
| | 172:17,19,20 | **many--** 36:16,19 | 310:12 | 233:15 241:24 |
| **M** | 183:12 190:16 | 55:5 95:2 | **me--** 9:11 64:8 | 248:25 256:6 |
| **ma'am** 38:2 | 190:24 193:13 | 175:10 248:23 | 90:1 92:2 | 257:5,13,19 |
| 252:13 | 193:17 194:5,9 | **many--how** 55:10 | 105:13 133:14 | 263:1 268:20 |
| **Mace** 65:10,12 | 194:12,13 215:7 | **map** 84:5 | 228:16 267:17 | 269:21 278:12 |
| 177:1 188:15,18 | 215:16,25 216:1 | **march** 21:5 | **me--stays** 68:6 | 280:25 285:8 |
| 188:21,24 189:3 | 216:4 222:12,14 | 165:18 178:22 | **meals** 267:6,8,11 | 286:19 287:9 |
| 190:11 191:23 | 233:1 253:24 | **MARGARET** | **mealtimes** 268:25 | 291:17 294:17 |
| 192:15 193:19 | 261:11,14 | 1:24 313:4 | **mean** 8:18,19 9:8 | 295:6,19 304:7 |
| 215:25 216:24 | **major's** 165:13 | 314:8 | 10:3 13:25 14:2 | 306:6,9 309:12 |
| 220:8 227:19 | **majority** 124:16 | **mark** 2:18 14:6 | 17:7 19:23 | **mean--** 18:1 |

| | | | | |
|---|---|---|---|---|
| 104:20 189:23 | 152:3 | **minutes** 71:25 | 33:19 44:12 | 110:23 111:2,7 |
| **mean,--** 120:20 | **memos** 58:3,9 | 86:23 116:22 | 203:7 204:16,17 | 111:12,15 |
| 249:3 | **men** 250:8,10 | 129:17,18,19,20 | 204:20,25 205:3 | 114:16,19 |
| **meaning--** 126:3 | **mental** 22:25 | 130:22 131:3,4 | 205:10,17,22 | 115:13 116:11 |
| **means** 140:20 | 32:24 44:21 | 131:19,19 132:2 | 208:4,13,16 | 116:14,24 117:5 |
| 185:3 249:20 | 45:3 140:14,15 | 230:13 231:15 | 209:1 210:6 | 117:15,22 |
| 251:14 287:7 | 140:17,17 141:1 | 231:15 244:12 | 223:13 235:8 | 122:14 123:6,9 |
| 291:20 295:19 | 141:2,9 210:9 | 264:18 267:1 | 240:21,23,25 | 123:14,17,22,25 |
| **means--** 179:11 | 256:21 257:7,16 | 302:7,13,14 | 241:3,8 258:1,3 | 124:4,9 125:3,20 |
| **meant** 49:17,20 | 296:13,18 | 303:3 | 258:4,4,9,9,12 | 129:7,15 130:7 |
| 83:9 148:6 | **mentally** 22:24,24 | **misconstruing--** | 258:18 262:22 | 130:12,21 |
| 239:22 | 23:8,8 | 163:11 | 296:20 301:21 | 131:18 133:15 |
| **measured** 67:4 | **mentioned** 38:23 | **missed** 273:17 | 303:25 307:23 | 133:16 135:7 |
| **measuring--** 67:5 | 275:12 310:18 | **missing** 45:8 | 310:4 313:11 | 136:1,8,25 137:4 |
| **mechanical** | 310:22 | 54:18 110:1,2,21 | 314:2 | 137:8 143:2,5,9 |
| 235:13,14 | **mentioned--** | 165:20 285:23 | **Monroe's** 258:17 | 143:11 144:9,15 |
| **med-** 189:20 | 310:18 | 285:25 | **month** 45:10,12 | 150:5,12,17 |
| **medical** 22:25 | **Mer** 60:16 | **misunderstood** | 157:9 263:8 | 151:8 152:7,9,16 |
| 138:1,9,13 149:3 | **merit** 279:10 | 130:12 | **Moore** 1:4 2:3 | 152:19,21,25 |
| 149:4,13,14 | 281:14 | **moan** 90:18 | 3:13,15 5:4 6:6 | 153:19 155:14 |
| 181:10,13 | **messages** 115:25 | **moaning** 109:15 | 44:21 45:3 | 155:15 176:4,13 |
| 182:15,15 190:3 | **met** 238:3 | **modify** 32:15 | 47:18 48:12,18 | 177:9,16,17,23 |
| 190:6 193:20,21 | **metal** 265:12 | **mom** 43:15 | 50:2,8,17 54:21 | 179:20 180:3,7,9 |
| 193:23 194:2 | **method** 313:14 | **moment** 18:17,19 | 55:6,17 56:22 | 180:21 181:3,6 |
| 195:1 210:20 | **methods** 40:23 | 118:4,21 | 57:4,9,21 58:21 | 181:10,17,25 |
| 212:21 214:11 | 41:1,6 | **moment--one** | 59:22 60:5 | 197:9,22 201:3 |
| 214:12 225:3,11 | **middle** 129:22 | 129:11 | 61:20 63:1,9 | 201:12 205:17 |
| 225:22 233:13 | 143:18 | **moments** 51:4 | 64:7,20 65:25 | 206:1,5,7,11 |
| 255:20 256:15 | **mikes** 73:14 146:9 | 55:7 104:7 | 66:10 68:12,17 | 216:22 217:4,9 |
| 257:11,17 287:6 | **military** 178:13 | **Monday** 35:13,22 | 69:20 71:16,18 | 217:15 219:20 |
| 298:19,23 | **mill** 51:9,12 54:22 | 48:3 | 71:23 72:5 76:3 | 219:22 220:22 |
| **medically** 149:19 | 55:21 60:16 | **Mondays** 149:4 | 76:17 77:15 | 221:1,7,22,24 |
| 149:22,23,24 | 310:23 | **monitor** 237:17 | 79:15 80:17 | 225:22 226:17 |
| 210:24 293:19 | **mind** 305:21 | 237:22 239:10 | 81:9 82:1 83:3 | 227:24 228:6,15 |
| 294:13 298:15 | **mines** 42:23 | 239:10,18 | 83:12 84:23 | 228:18 230:2 |
| **medication** | 241:18 | **monitored** 121:5 | 85:10,13 86:16 | 242:11 244:3,10 |
| 252:19,20 294:1 | **minimum** 254:17 | 121:7 239:6 | 86:20 87:9 89:6 | 255:21 258:24 |
| **meds** 212:24 | **minor** 59:7,10 | **monitoring** | 89:13,14,17 90:7 | 261:11,18,23 |
| **meet** 82:18 118:2 | 183:12 | 237:18,22 | 90:18,22 92:5 | 269:18 280:19 |
| 178:13 | **minute** 75:15 | **monitors** 115:6 | 93:10,21 95:3 | 286:25 297:24 |
| **mem-** 58:9 | 81:21,21 83:1 | 121:5 199:2,7 | 99:2,6,23 100:4 | 298:20 302:3 |
| **memo** 58:7 | 129:11,12 146:4 | **Monroe** 1:2,21 | 101:5,12,17,20 | 306:4 308:18 |
| **memory** 12:24 | 188:7 218:1 | 3:1,5,7 13:7 | 102:11 104:2,5 | 309:4,14 310:20 |
| 47:2 151:25 | 297:24 310:19 | 31:14 32:23 | 105:1,1 108:21 | **Moore's** 75:21 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 101 of 220 PageID #:
Gerald Hardwell
13726
August 28, 2017

Page 22

| | | | | |
|---|---|---|---|---|
| 76:7 82:3 84:17 | **multiple** 158:23 | 250:1 251:3 | 245:22 246:3,11 | 99:24 143:23 |
| 100:22 102:2 | **multipurpose** | 253:20 275:24 | 246:21 252:21 | 144:11 258:17 |
| 153:10 154:3 | 157:24,25 | 278:20,21 | 284:5,8,13 | 285:23,25 |
| 176:21 206:16 | **murder** 118:15 | **needs** 6:25 53:21 | 296:24 311:6 | **noticeable** 61:18 |
| 207:6 222:1 | 151:2 | 193:6 283:13 | **night--** 225:8 | **noticed** 28:4 |
| 241:14 256:9 | **Murphy** 86:18 | 302:15 | **nights** 48:25 | 81:25 113:14 |
| **Moore--** 228:3 | **my--** 46:12 146:2 | **needs--** 52:13 | **nighttime** 210:21 | 169:3 292:8 |
| **Moore--after** | | **Negative** 133:8 | 210:22 295:14 | **notified** 144:23 |
| 90:11 | N | **neither** 108:6 | **nine** 289:24 | **notify** 32:13 |
| **more--** 198:23 | **name** 6:4 8:5 | **Nelson** 2:5 6:4 | **no--** 69:24 160:2 | 165:15 215:25 |
| **morning** 44:18 | 16:24 17:1 20:4 | **Nelson--or** 147:14 | 274:2 281:24 | **now--** 47:2 168:7 |
| 49:3 61:2 | 21:6,10 25:2 | **net** 267:20 | **nod** 133:8 201:16 | 174:13 |
| 104:14 107:16 | 29:15 115:23 | **never** 16:9 17:20 | **nods** 7:9 | **Now,--** 176:24 |
| 167:25 177:17 | 141:22,23 | 65:3 70:12 71:6 | **noise** 104:9 | **number** 8:14 25:3 |
| 177:18 211:7 | 145:25 146:12 | 71:10 97:2 | **NOLES** 2:24 | 26:4 33:4 127:6 |
| 216:22,24 221:4 | 176:10 185:22 | 125:15 127:12 | **nonessential** | 127:13 169:3 |
| **Most--** 197:6 | 186:4 200:19,20 | 144:15,17 152:7 | 173:20 249:14 | 174:4 216:9 |
| **mother** 79:21 | 239:25 247:5,11 | 186:17 208:13 | 249:20 | 224:4 253:20 |
| 80:12 | 250:17 285:9 | 211:11 217:15 | **nonresponsive--** | 273:4 278:19 |
| **mouth** 58:19 | 299:18 311:3 | 238:15 247:4 | 229:10 | 287:25 289:23 |
| 154:14 222:11 | **named** 24:1 | 254:20 256:18 | **nonviolent** 304:10 | 295:3,22 |
| **move** 80:1 81:11 | 310:22 | 261:23 270:5 | **normal** 51:5,11 | **numbered** 145:9 |
| 81:13 92:18 | **names** 30:20 | 287:8 | 78:11 88:4 | 291:24,25 |
| 93:3,6 275:15,23 | 86:19 250:12,15 | **nevermind** 95:2 | 175:2 197:17 | **numbers** 26:18 |
| **moved** 12:3,5,6 | **Nanci** 3:4 51:14 | **new** 120:23 | 210:19 263:14 | 139:9 275:20 |
| 69:14 93:7 | **natural** 143:20 | 161:24 162:2 | 263:20 272:14 | 278:17 292:1,3 |
| 146:3 180:3 | **NCIC** 262:3,5,6 | 214:5,18 282:15 | 308:19 | **numerically** |
| **movement** 24:18 | 262:18 263:7 | **newly** 32:22 | **normally** 178:25 | 291:24 |
| 25:1,4 27:5 | **necessary** 70:1 | **next--** 57:10 62:18 | 211:13 | **nurse** 31:6,7 35:2 |
| **movements** 24:21 | 71:21 128:10 | **next-door** 63:16 | **not--** 137:24 | 35:20,21,23 |
| **moving** 35:19 | 294:14 | 180:11 | 144:18 222:23 | 44:16 104:13,16 |
| 46:22 80:1,2 | **neck** 65:20 | **night** 24:22 26:3 | 232:21 307:7,9 | 107:14,16,18 |
| 88:2 93:2,5 | **need** 6:20,21 8:4 | 44:19 57:5 60:9 | **not--you** 309:16 | 109:9 110:15 |
| 96:11 102:7,8 | 15:10 34:23 | 60:12,13,19,25 | **notebook** 26:7 | 123:7 142:18,20 |
| 109:14 131:10 | 35:4 44:2 | 61:12 63:10 | **noted** 142:7,16,17 | 142:20 149:21 |
| **MPD** 32:23 | 132:18 133:24 | 102:21,22 105:6 | **notes** 41:19,21,22 | 149:23,24 |
| 147:23 210:1 | 146:14 151:21 | 121:24 138:8,11 | 41:23 142:18 | 189:18,19 |
| 262:17 | 173:25 174:1 | 138:12,20 | **Nothing--** 149:18 | 193:22,22 211:8 |
| **Mr.--** 69:18 123:9 | 184:5 211:9 | 140:16 142:20 | 310:2 | 211:17,20 |
| 130:21 151:14 | 248:13 251:4 | 155:1 173:13,13 | **nothing--nothing** | 212:24 225:13 |
| 181:9 | 254:18 264:12 | 174:10 178:3 | 75:9 | **nurse's** 35:6 |
| **Mr.--Mr** 219:22 | 287:23 293:20 | 179:21,25 211:6 | **notice** 5:4 75:20 | 135:17 142:17 |
| **Mr.--with** 221:7 | **needed** 175:2 | 216:4 217:18 | 76:21,24 77:3 | 142:17 |
| **Multi-** 157:22 | 182:15 217:8 | 225:6 241:20 | 92:14 96:11 | **nurses** 35:10 |

| | | | | |
|---|---|---|---|---|
| 211:15,17 | 243:22 244:24 | off-- 99:2 | 106:16 120:22 | 7:21 8:7,16 9:10 |
| 225:15 | 245:2,22 254:6 | offender 10:15,15 | 120:23 128:24 | 9:15,19 10:25 |
| nursing 226:15 | occurrence 189:9 | 102:22 237:7 | 129:5 150:17 | 11:10,12 13:2,4 |
| | 190:5,14 193:14 | 304:10 | 156:16 168:15 | 13:20 14:16,20 |
| **O** | 194:25 209:24 | offenders 22:24 | 172:5,10 182:13 | 15:21 16:3 17:4 |
| o'clock 49:1 | 241:16 279:8 | offense 59:7,10 | 230:21 248:12 | 17:18 18:25 |
| 123:17 221:23 | 283:13 | 67:12 | 248:23 249:11 | 19:8 21:15,20,22 |
| 244:8 245:17,18 | occurring 259:10 | offenses 183:12 | 249:21,23 250:1 | 22:9,16,19 23:20 |
| oath 6:17 53:24 | 287:20 | offered 5:9 187:9 | 257:8 258:3 | 24:3 25:4,7 26:6 |
| object 119:15 | October 27:19,19 | office 1:19 2:12 | 286:12,13,14 | 26:9,11,11,14,18 |
| 152:14 181:23 | 29:4 31:20 | 2:19 3:6 46:13 | 288:20 295:3,15 | 26:20,24,24 27:4 |
| 182:25 201:7 | 48:20 51:23 | 46:21 63:15,17 | 295:19 | 27:10 28:25 |
| 208:19 209:11 | 52:3,17 53:3 | 118:9 145:15 | often-- 231:3 | 29:2,2,10,17,18 |
| 219:24 222:3 | 54:8 67:3 68:12 | 150:11 168:16 | Oh 12:16 14:23 | 29:22 30:19,24 |
| 226:24 227:25 | 114:2,23 116:5 | 180:9,12 181:17 | 15:23 17:14,17 | 31:12 32:8,17,19 |
| 228:8 236:10,16 | 125:15 134:19 | 279:2 296:7,7 | 19:6,8 21:11 | 33:6,19 35:7 |
| 242:6 253:4 | 138:21 152:10 | 303:10 313:10 | 26:8 31:4 35:7 | 36:4,24 37:4,10 |
| 257:1 272:25 | 155:17 170:9 | officer 26:2 32:13 | 38:18 41:19 | 38:7 39:1,1,5,14 |
| 294:19 | 174:17 175:13 | 33:18,20,22 35:2 | 46:14,18 49:4,24 | 40:23 41:13,21 |
| Objection 210:15 | 175:18 179:4 | 36:4 39:14 | 50:23 51:16 | 41:23,25 42:7 |
| objections 5:7 | 198:9 216:19 | 43:22 71:11,11 | 52:8 55:19 | 43:1,16 44:11 |
| objects 119:11 | 217:19,22,25 | 73:8 79:7 83:7,9 | 63:18 75:9 | 45:1,13,16 47:6 |
| obligated 276:18 | 218:2,3,5,9 | 101:6 128:7 | 81:18 82:10 | 47:17,21,25 |
| observe 61:13 | 219:16,17 | 138:15,20,23,24 | 91:22 94:23 | 48:14 49:2,5,14 |
| observed 200:17 | 220:14,18 | 144:23 147:11 | 95:15 98:15 | 50:12 51:1 52:2 |
| 305:21 | 232:10,14,16 | 147:20,20,22 | 104:1 114:10 | 52:14,15,25 53:1 |
| obtain 281:11 | 243:23 247:20 | 148:3,7 156:12 | 117:3 120:15 | 53:6,9,14,22,22 |
| obviously 77:20 | 266:21 270:9,25 | 156:13 162:6 | 121:18 136:18 | 53:22,25 54:4,11 |
| 311:6 | 286:5,5 287:21 | 195:18 198:5 | 136:21 142:12 | 54:15,19,20 56:6 |
| OCC 310:10 | 290:13 291:6 | 209:23,25 210:7 | 148:18 154:1 | 57:8,18,25 58:12 |
| occasions 121:15 | 297:24 301:25 | 210:18 252:11 | 163:6 167:2 | 59:6,19 60:5,11 |
| occupied 36:2 | October-- 17:10 | 252:15,16,19 | 170:20 177:25 | 60:22 61:8,20,25 |
| 52:19,21,23 53:8 | 24:11 28:21 | 255:10,14 | 187:5 192:11 | 62:14,22,25 63:5 |
| 53:8 292:20 | of-- 27:24 40:20 | 268:15 282:7 | 219:10,13 | 63:22 65:2,14,21 |
| occupied,-- 34:24 | 62:2 72:23 | 286:3,4 295:2 | 252:25 268:1 | 66:23 67:24 |
| occupy 30:8 | 156:5 178:12 | 296:5 305:21,25 | 279:20,21 | 69:19 72:9 |
| occur 140:13 | 227:11 273:16 | 313:5 | 285:17 287:10 | 73:25 75:1,15,15 |
| 149:25 209:24 | of--a 276:6 | officer's 73:14 | 289:11 290:11 | 75:16,17,18,19 |
| 211:1 219:5 | of--end 214:21 | officer--I 148:6 | 290:16 291:1 | 76:5 77:20 78:3 |
| 224:9 258:18 | of--it 143:23 | officers 17:25 | 305:18 311:17 | 78:10,15,17,17 |
| 268:11 | of--of 182:21 | 18:2,11 38:16 | Oh,-- 75:9 | 78:25,25 79:9,12 |
| occurred 177:24 | 197:21 295:3 | 46:24 64:3 | OJT 18:9,11,14 | 79:14,24 81:5,9 |
| 186:25 201:3 | of/sort 107:10 | 83:12 84:22 | okay 6:10,17,18 | 81:9,18,20 82:15 |
| 215:20,21 232:9 | off- 120:22 296:6 | 85:9 97:17,19 | 6:22 7:2,11,12 | 83:1,6,7,8,8,24 |

Case 3:16-cv-01007-TAD-KLH   Document 245-2   Filed 03/10/20   Page 103 of 220 PageID #:
Gerald Hardwell
13728
August 28, 2017

Page 24

| | | | | |
|---|---|---|---|---|
| 84:16,20,21,25 | 157:3,9,16,19,21 | 190:1,14,17,21 | 226:2,4,7,10,14 | 261:23 262:2,5 |
| 85:9 87:14,25 | 158:10,12,17,21 | 191:5,12,13,14 | 227:7,10,15,17 | 262:12,18,21,24 |
| 88:6,16 91:7,15 | 159:5,8,12,17,20 | 191:19,25 192:4 | 227:19,22 228:2 | 263:1,4,11,14 |
| 92:1,4,17 94:17 | 159:23 160:1,3,5 | 193:1,4,8,10,14 | 228:5,10,21 | 264:6,9,10,20,24 |
| 96:14 97:3,10,13 | 160:7,9,12,18,21 | 193:20 194:1,13 | 229:5,8,11,11,13 | 265:3,19,24 |
| 98:25,25 99:6 | 160:24 161:5,10 | 194:23 195:7,11 | 229:15,17,19 | 266:3,11,18,20 |
| 101:1,25 103:8 | 161:12,19,20,21 | 195:14 196:2,10 | 230:2,4,9,14,16 | 267:5,13,22 |
| 104:21,25 105:7 | 161:25 162:6,9 | 196:15,20,25 | 230:20,25 231:3 | 268:2,7,16,19,22 |
| 105:13 106:5,22 | 162:12,15,17,21 | 197:3,3,4,14,17 | 231:7,14,19,23 | 269:11,23 270:4 |
| 107:11 108:2,14 | 162:23,25 163:2 | 197:25 198:5,13 | 232:4,8,12,16,22 | 270:11,14,24 |
| 108:24 109:2,15 | 163:4,8,13,15,21 | 198:15,20 199:1 | 232:25 233:3,7 | 271:3,8 272:16 |
| 110:2,13,16,18 | 163:25 164:5,10 | 199:4,8,12,17,19 | 234:4,6,10,12,16 | 272:23 273:5,23 |
| 110:20 113:2,19 | 164:17,19,22,25 | 199:24 200:2,6 | 234:19,22,25 | 274:4 275:17 |
| 114:2 118:19 | 165:5,7,10,16,23 | 200:15,21 201:9 | 235:3,11,14,22 | 276:14,17,19,22 |
| 120:13 121:20 | 166:3,10,24 | 201:11,14 202:7 | 236:1,4,7,21,23 | 277:5,11 278:10 |
| 121:22 123:19 | 167:5,7,11,13,20 | 202:17,24 203:2 | 237:2,5,20,25 | 278:16 279:4 |
| 123:24 124:8 | 167:24 168:5,9 | 203:10,17,23,25 | 238:5,22,25 | 280:12 282:12 |
| 126:7,11,15 | 168:13,20,23 | 204:6,13,16,19 | 239:5,8,11,15,17 | 282:16,17,19 |
| 127:18,23 | 169:13,23 170:1 | 204:22,24 205:2 | 240:2,7,12 241:2 | 283:1 284:9 |
| 128:18,20 | 170:4,6,8,23 | 205:9,14,16,25 | 241:19,23 | 285:1,10,17,22 |
| 129:24 130:6,11 | 171:4,8,11,15,18 | 206:4,7,14,19 | 242:16,22 243:9 | 286:14,17 287:7 |
| 130:14,16,18,21 | 172:3,6 173:1,3 | 207:3,5,12,16 | 243:13,16,22 | 287:11,13 |
| 131:6,13,18 | 173:9,14,17,24 | 208:7,23 209:4 | 244:1,6,8,9,19 | 288:14 289:11 |
| 132:1,22 133:12 | 174:4,6,13,20,22 | 209:19,25 210:5 | 244:22 245:3,10 | 290:4 291:3 |
| 133:24 134:10 | 174:25 175:5,11 | 210:8,13,19,22 | 245:16 246:1,5,7 | 292:3,18,24 |
| 135:9 136:4,21 | 175:15,18,21,24 | 211:1,5,13,19,22 | 246:11,22 247:2 | 293:2,3,17 294:7 |
| 136:21 139:25 | 176:4,10,13,17 | 211:25 212:7,12 | 247:4,6,10,13,20 | 294:11 295:3,11 |
| 140:3,23 141:8 | 176:24 177:3,5,6 | 212:16,20,23,25 | 248:3,11,14,17 | 295:22 298:8 |
| 143:15,18,23 | 177:8,15,20,22 | 213:2,8,24 214:2 | 248:24 249:6,9 | 300:18 302:12 |
| 144:6,7,24 145:3 | 178:1,10,22 | 214:7,15,22 | 249:13,15,18,25 | 303:5,8 306:15 |
| 145:3,7,11,13,20 | 179:3,6,9,14,19 | 215:2,6,8,24 | 250:11,19,21,25 | 306:25 307:3,15 |
| 146:9,23 147:2 | 179:24 180:8,13 | 216:3,8,13,17,20 | 251:5,10,13,16 | 309:22,25 |
| 147:14,19,24 | 180:20,24 181:1 | 216:25 217:2,6,8 | 251:19 252:2,9 | 310:13,15 311:3 |
| 148:1,4,12,15,16 | 181:5,8,15 182:4 | 217:11,15 | 252:14,18,20,23 | okay,-- 205:8 |
| 148:21,23 149:2 | 182:6,12 183:6,9 | 218:12,16,20,24 | 253:3,3,6,7,12 | old 146:14 |
| 149:6,9,12,25 | 184:1,3,7,11,11 | 218:25 219:15 | 253:13,23 254:6 | on- 63:6 70:7 |
| 150:3,7,10,14,23 | 184:18,21,24 | 219:19 220:10 | 254:10,13,16,23 | on-- 62:22 115:12 |
| 151:1,5,11,14,23 | 185:6,13,17 | 220:11,21,25 | 255:6,10,13,19 | 160:21 173:12 |
| 151:25 152:2,6,9 | 186:4,6,14,19,22 | 221:4,9,21,24 | 255:25 256:4,9 | 302:5 |
| 152:21,24 153:6 | 186:25 187:4,5,7 | 222:5,8,12,19,24 | 257:10,21 258:7 | on--sit 60:17 |
| 153:15,19,22,24 | 187:18,21,23 | 223:3,6,10,13,16 | 258:11,16 259:7 | on-duty 286:12,13 |
| 154:11 155:1,5 | 188:2,4,6,11,17 | 223:24 224:2,8 | 259:14,18 260:5 | onboard 222:9 |
| 155:11,20,24 | 188:20,23 189:1 | 224:13,19 225:6 | 260:15,17,20 | once 12:22 60:9 |
| 156:2,5,13,18,23 | 189:9,13,16 | 225:8,14,21,25 | 261:10,14,17,20 | 66:9 79:14 |

| | | | | |
|---|---|---|---|---|
| 93:10 96:14 | opportunity 7:20 | 86:6,9 102:12 | pack 193:13 | 150:11 179:23 |
| 108:2,19 122:16 | 42:7 72:6 150:4 | 123:10 124:1,14 | 196:22 214:20 | 180:4,4,9,14 |
| 131:12 142:18 | 150:23 153:9 | 145:15 150:11 | 214:20,22,23 | 181:17 182:1 |
| 224:7 272:19 | 159:23 180:20 | 152:4,5 179:23 | packet 193:16 | 258:23 313:2 |
| once--once 68:21 | 187:9 277:18 | 180:4,4,8,14 | 194:4,16,17,23 | part 22:21 77:8 |
| oncoming 216:8 | 312:4,6 | 181:16 182:1 | 195:3,5 215:8,15 | 77:12 120:3 |
| one-- 134:22 | opposed 187:10 | 258:23 277:19 | 216:5 232:25 | 132:11 143:20 |
| 309:24 311:18 | 202:20 | 313:2 | page 4:2 16:4 | 144:4 214:7 |
| one-on-one | OPSO 93:8 97:1,7 | outcome 313:24 | 19:16 22:23 | 232:25 241:8 |
| 300:14 | 97:9 99:7 | outside 43:4,25 | 53:2 140:11 | 268:19 283:2 |
| one-person 10:21 | 244:11 263:2 | 44:6,9 76:11 | 145:8 153:25 | 295:25 |
| one-second 66:22 | or-- 10:15 26:7 | 77:8,15 94:17,18 | 213:10 251:16 | partial 120:7 |
| 66:23 | 31:7 51:18 | 94:21,22 112:13 | 276:8 314:1 | participated |
| ones 37:2 41:25 | 135:14 138:25 | 113:6,9 124:10 | pages 22:11,13 | 156:2 258:16 |
| 42:3 68:25 | 145:9 146:6 | 124:16 183:17 | 313:9 | particular 9:25 |
| 145:14 181:2,2,3 | 151:7 226:17 | 188:4 196:2 | paginated 147:6 | 67:24 68:11 |
| 204:4 286:15 | 246:15 253:20 | 221:6 233:17,23 | paid 157:25 158:3 | 79:20 138:20 |
| 311:24 | 257:19 275:4 | 237:10 258:3 | 158:7,9,10 | 179:12 198:6 |
| ongoing 63:7 | or--and 140:21 | over-- 153:12 | 166:24 167:11 | 199:20 211:2 |
| only-- 80:5 96:25 | or--or 31:10 73:15 | over--in 283:23 | 281:17,22 | 213:5 215:22 |
| 222:11 | 226:4 | overcome 128:11 | pain 90:19 | 238:9 241:8 |
| open 91:9 92:18 | oral 112:9 241:2 | overnight 211:9 | pair 234:13 | 254:8,24 265:17 |
| 95:21 99:10 | 254:3 | overseeing 284:10 | pamphlet 45:24 | 270:8 308:1 |
| 227:16,17 | order 59:11 70:9 | oversight 294:18 | pants 125:21 | particular--the |
| 265:15 | 175:12 178:22 | overtime 166:24 | paper 51:9,12 | 20:22 |
| opened 69:11 92:6 | 236:4 266:14 | 167:6 175:23,24 | 54:22 55:21 | parties 313:23 |
| 107:23 227:10 | orders 71:21 | 253:18,25 | 60:16 142:15 | parts 78:3 92:18 |
| 228:7,17 | 266:8 | 254:14 | 169:7 | 97:18 258:8 |
| opening 227:13 | ordinarily 79:5 | | paper- 257:9 | party 24:1 |
| operate 233:18 | organization | P | paper-- 181:8 | pass 88:3,4 211:4 |
| 240:4 | 170:15 | p 214:3 221:11,15 | papers 196:6 | 212:24 255:15 |
| operating 219:12 | organizational | 221:17 225:9 | 197:12 | 269:17 271:12 |
| 219:13 | 169:9 | P&P 4:9,13,19 | paperwork 24:15 | passed 282:4 |
| operations 297:18 | organizations | P.D 44:12 | 30:15,22 175:21 | passing 281:5 |
| operator 199:13 | 113:10 | p.m 48:20 57:14 | 194:10 214:25 | passive 128:14,15 |
| 239:18 240:1,12 | original 313:26,26 | 57:16 62:20 | 215:1,1,2,24 | 128:16,19,22 |
| 240:17 269:8,9 | originally 311:3 | 124:2,5 138:8,11 | 216:1 229:7 | passive-- 128:15 |
| 269:12,13 | other--any 176:7 | 211:14 214:16 | 230:5 257:9 | password 199:18 |
| 290:18 | other--like 18:2 | 217:22 218:10 | 296:22 | 199:19,22,25 |
| operators 284:15 | others--other | 220:14 242:8 | parallel 98:1,3 | 200:3 |
| opinions 313:22 | 275:23 | 243:23 244:21 | Parish 1:26 63:20 | pathway 83:16 |
| opportun- 312:3 | Otwell 297:6 | 245:22 266:21 | 80:8,25 86:6,10 | patience 271:15 |
| opportunities | Ouachita 1:26 | 313:12 | 102:12 123:10 | Patrick 2:24 |
| 169:3 | 63:20 80:8,24 | p.m./6 299:2 | 124:1,14 145:15 | 29:12,25 30:1,2 |

Case 3:16-cv-01007-TAD-KLH  Document 245-2  Filed 03/10/20  Page 105 of 220 PageID #:
13730
Gerald Bardwell
August 28, 2017

