# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

**ERIE MOORE, JR., ET AL.**                    **CIVIL ACTION NO. 3:16-CV-01007**

**VERSUS**                                     **JUDGE TERRY A. DOUGHTY**

**LASALLE CORRECTIONS, INC.,**                 **MAG. JUDGE KAREN L. HAYES**
**ET AL.**

## RULING

Pending here is a Motion for Summary Judgment filed by Defendants Kenneth Hart ("Hart"), Roy Brown ("Brown"), and Jody Foster ("Foster") [Doc. No. 219].  Plaintiffs have filed an opposition. [Doc. No. 300].  Defendants have filed a reply to the opposition [Doc. No. 336].

Defendants Hart, Brown, and Foster seek the dismissal of all of Plaintiffs' claims against them, both in their official capacities and in their individual capacities.  [Doc. No. 219].  Plaintiffs concede in their opposition that all claims against Hart and Brown should be dismissed.  Plaintiffs further concede that the claims against Foster in his official capacity should be dismissed, leaving only the claims against Foster in his individual capacity. [Doc. No. 300, pp. 13, 47].

For the following reasons, the Court GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Hart and Brown and against Foster in his official capacity.  The Court further GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Foster in his individual capacity for (1) failure to classify; (2) failure to train or implement policies, and (3) punitive damages under state law, and those claims are DISMISSED WITH PREJUDICE. In all other respects, Foster's motion is DENIED.

## I.      FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.  RCC is owned and operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died shortly after the altercation.  Moore was forcibly removed from the holding cell after the altercation occurred.  Soon thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including Hart and Brown.  [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants including Foster and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

In a separate Ruling, the Court has granted Defendants summary judgment on Plaintiff's claims that Defendants' use of excessive force caused the death of Moore.  [Ruling on MSJ No. 245].  However, Plaintiffs' claims against Defendants for Moore's less than lethal injuries remain pending.

The Court will now address Plaintiffs' claims against Foster in his individual capacity.

**A.    Factual Background**

Moore at the time of the incident was being detained at RCC after having been arrested by Monroe Police Officer Tommy Crowson for disturbing the peace.

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSP Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C/O") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurred at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went directly to the cell to see what was going on.  When he arrived at the cell, Moore was standing

directly in front of the small window on the cell door, blocking Runner's view into the cell. Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say. Runner said he would go find the lieutenant and he turned to leave. As Runner was walking away, he felt that something wasn't right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack. Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help.  Just after 6 p.m., White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC officer(s) that forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at 6:30 or so, but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C.O. Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78;

4

Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras, where he was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106]. As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

Foster was working the night shift, from 6:00 p.m. to 6:00 a.m. and was in charge of the kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with Reginald Curley. [*Id.*, p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with

Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright

and Tolbird and showed them the video recordings from the security camera in LD-7, which

showed the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp.

14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was

on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly.

[Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8,

at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be

in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No.

256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird

observed any apparent injuries to Moore at the time and RCC staff did not indicate to the OPSO

Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc.

No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20,

22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their

arrival; therefore, the cell showed no signs of the altercation between Moore and White when

Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield

Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21,

41, 46-47]. The OPSO Investigators nevertheless secured the scene as is was, and then continued

the investigation into the battery of White, which by then had morphed into an investigation into

White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC,

they took over the investigation because it was then considered a homicide investigation.

[Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42].

The investigation continued from that point and Lambright assisted as instructed. *Id*. Holyfield

was designated as the lead investigator on the case, and the others were to assist as needed.

[Tolbird Deposition, Doc. No. 256-8, at. p. 48].

> After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield

went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-

29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly.

[*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they

had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature

towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center

("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send

transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at

pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-

9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to

the purported crime scene to investigate further. [*Id*.]

> OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC,

collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at

p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition

that the call for him to head to RCC to pick up Moore and bring him to OCC was made at

approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and

arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition,

Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive

between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

> After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC

and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at pp. 46-47, 63]. C/O Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35;

Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene, however, testified at deposition that they did not see Moore get dropped as he was carried from the four-way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel removed him from the unit and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No.

256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33].

Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23;

Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed

the shift supervisor on scene that Moore showed signs of having a head injury and needed to be

taken to the hospital. [*Id.*, at p. 22].

Murphy and Wells took Moore to Conway.  Medical personnel treating Moore at Conway

performed a CT scan and other tests and determined that Moore had suffered a fractured skull.

[Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31].

Medical personnel also indicated that Moore had suffered a midline shift in his brain due to

bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc.

No. 256-17, at p.31-32]   At 12:29 a.m. on the 14th, Moore was transported by air evacuation

helicopter to LSU Health Center in Shreveport for additional care that could not be provided at

Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at

pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the

medical care providers indicated that Moore was likely brain dead and a decision would have to

be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p.

60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's

Office, to make. The investigation materials were then turned over to the DA's Office, which

declined prosecution of Moore in connection with the death of White, so as to allow the Moore

family to make that decision regarding life support. [*Id.*]. On or about November 14, Erie Moore,

Sr. died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that

Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs sued numerous members of the RCC staff, the owners of RCC, and the City of Monroe, among others that have already been dismissed prior to this point in the litigation. They sued Foster, alleging various claims under federal and state law.

### B.      Deposition of Jody Foster

Foster began working at RCC in 2014 as a C.O. On October 13, 2015, he was working the night shift, from 6:00 p.m. to 6:00 a.m. and was in charge of the kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with C.O. Reginald Curley. [*Id.*, p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22]. He recalls there being foot traffic going from booking, work release and back into the hallway because everyone had to go through the Four-Way. [*Id.*, p. 22]. While there, he saw that Moore was asleep. However, Moore woke and stated, "I'm pissing on myself". [*Id.*, pp. 22-23]. He later heard Moore snoring. [*Id.*, p. 26]. He never tried to wake Moore. He never examined Moore, but he stood within a foot or two of Moore, and never saw any bleeding from Moore's head. [*Id.*, pp. 24, 27, 32-33]. Curley was with him at first but left about halfway through Foster's wait in the Four-Way. [*Id.*, p. 24]. At the time Foster left the Four-Way, there were many people there including several lieutenants, a couple

of sergeants and some OPSO deputies that he thought were detectives. Before he left the Four-

Way he saw several people come, roll Moore unto his stomach, and carry Moore out the door.

Foster then walked through the booking office and into the parking lot which took about twenty

seconds. [Id., p. 24]. Once outside he saw several people carrying Moore, belly down. When they

got close to the car, they set Moore down, opened the door, picked Moore up and put him in the

car. He is not sure who carried Moore to the car, but he believes one of them was Sgt. Williams

and another may have been Lt. Hardwell. [*Id*., p. 25].

### C.     Plaintiffs' Assertions against Foster

Relevant to the pending motion, Plaintiffs assert the following claims against Foster:

1.     Foster violated Moore's right to be free from excessive
force;

2.     Foster acted with deliberate disregard toward Moore's right
to adequate medical care because he knew of Moore being
rendered unconscious and non-responsive due to force
inflicted;

3.     Foster knew he was violating Moore's rights when, without
provocation, Foster and RCC officers battered Moore in the
Four-Way area of the detention center;

4.     Foster participated in a conspiracy to aid and abet a team
cooperative effort to injure Moore, including a plan to do
harm and cooperative efforts to injure Moore;

5.     Foster is not entitled to qualified immunity nor good faith
defense;

6.     Foster committed acts that would support an award of
punitive damages; and

7.     Foster, under Louisiana law, failed to provide adequate
medical care.

Foster seeks the dismissal of all claims against him.  Specifically, he seeks summary

judgment as to the following claims and issues:

1.      Conspiracy claim under § 1983

2.      Use of Excessive Force

3.      Inadequate Medical Care

4.      Failure to Intervene (Bystander Liability)

5.      Classification

6.      Failure to Train and Implement Policies

7.      Good Faith

8.      Qualified Immunity

9.      Punitive Damages

10.     State Law Medical Care Claim

Foster essentially contends there is no evidence that he was in a conspiracy or that he used excessive force against Moore. Furthermore, there is no evidence to show that he ever knew that Moore was in need of medical care or to show that any action that may have led to any injury to Moore was ever performed while Foster was present.

The motion is fully briefed, and the Court is prepared to rule.

