# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **ERIE MOORE, JR., ET AL.** | **CIVIL ACTION NO. 3:16-CV-01007** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LASALLE CORRECTIONS, INC., ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Pending here is a Motion for Summary Judgment filed by Defendants Alton Hale ("Hale"), Danielle Walker ("Walker"), and William Mitchell ("Mitchell") [Doc. No. 222].   Plaintiffs have filed an opposition [Doc. No. 299].  Defendants have filed a reply to the opposition [Doc. No. 324].

Defendants Hale, Walker, and Mitchell seek the dismissal of all of Plaintiffs' claims against them, both in their official capacities and in their individual capacities.  [Doc. No. 222].  Plaintiffs concede in their opposition that all claims against Hale and Walker should be dismissed.  Plaintiffs further concede that the claims against Mitchell in his official capacity should be dismissed, leaving only the claims against Mitchell in his individual capacity. [Doc. No. 299, p. 12].

For the following reasons, the Court GRANTS the pending Motion for Summary Judgment [Doc. No. 222] and all claims against Hale, Walker, and Mitchell are DISMISSED WITH PREJUDICE in their entirety.

## I.    FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.  RCC is owned and

operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Erie Moore, Sr. ("Moore") was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died shortly after the altercation.  Moore was forcibly removed from the holding cell where the altercation occurred.  Shortly thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including Walker.  [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants including Hale and Mitchell and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

In a separate Ruling, the Court has granted Defendants summary judgment on Plaintiff's claims that Defendants' use of excessive force caused the death of Moore.  [Ruling on MSJ No. 245].  However, Plaintiffs' claims against Defendants for Moore's less than lethal injuries remain pending.

The Court will now address Plaintiffs' claims against Mitchell in his individual capacity.

## A.    Factual Background

Moore at the time of the incident was being detained at RCC after having been arrested

by Monroe Police Officer Tommy Crowson for disturbing the peace.

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSP Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C.O.") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurs at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went to the cell to investigate.  When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell.  Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say.  Runner said he would go find the lieutenant and he turned to leave. As Runner was walking away, he felt that something

wasn't right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack.  Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help. White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC officer(s) that forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at 6:30 or so, but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C.O. Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore and he was moved to the "Four-Way," an interlock area

4

between hallways of RCC which is not monitored by video cameras, where he was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106]. As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

Foster was working the night shift, from 6:00 p.m. to 6:00 a.m. and was in charge of the kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with Reginald Curley. [*Id*., p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp.

14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time, and RCC staff did not indicate to the OPSO Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

 Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as is was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the investigation because it was then considered a homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point and Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to the purported crime scene to investigate further. [*Id*.]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition that the call for him to head to RCC to pick up Moore and bring him to OCC was made at approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to

7

relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield

walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and

others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at

pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-

16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore

up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130;

C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-

6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield

Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield

Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No.

156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse

Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at

pp. 46-47, 63]. C/O Runner also recalled that Moore had a bump on his forehead during the time

he was in LD-7 and that it might have been a result of Moore's banging his head on the door to

the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110,

115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7.

[Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to

carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35;

Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down

because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition,

Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc.

No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene, however, testified at their depositions that they did not see Moore get dropped as he was carried from the four-way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel removed him from the unit and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No. 256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33]. Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23; Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed

9

the shift supervisor on scene that Moore showed signs of having a head injury and needed to be taken to the hospital. [*Id.*, at p. 22].

Murphy and Wells took Moore to Conway.  Medical personnel treating Moore at Conway performed a CT scan and other tests and determined that Moore had suffered a fractured skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31]. Medical personnel also indicated that Moore had suffered a midline shift in his brain due to bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31-32]   At 12:29 a.m. on October 14, Moore was transported by air evacuation helicopter to LSU Health Center in Shreveport for additional care that could not be provided at Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the medical care providers indicated that Moore was likely brain dead and a decision would have to be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the DA's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id.*]. On or about November 14, Erie Moore, Sr. died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6].  She

10

also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id*., pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs sued numerous members of the RCC staff, the owners of RCC, and the City of Monroe, among others that have already been dismissed prior to this point in the litigation. They sued Foster, alleging various claims under federal and state law.

### B.     Deposition of William Mitchell

Prior to working at RCC as an LPN, Mitchell worked at several hospitals/clinics as an LPN. [Sealed Deposition of William Mitchell, Doc. No. 223, pp. 7-9 and 11-15]. In 2005 he received his degree in practical nursing from what was then known as the Louisiana Technical College - Ruston Campus, which is now known as Delta Community College. He has been an LPN ever since. [*Id*., p. 17].

Mitchell's first recollection of Moore [on October 12, 2015] was when he saw Moore sitting on a bench in booking, directly across the hall from his medical office. [*Id*., pp. 21-22]. While Moore was seated on the bench, Mitchell was asked by a C.O. to take a look at him. [*Id*., p. 22]. In response to the request, Mitchell examined Moore while he was seated on the bench. [*Id*., p. 24]. Mitchell would have checked to see whether Moore was a diabetic, if his heart was racing, if he had high blood pressure and the like. He would also have checked to see if Moore was agitated or non-compliant. [*Id*., pp. 24-25]. Mitchell recalls that Moore cussed him while being assessed. [*Id*., p. 27]. Mitchell thought Moore was intoxicated because of his behavior. He told the C.O.'s his findings. [*Id*., pp. 34-35]. Before Moore was taken to a lock down cell, Mitchell told the C.O.'s that he would check on Moore later on because he was not getting anywhere with Moore at that time. [*Id*., pp. 27-28]. This was done to give Moore some time to become cooperative.

He recalls trying to speak with Moore later on but does not remember the number of times. [*Id.*, p. 29]. Mitchell specifically recalls seeing Moore again at the Nurse's Station and offering to rinse Moore's eyes after he had been pepper sprayed. [*Id.*, p. 30]. Moore refused Mitchell's assistance and cursed Mitchell again. [*Id.*, p. 31]. Moore also told Mitchell that he was from Mer Rouge, Louisiana, during two different assessments. [*Id.*, p. 32].

Later, while in his office (near the Four-Way), he heard a commotion. Because of the commotion, Mitchell walked about eight feet to the door of the Four-Way and peeped in and saw that several C.O.'s were trying to get Moore under control, who was actively resisting. Mitchell saw that Moore was agitated, irate, and fighting. [*Id.*, p. 36]. He saw Loring, Hardwell, Curley, and Runner in the Four-Way with Moore. [*Id.*, p. 37]. When the C.O.'s were trying to control Moore, he did not see any hands, arms or legs swinging at Moore. Moore was not being punched, kicked or struck in any manner. [*Id.*, p.40]. Mitchell then returned to his medical office to work on his paperwork. [*Id.*, pp. 38 and 42]. After hearing the initial commotion in the Four-Way way he did not hear any other commotion. [*Id.*, p. 59]. Mitchell was still at work because he needed to do medical intake on five-to-ten DOC inmates who had been received at RCC late in the day. [*Id.*, pp. 105-106].

Sometime later, he went back to the Four-Way to assess Moore. [*Id.*, p. 43]. On this occasion Moore's hands were handcuffed behind his back and he was sitting up against a wall. [*Id.*, p. 43]. Next, he spoke to Moore and noticed that Moore was tired and kind of "out of it." He asked Moore "what's up, how are you, you alright," but did not get a definite affirmative or negative answer from Moore. [*Id.*, pp. 44-45]. Moore did say that he was sore. He observed a red knot in the middle of Moore's forehead that was about the size of a vanilla wafer. [*Id.*, p. 46]. The next time he saw Moore in the Four-Way, Curley and Blackman were there with Moore. [*Id.*, p.

47]. He observed Moore for a couple of minutes and saw that Moore was alert and conscious. [*Id*., p.49]. Mitchell returned to the Four-Way to check on Moore less than thirty minutes later and saw Moore lying on his back on the floor, asleep and snoring. [*Id*., pp. 52-54]. There were no other injuries on Moore other than the knot on his forehead and some marks on Moore's wrists from his handcuffs. On this last visit he stayed for a couple of minutes and watched Moore. [*Id*., p. 54]. Mitchell thinks that he saw Moore still sleeping when the OPSO came to get him. [*Id*., p. 55].

On the last occasion that Mitchell assessed Moore in the Four-Way, he used a sternal rub on Moore and got "kind of a grimace and a grunt" from Moore. He just thought Moore was sleeping. [*Id*., p. 147-148]. After he did the sternal rub, he was told that Ouachita Correctional Center ("OCC") was on the way to get Moore. [*Id*., p. 148]. Moore was never bleeding at any time. [*Id*., p. 63].

### C.   Plaintiffs' Assertions against Mitchell

Relevant to the pending motion, Plaintiffs assert the following claims against Mitchell:

1.   Plaintiffs have circumstantial evidence of a conspiracy, aiding and abetting, and a team cooperative effort to do injury to Moore, when no force was objectively reasonable, and Mitchell acquiesced to the use of force in the Four-Way;

2.   Mitchell failed to intervene to stop the use of force in the Four-Way;

3.   Mitchell used excessive force against Moore;

4.   Mitchell acted with deliberate disregard toward Moore's right to adequate medical care because he knew of Moore being rendered unconscious and nonresponsive due to force inflicted, yet he did not request medical care, such as was eventually done at the OCC;

5.   Mitchell as a private correctional employee is not entitled to assert a qualified immunity defense, nor was he in good faith, because he acted with deliberate disregard when he failed to provide medical care;

13

6.       Mitchell committed acts that would support an award of punitive damages due to his deliberately indifferent acts; and

7.       Mitchell is liable under Louisiana law for failure to provide adequate medical care.

Mitchell seeks the dismissal of all claims against him.   Specifically, he seeks summary judgment as to the following claims and issues:

1.       Conspiracy claim under § 1983

2.       Failure to Intervene (Bystander Liability)

3.       Use of Excessive Force

4.       Qualified Immunity

5.       Inadequate Medical Care

6.       Classification

7.       Good Faith

8.       Punitive Damages

9.       State Law Medical Care Claim

Mitchell essentially contends there is no evidence that he was in a conspiracy, that he used excessive force against Moore, or that he provided inadequate medical care.

The motion is fully briefed, and the Court is prepared to rule.

## II.       LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

14

The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B.    Analysis

#### 1.    Conspiracy

Plaintiffs allege a § 1983 conspiracy claim.    In order to prevail on a § 1983 conspiracy claim, Plaintiffs must establish (a) the existence of a conspiracy involving state action; and (b) a deprivation of civil rights and furtherance of the conspiracy by a party to the conspiracy. *See Streetman v. Jordan*, 918 F.2d 555,557 (5th Cir. 1990); *Williams v. Castro*, No. SA-06-CA-1002,

2008 WL 4450314 (W.D. Tex. Sept. 29, 2008). Furthermore, a civil rights conspiracy is only actionable if an actual violation of § 1983 resulted from it. *Williams*, 2008 WL 4450314 at *3 and *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).

Plaintiffs assert that Mitchell, along with Defendants Curley, Williams, Runner, Hardwell, and Rosenthal were involved in a conspiracy or team effort, or aided and abetted one another, in an agreement to injure Moore. Plaintiffs claim that there was a conspiracy that included the plan for the rescue of White from LD-7, the extraction of Moore, and the dropping of Moore on the floor in the hallway in front of LD-7.

Plaintiffs also argue that there was a beating administered by a group of C.O.'s while Moore was in the Four-Way, which was followed by a cover-up. As evidence of the conspiracy, Plaintiffs have produced the declaration and deposition testimony of John Badger ("Badger"), a terminated, former RCC employee, who began work at RCC in 2017. According to Badger,

> He [Foster] told me exactly. They was beating a man. It was four --
> he said there was four of them beating him, and they beat him death,
> he said, and they laughed and talked about it, and they, you know,
> did things and how they was going to protect one another in court.

[Badger Deposition, Doc. No. 336-1, p.3]

Badger further testified that Foster told him that "they" kicked "him." Later in the deposition, Badger stated that Foster said that he stopped them from beating Moore, but then "they finished him." [*Id*., p. 4].

However, Badger did not implicate Mitchell at any point in his testimony. Further, it is undisputed that Mitchell is an LPN, is not a supervisor of any of the correctional officers, and, does not perform any C.O. function. A review of all of the testimony and evidence shows that Mitchell only performed his medical duties at RCC. Additionally, the depositions of all witnesses show that none of the C.O.'s testified that Mitchell was their supervisor, that Mitchell was present

16

when force was used, or that he gave them any instruction on how they were to perform their duties. The only argument advanced by Plaintiffs to show that Mitchell was part of a conspiracy is that, since he was in the area of the Four-Way, and since he looked in on Moore several times, he must have known of the conspiracy, and acquiesced with it.

Plaintiffs have produced no evidence to establish Mitchell touched Moore in a fashion that caused any injury. In addition, there is no evidence that Mitchell acted jointly or in concert with any other Defendant, or that he performed any act in furtherance of a conspiracy.

The Court is mindful that, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000). However, the Court is also mindful that conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the nonmovant's burden. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir. 1996). If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992).

Here, Plaintiffs have failed to present specific evidence to show that Mitchell participated in any alleged conspiracy to harm Moore. Plaintiffs have made only conclusory claims and unsubstantiated assertions to show that Mitchell was part of any conspiracy. Therefore, Mitchell's motion is GRANTED as to the § 1983 conspiracy claim.

### 2.      Failure to Intervene (Bystander Liability)

Plaintiffs allege that Mitchell should have intervened to protect Moore from excessive force administered by other Defendants. For an officer to be liable as a bystander, he must have been present for the underlying constitutional violation, must have known that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm,

and chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Mere presence at the

scene of an incident is not enough. In order to be held liable as a bystander, the officer must have

had time to appreciate the offending officer's use of excessive force and intervene. *Nowell v.*

*Acadian Ambulance Service*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001).

Plaintiffs allege that Mitchell admitted he peeked into the Four-Way for a couple of

minutes, and, therefore, he should have been aware that correctional officers were beating Moore,

yet he did nothing to stop them.

Mitchell contends that, on the one occasion when he peeked into the Four-Way and saw

that Moore was resisting the efforts of C.O.'s to gain control, none of the C.O.'s struck, kicked or

punched Moore.  Additionally, Mitchell argues that he is a nurse and not a C.O., and he had no

ability or authority to intervene in any use of force incident.

The Court finds that Plaintiffs have failed to establish a genuine issue of fact that Mitchell

was present for the underlying constitutional violation, knew that a fellow officer was violating an

individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not

to act.  Therefore, Mitchell's motion is GRANTED as to Plaintiffs' bystander liability claim.

### 3.    Use of Excessive Force Claim

Plaintiffs claim that Moore suffered injuries as a result of the unlawful use of excessive

force. Excessive force claims brought by someone, like Plaintiffs on behalf of Moore, who has not

been convicted of criminal activity, are analyzed under the Fourth Amendment, which requires the

plaintiff to only prove injury suffered as a result of a use of force that was objectively unreasonable.

*See Graham v. Connor,* 490 U.S. 386 (1989); *see also Kingsley v. Hendrickson,* ___ U.S. ___, 135

S.Ct. 2466, 2472-73, 192 L.Ed.2d 416 (2015); *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996).

Mitchell contends that the deposition testimony establishes that he played no role in the use of force against Moore. Mitchell asserts, accordingly, all use of excessive force claims against him must be dismissed with full prejudice.

As indicated above, Plaintiffs have produced no evidence which implicates Mitchell in the use of excessive force.  Therefore, Mitchell's motion is GRANTED as to the use of excessive force claim.

### 4.      Inadequate Medical Care and Qualified Immunity

Plaintiffs assert claims against Mitchell for violations of Moore's constitutional rights under 42 U.S.C. § 1983. Plaintiffs allege that Mitchell acted with deliberate disregard toward Moore's right to adequate medical care because he knew of Moore being rendered unconscious and nonresponsive due to force inflicted, yet he did not request medical care for Moore, such as was eventually done at the OCC.  In response, Mitchell has invoked the qualified immunity defense. [Doc. No. 160, p. 10].

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982).  The Supreme Court has recognized the importance of granting qualified immunity prior to trial when officers make reasonable but mistaken judgments, because "qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551-552 (2017). The Supreme Court has recognized the potency of the immunity: qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The burden is on the plaintiff to overcome the defense. *Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).

### a.    Is qualified immunity available to private correctional officers?

Citing *Richardson v. McKnight*, 521 U.S. 399 (1997), Plaintiffs first argue that Mitchell is a private correctional officer, and as such, he is not entitled to assert qualified immunity.

Mitchell responds that a strong dissent in *Richardson*, and the more recent rulings of the Fifth Circuit and the Supreme Court, suggest that *Richardson* is not applicable to the claims made against Mitchell. This can be seen, according to Mitchell, in Justice Scalia's dissent in *Richardson*, joined by Justices Rehnquist, Thomas, and Kennedy:

> Private individuals have regularly been accorded immunity when they perform a governmental function that qualifies. We have long recognized the absolute immunity of grand jurors, noting that like prosecutors and judges they must "exercise a discretionary judgment on the basis of evidence presented to them." "It is the functional comparability of [grand jurors'] judgments to those of the judge that has resulted in [their] being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well." Likewise, witnesses who testify in court proceedings have enjoyed immunity, regardless of whether they were government employees. "[T]he common law," we have observed, "provided absolute immunity from subsequent damages liability for all persons— governmental or otherwise—who were integral parts of the judicial process." I think it highly unlikely that we would deny prosecutorial immunity to those private attorneys increasingly employed by various jurisdictions in this country to conduct high-visibility criminal prosecutions. There is no more reason for treating private prison guards differently.

*Id*. at 417-418. (Scalia, J. dissenting) (internal citations omitted).

20

Discussing the majority's policy arguments, Justice Scalia opined that to the extent marketplace pressures were at play:

> It is almost certainly the case that, short of mismanagement so severe as to provoke a prison riot, price (not discipline) will be the predominating factor in such a regime's selection of a contractor. A contractor's price must depend upon its costs; lawsuits increase costs; and "fearless" maintenance of discipline increases lawsuits. The incentive to down-play discipline will exist, moreover, even in those States where the politicians' zeal for market emulation and budget cutting has waned, and where prison-management contract renewal is virtually automatic: the more cautious the prison guards, the fewer the lawsuits, the higher the profits. In sum, it seems that "market-competitive" private prison managers have even greater need than civil-service prison managers for immunity as an incentive to discipline.

*Id.* at 419-420.  (Scalia, J. dissenting). Mitchell argues that, as Justice Scalia wrote, price is the real motivator in these contractual situations.

The Court next took up the issue of qualified immunity for private parties assuming governmental roles in the case of *Filarsky v. Delia*, 566 U.S. 377 (2012), which was decided fifteen years after *Richardson*. In those intervening years the composition of the Court changed greatly. Justices who made up the majority in *Richardson*–O'Connor, Souter, and Stevens–had retired by the time *Filarsky* was decided.  Following in the footsteps of Justice Scalia's prescient dissent in *Richardson* and writing for a unanimous Court in *Filarsky*, Chief Justice Roberts further clarified the Court's stance on qualified immunity for private individuals. Chief Justice Roberts acknowledged that *Richardson* was still good law on its narrow facts. However, *Richardson* was distinguished because the *Richardson* majority explicitly narrowed its opinion to situations involving, "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in combination with other firms." *Richardson*, 521 U.S. at 413.

21

The Court agrees with Mitchell that, pursuant to the unanimous ruling in *Filarsky,* he is provided the protections of qualified immunity.  The level of governmental oversight described in *Richardson* only included one layer of governmental oversight. Here, however, while LaSalle and/or Richwood have assumed a major lengthy administrative task, Louisiana law closely regulates the operation of private prison management companies providing for greater supervision than that present in Tennessee. Louisiana Revised Statute 39:1800.1, *et seq.*, entitled the Louisiana Corrections Private Management Act, was enacted to authorize and regulate the private prison management industry. The Act authorizes the Louisiana Department of Public Safety and Corrections and local political subdivisions, "to enter into contracts with prison contractors for the financing, acquiring, designing, leasing, constructing, and operation of [prison] facilities." LA. R.S. 39:1800.4(A).  It requires that any firm contracting to provide prison management services demonstrate that it has:

(1)  the qualifications, experience, and management personnel necessary to carry out the terms of the contract;

(2)  The financial strength and ability to provide indemnification for liability arising from large prison management projects;

(3)  Evidence of past performance of similar contracts;

(4)  The ability to comply with applicable court orders and correctional standards.

LA. R.S. 39:1800.4(B).

Contracts under the Act also apply state regulations to private prison management firms that are equally imposed upon government run facilities including the provision of medical care to inmates, security to protect the public, discipline to inmates according to established rules and procedure, and the DOC's policies on the use of force. LA. R.S. 39:1800.4(D). The Act also authorizes the state and local political subdivisions, "to monitor the operations and correctional

services provided to them by a private prison contractor." LA. R.S. 39:1800.4(G). Not only can the private facilities be monitored by their governmental contracting partners at the DOC, but contractors are required to give preference in hiring to any former employee of the state or local government subdivision that has newly contracted for the provision of prison services. LA. R.S. 39:1800.6. Further, private facilities must adhere to the Corrections Administrative Remedy Procedure and associated procedures. LA. R.S. 39:1800.7(E).

Additionally, the Private Prison Contracting Act of 1986, Tennessee Code Annotated §41-24-101, et seq., appears to apply to and authorize only contracts for management of state facilities. In contrast, in Louisiana, a private prison management contractor may enter into an agreement to manage a prison facility with the State of Louisiana or with one of its many political subdivisions which are authorized and required to provide for the incarceration of inmates. This means that like the facility in *Richardson*, RCC was overseen (and regulated) by the state, but unlike the facility in *Richardson*, it was open to scrutiny by its local contracting partner and those local arresting authorities that brought inmates to be detained there. Thus, the regulations and potential oversight placed on private prison management contractors in Louisiana go above and beyond the "limited direct supervision" at issue in *Richardson*.

Further, though the facts of *Richardson* do not make explicit what oversight was specifically provided in Tennessee, the law cited by the Court suggests that under Tennessee law the facility at issue was exempt from even yearly monitoring by the state. *Richardson*, 521 U.S. at 409 ((citing TENN. CODE ANN. §41-4-140(c)(5), exempting private jails from certain monitoring)). Private facilities in Louisiana, on the other hand, are not exempt from yearly inspections. Instead, as explained in the deposition testimony of former LaSalle Chief of Operations Johnny Creed, RCC was inspected and audited annually by the DOC for compliance

23

with the Louisiana's Basic Jail Guidelines. [Deposition of Johnny Creed, Doc. No. 219-3, pp. 21, 85]. This is a level of scrutiny that the Tennessee law at issue in *Richardson* explicitly exempted the facility there from and provides further evidence that the narrowly defined *Richardson* holding cannot be automatically applied here. These Louisiana requirements serves to further distinguish *Richardson* from the facts before this Court.

Finally, the *Richardson* Court explicitly avoided discussion of whether the guards there had "acted under color of state law." *Richardson*, 521 U.S. at 413. However, here it is clear that Mitchell operated under color of state law by virtue of Louisiana's statutory authorization and regulation of the facility at issue. Here, LaSalle and/or Richwood and the employees were cloaked with the powers of the state through the assumption of the local political subdivision's role in detention.

In *Saenz v. G4SSecure Solutions (USA), Inc.,* 224 F. Supp. 477,481-482 (W.D. Tex. 2016), a district court in the Western District of Texas acknowledged the tension between the majority in *Richardson* and the holding in *Filarsky,* finding that, "the state of the law regarding the applicability of qualified immunity to private actors is anything but clear at this point." See also *Walter v. Horseshoe Entm't*, 483 Fed. App'x. 884, 886, n. 3 (5th Cir. 2012) ("[T]he law is not established in this circuit, however, as to whether private entities such as these are entitled to the protections of qualified immunity.").

When *Filarsky* and these other cases are examined, it is apparent that jurisprudence is recognizing that qualified immunity applies to a broader cast of individuals. The *Filarsky* Court found that, "affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to, 'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" 566 U.S. at 390. The *Filarsky* Court

recognized that the Court had "called the government interest in avoiding 'unwarranted timidity' on the part of those engaged in the public's business 'the most important special government immunity-producing concern.'" *Id*. By protecting against such timidity, the doctrine allows "those who serve the government [to] do so 'with the decisiveness and the judgment required by the public good.'" *Id*. That decisiveness "is of vital importance regardless whether the individual sued as a state actor works full-time or on some other basis." *Id*.

The same chilling effect warned against in *Filarsky* is applicable here. Mitchell does the same jobs as nurses at state and local facilities, but, under *Richardson*, the protection afforded by qualified immunity is lacking. Even if those individuals are employed by a private company, they are still performing public work.

Chief Justice Roberts' *Filarsky* opinion focuses on, "those engaged in the public's business" and, "others acting on behalf of the government," when deciding that qualified immunity should be extended to protect non-government employees. Here, Mitchell was one of "those engaged in the public's business," which is shown in the allegations of the Third Amended Complaint and in his depositions. As detailed above, Louisiana law authorizes private prison contractors to assume the government's incarceral role, whether that be from the State or a local political subdivision. *See* LA. R.S. 15:701, *et seq*. Louisiana state law also finds no difference between assault on a C.O. working for a private corporation and one working in a state facility. LA. R.S. 39:1800.7(A). These equivalencies do not stop at state law either.

It is well settled that the Fifth Circuit has applied § 1983 jurisprudence to private prisons and the companies that manage them. In *Rosborough v. Management &Training Corporation*, 350 F.3d 459 (5th Cir. 2003), the Fifth Circuit found that a private prison-management corporation and their employees may be sued under § 1983 because the services provide a public function. Since

*Rosborough*, the liability of private prison companies has been determined based upon the § 1983 jurisprudence found in the Fifth Circuit. For example, the Western District of Louisiana has applied the law applicable to political subdivisions to claims made against LaSalle for failure to train, use of force, failure to provide adequate medical care, and the like. *See, e.g., Henyard v. LaSalle Corrections*, No. 18-0062, 2018 WL 2424111 (W.D. La. May 29, 2018); *Wesley v. LaSalle Management*, No. 1:16-CV-1479, 2017 WL 4209112 (W.D. La. Sept. 19, 2017), and *Smith v. LaSalle Management*, No. 5:12-CV-3000, 2013 WL 949837 (W.D. La. Mar. 11, 2013).

Mitchell asserts that the recognition that qualified immunity applies to him is merely unifying § 1983 jurisprudence to apply equally to private and public prison facilities. The Court agrees. Accordingly, the Court finds that Mitchell is entitled to invoke the protections of qualified immunity despite being a private prison employee.  The Court will next examine whether Mitchell is entitled to qualified immunity under the facts and circumstances of this case.

### b.      Is Mitchell entitled to qualified immunity?

The Supreme Court has said the Eighth Amendment prohibits "deliberate indifference" to a prisoner's medical needs. *Farmer v. Brennan*, 511 U.S. 825, 834–47 (1994). The Fifth Circuit has held the same rule applies to pretrial detainees like Moore under the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir. 1996) (en banc).

To establish a constitutional violation, a plaintiff must show that the defendant: (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) subjectively "dr[e]w the inference" that the risk existed; and (3) disregarded the risk. *Farmer*, 511 U.S. at 837. In describing the second element, the Supreme Court has emphasized that a "prison official cannot be found liable" unless she "knows of" an excessive risk to inmate health or safety. *Id.* A failure to act "unaccompanied by knowledge of a significant risk of harm"

26

is insufficient to establish a constitutional violation. *Id*. at 837–38. It is not enough to identify a significant risk that the official "should have perceived but did not." *Id*. at 838.

 In the Fifth Circuit, post *Hare*, "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a condition of confinement or as an episodic act or omission." *Estate of Henson v. Wichita Cnty., Tex*., 795 F.3d at 456, 462 (5th Cir. 2015). "A challenge to a condition of confinement is a challenge to general conditions, practices, rules, or restrictions of pretrial confinement." I*d., * at 463. "An episodic-acts-or-omissions claim, by contrast, faults specific jail officials for their acts or omissions." *Id*.

Since there are no allegations in Plaintiffs' Complaint attacking the way in which healthcare was provided at RCC, nor are there any allegations that the inadequate treatment was a result of a pattern of acts or omissions sufficiently extended or pervasive, this claim is an episodic-acts-omissions claim. *Estate of Henson*, 795 F.3d at 463. To prevail on the episodic-acts-omissions claim, Plaintiffs must produce evidence of deliberate indifference by Mitchell. *Id*. at 463-64. Plaintiffs must prove that Mitchell either refused to provide treatment to Moore, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct evincing a wanton disregard for a serious medical need. *Fortune v.* McGee, 606 F. App'x. 741, 743 (5th Cir. 2015) (per curiam).

Plaintiffs argue that the evidence shows that Mitchell observed that Moore was unresponsive and unconscious in the Four-Way; that when Mitchell gave Moore a sternum rub, it produced only a grunt from Moore, whereas a typically healthy person would have responded differently; and that Mitchell should have requested medical help when he saw Moore unconscious and sleeping.   Plaintiffs further contend that Mitchell should have recognized that a person lying on his back with his hands cuffed behind him was not likely to be simply sleeping.

Mitchell responds that he had no reason to believe Moore was in need of any medical care at RCC because he was sleeping and snoring and because Moore showed no sign of physical injury. Moore also points to Plaintiffs' own allegations that Moore was injured when he was dropped as he was taken out of the RCC.

The Court finds that Mitchell is entitled to summary judgment. Plaintiffs make the arguments that Mitchell should have come to different medical conclusions on Moore's condition than the one that he did, and that Mitchell should have realized that Moore needed hospital care. However, in general, disagreement with medical treatment does not rise to the level of deliberate indifference to medical needs. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Deliberate indifference is an extremely high standard to meet. It is well established that an incorrect diagnosis by prison medical personnel does not state a claim for deliberate indifference. *Domino v. Texas Dept. of Crim. Justice*, 239 F.3d 752 (5th Cir. 2001).

The question of liability for failing to provide adequate medical care often arises in the context of a jail suicide. In *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020), a motion to dismiss was filed on behalf of paramedics and a motion for summary judgment was filed on behalf of police officers for claims arising out of the in-custody death of an eighteen-year old from self-inflicted head trauma. In *Dyer*, *supra*, the decedent/arrestee was known to be on LSD. It was alleged that the decedent, who had already been detained by police officers because of erratic behavior, should have been known to be in need of medical care. It was also alleged that the decedent had sustained a visible and serious head injury. Plaintiffs also alleged that the paramedics were aware that the decedent was not rational and was in a drug induced psychosis. It was further claimed that the two paramedics made no recommendations for further treatment or medical intervention, including sedation, which would have calmed the decedent and allowed him to become compliant with

instructions. They also alleged that the two paramedics knew of the substantial risk of serious harm that would result from ignoring the psychosis of someone who had ingested LSD, yet they did nothing to treat the decedent or transport him for treatment to an emergency room. In sum, the plaintiffs argued that the paramedics were aware of facts demonstrating a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures; thus, violating the decedent's 14th Amendment rights.

The Fifth Circuit reviewed the district court's grant of the paramedics' motion to dismiss based on qualified immunity, resting upon the first prong, which is that the plaintiffs failed to state a plausible deliberate-indifference claim. The Fifth Circuit affirmed the grant of the motion to dismiss and held:

> We agree with the district court that the Dyers' complaint fails to allege facts that plausibly show the Paramedics' deliberate indifference. The thrust of the complaint is that, after examining Graham and observing his head injury and drug-induced behavior, the Paramedics should have provided additional care–such as sending Graham to the hospital, accompanying him to jail, providing "further assessment or monitoring," or sedating him. At most, these are allegations that the Paramedics acted with negligence in not taking further steps to treat Graham after examining him. Our cases have consistently recognized, however, that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 458-59 (citing *Hare*,74 F.3d at 645); *see also, e.g. Delaughter v. Woodall*, 909 F.3d 130,136 (5th Cir. 2018) (clarifying that "mere disagreement with one's medical treatment is insufficient to show deliberate indifference"); *Gobertv. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (explaining that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference")(citations omitted). For instance, in *Stewart v. Murphy*, 174 F.3d 530, 533-534 (5th Cir. 1999), we held that a prison physician's failure, among other things, to discover earlier the ulcers that led to a prisoner's death "might constitute negligence, [but]not the requisite deliberate indifference." Finally, with particular salience here, we have long held that "the decision whether to provide additional treatment "is a classic example of a matter for medical judgment.' " which fails to give rise to a

> deliberate-indifference claim. *Gobert*, 463 F.3d at 346 (quoting *Domino*, 239 F.3d at 756).
>
> Measured against these standards, we cannot say the complaint plausibly states a deliberate indifference claim to the Paramedics. We therefore affirm the district court's dismissal of those claims.

*Dyer*, at pp. 318-322.  Even under the lesser standard applicable to a motion to dismiss, the claims made against Mitchell simply could not rise to the level of deliberate indifference sufficient to show the violation of Moore's right to adequate medical care.

Having reviewed the record, the Court finds no evidence that Mitchell subjectively "drew the inference" that Moore was experiencing a life-threatening medical emergency.  *Farmer*, 511 U.S. at 837.  Even if the evidence is construed in the light most favorable to Plaintiffs, it is insufficient to establish that Mitchell knew how serious the situation was.  Plaintiffs argue that Mitchell *should have* known; they do not produce evidence that he *did* know.

Accordingly, Plaintiffs' § 1983 claims made against Mitchell for failure to provide medical care for Moore should be dismissed with full prejudice.

### 5.    Classification

Plaintiffs concede in their opposition that they have no claim against Mitchell for failure to properly classify Moore.  [Doc. No. 299, p. 40].  Accordingly, Mitchell is entitled to judgment as matter of law dismissing Plaintiffs' claims against him on this issue.

### 6.    Good Faith Defense

Mitchell also contends that all § 1983 claims made against him should be dismissed, with prejudice, pursuant to the "good faith" defense.  They assert that in *Bryan v. Jones*, 530 F.3d 1210 (5th Cir. 1976), the Fifth Circuit, *en banc*, held that the good faith defense was available to shield a sheriff from liability for a Fourth Amendment claim pursuant to *Monroe v. Pape*, 365 U.S. 167

(1961). However, because the Court has found that Mitchell is entitled to qualified immunity, the motion as to this claim is DENIED AS MOOT.

### 7.   Punitive Damages

Mitchell seeks judgment as a matter of law holding that he is not liable for punitive damages under either federal or state law.   In order to establish entitlement to punitive damages from Mitchell under federal law, Plaintiffs must prove that Moore's constitutional rights were violated with evil intent or reckless or callous indifference to Moore's constitutional rights. *Williams v. Koffman County*, 352 F.3d. 994, 1015 (5th Cir. 2003); *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994). Mitchell asserts there is no evidence he violated Moore's constitutional rights, and, even if there were, there is no evidence to show he acted with evil intent or reckless or callous indifference to Moore's constitutional rights.

For the reasons set forth above, the Court finds that Plaintiffs have failed to show that Mitchell violated Moore's constitutional rights, and, further, there is no evidence to show that he acted with evil intent or reckless or callous indifference to his constitutional rights.

Mitchell next argues that punitive damages are not awardable under Louisiana state law unless expressly authorized by statute, citing *Ross v. Conoco, Inc*., 2002-0299 (La. 10/15/02) 828 So. 2nd 546, 555. He argues that, here, no statute allows the award of punitive damages for the death of Moore. Plaintiffs do not dispute Mitchell's arguments in their opposition, nor do they cite a Louisiana statute providing for punitive damages under these facts.

Accordingly, the Court GRANTS Foster's motion as to the issue of punitive damages under federal and state law, and Plaintiffs' claims against him for punitive damages are dismissed with prejudice.

8.      **State Law Medical Care Claim**

Finally, Mitchell seeks summary judgment on Plaintiffs' state law medical care claim.

In Louisiana, prison authorities owe a duty to provide an inmate with reasonable medical care. *See Harper v. Goodwin*, (La. App. 2nd Cir. 5/17/06), 930 So.2d 1160, *Robertson v. Stalder*, 1998-0558 (La. App. 1st Cir. 4/1/99), 734 So.2d 810; *Roy v. Phelps*, 488 So.2d 468 (La. App. 3rd Cir.1986).

In the State Law section of the Third Amended Complaint, Plaintiffs allege that Mitchell "observed Moore in the Four-Way when he was unresponsive and obviously suffering from a serious medical condition but failed to provide transport to the hospital."  [Doc. No. 140, p. 26].

Mitchell contends that Plaintiffs have no testimony or evidence to support the claim that Mitchell saw Moore being unresponsive and obviously suffering from a serious medical condition while in the Four-Way. He asserts that his testimony is undisputed and establishes that Moore was conscious and responsive to Mitchell's assessments on several occasions, and that his testimony is also corroborated by the deposition testimony of the other defendants and witnesses. Furthermore, there is no testimony or evidence that Mitchell knew that Moore had a serious medical condition that required transportation to a hospital or that Mitchell was unreasonable in the medical care he provided.

Plaintiffs respond that Mitchell is liable for failure to provide medical care for the same reasons cited on their federal claim.  Citing *Smith v. State of La., Dept. of Health and Hosp.*, 95-0038 (La. 6/25/96), 676 So.2d 543, Plaintiffs argue Louisiana law recognizes the loss of chance of survival claim. However, the holding in *Smith*, *supra*, was specifically restricted to a claim for medical malpractice made against a doctor. In footnote 7, the Louisiana Supreme Court stated:

> This decision only addresses damages in a medical malpractice case
> and is not considered damages for a loss of a chance of survival in

cases against other tortfeasors. *See Hardy v. Southwestern Bell Telephone Company*, 910 P.2d 1024 (Okla. 1996).[1] That decision is left for another day.

Recently, in *Niang v. Dryades YMCA School of Commerce, Inc*., 2019-0425 (La. App. 4 Cir. 12/4/19), 286 So.3d 506, the widow of a person who died at a recreational center brought suit for negligence, wrongful death, and the loss of chance of survival. The trial court granted the recreational center's exception of no cause of action as to the claim for loss of chance of survival. After evaluating the law in Louisiana, the State Fourth Circuit held that a claim for loss of chance of survival is not a cause of action for which Louisiana law affords a remedy in a non-medical malpractice case. Thus, contrary to Plaintiffs' arguments, the claim of loss of chance of survival is limited to medical malpractice claims and is not available against any defendant, including Mitchell.  As is set out in Plaintiffs' filings, and in the Motion for Summary Judgment filed by Mitchell, the standard for imposing liability for the failure to provide medical care in a prison is that the detainee is owed a duty of reasonable medical care, which is not medical malpractice.

There are no facts or evidence to show that Mitchell knew anything beyond what he testified to in his deposition and there is no testimony or evidence to show that a corrections LPN should have done anything more or differently. Accordingly, Plaintiffs have no claim or cause of action under state law for the failure to provide Moore adequate different medical care. In summary, Mitchell satisfied his duty to provide Moore with reasonable medical care as required by Louisiana law.

---

1 A review of *Hardy*, *supra*, reveals that the Oklahoma Supreme Court held that an action for loss of chance of survival is not available in an ordinary negligence claim brought against a defendant, other than a suit brought against a medical practitioner or a hospital.

The Court finds that Plaintiffs have failed to establish a genuine issue of fact that Mitchell failed to provide adequate medical care under State law.  Accordingly, this claim will be dismissed with full prejudice.

## III.    CONCLUSION

For the reasons set forth above, the Court GRANTS the pending Motion for Summary Judgment as to Plaintiffs' claims against Defendants Hart, Brown, and Mitchell, and all claims against them are DISMISSED WITH PREJUDICE in their entirety.

MONROE, LOUISIANA, this 30th day of October, August, 2020.


**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**