UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ERIE MOORE, JR., ET AL.   CIVIL ACTION NO. 3:16-CV-01007

VERSUS       JUDGE TERRY A. DOUGHTY

LASALLE CORRECTIONS, INC.,  MAG. JUDGE KAREN L. HAYES
ET AL.

## RULING

Pending here is a Motion for Summary Judgment filed by Defendant Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") seeking the dismissal of Plaintiffs' claims against him.  [Doc. No. 224].   Plaintiffs filed an opposition [Doc. No. 295].  Officer Crowson filed a reply to the opposition [Doc. No. 322].

For the following reasons, Officer Crowson's Motion for Summary Judgment [Doc. No. 224] is GRANTED.

## I. FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.  RCC is owned and operated by Defendants LaSalle and/or Richwood, related private entities.

At the time of the incident, Erie Moore, Sr. ("Moore"), was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died within a few hours of the altercation.  Moore was forcibly removed from the holding cell where the altercation occurred.  Shortly thereafter, Moore became

unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including individual corrections officers who allegedly used excessive force, and by the correctional facilities themselves. [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants including Officer Crowson, and, continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

Relevant to the pending motion, Plaintiffs allege that Officer Crowson displayed deliberate indifference to Moore's mental health issues when he arrested and booked Moore into RCC, and that Officer Crowson failed to inform RCC staff of these mental health issues. But for Officer Crowson's actions, Plaintiffs assert that Moore would not have been placed in the cell with White and would have not been subjected to the use of excessive force by other defendants. Officer Crowson is not alleged to have been involved with any use of force or any actions inside RCC.

Officer Crowson seeks the dismissal of all of Plaintiffs' claims against him in in his individual capacity.[1]  [Doc. No. 224].   Officer Crowson contends he is entitled to qualified immunity on all federal claims, and, further, that he was not negligent under state law.

On October 11, 2015, Louisiana State Trooper Jason Hanemann ("Trooper Hanemann") was pulled over by Moore.  [Doc. No. 140, ¶ 7]. Moore informed Trooper Hanemann that Moore

---

1 Plaintiffs brought claims against Officer Crowson in his individual and official capacities under federal law. A suit against a state or municipal officer in his or her official capacity is a treated as a suit against the entity itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Therefore, the claims against Officer Crowson in his official capacity should be treated as claims against the City of Monroe, which are addressed in a separate motion for summary judgment [Doc. No. 247].

was going to force a police officer to shoot him and that Moore wanted to be in front of the TV when the police officer shot him. Trooper Hanemann believed Moore was attempting to force him into a confrontation. Trooper Hanemann did not detain Moore.

It is undisputed that Officer Crowson received no information about the encounter between Trooper Hanemann and Moore.

On the morning of October 12, 2015, while on duty, at approximately 6:15 am, Officer Crowson went to Donut Palace in Monroe, Louisiana, to get something to eat. [Crowson Deposition, Doc. No. 224-3, pp 9-10, 54]. Officer Crowson parked directly in front of the building and proceeded inside. [*Id*., p. 11].

As he walked just inside the front door, Officer Crowson observed a man – later identified as Moore – at the front counter "hollering and screaming and cursing." [*Id*., pp. 11-12]. Officer Crowson observed Moore "ra[nting] and raving" and waving his arms. [*Id*., pp. 12-14]. Officer Crowson thought that Moore was "upset" at the employee behind the counter; the employee, in turn, seemed nervous and scared. [*Id*., pp. 12-13, 22-23]. Officer Crowson also observed other patrons leaving the business. [*Id*., pp. 13, 45-46].

When Officer Crowson entered, Moore turned from the counter towards the door and saw him. [*Id*., pp. 13-14]. Moore then approached him and closed the gap between the two of them to two to three feet. [*Id*., p. 15]. While approaching him, Moore hollered curse words at Officer Crowson, continued "ra[nting] and raving," and informed Officer Crowson that he knew the mayor. [*Id*., pp. 14-16]. Officer Crowson confronted Moore and told Moore that he needed to "calm down." [*Id*., pp. 13-15]. Officer Crowson's directive had no apparent effect. [*Id*., p. 14]. After the directive was ignored, Officer Crowson placed Moore under arrest, turned Moore around,

and handcuffed him behind his back. [*Id.*, p. 15]. Moore was advised of his rights but refused to explain his actions. [*Id.*, p. 27].

Moore did not resist being handcuffed, and Officer Crowson did not have to use force to effect the arrest. [*Id.*, pp. 16, 48]. Officer Crowson testified that he believed that arresting Moore was necessary to prevent further incident in the Donut Palace, [*Id.*, pp. 54-55], but that he never felt personally threatened by Moore. [*Id.*, p. 40].

Officer Crowson arrested Moore for disturbing the peace. [*Id.*, p. 33]. After arresting Moore, Officer Crowson began the process of moving Moore to his patrol unit for transport. Moore provided some resistance as he led Moore outside, which Officer Crowson described as having to "coax" Moore while Moore was "slightly" pulling on him. [*Id*, pp. 18-19].

Moore continued to shout on the way to the car, [*Id.*], and at some point, while already in custody, *Moore told Officer Crowson that Officer Crowson "was going to kill him."* [*Id.*, pp. 16, 30]. Moore made the latter statement only once, and Officer Crowson did not engage him about it. [*Id.*, pp. 16-18, 27, 30].

At the vehicle, Officer Crowson searched Moore incident to arrest and located Moore's driver's license, which he used when he called dispatch. [*Id.*, pp. 20-21]. Moore was placed in the patrol unit, and Officer Crowson secured Moore's vehicle. [*Id.*, pp. 20-22]. Officer Crowson then returned to the store to interview the employee, who provided his account of the event. [*Id.*, pp. 22-23, 25-26].

Officer Crowson testified that he did not believe that Moore was engaging in any suicidal behavior, had mental health issues, or that Moore was trying to get Officer Crowson to harm him. [*Id.*, pp. 30, 39]. Officer Crowson did not believe this was an "unusual" encounter, [*Id.*, p. 26]. Officer Crowson testified that he believed that Moore's singular statement that Officer Crowson

4

would "kill him" was not "abnormal" because Officer Crowson has previously encountered African American males who believe that Caucasian police officers intend to harm them. [*Id.*, p. 33]. Officer Crowson suspected that it was possible that Moore was intoxicated, but he admitted he was unable to detect the odor of any alcoholic beverages due to sinus issues. [*Id.*, pp. 19-20].

After arresting Moore, Officer Crowson notified dispatch of the arrest. [*Id.*, pp. 28-29]. Officer Crowson was not alerted to any outstanding issues concerning Moore by dispatch, so he began the process of taking him to RCC for booking. Officer Crowson does not recall Moore saying anything in the patrol car on the way to RCC, and Moore did not do anything unusual in the backseat while being transported. [*Id.*, p. 18].

Upon arrival at RCC, Officer Crowson took Moore to booking to be processed into the facility. [*Id.*, p. 31]. Officer Crowson testified that he informed the booking officer that he was charging Moore "with disturbing the peace, loud and profane, for him disturbing the peace and cussing." [*Id.*, pp. 32-33]. Crowson did not specifically inform the booking officer of Moore's singular statement that Crowson was going to "kill" Moore. [*Id.*, p. 33]. Crowson also did not inform the booking officer of any perceived concerns to the health and safety of Moore, because he states he did not know of any. [*Id.*, pp. 32-33]. After the arrest and booking, Crowson prepared an initial report and narrative. [*Id.*, pp. 24-25]; [MPD Initial Report, Doc. No. 224-4].

Shortly after Moore's arrival, Nurse William Mitchell, LPN, ("Nurse Mitchell"), the on-staff nurse at RCC, assessed Erie Moore. [Mitchell Deposition, Doc. No. 224-7, pp. 2-5, 6-8]. Nurse Mitchell believed that Moore was "intoxicated," [*Id.*, pp. 7, 9]; specifically, Nurse Mitchell believed that Moore was "either drunk or on something," meaning that his behavior was "chemically induced." [*Id.*, p. 10-11]. Nurse Mitchell further explained that Moore seemed "intoxicated," "[n]ot crazy." [*Id.*, p. 12]. Nurse Mitchell did not believe that Moore was showing

any signs of mental health issues, and he did not refer Moore for a mental health evaluation. [*Id.*, p. 10-11]

Officer Crowson has been employed with MPD since August 15, 1993. [Doc. No. 224-3, p. 3]. Crowson was a patrol officer for the MPD from the beginning of his career until January 2016, when he was promoted to Sergeant and began supervising patrol officers. [*Id.*, pp. 3, 8]. As a patrol officer, Crowson estimated that he had roughly one hundred encounters or "stops" per week. [*Id.*, p. 26].

Officer Crowson received training, just months before his encounter with Moore, concerning how to address persons with mental health issues. [*Id.*, pp. 2-7, 55-56]. Officer Crowson testified that he has encountered individuals with injuries and illnesses before; in those cases, where a need was disclosed, Officer Crowson has taken those individuals to seek treatment. [Id., pp. 42-44].

Officer Crowson contends he is entitled to judgment as a matter of law dismissing Plaintiffs' claims against him, first because he is entitled to qualified immunity as to Plaintiffs' federal law claims where the undisputed material facts show that he was not aware of or deliberately indifferent to a known and obvious mental health condition of Moore. Further, even if he was deliberately indifferent, he is still entitled to qualified immunity because no case clearly established the unlawfulness of Crowson's actions. As to the state-law claims, Crowson contends that summary judgment is warranted where Plaintiffs cannot show that Crowson breached a duty owed to Moore, or that if he did, the harm sustained by Moore was within the scope of protection afforded by that duty or was foreseeable to Crowson.

As to their federal claims, Plaintiffs respond that (1) Officer Crowson knew but disregarded Mr. Moore's obvious and serious suicidal ideations; (2) the law was clearly

established on October 12, 2015 that once in physical custody by arrest, an arrestee has a right to medical care for an obvious and serious health condition by either taking the arrestee to a health care provider or informing the booking officer; and (3) Officer Crowson failed to provide Moore mental health care because of Moore's race.  Plaintiffs further contend that Officer Crowson acted with deliberate indifference to Moore's right to medical care, thus entitling Plaintiff to punitive damages.  Plaintiffs contend that their state law claims survive for many of the same reasons.

The motion is fully briefed, and the Court is prepared to rule.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B.  Qualified Immunity

Plaintiffs assert claims against Officer Crowson for violations of Moore's constitutional rights under 42 U.S.C. § 1983. In response, Officer Crowson has invoked the qualified immunity defense. [Doc. No. 157, p. 15, ¶ 2].

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982).  The Supreme Court has recognized the importance of granting qualified immunity prior to trial when officers make reasonable but mistaken judgments, because "qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551-552 (2017). The Supreme Court has recognized the potency of the immunity: qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a

federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The burden is on the plaintiff to overcome the defense. *Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).

Officer Crowson contends that Plaintiffs have not shown that he violated any of Moore's constitutional rights or that existing law clearly established that he acted unlawfully.

### 1.    Did Crowson violate Moore's constitutional rights?

In their Third Amended Complaint, Plaintiffs allege that "Crowson displayed deliberate indifference to Moore's mental health issues" by failing "to provide medical care to Moore who was in his custody." [Doc. No. 140, p. 20, ¶ 35]. This is so, according to Plaintiffs, because "Moore displayed obvious and serious medical health conditions, including suicidal ideations," and because Crowson "failed to inform Richwood booking officers of the information he learned on the scene . . ." *Id.*

Plaintiffs argue that the statement by Moore that Officer Crowson was going to kill him was suicide ideation, which is a serious mental health condition.  They argue that Officer Crowson should have been able to detect "suicide by cop."  As a veteran officer, he should have known this was a suicidal gesture, yet he took no action to mitigate the suicidal ideation, such as by talking him down.  In support of their argument, Plaintiffs point to the deposition testimony of Dr. Robert Hanser, in which he expressed his opinion that Officer Crowson did nothing to mitigate the suicidal ideation by Moore.  [Doc. No. 295-5, p. 78].

Plaintiffs further assert that Officer Crowson expressed that the reason he did not tell RCC Booking of Moore's suicidal gesture was because all black arrestees say the white officer is going to kill them. Plaintiffs conclude from this that Officer Crowson denied Moore needed medical care

because of Moore's race, African American.

The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).

"Although pretrial detainees like Hyatt are not protected by the Eighth Amendment, we have held that 'the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement.'" *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (*Hare II* )).

"[T]he Supreme Court explained that to be deliberately indifferent to an inmate's needs in violation of the Eighth Amendment, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Therefore, to avoid liability, '[p]rison officials charged with deliberate indifference might show ... that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Id.* at 177 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 844  (1994)).

"Furthermore, evidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference. As the Supreme Court explained in *Farmer*, 'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted.'" *Id*. at 177 (quoting *Farmer*, 511 U.S. at 844).

Deliberate indifference "is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Negligence is insufficient to meet the deliberate indifference standard, *Hare v. City of Corinth, Miss*. ("Hare II"), 74 F.3d 633, 650 (5th Cir. 1996) (en banc); deliberate indifference requires "evidence of 'egregious intentional conduct.'" *Zaunbrecher v. Gaudin*, 641 F. App'x 340, 344 (5th Cir. 2016) (quoting *Gobert v. Caldwell,* 463 F.3d 339, 351 (5th Cir. 2006)).

"A plaintiff can show deliberate indifference by showing that an official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006)).

In the suicide context (which Plaintiffs invoke here), the relevant standard is "not whether the [police] officer[] 'knew or should have known'" of the potential suicide risks, "but whether [the officer] gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare*, 74 F.3d at 650.

Under these standards Officer Crowson moves for summary judgment, first arguing that Plaintiffs have no evidence, other than *post hoc* speculation, that Moore had a serious medical need at the time of his interaction with Crowson. Plaintiffs in this case, Moore's children, directly testified that they were unaware of any mental-health problems, including suicidal thoughts, that Moore might have had, and they were not aware of any history of mental health problems in the family. [Doc. No. 224-8, *en globo*]. Further, Plaintiffs have not presented any medical records indicating that Moore had any diagnosed mental illness.  Also, neither a physician, including a

11

psychiatrist, nor a psychologist, have testified about any mental conditions or suicidal ideations that Moore might have had at the time of his arrest.

Without a documented history of mental illness or medical condition, Officer Crowson asserts that Plaintiffs are forced to show that Moore had a serious medical need "for which the need [was] so apparent that even laymen would recognize that care [was] required." *Gobert*, 463 F.3d at n.12. He argues that Plaintiffs cannot meet this burden based on the encounter between Moore and himself.

Officer Crowson states he did not believe that Moore needed medical treatment or had suicidal thoughts, and no other fact witness has testified that Moore's actions on the scene caused them to believe he was suicidal. In fact, Moore's own sister, who talked to him about thirty minutes before Moore's encounter with Crowson, testified that Moore was not acting abnormally. [Catherine Moore Deposition, Doc. No. 224-9, pp. 2-3, 4-5].

According to Officer Crowson, Moore's limited resistance, the fact that he made the statement about Officer Crowson "killing him" while he was already in custody (and had no opportunity to force a violent encounter), and Moore's much calmer actions during transport and at booking, would not establish that he was "suicidal" or had a mental health condition. Moore's actions would certainly not lead a "layman" to the undisputed conclusion that Moore needed medical intervention, and "nothing he did so clearly indicated an intent to harm himself that [Crowson] could have only concluded that he posed a serious risk of harm to himself." *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th Cir. 1999).

Officer Crowson further argues that, if Plaintiffs are correct that when an arrestee, already in custody, makes a fleeting statement to an officer that the officer will "kill him," then any arrestee who ambiguously suggests that an officer might cause him injury at some point in the future will

have to be treated as a potential suicide risk or a mental health risk.

Additionally, Officer Crowson argues that, even if Moore had a serious medical need, Plaintiffs cannot establish that he had subjective knowledge or drew the inference of the need. See *Petzold v. Rostollan*, 946 F.3d 242, 249-50 (5th Cir. 2019) (prison nurse did not have subjective knowledge of broken ankle based on cursory encounters despite noticing that prisoner had significant limp). Officer Crowson thought Moore may have been intoxicated. So did Nurse Mitchell. Officer Crowson contends that, although he has been trained to assess such risks, he perceived no risk of suicide or a mental health issue in Moore based on his encounter.

Although Plaintiffs argue that Officer Crowson "should have known" about some a risk of injury to Moore, Officer Crowson asserts that it is not sufficient "that defendants should have known of a substantial risk; they must have actual knowledge of the risk and must thereafter have ignored it." *Debrow v. Caddo* Par. Comm'n, No. 5:15-CV-1717, 2015 WL 4406296, at *4 (W.D. La. July 16, 2015).

Officer Crowson argues that Dr. Hanser's opinions should be excluded because he was not retained as an expert, he admitted that he did not know the facts of this case, and his opinions at deposition were purely speculative and based on hypotheticals. [Hanser Deposition, Doc. No. 322-1, pp. 1-8].

Finally, Officer Crowson argues that Plaintiffs cannot establish that Crowson disregarded or was deliberately indifferent to any risk of harm to Moore. Officer Crowson brought Moore to RCC, which had a licensed nurse on staff. Shortly after Officer Crowson brought Moore to RCC, Moore was seen by Nurse Mitchell who concluded that Moore was likely intoxicated. Even a prison physician's incorrect assessment of suicide risk does not amount to deliberate indifference. *Domino*, 239 F.3d at 756. (finding that an incorrect assessment of suicide risk does not amount to

deliberate indifference). It cannot be deliberate indifference when an officer brings an arrestee to a facility with a nurse present who then assesses the arrestee, according to Officer Crowson.

The Court finds that Plaintiffs have not carried their burden of showing that Officer Crowson violated Moore's constitutional rights. Plaintiff's case hinges on speculation concerning what Moore meant when he told Officer Crowson that Crowson was "going to kill him." There is no evidence that Moore intended for Officer Crowson to kill him, or that Moore intended to commit "suicide by cop."

Plaintiffs have not shown that Officer Crowson was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Hyatt*, 843 F.3d 172. It is undisputed that Officer Crowson was not aware of the encounter between Trooper Hanemann and Moore. Plaintiffs are, therefore, left to rely on the encounter between Moore and Officer Crowson to support their claim.

However, this encounter, standing alone, does not reveal an imminent need for medical intervention or facts which indicate that Moore was at a substantial risk of harm. Officer Crowson encountered a disorderly person (or possibly intoxicated), who appeared to be upset and angry with a donut shop employee. Moore did not resist arrest, did not make any statements indicating that he intended to harm himself or others, displayed no outward signs of injury or illness, and was an otherwise cooperative arrestee. Even if Moore's statement could be construed as transforming this encounter into a constitutional issue, an officer is not deliberately indifferent when "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. There were no facts in the encounter that would have caused Officer Crowson to believe that Moore had a serious medical need or intended to commit suicide.

14

Although Plaintiffs assert that Officer Crowson, as a veteran police officer, was subjectively aware of the seriousness of Moore's condition, he testified he did not believe that Moore's statement was an indication of suicide; instead, he believed that Moore thought that Crowson intended to harm him after the arrest.  Whether an officer drew an inference is not a "would know" or "should know" analysis – it is whether the officer made the connection. Plaintiffs have no evidence that Crowson knew that Moore intended to commit suicide or had a mental health issue. *Farmer*, 511 U.S. at 837–38 (rejecting "should have known" standard).

Even if the Court were to consider Dr. Hanser's opinions, they are not sufficient to create an issue of fact for the same reasons Officer Crowson argues they should be excluded, i.e., because he was not retained as an expert, he admitted that he did not know the facts of this case, and his opinions at deposition were purely speculative and based on hypotheticals. Further, Dr. Hanser's opinion relates to whether Officer Crowson "should have" known, and, as indicated above, the issue is not whether Officer Crowson should have known, but whether he actually knew.

Plaintiffs have failed to produce facts that would show that Officer Crowson was deliberately indifferent to Moore's alleged medical needs.

Finally, Plaintiffs accuse Crowson of refusing medical care to Moore based on his race. However, they produce no evidence to support their accusation. Officer Crowson did not testify that he denied medical care to Moore based on race or that race ever motivated his decisions. Instead, Officer Crowson testified as to what he thought Moore meant when the statement was made (i.e., that Moore believed Crowson intended to harm him or would harm him).

For these reasons, the Court finds that Plaintiffs have not established that Officer Crowson violated a federal statutory or constitutional right.

## 2.     Did Crowson violate "clearly established" law?

The second prong of the qualified immunity analysis asks whether the right in question was "clearly established." A right is clearly established when "the contours of the right were sufficiently clear that a reasonable official would have understood that what he is doing violates" the law. *Mullenix v. Luna*, 136 S. Ct. 305, 313 (2015) (per curiam) (citations omitted). The right identified by the plaintiff cannot be abstract; the right must be tailored to the factual circumstances the officer faced at the time of the conduct. See *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Further, "[t]he rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-590. While this does not require a case directly on point, existing precedent must have placed it "beyond debate" that the officer's conduct violated the law. *White v. Pauly*, 137 S. Ct. 548, 551. To do so, "Plaintiffs must point th[e] court to a legislative directive or case precedent that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that law." *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020) (citations omitted).

Here, Plaintiffs are relying on the factual assertion that Moore told Officer Crowson that Crowson was "going to kill him" while Crowson brought Moore to the patrol vehicle. There is no evidence that Moore attempted to force a confrontation with Officer Crowson, or, that Moore outwardly expressed a desire to kill himself or to commit suicide.  He only made the statement once. Moore did not attempt to engage Officer Crowson in a violent act that could have precipitated "suicide by cop," Moore did not commit any act of self-harm, and there is no evidence that Moore informed Crowson that he needed medical attention.

Plaintiffs rely on four cases to show that the unlawfulness of Crowson's actions was "clearly established": *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010) (subsequent

history omitted); *Nerren v. Livingston Police Department*, 86 F.3d 469 (5th Cir. 1996); *Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992); and *Partridge v. Two Unknown Police Officers of City of Houston, Tex.*, 791 F.2d 1182 (5th Cir. 1986).

The Court finds that the facts of these cases are readily distinguishable from the instant case, and none of these cases identifies a "robust consensus" that Officer Crowson's actions were unlawful here.

For out-of-circuit cases to clearly establish the law, there must be a "robust" consensus among those cases that the law is clearly established. *Morrow v. Meachum*, 917 F.3d 870, 879–80 (5th Cir. 2019). In *Conn*, the Ninth Circuit denied qualified immunity to two officers who failed to report that an arrestee actually tried to commit suicide en route to the jail and told the officers that if they did not kill her, she would kill herself. *Conn*, 591 F.3d at 1105. In *Gordon*, which significantly predates modern qualified immunity jurisprudence, an officer was denied qualified immunity where it was "objectively unreasonable" to fail to pass along information concerning suicide after another officer explicitly warned him of the arrestee's potential for suicide. *Gordon*, 971 F.2d at 1096-1097.

Neither *Conn* nor *Gordon* would have provided the requisite notice to Officer Crowson that his actions in this case were unlawful. Unlike the situation in *Conn*, Moore did not engage in any physical behavior indicating suicide or physically attempt suicide in Officer Crowson's presence, nor did he threaten to kill himself or tell Officer Crowson that he would "make" Crowson shoot him, and Officer Crowson did not fail to pass along information concerning a known risk of suicide. Neither of those cases establish that an officer is required to pass along an ambiguous statement when the officer has no information indicating that the arrestee has a known propensity for potential suicide, when the circumstances did not indicate a suicide risk, and when Officer

Crowson, who encountered the person, did not believe that Moore was suicidal.

The remaining cases Plaintiffs rely on come from the Fifth Circuit; however, those cases, would not have clearly established the law. In *Partridge*, the court only held that it was wrong to dismiss claims against a detention center for deliberate and systemic denial of care to arrestees. 791 F.2d at 1187–88. While the court made broad pronouncements about the duties owed to detainees, the claims against the officers in that case (that they failed to pass along known information concerning medical needs and the detainee had injured himself) were dismissed.

In *Nerren*, the arresting officers were denied qualified immunity after refusing to take an arrestee to a medical facility, even though he complained of injuries, was in pain, and had visible abrasions on his chest. 86 F.3d at 473. In denying qualified immunity, the court did not discuss whether existing caselaw would have put the officers on notice that their conduct was unlawful but relied on the general proposition that pre-trial detainees have the right to access medical care. *Id*. The Court found that the officers' actions were not "objectively reasonable" because there was no "legitimate government interest" in denying medical care to an arrestee who complained of pain and had visible injuries, and the court found that the officers' reasons for not providing care indicated an intent to punish. *Id*. at 474.

Those cases do not establish that Officer Crowson acted unlawfully. Again, Moore made a singular statement to Officer Crowson that Officer Crowson was "going to kill him." Nothing in *Patridge* or *Nerren* establishes that Officer Crowson violated Moore's right to medical care by not relaying that statement or that Officer Crowson was required to immediately bring Moore to a medical facility. Officer Crowson relayed to the booking officer what Moore was arrested for, his actions ("what he done"), and transferred custody of Moore to RCC.

The caselaw does not establish, beyond debate, that Officer Crowson had an obligation to

do more just because an arrestee said that Officer Crowson might harm him. The law was not clearly established on this front, and summary judgment is warranted.

Accordingly, for the above reasons, Officer Crowson is entitled to judgment as a matter of law finding that he is entitled to qualified immunity on all federal claims. Plaintiffs' federal claims are DIMISSED WITH PREJUDICE.

### F. Putative Damages

 Plaintiffs seek punitive damages from Crowson for his alleged "malicious and deliberately indifferent actions[.]" [Doc. No. 140, pp. 28-29, ¶ 55]. There is no claim for punitive damages under state law where there is no authorization for such an award. *Ross v. Conoco, Inc*., 2002-0299 (La. 10/15/02) 828 So. 2d 546, 555.

With regard to Plaintiffs' claim for punitive damages under Section 1983, Officer Crowson argues that, even if Plaintiffs are entitled to press their federal claims to a jury, they are not entitled to the punitive damages they seek against him.  See *Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2017) (denying summary judgment on liability but dismissing claims for punitive damages). "Punitive damages may be awarded in § 1983 cases 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id*. (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "Reckless indifference has been described by the Supreme Court as subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Id*.  Officer Crowson argues that Plaintiffs cannot satisfy their burden.

The Court agrees, and, further, Plaintiffs do not dispute Officer Crowson's arguments in their opposition. Even if the Court were to find that Officer Crowson should have recognized the import of Moore's singular statement and relayed it, the only thing he is alleged to have done in

this case is transport Moore to RCC without explicitly relaying the statement (even though he did relay Moore's actions). The actions that led to Moore's death occurred over a day after Officer Crowson encountered Moore – after several intervening events –, and it is undisputed that Officer Crowson was not involved, whatsoever, in any events after he left RCC.

The Court finds that no reasonable jury could find that Officer Crowson acted with "evil motive or intent" or with "criminal indifference to civil obligations." Accordingly, Plaintiffs' claim for punitive damages against Officer Crowson is DISMISSED WITH PREJUDICE.

### G.    State Law Claims

Plaintiffs bring a claim under Louisiana state law that Officer Crowson was at fault under LA. CIV. CODE art. 2315 for (1) failing to provide medical care and (2) failing to inform the RCC booking officer of Moore's suicidal gesture.

Article 2315 states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." "Under Louisiana law, '[t]he duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability.'" *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (alteration in original) (quoting *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So.2d 627, 633 (La. 2006)). The duty-risk analysis requires a plaintiff to satisfy five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id*. (citing *Lemann*, 923 So.3d at 633).    Additionally, "if an unforeseeable intervening cause occurs, it will relieve the original tortfeasor of liability if 'the intervening cause [superseded] the

20

original negligence and alone produced the injury.'" *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 618 (5th Cir. 2018) (quoting *Adams v. Rhodia, Inc.*, 983 So.2d 798, 808 (La. 2008)) (emphasis added by appellate court). "An intervening cause is one which comes into play after the defendant's negligent conduct has ceased but before the plaintiff suffers injury." *Mosley v. Wood Grp. PSN, Inc.*, 760 F. App'x 352, 363 (5th Cir. 2019) (citation omitted).

Officer Crowson concedes the existence of a duty in this case. Louisiana courts have held that an arresting officer "owes a duty to a person in custody to protect him from injury and to care for his safety." *Phillips v. State, Dep't of Pub. Safety & Corr.*, 43,143 (La. App. 2 Cir. 3/19/08), 978 So. 2d 1223, 1229 (citations omitted). Further, an "officer also has the duty to see that reasonable medical care is provided to a person in his custody when the need for such care is indicated by the person's mental or physical condition." *Id.* (citations omitted). The need to provide such care, however, only remains "so long as the prisoner is in [the officer's] custody or subject to his control[.]" *Evans v. Hawley*, 559 So. 2d 500, 505 (La. Ct. App.), writ denied, 563 So. 2d 1156 (La. 1990) (quoting *Cobb v. Jeansonne*, 50 So.2d 100 (La.App.2d Cir. 1951)). Further, "this duty extends to doing only 'what is reasonable under the circumstances' and is limited to a certain set of risks." *Curran v. Aleshire*, 67 F. Supp. 3d 741, 767 (E.D. La. 2014)) (quoting *Griffis v. Travelers Ins. Co.*, 273 So. 2d 523, 526 (La. 1973)).

Although Officer Crowson does not dispute the existence of a general duty here, he denies that Plaintiffs can establish that his alleged actions breached a duty, were the cause-in-fact of Moore's injuries, or were foreseeable.

First, Officer Crowson argues that he did not breach any duty owed to Moore. Plaintiffs contend that he should have exercised care for Moore's medical condition or that he was required to alert the prison officials of Moore's "suicidal ideations." The duty, they claim, arose when

Moore stated that Crowson was "going to kill" him. However, Officer Crowson maintains that, following his arrest, Moore gave him minimal resistance, did not say anything noteworthy during transport, and did nothing to alarm Officer Crowson while at booking. Under those circumstances, Officer Crowson argues that he cannot be said to have breached any duty to Moore when it was not apparent that Moore had any mental or physical condition that required treatment. Even then, according to Officer Crowson, he discharged any duty when he transferred custody of Moore to RCC and Moore was seen by Nurse Mitchell.

Secondly, Officer Crowson argues that, even if his actions were sufficient to establish negligence, Plaintiffs cannot show that the alleged negligence was the cause-in-fact of the harm in this case, or that the harm was foreseeable to Officer Crowson. Although he admittedly did not inform booking of Moore's statement, the medical officer saw Moore minutes after Officer Crowson brought him and thought that Moore was intoxicated. Officer Crowson therefore argues that the subsequent events that happened were not a result of any failure to relay information, and, they had nothing to do with information sharing. See *Roberts v. Benoit*, 605 So. 2d 1032, 1042 (La. 1991), on reh'g (May 28, 1992) (stating that "cause-in-fact" is a "but-for" or "substantial factor" test). There is no "factual, causal relationship" between the ultimate harm suffered by Moore – the alleged use of force – and the actions of Officer Crowson; put differently, Officer Crowson's alleged inactions did not have "something to do with" Moore's later injuries. *Id*.

Since Moore was allegedly injured by the use of force over twenty-four hours after Officer Crowson booked him into RCC when officers extracted him from a cell, Officer Crowson argues that the mere act of arresting Moore and booking him into jail were not "substantial factors" in Moore's injuries. To hold otherwise would transform every arrest into potential liability for subsequent acts.  Officer Crowson further argues that he cannot be responsible for the subsequent

22

acts at RCC, all of which were intervening causes. He states he was not present and was not involved with Moore's brief incarceration, or the use of force. Thus, any purported negligent act by Officer Crowson had long ceased prior to the harm Moore suffered.

Plaintiffs respond that causation is an issue of fact that is generally decided at the trial on the merits and not on summary judgment or a motion to dismiss. *Wooley v. Lucksinger*, 14 So.3d 311 (1st Cir.,2008) at 397. *See also Estate of Adams v. Home Health Care of Louisiana*, 775 So.2d 1064 (La.,2000) (per curiam). A plaintiff need not show that the defendant's conduct was the only cause of his harm, nor must he negate all other possibilities; rather, he must show that more probably than not he suffered injuries because of the defendants' conduct. *Straley v. Calongne Drayage &Storage, Inc*., 346 So.2d 171 (La.1977). Defendant's conduct need not be the only cause. If Plaintiff shows that without defendant's wrongful conduct Plaintiff would not have been injured, cause in fact is shown. *Morris v. Orleans School Bd*, 553 So.2d 427, 429 (La. 1989).

In other words, the plaintiffs' burden is not to prove their case beyond all doubt or even beyond a reasonable doubt, but merely by a preponderance of the evidence, or 51%; he need not negate all viable theories, but only show that his position is more probable than not. *Howell v. Iacona*, 505 So.2d 821 (La. App. 2d Cir. 1987) (medical malpractice). If there was fault on the part of any Defendant, and that of some third party, or the deceased, then an allocation of comparative fault may be appropriate. La. C.C.art. 2323. *Hayes v. Kelly*, 625 So.2d 628, 632 (La. App. 3 Cir.,1993) (excessive incarceration caused by several actors).

Plaintiffs further argue that the acts of Officer Crowson contributed to the injuries and death suffered by Moore. But for Moore not being placed in medical care and booking at R.C.C. not being warned, he would not have been taken to RCC without medical attention or screening. If never sent to Richwood Correctional Center, Moore would not have been subjected to violence

that led to his death.

According to Plaintiffs, the officer who fails to provide the critical information is thus at fault for any subsequent injuries sustained by Moore from violence, particularly where, as here, the violence is inflicted within 48 hours of booking. If Officer Crowson had provided the information to booking that he had, Moore would have most likely been isolated and not subjected to violence.

Plaintiffs conclude that Officer Crowson knowingly left a fragile and fractured man on the doorstep of the RCC jail without any warning, endangering Moore, jail staff and others at the facility.

The Court finds that Officer Crowson is entitled to summary judgment dismissing Plaintiffs' state-law claims. As indicated in the discussion of Plaintiffs' federal law claims, Moore did not do or say anything that would have caused Officer Crowson to believe that Moore was suicidal, mentally ill, or needed any medical attention. A singular, ambiguous statement, without more, did not "disclose[] the need" for medical intervention or that the statement had to be disclosed apart from telling booking what Moore was arrested for. *Evans v. Hawley*, 559 So. 2d 500, 505 (La. Ct. App.), writ denied, 563 So. 2d 1156 (La. 1990). Plaintiffs do not cite any Louisiana cases where an officer has been held liable for similar conduct.

Plaintiffs also claim that Officer Crowson caused Moore's death because, they speculate, that no force would have ever been used if Officer Crowson would have handled the situation differently.

Crowson did not cause or contribute to the events that led up to the alleged use of excessive force (i.e., Crowson didn't cause Moore to be involved in a violent altercation in which his cellmate was beaten to death). Crowson did not cause or contribute to the alleged use of force on Moore.

And, Crowson did not cause or contribute to any delay in medical care. Therefore, Plaintiffs have not shown how Crowson was a cause of Moore's death.

Further, Plaintiffs have not shown how Moore's death was foreseeable to Officer Crowson. Officer Crowson could not have known that by simply arresting a disorderly person that that person would, over a day later, get into a violent altercation with a cellmate, refuse orders, or that someone would allegedly punch Moore in the head, or that Moore would have to be extracted from the cell. There is no ease of association in this case where the subsequent events would have been foreseeable to the arresting officer.

Accordingly, Officer Crowson is entitled to judgment as a matter of law dismissing Plaintiff's state-law claims against him, with prejudice.

## III.   CONCLUSION

For the reasons set forth above, Defendant Tommy Crowson's Motion for Summary Judgment [Doc. No. 222] is GRANTED.   Plaintiffs' claims against him are DISMISSED WITH PREJUDICE in their entirety.

MONROE, LOUISIANA, this 30th day of October, 2020.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE