UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

**ERIE MOORE, JR., ET AL.**            **CIVIL ACTION NO. 3:16-CV-01007**

**VERSUS**                             **JUDGE TERRY A. DOUGHTY**

**LASALLE CORRECTIONS, INC.,**         **MAG. JUDGE KAREN L. HAYES**
**ET AL.**

RULING

Pending here is a Motion for Partial Summary Judgment filed by Plaintiffs Erie Moore, Jr.;
Tiffany Robinson; and Tamara Green (collectively "Plaintiffs") [Doc. No. 230].   Defendants
Archie Altman; Sgt. Roy Brown; Reginald Curley; Jody Foster; Alton Hale; Warden Ray Hanson;
Sgt. Gerald Hardwell; Sgt. Kenneth Hart; William Mitchell; Sgt. Duan Rosenthal; Jeremy Runner;
Danielle Walker; Sgt. Reginald Williams; LaSalle Management Co., LLC; Richwood Correctional
Center, LLC have filed an opposition [Doc. No. 285].   Defendants Ouachita Parish Sheriff Jay
Russell and his deputy sheriffs Donald Murphy and Chase Wells ("the Sheriff Defendants") have
filed an opposition [Doc. No. 293].   Defendants City of Monroe and Tommy Crowson have filed
an opposition [Doc. No. 294].   Plaintiffs have filed replies to the oppositions [Doc. Nos. 328, 330,
332].

For the following reasons, the pending Motion for Partial Summary Judgment [Doc. No.
230] is DENIED.

**I.    FACTS AND PROCEDURAL HISTORY**

This lawsuit follows the death of two detainees at the Richwood Correctional Center
("RCC"), a private detention center located in Ouachita Parish, Louisiana.   RCC is owned and

operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died shortly after the altercation.  Moore was forcibly removed from the holding cell after the altercation occurred.  Soon thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants.  [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

A.      **Factual Background**

On October 11, 2015, Louisiana State Trooper Jason Hanemann ("Trooper Hanemann") was pulled over by Moore.  [Doc. No. 140, ¶ 7]. Moore informed Trooper Hanemann that Moore was going to force a police officer to shoot him and that Moore wanted to be in front of the TV when the police officer shot him. Trooper Hanemann believed Moore was attempting to force him into a confrontation. Trooper Hanemann did not detain Moore.

On the morning of October 12, 2015, while on duty, at approximately 6:15 am, Officer Crowson went to Donut Palace in Monroe, Louisiana, to get something to eat. [Crowson

Deposition, Doc. No. 224-3, pp 9-10, 54]. As he walked just inside the front door, Officer Crowson observed a man – later identified as Moore – at the front counter "hollering and screaming and cursing." [*Id.*, pp. 11-12]. Officer Crowson observed Moore "ra[nting] and raving" and waving his arms. [*Id.*, pp. 12-14]. Officer Crowson thought that Moore was "upset" at the employee behind the counter; the employee, in turn, seemed nervous and scared. [*Id.*, pp. 12-13, 22-23]. Officer Crowson also observed other patrons leaving the business. [*Id.*, pp. 13, 45-46].

When Officer Crowson entered, Moore turned from the counter towards the door and saw him. [*Id.*, pp. 13-14]. Moore then approached him and closed the gap between the two of them to two to three feet. [*Id.*, p. 15]. While approaching him, Moore hollered curse words at Officer Crowson, continued "ra[nting] and raving," and informed Officer Crowson that he knew the mayor. [*Id.*, pp. 14-16]. Officer Crowson confronted Moore and told Moore that he needed to "calm down." [*Id.*, pp. 13-15]. Officer Crowson's directive had no apparent effect. [*Id.*, p. 14].

After the directive was ignored, Officer Crowson placed Moore under arrest for disturbing the peace, turned Moore around, and handcuffed him behind his back. [*Id.*, p. 15]. Moore was advised of his rights but refused to explain his actions. [*Id.*, pp. 27, 33].

After arresting Moore, Officer Crowson began the process of moving Moore to his patrol unit for transport. Moore provided some resistance as he led Moore outside, which Officer Crowson described as having to "coax" Moore while Moore was "slightly" pulling on him. [*Id*, pp. 18-19].

At the vehicle, Officer Crowson searched Moore incident to arrest and located Moore's driver's license, which he used when he called dispatch. [*Id.*, pp. 20-21]. Moore was placed in the patrol unit, and Officer Crowson secured Moore's vehicle. [*Id.*, pp. 20-22]. Officer Crowson then

returned to the store to interview the employee, who provided his account of the event. [*Id.*, pp. 22-23, 25-26].

At some point, while already in custody, Moore told Officer Crowson that Officer Crowson "was going to kill him." [*Id.*, pp. 32, 51]. Moore made the latter statement only once, and Crowson did not engage him about it. [*Id.*, pp. 32-34, 44, 51].

Upon arrival at RCC, Officer Crowson took Moore to booking to be processed into the facility. [*Id.*, p. 31].  Officer Crowson testified that he informed the booking officer that he was charging Moore "with disturbing the peace, loud and profane, for him disturbing the peace and cussing." [*Id.*, pp. 32-33].

Shortly after Moore's arrival, Nurse William Mitchell, LPN, ("Mitchell"), the on-staff nurse at RCC, assessed Moore. [Mitchell Deposition, Doc. No. 224-7, pp. 2-5, 6-8]. Mitchell believed that Moore was "intoxicated," [*Id.*, pp. 7, 9]; specifically, Mitchell believed that Moore was "either drunk or on something," meaning that his behavior was "chemically induced." [*Id.*, p. 10-11].

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61].

Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].  Moore's irrational behavior continued and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the

camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSP Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C/O") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurred at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went directly to the cell to see what was going on.  When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell. Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say. Runner said he would go find the lieutenant and he turned to leave. As Runner was walking away, he felt that something wasn't right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack. Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help. White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC officer(s), including an alleged closed-hand strike by Defendant Runner, who forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100].

White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at about 6:30 p.m., but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C/O Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was removed, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id.*, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forcefully taken down to the floor by Defendant Hardwell in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras, where he was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106].

As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor.  [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8,

at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43].

Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed an altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time and RCC staff did not indicate to the OPSO Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when

7

Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as it was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the investigation because it was then considered a homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point and Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to the purported crime scene to investigate further. [*Id*.]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at

p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition that the call for him to head to RCC to pick up Moore and bring him to OCC was made at approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C/O Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at

pp. 46-47, 63]. C.O. Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35; Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene, however, testified at deposition that they did not see Moore get dropped as he was carried from the Four-Way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster

10

Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc.
No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel
removed him from the unit and placed him on the cart, deputies noticed there was some bleeding
from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy
Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined
Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No.
256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33].
Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23;
Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed
the shift supervisor on scene that Moore showed signs of having a head injury and needed to be
taken to the hospital. [*Id.*, at p. 22].

Murphy and Wells took Moore to Conway.  Medical personnel treating Moore at Conway
performed a CT scan and other tests and determined that Moore had suffered a fractured skull.
[Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31].
Medical personnel also indicated that Moore had suffered a midline shift in his brain due to
bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc.
No. 256-17, at p.31-32]   At 12:29 a.m. on the 14th, Moore was transported by air evacuation
helicopter to LSU Health Center in Shreveport for additional care that could not be provided at
Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at
pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the
medical care providers indicated that Moore was likely brain dead and a decision would have to

be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the District Attorney's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id.*]. On or about November 14, Erie Moore, Sr. died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

**B.   Plaintiffs' Motion for Summary Judgment**

Plaintiffs contend they are entitled to judgment as a matter of law that:

I.     Individual private defendant guards employed by Richwood Correctional Center, Richwood Correctional Center, LLC, and LaSalle Management Company, LLC, were acting under "color of state law" as that term is defined under 42 USC§1983;

II.    Individual private defendant guards employed by Richwood Correctional Center, Richwood Correctional Center, LLC and LaSalle Management Company, LLC, are not entitled as a matter of law to qualified immunity under 42 USC §1983;

III.   Individual private defendant guards Runner and Hardwell used deadly force against Erie Moore, Sr.;

IV.    Individual private defendant guards Runner and Hardwell used objectively unreasonable force against Erie Moore, Sr.;

V.     Moore sustained a head injury including a subdural hematoma while in the custody of RCC and Ouachita Parish Sheriff;

VI.    The City of Monroe has a non-delegable duty to care for its prisoners and is liable in *solido* with LaSalle Management Company, LLC and Richwood Correctional Center, LLC for any injury sustained by Moore, Sr. due to the fault of defendant guards and employees of LMC and RCC under Louisiana state law and due to a constitutional violation; and

VII.    Certain material facts are uncontested and admitted by Defendants including but not limited to that

(1)    Erie Moore, Sr., the deceased, was arrested by City of Monroe police officer Crowson for misdemeanor disturbing the peace;

(2)    Crowson presented Moore to the Richwood Correctional Center for booking asper a contract between RCC and the City of Monroe;

(3)    RCC accepted custody of Moore under the contract to house him as a pre-trial detainee misdemeanor;

(4)    Ouachita Parish Sheriff took joint custodial responsibility with RCC from the point in time when Moore was carried from the Four-Way until placed into the Sheriff transportation vehicle.

Defendants contend that Plaintiffs are not entitled to judgment as a matter of law as to any of the above issues.

The motion is fully briefed, and the Court is prepared to rule.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to

particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B.    Analysis

#### 1.    Acting Under Color of State Law

Plaintiffs assert they are entitled to judgment as a matter of law that the individual private defendant guards employed by Richwood Correctional Center, Richwood Correctional Center, LLC, and LaSalle Management Company, LLC, were acting under "color of state law" as that term is defined under 42 USC § 1983.  Section 1983 provides for the recovery of damages when a person is deprived on his or her constitutional rights by a person acting under color of state law. See *Davidson v. Cannon*, 474 U.S. 344 (1986); and *Daniels v. Williams*, 474 U.S. 327 (1986).

Citing *West v. Atkins*, 487 U.S. 42, 54–57 (1988), Plaintiffs assert that private actors may, under some circumstances, be liable under Section 1983.  Plaintiffs also show that in *Rosborough*

*v. Management & Training Corp.*, 350 F.3d 459 (5th Cir., 2003) (per *curiam*) the Fifth Circuit stated: "We agree with the Sixth Circuit and with those district courts that have found that private prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury." *Id.*, at 461.

Plaintiffs allege that guards at Richwood Correctional Center, LLC, struck and injured Moore, causing his death. Plaintiffs contend that administering force in a correctional setting against an inmate who was arrested by city police is a traditional state function.  They additionally contend that the fact that a prisoner is in the care and custody of  RCC establishes that his custodian acted under the color of state law as defined under Section 1983.

Plaintiffs' Motion is not clear as to whether Plaintiffs are seeking summary judgment that, as a general rule, private actors may, under some circumstances, be liable under Section 1983, or whether Plaintiffs are seeking summary judgment that these Defendants are liable under Section 1983 under the specific facts and circumstances of this particular case.  Defendants do not appear to be disputing the general rule, but they do raise genuine issues of material fact as to whether Defendants are actually liable under the facts of this case.  Accordingly, Plaintiffs' Motion is DENIED.

### 2.    Qualified Immunity

Citing *Richardson v. McKnight*, 521 U.S. 399 (1997), Plaintiffs argue that the correction officer Defendants are private correctional officers, and as such, they are not entitled to assert qualified immunity.

Defendants respond, in summary, that the dissent in *Richardson* shows the beginning of the path that leads to the grant of qualified immunity, under the facts and circumstances of this case. Similarly, Chief Justice Roberts' opinion in *Filarsky v. Delia*, 566 U.S. 377 (2012), provides

15

the next step that leads to application of qualified immunity to the individual defendants in this case. In addition, the fact that the Louisiana legislature has specifically enacted statutes which allow a private company to step into the shoes of the State and other political subdivisions in the operations of a prison provides important, distinguishing facts that lead to the conclusion that *Richardson* does not apply. The shift in the analysis found in *Richardson*, as illustrated by *Filarsky*, is further noted in *Saenz v. G4S Secure Solutions (USA), Inc.*, 224 F. Supp. 477 (W.D. Tex. 2016). Defendants conclude that Plaintiff's briefing on qualified immunity provides no response to the above jurisprudence or argument, and, accordingly, Plaintiffs' attempt to defeat the qualified immunity defense should be denied.

The Court has fully discussed this issue in its Ruling on the Motion for Summary Judgment filed by Defendants Alton Hale, William Mitchell, and Danielle Walker [Doc. No. 222]. Accordingly, for the reasons set forth in that Ruling, Plaintiffs' Motion for Partial Summary Judgment on the issue of qualified immunity is DENIED.

### 3.    Use of Deadly Force

Plaintiffs argue that they are entitled to judgment as a matter of law that Defendants Runner and Hardwell used deadly force against Moore.  "Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

Plaintiffs contend that there were no circumstances warranting the use of deadly force in this case. Plaintiffs assert that Moore was not resisting or threatening, he had no weapon, there was no threat to the safety of Runner, Hardwell, or a third party, and Moore was not attempting to escape. Plaintiffs further assert that Moore did not advance upon Runner and Hardwell; instead, it

was Runner and Hardwell who advanced on Moore. They state that Moore was squatting and apparently defecating, in a vulnerable position, when Runner swung his fist striking Moore in the back of the head; . Exh MA-12. and that Moore was standing still leaning on his bunk with his back to the cell door when Hardwell entered grabbed him from behind in a bear hug. Exh MA-33. Plaintiffs assert that there is no evidence of Moore doing anything that was objectively threatening before he was grabbed by Hardwell, who then slammed Moore headfirst onto a hard tile floor. Exh MA-2.

Defendants respond that Plaintiffs paint a picture that attempts to convince the Court that Moore played no role in the events that ultimately led to his death.  Plaintiffs argue that no C.O. at RCC ever had any reason to enter LD-7 at any time. Further, no C.O. at RCC had any right to touch or contact Moore in any fashion. Plaintiffs' argument leads to the conclusion that White should never have been rescued, that Moore should never have been removed from the conditions he created in LD 7, and should never have been arrested for his unprovoked attack of White. Defendants conclude that Plaintiffs seemingly argue that the RCC C.O.s singled Moore out, for no reason, and then intentionally subjected him to a punch, a take-down, a drop, another drop. and then a beating by four or more RCC C.O.s, and, curiously, all of these attacks on Moore left no sign of physical injury or even any blood on Moore.

Defendants further assert that, once Plaintiffs' unsupported arguments are disregarded and the deposition testimony of the actual eyewitnesses is studied and the video is reviewed, then the following facts are established:

1.   Moore attacked White;

2.   Moore was astute enough to push White out of the view of the sole surveillance camera in LD-7 during his attack;

    3.      Moore attempted to hide the result of his attack on White by placing himself in front of the window in the door of LD-7 whenever a C.O. came by;

    4.      When Runner was able to view White's body he immediately called for assistance;

    5.      Once enough C.O.s were assembled to enter LD-7, secure and remove White, and protect White and the C.O.s from Moore, entry was made; and

    6.      Upon entry, Runner placed himself between Moore, White and the other C.O.s to protect everyone from Moore.

Defendants argue that the testimony and evidence also show that before entry was made, Moore refused to comply with verbal instruction and continued to make threats to both the C.O.s and White. Runner, observing what both he and other C.O.s perceived to be a threat of harm, acted to protect White and the other C.O.s from Moore by using a single push or shove. After White was removed from LD-7, Moore remained inside. While he was no longer a danger to White, he remained a dangerous man. Moore was next removed from LD-7 because LD-7 had been contaminated by blood, feces, food, trash and pepper spray, and the need to secure Moore for his move to OCC by deputies for the Sheriff.

Defendants conclude that, far from being an innocent man being set upon by C.O.s for no reason, Moore was a threat to everyone because of his unprovoked attack on White, his continuing threats, and his refusal to comply with verbal commands and pepper spray.

The Court has viewed the summary judgment evidence, including the video evidence, and finds that Plaintiffs have not carried their burden of showing there are no genuine issues of material fact that Defendants used deadly force on Moore. Additionally, the Court has granted Defendants' Motion for Summary Judgment on the issue of causation as to Moore's death [Doc. No. 245] in a

18

separate Ruling. Accordingly, Plaintiffs Motion for PartialSummary Judgment on the issue of deadly force is DENIED.

### 4.      Use of Force Objectively Unreasonable

Plaintiffs additionally contend they are entitled to judgment as a matter of law that Defendants Runner and Hardwell used objectively unreasonable force against Moore.  For the same reasons set forth above on the issue of deadly force, the Court finds that Plaintiffs have not carried their burden of showing there are no genuine issues of material fact that Defendants used objectively unreasonable force against Moore.  More specifically, Plaintiffs have not established there are no genuine issues of material fact that there was no need for the application of force, that the amount of force used was unreasonable, or that the officers unreasonable perceived the threats presented by Moore.  Accordingly, Plaintiffs' Motion for Partial Summary Judgment on the issue of objectively unreasonable force is DENIED.

### 5.      Head Injury was Sustained While in Custody

Plaintiffs assert they are entitled to judgment as a matter of law that Moore sustained the injury that resulted in a subdural hematoma while in the custody of Defendants.

Defendants respond that there are several potential acts which could have caused the subdural hematoma which resulted in Moore's death, including:

   (1)   any blunt force trauma he may have suffered prior to his booking into RCC;

   (2)   any blunt force trauma he may have suffered during his altercation with Vernon White in LD-7;

   (3)   Runner's alleged closed hand strike;

   (4)   Hardwell's takedown;

   (5)   his drop by officers in the hallway outside LD-7; and

(6)      his alleged drop while being taken out of the Four-Way.

[Doc. 140, ¶29].

In addition, there have been allegations that Moore beat his head against the cell door.

The Court has granted Defendants' Motion for Summary Judgment on the issue of causation for Moore's death [Doc. No. 245] in a separate Ruling on the basis that Plaintiffs failed to show which of these incidents was the factual cause of Moore's subdural hematoma based upon the expert medical evidence available. For the reasons stated therein, Defendants' Motion for Partial Summary Judgment is DENIED as to this issue.

### 6.      City of Monroe's Non-delegable Duty

Plaintiffs assert that they are entitled to judgment as a matter of law that the City of Monroe had a non-delegable duty to Moore because it contracted with RCC to house its city misdemeanor prisoners. As such, the City of Monroe had a non-delegable duty to not commit acts of cruel and unusual punishment and to protect against excessive use of force and to provide medical care. Plaintiffs argue that, if a non-delegable duty exists, then the entity that owes the non-delegable duty is vicariously liable for any injury arising from the use of force.

The Court has addressed these issues in a separate Ruling on the City of Monroe's Motion for Summary Judgment [Doc. No. 247].  Accordingly, for the reasons set forth in that Ruling, Plaintiffs' Motion for Partial Summary Judgment is DENIED as to this issue.

### 7.      Certain Material Facts

Plaintiffs contend they are entitled to judgment as a matter of law that the following alleged material facts are uncontested:

(1)      Erie Moore, Sr., the deceased, was arrested by City of Monroe police officer Crowson for misdemeanor disturbing the peace. Exhibit 114. Officer Crowson's arrest report.

20

> (2) Crowson presented Moore to the Richwood Correctional Center for booking pursuant to a contract between RCC and the City of Monroe.
>
> (3) RCC accepted custody of Moore under the contract to house him as a pre-trial detainee misdemeant. Booking record Exhibit 102. Contract Exhibit 77.
>
> (4) Ouachita Parish Sheriff took joint custodial responsibility with RCC from the point in time when Ouachita Parish deputies arrived on the scene and identified Moore in the Four-Way.

Citing *Franklin-Mason v. Penn*, 259 F.R.D. 9, 11 (D.D.C. 2009) ("a party may not file a motion for partial summary judgment on a fact or an element of a claim") and *Collins v. Cottrell Contracting Corp*., 733 F. Supp. 2d 690, 697–98, (E.D.N.C. 2010) ("a number of courts have concluded that a motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief"), the Sheriff Defendants respond that Plaintiffs' Motion should be considered procedurally improper and should be denied as defective in form [Doc. No. 293].

The Court agrees.  Accordingly, Plaintiffs' Motion is DENIED as to these issues.

## III.    CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 230].

MONROE, LOUISIANA, this 30th day of October, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**