Page 26

| | | | | |
|---|---|---|---|---|
| 30:13 145:25 | 237:18 239:2,8 | 116:9 123:20 | 202:9,19 206:23 | 114:5 129:25 |
| 146:12 | 275:21 284:11 | 259:10,16,18,19 | 214:10 221:21 | 131:24 133:24 |
| **patrol** 102:11 | 284:12 286:6 | 260:3,5,10,17,20 | 236:7 248:12 | 140:25 145:21 |
| 123:10 198:24 | 302:9 303:1 | 297:7 | 263:20 275:6 | 146:25 195:7 |
| **pay** 169:4 | 304:23 307:22 | **phones** 185:21 | 300:19 301:13 | 206:2 210:2 |
| **payroll** 166:10 | **person's** 269:15 | 269:16 | 303:16 | 262:6 |
| **pays** 240:24 | 304:9 | **photo** 153:22 | **place--** 236:13 | **point--** 116:13 |
| **PD** 262:22 307:23 | **person,--** 192:6 | **photograph** 4:14 | **placed** 10:9 36:6,8 | **point--a** 150:21 |
| **peace** 59:1,5,15 | **personal** 30:4 | 4:15,16 143:1,6 | 36:10 69:14 | **pointing** 133:22 |
| 162:6 | 46:13 55:2 | 143:9,15 144:8 | 74:11,12,14 | **police** 31:14 32:23 |
| **pedestrian** 58:22 | 116:3,5,9 159:24 | 144:12 154:4 | 79:10 89:18 | 33:20 79:7 |
| 76:18 | 196:4 199:19,22 | 259:5 | 97:8 102:11 | 206:8 210:6 |
| **people** 61:5 | 210:16 277:5 | **photographs** | 106:15,18 | 258:3 301:21 |
| 135:10 160:14 | 278:18 280:17 | 142:23 197:4 | 123:10 125:3,12 | 303:25 |
| 163:3 169:5 | 308:25 310:19 | 259:9,20 260:3,8 | 152:21 177:23 | **policies** 148:2 |
| 174:18 200:3 | 313:15 | 261:3,8 | 181:20 205:16 | 156:19 157:7 |
| 204:23,25 253:9 | **personally** 198:17 | **physical** 26:24 | 205:18 206:2 | 184:16,19 |
| 253:18,25 | 209:16 | 72:15 89:14 | 207:9 208:13 | 188:14 297:20 |
| 295:23 | **personnel** 14:8,10 | 111:1,11 128:16 | 212:2 220:25 | **policies--** 156:15 |
| **pepper** 55:25 | 22:25 138:9 | 203:13,15 | 221:6 301:1 | **policy** 20:10 22:5 |
| 125:20,21,24 | 140:15 146:23 | 257:17 268:10 | 304:1 | 40:13 113:16 |
| 127:5 | 159:24 165:16 | 299:15,18 | **Placed--** 221:6 | 123:3 137:6 |
| **percentage** | 167:20 173:14 | **physically** 157:23 | **placing** 30:16 | 139:7 140:7,9 |
| 129:14 | 175:1 176:1 | 269:25 | 99:16 181:22 | 148:25 149:2,14 |
| **performance** | 178:14 182:16 | **pick** 93:8 123:14 | **plan** 69:10 | 150:1 157:3,4 |
| 184:8 | 203:8 225:3,22 | 235:4 310:7 | **play** 151:14 | 174:5 183:10,14 |
| **perhaps--** 304:11 | 226:15 249:14 | **picked** 180:7 | **PLAYING** 151:18 | 183:17,21 |
| **period** 19:3 24:8 | 249:20 250:12 | **picking** 83:13 | **please** 27:12 | 190:17,21 |
| 50:9 73:22 | 278:19 298:19 | **picture** 76:2 132:9 | 61:16 112:17 | 195:19 202:8,10 |
| 116:24 120:12 | **personnel--** 174:7 | **pictures** 114:13 | 134:3 169:21 | 202:12 204:17 |
| 124:5 150:21 | **persons** 301:8 | 114:15 297:7,8 | 207:22 227:23 | 204:19 205:21 |
| 214:4 275:15 | **PERUSES** 13:1 | **piece** 119:12 | 235:7 | 208:7,10 209:4 |
| 301:9 | 14:14 15:3 | 142:15 169:7 | **plus** 7:19 175:2 | 214:10 224:3 |
| **permission** 88:21 | 16:17 18:6 20:5 | **pill** 212:22,23 | **point** 22:21 35:1 | 230:9,14,18,24 |
| 253:24 | 22:2 27:13 29:8 | **pillow** 119:12 | 48:14 50:17 | 230:25 231:1,4,6 |
| **permitted** 5:6 | 139:8 213:15 | **pin** 105:20 | 51:12 55:15,18 | 231:9 235:20 |
| **person** 13:18 28:9 | 242:23 245:14 | **pinned** 107:2 | 55:24 56:22 | 236:24 270:1 |
| 32:9 34:6 43:14 | 247:8,16 248:1 | **place** 8:25 9:5 | 60:5 63:9,23 | 279:13,19 |
| 51:5 78:11 88:5 | 255:4 287:2,16 | 10:18 12:17 | 64:17 65:9,21,24 | 293:17,24,25 |
| 92:21 104:10 | 288:15 293:15 | 34:11 39:6 79:4 | 66:10 75:21 | 303:22 306:23 |
| 112:19 140:18 | 293:22 | 93:8 97:1 | 79:10 85:19 | 308:3 |
| 141:2,13 142:21 | **phone** 113:22,25 | 105:23 106:11 | 86:9,24 87:15,25 | **population** 50:9 |
| 191:22 193:20 | 114:6,7,10,18 | 107:20 117:20 | 88:25 99:22,23 | 196:18 197:1 |
| 199:24 227:2 | 115:22 116:1,3,6 | 118:15 196:5 | 101:8,25 109:11 | **port** 85:5 94:1 |

| | | | | |
|---|---|---|---|---|
| 100:20 125:9 | 44:6,9 129:2 | 188:24 201:10 | 140:15,17 141:2 | **proximity** 273:9 |
| 265:8 289:13 | **preparation** 43:2 | 206:5,8 259:10 | **PROFFERS** | **pull** 63:11 107:3 |
| **portal** 56:4 | 150:3 232:22 | 259:22 261:4 | 18:21 30:12 | 109:2 131:17 |
| **portion** 248:21 | 270:11 | **prison** 149:7 | **program** 18:14 | 154:15 |
| **portion--** 228:13 | **prepare** 41:17 | 241:5 | 280:13 | **pulled** 63:13 |
| **position** 85:19 | **prepared** 277:13 | **prisoner** 24:23 | **progressive** | 99:21 109:8 |
| 102:2 132:5 | 277:15 285:22 | **prisoners** 289:24 | 183:10,14 266:5 | 122:23 |
| 182:20 185:6 | 313:14,17 | 290:1 | **prohibited** 137:7 | **pump** 67:21,22 |
| 239:5,19,25 | **preparing** 232:9 | **probably** 55:12 | **prohibition** | **punch** 111:9 |
| 281:11 302:20 | 233:8 | 64:23 93:15 | 313:20 | **punching** 103:1 |
| 302:21 | **presence** 144:19 | 129:22 134:21 | **prohibits** 126:8 | 200:18 |
| **positions** 173:19 | 144:21 | 200:2 271:17 | **prolonged** 301:11 | **punish** 300:21 |
| 173:19 247:19 | **present** 3:13 | **problem** 108:6,9 | **promoted** 114:9 | **punishment** 126:8 |
| 249:23 283:16 | 85:23 86:10 | 127:20 152:25 | 212:14 | 224:19 300:19 |
| **positive** 15:20 | 117:11,22 118:5 | 171:5 202:8 | **pronounced** | 300:24 |
| 298:8 | 123:6 138:9 | 216:9 240:5,18 | 123:21 | **pupils** 92:14 |
| **possession** 234:20 | 186:10 297:11 | 263:15,19 | **proper** 8:14 237:6 | **purpose** 156:8 |
| 260:11,16 | 299:18 | **problematic** | 257:8,9 267:19 | 195:8,12,14 |
| **possible** 22:23 | **presented** 194:5 | 223:10 233:25 | 267:20 | 223:3 248:21 |
| **possibly** 125:10 | **preserving** 123:4 | 275:24 | **properly** 8:20 | 249:9,19 266:18 |
| **Post** 2:12,19 3:6 | 259:1 | **problems** 57:6 | **property** 148:11 | **purposes** 1:9 5:5 |
| 39:23,25 40:5 | **Presley** 245:24,25 | 210:9 | 196:3,8,9,13,22 | 214:13 |
| 161:20,21 162:1 | **press** 134:16 | **procedure** 5:6 | 196:22,23,24 | **pursuant** 5:4 |
| 162:6,9,12 163:2 | **pressure** 95:24,24 | 70:18 71:1 | **protect** 34:10 | 230:9 |
| 168:14 233:15 | **pretty** 51:11 | 140:12 222:19 | 70:23 | **push** 67:18 |
| 233:17 235:21 | 60:23 66:13 | 313:21 | **protection** 301:2 | **push-down** 67:20 |
| 235:22 237:8,10 | 69:24 80:24 | **procedure,--** | 301:4,5 | **pushed** 13:22,25 |
| **power** 168:21,23 | 90:25 120:9 | 197:18 | **protocol** 235:19 | **pushed--** 13:23 |
| 168:25 | 127:25 178:6 | **procedures** 19:19 | 236:7 263:20 | **pushing** 75:7 |
| **PR-24** 40:18 | **prevent** 107:24 | 19:21 64:7 | **protocols** 237:3 | **put** 25:4 34:5,23 |
| **practical** 307:20 | **prevention** 139:7 | 219:12,14 | **prove** 200:11,14 | 70:10,13,19 71:2 |
| 308:5 | 157:18 162:20 | **process** 31:16,21 | **provide** 20:25 | 71:7,11,18 74:13 |
| **practice** 59:9 | **previous** 102:22 | 63:18 149:3 | 168:16 237:5,11 | 78:11 79:5,14 |
| 137:6 214:4,8 | 216:14,18 222:9 | 156:3 211:10 | 237:12 300:15 | 90:11 97:3,5 |
| 308:4 | 222:10 229:21 | 264:22 265:6 | **provided** 17:25 | 104:25 105:5,8 |
| **practices** 297:21 | 246:10 299:22 | 267:17 268:4,19 | 20:14,21 21:15 | 108:2,19 111:7 |
| 306:23 | **previous--the** | 301:20 | 233:11 | 135:10 138:2 |
| **PREA** 20:22 | 104:14 | **processed** 80:6 | **provider** 115:23 | 148:8 153:18 |
| 45:14,18 149:7 | **previously** 145:17 | 293:19,25 | **provides** 128:13 | 193:12 196:13 |
| 149:15 157:18 | 245:10 247:23 | 296:17 308:2 | 162:16 | 198:2,10 201:22 |
| 163:19,20,24 | **print** 193:5 | **produce** 262:18 | **provides,--** 168:16 | 204:16,24 |
| **PREA--** 163:22 | **printed** 193:7 | **producing** 194:13 | **providing** 46:5 | 205:14,22 |
| **preceding** 155:5 | **prior** 102:21 | **profane** 59:2 | 162:2 | 206:14 235:22 |
| **premises** 43:20 | 139:23 188:20 | **professional** | **PROVOSTY** 2:11 | 236:9 278:19 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 107 of 220 PageID #:
Gerald Hardwell
13733
August 28, 2017

Page 28

| 288:3 301:8 | question--first | 138:24 212:12 | 263:7,20 265:25 | 137:11 205:18 |
|---|---|---|---|---|
| 304:2,13 312:2 | 284:9 | ranking 101:5 | 270:1 286:24 | 244:19 300:18 |
| put-- 103:22 | questioned 63:14 | Rape 149:7 | 287:14,14,15 | 308:1 |
| put--placed 99:18 | 238:11 | rarely 246:20 | 289:19 291:13 | reasoning 280:7 |
| puts 194:16,17 | questioning | rated 113:15 | 291:22 292:4,9 | recall 13:19,21 |
| putting 90:8 | 283:11 | Ray 3:17 | 292:11 293:13 | 16:21 17:1 |
| 95:24 | questionnaire | RCC 16:5 17:2,18 | 293:14,24 | 20:14,16,23 |
| | 286:25 | 17:20 21:23 | 301:20,23 | 22:22 23:2,3,5 |
| Q | questions 9:14 | 22:17 27:11 | 303:23 305:5,8 | 24:2 27:20 |
| qualify 210:13 | 31:25 32:8,24 | 41:13 45:7 48:8 | RCC's 152:19 | 28:22 29:5 |
| qualitative 211:6 | 33:3,4 49:21 | 52:2,17 53:3 | RCC/Hardwell | 30:20 41:8 |
| quality 216:9 | 91:25 146:15 | 139:3,11,14 | 12:24 14:9 15:1 | 54:24 57:12,23 |
| quantitative | 155:25 156:12 | 146:20 148:2,25 | 16:6,15 18:5 | 64:13 67:7 |
| 211:6 | 183:1 241:12 | 149:2,14 150:18 | 20:18 147:7 | 75:14 76:4 |
| quarter 62:6 | 248:15 256:7,11 | 152:10,11 154:3 | 213:13 | 77:17 79:20 |
| question 5:7 6:13 | 256:15 288:12 | 157:3,7 162:12 | re- 213:4 246:12 | 80:24 85:11 |
| 6:15 7:15,21,23 | 311:20 312:4,7 | 162:14,16 168:9 | reaction 68:17 | 86:2,3,5,19 88:2 |
| 7:25 17:13 32:1 | questions-- 6:9 | 169:3 171:12 | 72:12,15,15 91:7 | 89:2 91:16 |
| 32:14 37:9 | quick 64:13 309:3 | 173:15,18 176:6 | 101:20 | 93:22 96:13 |
| 42:12 50:22 | 310:1 | 177:15 179:4 | read 5:12 20:19 | 99:9 100:19 |
| 53:7 89:25 90:1 | quit 53:17 | 180:4 181:17 | 21:25 29:15 | 101:3,7 105:6 |
| 91:21 104:21 | quite 93:7 | 183:9,21 184:16 | 41:19 42:5 | 106:8,15 107:17 |
| 116:14 118:22 | | 186:14 188:14 | 194:21 250:3 | 107:19 110:14 |
| 120:13 136:20 | R | 190:17,21 | 293:20,21 | 112:11 114:17 |
| 140:11,16 | R 2:24 | 195:19 202:8 | 311:14,16 | 116:18 117:25 |
| 152:15 164:9 | R- 293:5 | 205:21 206:5,8 | readily 234:17 | 119:9 123:18 |
| 178:7,9 192:10 | R.S 313:8 | 209:7 211:5 | ready 131:17 | 125:25 131:10 |
| 201:8 208:20,23 | rack 103:1 | 213:12 214:10 | 299:16 | 131:22 138:22 |
| 209:12 226:25 | racks 26:1 | 223:19 225:4 | real 64:13 89:22 | 157:5 174:19 |
| 228:9 229:12 | radio 8:14 19:21 | 230:9 233:18 | 92:15 309:3 | 175:20 176:9 |
| 236:11,12,17 | 115:1,12 239:16 | 235:12,19 | 310:2 | 179:19 181:5,8,9 |
| 242:7 252:24 | 240:3 269:17 | 236:15,24 | real--happens | 181:25 182:12 |
| 253:5,5 257:2 | 271:1 286:7,9,11 | 237:10 239:18 | 272:20 | 182:17,18 184:9 |
| 263:17 273:1,4 | radioed 103:19 | 240:21,24,25 | really 49:22 | 198:8 200:20 |
| 275:20 276:10 | 271:4 | 241:7 242:20 | 120:18 153:4 | 201:15 202:2 |
| 276:16 278:4 | radioing 269:18 | 244:20 245:11 | 192:2 196:8 | 204:21 209:17 |
| 280:2 284:10,11 | 269:20 | 245:21 246:1,23 | 210:2 235:5,8 | 212:4,5,7,9 |
| 286:24 287:8,8 | radios 11:21 | 247:6,15,23 | 246:24 263:10 | 213:2 221:4 |
| 293:23 294:20 | 286:14 | 249:7 251:10 | 295:11 | 222:23 225:21 |
| 299:25 300:9,13 | raise 309:15,19,20 | 255:1,20 256:14 | really-- 194:11 | 226:9,15 227:20 |
| 301:8 307:21 | raised 62:8 64:15 | 256:15,20 258:5 | reason 25:4 45:2 | 230:15,19 |
| 310:1 | 112:23,25 | 258:14 259:8 | 63:13 80:5 | 232:11,21 237:1 |
| question-- 28:24 | 143:18 309:5,5 | 260:11,16,18 | 104:4,25 105:2 | 238:2 239:4 |
| 275:20 310:14 | rank 11:4,8,12,25 | 261:1 262:2,9,13 | 115:18,20 | 240:10,16 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 108 of 220 PageID #:
Gerald Bardwell
18633
August 28, 2017

Page 29

| | | | | |
|---|---|---|---|---|
| 241:10,19 246:4 | recordation 28:8 | refused 122:20 | relieves 62:16 | 290:19,20,22 |
| 247:5 254:12 | recorded 25:10 | 181:9 269:22 | remain 31:8 279:5 | 292:14 306:9,10 |
| 259:6,7 260:6 | 32:2,4,5 67:8 | refusing 98:8 | remarks 100:22 | 308:9 |
| 261:22 270:10 | 115:10 142:7 | 298:7 301:20 | remedy 175:6 | report,-- 191:1 |
| 276:12 278:4,18 | 231:24 238:19 | regard 150:8 | remember 13:2 | reported 1:23 |
| 278:23,23,25 | 268:22 269:21 | 168:20 176:4 | 13:15 68:25 | 125:20 174:22 |
| 284:13 296:16 | recording 6:23 | 185:17 188:15 | 72:22 98:14 | 283:13 313:13 |
| 305:11 307:14 | 73:6,9 110:25 | 217:3 223:13 | 109:22 150:10 | Reporter 1:25 |
| 309:21 310:20 | 124:19 125:12 | 231:5 233:19 | 150:16 151:1,11 | 15:22,25 16:3 |
| 311:10 | 151:18 277:19 | 234:12 251:25 | 160:9 181:16 | 18:16 20:12 |
| recall-- 219:3 | 277:25 | 258:14 278:8 | 185:21 186:4 | 21:2,21 22:9 |
| 238:3 | recordings 42:14 | 281:20 | 187:23 197:12 | 37:25 38:3 |
| receive 12:14,15 | recordkeeping | regarding 45:3 | 197:23 198:5 | 51:14,17 112:15 |
| 19:10 45:21 | 179:3,16 200:2 | 116:10 135:4,7 | 200:21 211:25 | 112:17 139:11 |
| 46:18 160:3,25 | records 27:24 | 308:9 | 213:16 219:8,15 | 139:13,17 145:5 |
| 165:11 216:21 | 28:8 150:4 | Reginald 19:2,4 | 220:17 240:11 | 146:4,8 161:8 |
| received 40:20 | 153:10 263:7 | 66:2 69:12 | 241:13,16 | 198:23 248:7 |
| 41:14 45:7 | 270:24 281:9,20 | 85:25 95:8 | 242:17 244:6 | 252:12,14 293:2 |
| 75:25 123:20 | red 91:10 | 291:11 | 277:22 308:16 | 293:12 294:10 |
| 127:2 157:6 | reentered 100:18 | Regional 43:5 | remember-- 244:6 | 313:4 |
| 195:19 219:15 | REEXAMINA... | regular 94:5 | remove 103:19 | Reporters 1:20 |
| 220:21 240:3 | 285:3 310:3 | 104:10 211:18 | removed 119:6,10 | 313:10 |
| recertified 159:7 | 311:2,19 | 259:15 275:2 | 130:8 176:21 | reporting 13:5 |
| recognize 12:25 | reference 278:10 | 301:10 302:6 | 221:25 258:24 | 172:16,17 |
| 14:9,13,16 15:2 | referenced 202:15 | regularity 272:20 | René 3:14 | 313:14 |
| 16:24 18:5,7 | referencing | regulation 30:25 | repeat 6:15 | reports 41:24,25 |
| 139:4 143:1,9 | 243:17 | regulations | 236:12 285:2 | 42:19,22 178:20 |
| 144:8 293:14 | referring 108:24 | 196:12 | repeatedly 87:13 | 178:21,23 |
| recollection 30:4 | 143:16 306:21 | reject 223:7 | 88:1 | 241:17 258:7,8 |
| record 26:25 27:5 | 306:23 | relate 56:19 | rephrase 6:15 | 258:21 262:19 |
| 34:2 36:14 | reflect 174:25 | related 33:10 | 92:3 95:2,16 | 272:9 277:15 |
| 37:11 51:17,20 | 256:10 276:24 | 179:20 186:20 | 104:20 117:4 | 285:23,25 |
| 51:22 83:19,22 | reflect-- 276:22 | 296:12 313:22 | 120:9 127:11 | 308:13,16 |
| 83:25 110:22 | reflected 166:10 | relationships | 302:5 303:9 | represent 6:5 |
| 123:25 132:23 | reflecting 175:25 | 313:20 | 306:4 | 145:25 146:12 |
| 139:1 146:10 | 244:24 | relax 88:23 | replacement | 237:14 255:19 |
| 153:11 165:16 | reflects 277:1 | relaxed 150:21 | 214:15 | 271:19 |
| 200:6 207:24,25 | reform--report | release 11:9 36:5 | report 33:15 43:1 | representative |
| 213:15 215:13 | 194:25 | 48:2 94:2 | 67:13 123:19 | 296:20 297:11 |
| 247:16 264:14 | refresh 12:24 | 147:11 212:14 | 172:20 189:9 | represented |
| 269:3,6 271:3,19 | 151:25 | 212:16 215:1 | 190:5,6,14 | 255:20 293:24 |
| 276:8,22,23,24 | refresher 113:19 | 289:7,10 | 193:14 194:10 | reprimand 14:3 |
| 277:12 287:24 | refusal 298:8 | relieved 49:14 | 194:18 242:21 | request 4:4 16:2 |
| 290:10 304:9 | refuse 266:9,15 | 57:18 59:19 | 263:4,7 279:11 | 175:22 212:7 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 109 of 220 PageID #: 13734
Gerald Hardwell
August 28, 2017

Page 30

| | | | | |
|---|---|---|---|---|
| **requested** 15:6 | 190:19 222:14 | 31:15 36:20 | 42:10,12,24 | 133:6,14,21,23 |
| 198:15 | 284:10,11 | 37:3,23,25 38:4 | 43:16 44:11 | 133:25 134:2,17 |
| **requests** 175:25 | **responsiveness** | 39:3 41:13 43:8 | 48:10 49:16 | 134:19,23,23 |
| **require** 179:6 | 5:8 | 46:15,17 47:6,19 | 50:8,15 51:11 | 135:18 136:15 |
| 295:3 | **rest** 65:18 131:6 | 73:8 84:12 | 52:17,21,25 | 141:24 142:3,4 |
| **required** 158:13 | 161:15 196:23 | 101:6 102:23 | 53:13 54:6,13,17 | 142:13,19,23 |
| 161:3 173:18 | **restrains** 78:14,20 | 103:5 105:16 | 54:25 55:15 | 143:17 144:3 |
| 189:3 191:22 | **restraint** 78:15 | 106:10 107:12 | 56:1,6,14 57:4 | 146:21,25 |
| 231:11 235:23 | **restraints** 8:13,14 | 113:6,23 118:10 | 58:7,16 59:17,17 | 150:16 151:17 |
| 249:7 294:5,12 | 11:21 78:11 | 123:3,11 125:11 | 61:3,10 62:8,10 | 152:8,9 153:3 |
| 298:3,5 313:18 | 79:10,11,12 | 126:17 128:25 | 62:14,20,23,25 | 156:8 157:14 |
| **requirements** | 92:21 106:12,14 | 134:24 135:4,7,9 | 63:13 64:11,17 | 158:25 162:13 |
| 158:22 | 106:18 137:13 | 135:13,15 141:1 | 65:3,7,9,10,16 | 162:18,23 |
| **requires** 293:18 | 181:20 233:24 | 142:6,9,20 154:7 | 66:7 67:3 68:21 | 163:10 164:11 |
| 293:25 | 234:1,10 235:11 | 174:5 199:10 | 68:25 69:1,6,8 | 164:20 165:8,25 |
| **reserved** 5:8 | 235:13,14 237:6 | 202:22 203:3,4 | 69:15 70:25 | 166:12,25,25 |
| **resident** 150:18 | **restroom** 148:9 | 203:21 204:3,8,9 | 71:15 72:1,5 | 167:15 168:7,13 |
| 152:10 | **result** 103:17 | 208:14 274:25 | 73:2,4,6 74:4 | 169:7 170:11 |
| **residents** 215:22 | 104:12 176:17 | 275:2 276:9 | 75:4 77:9,20,21 | 171:21,25 172:9 |
| **resign** 187:10 | 176:21 188:13 | 285:5 286:2 | 77:23 78:1,5,12 | 172:16,20,23 |
| **resist** 106:5 | **retarded** 22:24 | 287:21 293:17 | 78:18 79:14 | 173:5 178:14 |
| **resistance** 106:10 | 23:8 | 293:19,25 | 81:3,5,11,24,25 | 179:23 180:1,16 |
| 128:11,14,22 | **retrieve** 269:25 | 296:21 297:13 | 82:1,3,9,22 | 182:20,20 184:2 |
| **resistant** 39:10 | **returned** 69:2,6 | 297:18 308:4,23 | 84:14 85:15,17 | 185:10 188:21 |
| **resisting** 75:3,6 | 117:21 | 310:4 | 85:21 86:1,6,9 | 189:11,16 191:1 |
| 78:7,8 | **reveal** 51:7 | **rid** 260:23 | 86:12,20 88:8 | 191:21 192:2 |
| **respond** 7:23 | **review** 42:10 | **Ridgewood—Ri...** | 89:23 90:9,22 | 193:19 194:4,7 |
| **responding** 6:16 | 118:1 140:4 | 43:18 | 93:3,10,18 94:20 | 195:18,23 198:3 |
| **response** 90:15 | 150:4,7,23 | **right** 5:12,13 7:3 | 96:6 97:15,20 | 198:8 199:6 |
| 181:23 231:8 | 153:10 178:1,13 | 7:14,18 8:2 | 98:23 99:1 | 200:8,13,14 |
| 256:7 287:11 | 189:24 201:21 | 12:20 13:3,9 | 101:1 102:9 | 201:5,15 202:2 |
| 305:15 | 207:5 243:12 | 14:2,5,24 15:1 | 103:16,21 | 203:4,7 204:6 |
| **responses** 7:8 | 256:1 288:13 | 16:12 17:7 | 107:20 108:19 | 209:7 211:15,20 |
| **responsibil-** 8:21 | 306:3,5,7 307:6 | 18:13 19:10,14 | 109:6,17,23 | 214:10 215:19 |
| **responsibilities** | **reviewed** 43:2 | 19:18,19 20:7,21 | 110:10 113:14 | 216:3 220:13,17 |
| 11:18 147:22 | 102:24 189:18 | 21:4,20 22:4,7 | 113:23 115:14 | 221:12,14,19 |
| 251:25 252:6,7,8 | 238:18 258:12 | 22:17 23:13,15 | 115:20 117:5,11 | 223:18,22 |
| 252:9 253:8 | 285:23 | 24:17 25:7,12 | 117:14 119:11 | 224:25 226:21 |
| **responsibility** | **rewind** 199:14 | 26:12 27:8,10 | 119:19 121:8,10 | 230:23 233:10 |
| 8:21 156:18 | **Richwood** 4:9,13 | 28:3 30:15,24 | 121:12,15,17,25 | 234:8,12 235:19 |
| 165:13 171:23 | 4:19 8:7 9:23 | 31:7 33:4 34:12 | 122:4,7,11 | 238:11,18 |
| 193:21 232:4 | 10:4 12:4,20 | 34:17 35:20 | 127:10 128:2 | 240:16 241:11 |
| 268:7 | 18:12 19:12 | 36:13 37:4,21 | 129:6 130:23 | 241:11 242:5,10 |
| **responsible** | 27:16 28:1 | 38:17,21 41:3 | 131:6,18 132:25 | 242:14,19 |

Duke Copeland Court Reporting
(318) 387-2889

Case 3:16-cv-01007-TAD-KLH  Document 245-2  Filed 03/10/20  Page 110 of 220 PageID #:
Gerald Hardwell
13735
August 28, 2017

Page 31

| | | | |
|---|---|---|---|
| 243:24 244:11 | 171:25 178:5 | **Roy** 3:18 44:5 | 170:25 | **scale** 84:7 |
| 245:24 247:15 | 248:10 299:17 | 83:22,23 207:25 | **sally** 85:5 94:1 | **scene** 23:1 101:13 |
| 247:15 248:16 | 299:21 300:15 | **rule** 9:4,5 13:6 | 100:20 125:9 | 116:14 118:17 |
| 250:3 251:24 | **rolled** 109:9 | 30:25 194:22 | 289:13 | 192:12,15 226:7 |
| 253:14 254:2,20 | **rolling** 101:21,23 | 196:21 215:23 | **Samsung** 114:12 | 259:2 |
| 255:1 256:6,13 | 101:24 102:5 | 281:1 300:20,23 | 115:22 259:19 | **scenes** 123:4 |
| 257:25 260:25 | **room** 10:18 25:11 | 300:24 | 260:3,5 297:7 | **schedule** 158:17 |
| 262:8 265:6,9,11 | 37:18 38:8 | **rules** 5:6 196:11 | **San-** 113:2 | **school** 23:12,16 |
| 265:13 267:11 | 93:23 94:3,8,24 | 267:5 313:18,21 | **Sanders** 112:14 | 23:21 24:6 |
| 267:17 268:4,9 | 119:4 120:2 | **rumors** 238:15 | 112:16 113:3 | **scrapes** 77:3 87:6 |
| 268:13 269:6 | 121:13 196:8,23 | **run** 69:12 159:3 | **sat** 87:17 179:16 | **scratches** 100:8 |
| 270:8,17,20 | 199:1,5,13 | 173:12,13 | 179:19 309:9,10 | 100:12 |
| 275:17 278:10 | 237:17 238:12 | 175:12 251:3 | 309:12 | **screen** 140:18 |
| 278:18 285:16 | 269:8,9,18 | 252:21,21 | **sat--sat** 121:9 | 214:12 |
| 285:20 286:2 | 270:18,21,25 | 254:18,20 262:3 | **Savion** 112:14,16 | **screened** 44:21 |
| 287:4 288:6,11 | 271:4 273:9 | 262:9 263:8 | **saw** 47:18 55:3 | 149:19,22,23,24 |
| 288:17,17 290:2 | 283:24 284:15 | **run-in** 206:8,12 | 85:23 101:4 | 211:9 307:20 |
| 290:20 291:12 | 286:21 289:4 | 206:24 | 102:5,12 107:17 | 308:4 |
| 291:16 292:22 | 290:18 | **Runner** 44:8 66:2 | 110:16,17,18,19 | **screening** 140:12 |
| 293:4,10 295:16 | **room,--** 28:11 | 66:6,7 69:10 | 141:25 144:3,15 | 140:13 141:11 |
| 296:14 298:6 | **rooms** 289:2 | 78:13 81:15 | 231:20 243:6 | 149:3,4,15 |
| 300:5,12,21 | **Roosevelt** 176:10 | 86:11 89:8 | **say--** 56:15 64:11 | 257:11 279:5 |
| 301:1 302:22 | **ROR** 59:14,17 | 116:25 117:18 | 161:6 195:1 | 307:20,23 308:2 |
| 306:23 307:22 | **Rosenthal** 132:23 | 216:25 227:3,6 | 300:22,22 | **screens** 121:13 |
| 307:24 308:16 | 186:6 188:2,4 | 227:19 250:21 | **say--say** 40:10 | **scroll** 53:2 |
| 311:12,14,17 | **Rosenthal/Loring** | 278:9 291:8 | 300:24 | **scuttlebutts** |
| 312:9 | 188:13 | 302:2 | **say--speak** 153:4 | 238:15 |
| **right--right** 56:17 | **roster** 4:10 27:21 | **Runner--Jeremy** | **saying** 13:23 | **seal** 313:26 |
| **right--top** 97:20 | 38:22 248:10 | 66:1 | 26:15 37:25 | **search** 148:10 |
| **right,--** 80:6 | **rosters** 27:15 45:5 | **running** 171:24 | 50:1 64:17,24 | **searched** 148:8 |
| **rights** 126:2,18 | **Rouge** 60:16 | 278:11 279:2 | 85:24 86:21 | **searching** 212:18 |
| **ripple** 143:24 | **rounds** 295:2,15 | **runs** 159:4 | 87:13 88:1 | **second** 67:10 |
| 144:4 | 295:20,23 296:4 | **Ruston** 112:24,25 | 93:12 121:16 | 69:16 71:24 |
| **rippling** 144:1 | 296:8 302:17 | **RWHC** 204:20 | 130:22 155:21 | 72:6 73:18 76:5 |
| **rise** 309:16 | 303:4 | 205:4,11,23 | 167:1 169:16 | 77:6 89:17 |
| **risk** 140:13 | **roundup** 272:18 | **Ryan** 247:2 | 170:8 182:8,8 | 151:15,15 201:4 |
| **ROBERT** 1:6,12 | 275:13 | | 189:23 208:10 | **security** 8:11 |
| **Robinson** 1:4 2:3 | **route** 109:4 | **S** | 245:1 271:1 | 237:21 273:22 |
| 3:14 5:5 | **routine** 58:25 | **S** 291:14 | **says** 20:24 21:12 | 273:24 |
| **rocking** 80:4 | 59:9 214:3,7 | **S-A-V-I-O-N** | 22:22 34:22 | **see** 18:17,19 20:3 |
| **role** 261:14 | 299:5 | 112:18 | 140:20 147:16 | 21:6,10 27:11 |
| **roles** 171:12 | **rover** 294:25 | **SA/LD** 290:5 | 149:2 195:19 | 28:8 30:10 31:6 |
| **roll** 79:1 167:17 | 302:16,19 303:1 | **SADLER** 2:11 | 205:22 245:3 | 36:4 37:19,22 |
| 167:21,25 168:5 | **rover--** 302:22 | **salary** 167:4,9 | 254:16 292:8 | 38:10,12,16 |

Case 3:16-cv-01007-TAD-KLH   Document 245-2   Filed 03/10/20   Page 111 of 220 PageID #:
13736
Gerald Hardwell
August 28, 2017

Page 32

| | | | | |
|---|---|---|---|---|
| 43:22 44:11 | see-- 22:21 89:12 | 270:20 275:25 | 162:24 205:3 | 155:1 158:14,18 |
| 46:18 51:22 | 154:3 | separating 202:20 | 208:9,25 209:23 | 161:3 170:25 |
| 52:3,7,16,18 | seeing 181:8 | September 314:2 | 211:8 239:17 | 171:16,21,24 |
| 53:19,21 56:12 | 197:12 268:6 | sergeant 11:9,9,10 | 240:3 256:14 | 172:6,11,13,23 |
| 56:22 57:2 | seek 150:14 183:6 | 11:12 19:2 66:1 | 266:7 | 172:23,24,25 |
| 62:11 73:17 | 184:15 206:4,19 | 86:13 117:23 | seventeen 174:1,2 | 173:2,3,6,7,11 |
| 76:6,9 77:13 | 256:4 257:17 | 147:11,12 | 174:15 175:2 | 173:12,12,13,13 |
| 79:7 83:11 85:9 | seen 44:16,20 | 172:23 191:8,9 | 250:20 | 173:19,24 174:6 |
| 85:13,15 86:6,24 | 71:6,10 73:4 | 191:11,17,25 | seventy-five 64:24 | 174:9 175:5,12 |
| 89:5,6,8,10,13 | 76:1 81:14 82:6 | 192:18 212:15 | seventy-two | 178:2,3,24,24 |
| 94:19 95:3 | 82:7 104:13,16 | 212:17 213:20 | 190:23,24 | 179:1 182:20 |
| 100:7,11,15 | 107:16 110:25 | 232:7 233:24 | 193:15,17 194:5 | 183:19 184:21 |
| 101:18 103:16 | 120:6 144:17 | 236:6 252:19 | shakedown | 188:20,23 189:1 |
| 104:13 107:13 | 149:13,21 | 265:22 267:12 | 224:11,16 | 190:18 193:20 |
| 107:14 109:23 | 153:17 167:20 | 267:13,16 | shape 143:21 | 193:25 194:14 |
| 110:11 111:5,10 | 180:6 182:15 | 268:10 270:16 | shared 300:13 | 200:22,25 202:3 |
| 116:15 120:7 | 209:23 223:16 | 271:1 281:1 | 308:25 | 206:1,20 211:12 |
| 122:10 129:14 | 223:18,24 224:6 | 282:7,24 291:7 | sharing 299:21 | 211:13,17,17,23 |
| 139:10 142:18 | 243:8 246:20 | 292:13 295:24 | 310:19 | 211:23 212:2,3 |
| 143:5,12,15 | 247:24 255:6,22 | 296:1,3,6 | she'll 211:17 | 212:10,13 213:3 |
| 148:7 151:14,16 | 256:13,18 261:8 | sergeant's 24:16 | She-- 246:20 | 213:5 214:2,5,21 |
| 153:22,24 154:1 | 263:4 270:5 | 232:7 268:7 | sheet 24:18 25:1 | 214:23 215:16 |
| 154:6,7,9,18 | 287:1 | sergeant-- 190:18 | 25:14,15,17 26:5 | 216:6,10,11,15 |
| 155:24 169:21 | segregate 275:23 | sergeants 46:25 | 26:6,11,16 142:7 | 216:25 219:5,17 |
| 181:1 188:6,7 | segregated 241:8 | 167:16 173:1,2 | 159:21 164:12 | 222:13,21,21,22 |
| 189:18 193:6,23 | segregation 9:9 | 188:25 226:4 | 165:17,18,23 | 222:22 225:3,5 |
| 194:14 197:7 | 36:17 | 231:22 233:12 | 175:23,24 | 225:11,17 |
| 199:14 200:3 | self 34:11,11 | 283:2,17 | sheet-- 24:21 | 229:17,21 |
| 204:11,14 | 194:17 | series 6:9 27:10 | sheets 4:18 26:15 | 231:22 232:2,3,7 |
| 209:25 210:3 | sell 260:22 | 31:24 | 27:4 148:14 | 233:1 234:19 |
| 223:5 232:8,22 | send 115:25 168:1 | serious 82:21 | 159:15 164:13 | 237:21 238:22 |
| 233:7 237:23 | 210:6 223:7,14 | seriously 34:19 | 215:10 293:7,12 | 240:13,18 |
| 239:11 243:4 | sends 194:18 | serve 171:12 | sheets-- 293:9 | 241:25 242:1,2 |
| 245:6 248:19 | Senior 23:16 | 211:22 | sheriff 63:17 | 242:14 247:20 |
| 249:13 250:21 | seniors 178:14 | served 194:18,20 | sheriff's 63:11,15 | 248:12,25 |
| 251:17 256:1 | sense 264:2 | 194:21 | 145:15 150:11 | 249:12,22,24 |
| 258:4 261:17 | 303:16 | serving 267:20 | 176:6 180:9,21 | 250:2 251:3,15 |
| 265:18,20,21,23 | sent 154:24 | set 180:13 252:5 | 181:17 182:2 | 251:19,25 252:5 |
| 265:24 270:8,12 | 193:20 209:9 | 270:20 313:8 | 279:1 | 252:6 253:14 |
| 273:9,21 274:1 | 282:1 | set--set 33:4 | shift 8:11,12,20 | 254:7,8,10,18,24 |
| 279:4 285:7 | sent-- 192:9 | setting 157:19 | 24:16 34:4 | 255:25 256:20 |
| 287:24 298:1,13 | separate 39:11 | seven 64:23,23 | 49:13 57:13,25 | 260:13 265:21 |
| 299:6,8 309:12 | 105:3 158:12,16 | 65:1 71:25 | 58:4,4,7,7 63:7 | 267:12,13,16,18 |
| 309:19 | 264:4 269:13 | 131:4,19 146:21 | 102:22 148:4,6,7 | 270:16 271:1 |

Case 3:16-cv-01007-TAD-KLH   Document 245-2   Filed 03/10/20   Page 112 of 220 PageID #:
Gerald Hardwell
13737
August 28, 2017

Page 33

| | | | |
|---|---|---|---|
| 278:13 281:4 | 287:13 | sir 7:6,17,22 8:1,9 | 57:20 58:2,15,24 | 103:10,13,15,23 |
| 282:15 283:25 | showed 253:15 | 8:24 9:2,21 10:2 | 59:8,16,16,18,21 | 104:3,16,24 |
| 284:1,5,8,13,22 | shower 122:17,19 | 10:6,8,11,22 | 59:23 60:1,7,21 | 105:15,17 106:6 |
| 284:23 286:6,16 | showing 264:1,7 | 11:3 12:9,13 | 60:24 61:15,19 | 107:7,19 108:1,6 |
| 288:16,17,20,21 | shown 143:6 | 13:8 14:1,15,19 | 61:22,24 62:9,13 | 108:18,18 109:4 |
| 290:7 291:3,5,7 | 144:11 | 14:21,23,23,23 | 62:15,17,21,24 | 109:12,14,16,19 |
| 294:16,17 295:4 | shows 28:9 44:20 | 15:4,7,12,18 | 63:19,21,25 65:5 | 110:4,6,9,24 |
| 295:8,9,12,18,24 | 73:2 123:25 | 16:8,10 17:1,3,5 | 65:8,11,13,23 | 111:4,13,16,18 |
| 296:1,3,6,6,24 | 179:16 | 17:9,19,21,24 | 66:4,19 67:14 | 111:24 112:1,5,7 |
| 297:1,3 299:3,16 | Shreveport 2:6 | 18:3,16 19:5,7 | 68:1,10,14,16 | 112:11,24 113:4 |
| 299:18,22 | Shunta 245:24,25 | 19:11,13,13,17 | 69:3,5,7,17,21 | 113:8,11,18,21 |
| 302:24 305:3 | shy 251:1 | 19:20,22 20:1,6 | 70:4,17 71:9,17 | 113:24 114:4,14 |
| 311:6 | sic 29:13,19,25 | 20:16,20,23 21:1 | 71:20 72:4,8,14 | 114:20,22 115:3 |
| shift-- 148:16 | 30:1,2,14 47:11 | 21:7,17,19 22:6 | 72:16 73:1,3,5,7 | 115:8,11,15,24 |
| 284:17 290:24 | 103:11 104:11 | 22:9,11 23:9,19 | 73:10,12,16,24 | 116:2,4,12,16 |
| shift,-- 214:16 | 104:15,21 105:3 | 23:22,24 24:2,5 | 74:2,5,7,9,17,20 | 117:1,6,17,25 |
| shifts 8:17,18 | 107:8 114:16 | 24:9,12,16,19 | 74:25 75:9,12,14 | 118:16,18,23 |
| 11:20 172:10 | 123:20 171:11 | 25:9,16,19,21 | 75:22,24 76:8,10 | 119:1,7,17,20 |
| 174:11 212:8 | 172:14 246:15 | 26:1,8 27:1,3,9 | 76:13,15,20,23 | 120:1,17 121:11 |
| 222:9,10 254:23 | sick 209:8 | 27:14,17,23 28:2 | 77:1,5,11,19,22 | 121:14,21 122:3 |
| shipped 24:24 | sickly 210:2 | 28:6,10 29:5,9 | 77:25 78:2,19 | 122:6,10,12 |
| shirt 87:20 | side 56:17 77:9 | 30:6,18 31:17 | 79:3,6,8,13 80:2 | 123:1,5,8,12,15 |
| shop 206:12 | 78:5 99:21 | 32:5,12 33:1,5 | 80:9,16,19,21 | 123:24 124:3,12 |
| short 61:21 175:9 | 102:4 109:10 | 33:12 34:18,18 | 81:2,8,12 82:2,4 | 124:18,20,23 |
| 250:7,10 275:15 | 131:25 132:4 | 34:20,25 36:1,6 | 82:10,10,14,16 | 125:1,7,9,14,18 |
| 278:11 279:2 | 142:3 144:12 | 36:9,18 37:9,17 | 83:6,13 84:4,6,8 | 125:22 126:6,13 |
| 294:17 295:5,18 | 309:5 | 37:17 38:9,11,13 | 85:2,4,7,14,22 | 126:20,25 127:8 |
| 301:9 | sides 132:7 | 39:4,9,13,16,19 | 86:8 87:1,3,5,8 | 127:14,17,22,24 |
| shorthanded | sign 5:12 132:12 | 39:22,24 40:3,6 | 87:11,18,24 88:9 | 128:1,4,8,12,23 |
| 174:20,23 175:6 | 134:2 159:17 | 40:12,19,22,24 | 88:11,14,18,20 | 129:1,19 130:1 |
| 175:8 278:14 | 195:21 311:14 | 41:5,10,12,16 | 89:7,9,11,15,20 | 130:10,20,24 |
| shorthanded-- | 311:16 | 42:2,4,9,11,13 | 89:24 90:6,10,14 | 131:4,8,16,20 |
| 175:8 | sign-in 159:14,21 | 42:16,18,21,25 | 90:17,20,23 91:6 | 132:3,6 133:2,5 |
| shortly 150:11 | 164:12,12 | 43:3,7,11,21 | 91:19 92:10,16 | 133:13,20 134:9 |
| shorts 87:20 | 165:17,18 | 44:4,7,10,15,23 | 93:4,19 94:9,23 | 134:13,15,21 |
| shoulder 73:14 | signature 19:14 | 44:25 45:4,9,20 | 95:1,4,10,13,20 | 135:2,5,8,12,20 |
| 77:10,23 78:1 | 313:26 | 46:1,4,10 47:1,8 | 95:22 96:1,3,7 | 135:22 136:6,24 |
| show 12:23 15:1 | signed 42:3 112:8 | 48:9,19,22 49:4 | 96:10,16,25 97:4 | 137:1,5,23,25 |
| 18:4 20:2,17 | 165:23 179:15 | 49:15 50:7,20,25 | 97:7,14,22,25 | 138:4,7,12,19 |
| 21:23 27:10 | 193:8 | 51:13,24 52:5,20 | 98:5,12 99:5,12 | 140:5,8,10,19,24 |
| 52:2,12 142:23 | significant 308:12 | 52:22,23,24 53:4 | 99:15,25 100:6 | 141:12,18 142:5 |
| 143:8 144:6 | signs 264:7 | 54:5,12 55:1,4 | 100:10,14,16,23 | 142:8,11,12,14 |
| 242:19 247:23 | similar 273:11 | 55:16 56:2,9,21 | 101:10 102:10 | 142:22 143:3,7 |
| 255:1 276:4 | simple 271:17 | 56:24 57:1,15,17 | 102:14,18 | 143:10,14,17,19 |

Case 3:16-cv-01007-TAD-KLH  Document 245-2  Filed 03/10/20  Page 113 of 220  PageID #:
13738
Gerald Hardwell
August 28, 2017

Page 34

| | | | | |
|---|---|---|---|---|
| 143:22 144:2,10 | 183:15,25 184:6 | 224:14,21,24 | 262:20 263:6,13 | 303:24 304:3,12 |
| 144:14,17,20 | 184:14,17,20,23 | 225:2,18,20,24 | 263:23 264:19 | 304:15,17,19,22 |
| 146:17,22 147:1 | 185:2,7,9,16,24 | 226:6,13,16,18 | 264:25 265:10 | 304:25 305:2,4,7 |
| 147:13 148:18 | 186:1,3,5,8,16 | 226:20 227:9,11 | 265:14 266:23 | 305:11,13,19,23 |
| 148:20 149:1,16 | 186:18,21 | 227:16,18 | 267:2,4,10 268:8 | 306:1,14,17,22 |
| 149:21 150:6,9 | 187:11,20 188:1 | 228:20,24 229:4 | 268:12,24 269:1 | 307:16,25 308:7 |
| 150:13,15,25 | 188:3,5,10,16,22 | 229:16,18,20,22 | 269:3,5,10,14,24 | 308:11,14,17,21 |
| 151:4,13,22 | 189:5,10,15 | 229:24 230:1,3,6 | 270:3,7,13,23 | 308:24 309:1,7 |
| 152:1,8,18,20,23 | 190:4,7,13,25 | 230:8,22 231:2 | 271:24 272:3,5 | 309:18 310:6,9,9 |
| 153:2,12,21,23 | 191:7,17,24 | 231:13 232:18 | 272:10,12,22,24 | 310:11 311:5,7 |
| 154:5,10,13,19 | 192:7,17,20,22 | 232:24 233:2,6,9 | 273:7,10,13,15 | 311:22,22 312:5 |
| 154:22,25 | 192:25 193:3,9 | 233:20 234:9,11 | 274:3 275:11,16 | 312:8 |
| 155:10 156:1,4,7 | 193:18 194:3,6 | 234:15 235:7,25 | 276:1,3,21 277:4 | **sir**-- 270:13 |
| 156:14,17,20,24 | 195:2,4,9,13,17 | 236:3 237:9,13 | 277:7,16,21,23 | **Sirmon** 123:20 |
| 157:2,10,15,20 | 195:22 196:14 | 237:19,24 238:4 | 278:3,7,15,25 | **sit** 87:16 88:10 |
| 158:2,4,11,20 | 197:8,11,13,16 | 238:7,10,14,17 | 279:3,9,12,16,21 | 92:22 128:17,17 |
| 159:16,19,22,25 | 197:19,24 198:4 | 238:21,24 239:7 | 280:5,9,16,20,20 | **site** 226:11 261:17 |
| 160:2,2,11,13,17 | 198:7,12,14,19 | 239:14,24 240:1 | 280:22 281:3,10 | **sits** 88:12 |
| 160:20 161:1,14 | 199:3,16,23 | 240:6,15,19,22 | 281:16,18,23 | **sitting** 64:2 88:12 |
| 161:22 162:3,5,8 | 200:5,7,12 | 241:1,6,10,18 | 282:2,5,9,23,25 | 121:16 296:7 |
| 162:11 163:9,17 | 201:24 202:1,14 | 242:9,15,18 | 282:25 283:4,7,9 | 309:16 |
| 164:1,7,16,18,21 | 202:16 203:3,6,9 | 243:19,21,25 | 283:14,18,21 | **situation** 16:12 |
| 164:24 165:9,15 | 203:21 204:5,11 | 244:5,14 245:5,9 | 284:2,18,24 | 23:7 127:7 |
| 165:24 166:2,7,9 | 204:15,18 205:1 | 245:20,23 246:6 | 285:11,21,24 | 175:2,7 202:7 |
| 166:11 167:4,8 | 205:6,13,24 | 246:8,14,16,18 | 286:1,4,8,8,10 | 226:21 239:13 |
| 167:10,12,16 | 206:3,6,10,13,18 | 246:24 247:1,3 | 286:15,18,23 | 306:16 |
| 168:17,22,24 | 206:21 207:2,4,7 | 247:12,14,21 | 287:3,6,10,12,19 | **situation**-- 265:7 |
| 169:6,22,25 | 207:11,13,14 | 248:2,7,20 249:5 | 288:16,22 289:3 | **situations** 209:22 |
| 170:5,7,10,13 | 208:6,10,18 | 249:8,17 250:6 | 289:5,12,15,17 | **six** 17:4 94:5,6 |
| 171:7,10,17,20 | 209:3,6,18 | 250:22 251:12 | 289:22,25 290:3 | 97:17,19 134:11 |
| 171:22 172:2,8 | 210:10,25 | 251:18,20 | 290:8,12,15,21 | **sixteen** 175:1 |
| 172:12,15,22 | 211:21,24 212:6 | 252:17,22 253:1 | 290:24 291:2,4,9 | 249:23 250:9,12 |
| 173:10,16,23 | 212:11,22 213:1 | 253:16,21 254:1 | 291:18,23 292:5 | 251:4 253:9 |
| 174:8,12,14,16 | 213:7,9,14,17 | 254:9,19,22,25 | 292:10,12,23 | **size** 61:17,25 62:4 |
| 174:21,24 | 214:1,6,9 215:18 | 255:5,9,12,19,24 | 293:16 294:4,6 | 94:3,4,5,12,13 |
| 175:23 176:3,12 | 216:2,7 217:1,5 | 256:3,5,8,12,17 | 294:10 295:17 | 142:4 |
| 176:19,23 177:7 | 217:7,10,14,17 | 256:19,23 | 295:21 296:5,15 | **slammed** 74:14 |
| 177:12,19,21,25 | 217:24 218:11 | 257:12,20,22,24 | 296:19,23,25 | **slap** 75:10 |
| 178:4,8,16 179:8 | 218:15 219:6,18 | 258:2,6,10,15,19 | 297:10,14,19,22 | **sleep** 55:23 57:4 |
| 179:13,18 | 219:21 220:16 | 258:22 259:3,13 | 298:18,21,25 | 60:22 88:5 |
| 180:11,15,17,19 | 220:20,24 221:3 | 259:21 260:2,4,7 | 299:12,20 301:3 | **slots** 253:19 |
| 180:22,25 181:4 | 221:10,18,20 | 260:19,21,24 | 301:6,22,24 | **SM** 272:8 290:5 |
| 181:7,11,14 | 222:2,7,16 223:9 | 261:2,7,9,13,19 | 302:1,4,8,25 | **SM-1** 29:12,24 |
| 182:3,17 183:5,8 | 223:15,17,23 | 262:1,4,7,11,15 | 303:4,7,14,18,21 | 30:1,2 31:2 |

Case 3:16-cv-01007-TAD-KLH   Document 245-2   Filed 03/10/20   Page 114 of 220 PageID #:
Gerald Hardwell
13739
August 28, 2017

Page 35

| | | | | |
|---|---|---|---|---|
| 38:19 54:3,4 | **Somewhat** 180:22 | 28:13 93:11 | **spot,--** 121:1 | 193:1 |
| 204:11,17 | **soon** 150:2 179:1 | 109:13 177:22 | **spots** 122:1,5,11 | **stand** 83:11 97:2 |
| 205:15 210:12 | 299:10,13 | 180:20,23 184:7 | 274:2 | 120:5 130:2 |
| 272:4,11,13 | 307:20 308:5 | 188:2 217:6 | **spray** 55:25,25 | 181:21 298:10 |
| **SM-2** 29:13,25 | **sorry** 6:21 14:23 | 266:12,24 | 57:22,23 59:25 | **standard** 219:12 |
| 30:1,3 38:20 | 15:23 17:14 | 268:15 | 65:15 66:15,21 | 219:13 222:19 |
| 54:11 204:11 | 18:18 22:12 | **speaking** 56:3,4 | 66:24 67:9,9,15 | **Standards** 162:6 |
| 205:15 210:12 | 31:4,4 36:15 | 109:11 189:22 | 67:19 68:9 72:2 | **standing** 63:23 |
| 272:6,11,23 | 46:16 50:23 | 202:12 217:25 | 76:6,16 77:21 | 69:23 70:13,19 |
| 273:3 | 51:2 58:11 | 227:12 | 106:7 122:14 | 71:7 72:11,18,21 |
| **small** 92:15 310:1 | 66:19,22 71:17 | **special** 9:18,19,22 | 125:17,21,21,24 | 102:25 106:17 |
| **snoring** 87:22,23 | 85:18,24 86:22 | 10:10,12,14,20 | 127:5,13,18,23 | 120:11 |
| 88:1 90:22 | 87:12 88:1 90:2 | 28:19,20 29:3 | 128:14,21 129:3 | **standpoint** 138:1 |
| **so--** 35:19 73:17 | 90:2 91:22 | 30:17 31:1 | 191:6 | **stars** 285:18 |
| 107:4 136:16 | 93:12,14,21 | 34:24 36:2 37:5 | **spray,--** 75:17 | **start** 51:4 103:1 |
| 151:17 158:9 | 95:15,15 98:15 | 37:11 38:14,15 | **sprayed** 65:9,16 | 114:7 200:18 |
| 228:11 249:24 | 98:15,17 104:1,1 | 39:8,11 52:18 | 68:17 77:21 | 205:7 253:18 |
| 259:17 284:16 | 108:15,15,15 | 53:7 105:8 | 127:9 | 269:20 299:14 |
| **soap** 148:14 | 112:15 115:19 | 107:21 122:7 | **spraying** 71:23 | **started** 13:10 43:8 |
| **SOBEL** 2:11 | 117:3,3 126:12 | 204:7 205:18 | **sprays--** 192:4 | 79:17 299:10 |
| **social** 113:10 | 127:11 139:20 | 272:1,7 275:10 | **squinching** | **starting** 169:10 |
| **socialize** 43:23 | 141:5 154:1,17 | 275:12,22 | 153:24 | **state** 1:26 18:1 |
| 44:5,8 | 161:6 163:10 | 290:23 292:19 | **squirming** 74:22 | 79:22 126:7 |
| **some--** 207:23 | 189:25 190:2 | **Special--** 9:18 | 74:23,23 75:1,4 | 206:8 293:23 |
| **some--release** | 200:24 213:22 | **specific** 146:15 | 101:24 102:5 | 313:1,5 |
| 301:18 | 217:11 218:2 | 178:9 220:17 | **Sr** 6:6 44:21 45:3 | **state-issued** |
| **some--some** | 220:4,12 239:22 | 279:13 | 47:18 50:2,9,17 | 148:13 |
| 275:14 | 242:1 243:14 | **specifically** | 54:21 55:6 | **Stated** 93:12 |
| **some--there** 171:4 | 248:4 252:3 | 215:20 | 110:23 111:3,12 | **statement** 42:17 |
| **somebody** 78:14 | 260:14 268:1 | **specifics** 187:24 | 111:15 114:19 | 112:9,9 150:10 |
| 121:9 158:24 | 273:4 276:15 | **speculation** | 115:13 116:11 | 150:24 180:24 |
| 162:14 168:16 | 279:23 287:17 | 210:16 236:11 | 125:20 135:7 | 218:22 279:2 |
| 172:9 175:17 | 287:23 293:2 | 236:17 294:20 | 143:2,5,9,12 | **statements** 259:7 |
| 187:3 224:16 | 305:4,20 | **speed** 243:14 | 144:9 | **states** 1:1 34:13 |
| 235:22 239:5 | **sort** 25:12 26:7 | **spell** 29:14,16,19 | **stack** 224:23 | 140:12 287:7 |
| 251:2 253:24 | 118:9 119:6 | 112:17 | 243:5 | **stating** 85:18 |
| 266:3 271:3,5 | **sort--** 35:25 | **spent** 124:16 | **stacked** 166:18 | **station** 35:6 |
| 284:21 299:7,8 | **sound** 62:23 90:19 | **Spitting** 109:16 | **staff** 120:9 141:3 | 135:17 |
| 310:22 | 165:8 243:24 | **spoke** 118:5 | 251:15 252:1,4 | **statute** 313:18 |
| **somebody's** 61:3 | **sounds** 109:15 | 214:15 | 254:17 263:15 | **stay** 31:1 196:7 |
| **somebody--it's** | 165:5 | **spoken** 43:4 | **staff--** 120:14 | **stayed** 55:19 66:8 |
| 158:24 | **source** 111:14 | **spot** 119:21,24 | **staffed** 8:20 | 69:11 131:16 |
| **someplace** 32:2 | **South** 113:1 | 120:3,10,16,18 | **stamp** 179:9,10 | **stays** 68:6 196:8 |
| · 296:7 | **speak** 6:20,21 | 282:21 | **stamped** 145:10 | **step** 64:12 266:8 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 115 of 220 PageID #:
Gerald Hardwell
13740
August 28, 2017

Page 36

| | | | | |
|---|---|---|---|---|
| **step--give** 266:7 | 165:11 167:13 | **support** 111:25 | 135:7 | **taken** 1:19 5:3 |
| **stick** 133:16 | 168:1,20 177:23 | 175:22 226:11 | **sweep** 41:2 | 80:5 101:15 |
| **still--** 95:12 | 178:2 183:20 | **supporting** 96:24 | **switch** 132:7 | 107:14 118:15 |
| **stipulated** 5:2 | 189:3 237:2,12 | **supposed** 28:14 | 145:22 | 124:17 130:4,12 |
| **STIPULATIONS** | 259:5 | 138:14 149:25 | **sworn** 6:2 112:9,9 | 130:17 144:22 |
| 5:1 | **substance** 141:3,6 | 156:25 185:4 | 313:7 | 181:12 188:14 |
| **stir** 151:10 | 147:11 214:25 | 204:24 205:22 | **system** 32:7 | 196:12 197:10 |
| **stop** 55:13 60:15 | 289:7 | 237:18,22 250:8 | 140:14,21 | 206:16 212:1 |
| 61:6 | **substantially** | 253:9,11 264:21 | 142:10 147:18 | 261:24 280:18 |
| **store** 93:25 94:1 | 273:11 | 266:25 267:23 | 148:8 179:4,16 | 297:25 298:1 |
| **storm** 242:13 | **suggested** 73:13 | 268:3,11 269:22 | 199:20 237:17 | 306:8 313:6 |
| **stormed** 152:10 | **suicidal** 10:15 | 303:2 | | **takes** 270:4 |
| 201:12 | 34:8 304:24 | **supposed--are** | **T** | **talk** 51:5 60:14 |
| **straight** 22:16 | 305:1 | 303:11 | **tabulation** 25:17 | 61:7 141:24 |
| 24:16 50:10 | **suicide** 20:3,9 | **Supposedly** | **tactics** 40:21 41:9 | 155:8 162:15 |
| 94:19 137:21 | 30:18,21,23 | 187:15 | 41:15 | 219:4 246:5,13 |
| **stream** 199:21 | 32:10,24 39:10 | **sure** 8:13,20 9:12 | **tactics--** 306:24 | 246:25 261:20 |
| **street** 2:6 261:25 | 44:22 45:3 | 15:19 18:20 | **take** 12:17 14:12 | **talked** 50:25 |
| 279:5,14 | 139:6,7 140:13 | 24:15 26:20 | 21:25 33:13 | 55:20 100:13 |
| **strength** 74:16 | 157:18 162:20 | 30:11 39:6 48:6 | 34:19 53:12 | 113:2 157:9 |
| **stretcher** 135:10 | 163:18 202:10 | 56:18 61:10 | 55:17 63:16 | 217:15 238:5 |
| 135:24 136:7,13 | 206:12 304:20 | 73:21 85:12 | 64:11 77:7 79:4 | 247:4 264:16 |
| 136:22 137:4,7 | 305:6,8 | 143:20,22 144:3 | 84:14 85:10 | 272:17 283:22 |
| 137:16,21 138:6 | **suit** 280:18 | 144:23 145:16 | 103:17 114:13 | 306:2 |
| **stretcher--** 136:19 | **Suite** 1:21 313:11 | 145:16 146:7,18 | 114:15 122:17 | **talking** 7:19 35:17 |
| **stretchers** 137:20 | **Summersgill** 3:4 | 147:2 148:9,10 | 132:16,18 | 42:17 48:4 |
| **Strictly** 43:21 | 51:14 | 148:13 166:3 | 151:15 155:12 | 50:24 51:12 |
| **strike** 80:18 89:3 | **Sumter** 113:1 | 169:20,23,23 | 157:13 164:3 | 53:17 55:8 |
| 89:6 111:11 | **superiors** 157:4 | 178:19 180:1 | 166:13 180:11 | 60:15,20 63:2 |
| **strip** 212:18 | 306:7 307:6 | 183:2 188:18 | 182:14 196:22 | 67:16 74:13 |
| **stripped** 148:7 | **supervising** 256:2 | 209:13 211:11 | 207:5,21 213:14 | 75:5,20 77:10 |
| **strong** 66:13 | 256:22 257:6 | 212:9 214:14 | 219:1 242:20 | 78:15 81:1 82:8 |
| **strong--** 69:24 | 283:23 284:15 | 227:1 236:13 | 243:11 245:11 | 94:20,21 104:20 |
| **stuff** 60:17 178:19 | **supervision** | 250:12 255:17 | 247:6,23 257:6 | 111:2 114:23 |
| **sub-** 28:17 30:16 | 141:20 232:13 | 257:8 265:2 | 259:9 260:8,10 | 117:21 119:22 |
| **subject** 9:16 12:21 | 313:15 | 271:7,9,18 | 260:20 264:12 | 121:12 127:21 |
| 28:17 | **supervisor** 184:8 | 280:14 283:8,10 | 264:13 267:8 | 129:13 131:23 |
| **subject--I** 28:16 | 184:18 213:3 | 288:2 289:20 | 268:13 279:14 | 155:13,17 156:9 |
| **submitted** 258:8 | 237:21 248:25 | **surveillance** | 283:10,12 | 163:5 174:13 |
| **subordinate** | 253:14 266:2,10 | 36:25 37:2,12 | 287:22 288:9,9 | 175:9 176:25 |
| 170:6 | 266:12,13 | 199:9 | 299:18 | 177:1,10 178:3 |
| **subordinates** | **supervisors** 212:8 | **sustain** 104:11 | **take--** 105:14 | 183:4 189:2 |
| 156:19 157:1,3 | 237:16 | 107:12 | **takedown** 40:23 | 197:21,25 |
| 160:19,25 | **supply** 258:20 | **sustained** 109:24 | 40:25 41:4,6 | 203:13 209:20 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 116 of 220 PageID #:
Gerald Hardwell
13741
August 28, 2017

Page 37

| | | | | |
|---|---|---|---|---|
| 209:21 218:5,9 | 78:10 80:3 | tells 59:24 196:11 | 252:14 277:8 | 100:21 102:11 |
| 218:18 228:4 | 89:23 90:4,9 | temporary 223:19 | 279:22 312:9 | 105:7 106:25 |
| 233:10 237:16 | 91:7,12 92:11,24 | 223:20 301:9,12 | Thanks 137:2 | 109:17 110:14 |
| 242:11,13 | 93:5 94:4 96:19 | ten 67:17 116:23 | 310:12 | 115:22 129:22 |
| 247:18,22 | 100:21 102:1 | tend 226:17 | that's-- 18:22 | 136:17 178:15 |
| 280:18 301:16 | 104:4 105:13,18 | tended 123:6 | 34:12 35:9,9 | 194:18 222:12 |
| 307:8 | 105:25 106:9 | tender 145:22 | 54:14,14 65:11 | 243:4 260:12 |
| talking-- 47:10 | 116:17 127:1 | 309:22 | 152:8 153:5 | 273:25 280:23 |
| talking--talking | 128:5,17 147:21 | term 28:16 126:21 | 239:25 279:8 | 280:23,24 |
| 311:4 | 148:23 149:2 | 173:15,22 | 284:21 | 283:22 286:5 |
| Tamara 1:4 2:3 | 150:14 151:5 | 248:24 287:1 | that's--why 277:6 | 293:6 295:15 |
| 3:16 5:4 | 153:3,6,16 | terminal 192:21 | that-- 21:3 26:12 | the--as 282:4 |
| tape 151:18 | 155:11,15 156:5 | terminate 184:19 | 43:14 47:19 | the--by 113:22 |
| 201:21 | 157:16 159:5 | terminated | 65:21 69:2 | the--doing 281:21 |
| Taser 128:25 | 160:15 161:23 | 183:13 187:8,10 | 78:25 119:24 | the--for 28:17 |
| tattoo 285:7,8 | 165:21 167:22 | 187:12,25 | 120:2 145:17 | the--in 46:19 |
| tattoos 285:10,12 | 178:17,22 179:3 | termination 183:7 | 151:6 155:7 | 122:1 |
| 285:20 | 179:22 181:15 | 183:18 184:15 | 164:7,15 184:4 | the--kind 85:7 |
| taught 41:3 138:1 | 183:16 185:3,25 | 188:14 | 186:23 201:17 | the--of 68:9 241:4 |
| 231:18 308:12 | 186:2,9 187:7,14 | terms 62:2 | 218:21 228:17 | the--on 67:8 282:1 |
| Taylor 13:17 | 187:18,21 | test 148:9 | 237:14 252:7 | the--other 202:10 |
| Taylor--I 13:25 | 188:17 194:8 | tested 149:11,15 | 276:6,7 296:14 | the--see 299:6 |
| teach 265:3 | 196:15 199:17 | testified 6:2 16:9 | 297:23 | the--some 277:15 |
| team 155:2,3,4,6 | 209:19 210:3 | 152:24 201:19 | that--in 265:16 | the--that's 67:12 |
| 160:22 169:11 | 212:12 214:24 | 283:1,11 | that--on 115:4 | the--the 13:23 |
| 169:12,13 | 215:2,8 216:23 | testify 53:23 | 175:18 | 21:8 58:18 |
| 171:14,14 | 217:8 223:10 | 313:8 | that--or 256:10 | 60:11 77:23 |
| 173:24 288:20 | 235:14 240:7 | testifying 7:4 | 262:21 | 121:6,12,13 |
| team-- 288:18 | 242:20 244:1,25 | 219:11 | that--that 41:22 | 134:5 136:1,4 |
| teammates 213:24 | 245:11 247:6,24 | testimony 41:18 | 63:10 75:22 | 143:16 144:11 |
| teeth 110:1,2,5,7,9 | 248:8 249:11,20 | 144:15 275:13 | 127:2 168:14 | 151:1 158:21 |
| 110:19,21 | 251:13 255:2 | 313:6,13 | 179:16 227:3 | 176:5 190:22 |
| telephone 3:1 | 259:14 262:16 | text 115:25 | 228:6 281:4 | 191:11,25 |
| 51:15 | 263:14 264:20 | than--other | 295:19 | 196:11 209:22 |
| tell 8:5 9:3 13:9 | 267:5,17 268:17 | 283:17 | that--the 200:22 | 216:14,22 224:3 |
| 14:24 18:10 | 272:13 279:1 | Thank 12:10 | that--you 59:24 | 230:4 237:18 |
| 19:3 28:16,20 | 280:11 292:16 | 15:13 18:25 | 65:9 | 268:9 303:6 |
| 29:3,6,10 30:7 | 297:15 298:3,8 | 38:3 54:10,19 | that,-- 34:15 | the--this 36:7 |
| 45:11,13 47:21 | 299:23 | 65:2 66:20 | THC 289:20 | 133:6 |
| 49:12 50:8 | tell--talk 54:25 | 84:20 96:4 | the-- 27:25 30:24 | the--to 79:1 |
| 54:22 55:13 | telling 50:6 54:21 | 139:15 147:8 | 35:18 37:18 | the--what 280:24 |
| 57:21 60:11,18 | 61:1 80:12 | 151:24 161:10 | 38:21 43:22 | the--what's |
| 67:9 70:19 | 151:6,11 208:2 | 169:18 207:15 | 48:25 68:8 | 280:24 |
| 71:18 72:9 | 299:13 | 218:7 220:10 | 84:20,24 85:3 | the--who 278:5 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 117 of 220 PageID #:
Gerald Hardwell
13744
August 28, 2017

Page 38

| | | | | |
|---|---|---|---|---|
| 282:7 | 122:18 135:11 | thirty-- 162:23 | 80:20 | 121:18,20 |
| the--you 178:18 | 137:13 245:12 | thirty-seven | thrown 297:25 | 122:13,21,22 |
| their--on 148:11 | 285:4 289:18 | 161:15 | Thursday 42:6 | 123:9,13 124:5 |
| their--someplace | 291:14 299:24 | thirty-three 163:1 | ticks 150:22 | 124:14,16 127:8 |
| 223:8 | 309:2 311:18 | this-- 6:23 20:21 | ties 234:5,8,16,22 | 127:11 129:14 |
| their--their | things 8:23 45:6 | 96:25 100:12 | 235:1 | 129:15,25 |
| 148:13 | 88:22 149:10 | 287:14 | Tiffany 1:4 2:3 | 130:19,21 131:7 |
| them-- 146:3 | 172:4 243:15 | this--anything | 3:14 5:5 | 131:23 132:5 |
| 200:11 300:21 | 299:19 306:11 | 114:15 | tight 97:20 | 133:17 134:10 |
| them--a 272:1 | think 39:5 41:7 | this--the 134:6 | till 73:23 80:24 | 136:3,8,10 |
| themself 34:23 | 45:7 48:5,5,22 | 141:25 193:12 | 99:13 124:14 | 138:10 140:14 |
| then-- 65:21 69:4 | 49:6 50:11 | this--this 140:6 | time 5:8 13:17 | 140:25 143:4 |
| 281:19 | 57:23 59:24 | those-- 145:8 | 19:3 21:25 24:8 | 150:21 153:9 |
| there's--if 115:9 | 78:1 85:11 | 164:6 171:15 | 28:5,7,14 29:4 | 158:24 159:2,4 |
| there's--there's | 93:13 102:3 | those--those 163:3 | 35:10,14,15 | 159:20 168:3,4 |
| 28:7 280:25 | 110:14 116:18 | 164:8 179:9 | 46:22 47:17,24 | 168:12 169:5 |
| there-- 13:10 | 128:4 129:16 | thought 32:9 33:7 | 47:25 48:15,23 | 170:8 180:2,6,6 |
| 30:22,24 36:13 | 130:2 139:14 | 111:5 243:6 | 50:9,17 51:12 | 183:10 186:10 |
| 45:1 67:8 200:8 | 149:18 170:19 | threat 34:19 | 53:12 54:20 | 188:7,8 189:2 |
| 226:15 232:1 | 174:21 197:8 | 35:24 80:11 | 55:3,18,19,24 | 190:10,17,21 |
| 280:6 282:22 | 200:6 213:19 | threats 80:14,15 | 56:22 57:8,11,12 | 191:25 193:1,24 |
| 291:22 299:17 | 224:25 226:2 | three 17:7,8 24:15 | 58:20 60:6,10 | 197:21 198:17 |
| there--that 252:5 | 227:21 257:3 | 35:11,12 55:12 | 61:12 63:23 | 200:23 205:2,2,4 |
| there--there 250:4 | 263:9 277:14,17 | 73:20,21 74:1 | 64:14,18 65:21 | 205:4,7 207:5 |
| these-- 268:22 | 280:22 283:1 | 78:21 86:23 | 65:24 66:10 | 208:3,3,4,4,12 |
| 276:5 | 284:25 288:4 | 91:24 93:15 | 70:5,5,12 71:15 | 211:15,18 214:4 |
| they're--is 304:10 | 296:12 309:3 | 94:11 95:7 | 71:22,22,23,24 | 221:4,21 225:8 |
| they-- 9:25 10:16 | think-- 58:11 | 160:8,9 166:17 | 72:6 73:18,22,22 | 225:23 227:22 |
| 94:14 120:23 | thinking 31:21 | 170:11 173:2 | 73:23,25 75:19 | 228:6,17 229:5 |
| 141:10 197:3 | 57:22 100:19 | 183:11 224:6,16 | 75:21 76:5,6 | 236:18,18 |
| 240:1 | 227:6 | 224:23 225:5 | 77:6,14 78:4 | 239:17 241:21 |
| they--if 210:1 | third 22:23 | 276:25 277:1,2,2 | 82:20 83:13 | 242:17 243:11 |
| they--the 26:4 | thirteen 17:7,8 | 277:3 301:8,14 | 84:17 85:19,20 | 243:23 244:7,24 |
| they--they 264:7 | 36:23,23,24 | 301:16 | 85:23,25 86:9,24 | 245:2,3,6,13,15 |
| they--they--they | 38:24 173:8 | three-hour 161:12 | 87:9,15,19,25 | 245:18 249:22 |
| 31:24 | 197:1 202:18 | 162:18 166:13 | 88:25 89:17 | 254:6 256:20 |
| they--to 180:11 | 203:5 241:4 | 166:20 | 95:9 99:13,13,22 | 259:15 264:7 |
| they--we 130:1 | 271:23 | threw 74:10 | 99:23 100:2,15 | 271:14 275:15 |
| thing 8:4 13:15 | thirteen-- 271:22 | 122:24 | 101:5,25 102:12 | 279:6 287:22 |
| 17:22 25:7 28:3 | thirty 230:13 | throat 111:8 | 104:5,9 105:21 | 288:9 292:21 |
| 34:2,10 36:17 | 231:15,15 | through-- 12:14 | 106:1 107:22 | 296:12 299:1 |
| 47:12 67:6 | 244:12 264:18 | 25:25 63:18 | 109:11 114:5 | 300:11 301:7,8,9 |
| 79:12 85:5 97:1 | 267:1 302:7,14 | 287:17 | 116:24 117:4 | 303:12 305:16 |
| 119:16,16 | 303:3 | throw 46:11,12 | 118:7 120:12 | 307:4 308:22 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 118 of 220 PageID #:
Gerald Hardwell
13043
August 28, 2017

Page 39

| | | | | |
|---|---|---|---|---|
| **time--** 131:6 | 166:17 168:10 | 17:18,20,25 | **translate** 7:12 | 106:11 117:20 |
| 272:16 | 168:14 176:5 | 18:11 19:4,5,6,9 | **transmit** 59:11 | 124:4 130:1 |
| **time,--** 69:16 | 181:5 187:4,6,24 | 19:13,17 20:3,15 | **transmitted** 58:4 | 164:11 202:17 |
| **timed** 179:15 | 202:11 204:24 | 20:17,21,25 21:4 | 58:14,17 193:5 | 214:2 243:14 |
| **times** 35:11,16,17 | 205:16 219:3 | 21:15 40:21 | **transport** 180:9 | 244:23 245:7 |
| 73:18,20,22 74:1 | 258:21 298:9,10 | 41:15 45:5,6,9 | 180:21 181:3,6,9 | 249:6 251:2 |
| 74:2 93:13,15 | 298:12 310:20 | 45:10,12,14,16 | **transportation** | **Tubbs** 148:24 |
| 122:14 127:13 | **told--** 72:8 | 45:18 46:5,9 | 129:4 | 168:12 170:12 |
| 129:9 143:11 | **Tommy** 159:9 | 47:4,9,16 113:20 | **transported** 124:1 | 170:14 171:8 |
| 150:21 152:18 | **too--he's** 210:2 | 126:17 127:1,4 | 124:11 | 172:17,19,20 |
| 167:21 183:11 | **tool** 262:8 | 157:6,9,17 158:1 | **transporting** | 261:11 |
| 185:11 188:21 | **tools** 183:19,22 | 158:3,5,12,15,16 | 181:17 182:13 | **Tubbs'** 261:14 |
| 250:23 272:17 | 256:24 257:1 | 158:17,18,19,23 | **tray** 267:7,23 | **tube** 67:15,24 |
| 275:21 283:2,19 | **toothbrush** | 158:25 159:2,2,4 | 268:3,5,6,10,18 | **Tuesday** 62:23 |
| 292:18 309:4,5 | 148:14 | 159:7,8,14,21 | 269:19,22 270:1 | 63:3 |
| 309:14 | **toothpaste** 148:14 | 160:1,3,18,25 | 271:6 | **turn** 26:5 64:7 |
| **times--** 152:13 | **top** 7:19 22:22 | 161:3,20,21 | **trays** 267:15,20 | 72:10,13 73:19 |
| **title** 8:10 282:12 | 53:3 56:13,17 | 162:4,7,12,16,19 | 267:21 268:14 | 232:25 |
| **to--** 12:2 57:13 | 72:21 76:19,22 | 163:2 164:5 | 269:17,23 270:5 | **turned** 69:13 |
| 83:15 137:22 | 142:2 144:12 | 165:6,11 166:3 | 271:5,6 281:5 | 178:21 214:20 |
| 145:7 167:11 | 154:16 169:24 | 166:12,14,15,19 | **treatment** 75:25 | 260:17 |
| 310:2 | 249:13 276:10 | 167:3,18 168:1,2 | **tried** 64:9 181:20 | **Turner** 20:24 |
| **to--in** 101:4 | **top--** 199:7 | 168:6,8,9,14,15 | 206:12 | 21:12,13,14,14 |
| **to--to** 50:10 72:6 | **total** 38:25 289:21 | 168:18 204:23 | **tries** 268:13 | 21:15 47:5 |
| 72:12 92:22 | **towels** 148:14 | 233:11,15,17,18 | **troublesome** | 160:6 170:1,23 |
| 125:23 140:18 | **town** 14:25 | 235:21,22 237:5 | 223:6 | 246:7 |
| 292:3 309:16 | **track** 25:23 | 237:8,10,11 | **true** 148:25 | **twelve** 36:21,22 |
| **today** 43:2 150:4 | 281:24 | 251:10 267:25 | 164:23 193:8 | 39:3 |
| 152:4,24 153:10 | **train** 158:10,13 | 284:12 286:3,3,4 | 207:10 209:2 | **twelve-hour** |
| 159:24 166:20 | 237:2 265:6 | 306:10 308:9,9 | 313:15 | 216:15 |
| 220:12 228:5 | 284:20 | **training--** 19:10 | **trustee** 267:14 | **twenty** 173:12 |
| 232:23 270:11 | **trained** 18:2 | 165:1 | 268:9 | 174:10 251:23 |
| **today's** 41:18 | 22:22 23:3 41:8 | **trans-** 129:4 | **truth** 150:14 | 253:9 |
| 132:13 | 126:1,24 127:6 | **transaction** | **try** 29:17 34:10 | **twenty-** 171:18 |
| **toilet** 60:17 | 127:12,15 | 268:11 | 46:21 50:24 | **twenty-five** |
| **told** 49:10 50:1 | 128:13,21 138:5 | **transcribed** | 58:5 60:14 61:6 | 134:17 |
| 51:9 55:2 64:8 | 140:6,15,17 | 313:14 | 138:18 146:2 | **twenty-four** |
| 72:10 101:11 | 141:2 161:16 | **transcript** 313:16 | 151:16 175:17 | 176:14 |
| 104:7 119:18 | 165:14 249:18 | 313:17,18,25 | 179:1 219:4,6 | **twenty-four-hour** |
| 122:4 147:14 | 264:17 265:19 | **transfer** 12:2 | 239:13 285:2 | 24:18 25:1 |
| 149:10 150:16 | 265:25 284:15 | **transferred** 11:15 | 299:7 309:19 | **twenty-four/sev...** |
| 151:1 157:7,8,13 | 304:20,23 | 16:23 | **trying** 6:14 61:3 | 171:19 |
| 161:16,19 | **training** 4:5,6,7,8 | **transfers** 140:14 | 75:10 81:13 | **twenty-nine** |
| 163:19 164:25 | 12:14,15,16 | 140:21 | 92:22 93:8 | 163:25 164:2 |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 119 of 220 PageID #:
Gerald Hardwell
13744
August 28, 2017

Page 40

| | | | | |
|---|---|---|---|---|
| **twenty-seven** | **Two—** 17:11 | 68:5 69:17,25 | 164:11 165:20 | 179:5 |
| 223:23,25 | **two—almost** 160:8 | 70:12,22 71:4,17 | 169:24 180:1 | **up—** 98:11,22 |
| **twice** 60:9 122:16 | **two--I** 17:7 | 72:12 74:20 | 186:12,22,25 | 186:15 243:15 |
| 180:4 224:7 | **two-person** 10:23 | 79:18,24 82:9 | 202:17,18 | **updates** 46:19 |
| 250:24 272:19 | **type** 10:17,17 | 88:7 91:2 92:22 | 244:23 249:6 | **upon--because** |
| **two** 9:6,24 10:24 | 24:13 31:25 | 96:21 97:21 | 250:8,25 251:2 | 282:20 |
| 10:24 17:17 | 40:20 42:22 | 98:10 103:3 | 255:22 263:17 | **UR** 189:7 |
| 30:4,8 36:5 37:4 | 47:12 98:21 | 104:8 105:7,13 | 282:16 289:20 | **UR--UOR** 190:19 |
| 38:6 55:12 | 100:7 114:10 | 107:4 108:11 | 307:21 312:1,4 | **use** 7:9 21:5,16 |
| 81:25 83:5 | 135:25 137:16 | 111:10,17 | **understand--** 6:19 | 22:4 39:13 |
| 84:22 85:9 | 179:7 183:12 | 112:19,21 | **understanding** | 40:13,15 45:14 |
| 86:23 91:24 | 191:20 197:12 | 118:11 119:5,15 | 124:9 149:14 | 45:18 46:7 47:3 |
| 94:18 95:7 | 209:24 241:15 | 120:24 121:2,25 | 161:25 241:2 | 47:14,16 55:25 |
| 103:7 105:3 | 257:15 273:16 | 127:5 134:7 | 313:16 | 70:1 71:21 |
| 134:11,17 | 297:13 | 137:15,18 | **understood** 7:24 | 114:18 115:12 |
| 139:19 141:21 | **type--** 273:18,18 | 138:17 151:20 | 147:21 152:25 | 116:9 122:14 |
| 147:17 148:14 | **typed** 41:25 42:19 | 157:12 169:14 | 311:20 | 125:24 127:3,6 |
| 148:18,19 | 42:20 269:22 | 169:14 208:21 | **unemployment** | 128:7,9,14,21 |
| 154:23 159:3,3,5 | **types** 40:13 | 208:24,24 | 24:4 | 135:23 136:8 |
| 159:6 166:20 | 147:17 156:5 | 214:17 221:16 | **uniform** 280:8 | 137:4,7,11,17 |
| 172:16 177:9 | 184:24 194:17 | 250:18 291:19 | **uniforms** 148:17 | 157:18 160:4 |
| 183:11 185:21 | **typical** 140:25 | 292:6 310:24 | 148:18,19 | 161:18 162:19 |
| 199:7 202:19 | 178:22 308:19 | **uh-huhs** 7:8 | 154:24 | 163:18 188:15 |
| 203:7 204:20 | **typically** 211:19 | **ultimately** 198:2 | **unit** 155:12 199:5 | 189:4 190:9,10 |
| 211:8 222:13,14 | 241:7 294:17 | 227:4 242:12 | 199:6 | 194:7,11,13,15 |
| 222:18,21 224:5 | 299:1 | 258:8 | **United** 1:1 126:7 | 194:24 203:1 |
| 224:6,9,22 | | **Umph** 129:14 | **units** 204:7 | 210:8 215:20,25 |
| 225:15 226:11 | **U** | **Un-huh** 43:24 | **unoccupied** 54:11 | 235:8,9,10,11,20 |
| 240:8 241:3 | **Uh--** 70:15 | 44:1 57:6 65:1 | 292:20 | 236:14,18,21,24 |
| 242:4 244:13 | **uh-huh** 6:7 10:20 | 67:11 78:16 | **unresponsive** | 237:3 247:9 |
| 250:1,8,10 251:1 | 12:7 13:14,23 | 80:16 100:14 | 227:4 | 255:10 272:8,8 |
| 263:15,19 265:5 | 14:22 15:9,14,17 | 114:17 145:19 | **until--** 63:2 | 305:21 |
| 265:16 267:22 | 15:21 19:1 22:3 | **un-huhs** 7:9 | **unusual** 126:8 | **use--place** 237:6 |
| 268:13 271:6 | 23:17,19 26:17 | **underneath** 120:5 | 143:21 189:9 | **used--** 115:18 |
| 272:1 273:22 | 26:19,22 28:6,12 | 120:10 | 190:5,14 193:14 | **used--two** 203:1 |
| 274:6,7,8,9,10 | 31:23 33:9,17,21 | **underneath--** | 194:24 241:16 | **user** 179:7 |
| 274:11,12,13,14 | 33:24 34:9 35:9 | 120:19 | 279:8 283:12 | **uses** 68:3 272:6 |
| 274:16,17,18,19 | 36:7 37:13 | **understand** 6:13 | **unusual--** 126:13 | **usual** 150:19 |
| 274:20,22,23,24 | 40:11 46:23 | 7:3,13,20 9:13 | **UOR** 67:11 189:6 | **usually** 149:4 |
| 275:8,9,9,10,24 | 48:7 50:1 51:7 | 49:22 50:2 | 189:8 190:22 | 214:20 232:7 |
| 276:11,25 | 55:9,14,22,24 | 72:23 118:14 | 216:2 236:8 | 281:4 |
| 278:13 288:20 | 56:9 59:14 61:8 | 122:7 128:5 | 243:2 270:1,6,8 | **utilized** 189:3 |
| 295:18,18,19 | 63:4,8 64:5 | 145:3 147:16,25 | 270:15 271:5 | |
| 301:16 303:16 | 66:16 67:12 | 156:8 158:7 | **UORs** 58:18 | **V** |

Case 3:16-cv-01007-TAD-KLH Document 245-2 Filed 03/10/20 Page 120 of 220 PageID #:
13745
Gerald Hardwell
August 28, 2017

Page 41

vacancies 252:1,4
vague 209:12
valid 313:25
vast 124:16
vault 196:3
vehicle 97:1,7,9
 97:11 98:7 99:7
 100:17 125:3,13
 239:12
verbal 7:8 14:3,4
 70:9 71:20
 72:15 184:1
 266:8,14 298:8
Vernon 81:6,7
 102:16,21,25
 103:8,20,24
 104:12,17,22
 105:1,5,10,14,20
 105:24 106:9,17
 107:5,11,21
 108:2,4,19,25
 109:2,13,21,24
 110:11,23 111:2
 111:10,15
 114:16,21
 115:13 116:11
 123:20 135:4
 150:8 151:6
 152:11 176:8
 200:17 221:6
 227:12 228:12
 229:1 261:4
 263:8 306:3,5,15
 307:4
Vernon-- 229:1
versus 1:6,11
 249:19
vial 67:1
vials 67:4
video 36:25 37:2,7
 37:12 72:23
 73:4 81:14 82:2
 89:22 90:5
 103:16 110:25

111:10 118:2
124:19,21,24
125:2,4,10 198:8
198:13,15,17,20
199:9,20 200:9
227:21
videos 42:10
 200:4
view 38:18,19
 198:20 199:21
 266:4 268:11
viewed 38:15
Viking 2:25
violated 9:5
violation 13:6
 194:22 196:21
 215:23 300:20
 300:23,25
violations 9:4
violent 206:16
 263:25
Vision 37:8
vision-- 37:6
visit 42:8 59:22
 60:8
visits 60:11
visual 26:23
 148:10 231:23
 265:8,25 266:19
 266:25
visualize 56:8
 286:20,22
visually 110:11
 231:20 268:6
voice 80:10
 151:19
volatile 105:11
 155:23 264:1
voluntarily
 105:24
volunteer 29:1
 281:13
___W___

W 2:5,18
waist 74:4 77:7
 127:19,20
 234:10
Waists 234:1
wait 81:21,21
 90:1 100:17
Wait-- 95:14
waiting 105:22
 129:7 180:3
wake 91:2
wakes 92:17
walk 63:6 93:25
 94:1 95:3 98:8
 101:19 102:1,1
 147:24 298:7,9
 298:10,10,11,12
 298:14
Walker 3:19
 100:24,25
 217:12,13,15
 238:3,23
walking 216:5
 298:9
wall 70:10 71:2
 88:13 89:1
 94:14
want 11:23 13:17
 22:21 29:14,19
 31:19 34:22
 35:13 39:6
 44:14 49:8,19,21
 52:2,6 56:15
 57:10 78:9
 83:15,15 101:21
 102:3 114:12
 141:21,24
 145:22 146:3,5
 147:2 153:8
 169:8 171:13
 180:1 181:19
 202:17 207:17
 207:21 235:5
 247:22 249:2

279:14 280:7
285:4 286:24
287:14 288:3
289:18,19 309:2
310:2
wanted 28:3
 122:19,24
 145:16 200:11
 264:16 275:17
 280:3
wanting 32:10
 34:13,14 49:17
wanting-- 50:3
wants 33:23 51:15
warden 3:17
 20:24 21:9 46:7
 47:5 82:18,23,24
 138:25 148:24
 148:24 160:6
 168:10 169:10
 169:24 170:1,2,2
 170:3,4,6,23,23
 170:24 178:18
 212:1 246:10,10
 258:25 261:5
wardens 172:18
 172:21
warrant 263:2
was-- 60:5 76:1
 86:3,3 88:2
 102:3 103:8
 118:17 170:23
 213:21 278:13
 282:21 306:20
was--had 69:13
was--he 309:4
was--I 131:10
was--if 121:24
was--it 61:18
was--was 87:14
 142:1
was--you 49:8
wasn't 49:25
 68:19 69:22

75:10 90:10
 100:3 104:6,9
 106:4 108:20
 117:24 119:6
 121:23 122:3
 123:8 129:24
 144:4,18 154:23
 160:17 182:9
 186:10 214:11
 264:7 280:18,21
 286:10 308:22
 308:24
wasn't--if 182:8
wasn't--you 104:5
watch 20:3,9
 30:18,21,23
 100:19 117:9
 121:9 217:9
 302:5,10 303:13
watched 89:22
 198:18 200:15
 302:6 304:24
watches 121:5
watching 121:16
way 7:18 11:19
 32:22 36:6,12
 48:2 59:3 63:11
 67:4 78:8 96:14
 111:15 178:21
 182:1 201:10
 208:8 228:16
 237:6 250:3
 258:5 265:22
 281:24 306:11
 309:9,10,12
we'll 9:5 10:18
 58:9 83:1
 151:16 154:1
 292:25 294:8
we're 7:18 47:9
 75:15,20 94:20
 112:9 146:18
 155:17 163:25
 170:8 220:11

Case 3:16-cv-01007-TAD-KLH  Document 245-2  Filed 03/10/20  Page 121 of 220 PageID #:
13946
Gerald Hardwell
August 28, 2017

Page 42

| | | | | |
|---|---|---|---|---|
| 228:5 280:18 | went 13:13 19:23 | 211:13 246:1 | 201:13,19,22,22 | 273:20 |
| 311:16 | 19:24 50:10,11 | 281:9 | 202:4 205:18 | windows 94:8,10 |
| we've 16:21 28:5 | 55:21,23 57:4 | wheelchair 97:3,5 | 206:2,14,23 | 94:12,13,14,17 |
| 36:21 39:5 | 60:22 64:3 | 135:18 136:4,8 | 207:1,9 217:16 | 94:18,21 |
| 70:23 78:17 | 66:11 68:22 | 136:23 137:4,8 | 220:25 221:6,21 | windows— 273:22 |
| 162:23,23 | 69:13,15 74:3 | 138:6 | 225:22 226:19 | Winn 11:22,23 |
| 271:22,22 | 75:17 79:19 | wheelchair-- | 227:3,13 228:4 | 12:2,11,15 17:22 |
| 291:16 | 82:15 87:25 | 136:22 | 228:12,18 229:1 | 23:10 41:11 |
| we-- 51:19 82:23 | 88:5,10,16 99:20 | wheels 137:24 | 241:13 242:11 | 126:18 |
| 91:3 131:24 | 102:24 108:21 | when-- 63:2 90:11 | 242:12 244:3,9 | Winn- 112:23 |
| 169:20 | 108:21 109:2 | 111:7 136:23 | 258:23 261:4,18 | Winnfield 11:15 |
| we—we 195:25 | 116:15 131:24 | 243:7 277:13 | 263:8 306:3,15 | 12:18 23:16 |
| we--we've 45:5 | 178:2,6,14,15 | when--on 282:1 | 307:4 | 112:22,25 113:1 |
| weapon 125:16 | 179:22 180:2 | when--the 244:2 | White's 106:9 | wire 273:24 |
| weapons 40:14 | 199:15 200:8,15 | when--when 26:2 | 201:11 306:5 | with-- 155:2 187:2 |
| 129:2 | 201:4,22 225:21 | where-- 26:11 | White--or 150:5 | 302:21 |
| Weaver 217:6,8 | 227:24 242:10 | where--where | White/Moore | with--with 161:8 |
| 217:10,11 | 245:8,15,18 | 86:15 | 226:22 270:9 | 223:10 |
| Wednesday 35:13 | 253:23 271:25 | which-- 56:16 | Who's-- 284:9,9 | witness 5:11 6:7 |
| 278:1,2 | 278:16 309:10 | 133:22 | who-- 86:1 121:4 | 6:10,18,22,24 |
| week 35:11 45:17 | were-- 279:1 | which--which | 141:13 218:12 | 7:2,6,11,13,17 |
| 46:6 141:1,16 | were--when 11:17 | 133:21 | 228:21 302:19 | 7:22 8:1 12:9 |
| 158:12,16,17,19 | weren't 82:13 | White 1:10 2:22 | who--that 286:15 | 13:1 14:14 15:3 |
| 158:23 159:1,7 | 90:8 105:4 | 81:7 102:17,21 | who--who 117:22 | 16:17 17:14 |
| 160:23 170:25 | 155:22 182:14 | 102:25 103:8,24 | 135:23 281:20 | 18:6 20:5 22:2 |
| 171:2,5,6 | 184:16 212:3 | 104:12,17,22 | 281:25 | 27:13 28:25 |
| week--forty-hour | 286:20 | 105:1,3,5,10,14 | who--who's 81:13 | 29:2,8,17 32:17 |
| 158:23 | WESTERN 1:1 | 105:20,24 | why-- 103:8 | 32:19 37:10 |
| weekday 138:8,11 | What's-- 94:12 | 106:17 107:5,11 | 106:24,24 | 38:2 50:23 |
| 138:12 140:16 | 163:25 164:2 | 107:21 108:2,4 | why--how 277:6 | 52:14 53:19,22 |
| 170:24 171:8 | what- 306:12 | 108:19,25 109:2 | wide 91:9 | 53:25 54:9 |
| weekend 48:22 | what-- 33:25 35:9 | 109:13,21,24 | wild 150:20 | 58:12 65:1 83:2 |
| weeks 40:10 | 38:7 62:2 65:12 | 110:11,23 111:2 | Williams 19:3,4 | 83:6 84:19 |
| 166:21 | 93:1 111:5 | 111:11,15 | 43:5 66:1,5,7 | 91:22 92:1,4 |
| weighed 134:11 | 127:1 170:18 | 114:16,21 | 68:24 69:12 | 95:15,17 96:3 |
| Weighing 67:6 | 183:19,22 | 115:13 116:11 | 81:19 86:3,13 | 98:15,17,20,25 |
| weight 17:6,10 | 222:24 224:8 | 123:21 135:4 | 95:8 117:23 | 104:1 108:10,12 |
| 74:17 | 235:11 239:19 | 146:1,13 150:8 | 226:1,14 291:11 | 108:15 110:22 |
| weightlifting | 278:11,11 290:5 | 150:12 151:3,7 | 292:13 | 112:16,18 |
| 134:14 | 305:10 | 152:11 176:8,15 | Williams-- 86:13 | 126:13 132:14 |
| well-being 50:21 | what--hear 48:10 | 177:9,16,24 | willing 181:6 | 132:18,22 |
| well,-- 130:11 | what--what 11:8 | 179:20 197:10 | window 38:16 | 133:18 134:1,4 |
| 159:6 300:8 | 49:17,20 107:17 | 197:22 198:1,2 | 94:19 122:8 | 136:21 139:8,18 |
| Wells 86:18 | 185:20 187:3 | 198:10 200:9,17 | 265:9,12 273:16 | 146:17 153:14 |

Case 3:16-cv-01007-TAD-KLH   Document 245-2   Filed 03/10/20   Page 122 of 220 PageID #:
Gerald Hardwell
13847
August 28, 2017

Page 43

| | | | | |
|---|---|---|---|---|
| 153:15 163:6,8 | 151:16 156:16 | 157:16 225:13 | **wrong** 106:1 | 126:10,16 |
| 163:13,15 | 156:23 158:21 | 267:18 | 178:15 200:13 | 131:24 132:20 |
| 164:10 169:15 | 158:21 167:23 | **worry** 163:7 | 200:14 298:15 | 136:22 139:6 |
| 178:10 184:11 | 171:1 172:10,13 | **would--** 118:19 | **wrote** 13:5 | 141:19 145:6 |
| 185:15 187:5 | 175:17 185:12 | 282:10 286:7 | | 146:8 162:11 |
| 189:23 190:2 | 185:13 188:4,9 | **would--who** 284:3 | **X** | 163:14,20,22 |
| 191:5 192:11 | 211:10,13 | **would--would** | **X** 84:16 127:6 | 164:14 170:21 |
| 198:25 207:14 | 212:10,14,16,18 | 153:18 | 133:19 295:3 | 170:21 177:4 |
| 208:21,24 | 212:19 215:1 | **wouldn't** 49:4 | | 201:2,18 203:24 |
| 213:15,23 | 216:3 225:11,15 | 54:2 96:20 | **Y** | 207:23,23,24 |
| 218:17,20,25 | 230:21 232:2 | 117:13 120:4 | **y'all** 33:25 47:6 | 213:11 214:1,6,6 |
| 219:10,13 | 238:23,25 | 137:11 181:21 | 59:9 64:19 70:3 | 216:16 220:1,9 |
| 229:11,13,15 | 243:18 254:23 | 199:22 215:4,4 | 79:21 80:12 | 225:13 227:1 |
| 242:1,23 243:11 | 267:23 275:24 | 224:22 232:13 | 95:11 96:5 98:6 | 228:1 230:17 |
| 243:13,16 | 281:4,13 289:7 | 244:16 256:10 | 98:10 118:7,14 | 242:1 243:10 |
| 245:14 247:8,16 | 289:10 299:2,5 | 276:2 290:6 | 120:18 157:8,13 | 244:18 255:18 |
| 248:1,5 250:14 | 299:14,15 | 296:9 298:10,11 | 157:21 158:17 | 257:4 259:24 |
| 252:4,13,25 | 310:23,25 | 298:12 300:22 | 158:21 159:14 | 264:3,5,13 |
| 253:3,6 255:4 | **work--you** 299:2 | 300:22,24 | 159:14 180:3 | 268:21 271:13 |
| 263:18 271:12 | **worked** 43:9,10 | **wouldn't--** 78:9 | 195:15 207:21 | 272:8 273:2,21 |
| 271:14 276:14 | 146:20,20 | 120:4 | 210:8 217:3 | 273:25 275:5 |
| 276:17,19 | 147:10,15,16,22 | **wrists** 77:2 78:18 | 227:4 228:4,18 | 277:10,10 |
| 279:20,23 280:5 | 156:5 170:24 | 78:24 87:7 | 244:6 252:20,20 | 285:16 288:5,8 |
| 287:2,16 288:3,5 | 188:8 212:13 | 100:9 | 272:8,8 278:11 | 290:19 292:2 |
| 288:11,14,15 | 221:11 232:16 | **write** 67:13 | 298:22 302:12 | 293:8 298:17 |
| 291:1 293:15,22 | 241:4 246:2 | 168:23 182:21 | 304:4 310:7 | 300:2,2,4,11 |
| 300:9,11 307:12 | 254:10 270:17 | 183:23 184:21 | **y'all--** 57:25 | 303:19 309:25 |
| 310:13 | 270:18 296:24 | 191:17 213:4 | **y'alls** 281:8 | 311:25 |
| **witnessed** 201:19 | **worker** 281:12 | 231:19,21 | **yeah** 17:16 18:7 | **year** 11:2 15:15 |
| **woke** 91:3,5,8,14 | **workers'** 24:4 | 308:12 | 19:7,17 22:18 | 15:15,15 45:14 |
| 92:5 93:10,14,21 | **working** 13:10 | **write--** 290:15 | 28:20 31:5 37:6 | 159:3,5 164:22 |
| 95:3,5 | 23:10 24:7 26:3 | **writeup** 279:10 | 37:11 46:21 | 263:8 |
| **woman** 161:3 | 28:10 43:8 | **writing** 58:17,18 | 50:4,6 51:19 | **yearly** 157:17 |
| **wondered** 59:4 | 44:19 57:13 | 211:25 213:16 | 52:10,11,15,16 | 297:16,17,20 |
| **wondering--** | 134:22 166:14 | 306:9,10 308:10 | 53:11,11,13,15 | **years** 146:21 |
| 289:19 | 169:10 180:18 | **written** 45:21,23 | 53:20 56:7 58:9 | 147:9 159:3,3,5 |
| **word** 40:14 58:19 | 208:8 209:5 | 112:9 123:3 | 60:5 61:2,10 | 159:6 188:12 |
| 133:6 222:11 | 212:3 239:9,18 | 147:4 167:21 | 62:1,6,12 70:8 | 205:3 208:9,25 |
| **word--** 58:18 | 246:21 256:14 | 183:11 202:12 | 72:18,24 79:13 | 209:23 213:19 |
| **work** 11:9 23:17 | 263:20 281:25 | 204:19 205:21 | 86:8 91:3 92:2 | 239:17 240:3,10 |
| 43:18 48:2 51:9 | 282:3,8 284:13 | 222:20 231:4 | 93:12 94:7,18 | 256:14 |
| 52:12 60:16 | 290:13 297:1 | 236:24 254:2,5 | 95:16 98:20,20 | **years--** 147:4 |
| 94:2 134:17 | 299:11 301:23 | 270:1 279:11,18 | 99:19 101:18 | **Yes--** 37:14 |
| 141:9 147:11 | **works** 141:16 | 303:22 | 107:10 108:16 | 102:10 |
| | | | 110:17 119:24 | |

| | | | | |
|---|---|---|---|---|
| you're--when | your-- 24:10 | 12th 48:3,21 | 17 4:19 11:7 294:9 | 186:7 188:20,24 |
| 74:18 118:2 | 48:23 174:25 | 51:23 52:4,16,18 | 179 1 2:12 | 2016-- 166:6 |
| you're--you | 215:10 219:7 | 155:1,18 174:17 | 18 4:5 247:6 | 2017 1:17 47:3 |
| 133:15 292:18 | 220:2 295:1 | 175:19 198:9 | 180 134:22,22,23 | 160:1,12 161:13 |
| you're--you're | your--got 199:6 | 217:19 218:3,6,9 | 182 4:13 20:10 | 164:22 165:3,19 |
| 65:6 | your--in 297:24 | 219:17 221:1,9 | | 166:3 168:9 |
| you-- 10:3 17:18 | your--your 214:8 | 221:22 232:16 | **2** | 313:12 314:2 |
| 19:14,14 24:6 | 222:20 | 232:20 286:5 | 2 4:4 15:25 16:1 | 21 4:7,8 |
| 29:3 34:4,4 39:5 | | 12th-- 221:13 | 204:7,8,17 | 22 4:9 247:15 |
| 43:8 47:21 66:9 | **Z** | 12th,-- 216:19 | 231:20 274:7 | 225 134:18 |
| 66:21 73:17 | zero 252:1,3 | 13 4:15 28:23 29:4 | 276:25 277:1 | 23 18:5,22 |
| 74:3 82:7 | zip 234:5,8,16,22 | 38:23,24 143:8 | 2/11/15 4:7 | 23rd 147:4 |
| 105:13 110:18 | 235:1 | 145:6 220:18 | 20 4:6 | 24/7 171:19 |
| 115:6 118:1 | | 232:14 247:20 | 20- 11:11 | 240 27:11 276:9 |
| 121:25 123:13 | **0** | 286:5 287:21 | 2009 11:15,23 | 247 27:11 |
| 126:1,9 136:7 | | 133 4:12 | 23:14 40:1,22 | 257 21:23 22:14 |
| 140:6 143:15 | **1** | 135 4:9 | 2010 11:11 17:2 | 259 21:24 22:15 |
| 146:16 165:19 | 1 4:3 14:7 154:3 | 139 4:13 | 121:18 | 25th 14:18 |
| 198:3 202:13 | 204:7,7 231:20 | 13th 54:8,9 62:23 | 2013 20:9 | 26 18:5,22 |
| 213:2,8 238:5 | 274:4 292:4 | 68:12 201:12 | 2014 113:15 | 270 293:14,24 |
| 240:2 241:19 | 313:9 | 220:3,6,14 | 165:19 166:8 | 271 139:3,12,13 |
| 255:6,15 262:8 | 1-97 291:17 | 221:17 228:4 | 2015 11:7 14:18 | 139:14 |
| 262:21 277:17 | 1,100 223:22 | 232:10 233:4,5 | 17:12,15 20:18 | 275 139:14 |
| 277:24 296:16 | 1,127 223:23,25 | 241:20 242:8,14 | 21:5 24:13 | 28 1:17 |
| 300:1 | 1/30/13 4:6 | 243:23 244:21 | 31:20 52:18 | 282 139:3,11,17 |
| you--all 7:7 | 10 4:12 133:3 | 266:21 270:9,25 | 53:5 67:3 68:12 | 139:18,20 |
| you--and 41:13 | 139:23,25 204:7 | 282:1,4,8 284:4 | 113:16 114:2,24 | 285 17:17 134:11 |
| you--do 275:22 | 274:23 | 297:24 | 116:5 125:15 | 28th 313:11 |
| you--how 291:13 | 10- 255:1 | 13th-- 51:23 | 134:19 138:21 | 293 4:18 |
| you--if 73:25 | 10/11/15 29:24 | 13th,-- 53:3 | 146:24 147:5 | 294 4:19 |
| you--like 280:8 | 10/14/15 29:25 | 14 4:3,16 28:23 | 152:10 165:17 | |
| you--that 41:1 | 10/15/15 30:2 | 144:6 145:5,6 | 165:18 169:10 | **3** |
| 279:4 | 100 2:25 | 142 4:14 | 170:9,19,21 | 3 4:5 18:15,23 |
| you--were 101:8 | 106 255:1,20 | 143 4:15 | 175:13,19 179:4 | 19:25 38:8,10 |
| you--where 78:22 | 286:24 | 1434 313:21 | 189:2 190:22 | 78:21 204:7 |
| you--y'all 79:4 | 107 255:2,20 | 144 4:16 | 216:21 217:22 | 239:20,21 |
| you--you 19:18 | 10th 27:19 | 15 4:17 169:20 | 218:5,9 219:16 | 242:20 244:20 |
| 55:3 62:14 | 11 4:13 20:18,18 | 245:11,21 | 220:14,18 224:3 | 274:9 277:2 |
| 245:18 | 139:2,21,22 | 15th 27:19 218:1 | 232:14 247:20 | 3--four 277:1 |
| you--you've 59:19 | 111 1:21 313:10 | 218:2 | 266:21 270:25 | 3/3/15 4:8 |
| you,-- 91:18 | 11th 198:9 | 16 4:4,18 293:2,3 | 286:6 287:21 | 3:16-CV-01007 |
| Young 29:12,24 | 12 4:14 28:23 29:4 | 1628 2:19 | 290:13 291:6 | 1:6 |
| 30:1,3,13 54:3,4 | 142:25 145:6 | 165 4:19 | 299:2 301:25 | 3:16-CV-011405 |
| Young,-- 53:14 | 217:22 219:16 | 169 4:17 | 2016 165:18 167:7 | 1:11 |
| | 123 3:6 | | | |

| | | | |
|---|---|---|---|
| **30** 20:9 | **5:30** 58:6 299:4 | 108:2,20,21,22 | **84** 4:11 |
| **31** 4:10 | **5:35** 299:10,13 | 110:3,8 118:15 | **8th** 126:4 |
| **312** 313:9 | **5:40** 299:4 | 120:16,19 | |
| **313** 17:7,8 | **50** 290:1 | 123:17 124:10 | **9** |
| **33** 16:15 | | 124:17 138:8,11 | **9** 4:11 84:9 124:2 |
| **37:2554** 313:8 | **6** | 152:22 154:24 | 124:5 132:11,13 |
| **38s** 129:5 | **6** 4:8 21:21,22 | 176:8,21 197:5 | 204:7 221:23 |
| **3rd** 21:5 | 37:3,20,22,23 | 198:3,11 199:10 | 274:21 |
| | 38:19 48:25 | 201:23 202:22 | **9:10** 313:12 |
| **4** | 57:13,14,14,16 | 203:2,12,20,21 | **911** 225:19 |
| **4** 4:6 20:12,13 | 62:20 198:21,22 | 204:1,2,9,20 | **915** 289:24 |
| 38:8,10 78:21 | 198:24 199:1,6 | 205:4,11,17,18 | **92** 247:23 |
| 204:7 239:20,21 | 199:10,13 | 205:23 206:15 | **92160** 1:25 |
| 274:11 277:2 | 201:21 203:21 | 206:23 208:14 | **94** 52:2,17 |
| 291:14 | 203:24 204:9 | 215:21 219:23 | **95** 12:24 53:3 |
| **4:00** 35:22 141:10 | 205:15 211:14 | 221:22,25 | **96** 53:10 |
| 225:13 | 211:14,18 214:3 | 243:23 245:17 | **965** 289:20 |
| **40** 15:1 16:6,6 | 214:3,16,16 | 245:18,22 | |
| **427** 287:14,17 | 217:22 218:10 | 261:24 265:8 | |
| 293:13 | 220:14 221:11 | 266:22 270:25 | |
| **433** 289:19 291:13 | 221:11,15,15,17 | 271:5 274:17 | |
| **434** 287:14,18 | 221:17 225:9,9 | 286:20 292:4 | |
| **435** 287:24 293:13 | 237:17 238:12 | 302:13 | |
| **4442** 2:25 | 239:22,23 240:1 | **7:00** 48:1 123:16 | |
| **46** 147:7 | 240:4,8,12,17 | 177:17 221:23 | |
| **47** 14:9 | 242:8 244:8,21 | **7:30** 124:5,6,8 | |
| | 266:21 269:9 | **7:37** 123:19 | |
| **5** | 274:15 277:3 | **7:45** 48:20 49:3 | |
| **5** 4:7 21:2 37:3,20 | 299:2 | **71101** 2:6 | |
| 37:22,23 38:19 | **6'5** 17:4 134:12 | **71111** 2:26 | |
| 198:21,22,23 | **6--** 205:15 | **71201** 1:21 313:11 | |
| 199:1,5,9,13 | **6:00** 177:18 | **71210-0123** 3:7 | |
| 201:21 203:12 | 225:16,16 | **71309-1791** 2:12 | |
| 203:21,23 204:9 | 243:23 | **71418** 2:19 | |
| 205:15,15 | **675** 2:6 | **7th** 314:2 | |
| 231:20 237:17 | **6th** 11:24 | | |
| 238:12 239:22 | | **8** | |
| 239:23 240:1,4 | **7** | **8** 4:10 31:13 38:22 | |
| 240:12,17 269:9 | **7** 4:9 17:2 22:8 | 51:25 203:12 | |
| 274:13 277:2 | 37:3,19,20 48:16 | 204:7 274:19 | |
| **5--** 37:23 | 49:7 50:13 55:6 | 276:4,9 | |
| **5:00** 225:12 244:3 | 55:14 60:6 | **8:00** 35:22 141:9 | |
| 244:4 266:21 | 63:14,22 83:16 | 225:12,13 | |
| **5:06** 313:12 | 84:11,12,13 | **80** 213:11,13 | |
| **5:20** 58:6 | 102:16,20 104:2 | | |

### RICHWOOD CORRECTIONAL CENTER
### EMPLOYEE VERBAL COUNSELING DOCUMENTATION FORM

Gerald Hardwell
**EMPLOYEE (TITLE OR RANK)**

8/3/2011
**DATE**

D Team
**JOB ASSIGNMENT /TEAM**

Approx 4:30am
**TIME**

Lt hardy
**SUPERVISOR (TITLE & RANK)**

**The above employee was verbally counseled on the above date and time due to: (Be Specific)**
on 8-2-2011 you C/O Hardwell failed to report a violation of employee rule and diciplinary procedures in which force was used on a monror city inmate

**Summary and/or results of the counseling sessions:**
   when use of force occcures ensure superyisors are informed and all paper work completed before end of shift   and the inportance of all the proper paper work  completed  to ensure all parties involved are protected

**EMPLOYEE SIGNATURE**

8 / 0 / 11
**DATE**

**SUPERVISOR SIGNATURE**

/   /
**DATE**

EXHIBIT
/

RCC/HARDWELL 95

Louisiana Department of Public Safety and Corrections
QUEST FOR ADMINISTRATIVE HEARING

**DRIVER**

Driver: _Hardwell_ (Last) _Gerald_ (First) _D_ (M.I.)   Race _B_  Sex _M_  DOB. _____  Tel. h. ____ (State) La

Address _1703 Hoover Ave_   City _Bastrop_   State _La_  Zip _71220_

Arrested in _Franklin_   Parish on the _13th_ day of _September_ _2015_ at _04: 12_ a.m

**TEST**

- ☐ Refused Chemical Test   ☑ Submitted to Chemical Test – Results _.109_ %   Instrument # _SN 68-013204_
- ☐ Breath    ☑ Breath   Operator's: Name/Agency _K Robbins_   Permit # _2369_
- ☐ Blood    ☐ Blood
- ☐ Urine    ☐ Urine   Test Results Pending at _____   Drawn by _____
- ☐ Operating Commercial Vehicle ☐ Hauling Hazardous Material ☐ Fatality ☐ Serious Bodily Injury ☐ Passenger 12 or under in vehicle

**LICENSE**

RECEIPT FOR LICENSE and/or TEMPORARY LICENSE

LICENSE SURRENDERED _✓_ YES ____ NO   CLASS _E_  ENDORSEMENTS _____

_✓_ TEMPORARY D.L. ISSUED   ____ TEMPORARY D.L. NOT ISSUED  REASON ____ UNDER SUSPENSION
(Temporary D.L. valid for 30 days only)   ____ NO D.L. IN POSSESSION   ____ D.L. EXPIRED  OTHER _____

**WITNESS**

Name and agency of law enforcement officers involved in the traffic stop, detention, investigation, and arrest:

_Joshua Dim_   _28_   _FPSO_
Name          Badge #  Agency       Name          Badge #      Agency

Name          Badge #  Agency       Name          Badge #      Agency

I have been furnished with a copy of the official notice of withdrawal of driving privileges, and with the name and agency of all officers involved in the stop, detention, investigation and arrest. SIGNATURE _____

The above listed person either refused or was unable to sign form. OFFICER SIGNATURE _____

## REQUESTING AN ADMINISTRATIVE HEARING

You are entitled to an administrative hearing where you may present facts or evidence on your behalf. REQUEST FOR THE HEARING MUST BE MADE IN WRITING POSTMARKED OR RECEIVED AT THE OFFICE OF MOTOR VEHICLES WITHIN 30 CALENDAR DAYS FROM THE DATE OF YOUR ARREST. If you fail to request such a hearing within the time specified above the suspension will be enforced.
(A hearing is not for the purpose of obtaining a hardship license.)
The scope of the hearing shall cover:

(1) Whether a law enforcement officer had reasonable grounds to believe the person, regardless of age, had been driving or was in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages and/or any abused or illegal controlled dangerous substance as set forth in R.S. 40:964.
(2) Whether the person was placed under arrest.
(3) Whether he was warned by the officer(s) of the consequences of his submission to or refusal of the chemical test and whether he was advised of his constitutional rights.
(4) Whether he voluntarily submitted to an approved chemical test and whether the test resulted in a blood alcohol reading of 0.08 percent or above by weight, or 0.02 percent or above if he was under the age of twenty-one years on the date of the test.
(5) Whether he refused to submit to the test upon the request of the officer.
(6) Such additional matters as may relate to the reasonableness of a suspension of the license.

If you want witnesses subpoenaed to appear at the hearing, payment for each witness must be sent with the request for hearing. Payment must be made by a certified check, money order, or a check on an attorney's account in the amount indicated below. You must send a separate check or money order made payable to the order of each witness you want subpoenaed. NO PERSONAL CHECKS ACCEPTED.

(7) Subpoena fee for each witness (non-law enforcement officer) is ............................... $15.00
Note: R.S. 32:668 (A) states **no law enforcement officer shall be compelled by such person to appear or testify at such hearing.**

ALTHOUGH AN ATTORNEY IS NOT REQUIRED, YOU MAY BE REPRESENTED BY AN ATTORNEY AT THE HEARING AT YOUR OWN EXPENSE. (Complete the reverse side if you wish to request a hearing)

REQUEST FOR ADMINISTRATIVE HEARING     (VIOLATOR COPY)



EXHIBIT
2

ON THE JOB TRAINING PROGRAM CHECKLIST

NAME: Gerald Hardwell ASSIGNED: 6-A-10 DATE 6-15-10

OJT OFFICER Sgt. Reginald Williams

THE ABOVE NAMED OFFICER HAS COMPLETED THE BELOW LISTED
TASK SUCCESSFULLY:

1. **COUNT PROCEDURES:**
   Major count periods explained;          Supv. Initial ___ Emp. Initial ___
   Major count conducted with
   OJT                                     Supv. Initial ___ Emp. Initial ___
   Unofficial count explained              Supv. Initial ___ Emp. Initial ___
   Unofficial count conducted              Supv. Initial ___ Emp. Initial ___
   Freeze count explained                  Supv. Initial ___ Emp. Initial ___
   Emergency count explained               Supv. Initial ___ Emp. Initial ___
   Roll Call count explained               Supv. Initial ___ Emp. Initial ___
   Bed Count(See Flesh)                    Supv. Initial ___ Emp. Initial ___

2. **RADIO PROCEDURES:**
   Proper use of radio                     Supv. Initial ___ Emp. Initial ___
   10 Codes explained                      Supv. Initial ___ Emp. Initial ___
   Caution to radio abuse                  Supv. Initial ___ Emp. Initial ___

3. **CENTRAL CONTROL PURPOSE:**
   Observation cameras explained           Supv. Initial ___ Emp. Initial ___
   Central control count procedures        Supv. Initial ___ Emp. Initial ___
   Movement sheets                         Supv. Initial ___ Emp. Initial ___
   DB court sheets                         Supv. Initial ___ Emp. Initial ___
   Transportation logs                     Supv. Initial ___ Emp. Initial ___
   Forms for inmates                       Supv. Initial ___ Emp. Initial ___
   Mail and Money Orders                   Supv. Initial ___ Emp. Initial ___
   Key control for facility                Supv. Initial ___ Emp. Initial ___
   Telephone/Televisions                   Supv. Initial ___ Emp. Initial ___
   Vehicle/Radio traffic                   Supv. Initial ___ Emp. Initial ___
   Suicide cell monitoring                 Supv. Initial ___ Emp. Initial ___
   Observation of Unit 1 & Unit 2          Supv. Initial ___ Emp. Initial ___
   Observation Of Unit 3,5,& 6             Supv. Initial ___ Emp. Initial ___
   Observation Of Unit 4(MPD)              Supv. Initial ___ Emp. Initial ___

4. **CHEMICAL CONTROL:**
   Chemicals use and monitoring            Supv. Initial ___ Emp. Initial ___
   Inventory of chemicals/purpose          Supv. Initial ___ Emp. Initial ___
   Chemical agents/usage                   Supv. Initial ___ Emp. Initial ___
   MSDS Books/Locations                    Supv. Initial ___ Emp. Initial ___



EXHIBIT
3

RCC/HARDWELL 23

## ON-THE-JOB TRAINING CHECKLIST
### PAGE 2

**5. DORMITORY LOGBOOKS:**

| | |
|---|---|
| Log Book purpose | Supv.Initial ___ / Emp.Initial ___ |
| Equipment logging | Supv.Initial ___ / Emp.Initial ___ |
| Dormitory activities | Supv.Initial ___ / Emp.Initial ___ |
| Inmate movement | Supv.Initial ___ / Emp.Initial ___ |
| Date/Time/Signature | Supv.Initial ___ / Emp.Initial ___ |

**6. USE OF RESTRAINTS:**

| | |
|---|---|
| Purpose of restraining devices | Supv.Initial ___ / Emp.Initial ___ |
| Leg Irons | Supv.Initial ___ / Emp.Initial ___ |
| Waist Chain | Supv.Initial ___ / Emp.Initial ___ |

NOTE: ONLY SERGEANTS AND LIEUTENANTS ARE ALLOWED TO CARRY HANDCUFFS AND KEYS.

**7. KEY CONTROL**

| | |
|---|---|
| Security of keys/possession | Supv.Initial ___ / Emp.Initial ___ |
| Key usage and issue | Supv.Initial ___ / Emp.Initial ___ |
| Key control box | Supv.Initial ___ / Emp.Initial ___ |
| Logging key rings/number of | Supv.Initial ___ / Emp.Initial ___ |
| Officer to Officer passing of | Supv.Initial ___ / Emp.Initial ___ |

**8. INVENTORY OF PROPERTY**

| | |
|---|---|
| Purpose of property inventory | Supv.Initial ___ / Emp.Initial ___ |
| Security of property | Supv.Initial ___ / Emp.Initial ___ |
| Inmate property inventory sheets | Supv.Initial ___ / Emp.Initial ___ |
| Verification of signatures | Supv.Initial ___ / Emp.Initial ___ |

**9. UNUSUAL OCCURRENCE REPORTS:**

| | |
|---|---|
| Purpose of | Supv.Initial ___ / Emp.Initial ___ |
| Checking proper block | Supv.Initial ___ / Emp.Initial ___ |
| Complete Description of incident | Supv.Initial ___ / Emp.Initial ___ |
| How To Report Information | Supv.Initial ___ / Emp.Initial ___ |
| Sign/Date | Supv.Initial ___ / Emp.Initial ___ |

## ON-THE-JOB TRAINING PROGRAM CHECKLIST
### PAGE 3

**10. FORM USAGE:**

Types of forms — Supv.Initial ___ / Emp.Initial ___
Chemicals inventory form — Supv.Initial ___ / Emp.Initial ___
Tool Inventory forms — Supv.Initial ___ / Emp.Initial ___
UOR'S forms — Supv.Initial ___ / Emp.Initial ___
Disciplinary reports — Supv.Initial ___ / Emp.Initial ___
Accident reports — Supv.Initial ___ / Emp.Initial ___
Employee Write Ups Form — Supv.Initial ___ / Emp.Initial ___
Suicide watch forms — Supv.Initial ___ / Emp.Initial ___
Shakedown forms — Supv.Initial ___ / Emp.Initial ___
Inmate request forms — Supv.Initial ___ / Emp.Initial ___
Inmate's ARP (Grievance) form — Supv.Initial ___ / Emp.Initial ___
Others — Supv.Initial ___ / Emp.Initial ___

**11. DISCIPLINARY REPORTS:**

Purpose and use — Supv.Initial ___ / Emp.Initial ___
Name, Number, Location, Date/Time — Supv.Initial ___ / Emp.Initial ___
Proper rule number — Supv.Initial ___ / Emp.Initial ___
Description of violation's — Supv.Initial ___ / Emp.Initial ___
Signature — Supv.Initial ___ / Emp.Initial ___
DB court results — Supv.Initial ___ / Emp.Initial ___

**12. HOUSEKEEPING PROCEDURES:**

Assignment of offenders — Supv.Initial ___ / Emp.Initial ___
Area of assignment — Supv.Initial ___ / Emp.Initial ___
Inspection of areas — Supv.Initial ___ / Emp.Initial ___

**13. ROLL CALL PROCEDURES AND DRESS CODE:**

Reporting on time — Supv.Initial ___ / Emp.Initial ___
Properly dressed — Supv.Initial ___ / Emp.Initial ___
Listening to all information — Supv.Initial ___ / Emp.Initial ___
Signing appropriate documents — Supv.Initial ___ / Emp.Initial ___
Signing of Time sheet/OT sheets — Supv.Initial ___ / Emp.Initial ___
Questions information to clarify — Supv.Initial ___ / Emp.Initial ___

At the end of an officer's OJT, the supervisor shall complete an evaluation of the officer's attention to the areas listed and as to his/her potential as a officer at this facility.

The Supervisor shall pay close attention to each area and promote more training in areas felt that can be improved. The space below is for supervisor's comments:

_____

_____

_____

_____

_____

_____

_____

_____          _____
Supervisor Signature                Trainee Signature

SUPERVISORS ARE TO TURN IN DOCUMENTATION TO THE ASSISTANT WARDEN'S OFFICE FOR PLACEMENT IN THE OFFICER'S PERSONNEL RECORDS.

Richwood Correctional Center

# Training Attendance

## SUICIDE TRAINING FORM
## SUICIDE WATCH – POLICY #182

Date:  January 30, 2013

| PRINT NAME | SIGNATURE |
|---|---|
| Myra Russ | Myra Russ |
| Kaila Blossom | Kaila Blossom |
| Fred Fulton | Fred Fulton |
| Michael Coleman | |
| Benny Kerry | Benny Kerry |
| Willie Chapman | Willie Chap |
| Jamarcus Montgomery | Jamarcus Montgomery |
| Steve Hunter | |
| Tyrone Coleman | Tyrone Coleman |
| Garreld Hutchinson | |
| Stanton Johnson | Stanton Johnson |
| Reginald Williams | Reginald Williams |
| Johnny James | Johnny James |
| Michael Torture | Michael |
| Rodney Cuff | |
| Erika Williams | Erika Wil |
| Wilbur Dale Hayes | Wilbur Dale Hayes |
| Joey Kedley | |
| Christopher Loring | x |
| Tommy Farmer | x |

EXHIBIT

RCC/HARDWELL 15

Richwood Correctional Center

# Training Attendance

Date: 02/11/2015

Team/Department: D-Team / Security

| PRINT NAME | SIGNATURE |
|---|---|
| Vickey - Johnson | Vickey Johnson |
| Tommy Reed | Tommy Reel |
| Shaun Phillips | Shaun Phillips |
| Dennis Navarro | Dennis Navarro |
| Jody Foster | Jody Foster |
| David McMillan | David McMillan |
| Tray Stafon | Tray Stafon |
| Tiffany Hall | Tiffany Hall |
| Marion Goodpoint | Marion Goodpoint |
| Barbara Dooley | Barbara Dooley |
| Rhonda Rey | Rhonda Rey |
| Yolanda Jackson | Yolanda Jackson |
| Quedus Morchwell | Quedus Morchwell |
| Reginald Williams | Reginald Williams |
| Jeramey Kunner | Jeramey Kunner |
| Shundarrius Ballard | Shundarrius Ballard |
| Antoine Jackson | Antoine Jackson |

Instructor: Asst. Warden A-Hollio Turner

Prison Rape Elimination Act
( PREA )

EXHIBIT
5

RCC/HARDWELL 11

Richwood Correctional Center

# Training Attendance

### TOPIC:  USE OF FORCE

Date: _____03/03/2015_____

Team/Department: _____

| PRINT NAME | SIGNATURE |
|---|---|
| Tommy Farmer | Tommy Farmer |
| Tyrone Coleman, Captain | Tyrone Arthur Coleman |
| La Quenna Hardwell Twps | La Quenna Hardwell |
| Michael Watson | MW |
| Benny Keen | Benny Keen |
| Wesley Mock | Wesley Mock |
| Michael Celuscai | |
| Juan Rosenthal | Juan Rosenthal |
| Willie Chapman | Willie Chap |
| Annette Seales | Annette Seales |
| Stanton Johnson | Stanton Johnson |
| Reginald Williams | Reginald Williams |
| Derrick Hammond | Derrick Hammond |
| Gerald Hardwell | Gerald Hardwell |
| Tommy Reed | Tommy Reed |
| Antoine Jackson | Antoine Jackson |
| Wilbur Dale Hayes | Wilbur Delaughter |
| Jessica Shoemaker | Jessica Shoemaker |
| Kanitra Turner | Kanitra Turner |

Instructor: Asst. Warden Turner




EXHIBIT
6

RCC/HARDWELL 5

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 135 | 6 |
| Chapter | Related Standards | |
| Use of Force | BJG II-B-001, II-B-003, II-B-004, VII-A-002 | |
| Subject | | |
| Use of Force | | |

## PURPOSE

To state the Warden's policy regarding use of force at Richwood Correctional Center.

## POLICY

It is the policy of Richwood Correctional Center to provide employees with the proper training and guidance on the use of force. This includes physical force, chemical agents, firearms, electrical and other similar devices, intermediate/impact weapons, restraints, less-than-lethal munitions and devices, and other tactical equipment authorized.

## Definitions

A.  <u>Force</u>: Bodily contact of some nature—either with or without the use of restraints, electronic devices, chemical agents, less-than-lethal munitions and device, or firearm, which causes someone either to act in a manner contrary to his intent or to change his behavior to the desired action.

B.  <u>Necessary Force</u>: Force needed to gain control of an individual.

C.  <u>Reasonable Force</u>: Force justified by the specific elements of a situation, such as the amount of force responded to, a person's perception of danger, the existence of non-forceful alternatives and any other relevant factors.

D.  <u>Excessive Force</u>: Force used in a situation justifying force that exceeds the force necessary to control the situation or continues after the person is subdued or restrained.

E.  <u>Non-deadly Force</u>: Force which normally causes neither death nor serious bodily injury.

F.  <u>Deadly Force</u>: Any intentional force that is capable of causing death or serious physical injury.



EXHIBIT
7

RCC 257

Use of Force
#135
Page 2 (cont.)

G. <u>Restraints</u>: Mechanical or other devices used to restrict movement for security or Medical purposes.

H. <u>Chemical Agent</u>: An active substance, such as gas, mace or irritant dust, used to deter activities that might cause personal injury or property damage.

I. <u>Electrical Devices</u>: Device which delivers an electric charge when activated by the operator, used to deter activities that might cause personal injury or property damage.

J. <u>Intermediate/Impact Weapons</u>: Non-lethal weapons which are used as an alternative to deadly force.

K. <u>Less-than-lethal Munitions and Devices</u>: A substantial array of low-lethality weapons which allow a wide range of options, which can be used within the use of force continuum. Less-than-lethal munitions and devices should be used as an alternative to deadly force whenever possible under prevailing circumstances.

## POLICY

It is the policy of the Warden that all reasonable steps are taken to minimize situations requiring the use of force by staff against offenders and to minimize the amount of force used in those situations. It is recognized, however, that force may be necessary to accomplish the goals of the facility (including public safety, the safety of staff and offenders, and maintenance of stability with the facility).

This policy is not designed to discourage employees from using force when it is necessary, but to assist them in acting reasonably when confronted with situations requiring the use of force.

It is further the policy of the Warden that gas, mace, irritant dust, electrical devices, restraints, intermediate/impact weapons, or less-than-lethal munitions and devices may be used only by employees specifically trained in their use and when all available less drastic measures fail to accomplish control in handling group disturbances and subduing individuals. Said force employed shall be proportional to the threat to which it is a response and shall cease when the resistance ceases. The use of gas, mace or irritant dust as set forth herein is based on the concept established by the American Correctional Association that in quelling disturbances such use may be more humane in that it generally causes no serious or lasting damage and can pose less potential for injury to offenders and staff than other types of physical force. All uses of force shall be managed and monitored by appropriate supervisory personnel whenever possible.

## USE OF FORCE GUIDELINES

A. General Considerations:

1. Whenever possible, the determination to use force shall be made by the highest ranking supervisor in the immediate area.

RCC 258

Use of Force
#135
Page 3 (cont.)

    2.  Whenever possible, force shall not be used against mentally ill or mentally retarded offenders before appropriate medical or mental health personnel can be called to the scene.
    3.  Reasonable steps shall be taken to minimize the amount of force used.
    4.  The use of any type of force for punishment or reprisal is strictly prohibited.

B.  Elements to Consider in the Review of Use of Force Incidents:
    1.  The extent of the injury suffered.
    2.  The need for the application of force.
    3.  The relationship between the need and the amount of force used.
    4.  The threat reasonably perceived by the responsible supervisor (s).
    5.  Any efforts made to temper the severity of a forceful response.

C.  Deadly Force should only be used as a last resort and then only in the following instances:
    1.  To prevent the commission of a felony, including escape.
    2.  To prevent an act that could result in death or severe bodily harm to one's self or another person.

D.  Non-deadly Force – Physical force, chemical agents, electrical devices, intermediate/impact weapons, or less-than-lethal munitions and devices may be used only in the following instances:
    1.  To prevent the commission of a felony, including escape.
    2.  To prevent an act that could result in death or severe bodily harm to one's self or to others.
    3.  To defend one's self or others against any physical assault.
    4.  To prevent commission of a misdemeanor.
    5.  To prevent serious damage to property.
    6.  To enforce facility rules.
    7.  To prevent or quell a riot.

E.  Chemical Agents-Special Conditions
    1.  Shall not be
        a.  used without approval of the Warden or designee, if approval is possible under the circumstances.
        b.  Repeated against an offender in a short period of time.
    2.  Individuals affected by chemical agents should be permitted to wash their face, eyes, or other exposed skin areas as soon as possible after use.

F.  Air Taser
    1.  Shall not be
        a.  Used without approval of the Warden or designee, if approval is possible under the circumstances.
        b.  Repeated against and in a short period of time.
    2.  The air taser automatically when shot will deliver a shock for five seconds. If individual is not disabled, an additional 5 seconds may be administered.  This should be enough to subdue the offender.
    3.  After use of the air taser, the officer may remove the electrodes from the offender using proper procedures. Any barb in the facial or neck area should be removed by medical personnel.
    4.  Individuals affected by the air taser shall be photographed and seen by medical personnel.

RCC 259

RCC FORM #105

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN

Date: _11-16-15_

| CELL | NAME | DOC# | DORM | RACE | RULE# | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Emanuel Sandifer | | | W | Medical | 12-04-15 | | Lt Louie | | |
| 10.2 | Aubrey Longfellow | | | W | 10 | 9-23-15 | | Lt. Donbello | | |
| 10.2 | Kenneth Jackson | | | B | 1 | 9-24-15 | | Lt Lacing | | |
| 10.2 | Dominique Lecter | | | B | 3 | 10-01-15 | | Lt Louier | | |
| 10.3 | Lacey Walker | | | B | 21 | 9-3015 | | Lt. Louios | | |
| 10.3 | Larry Cheatham | | | B | 21 | 10-11-15 | | Lt Louios | | |
| 10.3 | Joseph Hughes | | | B | 1 | 10-08-15 | | Lt Lacing | | |
| 10.3 | Gerald Riley | | | B | 1 | 10-09-15 | | Lt. Kern | | |
| 10.4 | Steven Alexander | | | B | 21 | 10-03-15 | | Lt. Lacing | | |
| 10.4 | Dedric Houghton | | | B | 21 | | | Lt Louis | | |
| 10.4 | Dedrick Dark Jarae | | | B | 3 | 10-09-15 | | Lt Louier | | |
| 10.5 | Joshua Isom | | | B | 21 | 10-01-15 | | Lt. Louier | | |
| 10.5 | Sidney Savage | | | B | 1 | 10-01-15 | | Lt. Lacing | | |
| 10.5 | Jonathan Sutton | | | B | 1 | 10-08-15 | | Lt. Lacing | | |
| 10.6 | Jacob Ardoin | | | B | 1 | 10-08-15 | | Lt Lacing | | |
| 10.6 | Frank Isom | | | B | 21 | 10-01-15 | | Lt Louier | | |
| 10.6 | Tishh Pendleton | | | W | 1 | 10-08-15 | | Lt. Lacing | | |
| 10.6 | Terry Kirby | | | B | 1 | 10-05-15 | | Lt. Kirby | | |
| 10.8 | Terrell Clark | | | B | 1 | 9-27-15 | | Lt. Louier | | |
| 10.9 | Antonio Bryant | | | R | City | 10-09-15 | | Lt Louier | | |
| 10.10 | Charles Trim | | | B | Parchy | 10-09-15 | | Lt Isom | | |
| 10.10 | Donald Franklin | | | B | SKS | 9-27-15 | | Lt Caldwell | | |
| SM1 | Derik Vasey | | | B | Absconded | 10-09-15 | | Lt Louier | | |



RCC 240

RCC FORM #106

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: _11-10-15_

| CELL | NAME | DOC# | DOB# | RACE | RULER | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| SH2 | Dabacki Cornbanks | | | W | marshall | 9-14-15 | | L. Woodard | | |
| Pal#c | Kbastman(i)bb(ie) | | | B | City | 11-10-15 | | J.J. Lewis(i)(b) | | |
| L07 | Zachariah Myles | | | B | City | 11-09-15 | | J.J. Lewis(e) | | |

RCC 241



RCF FORM #126

## RICHWOOD CORRECTIONAL CENTER
## ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-16-15

| CELL | NAME | DOOR | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 101 | Terrance J Sanchez | | | W | Med | 10-6-15 | | J.J. Leblanc | | |
| 102 | Ashton Schneider | | | W | In | 8-13-15 | | J.J. Rodriguez | | |
| 102 | Kenneth Coleman | | | B | In | 9-24-15 | | J.J. Leblanc | | |
| 103 | Dominique Carter | | | B | 3 | 10-01-15 | | J.J. Leblanc | | |
| 103 | Cora Miller | | | B | 21 | 9-27-15 | | J.J. Leblanc | | |
| 103 | Lacey L Phillips | | | B | 21 | 10-01-15 | | J.J. Leblanc | | |
| 105 | Joseph Hughes | | | B | 1 | 10-05-15 | | J.J. Lacine | | |
| 105 | Gerald Riley | | | B | | 10-05-15 | | J.J. Kerry | | |
| 104 | Shawn Alphonser | | | B | 21 | 10-05-15 | | J.J. Kerry | | |
| 104 | Dexter Humphrey | | | B | 21 | 10-05-15 | | J.J. Leblanc | | |
| 104 | Patrick Richardson | | | B | 3 | 10-01-15 | | J.J. Leblanc | | |
| 105 | Joseph J Sams | | | B | 21 | 10-01-15 | | J.J. Leblanc | | |
| 105 | Sidney Sanz | | | B | 1 | 10-08-15 | | J.J. Leblanc | | |
| 105 | Stephen Oliver | | | B | 1 | 10-08-15 | | J.J. Leblanc | | |
| 106 | Jacob Aiken | | | B | 1 | 10-08-15 | | J.J. Leblanc | | |
| 106 | Ernest Jenkins | | | A | 21 | 10-08-15 | | J.J. Leblanc | | |
| 106 | Justin Denkleton | | | W | 1 | 10-01-15 | | J.J. Leblanc | | |
| 106 | Terry Richy | | | B | | 10-01-15 | | J.J. Leblanc | | |
| 108 | Terrell Clark | | | B | | 10-05-15 | | J.J. Kerry | | |
| 109 | Antonio Bryant | | | B | | 9-30-15 | | J.J. Lacine | | |
| 110 | Chuck Irvin | | | B | city | 10-05-15 | 10-17-15 | J.J. Leblanc | ct Leno | 10-15-15 Per Release |
| 110 | Daniel Franklin | | | B | 365.6 | 10-09-15 | | J.J. Kerry | | |
| 201 | Kevin Young | | | B | detainer | 10-08-15 | | J.J. Leblanc | | |



RCC FORM #1202

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: 12-11-15

| CELL | NAME | DOC# | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| S-213 | Patrick Cardwell | | | W | Medical | added 12-11-14 | | Lt. Goodwin | | |
| B-106 | Terrance Washington | | | B | Cell | 12-10-15 | | Lt. Levine | | |
| 107 | Zachariah Marks | | | B | Cell | 10-30-15 | | Lt. Levine | | |
| 108 | Zachary Hubbard | | W | Blk | Asst 21 | 10-1-15 | | Lt. Loomis | | |
| 104-1 | David Ferguson | | | W | Cell | 10-11-15 | | Lt. Davis | | |
| 105 | Roy Clanton | | | B | 10 | 10-11-15 | | Lt. Loomis | | |
| 104 | Richey Silvas | | | B | 10 | 10-14-15 | | Lt. Loomis | | |

RCC 243

RCC 244

RCC FORM #026

**RICHWOOD CORRECTIONAL CENTER**

**ADMINISTRATIVE LOCKDOWN ROSTER**

Date: 10/14/15

| CELL | NAME | DOOR | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 D 1 | Emmanuel Sanchez | | | W | Medical | 10/06/15 | | Lt Garstka | | |
| 1 D 2 | Anthony Taylor | | | B | 10 | 9/29/15 | | Lt Blackwell | | |
| 1 D 2 | Kenneth Chatman | | | B | 1 | 9/24/15 | | Lt Loring | | |
| 1 D 3 | Darius Gauthier | | | B | 3 | 10/01/15 | | Lt Loring | | |
| 1 D 3 | Joseph Brookes | | | B | 1 | 10/08/15 | | Gibson | | |
| 1 D 3 | Jr. Keithon Cotton | | | B | 1 | 10/06/15 | | Gibson | | |
| 1 D 3 | Cory Miller | | | B | 2 | 09/21/15 | | Lt Lavergne | | |
| 1 D 4 | Fonterius Alexander | | | B | 5 | 10/13/15 | | Lt Loring | | |
| 1 D 4 | Joshua Isaac | | | B | 5 | 10/01/15 | | Lt Lewis | | |
| 1 D 4 | Merrill Hensley | | | B | 5 | | | Garstka | | |
| 1 D 5 | Isaac Carmel | | | W | Med LD | 10/12/15 | | Lt Blackwell | | |
| 1 D 5 | Leander Evans | | | B | Med LD | 10/14/15 | | Lt Blackwell | | |
| 1 D 6 | Derek Ardoin | | | B | 1 | 10/08/15 | | Lt Loring | | |
| 1 D 6 | Carnell Jenkins | | | B | 21 | 10/01/15 | | Lt Loring | | |
| 1 D 6 | Josh Pendleton | | | W | 1 | 10/08/15 | | Gibson | | |
| 1 D 6 | Tony Kirby | | | B | 1 | 10/05/15 | | Gibson | | |
| 1 D 7 | | | | B | | | | | | |
| RWHU | Charles Steed | | | W | City | 10/12/15 | | Lt Blackwell | | |
| RWHU | Eric Daniel | | | B | City | 10/12/15 | | Lt Blackwell | | |
| RWHU | Zechariah Myles | | | B | City | 10/09/15 | | Lt Loring | | |
| S M 1 | Dedrick Coolsknott | | | W | Medical | 9/14/15 | | Lt Blackwell | | |
| S M 2 | Denis Young | | | B | Discre | 10/09/15 | | Lt Combs | | |

RCL FORM # 205

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: _____

| CELL | NAME | DOC# | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 108 | Lawrence Hibbard | | | B | 7 | 10/1/15 | | Lt Gowins | | |
| 13 ? | Steven Alexander | | | B | 21 | 10/01/15 | | Lt Locker B | | |
| 1010 | Derill Franklin | | | B | 345 | 10/24/15 | | Lt Odell | | |
| 109 | Les Barker | 541-12 | D | W | 3 | 10/14/15 | | Lt Crosby | | 510 Lockdown |
| | R | | | | | | | | | |

RCC 245

RCC FORM #105

## RICHWOOD CORRECTIONAL CENTER
## ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-15-15

| CELL | NAME | DOC# | DORM | RACE | RULE# | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| DH1 | Demond Searles | | | 12 | Medical | 10-6-15 | | Lt. Devine | | |
| LDH2 | Antwan Skillern | | | 13 | 10 | 9-18-15 | | Lt. Hazeldell | | |
| LDH2 | Kandrih Caldwell | | | B | 1 | 9-24-15 | | Lt. Lorenq | | |
| LDH2 | Dominique Dukes | | | B | 3 | 10-1-15 | | Lt. Levine | | |
| LDH2 | Corey Phillips | | | B | 21 | 9-27-15 | | Lt. Levine | | |
| LDH3C | Jae'Rhon Cotton | | | B | | 10-3-15 | 10/15/15 | Lt. Loreng | Lt. Odwell | Moved to W4 |
| LDH4 | Jonathan Charles | | | B | 3 | 10-3-15 | 10/15/15 | Lt. Loreng | Lt. Odwell | Moved to W1 |
| LDH4 | Joshua Issac | | | B | 21 | 10-1-15 | | Lt. Levine | | |
| LDH4 | Darby Rainey | | | B | | | | | | |
| SHH1 | Patrick Charleston | | | 13 | Medical | 9-14-15 | | Lt. Hazeldell | | |
| SHH2 | Devin Young | | | B | Diversion | 10-9-15 | | Lt. Levine | | |
| SH7 | Isaac Coleman | | | 13 | | 10-12-15 | 10/15/15 | Lt. Hazeldell | Lt. Odwell | Moved to W6 |
| LDH8 | Damario Evans | | | 6 | | 10-12-15 | 10/15/15 | Lt. Hazeldell | Lt. Odwell | Moved to W6 |
| LDH8 | Justin Pendleton | | | 3 | 1 | 10-8-15 | | Lt. Lorenq | | |
| LDH9 | Corey Kirby | | | B | | 10-5-15 | | Ada Keep | | |
| LDH10 | Jacob Proctor | | | 13 | 1 | 10-8-15 | 10/15/15 | Lt. Loreng | Lt. Odwell | Moved to W1 |
| LDH5 | Earnest Stewards | | | B | 21 | 10-1-15 | | Lt. Levine | | |
| RH1C | Zachern Hyles | | | B | | | | | | |
| RH1C | Charles Steed | | | 13 | | | | | | |
| SH9C | Evan Liukala | | | B | Class | 10-12-15 | | Lt. Hazeldell | | |
| SHH1C | Venan White | | | B | | | 10/15/15 | Lt. Odwell | | dec |
| LDH3 | Robin Belton | | | B | | | 10-15-15 | Lt. Levine | | moved to week 4 |
| | | | | 13 | | | 10/15/15 | Lt. Odwell | | |

RCC 246

RCC FORM #106

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-15-15

| CELL | NAME | DOC# | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| LD#1 | Lawrence Hubbard | | | B | 1 | 10-1-15 | | Lt. Dupre | | |
| LD#2 | Steven Almonds | | | B | 21 | 10-3-15 | | Lt. Lowe/Lt. | | |
| LD#3 | Derrick Franklin | | | B | 8-5 | 10-24-15 | | Lt. Otwell | | |
| LD#4 | Joe Knucks | | | W | 2 | 10-14-15 | 10-12-12 | Otwell | Lt. Otwell | Moved to Dorm D |
| LD#5 | Bobby Hockumope | | | B | 1 | 10-15-15 | | Lt. Otwell | | |
| LD#7 | Fitzgerald Jones | | | B | | 10-15-15 | | Lt. Otwell | | |
| LD#8 | John Abrams | | | B | 1 | 10-15-15 | | Lt. Otwell | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

RCC 247

Suicide Prevention
#182   .
Page 1

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 182 | 8 |
| Chapter | Related Standards | |
| Suicide Prevention and Intervention | BJG IV-C-014 | |
| Subject | | |
| Suicide Prevention and Intervention | | |

## PURPOSE

To establish a formal policy and a written suicide prevention plan for Richwood Correctional Center (RCC) to manage offenders who display suicidal tendencies or behavior and to establish a formal procedure for staff and offender critical incident debriefing that covers the management of suicidal incidents. To provide guidelines at Richwood under which restraints are employed on offenders in an authorized and safe manner as part of a health care regimen.

## POLICY

It is the policy of RCC to have a written suicide prevention plan that is approved by the Medical Director, Health Care Authority, and reviewed by the Director of Mental Health. Management of self-destructive and suicidal offenders is conducted under the supervision and direction of a qualified medical person or a qualified mental health person so as to enhance each institution's ability to prevent suicides. It is the policy of RCC to have established procedures for the utilization of restraints for Mental Health purposes. It is critical that staff understand that the use of restraints mental health purposes is designed to control destructive and/or dangerously aggressive behaviors.

## PROCEDURE

### A.   SCREENING AND ASSESSMENT

1.   Initial screening of suicide risk will occur at all inter- and intra-system transfers at the time of admission by a mental health professional or by mental health trained personnel. ·

2.   If an offender is scheduled, transferred, and identified as a significant risk for suicide, RCC staff will review the Medical Transfer Summary and begin observation of the offender until a Mental Health Management Order can be started.

3.   While screening for potentially suicidal offenders is a routine



RCC 271

Suicide Prevention
#182
Page 2

function of medical personnel, a potential suicide may also be tentatively identified by other RCC direct care staff based on their interactions with and observations of offenders. If a Correctional Security Officer believes an offender is a potential suicide risk, that person must communicate this to their immediate supervisor. The supervisor will notify the Medical Department for additional screening. The responding clinician will request the Mental Health Behavioral Checklist RCC Form 199, (HC-38 Form A) which should be completed by the security supervisor. The RCC Form 199, (HC-38 Form A) serves as a tool to aid in determining suicide risk and should be completed each time a direct care staff reports a potential suicide risk. The original of RCC Form 199, (HC-38 Form A) shall be placed in the offender's mental health section of the medical record.

When clinically indicated, the medical personnel may request to examine parts of the offender's property, such as correspondence, to assess the offender's potential for self injury.

**B. MENTAL HEALTH MANAGEMENT ORDERS (STANDARD AND EXTREME)**

1. There are two levels of mental health management orders: standard and extreme. When an offender is identified as in need of watch precautions, on-site staff will maintain continuous observation of the offender until either standard or extreme watch is implemented. Standard watch is employed only for the management of offenders who are at risk for suicide who are not engaged in self destructive behaviors. Extreme watch is employed only for the management of offenders who have actively engaged in self-destructive behavior.

2. Whenever possible, suicide precautions will be instituted by a mental health professional. In the absence of mental health professionals, other treatment staff may implement a suicide watch, and an offender may be placed on watch by employees other than treatment staff (e.g., the Unit Head or designee). In all such instances, medical will be notified immediately, and the offender will be assessed at the earliest possible time.

3. The Mental Health Management Order (see attached HC-38 Form B) will be completed on each new watch and watch discontinuation. The order will describe which techniques are to be used for each individual. The management order will specify items permitted and not permitted while on this level of watch. Examples

RCC 272

Suicide Prevention
#182
Page 3

of such orders:" Paper Gown"; "Paper Sheet"; "Suicide Mattress";
"No Razor"; "Toothbrush controlled by C.S.O./Use of toothbrush
monitored"; "No pens, pencils, or sharp objects").

4. When standard issue clothing presents a risk, provisions are made
to supply the offender with a "paper gown no string" to promote
offender safety in a way that is designed to prevent humiliation and
degradation.

5. Once the Mental Health Management Order is completed and a
copy is given to the security officer(s) supervising the offender,
documented observation begins using attached RCC Form 434C
(HC-38 Form C) is initiated. Shift Lts, Captains, and Duty
Officers will be notified of the watch.

6. The shift Lt will be responsible for ensuring that an accurate log is
maintained. This form is a daily documentation of all offenders'
actions and behavior, including but not limited to sleep patterns,
meals, showers. Any unusual behavior or worsening of the offender's
condition shall be reported to a Medical/Mental Health Staff
immediately. The log is maintained in the Control Room where the
offender is on watch and shall be placed in the medical record upon
termination of the watch log. The log shall be made available to
medical or mental health personnel upon request.

7. An offender who has been placed on a standard suicide watch will be
evaluated by mental health (or other treatment staff in the absence of
mental health professionals) at a minimum of every 24 hours. RCC has
Medical/Mental health staff on call 24/hr. per day. Upon initiation of
extreme suicide watch and at no longer than 12 hour intervals
thereafter, the Medical Director or designee (qualified medical and
mental health professional) shall assess the medical and mental health
status of the offender to determine if modification or discontinuation
of the restraint is appropriate for medical or mental health reasons.

8. A suicide watch may be discontinued or down-graded only by a
Mental Health Staff or Physician.

9. For all watch settings, frequency of observation shall be included in
the management instructions and will vary from continual observation
to intervals of 15 minutes or less.

10. Behavior management on Extreme Watch involves the use of
medical restraints. Refer to HC Policy 29 entitled Utilization of
Restraints for Medical and Mental Health Management Orders and
EMP #02-01-030, Use of Restraints/Offender Control. Due to the

RCC 273

Suicide Prevention
#182
Page 4

risk of positional asphyxia, an offender should be restrained in a prone (face-down) position only when necessary. Further, after the restraints are applied, the offender should remain face-down only as long as necessary.

C.   **USE OF RESTRAINTS FOR MENTAL HEALTH MANAGEMENT ORDERS**

1.   Use of restraints from Mental Health Management orders is governed by HC-29, which stipulates as follows:

   a.   Authority for initial utilization of restraints must be given by the institution's Medical Director or designee, (qualified medical or mental health professional). The institution's Medical Director must also be notified of the offender's medical and mental health condition in order to determine whether on the basis of serious danger to self or others. Direct complete visual observation of the offender must be continuous until the initial medical/mental health assessment by the Medical Director or designee, (qualified medical or mental health professional is completed and should continue at no greater than fifteen minute intervals thereafter.

   b.   Types of restraints permitted:

   * Waist chain with side handcuffs;
   * soft restraints (vinyl, leather or cloth);
   * Body Sheet and protective helmet.
   * Prostraint Violent Prisoner Chair.

   c.   Extreme Watch suicide management orders require the authorization of a physician, in consultation with on-site mental health professional. The initial assessment and determination may be made by the Medical Director's designee (qualified medical or mental health professional). Such use must be subsequently approved in writing by the Medical Director. Following initiation, medical staff or a trained staff member (which may include a Correctional Security Officer certified in first-aid), shall examine the offender every two hours and Employee Policy Memorandum #03-02-001 Suicide Prevention and Post Suicide Management document the presence or absence of swelling and/or discoloration of extremities, the adequacy of blood circulation, and any other potential risk to the offender's health. Any abnormality should be reported

RCC 274

Suicide Prevention
#182
Page 5

immediately to appropriate medical or mental health staff.
Medical staff (physician, nurse, EMT or certified first
responders) should examine the offender at least every
twelve hours, observing for decreased blood circulation and
other potential risks to risks to the offender's health.
Release from restraint for toilet, sanitation, and
nourishment functions shall be arranged at intervals no
greater than two hours. Whenever the offender is released
for break, direct full body observation must be continuous
until placed back into restraints. The record should reflect
approximate consumption of solids and liquids and (this
activity should be documented on RCC Form 434-C (HC-
38 Form C). See Use of Restraint/Offender Control Policy
for release of restraint procedures.

d.      Once restraints are in place, visual observation must be
        made at least every fifteen minutes. Procedures for
        applying restraints must be in accordance with guidelines
        approved by the institution's Medical Director. Upon
        initiation and at no longer than twelve hour intervals
        thereafter, the Medical Director or designee, (qualified
        medical or mental health professional), shall assess the
        medical and mental health status of the offender.  Based on
        this assessment, the Medical Director or designee,
        (qualified medical or mental health professional), will
        determine if continuation, modification or discontinuation
        of restraint is appropriate for medical or mental health
        reasons.  A new physician's order is required whenever
        restraints are continued or require upgrading.

e.      An Extreme Watch should be stepped down to a Standard
        Watch for a length of time sufficient to assess the
        offender's stability, then utilization of the case consultation
        committee  prior to removing the offender from a suicide
        management order.  A suicide watch may be discontinued
        or down graded only by a mental health professional or
        attending physician in consultation with the Medical
        Director or designee, (qualified medical or mental health
        professional).  Notification of watch discontinuance or
        downgrade shall be sent to the Medical Director.  Prior to
        releasing an offender from any suicide watch, the security
        staff assigned to the offender's housing area shall be
        notified.

f.      When restraints are used for other than medical reasons
        they are not to be initiated by medical staff.

Suicide Prevention
#182
Page 6

    g.    After a suicide watch or Mental Health Management Order has been discontinued, a follow-up contact with the offender by a mental health professional will be conducted within 7 days to assess the offender's current mental status and suicide intent.

### D.    SUICIDE ATTEMPT

    1.    Duties of the first officer on the scene:

- Notify other staff (call for help, utilize radio, etc.);
- Get the victim down if hanging (using C-spine stabilization) (IMMEDIATE ACTION IS REQUIRED! SECONDS MAY SAVE A LIFE!!). *Policy permits single officer cell entry to save a life; Initiate first aid (control bleed, begin CPR, etc.).

    2.    Second officer on the scene:

- Request ambulance or medical assistance;
- Assist with first aid and CPR as necessary;
- Maintain security and preserve scene as much as possible;
- Assist with evacuation of offender.

    3.    Duties of the Security Supervisor:

- Insure that ambulance or medical response team has been called;
- Supervise and assist with first aid/CPR, as necessary, until medical assistance arrives or until evacuation to a medical area occurs;
- Insure that staff cooperates with medical team's speedy entry of area and evacuation of victim.
- Insure that scene is preserved as much as possible;
- Notify unit manager/duty officer, institution's investigator, and mental health treatment staff so that the supervisor then can focus his full attention on the suicide incident. The unit manager/duty officer is then to be responsible for notifying other appropriate institutional personnel.

    4.    Duties of the EMT's, Paramedics, or Medical Response Team:

- Initiate advanced life support care, resuscitation, or other necessary life recovery treatment commensurate with their

Suicide Prevention
#182
Page 7

training level):

- Transport victim to the appropriate medical facility.

5. Equipment:

An Emergency/Suicide Kit is kept in Main Control. The shift Captains are responsible for proper maintenance of the equipment in the emergency medical kit. Once the seal is broken it is routed to the Director of Nursing along with a UOR stating what has been removed from the kit. The seal on these Suicide Prevention Supply Kits should rarely be broken and then only for the purpose for which it was intended. The kit will contain the following items:

a. Airway protection device
b. Non-sterile protective gloves
c. Bite block
d. Gauze
e. Pocket mask for rescue breathing
f. Large Paramedic shears
g. Bandage scissors
h. Blood stopper compression bandages
i. Small dressing (4x4)
j. Tape

*Hoffman Medical Rescue tool kept in the Key room

6. If death occurs, the Health Authority will request that an autopsy be performed.

E. **POST SUICIDE INCIDENT**

1. After significant attempt or a completed suicide, RCC will access the situation and consider intensifying efforts to increase observation in high risk areas.

2. The investigation team will interview witnesses, associates of the victim, and staff members in an effort to determine if any recent events in the victim's life may have served as a "trigger" to motivate the suicide. The team will also physically reenact the event to determine if structural or procedural changes could prevent reoccurrences. A report will be prepared by the investigative team and forwarded to the Unit Head.

3. The Unit Head or designee must report all attempts or completed suicides in accordance with Department Regulation C-05-001.

RCC 277

Suicide Prevention
#182
Page 8

4. For the purposes of outcome measures operational definitions for suicide attempt and suicide gesture is as follows: A suicide attempt will be defined as any self injurious behavior which could have resulted in death if no intervention occurred and/or an injury severe enough to do significant self harm. A suicide gesture will be defined as any self injurious behavior which would not have resulted in death if no intervention occurred. If no self-injurious behavior occurred, the behavior is neither an attempt nor a gesture.

5. An in-depth post suicide investigation will be conducted following a completed suicide. The suicide investigative team will consist of a Mental Health staff member, an Institutional Correctional Investigator, the security supervisor from the area where the suicide occurred; and a medical staff member (physician, registered nurse, or paramedic).

6. Critical Incident Stress Management debriefing will be afforded to offenders and staff following a critical incident.

## H. TRAINING

1. All staff with the responsibility for offender supervision is trained on an annual basis in the implementation of suicide prevention and intervention. Training will include but is not limited to:

    - Identifying the warning signs and symptoms of impending suicidal behavior.
    - Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors.
    - Responding to suicidal and depressed offenders.
    - Communication between correctional and health care personnel.
    - Referral procedures.
    - Housing observation and suicide watch level procedures
    - Follow-up monitoring of offenders who make a suicide attempt.

2. In addition to regular yearly training, the clinical staff at each institution is encouraged to seek ongoing continuing education specific to suicide prevention.

_____
WARDEN

Ralph Olan Ph.D. Ncc, LPe, LAC

3-5-14
DATE

RCC 278

FEB-03-1996  23:47                                                    P.01/01

DWCC Form #416 (Revised 10/2001)

Department of Public Safety & Corrections
David Wade Correctional Center/FWCC

## Restraint Chair Medical Review

## Physical Examination (every 12 hours)

Name: _____   DOC #: _____   Date: _____

| | |
|---|---|
| **Vital Signs:** | BP _____   Pulse _____   Temp. _____   Respiration _____ |

Urine dipstick (every 24 hours) _____

Chest (are breath sounds equal and clear)?  • •Yes  • •No   If no, _____

CV (regular rate and rhythm):  • •Yes  • •No   If no, _____

Abdomen (are bowel sounds present?)  • •Yes  • •No   If no, _____

**Extremities**   (Absence of edema or cyanosis?) • •Yes  • •No   If no, _____

(Pulses present distal to restraints?)  • •Yes  • •No   If no, _____

Intake Reported (every 12 hours)
(Has eaten?)      • •Yes  • •No   (circle # of meals)      1      2      3      blue only
(Has taken fluids?)   • •Yes  • •No   If no, _____

## Mental Status Examination (every 12 hours)

**Orientation**      • •Time      • •Place      • •Person      • •Situation

Oriented times (circle the # of correct responses)      1      2      3      4

**Appearance** – Level of Consciousness      • •Attentive      • •Responsive      • •Eye Contact

**Cooperation**      • •Cooperative      • •Defiant

**Hallucinations**      Hallucinations      • •Yes      • •No
Type Hallucination      • •Auditory      • •Visual
Command Type      • •Self Harm      • •Harm-others
Can the inmate control the commands      • •Yes      • •No

**Thoughts**      • •Suicidal      • •Homicidal      • •Fearful      • •Delusional

**Speech**      • •Fluent      • •Confusing

**Affect**      • •Normal      • •Cheerful      • •Depressed      • •Angry      • •Anxious

Additional Notes: _____
_____
_____

re:   Medical Director
      Mental Health Director          _____
      Wardens                        Nurses Signature/Date/Time
      Inmate's Record

FEB-03-1996  23:33
(ILAD-HUZUI-USU, HUJ-UJ-UU1, HU-UZ-UUU)

**WATCH LOG SHEET**

P.16/16

ATE NAME:_____ DOC#: _____ DATE:_____

:LE ONE: EXTREME/STANDARD/MENTAL HEALTH OBSERVATION/OTHER _____
ord the time of the observation, check (x) the behavior you observe, or write in the appropriate space the
wior you observe and sign.

| Time | Acting Out (tracking down, yelling, throwing things, flooding cell, etc.) | Sleeping | Using the bathroom | Talking to others | Laughing or crying to self. | Self-stimulating (rocking, mutilation, masturbating, talking to self, singing) | Liquids offered | Other: Sitting or lying on bed, standing, etc... (please write in any other activity deemed necessary) | Officer's Signature |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Record % of Solids & Liquids Consumed

Breakfast_____ Time:_____ Lunch____ Time:_____ Dinner____ Time:_____ Time of Shower_____
Original: Mental Health
Copies: Security

RCC 280

FEB-03-1996  23:32
(EMP #03-02-008)

P.14/16

## MENTAL HEALTH BEHAVIORAL CHECKLIST

Name:_____ DOC#:_____ Date:_____ Time:_____

Location of Observation: _____

**Yes**          **Comment**

*1.    Self Destructive Act          _____

*2.    Suicide Ideation              _____

3.    Critical Changes in Situation  _____

4.    Depressed                      _____

5.    Mood Changes                   _____

6.    Agitated                       _____

7.    Hostile                        _____

8.    Insomnia/Hypersomnia           _____

*9.    Gives Away Property           _____

*10.   Bizarre Behavior              _____

11.   Homicidal Ideation             _____

12.   Other                          _____

*If any of these items with the asterix are checked, suicide precautions should be initiated.

Mental Health Notified:_____

Name                                              Date/Time

Action Taken: _____

Supervisor's Signature: _____ Date/Time: _____

Reporting Officer: _____ Date/Time: _____

**Definitions:**

1.    Self destructive acts - cuts self, hangs, make noose, bashes head against wall.
2.    Suicidal ideation - talks of suicide, indirectly talks of suicide (the world would be a better place without me).
3.    Critical changes - death of a loved one, major change in health status, change in loved one's health, change in marital or significant relationship, additional sentence, appeal denied, dropped from IMPACT or other special program.
4.    Depression - cries, emotionally flat, apathetic, withdrawn, uncommunicative, verbalize hopelessness worthlessness moves/speaks slowly, difficulty carrying out routine tasks.
5.    Mood changes - severe changes in mood from sad to happy or happy to sad.
6.    Agitation - offender begins pacing, has excessive body movements or excessive speech.
7.    Hostility - out of character hostility, offender normally cooperative becomes hostile.
8.    Insomnia/hypersomnia - sleeps too little or too much (not one sleepless night or one period of sleeping too much.
9.    Gives away personal possessions - pays debts, says goodbye to friends.
10.   Bizarre behavior - speaks in a nonsensical manner, expresses bizarre ideas, inattentive to surroundings (appears to be attending to only his/her own thoughts, appears "lost"), rapid speaking with overflow of ideas, talks to self, appears to be hallucinating.
11.   Homicidal ideation - talks to homicide; indirectly talks of homicide; threatens to hurt or kill someone.
12.   Other - any observation that reporter feels significant; describe briefly.

Copies: Medical Records, Security

Revised 8/1/02

RCC 281

FEB-03-1996 23:33

P.15/16

Form HC-38-B
01 August 2002

## MENTAL HEALTH MANAGEMENT ORDER

Name:_____ DOC#:_____ Location:_____

Begin _____     Check One: ☐   Standard

Discontinue _____                ☐   Extreme
                                                    ☐   Other _____

Continue _____

Change to _____

Management instructions:_____

_____

Housing:_____     Able to be doubled? ☐ Yes    ☐ No

Property:_____

_____

_____

Observation frequency:_____

Other:_____

_____

Date and time examined:_____

Date and time of order:_____

Ordered by:_____
            Signature                    Title

If an extreme mental health management is ordered a physician signature is required.

Verbal order received by:_____ Date/Time:_____

Any changes requires a new Mental Health Management Order

Copy: Original to Mental Health
      Medical Records
      Security

RCC 282







Warden  Hanson
Warden  Turner
Warden  Aultman
Major  Tubbs
Captain  Coleman
Captain  Farmer
Shift  Lts.
Shift  Sgt
Cpl's
C/o 's



A.T. Hardwell          D. Tram          Cpl Dewey
Sgt Williams          10-13-15          main cutrol
LSt 10-15 Trevis Adams  back in w/ Prem trin
455 1097 Church
713 Clo Blackmon back on Clp ots van 14
    from wlt
720 CP 1 Good joint off P Clp 10-15x1RF Lashion ch.ll.o.s
    enroute PPPC van 14
725 NC8 Conducts rounds A Hall Lockdown
730 CPl McMillan offClp ot3 enroute to North
    Monroe Health van 28
754 Ranger rounds Lockdown
609 MPP 573 on Clp 10-15x1RF
714 Cpl Good joint back on Clp ot3 from
    PPDC
817 Cpl Dawkins, Cpl Johnson back on Clp
    ot3
818 Cpl McMillan back on Clp ot3
821 MPD 519 off Clp ot3
821 NCC, LT Loving RC4 enters main
832 RC4, Lt loving NCU exits main
851 Captain Douglas have book

EXHIBIT
16
RCC 427

Main Control

LT Hardwell          D-Team          CPL Dodd

Sgt Williams          10-13-15          main Con

600 LCPL Dooley relieved Vineyard OF main
Control, she has left necessary equipment

3 stacked   I have read and understood my post
Count 46   orders and duties. Count as shown when
and 47   I arrived. The 965 DOC 915 C.74 49 lts
Quinton Houston
Trevis Adams   41=98 42=98 43=91 44=66 45=94
46=87 47=44 LD=23 Blk=1 fm 14=99
B=52 C=105 D=104 LD8= LD9= LD10=
608 NCT advised main to call AMR
608 10.98 Chow
610 CLO Curkey rounds 41 and c4
4:30 CPL Curkey, phillip on CLP 10-10x5 from
Rivers
635 CPL Eaton, CPL Kelly back on CLP 10-154
From Court Trevis Adams
621 ute entry — AMR & CLO serman off CLP 10-15X1 BM
king white   enroute to U.H.
629 CLO Blackman off CLP 0x5 enroute to
U.H. following AMR van 14
642 NCT rounds & CT LP
647 CT Clear The 970 DOC 920 C.74 49 /fm
41=98 42=96 43=91 44=66 45=94
46=87 47=44 LD=23 Blk=1 fm
SMender
A=99 B=52 C=105 D=104 LD8=1 LD9=1
LD10=1

RCC 428

Main Control

| LT. Loving | Vinyard / Hatfield | 6A Cop |
| Sgt Rosenthal | 10-13-15 | B-Team |

545 Roll call

Ver. I & Vinyard + & Hatfield have wait
and understand the duties of our post.
Received all verbal information &
logged equipment + verbal information
from CPL Dooley

Ver. Verified count & booking
1-99            A-99            THC-474
2-97            B-52            DOC-933
3-91            C-105           City-52
4-66            D-104
5-94            8M/6D-7
6-88
7-46
70-26

6400 114 pill call
1045 113 pill call
1700 MPD on compound for pick up)
1704 MPD black van off compound w/(7)
      trustee
1750 Kds md A/S 46
830 CPL Elisava, Cinky, Phillips + Hernandez
      enter CU for dorm inspection

RCC 429.

| | | |
|---|---|---|
| 1T. Loring | Vinyard | CALep |
| Sgt Rosenthal | 10-13-15 | B-Team |

0845 US pill call

0808 all the above enter US along
      W RC 7

0814 enter U2 on inspection

0840 U6 pill call

0850 CC6 md idk in SH

0852 CPl Phillips + Elisaia ept w/ 1 enroute
      to Conway Donnel Felon

0900 yard call for 5+6 over @ 0955
                     1+2 over @ 1012

0915 md idk in US

0920 Lt. Loring enroute through front door
      with (1) Emmanuel Burrer #25
      THC-973  DOC-921  Cty-52

0921 mpd on cp 1015 1k BM off @ 0950
      THC-974  DOC-921  City-53  Jakion Bryant

0940 idk in U4

0945 10-97 lockdown chow

100 Sgt Turner enter main control for
     legal mail

1041 U6 chow

1102 10-15 (1) Devin Young from SM 1 to
      SM2

LT. Loring          Vinyard        Left lep
Sgt Rosenthal       10-13-15       B-Team

125 Court cleared
1-98          A-99        THC=974
2-97          B-52        DOC=921
3-91          C-105       City=53
4-66          D-104       Booking=8
5-94          SA/D-7
6-88
7-47
8-24
1145 OKSO on compound for pick ups
Valante Rutland U1 ↓ 46
10-15 (1) Donta Woods from RWHC
to booting for release   THC-972  DOC-921  City-51
1208 U1 chow
1220 U5 Chow
1238 U2 chow
    CH & Elzina & James eat w/ d James
    Cooper enroute to Medical lab
1240 10-15 (1) Michael Dennie from U2 ↓ 96
    to booking for release through front door
    THC 9910  DOC 920  City-51
1250 U3 Chow
1322 U4 Chow

RCC 431

LT. Loring          Vinyard          6A6P
Sgt. Rosenthal      10-3-15          B-Team

1338  CPL Nickee off compound w/ Richard
      Steadman from U7 & 45  THC-970
                                 DOC-920
                                 City-50

1335  10-98 on chow
      10-15(1) Darryle Winley from U1 ↓97
      to 40#4
1346  U4 pill call
1350  U3 pill call
1404  U2 pill call
1406  MPD #2214 on compound w/(7)
      city trustee off @ 1410
1420  U6 pill call
      diabetics call
1440  yard call 3↓# over @ 1540
1500  Malachi Dad call out
      U6 chow
1505  Warden Hanson enter main control
      CPL Phillips + Curley exit w/ 5 enroute
      to Riverbend
      1. Charles Irvin     THC-965
      2. Larry Cheatteam   DOC-915
      3. Roderick Poindexter  City-50
      4. Donald Clark

Lt. Loving          Vinyard          6A-6P
Sgt Rosenthal       10-13-15         B-Team

520  verified count w/ booking
605  count cleared
     1-97          A-99          THC - 965
     2-97          B-52          DOC - 915
     3-91          C-105         City - 50
     4-66          D-104
     5-94          5%D-4
     6-87
     7-45
     8-24

Unit #1 7hr (p. chow)
1630  10-15 (1) Robert Mitchell from U7 to booking for release
1640  U2 Chow
1645  MPD on compound w/ 1 female off @ 1708
      Ja'Shune Williams    THC - 965
                           DOC - 915
                           City - 49   1 female
1655  U1 pill call
1715  10-15 (1) Germany Singleton U2 98
      10-15 (1) Jessie Pocca U1 98
1720  U7 Chow
1730  10-98 on Chow
      Lt. Vinyard have completed my Shift

RCC 433



Booking Log

| | | | |
|---|---|---|---|
| | Lt. Hardwell | D-team | Co wc |
| | Sgt. Williams | 4pm team | B/wk |

| | | |
|---|---|---|
| 4pm | I, C/o Watson relieved CPL Staels | |
| at 2 | & received 1 keys (1) radio (1) logbook | |
| 6:25pm | AMR O/c OX | |
| 6:30pm | AMR 4/c N (Vernon White) to | |
| | LSU medical O/of LD" | |
| 10:34pm | CPL Phillips / CPL Curely O/c SIS New | |
| | TICs | |
| | | |
| 6:55pm | CPL Kelly / CPL Eaton O/c IX 72cm | |
| | Jefferson (10) | |
| 7:25pm | CPL Goodiount OF/c IX B/F to BPSO | |
| | N/F (Lashune Williams) | |
| 7:27pm | CPL Goodbury | |
| 8:07pm | MPD (5A) O/c IX B/F | |
| 8:20pm | MPD (519) OF/c OX | |

RCC 434

| Time | Entry |
|---|---|
| | LT Hancock   LT Kian   CO Watson |
| | Sgt Williams   6pm·6am   Booking |
| 6pm | I CO Watson relieved CPL Starks |
| 6:12 | I recieved (7) keys (1) Radio (1) logbook |
| 6:25pm | AME O/C DX |
| 6:30pm | AME OP/C 1x (Vernon White) to LSU medical O/of LST |
| 6:31pm | CPL Phillips / CPL Curely O/c 5/8 NEW DOCS |
| 6:36pm | CPL Kelly / CPL Eaton O/c 1x from Jefferson (10) |
| 7:25pm | CPL Goodjoint OP/c 1x B/F to RPSO. N/R (Lashune Williams) |
| 7:33pm | CPL Goodjoint |
| 8:09pm | mPD (519) /c 1x B/F |
| 8:20pm | mPD (519) OP/c DX |
| 9:02pm | OPSO O/c DX |
| 9:04pm | OPSO OP/c 1x B/m (Erie Monroe) |

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 165 | 1 |
| Chapter | Related Standards | |
| Health Screening Upon Intake | BJG IV-C-006 | |
| Subject | | |
| · Intake Screening Process (PREA) | | |

## PURPOSE

To state the Warden's policy regarding Medical Intake for DOC Offenders at Richwood Correctional Center.

## POLICY

It is the policy of Richwood Correctional Center that all offenders upon arrival at Richwood Correctional Center be seen by the on duty nurse to complete an initial screening pursuant to the (PREA Screening Checklist Form, Medical Intake Screening Form, & Medical Intake Summary Form).

_____
Warden

3-5-14
Date



RCC 270

RICHWOOD CORRECTIONAL CENTER
EMPLOYEE VERBAL COUNSELING DOCUMENTATION FORM

Gerald Hardwell
**EMPLOYEE (TITLE OR RANK)**

8/3/2011
DATE

D Team
**JOB ASSIGNMENT /TEAM**

Approx 4:30am
TIME

Lt hardy
**SUPERVISOR (TITLE & RANK)**

**The above employee was verbally counseled on the above date and time due to: (Be Specific)**
on 8-2-2011 you C/O Hardwell failed to report a violation of employee rule and diciplinary procedures in
which force was used on a monror city inmate

**Summary and/or results of the counseling sessions:**
   when use of force occcures ensure supervisors are informed and all paper work completed before end
of shift   and the inportance of all the proper paper work  completed  to ensure all parties involved are
protected

**EMPLOYEE SIGNATURE**

$8 / 0 / 11$
**DATE**

**SUPERVISOR SIGNATURE**

___/ . /___
**DATE**

EXHIBIT
/

RCC/HARDWELL 95

Louisiana Department of Public Safety and Corrections

**QUEST FOR ADMINISTRATIVE HEARING**

| | |
|---|---|
| **D**<br>**R**<br>**I**<br>**V**<br>**E**<br>**R** | Driver _Hardwell_ (Last) _Gerald_ (First) _D_ (M.I.)   Race _B_ Sex _M_ DOB. ▮▮▮ Tel. ▮ (State) La<br><br>Address _1703 Hoover Ave_   City _Bastrop_   State _La_ Zip _71220_<br><br>Arrested in _Franklin_   Parish on the _13th_ day of _September_ _2015_ at _04:12_ a.m. |

| | |
|---|---|
| **T**<br>**E**<br>**S**<br>**T** | ☐ Refused Chemical Test   ☑ Submitted to Chemical Test – Results _.109_ % Instrument # _SN 68-013204_<br>☐ Breath        ☑ Breath     Operator's: Name/Agency _K Robbins_   Permit # _2369_<br>☐ Blood        ☐ Blood ·<br>☐ Urine        ☐ Urine     Test Results Pending at _____ Drawn by _____<br>☐ Operating Commercial Vehicle ☐ Hauling Hazardous Material ☐ Fatality ☐ Serious Bodily Injury ☐ Passenger 12 or under in vehicle |

| | |
|---|---|
| **L**<br>**I**<br>**C**<br>**E**<br>**N**<br>**S**<br>**E** | **RECEIPT FOR LICENSE and/or TEMPORARY LICENSE**<br><br>LICENSE SURRENDERED _✓_ YES ___ NO       CLASS _E_ ENDORSEMENTS _____<br>_✓_ TEMPORARY D.L. ISSUED       ___ TEMPORARY D.L. NOT ISSUED  REASON ___ UNDER SUSPENSION<br>(Temporary D.L. valid for 30 days only)       ___ NO D.L. IN POSSESSION ___ D.L. EXPIRED  OTHER _____<br>                                         ···none |

| | |
|---|---|
| **W**<br>**I**<br>**T**<br>**N**<br>**E**<br>**S**<br>**S** | Name and agency of law enforcement officers involved in the traffic stop, detention, investigation, and arrest:<br><br>_Joshua Dom_    _28_    _FPSO_<br>Name       Badge #     Agency     Name       Badge #     Agency<br><br>Name       Badge #     Agency     Name       Badge #     Agency |

I have been furnished with a copy of the official notice of withdrawal of driving privileges, and with the name and agency of all officers involved in the stop, detention, investigation and arrest. SIGNATURE _____

The above listed person either refused or was unable to sign form.  OFFICER SIGNATURE _____

## REQUESTING AN ADMINISTRATIVE HEARING

You are entitled to an administrative hearing where you may present facts or evidence on your behalf. REQUEST FOR THE HEARING MUST BE MADE IN WRITING POSTMARKED OR RECEIVED AT THE OFFICE OF MOTOR VEHICLES WITHIN 30 CALENDAR DAYS FROM THE DATE OF YOUR ARREST. If you fail to request such a hearing within the time specified above the suspension can be enforced.
(A hearing is not for the purpose of obtaining a hardship license.)
The scope of the hearing shall cover:

(1) Whether a law enforcement officer had reasonable grounds to believe the person, regardless of age, had been driving or was in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages and/or any abused or illegal controlled dangerous substance as set forth in R.S. 40:964.

(2) Whether the person was placed under arrest.

(3) Whether he was warned by the officer(s) of the consequences of his submission to or refusal of the chemical test and whether he was advised of his constitutional rights.

(4) Whether he voluntarily submitted to an approved chemical test and whether the test resulted in a blood alcohol reading of 0.08 percent or above by weight, or 0.02 percent or above if he was under the age of twenty-one years on the date of the test.

(5) Whether he refused to submit to the test upon the request of the officer.

(6) Such additional matters as may relate to the reasonableness of a suspension of the license.

If you want witnesses subpoenaed to appear at the hearing, payment for each witness must be sent with the request for hearing. Payment must be made by a certified check, money order, or a check on an attorney's account in the amount indicated below. You must send a separate check or money order made payable to the order of each witness you want subpoenaed. NO PERSONAL CHECKS ACCEPTED.

(7) Subpoena fee for each witness (non-law enforcement officer) is.................................... $15.00
Note: R.S. 32:668 (A) states **no law enforcement officer shall be compelled by such person to appear or testify at such hearing.**

ALTHOUGH AN ATTORNEY IS NOT REQUIRED, YOU MAY BE REPRESENTED BY AN ATTORNEY AT THE HEARING AT YOUR OWN EXPENSE. (Complete the reverse side if you wish to request a hearing)

REQUEST FOR ADMINISTRATIVE HEARING     (VIOLATOR COPY)



EXHIBIT
2

RCC/HARDWELL 40

<u>ON THE JOB TRAINING PROGRAM CHECKLIST</u>

NAME: Gerald Hardwell ASSIGNED: 6-8-10 DATE 6-13-10

OJT OFFICER Sgt. Reginald Williams

**THE ABOVE NAMED OFFICER HAS COMPLETED THE BELOW LISTED TASK SUCCESSFULLY:**

**1. COUNT PROCEDURES:**
Major count periods explained;                Supv. Initial ___ Emp.Initial ___
Major count conducted with
OJT                                            Supv.Initial ___ Emp.Initial ___
Unofficial count explained                    Supv.Initial ___ Emp.Initial ___
Unofficial count conducted                    Supv.Initial ___ Emp. Initial ___
Freeze count explained                        Supv.Initial ___ Emp.Initial ___
Emergency count explained                     Supv.Initial ___ Emp.Initial ___
Roll Call count explained                     Supv.Initial ___ Emp.Initial ___
Bed Count(See Flesh)                          Supv.Initial ___ Emp.Initial ___

**2. RADIO PROCEDURES:**
Proper use of radio                           Supv.Initial ___ Emp.Initial ___
10 Codes explained                            Supv.Initial ___ Emp.Initial ___
Caution to radio abuse                        Supv.Initial ___ Emp.Initial ___

**3. CENTRAL CONTROL PURPOSE:**
Observation cameras explained                 Supv.Initial ___ Emp. Initial ___
Central control count procedures              Supv.Initial ___ Emp.Initial ___
Movement sheets                               Supv.Initial ___ Emp.Initial ___
DB court sheets                               Supv.Initial ___ Emp.Initial ___
Transportation logs                           Supv.Initial ___ Emp.Initial ___
Forms for inmates                             Supv.Initial ___ Emp.Initial ___
Mail and Money Orders                         Supv.Initial ___ Emp.Initial ___
Key control for facility                      Supv.Initial ___ Emp.Initial ___
Telephone/Televisions                         Supv.Initial ___ Emp.Initial ___
Vehicle/Radio traffic                         Supv.Initial ___ Emp.Initial ___
Suicide cell monitoring                       Supv.Initial ___ Emp.Initial ___
Observation of Unit 1 & Unit 2                Supv.Initial ___ Emp.Initial ___
Observation Of Unit 3,5,& 6                   Supv.Initial ___ Emp.Initial ___
Observation Of Unit 4(MPD)                    Supv.Initial ___ Emp.Initial ___

**4. CHEMICAL CONTROL:**
Chemicals use and monitoring                  Supv.Initial ___ Emp.Initial ___
Inventory of chemicals/purpose                Supv.Initial ___ Emp.Initial ___
Chemical agents/usage                         Supv.Initial ___ Emp.Initial ___
MSDS Books/Locations                          Supv.Initial ___ Emp.Initial ___



EXHIBIT
3

RCC/HARDWELL 23

## ON-THE-JOB TRAINING CHECKLIST
## PAGE 2

**5. DORMITORY LOGBOOKS:**
Log Book purpose                Supv.Initial ____ / Emp.Initial ____
Equipment logging               Supv.Initial ____ / Emp.Initial ____
Dormitory activities            Supv.Initial ____ / Emp.Initial ____
Inmate movement                 Supv.Initial ____ / Emp.Initial ____
Date/Time/Signature             Supv.Initial ____ / Emp.Initial ____

**6. USE OF RESTRAINTS:**
Purpose of restraining devices  Supv.Initial ____ / Emp.Initial ____
Leg Irons                       Supv.Initial ____ / Emp.Initial ____
Waist Chain                     Supv.Initial ____ / Emp.Initial ____
NOTE: ONLY SERGEANTS AND LIEUTENANTS ARE ALLOWED TO
CARRY HANDCUFFS AND KEYS.

**7. KEY CONTROL**
Security of keys/possession     Supv.Initial ____ / Emp.Initial ____
Key usage and issue             Supv.Initial ____ / Emp.Initial ____
Key control box                 Supv.Initial ____ / Emp.Initial ____
Logging key rings/number of     Supv.Initial ____ / Emp.Initial ____
Officer to Officer passing of   Supv.Initial ____ / Emp.Initial ____

**8. INVENTORY OF PROPERTY**
Purpose of property inventory   Supv.Initial ____ / Emp.Initial ____
Security of property            Supv.Initial ____ / Emp.Initial ____
Inmate property inventory sheets Supv.Initial ____ / Emp.Initial ____
Verification of signatures      Supv.Initial ____ / Emp.Initial ____

**9. UNUSUAL OCCURRENCE REPORTS:**
Purpose of                      Supv.Initial ____ / Emp.Initial ____
Checking proper block           Supv.Initial ____ / Emp.Initial ____
Complete Description of incident Supv.Initial ____ / Emp.Initial ____
How To Report Information       Supv.Initial ____ / Emp.Initial ____
Sign/Date                       Supv.Initial ____ / Emp.Initial ____

RCC/HARDWELL 24

## ON-THE-JOB TRAINING PROGRAM CHECKLIST
### PAGE 3

**10. FORM USAGE:**

| | |
|---|---|
| Types of forms | Supv.Initial _____ / Emp.Initial _____ |
| Chemicals inventory form | Supv.Initial _____ / Emp.Initial _____ |
| Tool Inventory forms | Supv.Initial _____ / Emp.Initial _____ |
| UOR'S forms | Supv.Initial _____ / Emp.Initial _____ |
| Disciplinary reports | Supv.Initial _____ / Emp.Initial _____ |
| Accident reports | Supv.Initial _____ / Emp.Initial _____ |
| Employee Write Ups Form | Supv.Initial _____ / Emp.Initial _____ |
| Suicide watch forms | Supv.Initial _____ / Emp.Initial _____ |
| Shakedown forms | Supv.Initial _____ / Emp.Initial _____ |
| Inmate request forms | Supv.Initial _____ / Emp.Initial _____ |
| Inmate's ARP (Grievance) form | Supv.Initial _____ / Emp.Initial _____ |
| Others | Supv.Initial _____ / Emp.Initial _____ |

**11. DISCIPLINARY REPORTS:**

| | |
|---|---|
| Purpose and use | Supv.Initial _____ / Emp.Initial _____ |
| Name, Number,Location, Date/Time | Supv.Initial _____ / Emp.Initial _____ |
| Proper rule number | Supv.Initial _____ / Emp.Initial _____ |
| Description of violation's | Supv.Initial _____ / Emp.Initial _____ |
| Signature | Supv.Initial _____ / Emp.Initial _____ |
| DB court results | Supv.Initial _____ / Emp.Initial _____ |

**12. HOUSEKEEPING PROCEDURES:**

| | |
|---|---|
| Assignment of offenders | Supv.Initial _____ / Emp.Initial _____ |
| Area of assignment | Supv.Initial _____ / Emp.Initial _____ |
| Inspection of areas | Supv.Initial _____ / Emp.Initial _____ |

**13. ROLL CALL PROCEDURES AND DRESS CODE:**

| | |
|---|---|
| Reporting on time | Supv.Initial _____ / Emp.Initial _____ |
| Properly dressed | Supv.Initial _____ / Emp.Initial _____ |
| Listening to all information | Supv.Initial _____ / Emp.Initial _____ |
| Signing appropriate documents | Supv.Initial _____ / Emp.Initial _____ |
| Signing of Time sheet/OT sheets | Supv.Initial _____ / Emp.Initial _____ |
| Questions information to clarify | Supv.Initial _____ / Emp.Initial _____ |

At the end of an officer's OJT, the supervisor shall complete an evaluation of the officer's attention to the areas listed and as to his/her potential as a officer at this facility.

The Supervisor shall pay close attention to each area and promote more training in areas felt that can be improved. The space below is for supervisor's comments:

_____

_____

_____

_____

_____

_____

_____

Supervisor Signature                    Trainee Signature

SUPERVISORS ARE TO TURN IN DOCUMENTATION TO THE ASSISTANT WARDEN'S OFFICE FOR PLACEMENT IN THE OFFICER'S PERSONNEL RECORDS.

RCC/HARDWELL 26

Richwood Correctional Center

# Training Attendance

## SUICIDE TRAINING FORM
## SUICIDE WATCH – POLICY #182

Date:   January 30, 2013

| PRINT NAME | SIGNATURE |
|---|---|
| Myra Russ | Myra Russ |
| Kawla Blossom | Kawla Blossom |
| Fred Fulton | Fred Fulton |
| Michael Coleman | |
| Benny Kerry | Benny Kerry |
| Willie Chapman | Willie Chap |
| Jamarcus Montgomery | Jamarcus Montgomery |
| Steve Hunter | |
| Tyrone Coleman | |
| Garrcia Hitchnell | |
| Stanton Johnson | Stanton Johnson |
| Reginald Williams | Reginald Williams |
| Johnny James | Johnny James |
| Michael Tortum | Michael |
| Rodney Cuff | |
| Erika Williams | Erika Wil |
| Wilbur Dale Hayes | Wilbur Dale Hayes |
| Joey Kedley | |
| Christopher Loring | x |
| Tommy Farmer | x | Tommy Farm |

EXHIBIT

RCC/HARDWELL 15

Richwood Correctional Center

# Training Attendance

Date: 02/11/2015

Team/Department: D-TEAM / SECURITY

| PRINT NAME | SIGNATURE |
|---|---|
| Vickey -Johnson | Vickey Johnson |
| Tommy Reed | Tommy Reed |
| Shaun Phillips | Shaun Phillips |
| Dennis Navarro | Dennis Navarro |
| Jody Foster | Jody Foster |
| David McMillan | David McMillan |
| *Tray Stafon | Tray Stafon |
| Tiffany Hall | Tiffany Hall |
| Marion Goodpoint | Marion Goodpoint |
| Barbara Dooley | Barbara Dooley |
| Rhonda Rey. | Rhonda Rey |
| Yolanda Jackson | Yolanda Jackson |
| Quellus Mardwell | Quellus Mardwell |
| Reginald Williams | Reginald Williams |
| Jammy Kunner | Jammy Kunner |
| Shundarrius Ballard | Shundarrius Ballard |
| Antoine Jackson | Antoine Jackson |

Instructor: Asst. Warden A-Jodio Turner

Prison Rape Elimination Act
(PREA)

EXHIBIT
5

RCC/HARDWELL 11

Richwood Correctional Center

# Training Attendance

### TOPIC:  USE OF FORCE

Date:  _____03/03/2015_____

Team/Department:

| PRINT NAME | SIGNATURE |
|---|---|
| Tommy Farmer | Tommy Farmer |
| Tyrone Coleman, Captain | Tyrone Arthur Coleman |
| La Quenna Hardwell Twps | La Quenin Hardwell |
| Michael Watson | Michael Watson |
| Benny Keey | Benny Key |
| WESLEY MOCK | Wesley Mock |
| Michael Celuscia | |
| Juan Rosenthal | Juan Rosenthal |
| Willie Chaptman | Willie Chap |
| Annette Seales | Annette Seales |
| Stanton Johnson | Stanton Johnson |
| Reinald Williams | Reginald Williams |
| Derrick Hammond | Derrick Hammond |
| Gerald Hardwell | Gerald Hardwell |
| Tommy Reed | Tommy Reed |
| Antoine Jackson | Antoine Jac |
| WILBUR DALE HAYES | Wilbur Dale Hayes |
| Jessica Shoemaker | Jessica Shoemaker |
| Kanitra Turner | Kanitra Turner |

Instructor:  Asst. Warden Vurgic





EXHIBIT
6

RCC/HARDWELL 5

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 135 | 6 |
| Chapter | Related Standards | |
| Use of Force | BJG II-B-001, II-B-003, II-B-004, VII-A-002 | |
| Subject | | |
| Use of Force | | |

## PURPOSE

To state the Warden's policy regarding use of force at Richwood Correctional Center.

## POLICY

It is the policy of Richwood Correctional Center to provide employees with the proper training and guidance on the use of force. This includes physical force, chemical agents, firearms, electrical and other similar devices, intermediate/impact weapons, restraints, less-than-lethal munitions and devices, and other tactical equipment authorized.

## Definitions

A.  Force: Bodily contact of some nature—either with or without the use of restraints, electronic devices, chemical agents, less-than-lethal munitions and device, or firearm, which causes someone either to act in a manner contrary to his intent or to change his behavior to the desired action.

B.  Necessary Force: Force needed to gain control of an individual.

C.  Reasonable Force: Force justified by the specific elements of a situation, such as the amount of force responded to, a person's perception of danger, the existence of non-forceful alternatives and any other relevant factors.

D.  Excessive Force: Force used in a situation justifying force that exceeds the force necessary to control the situation or continues after the person is subdued or restrained.

E.  Non-deadly Force: Force which normally causes neither death nor serious bodily injury.

F.  Deadly Force: Any intentional force that is capable of causing death or serious physical injury.



EXHIBIT

7

RCC 257

Use of Force
#135
Page 2 (cont.)

G.   Restraints:  Mechanical or other devices used to restrict movement for security or Medical purposes.

H.   Chemical Agent:  An active substance, such as gas, mace or irritant dust, used to deter activities that might cause personal injury or property damage.

I.   Electrical Devices:  Device which delivers an electric charge when activated by the operator, used to deter activities that might cause personal injury or property damage.

J.   Intermediate/Impact Weapons:  Non-lethal weapons which are used as an alternative to deadly force.

K.   Less-than-lethal Munitions and Devices:  A substantial array of low-lethality weapons which allow a wide range of options, which can be used within the use of force continuum. Less-than-lethal munitions and devices should be used as an alternative to deadly force whenever possible under prevailing circumstances.

## POLICY

It is the policy of the Warden that all reasonable steps are taken to minimize situations requiring the use of force by staff against offenders and to minimize the amount of force used in those situations.  It is recognized, however, that force may be necessary to accomplish the goals of the facility (including public safety, the safety of staff and offenders, and maintenance of stability with the facility).

This policy is not designed to discourage employees from using force when it is necessary, but to assist them in acting reasonably when confronted with situations requiring the use of force.

It is further the policy of the Warden that gas, mace, irritant dust, electrical devices, restraints, intermediate/impact weapons, or less-than-lethal munitions and devices may be used only by employees specifically trained in their use and when all available less drastic measures fail to accomplish control in handling group disturbances and subduing individuals.  Said force employed shall be proportional to the threat to which it is a response and shall cease when the resistance ceases. The use of gas, mace or irritant dust as set forth herein is based on the concept established by the American Correctional Association that in quelling disturbances such use may be more humane in that it generally causes no serious or lasting damage and can pose less potential for injury to offenders and staff than other types of physical force.  All uses of force shall be managed and monitored by appropriate supervisory personnel whenever possible.

## USE OF FORCE GUIDELINES

A.   General Considerations:

1.   Whenever possible, the determination to use force shall be made by the highest ranking supervisor in the immediate area.

RCC 258

Use of Force
#135
Page 3 (cont.)

    2. Whenever possible, force shall not be used against mentally ill or mentally retarded offenders before appropriate medical or mental health personnel can be called to the scene.
    3. Reasonable steps shall be taken to minimize the amount of force used.
    4. The use of any type of force for punishment or reprisal is strictly prohibited.

B. Elements to Consider in the Review of Use of Force Incidents:
    1. The extent of the injury suffered.
    2. The need for the application of force.
    3. The relationship between the need and the amount of force used.
    4. The threat reasonably perceived by the responsible supervisor (s).
    5. Any efforts made to temper the severity of a forceful response.

C. Deadly Force should only be used as a last resort and then only in the following instances:
    1. To prevent the commission of a felony, including escape.
    2. To prevent an act that could result in death or severe bodily harm to one's self or another person.

D. Non-deadly Force – Physical force, chemical agents, electrical devices, intermediate/impact weapons, or less-than-lethal munitions and devices may be used only in the following instances:
    1. To prevent the commission of a felony, including escape.
    2. To prevent an act that could result in death or severe bodily harm to one's self or to others.
    3. To defend one's self or others against any physical assault.
    4. To prevent commission of a misdemeanor.
    5. To prevent serious damage to property.
    6. To enforce facility rules.
    7. To prevent or quell a riot.

E. Chemical Agents-Special Conditions
    1. Shall not be
        a. used without approval of the Warden or designee, if approval is possible under the circumstances.
        b. Repeated against an offender in a short period of time.
    2. Individuals affected by chemical agents should be permitted to wash their face, eyes, or other exposed skin areas as soon as possible after use.

F. Air Taser
    1. Shall not be
        a. Used without approval of the Warden or designee, if approval is possible under the circumstances.
        b. Repeated against and in a short period of time.
    2. The air taser automatically when shot will deliver a shock for five seconds. If individual is not disabled, an additional 5 seconds may be administered. This should be enough to subdue the offender.
    3. After use of the air taser, the officer may remove the electrodes from the offender using proper procedures. Any barb in the facial or neck area should be removed by medical personnel.
    4. Individuals affected by the air taser shall be photographed and seen by medical personnel.

RCC 259

RCC FORM #135
RICHWOOD CORRECTIONAL CENTER
ADMINISTRATIVE LOCKDOWN

Date: 11-16-15

| CELL | NAME | DOC# | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 19.1 | Emanuel Sandiford | | | W | Medical | 12-04-15 | | J.J.Lewis | | |
| 10.2 | Aubrey Boylston | | | W | 10 | 9-15-15 | | J.J.Harbell | | |
| 19.2 | Kenneth Jackson | | | B | 1 | 9-24-15 | | J.J.Loring | | |
| 10.2 | Dominique Foster | | | B | 3 | 10-01-15 | | J.J.Lewis | | |
| 103 | Lester Willer | | | B | 21 | 9:3015 | | J.J.Lewis | | |
| 103 | Larry Cheatham | | | B | 21 | 10-11-15 | | J.J.Lewis | | |
| 1.53 | Joseph Hughes | | | B | 1 | 10-08-15 | | J.J.Loring | | |
| 1.53 | Gerald Riley | | | B | 1 | 10-08-15 | | J.J.Kern | | |
| 104 | Steven Alexander | | | B | -21 | 10-53-15 | | J.J.Loring | | |
| 104 | Dedric Houghton | | | B | 21 | | | J.J.Lewis | | |
| 104 | Dedrick Dardshe | | | B | 3 | 10-09-15 | | J.J.Lewis | | |
| 105 | Joshua Isaac | | | B | 21 | 10-01-15 | | J.J.Lewis | | |
| 105 | Sidney Savage | | | B | 1 | 10-08-15 | | J.J.Loring | | |
| 105 | Isketham Sutton | | | B | 1 | 10-08-15 | | J.J.Loring | | |
| 1506 | Sarah Alston | | | B | 1 | 10-08-15 | | J.J.Loring | | |
| 1.506 | Frank Foster | | | B | 21 | 10-01-15 | | J.J.Loring | | |
| 1.506 | Tishb Bradleton | | | W | | 10-08-15 | | J.J.Loring | | |
| 1.506 | Terry Kirby | | | B | 1 | 10-05-15 | | J.J.Kirby | | |
| 108 | Terell Clark | | | B | 1 | 9-27-15 | | J.J.Lewis | | |
| 109 | Antonio Bryant | | | B | City | 10-08-15 | | J.J.Lewis | | |
| 10.10 | Charles Trim | | | B | Booking | 10-08-15 | | J.J.Lewis | | |
| 10.10 | Donald Franklin | | | B | 345 | 9-87-15 | | J.J.Colwell | | |
| SM1 | Devin Yancey | | | B | Absconded | 10-09-15 | | J.J.Lewis | | |



RCC 240

RCC FORM #106

**RICHWOOD CORRECTIONAL CENTER**

**ADMINISTRATIVE LOCKDOWN ROSTER**

Date: 11-10-15

| CELL | NAME | DOC# | DOB# | RACE | RULE# | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| SH#2 | Roberts, Cornelius | | | W | Mutual | 9-14-15 | | L. Goodman | | |
| PH#1 co | Chretien(?), Joshua | | | B | City | 11-04-15 | | J. Lewis(?) | | |
| L07 | Zachariah Myles | | | B | City | 11-05-15 | | J. Lewis(?) | | |

RCF FORM 03.DS

## RICHWOOD CORRECTIONAL CENTER
### ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-16-15



| CELL | NAME | DOCC | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 101 | Brennell Sanchez | | | W | Med | 10-6-15 | | Lt Lewine | | |
| 102 | Adrian Edwards | | | W | | 10-13-15 | | Lt Rodriguez | | |
| 102 | Kenneth Coultman | | | B | | 10-14-15 | | Lt Loving | | |
| 103 | Dominique Carter | | | B | 3 | 10-21-15 | | Lt Lewine | | |
| 103 | Cody Miller | | | B | 21 | 10-21-15 | | Lt Lewine | | |
| 103 | Lacey Ibottison | | | B | 1 | 10-08-15 | | Lt Lewine | | |
| 104 | Joseph Hughes | | | B | | 10-01-15 | | Lt Loving | | |
| 104 | Gerald Estes | | | B | 21 | 10-07-15 | | Lt Lewine | | |
| 104 | Susan Alphonster | | | B | 21 | 10-08-15 | | Lt Loving | | |
| 105 | Deotlee Humphier | | | B | 13 | 10-01-15 | | Lt Lewine | | |
| 105 | Patrick Polasehr | | | B | 21 | 10-01-15 | | Lt Lewine | | |
| 105 | Joseph Isaac | | | B | 1 | 10-08-15 | | Lt Loving | | |
| 105 | Sidney Sample | | | B | 1 | 10-08-15 | | Lt Loving | | |
| 106 | Stephen Odtion | | | A | 21 | 10-08-15 | | Lt Loving | | |
| 106 | Josh Blake | | | W | 1 | 10-05-15 | | Lt Lewine | | |
| 106 | Ernest Jenkins | | | B | | 10-02-15 | | Lt Loving | | |
| 107 | Justin Pendleton | | | B | | 10-01-15 | | Lt Loving | | |
| 107 | Jacob Richey | | | B | | 10-01-15 | | Lt Keen | | |
| 108 | Jacoell Clark | | | B | | 10-01-15 | 10-07-15 | Lt Keen | Lt Lewine | |
| 108 | Antonio Bryant | | | B | 1 | 10-01-15 | | Lt Lewine | Lt Lewine | 10-15-15 for Release |
| 109 | Chuckie Irving | | | B | city | 10-09-15 | | Lt Keen | | |
| 109 | David Franklin | | | B | 305 | 10-21-15 | | Lt Oswell | | |
| 3M1 | Devin Young | | | B | descender | 10-08-15 | | Lt Lewine | | |



RCC 243

RCC FORM #262

**RICHWOOD CORRECTIONAL CENTER**

**ADMINISTRATIVE LOCKDOWN ROSTER**

Date: 12-11-15

| CELL | NAME | DOC# | DORM | RACE | RULE# | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 MB | Patrick Cranberry | | | B | Medical | 12/11 19:44 | | Lt. Woodnell | | |
| | Brandon Whiteside | | | B | Cell | 10-16-15 | | Lt. Lewis/Bi | | |
| | Zachariah Marks | | | B | City | 10-30-15 | | Lt. Lewis | | |
| | Lindsey Hibbard | ul | | B/W | cell 27 | 10-31-15 | | Lt. Lawrence | | |
| | David Toquicon | | | CM | city | 10-11-15 | | Lt. Lewis | | |
| | Levi Oaths | | | B | 10 | 10-11-15 | | Lt. Lewis | | |
| | Ruben Silvas | | | B | 10 | 10-14-15 | | Lt. Lawrence | | |

RCC 244

RICFORM RCDS

## RICHWOOD CORRECTIONAL CENTER
## ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10/14/15

| CELL | NAME | DOOR | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| LD1 | Emmanuel Sanchez | | | W | Medical | 10/06/15 | | Lt Goodroe | | |
| LD2 | Anthony Taylor | | | W | 10 | 9/19/15 | | Lt Blackwell | | |
| LD2 | Kenneth Chatman | | | B | 1 | 9/24/15 | | Lt Levine | | |
| LD3 | Darius Carter | | | B | 3 | 10/01/15 | | Lt Levine | | |
| LD3 | Joseph Stokes | | | B | 1 | 10/08/15 | | Levine | | |
| LD3 | Jr. Nathan Cabin | | | B | 1 | 10/03/15 | | Levine | | |
| LD3 | Cory Miller | | | B | 2 | 10/07/15 | | Lt Levine | | |
| LD4 | Jaartivus Eludora | | | B | 5 | 10/13/15 | | Lt Levine | | |
| LD4 | Joshua Isaac | | | B | 3 | 10/01/15 | | Lt Levine | | |
| LD4 | Morill Lambley | | | B | | | | Levine | | |
| LD5 | Isaac Carmel | | | W | | | | Blackwell | | |
| LD5 | Lamarcus Evans | | | B | Vent. Ecb | 10/13/15 | | Lt Blackwell | | |
| LD6 | Jacob Ardon | | | B | Vent. Ecb | 10/14/15 | | Levine | | |
| LD6 | Earnest Joshua | | | B | 1 | 10/02/15 | | Lt Levine | | |
| LD6 | Josh Pendleton | | | W | 31 | 10/01/15 | | Levine | | |
| LD6 | Tommy Kirby | | | B | 1 | 10/08/15 | | Sidney | | |
| LD7 | | | | B | 1 | 10/05/15 | | A Henry | | |
| LD7 | | | | B | | | | | | |
| PubH | Charles Sheed | | | W | City | 10/12/15 | | Lt Blackwell | | |
| PubH | Eric Daniel | | | B | City | 10/12/15 | | Lt Blackwell | | |
| PubH | Zachariah Mydes | | | B | City | 10/09/15 | | Lt Levine | | |
| SM1 | Patrick Cook | | | W | Medical | 9/14/15 | | Lt Blackwell | | |
| SM2 | Devin Young | | | B | Obsrv | 10/09/15 | | Lt Levine | | |

RCC FORM #305

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: _____

| CELL | NAME | DOC# | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|------|------|------|------|------|-------|--------------|---------------|--------------|---------------|----------|
| 108 | Lawrence Hubbard | | | B | 1 | 10/1/15 | | St Gowins | | |
| 18 | Steven Alexander | | | B | 21 | 10/21/15 | | Lt Lachry B | | |
| 100 | Dorell Franklin | | | B | 3-5 | 10/21/15 | | Lt O'Neill | | |
| 109 | Leg Barker | 504472 | D | W | 3 | 10/14/16 | | Lt O'Neal | | 510 Lockdown |
| 1019 | JL | | | | | | | | | |

RCC 245

RCC FORM RDS

## RICHWOOD CORRECTIONAL CENTER
## ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-15-15

| CELL | NAME | DOC# | DORM | RACE | RULE# | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| DM1 | Dominique Sparks | | | W | Medical | 10-1-c-15 | | Lt. Devine | | |
| LDM2 | Anthony Skylark | | W | 10 | 9-18-15 | | Lt. Headbell | | |
| LDM2 | Kunreth O'Cobeal | | B | 1 | 9-24-15 | | Lt. Lozano | | |
| LDM2 | Dominique Dutter | | B | 3 | 10-1-15 | | Lt. Levine | | |
| LDM3 | Coren Miller | | B | 2 | 9-27-15 | | Lt. Levine | | |
| LDM5 | Jac. Than Cotton | | B | 2 | 10-8-15 | 10/15/15 | Lt. Lozano | Lt. Odwell | Moved to U4 |
| LDM6 | Jonathan Cheeks | | B | 3 | 10-8-15 | 10/15/15 | Lt. Lozano | Lt. Odwell | Moved to U4e |
| LDM7 | Joshua Issue | | B | 2 | 10-1-15 | | Lt. Levine | | |
| LDM8 | Breesi Rainey | | B | | | | | | | |
| SDM4 | Roderick Carleston | | W | Medical | 9-14-15 | | Lt. Headbell | | |
| QMI4 | Devin Young | | B | Diesalin | 10-9-15 | | Lt. Levine | | |
| DM7 | Isaac Gagnet | | W | 3 | 10-12-15 | 10/15/15 | Lt. Headbell | Lt. Odwell | Moved to U4B |
| LDM5 | Jamario Bright | | B | 2 | 10-12-15 | 10/15/15 | Lt. Headbell | Lt. Odwell | Moved to U4e |
| LDM8 | Justin Pendleton | | W | 1 | 10-8-15 | | Lt. Lozano | | |
| LDM8 | Coby Kirby | | B | 1 | 10-5-15 | | Alt. Kerry | | |
| LDM6 | Jacob Preston | | B | 1 | 10-8-15 | 10/15/15 | Lt. Lozano | Lt. Odwell | Moved to U4I |
| LDM5 | Ernest Jenkins | | B | 21 | 10-1-15 | | Lt. Levine | | |
| RUI4 | Zaahin Myles | | B | | | | | | | |
| RUI4 | Charles Steed | | W | | | | | | | |
| RUI4 | Egon Webb | | W | Cell | 10-12-15 | | Lt. Headbell | | |
| RUI4 | Venon White | | B | | | 10/15/15 | Lt. Odwell | dsc | |
| LDM3 | Robin Belter | | W | | | 10-15-15 | Lt. Levine | | Moved to week 4 |
| | | | B | | | 10/15/15 | Lt. Odwell | | |

RCC 246

RCC FORM #105

RICHWOOD CORRECTIONAL CENTER

ADMINISTRATIVE LOCKDOWN ROSTER

Date: 10-15-15

| CEL | NAME | DOCR | DORM | RACE | RULES | DATE/TIME IN | DATE/TIME OUT | IN AUTHORITY | OUT AUTHORITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| D#7 | Lawrence Hubbard | | | B | 1 | 10-1-15 | | Lt. Dupre | | |
| D#2 | Sidrion Edmonds | | | B | 24 | 10-3-15 | | Lt. Osborn | | |
| D#10 | Navada Franklin | | | B | 8-5 | 10-24-15 | | Lt. Otwell | | |
| D#10 | Joe Fowler | | | W | 2 | 10-14-15 | 10-12-15 | Otwell - | Lt. Otwell | Moved to Dorm D |
| D#5 | Bobby Hochimore | | | B | 1 | 10-15-15 | | Lt. Otwell | | |
| D#5 | Fitzgerald Jones | | | B | | 10-15-15 | | Lt. Otwell | | |
| D#8 | Sam Abrams | | | B | 1 | 10-15-15 | | Lt. Otwell | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

RCC 247

EXHIBIT

10

Suicide Prevention
#182
Page 1

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 182 | 8 |
| Chapter | Related Standards | |
| Suicide Prevention and Intervention | BJG IV-C-014 | |
| Subject | | |
| Suicide Prevention and Intervention | | |

## PURPOSE

To establish a formal policy and a written suicide prevention plan for Richwood Correctional Center (RCC) to manage offenders who display suicidal tendencies or behavior and to establish a formal procedure for staff and offender critical incident debriefing that covers the management of suicidal incidents. To provide guidelines at Richwood under which restraints are employed on offenders in an authorized and safe manner as part of a health care regimen.

## POLICY

It is the policy of RCC to have a written suicide prevention plan that is approved by the Medical Director, Health Care Authority, and reviewed by the Director of Mental Health. Management of self-destructive and suicidal offenders is conducted under the supervision and direction of a qualified medical person or a qualified mental health person so as to enhance each institution's ability to prevent suicides. It is the policy of RCC to have established procedures for the utilization of restraints for Mental Health purposes. It is critical that staff understand that the use of restraints mental health purposes is designed to control destructive and/or dangerously aggressive behaviors.

## PROCEDURE

A.   SCREENING AND ASSESSMENT

   1.   Initial screening of suicide risk will occur at all inter- and intra-system transfers at the time of admission by a mental health professional or by mental health trained personnel.

   2.   If an offender is scheduled, transferred, and identified as a significant risk for suicide, RCC staff will review the Medical Transfer Summary and begin observation of the offender until a Mental Health Management Order can be started.

   3.   While screening for potentially suicidal offenders is a routine



EXHIBIT
11

RCC 271

Suicide Prevention
#182
Page 2

function of medical personnel, a potential suicide may also be
tentatively identified by other RCC direct care staff based on their
interactions with and observations of offenders. If a Correctional
Security Officer believes an offender is a potential suicide risk,
that person must communicate this to their immediate supervisor.
The supervisor will notify the Medical Department for additional
screening. The responding clinician will request the Mental Health
Behavioral Checklist RCC Form 199, (HC-38 Form A) which
should be completed by the security supervisor. The RCC Form
199, (HC-38 Form A) serves as a tool to aid in determining suicide
risk and should be completed each time a direct care staff reports a
potential suicide risk. The original of RCC Form 199, (HC-38
Form A) shall be placed in the offender's mental health section of
the medical record.

When clinically indicated, the medical personnel may request to
examine parts of the offender's property, such as correspondence,
to assess the offender's potential for self injury.

**B.   MENTAL HEALTH MANAGEMENT ORDERS (STANDARD AND
EXTREME)**

1.   There are two levels of mental health management orders: standard
and extreme. When an offender is identified as in need of watch
precautions, on-site staff will maintain continuous observation of
the offender until either standard or extreme watch is implemented.
Standard watch is employed only for the management of offenders
who are at risk for suicide who are not engaged in self destructive
behaviors. Extreme watch is employed only for the management
of offenders who have actively engaged in self-destructive
behavior.

2.   Whenever possible, suicide precautions will be instituted by a
mental health professional. In the absence of mental health
professionals, other treatment staff may implement a suicide
watch, and an offender may be placed on watch by employees
other than treatment staff (e.g., the Unit Head or designee). In all
such instances, medical will be notified immediately, and the
offender will be assessed at the earliest possible time.

3.   The Mental Health Management Order (see attached HC-38 Form
B) will be completed on each new watch and watch
discontinuation. The order will describe which techniques are to be
used for each individual. The management order will specify items
permitted and not permitted while on this level of watch. Examples

RCC 272

Suicide Prevention
#182
Page 3

of such orders:" Paper Gown"; "Paper Sheet"; "Suicide Mattress"; "No Razor"; "Toothbrush controlled by C.S.O./Use of toothbrush monitored"; "No pens, pencils, or sharp objects").

4. When standard issue clothing presents a risk, provisions are made to supply the offender with a "paper gown no string" to promote offender safety in a way that is designed to prevent humiliation and degradation.

5. Once the Mental Health Management Order is completed and a copy is given to the security officer(s) supervising the offender, documented observation begins using attached RCC Form 434C (HC-38 Form C) is initiated.  Shift Lts, Captains, and Duty Officers will be notified of the watch.

6. The shift Lt will be responsible for ensuring that an accurate log is maintained.  This form is a daily documentation of all offenders' actions and behavior, including but not limited to sleep patterns, meals, showers.  Any unusual behavior or worsening of the offender's condition shall be reported to a Medical/Mental Health Staff immediately.  The log is maintained in the Control Room where the offender is on watch and shall be placed in the medical record upon termination of the watch log.  The log shall be made available to medical or mental health personnel upon request.

7. An offender who has been placed on a standard suicide watch will be evaluated by mental health (or other treatment staff in the absence of mental health professionals) at a minimum of every 24 hours. RCC has Medical/Mental health staff on call 24/hr. per day. Upon initiation of extreme suicide watch and at no longer than 12 hour intervals thereafter, the Medical Director or designee (qualified medical and mental health professional) shall assess the medical and mental health status of the offender to determine if modification or discontinuation of the restraint is appropriate for medical or mental health reasons.

8. A suicide watch may be discontinued or down-graded only by a Mental Health Staff or Physician.

9. For all watch settings, frequency of observation shall be included in the management instructions and will vary from continual observation to intervals of 15 minutes or less.

10. Behavior management on Extreme Watch involves the use of medical restraints. Refer to HC Policy 29 entitled Utilization of Restraints for Medical and Mental Health Management Orders and EMP #02-01-030, Use of Restraints/Offender Control.  Due to the

RCC 273

Suicide Prevention
#182
Page 4

risk of positional asphyxia, an offender should be restrained in a prone (face-down) position only when necessary. Further, after the restraints are applied, the offender should remain face-down only as long as necessary.

C.     **USE OF RESTRAINTS FOR MENTAL HEALTH MANAGEMENT ORDERS**

1.     Use of restraints from Mental Health Management orders is governed by HC-29, which stipulates as follows:

a.     Authority for initial utilization of restraints must be given by the institution's Medical Director or designee, (qualified medical or mental health professional). The institution's Medical Director must also be notified of the offender's medical and mental health condition in order to determine whether on the basis of serious danger to self or others. Direct complete visual observation of the offender must be continuous until the initial medical/mental health assessment by the Medical Director or designee, (qualified medical or mental health professional is completed and should continue at no greater than fifteen minute intervals thereafter.

b.     Types of restraints permitted:

*        Waist chain with side handcuffs;
*        soft restraints (vinyl, leather or cloth);
*        Body Sheet and protective helmet.
*        Prostraint Violent Prisoner Chair.

c.     Extreme Watch suicide management orders require the authorization of a physician, in consultation with on-site mental health professional. The initial assessment and determination may be made by the Medical Director's designee (qualified medical or mental health professional). Such use must be subsequently approved in writing by the Medical Director. Following initiation, medical staff or a trained staff member (which may include a Correctional Security Officer certified in first-aid), shall examine the offender every two hours and Employee Policy Memorandum #03-02-001 Suicide Prevention and Post Suicide Management document the presence or absence of swelling and/or discoloration of extremities, the adequacy of blood circulation, and any other potential risk to the offender's health. Any abnormality should be reported

RCC 274

Suicide Prevention
#182
Page 5

immediately to appropriate medical or mental health staff. Medical staff (physician, nurse, EMT or certified first responders) should examine the offender at least every twelve hours, observing for decreased blood circulation and other potential risks to risks to the offender's health. Release from restraint for toilet, sanitation, and nourishment functions shall be arranged at intervals no greater than two hours. Whenever the offender is released for break, direct full body observation must be continuous until placed back into restraints. The record should reflect approximate consumption of solids and liquids and (this activity should be documented on RCC Form 434-C (HC-38 Form C). See Use of Restraint/Offender Control Policy for release of restraint procedures.

d.   Once restraints are in place, visual observation must be made at least every fifteen minutes. Procedures for applying restraints must be in accordance with guidelines approved by the institution's Medical Director. Upon initiation and at no longer than twelve hour intervals thereafter, the Medical Director or designee, (qualified medical or mental health professional), shall assess the medical and mental health status of the offender. Based on this assessment, the Medical Director or designee, (qualified medical or mental health professional), will determine if continuation, modification or discontinuation of restraint is appropriate for medical or mental health reasons. A new physician's order is required whenever restraints are continued or require upgrading.

e.   An Extreme Watch should be stepped down to a Standard Watch for a length of time sufficient to assess the offender's stability, then utilization of the case consultation committee prior to removing the offender from a suicide management order. A suicide watch may be discontinued or down graded only by a mental health professional or attending physician in consultation with the Medical Director or designee, (qualified medical or mental health professional). Notification of watch discontinuance or downgrade shall be sent to the Medical Director. Prior to releasing an offender from any suicide watch, the security staff assigned to the offender's housing area shall be notified.

f.   When restraints are used for other than medical reasons they are not to be initiated by medical staff.

Suicide Prevention
#182
Page 6

g. After a suicide watch or Mental Health Management Order has been discontinued, a follow-up contact with the offender by a mental health professional will be conducted within 7 days to assess the offender's current mental status and suicide intent.

D. **SUICIDE ATTEMPT**

1. Duties of the first officer on the scene:

   - Notify other staff (call for help, utilize radio, etc.);
   - Get the victim down if hanging (using C-spine stabilization) (IMMEDIATE ACTION IS REQUIRED! SECONDS MAY SAVE A LIFE!!). *Policy permits single officer cell entry to save a life; Initiate first aid (control bleed, begin CPR, etc.).

2. Second officer on the scene:

   - Request ambulance or medical assistance;
   - Assist with first aid and CPR as necessary;
   - Maintain security and preserve scene as much as possible;
   - Assist with evacuation of offender.

3. Duties of the Security Supervisor:

   - Insure that ambulance or medical response team has been called;
   - Supervise and assist with first aid/CPR, as necessary, until medical assistance arrives or until evacuation to a medical area occurs;
   - Insure that staff cooperates with medical team's speedy entry of area and evacuation of victim.
   - Insure that scene is preserved as much as possible;
   - Notify unit manager/duty officer, institution's investigator, and mental health treatment staff so that the supervisor then can focus his full attention on the suicide incident. The unit manager/duty officer is then to be responsible for notifying other appropriate institutional personnel.

4. Duties of the EMT's, Paramedics, or Medical Response Team:

   - Initiate advanced life support care, resuscitation, or other necessary life recovery treatment commensurate with their

Suicide Prevention
#182
Page 7

training level):
Transport victim to the appropriate medical facility.

5.  Equipment:

An Emergency/Suicide Kit is kept in Main Control.  The shift Captains are responsible for proper maintenance of the equipment in the emergency medical kit.  Once the seal is broken it is routed to the Director of Nursing along with a UOR stating what has been removed from the kit.  The seal on these Suicide Prevention Supply Kits should rarely be broken and then only for the purpose for which it was intended.  The kit will contain the following items:

a.  Airway protection device
b.  Non-sterile protective gloves
c.  Bite block
d.  Ganze
e.  Pocket mask for rescue breathing
f.  Large Paramedic shears
g.  Bandage scissors
h.  Blood stopper compression bandages
i.  Small dressing (4x4)
j.  Tape

*Hoffman Medical Rescue tool kept in the Key room

6.  If death occurs, the Health Authority will request that an autopsy be performed.

E.  **POST SUICIDE INCIDENT**

1.  After significant attempt or a completed suicide, RCC will access the situation and consider intensifying efforts to increase observation in high risk areas.

2.  The investigation team will interview witnesses, associates of the victim, and staff members in an effort to determine if any recent events in the victim's life may have served as a "trigger" to motivate the suicide. The team will also physically reenact the event to determine if structural or procedural changes could prevent reoccurrences. A report will be prepared by the investigative team and forwarded to the Unit Head.

3.  The Unit Head or designee must report all attempts or completed suicides in accordance with Department Regulation C-05-001.

Suicide Prevention
#182
Page 8

4.  For the purposes of outcome measures operational definitions for suicide attempt and suicide gesture is as follows: A suicide attempt will be defined as any self injurious behavior which could have resulted in death if no intervention occurred and/or an injury severe enough to do significant self harm. A suicide gesture will be defined as any self injurious behavior which would not have resulted in death if no intervention occurred. If no self-injurious behavior occurred, the behavior is neither an attempt nor a gesture.

5.  An in-depth post suicide investigation will be conducted following a completed suicide. The suicide investigative team will consist of a Mental Health staff member, an Institutional Correctional Investigator, the security supervisor from the area where the suicide occurred; and a medical staff member (physician, registered nurse, or paramedic).

6.  Critical Incident Stress Management debriefing will be afforded to offenders and staff following a critical incident.

## H. TRAINING

1.  All staff with the responsibility for offender supervision is trained on an annual basis in the implementation of suicide prevention and intervention. Training will include but is not limited to:

    - Identifying the warning signs and symptoms of impending suicidal behavior.
    - Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors.
    - Responding to suicidal and depressed offenders.
    - Communication between correctional and health care personnel.
    - Referral procedures.
    - Housing observation and suicide watch level procedures
    - Follow-up monitoring of offenders who make a suicide attempt.

2.  In addition to regular yearly training, the clinical staff at each institution is encouraged to seek ongoing continuing education specific to suicide prevention.

_WARDEN_

3-5-14
DATE

Ph.D. Mcc, LPC, LAC

RCC 278

FEB-03-1996   23:47                                                    P.01/01

DWCC Form #416 (Revised 10/2001)

**Department of Public Safety & Corrections**
**David Wade Correctional Center/FWCC**

## Restraint Chair Medical Review

### Physical Examination (every 12 hours)

Name: _____   DOC #: _____   Date: _____

| | |
|---|---|
| Vital Signs: | BP _____   Pulse _____   Temp. _____   Respiration _____ |

Urine dipstick (every 24 hours) _____

Chest (are breath sounds equal and clear)? • Yes • No   If no, _____

CV (regular rate and rhythm): • Yes • No   If no, _____

Abdomen (are bowel sounds present?) • Yes • No   If no, _____

Extremities     (Absence of edema or cyanosis)? • Yes • No   If no, _____

                (Pulses present distal to restraints?) • Yes • No   If no, _____

Intake Reported (every 12 hours)
(Has eaten?)     • Yes • No   (circle # of meals)     1     2     3     blues only
(Has taken fluids?)     • Yes • No   If no, _____

## Mental Status Examination (every 12 hours)

Orientation     • Time     • Place     • Person     • Situation

        Oriented times (circle the # of correct responses)     1     2     3     4

Appearance - Level of Consciousness     • Attentive     • Responsive     • Eye Contact

Cooperation     • Cooperative     • Defiant

Hallucinations     Hallucinations     • Yes     • No
                   Type Hallucination     • Auditory     • Visual
                   Command Type     • Self Harm     • Harm others
                   Can the inmate control the commands     • Yes     • No

Thoughts     • Suicidal     • Homicidal     • Fearful     • Delusional

Speech     • Fluent     • Confusing

Affect     • Normal     • Cheerful .     • Depressed     • Angry     • Anxious

Additional Notes: _____

_____

_____

xc:     Medical Director
        Mental Health Director
        Warden
        Inmate's Record

Nurses Signature/Date/Time _____

RCC 279

FEB-03-1996   23:33
(ELKP NU24UI-US0, NUS-UD-UUI, NU-US-UUU)

**WATCH LOG SHEET**

P.16/16

ATE NAME:_____ DOC#: _____ DATE:_____

CLE ONE: EXTREME/STANDARD/MENTAL HEALTH OBSERVATION/OTHER _____
ord the time of the observation, check (x) the behavior you observe, or write in the appropriate space the
vior you observe and sign.

| Time | Acting Out (tracking down, yelling, throwing things, flooding cell, etc.) | Sleeping | Using the bathroom | Talking to others | Laughing or crying to self. | Self-stimulating (rocking, mutilation, masturbating, talking to self, singing) | Liquids offered | Other: Sitting or lying on bed, standing, etc... (please write in any other activity deemed necessary) | Officer's Signature |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Record % of Solids & Liquids Consumed

Breakfast_____Time:_____Lunch_____Time:_____Dinner_____Time:_____Time of Shower_____
Original: Mental Health
Copies: Security

RCC 280

FEB-03-1996  23:32
(EMP #03-02-008)

P.14/16

## MENTAL HEALTH BEHAVIORAL CHECKLIST

Name:_____ DOC#:_____ Date:_____ Time:_____

Location of Observation: _____

| Yes | | Comment |
|-----|-------------------------------|---------|
| *1. | Self Destructive Act | |
| *2. | Suicide Ideation | |
| 3. | Critical Changes in Situation | |
| 4. | Depressed | |
| 5. | Mood Changes | |
| 6. | Agitated | |
| 7. | Hostile | |
| 8. | Insomnia/Hypersomnia | |
| *9. | Gives Away Property | |
| *10. | Bizarre Behavior | |
| 11. | Homicidal Ideation | |
| 12. | Other | |

*If any of these items with the asterix are checked, suicide precautions should be initiated.

Mental Health Notified:_____
Name                                      Date/Time

Action Taken: _____

Supervisor's Signature: _____ Date/Time: _____

Reporting Officer: _____ Date/Time: _____

Definitions:

1. Self destructive acts - cuts self, hangs, make noose, bashes head against wall.
2. Suicidal ideation - talks of suicide, indirectly talks of suicide (the world would be a better place without me).
3. Critical changes - death of a loved one, major change in health status, change in loved one's health, change in marital or significant relationship, additional sentence, appeal denied, dropped from IMPACT or other special program.
4. Depression - cries, emotionally flat, apathetic, withdrawn, uncommunicative, verbalize hopelessness worthlessness moves/speaks slowly, difficulty carrying out routine tasks.
5. Mood changes - severe changes in mood from sad to happy or happy to sad.
6. Agitation - offender begins pacing, has excessive body movements or excessive speech.
7. Hostility - out of character hostility, offender normally cooperative becomes hostile.
8. Insomnia/hypersomnia - sleeps too little or too much (not one sleepless night or one period of sleeping too much.
9. Gives away personal possessions - pays debts, says goodbye to friends.
10. Bizarre behavior - speaks in a nonsensical manner, expresses bizarre ideas, inattentive to surroundings (appears to be attending to only his/her own thoughts, appears "lost"), rapid speaking with overflow of ideas, talks to self, appears to be hallucinating.
11. Homicidal ideation - talks to homicide; indirectly talks of homicide; threatens to hurt or kill someone.
12. Other - any observation that reporter feels significant; describe briefly.

Copies: Medical Records, Security

Revised 8/1/02
RCC 281

FEB-03-1996  23:33

P.15/16

Form HC-38-B
01 August 2002

## MENTAL HEALTH MANAGEMENT ORDER

Name:_____ DOC#:_____ Location:_____

Begin          _____          Check One:  ☐  Standard
                                                           ☐  Extreme
Discontinue    _____                       ☐  Other_____

Continue       _____

Change to      _____

Management instructions:_____

_____

Housing:_____          Able to be doubled?  ☐ Yes    ☐ No

Property:_____

_____

_____

Observation frequency:_____

Other:_____

_____

Date and time examined:_____

Date and time of order:_____

Ordered by:_____          _____
                   Signature                              Title

If an extreme mental health management is ordered a physician signature is required.

Verbal order received by:_____          Date/Time:_____

Any changes requires a new Mental Health Management Order

Copy: Original to Mental Health
         Medical Records
         Security

RCC 282







Warden Hanson
Warden Turner
Warden Aultman
Major Tubbs
Captain Coleman
Captain Farmer
Shift Lts.
Shift Sgt
Cpl's
C/o's



LT Hardwell          D-Tram       CPl Dodge
Sgt Williams          10-13-15     main cyhel
LST 10-15 Trevis Adams  back in w/ Fron tri'r
455 1097 Church
713 Clo Blackmon back on Clp ots wan 14
  from wilt
720 C P I Goodjoint of P CLP 10-15X1RF Lashmre williams
  enroute. PPPC  van 14.
725 NCg Conducts rounds A Hall Lockdown
730 CPI mcmillan offClp ots enroute to North
  monroe Health van 28
754 Rever rounds. Lockdown
609 MPP 513 on Clp 10-15X1RF
714 Cpl Goodjaint back on Clp ots from
  RPDC
817 Cpl Dawkins, Cpl Johnson back on Clp
  ots
818 Cpl mcmillan back on CLP ots
921 MPD 519 off Clp ots
821 NCle, LT Loving RC4 enters main
832 RClei Lt Loving ncu exits main
851 Captain Douglas have book

EXHIBIT
16
RCC 427

Main Control

LT Hardwell          D-Team          Cpt Dodd

Sgt Williams          10-13-15          main Con

600 Cpl Dooley relieved Vineyard of main Control, She has left necessary equipment

3 stacked  I have read and understood my post Count 46 Orders and duties. Count as shown when and 41 I arrived. The 965 Doc 915-Ci# 49 LPS
Quintin Houston 1 = 98  42 = 98  43 = 91  44 = 66  45 = 94
Trevis Adams  46 = 87  47 = 44  LD = 23  Blc = 1 pm  A = 99
B = 52  C = 105  D = 104  LD8 =  LD9 =  LD10 =

603 NC7 Advised main to Call AMR.

605 10-98 Chow.

Cpt Clo Curley rounds 41 and c4

4:30 Cpl Curley, phillips on Clp 10-10X5 from Rivers

635 Cpt Eaton, Cpt Kelly back on Clp 10-1574
From Court Trevis Adams.

629 Late entry — AMR & Clogerman off c/p 10-15X1 BM Viking white  enroute to U.H.

629 Clo Blackmon off Clp 0X5 enroute to U.H. following AMR Van 14.

645 NC7 rounds & Ct LP

647 Ct Clear The 970 Doc 920 Ci# 49 LPm
1 = 98  42 = 96  43 = 91  44 = 66  45 = 94
46 = 87  47 = 44  LD = 23  Blc = 5 newfda FM
A = 99  B = 52  C = 105  D = 104  LD8 = 1  LD9 = 1
LD10 = 1

RCC 428

Main Control

| LT. Loving | Vinyard / Hatfield | 6A cp |
| Sgt Rosenthal | 10-13-15 | B-Team |

545 Roll call

Rec'd both Vinyard & Hatfield have read and understand the duties of our post. Received all verbal information & logged equipment & verbal information from CPL Doley

Rec'd verified count & booking
- 1-99        A- 99        THC-474
- 2-97        B- 52        DOC-932
- 3-91        C- 105       City- 52
- 4-66        D- 104
- 5-94        8M/6D- 7
- 6-88
- 7-46
- /D-26

640 U4 pill call
645 U3 pill call
1700 MPD on compound for pick up
1704 MPD black van off compound w/(7) trustee
1750 Kdi md A/S U6
830 CPL Elisana, Cinky, Phillips & Hernandez enter U1 for dorm inspection

RCC 429

| 1T. Loring | Vinyard | 6A6p |
| Sgt Rosenthal | 10-13-15 | B-Team |

0845 U5 pill call
0808 all the above enter U5 along
w/ RC 7
0814 enter U2 on inspection
0840 U6 pill call
0850 CC6 md idk in SH
0852 CPl Phillips + Elosaig ent w/ 1 enroute
to Conway Donnel Felber
0900 yard call for 5+6 over @ 0955
1+2 over @ 1012
0915 md idk in U5
0920 Lt. Loring enroute through front door
with (1) Emmanuel Burnes b# 25
THC-973   DOC-921   Cty-52
0921 md on fp 1015 lk Bm off @ 0950
THC-974   DOC-921   City-53 Jakion Bryant
0940 idk in U4
0945 10-97 lokdown chow
1000 Sgt Juanen enter main control for
legal mail
1041 U6 chow
1102 10-15 (1) Devin Young from SM 1 to
SM2

LT. Loring          Vinyard          6A-6p
Sgt Rosenthal       10-13-15         B-Team

125 Count cleared
    1-98            A- 99           THC = 974
    2-97            B- 52           DOC = 921
    3-91            C- 105          City = 53
    4- 66           D- 104          Booking = 2
    5-94            SA/D - 7
    6-88
    7-47
    8-24
1145 OKSO on compound for pick ups
    Valante Ridland  U4  ↓ 46
    10-15 (1) Donta Woods from RWTC
    to booking for release  THC-972  DOC-921  City-51
1208 U1 chow
1220 U5 chow
1238 U2 chow
    O/C & Elinon & James eat w 2 James
    Cooper enroute to Medical lab
1240 10-15 (1) Michael Dennie from U2 ↓ 96
    to booking for release through front door
    THC 9910  DOC 920  City-51
1250 U3 Chow
1322 U4 Chow

RCC 431

LT Loving          Vinyard       6A6P
Sgt Rosenthal      10-3-15      B Team

1338 CPL Nickes off compound w/ Richard
Steadman from U7 & 45  THC-970
                        DOC-920
                        City-50

1335 10-98 on chow
10-15 (1) Danryle Winley from U1 ↓ 97
to 40 # 4

1348 U4 pill call
1350 U3 pill call
1404 U2 pill call
1406 MPD #2214 on compound w/ (7)
    city trustee off @ 1410
1420 U6 pill call
    diabetics call
1440 yard call 3 # over @ 1540
1500 Malachi Dad call out
    U6 chow
1505 Warden Hanson enter main control
    CPL Phillips + Curley exit w/ 5 enroute
    to Riverbend
    1. Charles Irwin    THC-965
    2. Larry Cheatteam    DOC-915
    3. Roderick Poindexter  City-50
    4. Terrill Clark

RCC 432

LT. Loring          Vinyard          6A-6P
Sgt. Rosenthal      10-13-15         B Team

520  verified count w/ booking
605  count cleared
     1-97          A-99        THC-965
     2-97          B-52        D&C-915
     3-91          C-105       City-50
     4-66          D-104
     5-94          S%ED-4
     6-87
     7-45
     8-24
     Unit #1 Flr. (p. chow)
1630 10-15 (1) Robert Mitchell from U7 ↓44
     to booking for release
1640 U2 chow
1645 MPD on compound w/ female off @ 1708
     Ja'Shune Williams    THC-965
                          D&C-915
                          City-49   1 female
1655 Ud pill call
1715 10-15 (1) Germany Singleton U2 ↑98
     10-15 (1) Jessie Rocca U4 ↑98
1720 U7 chow
1730 10-98 on chow
     LT. Vinyard have completed my shift

RCC 433



Booking Log

| | | | |
|---|---|---|---|
| | Lt. Hardwell | D-team | Co wa |
| | Sgt. Williams | 6pm-team | Book |
| 6pm | I. CO. Watson relieved CPL Staples | | |
| at 7 | I received 1 keys (1) Radio (1) Logbo | | |
| 6:25pm | AMR °/c OX | | |
| 6:36pm | AMR 4/c N (Vernon White) to | | |
| | LSU medical °/of LO? | | |
| 10:34pm | CPL Phillips / CPL Curly °/c SJS New | | |
| | TICS | | |
| 6:35pm | CPL Kelly / CPL Eaton °/c 1x from | | |
| | Jefferson (10) | | |
| 7:25pm | CPL Goodwin OF/c 1x B/F to BRDC | | |
| | N/F (Lashune Williams) | | |
| 7:27pm | CPL Goodwin | | |
| 8:07pm | MPD (519) °/c 1x B/F | | |
| 8:29pm | MPD (519) OF/c OX | | |

RCC 434

| | LT Hancock | D. Kinn | CO Watson |
| | Sgt Williams | 6pm 6am | Booking |

6pm  I CO Watson relieved CPL Staples

6:?  I recieved (7) keys (1) Radio (1) logbook

6:25pm ame °/c Ox

6:??pm ame °P/c 1x (Vernon White) to LSU medical °/oF LD'

6:3?pm CPL Phillips / CPL Curely °/c 5/8 New DOCS

6:?pm CPL Kelly / CPL Eaton °/c 1x from Jefferson (18)

7:25a CPL Goodjoint °P/c 1x B/F to RPSO N/R (Lashune Williams)

?:?pm CPL Goodjoint

8:09pm MPD (5A) °/c 1x B/F

8:2?pm MPD (519) °P/c Ox

9:0?pm OPSO °/c Ox

9:04pm OPSO °P/c 1x B/m (Erie Mclree)

ROC 435

| RICHWOOD CORRECTIONAL CENTER | Policy Number | Page(s) |
|---|---|---|
| Policy and Procedures | 165 | 1 |
| **Chapter** <br><br> Health Screening Upon Intake | **Related Standards** <br><br> BJG IV-C-006 | |
| **Subject** <br><br> · Intake Screening Process (PREA) | | |

## PURPOSE

To state the Warden's policy regarding Medical Intake for DOC Offenders at Richwood Correctional Center.

## POLICY

It is the policy of Richwood Correctional Center that all offenders upon arrival at Richwood Correctional Center be seen by the on duty nurse to complete an initial screening pursuant to the (PREA Screening Checklist Form, Medical Intake Screening Form, & Medical Intake Summary Form).

_____
Warden

3-5-14
Date



RCC 270