## II.      LAW AND ANALYSIS

### A.      Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact.

*Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B.    Analysis

#### 1.    Conspiracy

Plaintiffs allege a § 1983 conspiracy claim.   In order to prevail on a § 1983 conspiracy claim, the Plaintiffs must establish (a) the existence of a conspiracy involving state action; and (b) a deprivation of civil rights and furtherance of the conspiracy by a party to the conspiracy. *Streetman v. Jordan*, 918 F.2d 555,557 (5th Cir. 1990) and *Williams v. Castro*, 2008 WL 4450314(W.D. Tex. 9/29/08). Furthermore, a civil rights conspiracy is only actionable if an actual

violation of § 1983 resulted from it. *Williams*, and *Hale v. Townley*, 45 F.3d 914,920 (5thCir.

1995).

Plaintiffs assert that Foster along with Defendants Curley, Williams, Runner, Hardwell,

and Rosenthal were involved in a conspiracy or team effort, or aided and abetted one another, in

an agreement to injure Moore. Plaintiffs claim that there was a conspiracy that included the plan

for the rescue of White from LD-7, the extraction of Moore and the drop of Moore on the floor in

the hallway in front of LD-7.

Plaintiffs also argue that there was a beating administered by a group of COs, including

Foster, while Moore was in the Four-Way, which was followed by a cover-up.  As evidence of

Foster's participation in the conspiracy, Plaintiffs have produced the declaration and deposition

testimony of John Badger ("Badger"), a terminated, former employee at RCC, who began work at

RCC in 2017. According to Badger,

> He [Foster] told me exactly. They was beating a man. It was four --
> he said there was four of them beating him, and they beat him death,
> he said, and they laughed and talked about it, and they, you know,
> did things and how they was going to protect one another in court.

[Badger Deposition, Doc. No. 336-1, p.3]

Badger further testified that Foster told him that "they" kicked "him". Later in the

deposition, Badger stated that Foster said that he stopped them from beating Moore, but then "they

finished him". [Id., p. 4].

Foster argues that Plaintiffs have failed to produce sufficient evidence to avoid summary

judgment.  Foster states that, despite taking some 60 depositions, the thorough and independent

investigation of the incident by the OPSO, together with the video of the events, there is no

testimony or evidence to show that any of the events described by Badger, as purportedly related

by Foster, actually occurred. Foster argues further that the evidence shows that Moore was not

beaten by four C.O.'s in the Four-Way. Instead, the facts and evidence show that at some point before, during, or after his incarceration at RCC, Moore suffered an unknown and unidentifiable injury that caused a subdural hematoma that led to his death, a month later. Even assuming for the sake of this argument that Badger accurately described his recollection of a conversation with Foster that occurred in 2018, Foster argues that this is not material evidence that Foster, or any other C.O. actually beat/kicked Moore in the Four-Way.

According to Foster, an overview of Badger's story is that after Badger started working for RCC on June 11, 2018, Foster decided to brag about how he and other C.O.'s beat and kicked Moore. This story was allegedly told to Badger sometime before Badger was fired from RCC in July of 2018.   Badger's mother worked at RCC until she was fired, about a month after he was. [Doc. No. 336-1, p. 1].

Foster asserts that this story does not match with the undisputed facts, that Moore died a month after the incident from a hematoma, the cause of which is unknown. Badger's story is also refuted by the testimony of all the C.O.'s and the OPSO deputies who testified that Moore showed no sign of injury while he was in RCC, other than a small mark on his forehead that was seen by only a few of the witnesses. Everyone was consistent in the description of Moore, asleep, laying on the floor of the four way at RCC with no blood. Furthermore, when Moore was seen at the hospital, after being transported from RCC, there was no record or note made which showed that his body suffered any kind of injury consistent with beating or kicking.  So, the only "evidence" of the conspiracy and alleged beating is the baseless story told by Badger.

The Court is mindful that, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000). The Court is also mindful that

conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the nonmovant's burden. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir. 1996). If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992).

The arguments that Foster makes regarding the lack of evidence against him are compelling. However, in order to grant Foster's motion, the Court would be required to make a credibility determination as to Badger, or weigh the evidence, which the Court is forbidden to do at the summary judgment stage. Therefore, Foster's motion is DENIED as to the § 1983 conspiracy claim.

2**.    Use of Excessive Force Claim**

Plaintiffs claim that Moore suffered injuries due to the unlawful use of excessive force. Excessive force claims brought by someone, like Plaintiffs on behalf of Moore, who has not been convicted of criminal activity, are analyzed under the Fourth Amendment, which requires the plaintiff to only prove injury suffered as a result of a use of force that was objectively unreasonable. *See Graham v. Connor,* 490 U.S. 386 (1989); *see also Kingsley v. Hendrickson,* ___ U.S. ___, 135 S.Ct.2466, 2472-73, 192 L.Ed.2d 416 (2015); and *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996).

Foster contends that the deposition testimony establishes that he played no role in the use of force against Moore. Foster asserts that, accordingly, all use of excessive force claims against him must be dismissed with full prejudice.

As indicated above, Plaintiffs have produced the testimony of Badger, which directly implicates Foster.in the use of excessive force. Also as indicated above, the Court is not allowed

to make a credibility determination or weigh the evidence. Therefore, Foster's motion is DENIED as to the use of excessive force claim.

### 3.     Inadequate Medical Care

Plaintiffs allege that Foster acted with deliberate disregard toward Moore's right to adequate medical care because he knew Moore had been rendered unconscious and non-responsive, yet he failed to provide Moore medical care.  Foster argues that Plaintiffs have no evidence that he failed to provide medical care, and that those claims should be dismissed.

"[T]he State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm during their confinement ...." *Hare v. City of Corinth, Miss*., 74 F.3d 633, 650 (5th Cir. 1996) (en banc). "In this circuit, post *Hare*, "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'"". *Estate of Henson v. Wichita Cnty., Tex*., 795 F.3d at 456, 462 (5th Cir. 2015). "A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Estate of Henson*, 795 F.3d at 463 (quoting *Hare*, 74 F.3d at 644). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Estate of Henson*, 795 F.3d at 463 (quoting *Hare*, 74 F.3d at 452).

Foster contends that, since there are no allegations in Plaintiffs' Complaints attacking the way in which healthcare was provided at RCC, nor are there any allegations that the inadequate treatment was a result of a pattern of acts or omissions sufficiently extended or pervasive, this claim is an episodic-acts-omissions claim. *Estate of Henson*, 795 F.3d at 463. To prevail on the episodic-acts-omissions claim, Plaintiffs must  produce  evidence  of  deliberate  indifference  by

Foster. *Estate of Henson*, 795 F.3d at 463-64. Plaintiffs must prove that Foster either refused to provide treatment to Moore, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct evincing a wanton disregard for a serious medical need. *Fortune v. McGee*, 606 F. App'x.741, 743 (5th Cir. 2015) (per curiam).

Foster argues that Plaintiffs cannot show that he was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Moore existed, or that he subjectively drew the inference that the risk existed and then disregarded that risk

The Court finds that Badger's testimony, if true, shows that Foster actively participated in the alleged use of excessive force against Moore in the Four-Way, and therefore was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Moore existed, yet Foster failed to provide Moore with medical care. Therefore, Foster's motion must be DENIED as to the allegations of failure to provide medical care.

### 4.      Failure to Intervene (Bystander Liability)

Plaintiffs allege that Foster should have intervened to protect Moore from excessive force administered by other defendants. For an officer to be liable as a bystander, he must have been present for the underlying constitutional violation, knew that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Mere presence at the scene of an incident is not enough. In order to be held liable as a bystander, the officer must have had time to appreciate the offending officer's use of excessive force and intervene. *Nowell v. Acadian Ambulance Service*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001).

Foster contends that a review of the Third Amended Complaint, together with his deposition shows that he was not present at any time when force was used. Thus, any claim that

he failed to intervene during the course of use of excessive force should be dismissed with full prejudice.

Plaintiffs respond that Foster's admissions show he was in the Four-Way when Moore was beaten by Foster, Curley, and likely Williams and Blackman (an unnamed defendant); that the Four-Way is fairly small giving Foster the time and space to intervene physically or verbally; and that Foster neither intervened physically or verbally, but instead decided to join the beating. Plaintiffs point to Badger's testimony.

Assuming again that Badger's testimony is true, then Plaintiffs have established that Foster was present for the underlying constitutional violation, knew that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. Therefore, Foster's motion as to bystander liability must be DENIED.

### 5.    Classification

Plaintiffs concede there is no cause of action for failure to properly classify standing alone. However, Plaintiffs contend that the failure to recognize and classify Moore as either a mental health prisoner or suicidal placed him in harm's way when housed with White, a violent inmate and one who was prone to seizures. This cause of action is based on deliberate indifference to Moore's medical condition.

To establish a failure-to-protect claim under Sec. 1983, Plaintiffs must show that Moore was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. *Farmer v. Brennan*, --- U.S. ----, ----, 114S.Ct. 1970 1977, 128 L.Ed.2d 811 (1994).  A prison inmate does not have a protectable liberty or property interest in custodial classification and an inmate's disagreement with his classification is insufficient to establish a constitutional violation. *Wilson v. Budney,* 976 F.2d 957 (5th Cir. 1992),

*Neals v. Norwood,* 59 F.3d 530 (5th Cir. 1995), and *Ivey v. Dretke*, 2007 WL3118351 (E.D. Tex. 10/22/07). Furthermore, a disagreement with an inmate's medical classification is also insufficient to establish a constitutional violation. *Wilson*, *supra*, and *Varnado v. Lynaugh*, 920 F.2d 320,321 (5th Cir. 1991).

Foster contends that Plaintiffs do not allege that he failed to properly classify Moore, and, furthermore, if the Plaintiffs made such a claim, it is without merit.

The Court finds that Plaintiffs have produced no evidence to show that Foster was responsible for classifying Moore, or, even if he were, that he failed to properly classify Moore. Accordingly, Foster's motion as to the claim for the failure to properly classify Moore is GRANTED and that claim is DISMISSED WITH PREJUDICE.

### 6.       Failure to Train and Implement Policies

Foster asserts that Plaintiffs vaguely claim that he failed to train and implement policies, yet they presented no proof or evidence that he was responsible for any training or policies. He further argues that there is no proof of deliberate indifference.  Foster contends, therefore, that he is entitled to judgment as a matter of law on these claims.

The Court agrees that Plaintiffs have produced no summary judgment evidence to show that Foster was responsible for any training or policies.  Accordingly, Foster is entitled to summary judgment dismissing any claims that Plaintiffs' may have made against him for failure to train or implement policies, and those claims are DISMISSED WITH PREJUDICE.

### 7.       Good Faith Defense

Foster contends that all § 1983 claims made against him should be dismissed, with prejudice, pursuant to the "good faith" defense.  Foster asserts that in *Bryan v. Jones*, 530 F.3d 1210 (5th Cir. 1976), the Fifth Circuit, *en banc*, held that the good faith defense was available to

shield a sheriff from liability for a Fourth Amendment claim pursuant to *Monroe v. Pape*, 365 U.S. 167 (1961).  He further asserts that the distinction between "qualified immunity" and the "good faith defense" was recognized in *Richardson* v. *McKnight*, 521 U.S. 399 (1997), wherein the Court held that private prison guards were not entitled to qualified immunity but the Court specifically noted that the opinion did not address the availability of the good faith defense as to those private prison guards and no view was expressed on that issue.

Although Foster does not provide a specific definition of the good faith defense, he asserts he is entitled to invoke the good faith defense because there is no evidence to show he acted with malice.  The Court finds, however, that Badger's testimony, if true, would indicate otherwise. Accordingly, Foster's motion is DENIED as to the good faith defense.

### 8.    Qualified Immunity

Plaintiffs assert claims against Foster for violations of Moore's constitutional rights under 42 U.S.C. § 1983. In response, Foster has invoked the qualified immunity defense. [Doc. No. 162, p. 10].

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982).  The Supreme Court has recognized the importance of granting qualified immunity prior to trial when officers make reasonable but mistaken judgments, because "qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551-552 (2017). The Supreme Court has recognized the potency of the immunity: qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The burden is on the plaintiff to overcome the defense. *Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).

Plaintiffs argue that Foster is a private correctional officer, and as such, he is not entitled to assert qualified immunity, citing *Richardson v. McKnight*, 521 U.S. 399 (1997). Plaintiffs further contend that, since the summary judgment evidence shows that there was no need for the application of force by Foster in the Four-Way, and that the force occurred when Plaintiff was non-threatening, subdued, and handcuffed, then the force used would necessarily be excessive.  Thus, Foster would not be entitled to qualified immunity.

In support of their position, Plaintiffs cite *Cowart v. Erwin*, 837 F.3d 444 n. 32 (5th Cir. 2016) (use of force against a non-resisting inmate is excessive); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009) (summary judgment inappropriate where evidence of knee strike after handcuffing with minimal struggle objectively unreasonable) (citing *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir.2006). The Court in *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir.2018) at 453 stated,

> We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest. *See Ramirez v. Martinez*, No. 11-41109, 716 F.3d at 377–78 (5th Cir. 2013); *Newman v. Guedry*, No.11 41192, 703 F.3d 757, 764 at 762–63 (5th Cir. 2012); *Bush v. Strain* , 513 F.3d 492, 501 (5th Cir. 2008).

Plaintiffs conclude that, if a jury were to find Moore was not actively resisting, then any physical force like the strike to the head or the slam and hard drop to the floor is excessive.

Foster responds that a strong dissent in *Richardson*, and the more recent rulings of the Fifth Circuit and the Supreme Court suggest that *Richardson* is not applicable to the claims made against him, and that he is therefore entitled to assert qualified immunity as a defense even if he is a private correctional officer.

Assuming arguendo that Foster is entitled to assert qualified immunity as a defense despite being a private correctional officer, the Court finds that Foster is not entitled to summary judgment in his favor.  Once again, if Badger's testimony is true, then Foster violated a Constitutional right and the alleged actions or inactions of Foster would have been known to be unconstitutional by all reasonable C.O.'s.  Accordingly, qualified immunity would not protect Foster.

### 9.    Punitive Damages

Foster seeks judgment as a matter of law holding that he is not liable for punitive damages under either federal or state law.   In order to establish entitlement to punitive damages from Foster, Plaintiffs must prove that Moore's constitutional rights were violated with evil intent or reckless or callous indifference to Moore's constitutional rights. *Williams v. Koffman County*, 352 F.3d. 994, 1015 (5th Cir. 2003) and *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).  Foster asserts there is no evidence he violated Moore's constitutional rights, and even if there were, there is no evidence to show he acted with evil intent or reckless or callous indifference to Moore's constitutional rights.

Plaintiff's respond that the evidence shows that, instead of providing medical care to Moore for injuries Foster helped to inflict, he and his co-conspirators attempted to cover up for wrongdoing by not sending Moore to a hospital.

The Court finds that Badger's statement, if true, would belie Foster's assertions.  Therefore, Foster's argument has no merit, and his motion must be DENIED as to punitive damages under federal law.

Foster next argues that punitive damages are not awardable under Louisiana state law unless expressly authorized by statute, citing *Ross v. Conoco, Inc*., 2002-0299 (La. 10/15/02) 828 So. 2nd 546, 555. He argues that, here, no statute allows the award of punitive damages for the death of Moore.  Plaintiffs do not dispute Foster's arguments in their opposition, nor do they cite a Louisiana statute providing for punitive damages under these facts.

Accordingly, the Court GRANTS Foster's motion as to the issue of punitive damages under state law, and Plaintiffs' claims against him for punitive damages under state law are DISMISSED WITH PREJUDICE.

### 10.    State Law Medical Care Claim

Foster contends that Plaintiffs did not assert a claim under state law against him for failure to provide medical care, that there is no testimony or evidence to support the claim that he saw Moore being unresponsive and obviously suffering from a serious medical condition while in the Four-Way, and that there is no testimony or evidence to show that he knew that Moore had a serious medical condition that required transportation to a hospital. He therefore asks for judgment as a matter of law on this issue.

Plaintiffs respond that all of the officers in the Four-Way should have seen something was seriously wrong with Moore and should have requested transport to a hospital.

In Louisiana, prison authorities owe a duty to provide an inmate with reasonable medical care. *Harper v. Goodwin*, (La. App. 2nd Cir. 5/17/06), 930 So.2d 1160, *Robertson v. Stalder*, 1998-

0558 (La. App. 1st Cir. 4/1/99), 734 So.2d 810 and *Roy v. Phelps*, 488 So.2d 468 (La. App. 3rd Cir.1986).

The Court finds that Foster has not carried his burden of proving there is no genuine issue of fact as to this claim.  Accordingly, Foster's motion is DENIED as to this issue.

## III.    CONCLUSION

For the reasons set forth above, the Court GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Defendants Hart and Brown, and all claims against Hart and Brown are DISMISSED WITH PREJUDICE in their entirety.

The Court further GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Defendant Foster in his official capacity, and those claims are DISMISSED WITH PREJUDICE in their entirety.

Additionally, the Court GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Foster in his individual capacity for (1) failure to classify; (2)  failure to train or implement policies, and (3) punitive damages under state law, and those claims are DISMISSED WITH PREJUDICE.

In all other respects, the motion is DENIED.

MONROE, LOUISIANA, this 30th day of October, 2020.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE