UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ERIE MOORE, JR., ET AL.                    CIVIL ACTION NO. 3:16-CV-01007

VERSUS                                     JUDGE TERRY A. DOUGHTY

LASALLE CORRECTIONS, INC.,                 MAG. JUDGE KAREN L. HAYES
ET AL.

RULING

Pending here is a Motion for Summary Judgment filed by Defendants Ray Hanson ("Hanson"), Archie Aultman ("Aultman"), Richwood Correctional Center, LLC ("Richwood"), and LaSalle Management Company, LLC ("LaSalle") (collectively "Defendants") [Doc. No. 237]. Plaintiffs have filed an opposition. [Doc. No. 302]. Defendants have filed a reply to the opposition [Doc. No. 337].

For the following reasons, the pending Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

I.      FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana. RCC is owned and operated by Defendants LaSalle and/or Richwood, related private entities.

At the time of the incident, Erie Moore, Sr. ("Moore"), was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015. The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White"). White died within a few hours of the altercation. Moore was forcibly removed

from the holding cell where the altercation occurred.  Shortly thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including Defendants Hanson and LaSalle [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants, including Defendants Aultman and Richwood, and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

In a separate Ruling, the Court has granted Defendants summary judgment on Plaintiffs' claims that Defendants' use of excessive force caused the death of Moore.  The Court has dismissed those claims with prejudice.  [Ruling on MSJ No. 245].  Plaintiffs' claims against Defendants for Moore's less-than-lethal injuries remain pending.

### A.    Factual Background

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Officer Tommy Crowson for disturbing the peace.

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another

detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued, and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSO Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C.O.") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurs at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7. Moore was sitting on an empty bed rack from which he had knocked off the mattress. Two dinner trays had been delivered to the cell, but Moore was eating from both trays. Runner went directly to the cell to see what was going on. When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell. Moore stated he wanted to see the lieutenant. Runner asked why, but Moore refused to say. Runner said he would go find the lieutenant, and he turned to leave. As Runner was walking away, he felt that something was not right, so he went back to the cell door and looked in the window. Moore was no longer standing in front of the window but had returned to his rack. Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure. [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help. White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC officer(s) that forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell

Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at approximately 6:30 p.m., but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C.O. Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore, and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras.  He was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106]. As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor.  [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

Foster was working the night shift, from 6:00 p.m. to 6:00 a.m., and was in charge of the

kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with Reginald Curley. [*Id*., p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird

observed any apparent injuries to Moore at the time, and RCC staff did not indicate to the OPSO Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as it was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point, and, Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at

pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to LD-7 to investigate further. [*Id.*]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at his deposition that he received the call to pick up Moore at approximately 8:50 p.m. [*Id.*] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield

7

Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at pp. 46-47, 63]. C.O. Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35; Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene,

however, testified at their depositions that they did not see Moore get dropped as he was carried

from the Four-Way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224;

Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p.

33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at

pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster

Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc.

No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel

removed him from the unit and placed him on the cart, deputies noticed there was some bleeding

from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy

Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined

Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No.

256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33].

Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23;

Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed

the shift supervisor on scene that Moore showed signs of a head injury and needed to be taken to

the hospital. [*Id*., at p. 22].

Murphy and Wells took Moore to LSU-E.A. Conway Medical Center ("Conway").

Medical personnel treating Moore at Conway performed a CT scan and other tests and

determined that Moore had suffered a fractured skull. [Wells Deposition, Doc. No. 256-16, at

pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31]. Medical personnel also indicated that

Moore had suffered a midline shift in his brain due to bleeding in his skull. [Wells Deposition,

Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31-32]   At 12:29 a.m.

9

on October 14, Moore was transported by air evacuation helicopter to LSU Health Center in Shreveport for additional care that could not be provided at Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the medical care providers indicated that Moore was likely brain dead, and a decision would have to be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the DA's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id.*]. On or about November 14, Erie Moore, Sr., died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs sued numerous members of the RCC staff, the owners of RCC, and the City of Monroe, among others that have already been dismissed prior to this point in the litigation. They sued these Defendants, alleging various claims under federal and state law.

      **B.**      **Deposition of Archie Aultman**

Immediately prior to working at RCC, Aultman worked for the Transportation Safety Administration with the Department of Homeland Security as a screener at the Monroe airport. [Doc. No. 237-5, p.16]. Aultman previously worked for the Louisiana Department of Corrections ("DOC"), but retired in 2002 and then started work for the TSA. [*Id.*, p. 16]. While working for the DOC, Aultman was a major at David Wade Correctional Center ("David Wade"), and worked under Ray Hanson. [*Id.*, p. 17]. Aultman first began working for the DOC at Angola in 1979, where he worked for approximately two years. He then transferred to what is now the OCC. He next transferred to the Work Training Facility North ("WTFN") in Alexandria, Louisiana. [*Id.*, p. 18]. Aultman then moved from WTFN to David Wade. [*Id.*, p. 18].

Aultman went through a certified corrections academy in corrections when he began working at Angola in 1979. [*Id.*, p. 23]. While working at RCC he conducted training on the use of force policy on an annual basis. [*Id.*]. At RCC there was a monthly security meeting where they might discuss a new policy and instruct the supervisors at RCC in it. Also, if a routine used at RCC needed to be changed, then it would be brought up at the meeting. [*Id.*, p. 25]. When Aultman trains on the use of force during annual training, he reads the RCC use of force policy out loud. He does not do a hands-on demonstration as far as the use of force. There is no training done at RCC on defensive tactics. Defensive tactics are learned when the correctional officer goes through an academy. [*Id.*, p. 28]. RCC has Post Orders which tell the correctional officers what to do. [*Id.*, p. 31]. There is a Post Order for every job position at RCC. [*Id.*, p. 32]. RCC is audited by the Department of Corrections for compliance with the Basic Jail Guidelines ("BJG"). Aultman understands that the BJG apply both to DOC inmates and Monroe Police Department arrestees. [*Id.*, pp. 104-105].

In October of 2015 Aultman was the Assistant Warden at RCC. [*Id.*, p. 7]. As the Assistant Warden, he was responsible for supervising the maintenance crew, the yard crews, and security. [*Id.*, p. 8]. Aultman would also inspect the dorms at 8:00 a.m. and make rounds looking for cleanliness. He might walk out and check the fences, go through the maintenance area, and see what equipment may be broken. [*Id.*, p. 9]. He would also review paperwork. In the afternoon he would repeat what he did that morning. [*Id.*, p. 10]. While in his office he could pull up video from any camera in the prison, including LD-7. [*Id.,* pp. 10-12]. Aultman did not have a practice of monitoring cameras from his office, but he could pull up different video feeds and replay them. [*Id.*, p. 15]

Aultman identified the RCC Use of Force policy in effect in October of 2015 and testified that he reviewed that with C.O.s on an annual basis. [*Id.*, pp. 81-82]. It is the policy or practice of RCC that the highest-ranking supervisor will direct the acts of the C.O.s. [*Id.*, p. 82]. A supervisor or a C.O. who sees an inmate acting irrationally can refer that inmate for mental health issues. [*Id.*, p. 85]. A decision to extract an inmate from a cell will be made by the highest-ranking officer on scene. [*Id.*, p. 91]. Typically, the restraint of an inmate is done inside the cell, if possible. Some C.O.s would rather do it inside a cell, and some C.O.s would rather have more room and do the restraint outside the cell. [*Id.*]. If an inmate is passive and the inmate is complying with orders, the restraint will be done inside the cell. [*Id.*]. The decision to restrain inside the cell or outside the cell will depend upon whether the C.O.s believe that it can be done safely. [*Id.,* p. 93]. He has never taught anyone takedown methods and is unaware of any takedown methods being taught at RCC. [*Id.*].

On October 13, 2015, he was at home and received a telephone call telling him of a fight at RCC in a lockdown cell with injury and that an ambulance had been called. It took Aultman

about 30 to 45 minutes for him to get to RCC from his home. [*Id.,* p. 42]. Upon arrival at RCC, sometime after 7:00 p.m. on October 13, 2015, he was informed that White was injured and had received medical attention. He first became aware of Moore when he walked over and saw Moore in the Four-Way. [*Id.,* p. 44]. He saw Moore was in restraints and was snoring like he was asleep. He believes there were two RCC C.O.s in the Four-Way with Moore. Moore was lying on his back, handcuffed. [*Id.,* p. 46]. He only stayed in the Four-Way for a couple of minutes. [*Id.*, p. 47]. Nobody ever explained to him why Moore was in the Four-Way. [*Id.*]

After seeing Moore, he walked to the front of RCC to meet the OPSO deputies who were on the way. [*Id.*, pp. 45, 47-48]. When the first OPSO deputy arrived, Aultman told him that there had been a battery. While he was standing out front, somebody stated that White had passed away at the hospital. [*Id.*, p. 48]. He then told the OPSO deputy of this new information. [*Id.*]. Aultman then walked with the OPSO deputy to the Four-Way. [*Id.* p. 50]. When Aultman reached the Four-Way with the OPSO deputy, he saw that Moore was in the same condition and position as he had been earlier. [*Id.*, p. 52]. On the second occasion that Aultman saw Moore in the Four-Way, there were still two C.O.s with him. [*Id.*]. He stayed there until Moore was picked up and carried outside. [*Id.*, p. 54].

After Moore was taken away, Aultman returned to his office to start his paperwork. [*Id.*, p. 56] The decision to transport Moore to OCC was made by OPSO deputies. He never saw Moore with a busted lip or any blood on his face. [*Id.,* p. 102]. Aultman did not have any contact with anyone with LaSalle about the incident. [*Id.*, pp. 164, 208].

### C.    Deposition of Ellis Ray Hanson

Hanson was employed as the Warden at RCC by LaSalle. His direct supervisor at the time of his deposition on December 5, 2017 was Rodney Cooper, who also worked for LaSalle. At the

time of the events in October of 2015, his immediate supervisor was Johnny Creed, who worked as the Chief of Operations for LaSalle. [Deposition of Ellis Ray Hanson, Doc. No. 237-12, p. 8]. Hanson first began working at RCC as the Assistant Warden in April of 2011. [*Id.*, p. 10]. Prior to his employment at RCC, he had worked for the DOC and retired as the Assistant Warden at David Wade. [*Id.*, p. 20].

In October of 2015, training at RCC was provided by Hanson, the two Assistant Wardens, and the Chief of Security. [*Id.*, p. 11]. Aultman and Turner conducted the use of force training at RCC. [*Id.*, p. 117]. He first became POST certified as a C.O. in March of 1985. [*Id.*, p. 21]. At the time of his deposition, he had been in corrections twenty-seven years. [*Id.*, p. 26]. Hanson was promoted to Warden at RCC on January 1, 2014, when Creed placed him in that position. [*Id.*, p. 15]. As the Warden at RCC he was the person in charge of establishing policy. [*Id.*, p. 34]. When he took over as Warden at RCC he reviewed the policies that were in place and changed a few of them. [*Id.*]. Assistant Warden Aultman assisted him in conducting his review of the written policies. [*Id.*, p. 35]. Hanson was shown, explained, and identified various written policies, and post orders in place at RCC. [*Id.*, pp. 41-44, 48, 159-160].

Hanson explained that the annual in-service training conducted at RCC follows the requirements of the Basic Jail Guidelines (BJG). [*Id.*, p. 45]. The DOC conducts an annual inspection of RCC and a BJG audit. [*Id.*, p. 89]. The intake staff is trained to detect mental health issues that would warrant being seen by a nurse or a mental health professional. [*Id.*, p. 126]. The medical staff at RCC includes four LPNs, one of whom is designated the Director of Nursing. There is also a nurse practitioner that comes by RCC as needed, but routinely every Wednesday. There is also an agreement with a mental healthcare provider for weekly visits. [*Id.*, p. 161].

14

Monroe Police Department arrestees are only held in one level of custody, which is as a misdemeanor pretrial detainee. [*Id.*, p. 182]. The booking process for Monroe Police Department arrestees includes addressing any medical and mental health concerns. The booking officer also conducts a preliminary pat/frisk and confirms that no weapons or contraband are introduced into the facility. The booking officer goes over the screening questions with the detainee, some of which are medically related. [*Id.*, pp. 185-186]. RCC staff is to check the lock down cells at least every thirty minutes. [*Id.*, p. 199]. The assignment to any particular dorm or general population is done by the shift supervisor. [*Id.*, p. 182].

When there is a newly hired C.O., that employee is put through a forty-hour training program at RCC. The new C.O. goes through an on-the-job training checklist with the Chief of Security. Then, in accordance with the BJG, the new hire is run through a POST training academy within one year of employment. The POST training is now done at Winn Correctional Center. [*Id.*, pp. 231-232]. In the past RCC has used Delta College and Morehouse Parish for the required POST training. [*Id.*]. At RCC, the Warden has the authority to hire a C.O. [*Id.*, p. 233]. C.O.s at RCC were provided defensive tactics training during their POST training. [*Id.*, pp. 46-47].

On October 13, 2015, Hanson was off-duty at his home when he received a telephone call from Aultman and was told there had been a fight in LD-7 and that White had been transported to the hospital. [*Id.*, pp. 65-66]. After receiving the call from Aultman, it took him an hour and a half to get to RCC from his home. [*Id.*]. When he arrived at RCC, there were numerous OPSO deputies in Aultman's office and all were reviewing the video of the incident. [*Id.*, p. 67]. Since it was an OPSO investigation, the RCC staff took a backseat and were there strictly to assist the OPSO in whatever they needed. [*Id.*, p. 69]. He has no personal knowledge of what may have happened in the Four-Way [*Id.*, pp. 69-70].

15

On the night of the incident, after he spoke with Aultman, he telephoned Creed, and spoke with Creed twice. [*Id*., p. 75]. Creed did not provide any instructions to any of the RCC staff. LaSalle did not send anybody to RCC to conduct an investigation. [*Id*., p. 76].

**D.      Deposition of Johnny Creed**

Johnny Creed retired on November 1, 2017, from employment with LaSalle. [Deposition of Johnny Creed, Doc. No. 237-10, p. 8]. Creed began employment with LaSalle on September 1, 2007, after he retired from working for the DOC in July of 2007. [*Id*., p. 9]. At the time of his retirement from the DOC, he was the Assistant Secretary. Prior to that, he had been at David Wade as Chief of Security with a rank of Lieutenant Colonel. [*Id*., p. 11]. He began working at David Wade in January of 1981. [*Id*., p. 13]. From 1995 until 2001, he was also an auditor with the American Correctional Association (ACA), but he did not do any inspections in Louisiana. [*Id*., p. 21]. He inspected facilities in Michigan, Florida, Kansas, and Massachusetts for the ACA. [*Id.*, p. 22]. Creed's duty as Chief of Operations for LaSalle was to respond to any questions posed by any warden, but most of his time was spent consulting with sheriffs. [*Id.*, p. 14]. It was the warden's job at a facility to impose discipline or recommend discipline for the C.O.s [*Id.*, p. 16]. He did not sign off on any reports on a regular basis. [*Id*., pp. 17-18].

Typically, Creed would not receive reports of any incidents from the facilities. [*Id*., pp 28-30]. He did not have any responsibilities to make sure that any facility had adequate staffing. That was the warden's responsibility. [*Id*., p. 20]. With LaSalle, he had input into the hiring or firing of wardens. He did not have input into the hiring or firing of assistant wardens, which was left to the warden of each facility because the warden was the one that had to work with the assistant warden. [*Id*., p. 24]. The warden at each facility had the authority to fire a C.O. [*Id*., p. 23]. Creed did not set the budget for any of the wardens. [*Id.,* pp. 23-24].

16

The warden determines the rate of pay of any particular employee at a facility. [*Id*.]. The level of training for new hire correctional officers was determined by the BJG, which training included the POST Corrections school. [*Id.*, p. 25].  All staffing at RCC is done in accordance with the BJG. [*Id*., p. 49]. When the BJG inspection occurs, the inspectors look at the logbooks and make the determination that the facility has adequate staff. [*Id*., p. 49]. RCC has a written use of force policy. [*Id*., p. 66].

Creed is unaware of any inmates who died while in the custody of LaSalle as a result of an act of a C.O. [*Id.,* p. 83]. There is no direction from LaSalle to the facilities that if there is a death, it needs to be investigated. [*Id*., p. 84]. He is unfamiliar with any policies that LaSalle has issued that it requires all of the facilities to follow. [*Id*.]. All of the facilities that house Louisiana DOC inmates have to follow the BJG. [*Id*., p. 85].

On October 13, 2015, he was in south Arkansas and received a call from Hanson, who informed Creed of what had occurred at RCC and that the OPSO was on the way. [*Id*., pp. 33-34]. It took a little over an hour for Creed to get to RCC after the call from Hanson, and when he got to RCC, he saw OPSO units parked in front. Upon entry into RCC he saw OPSO Captain Holyfield with Aultman and Hanson. Hanson told him that the OPSO had assumed the investigation. Creed stayed at RCC for maybe five minutes or so, then he left. [*Id.*, p. 34]. Creed did not go to the cell where the incident occurred and does not recall seeing either of the two inmates involved. [*Id*., p. 37].

**D.      Plaintiffs' Assertions Against Defendants**

In the Third Amended Plaintiff it is alleged that Richwood and LaSalle were responsible for the death of Moore. Specifically, the following allegations were made as to Richwood and LaSalle:

1.  Both are private, domestic corporations. [Doc. No. 140, paragraph 4];

2.  LaSalle and Richwood had a contract with the City of Monroe concerning the detention of City of Monroe pre-trial detainees at RCC. [Doc. No. 140, paragraphs 5 and 9];

3.  Various individual Defendants who were employees of LaSalle and/or Richwood caused or contributed to Moore's death. [Doc. No. 140, paragraphs 10-24];

4.  LaSalle and Richwood were responsible for the excessive use of force upon Moore. [Doc. No. 140, paragraph 27];

5.  LaSalle and Richwood were responsible for the individual Defendants' failure to intervene and their forming of a conspiracy to harm Moore.  Plaintiffs also contend LaSalle and Richwood failed to supervise the individual Defendants. [Doc. No. 140, paragraphs 30-33];

6.  LaSalle and Richwood failed to monitor, classify, train and implement policies or provide adequate medical attention to Moore. [Doc. No. 140, paragraph 34, 36-38];

7.  LaSalle and Richwood failed to train individual Defendants or implement adequate policies. [Doc. No. 140, paragraphs 39-42];

8.  Both LaSalle and Richwood failed to protect and classify inmates. [Doc. No. 43];

9.  LaSalle and Richwood were responsible, under Louisiana law, for the use of force against Moore and failed to properly train their employees in classification, use of force and proper monitoring of known violent offenders. [Doc. No. 140, paragraphs 46-47]; and

18

10. Ray Hanson, Asst. Warden Aultman, Gerald Hardwell, Christopher Loring, Jeremy Runner, Reginald Williams, Reginal Curley, Duan Rosenthal, Roderick Douglas, Kenneth Hart, Danielle Walker, Roy Brown, Alton Hale, Jody Foster and William Mitchell were all alleged to be employees of Richwood and LaSalle and all were alleged to have been acting under color of state law [Doc. 140, paragraphs 4 and 5].

The allegations made as to Hanson are that:

1. He was the Warden of RCC, the chief policymaker, and was responsible for the daily operations of RCC. [Doc. No. 140, paragraph 4(b)]; and

2. He is sued in his individual and official capacities and it is alleged that he acted under color of law. [Doc. No. 140, paragraph 4(6)].

The allegations made as to Aultman are that:

1. He was the Assistant Warden of RCC and was its chief policy maker. It was also alleged that he was responsible for the daily operations of RCC. [Doc. No. 140, Paragraph 4(c)]; and

2. He was sued in his individual and official capacities and it is alleged that he acted under color of law. [Doc. No. 140, paragraph 4(c)].

### E.      Defendants' Motion for Summary Judgment

Defendants Hanson and Aultman seek the dismissal of all claims against them.

Specifically, they seek summary judgment on the following claims and issues:

a.      Supervisory liability for failure to train

b.      Failure to provide medical care

c.      Failure to Intervene (Bystander Liability)

       d.       Classification

       e.       Conspiracy

       f.       Qualified Immunity

       g.       Good Faith

       h.       Punitive Damages

Defendants LaSalle and Richwood seek the dismissal of all claims against them. Specifically, they seek summary judgment on the following claims and issues:

       a.       Direct § 1983 Claims

           i.       Training

           ii.       Policies and Procedures

           iii.       Medical Procedures

       b.       Punitive Damages

       c.       State Law Claims

The motion is fully briefed, and the Court is prepared to rule.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A

party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.).

B.   **Analysis**

1.   **Defendants Hanson and Aultman**

a.   **Supervisory Liability**

Plaintiffs have alleged that Defendants Hanson and Aultman have supervisory liability for failing to train the Defendant C.O.s properly in defensive tactics and cell extraction procedures, and for failure to provide annual refresher training.

Defendants Hanson and Aultman contend they have no supervisory liability in this case. Supervisors cannot be held liable under § 1983 for the actions of subordinates, on any theory of

vicarious or *respondeat superior* liability. In *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375 (5th Cir. 2005), the Fifth Circuit set out the elements of a supervisory liability claim as:

1. The supervisor either failed to supervise or train the subordinate;

2. A causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and

3. The failure to train or supervise amounts to deliberate indifference.

Citing *Roberts v. City of Shreveport*, 397 F.3d 287 (5th Cir. 2005), Hanson and Aultman contend that Plaintiffs' claims should be dismissed.  In *Roberts*, the district court denied a motion for summary judgment filed by the chief of police for the City of Shreveport on failure to train claims. The Fifth Circuit reversed the district court and found that the plaintiffs did not provide sufficient evidence of the chief's failure to train or that any failure was deliberately indifferent to the decedent's constitutional rights. The Fifth Circuit also noted that a plaintiff seeking recovery under a failure to properly train or supervise theory of liability must prove that the supervisor failed to control an officer's known propensity for the violation of rights and also noted that, to prove deliberate indifference, a plaintiff must demonstrate "at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a Constitutional violation." *Roberts*, 397 F.3d at 293.

Hanson and Aultman assert that a review of the deposition testimony, with attached exhibits, shows that RCC had, in place, written policies on the use of force. Furthermore, the deposition testimony establishes that all the Defendants who applied any force upon Moore were trained in the use of force, as well as a large number of other skills. Hanson and Aultman additionally contend they were not present or personally involved in any of the facts or circumstances of Moore's incarceration at RCC. Also, there is no testimony or evidence of a

pattern of similar violations arising from training or other policy issues. Furthermore, there is no testimony or evidence that Hanson or Aultman improperly hired, retained or assigned any defendant, that there was a causal link between the alleged failure(s) of Hanson or Aultman and the violation of Moore's rights, or that either Hanson or Aultman was deliberately indifferent. Accordingly, Hanson and Aultman conclude that all federal claims and causes of action made against them based on supervisory liability should be dismissed with prejudice.

Plaintiffs agree that neither Hanson nor Aultman themselves personally applied force to Moore. Plaintiffs argue, instead, that Hanson and Aultman are responsible under the theory of supervisory liability for failing to train the C.O.s properly in defensive tactics. Plaintiffs acknowledge that the C.O.s involved in this case, Hardwell, Runner, Williams, Curley, Loring, Douglas, and Foster, were POST certified at Level 3 (30 hours OJT plus 90 hours at the academy which is two weeks); however, Plaintiffs contend that the Correctional Officers should have received annual or regular refresher training in defensive tactics. Plaintiffs state that it was foreseeable that guards would need to use defensive tactics repetitively. Plaintiffs argue, therefore, that it was incumbent on the supervisors to provide annual refresher training and, further, to provide cell extraction training. Plaintiffs assert that these failures were a moving cause of the "street fighting" tactics used by the Correctional Officers which led to Moore's head injury. [Plaintiffs' Opposition Memorandum, Doc. No. 302, pp. 36=37].

The Court finds that Plaintiffs have not established that Hanson or Aultman were deliberately indifferent to Moore's rights.   "[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir.1992). The Court's finding

is supported by the following deposition evidence which clearly establishes that Defendants hired experienced correctional officers and provided extensive training for them.

*Warden Hanson*

Hanson testified that the policies at RCC that dealt with the use of force were developed from the BJG by Hanson. [Hanson Deposition, Doc. No. 237-14, p. 11]. Hanson was required to follow the BJGs at RCC as a requirement by the State of Louisiana to house DOC offenders. [*Id.*, p. 37]. The BJG requires annual refresher training. [*Id.*, p. 28]. The mental health and medical health services required at RCC were governed by BJG. [*Id.*, p. 49]. At RCC there is a written policy on medical care that met the BJG requirements. [*Id.*, p. 53]. At RCC the BJGs were followed whenever a death occurred. [*Id.*, p. 56]. All written policies at RCC would have been reviewed by the BJG auditors. [*Id.*, p. 57]. While Hanson was employed at David Wade, he was a BJG auditor for several years and learned the DOC regulations. [*Id.*, p. 66].

*Rodney Cooper*

Rodney Cooper, the Executive Director for LaSalle, testified that, before coming to work for LaSalle in 2009, he worked for thirty years for the Department of Corrections in Texas and retired as Deputy Director [Rodney Cooper Deposition, Doc. No. 237-15, p. 8].  In Louisiana, policies for the detention centers have to meet the BJGs. [*Id.*, pp. 31-32].  Compliance with the BJG is determined by the DOC facility inspections. BJG facility inspection reports would be delivered to the warden of the facility, who would then send a copy to Cooper. [*Id.*, p. 34]. LaSalle expects the warden of each facility to meet the guidelines applicable. [*Id.*, p. 35].  In 2015, RCC was in compliance with the BJG. [*Id.*, p. 130].

Cooper testified that LaSalle does not investigate deaths in a facility. That investigation is always conducted by a third-party law enforcement agency. [*Id.*, p. 41]. Nobody from the LaSalle

24

corporate office investigated the Moore death after the Sheriff's office completed its investigation. [*Id*., p. 64].    LaSalle does not have a uniform use of force policy that is applicable to all of the correctional facilities. The Texas facilities would have policies to meet the Texas Jail Commission requirements. The policies of each facility would all look a lot alike, but the policies are not developed by the corporate office. [*Id*., p. 56]. There are no standard policies and procedures because each facility is required to operate under the rules and procedures applicable. For example, if a facility is housing ICE detainees, then the policies and procedures for those detainees must be followed. If a facility is housing DOC offenders in Louisiana, then the Louisiana DOC rules must be followed. If DOC offenders in Texas or Georgia are being housed, then those states' rules would be applicable. [*Id*., p. 74].

Cooper further testified that the training afforded to C.O.s depends upon the group for whom the subjects are being detained. For example, ICE has certain requirements for training that are not required by the Louisiana DOC. [*Id*., p. 90]. The warden is responsible for ensuring that C.O.s are properly trained according to the applicable standards. [*Id*., p. 91-92]. The warden of each facility is to make sure that the C.O.s are getting trained under whatever guidelines are applicable. [*Id*., p. 92]. For training in Louisiana, LaSalle required that the POST training standards be followed. [*Id*., p. 126].

Cooper also testified that LaSalle expects the wardens and assistant wardens to review the uses of force that occur at their facilities and to take proper measure. [Id., pp. 93-94]. LaSalle leaves all of the operational decisions of each facility to the warden. The warden is responsible for the day-to-day operations. The warden is responsible to meet whatever standards apply to that facility. [Id., p. 124].

*George Armbruster*

Defendants have also presented the Affidavit of George Armbruster ("Armbruster"), who was engaged to conduct a review of all discovery materials, pleadings, and other information, and to render an opinion as to liability issues, including the issues related to the claims made against Hanson, Aultman, Richwood, and LaSalle. [Affidavit of George Armbruster, Doc. No. 237-16]. Armbruster has been tendered and accepted as an expert in police, corrections, and law enforcement practices, policies, procedures, and training (including the use of force) in federal and state court on numerous occasions in Louisiana. [*Id*., p. 2]

After examining the materials provided him [*Id*., Exhibit B], materials which are generally used to reach opinions concerning the adequacy of training, policies, procedures, and supervision, Armbruster has reached the following opinions, based upon his training, education and experience:

> All defendants who used force on Erie Moore had been properly trained in and did properly utilize the use of force continuum, including officer presence, verbal commands, and/or empty hand control techniques and/or pepper spray;
>
> Runner and Hardwell did properly utilize the use of force continuum as described above, including escalating to empty hand control techniques and/or the use of pepper spray;
>
> The training of Alton Hale, William Mitchell, Danielle Walker, Roy Brown, Jody Foster, Kenneth Hart, Ray Hanson Archie Aultman, Reginald Curley, Reginald Williams, Gerald Hardwell, Duan Rosenthal, Jeremy Runner, Roderick Douglas and Christopher Loring, falls within the generally accepted guidelines of the law enforcement community in Louisiana, including training afforded correctional officers; and
>
> The use of pepper spray by Runner and Hardwell was consistent with the training afforded in POST correctional officer training.
>
> Appearer has reviewed the written policies for RCC which are pertinent to the issues in this matter and knows that these written policies meet the requirements of the Louisiana Basic Jail Guidelines. This knowledge is corroborated by the Richwood

26

> Correctional Center being inspected and audited by the Louisiana
> Department of Public Safety and Corrections for several years and
> on each occasion Richwood Correctional Center passed the Basic
> Jail Guidelines requirements.

[*Id*., p.2]

Armbruster declared that he has reviewed the training records and deposition testimony of Alton Hale, Danielle Walker, Roy Brown, Jody Foster, Ray Hanson Archie Aultman, Reginald Curley, Reginald Williams, Gerald Hardwell, Duan Rosenthal, Jeremy Runner, Roderick Douglas and Christopher Loringand knows, of his own personal knowledge, that the training described in the records and depositions met or exceeded the requirements set by POST for C.O.s, under authority of LSA-R.S. 40:2405.  [*Id*., p. 3]

Armbruster further declared that no information has been received that would tend to show that any of the policies, procedures, training, and supervision afforded any C.O. or supervisor at RCC was in any way inadequate, or in violation of any law or standard.  [*Id*.]

*Gerald Hardwell*

Before coming to RCC, Hardwell worked at Winn Correctional Center, where he received four (4) weeks of training. [Deposition of Gerald Hardwell, Doc. No. 237-8, p. 12]. Hardwell was POST certified in 2009 after completing a four (4) week class at Winn Correctional Center. [*Id*., p. 40]. Hardwell underwent a five (5) day on-the-job training program at RCC, suicide-watch training, Prison Rape Elimination Act ("PREA") training, and use-of-force training. [*Id*., pp. 18, 20, 21].

Hardwell also went through 40-hour training every February at RCC. That training covered PREA, use-of-force, and CPR. [*Id*., pp. 45-46]. The 40-hour training at RCC is attended by all C.O.s, lieutenants, sergeants, and captains. [*Id.*]. Cell extraction is also included in the use-of-force training. [*Id*., p. 47].

*Jeremy Runner*

Runner was employed at RCC from January 2015 through December 2015. [Deposition of Jeremy Runner, Doc. No. 237-7, pp. 8, 14]. Prior to working at RCC, he earned a Bachelor Degree in Criminal Justice from Grambling State University. [*Id*., p. 12]. After becoming employed at RCC, he attended a 90-hour corrections school at the Morehouse Parish Sheriff's Office and was POST certified. [*Id*., pp. 14-15]. His training included suicide prevention, defensive tactics, and CPR training. [*Id*., p. 18]. At RCC, he received on-the-job training. [*Id*., pp. 19-20]. While employed at RCC, he went through refresher training. [*Id*., pp. 38-39]. He was POST certified with a firearm. [*Id.*, pp. 143-145]. He attended PREA and CPR training in March of 2015. [*Id.*, p. 145]. He attended classroom training at RCC. [*Id.*, p. 146]. Runner's on-the-job training at RCC was received from two or three instructors, including Hardwell. [*Id*., p. 147].

*Reginald Williams*

Williams first began working at RCC in August of 2008. [Deposition of Reginald Williams, Doc. No. 237-9, p. 8]. Prior to that he had been a biology teacher at Lake Providence High School for approximately thirteen years. [*Id*., p. 9]. Williams has a master's degree in education and an undergraduate degree in biology. [*Id*., pp. 10-11]. Upon being hired at RCC, he went through POST training at Catahoula Correctional Center. He also had on-the-job training at RCC. He has been trained in PREA, first aid, and suicide prevention. [*Id*., p. 13]. He has had two training sessions at RCC taught by Hanson on suicide prevention. [*Id.*, pp. 14-15]. He received use-of-force training as a C.O. and was taught that you only use the force necessary to gain control of the situation. He knows the RCC written Use of Force Policy. [*Id*., p. 21]. Williams' use-of-force training was in-house, on-the-job training, and through POST. Williams is a POST certified C.O.

and has been trained in defensive tactics. [*Id*., p. 32]. Williams was also trained in PREA and in use-of-force while employed at RCC. [*Id*., p. 41].

### Reginald Curley

Prior to working at RCC, Curley worked at the East Carroll Detention Center and Riverbend Detention Center. Curley first worked at RCC from November 2011 to October 2013. [Deposition of Reginald Curley, Doc. No. 237-6, pp. 11-12]. When he first returned to work for RCC in 2015, he underwent on-the-job training given by Hardwell. [*Id*., p. 33]. Curley was employed at RCC through the end of July 2017. [*Id*., p. 8]. He was also trained on PREA by Antonio Turner on March 30, 2017. [*Id*., p. 16]. Curley attended use of force training and suicide prevention training on March 30, 2017. [*Id*., p. 18]. Curley was shown a piece of paper that he signed which showed he had been trained in use of force on November 14, 2016 at RCC, but he did not remember that training. [*Id.*, pp. 19-20]. Curley also was POST certified while working at RCC, which training included defensive tactics. [*Id*., p. 23]. After he came back to work at RCC in 2015, he did a week of on-the-job training. [*Id*., p. 112].

### Alton Hale

Prior to working at RCC, Alton Hale had worked at Forcht-Wade Correctional Center ("Forcht-Wade") for approximately six years. He had received corrections training at Angola State Penitentiary ("Angola") and was certified in corrections. [Deposition of Alton Hale, Doc. No. 237-4, p.9]. While at Angola he received training in report writing, searches (personal and property), and some defensive tactics training. His training totaled eighty hours. [*Id*., p. 10]. He also had once-a -year refresher training at Forcht-Wade. [*Id*., p. 11]. He had worked at West Carroll Detention Center for approximately eight months as a C.O., where he had on-the-job training. [*Id*., pp. 11-12]. At Forcht-Wade, he was trained by mental health instructors on how to monitor

individuals inside isolation cells. [*Id*., p. 19]. Hale had experience feeding inmates who were in isolation cells at Forcht-Wade. [*Id.*, p. 20]. He was also trained on the use of force, including deadly force; however, Hale never used deadly force. [*Id*., p. 26].

While working for the DOC, Hale was a supervisor, made rounds, and trained the C.O.s in the policies and procedures of the facility. He also conducted periodic performance reviews and helped supervise his shift. [*Id*., p. 30]. Once re-hired at RCC, he had on-the-job training from a sergeant. [*Id.*, p. 40]. He also had one day of classroom training [*Id*., p. 77]. When he was re-hired at RCC, he was assigned to the substance abuse building, which was used for classes for the inmates. [*Id*., pp. 41-42]. Upon starting work at RCC, he received a book that included policies on inmates and orders for the area that he was assigned to work. The sergeant trained him on this. [*Id*., p. 44]. His on the job training lasted three to six months. [*Id*., p. 45]. RCC's use-of-force policy was pretty much the same as what was used when he worked for the DOC. [*Id.*, p. 121].

*Danielle Walker*

After being initially hired at RCC in 2011, Danielle Walker attended a two-week (90 hour) POST corrections training which also covered the entire RCC employee handbook. In 2011 she also received on-the-job training at RCC, when an RCC lieutenant trained her for main control duty. After leaving RCC, Walker returned to employment at RCC in September of 2015 and was again trained in a classroom setting. [Deposition of Danielle Walker, Doc. No. 237-3 p. 12]. While employed at RCC, she also received some training in booking, but she never performed any duties as a booking officer. [*Id*., p. 17]. She was trained to work in the main control room. [Id., p. 10]. She also received training in the PREA at RCC in 2015. [*Id*., p. 67].

*Duan Rosenthal*

While working at RCC, Duan Rosenthal attended PREA training. [Deposition of Duan Rosenthal, Doc. No. 237-13, p. 31]. Rosenthal received correctional training while employed at Concordia Correction Center and at RCC. [Id., p. 34]. His training included defensive tactics. Rosenthal received use-of-force training on March 3, 2015. [Id., p. 36]. Rosenthal recognized the RCC Use of Force Policy. [Id., p. 68]. Rosenthal recalled that he had also received training in CPR, first aid, suicide prevention and weapons (including shotgun and handgun). He was also certified to use aerosol chemical agent. [Id., pp. 81-82].

The above deposition testimony establishes that the C.O.s were experienced, were provided extensive training, and were adequately supervised.  Further, the mere fact that they could have been provided even more training does not establish that Hanson and Aultman were deliberately indifferent to Moore's constitutional rights.

The Court finds that Plaintiffs have not established a genuine issue of material fact that Hanson and Aultman provided inadequate training or supervision, or that they were deliberately indifferent.  Accordingly, Defendants' motion is GRANTED, and all claims against Hanson and Aultman on the basis of supervisory liability are DISMISSED WITH PREJUDICE.

### b.    Failure to provide medical care

Plaintiffs have alleged that Hanson and Aultman are liable for failure to provide adequate medical care for Moore. Hanson and Aultman contend that there is no evidence that either of them were responsible for any inadequate medical care, were deliberately indifferent, or had any personal knowledge of Moore or his medical issues.  Therefore, any claims against them for failure to provide medical care should be dismissed.

In their opposition, Plaintiffs acknowledge that they do not have a cause of action against

Hanson.  However, they do contend that there is a reasonable inference that Aultman knew of a serious medical condition of Moore when he observed Moore unresponsive and unconscious in the Four-Way.  They assert that it appeared obvious to Holyfield that something was wrong with Moore, and that Aultman should have drawn the same conclusion.  Plaintiffs further assert that Moore was lying on his back on top of his handcuffs, a painful position that would typically make a person wake up if he was merely asleep.  Therefore, according to Plaintiffs, Aultman should not have concluded Moore was simply sleeping.  Plaintiffs conclude that the risk to Moore's health due to unconsciousness was excessive and obvious, that Aultman should have recognized the grave risk and immediately requested his transport to a hospital, and that his actions in not doing so were unconscionable.

"[T]he State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm during their confinement ...." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (*en banc*).  In the Fifth Circuit, post *Hare*, "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d at 456, 462 (5th Cir. 2015). "A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Id.*, at 463 (quoting *Hare*, 74 F.3d at 644). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Id.*, at 463 (quoting *Hare*, 74 F.3d at 452).

Since there are no allegations in Plaintiffs' Complaints attacking the way in which healthcare was provided at RCC, nor are there any allegations that the inadequate treatment was a result of a pattern of acts or omissions sufficiently extended or pervasive, this claim is an episodic-

acts-omissions claim. *Id*. To prevail on the episodic-acts-omissions claim, Plaintiffs must produce evidence of deliberate indifference by Aultman. *Id*., at 463-64. Plaintiffs must prove that Aultman either refused to provide treatment to Moore, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct evincing a wanton disregard for a serious medical need. *Fortune v. McGee*, 606 F. App'x 741, 743 (5th Cir. 2015) (*per curiam*).

Additionally, any supervisor, such as Aultman, is liable "only if there was 'personal involvement in the constitutional deprivation, or ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Id*., at 743 (internal citations omitted).

The facts in *Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019), are similar to those in the instant case.  In *Cleveland*, the inmate was seen, on multiple occasions, by a nurse who was never aware that the decedent was suffering from a life-threatening medical condition. Even though the detainee ultimately died from the lack of medical care, it was held that the nurse did not violate the deceased detainee's constitutional rights to adequate medical care. Likewise, here, Moore was seen on multiple occasions by Mitchell, the nurse.  There is no evidence that any Defendant was deliberately indifferent to a known risk. If each failed to act, a constitutional violation can only be found when that failure to act is accompanied by the knowledge of a significant risk of harm. *Farmer v. Brennan*, 511 U.S. 825 (1994).

To the extent Plaintiffs are asserting inadequate medical care as to Aultman, the Court finds that there is no proof of deliberate indifference to a substantial risk of serious harm, that Aultman drew that inference, and that Aultman then disregarded it.

Accordingly, Hanson and Aultman's motion is GRANTED as to the failure to provide medical care, and those claims are DISMISSED WITH PREJUDICE.

### c.    Failure to Intervene (Bystander Liability)

Hanson and Aultman contend they have no liability for failure to intervene.  For an officer to be liable as a bystander in the circumstances alleged, he must have been present for the underlying constitutional violation, knew that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Mere presence at the scene of an incident is not enough. In order to be held liable as a bystander, the officer must have had time to appreciate the offending officer's use of excessive force and intervene. *Nowell v. Acadian Ambulance Service*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001).

Hanson and Aultman assert that a review of the Third Amended Complaint, together with the deposition testimony, shows that neither of them was present at any time when force was used. Thus, any claim that they failed to intervene during the course of use of excessive force should be dismissed.

In their opposition, Plaintiffs acknowledge that they have no claim against Hanson or Aultman for failure to intervene to stop use of excessive force. [Doc. No. 302, p. 54].

Accordingly, Hanson and Aultman's motion is GRANTED as to any failure to intervene claims against them, and those claims are DISMISSED WITH PREJUDICE.

### d.    Classification

Hanson and Aultman seek judgment as a matter of law on any classification claim asserted by Plaintiffs.  They argue that a prison inmate does not have a protectable liberty or property interest in custodial classification, and, that an inmate's disagreement with his classification is insufficient to establish a constitutional violation, citing *Wilson v. Budney*, 976 F.2d 957 (5th Cir. 1992) and *Neals v. Norwood*, 59 F.3d 530 (5th Cir. 1995).  They further contend that a disagreement

with an inmate's medical classification is also insufficient to establish a constitutional violation, citing *Wilson*, *supra*, and *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

In their opposition, Plaintiffs concede they have no cause of action against Hanson or Aultman for failure to properly classify, standing alone.

Accordingly, Hanson and Aultman's motion is GRANTED, and the claims against Hanson and Aultman for failure to properly classify are DISMISSED WITH PREJUDICE.

e.      **Conspiracy**

Plaintiffs concede that no action for a conspiracy pursuant to 42 U.S.C. § 1985 exists because there is no evidence of a violation of the equal protection clause or of a class-based right. However, Plaintiffs allege that Aultman and Hanson acted to cover up the cause of death of Moore, thereby acquiescing and ratifying the other individual Defendants' acts.  Thus, according to Plaintiffs, Hanson and Aultman aided, abetted, and joined in a § 1983 conspiracy with the remaining Defendants.

In order to prevail on a § 1983 conspiracy claim, Plaintiffs must establish (a) the existence of a conspiracy involving state action; and (b) a deprivation of civil rights and furtherance of the conspiracy by a party to the conspiracy. See *Streetman v. Jordan*, 918 F.2d 555, 557 (5th Cir. 1990); *Williams v. Castro*, No. SA-06-CA-1002-NSN, 2008 WL 4450314 (W.D. Tex. Sept. 29, 2008). Furthermore, a civil rights conspiracy is only actionable if an actual violation of § 1983 resulted from it. See *Williams*; *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).

Plaintiffs assert that there is circumstantial evidence of Hanson and Aultman's participation in a conspiracy in that they acquiesced in the infliction of force upon Moore.  "A supervisor acquiesces and is liable if he 'know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye for fear of what they might see.'" *International Action Ctr. v.*

35

*United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (quoting *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *Slakan v. Porter*, 737 F.2d 368, 373-75 (4th Cir. 1984). This line of cases was approved in *Turner v. Lieutenant Driver*, 848 F.3d 678, 696 (5th Cir. 2017) fn 88.  Plaintiffs contend that Hanson became aware of the alleged use of excessive force that led to head trauma to Moore and condoned it, in that he reviewed the circumstances of the October 13, 2015 incidents, yet he took no action at all to supervise or discipline his subordinates.  Plaintiffs assert that neither Hanson nor Aultman raised any issue with the amount of force used, nor did they request an investigation. Therefore, according to Plaintiffs, they acquiesced in the use of force and the level of force used, which they say constitutes evidence of a conspiracy.

Plaintiffs further asset that Aultman took steps to cover up the cause of Moore's injury when he instructed officers to clean LD-7 before the investigators had even left the R.C.C. Plaintiffs state that this cleaning of a probable crime scene constitutes additional evidence of a conspiracy.  Plaintiffs argue that Aultman did this in order to remove evidence that would exonerate Moore in White's death.

In summary, Plaintiffs contend that a conspiracy to harm Moore is established by their allegations of acquiesce, the admissions of the officers that they worked together to enter LD-7 to rescue the fatally-injured White, the admissions of the officers that they worked together to extract Moore, and speculation that officers wanted to shut up Moore and they could do that in the Four-Way. Plaintiffs further speculate that Defendants purposefully delayed or denied Moore medical care to prevent physicians and nurses finding the extent of Moore's injuries.  As noted above, Hall and Aultman are alleged to have participated in the conspiracy through their acquiescence and covering up. Plaintiffs conclude all Defendants are equally liable for the injuries sustained by

Moore, regardless of whether those injuries were inflicted by chemical spray, closed fist strikes to the body, kicks, jabs, strikes to the head, drops, or head-first body slams.

Defendants respond that, with regard to Aultman, at the time he had LD-7 cleaned, there was no mystery. It was apparent that all believed Moore had attacked White. At the time the clean-up was performed, White was still alive or at least, not known to have died. It was also known that LD-7 contained pepper spray, feces, food, blood and urine. Aultman ordered the clean up to remove the known contaminants and because he had no belief or understanding that he was destroying any needed evidence. Defendants assert that, to argue that the clean-up was part and parcel of a conspiracy to cover up the murder of Moore is disingenuous, at best, and not supported by any evidence.

Defendants further respond that, with regard to Hanson, he had no personal knowledge of what happened in the Four-Way, and he and his staff took a back seat in the investigation and merely assisted the OPSO.  Defendants dispute Plaintiffs' allegation that Hanson did not investigate, or report internally, what were obvious constitutional violations and criminal activity. Hanson states he performed an administrative review of the events and found that there was no misconduct or other violations. Also, the OPSO was quickly informed of the incident and made an independent investigation of the matters. To the extent Hanson had an obligation to do anything, he contends that duty was met when OPSO was informed of the events, and OPSO arrived at RCC and began a criminal investigation.

Hanson further argues that there is no testimony or evidence to show that he had any knowledge of any injury to Moore before Moore was examined at the hospital, and there is no evidence that he had any knowledge of the severity of any head injury until after Moore died, almost a month later. [*Id*., p. 62]. To now argue that he should have instituted an immediate

investigation of the use of force against Moore on the night of the incident is simply not reasonable, according to Hanson. There was no reason for him, who has no criminal investigative authority, to have done anything more than what he did.

Defendants additionally assert that any allegation that Hanson would try to cover up improper conduct of his C.O.s is belied by his actions with regard to another incident.  In October or November of 2016, Hanson learned that some C.O.s had used pepper spray while they questioned an inmate about his tattoos. [Doc. No. 237-12, p. 109]. The incident came to his attention because the inmate showed Hanson his injuries. [*Id*., p. 110]. Hanson was told that two inmates had been maced, one of whom was sprayed directly and the second was contaminated by the spray. Hanson then reviewed the report of the incident, and, based upon his more than 30 years of corrections experience, he felt the report on the incident did not seem right. Following up on his belief that something was wrong, Hanson went to the inmate's cell and saw that the inmate had injuries to his eyes. [*Id*., pp. 110-111]. Hanson's review of the matter led to the termination of Rosenthal, Douglas, Loring, and C.O. Clinton Credit. [*Id*., pp. 111-112]). Henson testified that these former C.O.s were terminated because they used unnecessary or excessive force. [*Id*., p. 113]. Hanson recalls that he has terminated other C.O.s, but he does not remember their names. [*Id*., p. 113].

Defendants thus assert that Hanson's actions, upon discovery of improper conduct by some of the same C. O.s involved in the Moore case, approximately a year later, led to the C.O.'s termination, prosecution, and guilty pleas. These actions of Hanson, in discovering and reporting unsavory misconduct, according to Defendants, should dispel any claim that Hanson was involved in any conspiracy to deprive anyone of any rights.

Additionally, Hanson and Aultman stated that, once the deputies and detectives arrived, they were given full cooperation as well as access to all video evidence. [*Id.*, p. 172]. Finally, Defendants conclude there has never been any mystery as to what happened in LD-7.

The Court is mindful that, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000). However, the Court is also mindful that conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the nonmovant's burden. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992).

Here, Plaintiffs have failed to present specific evidence to show that Hanson or Aultman participated in any alleged conspiracy to harm Moore. Plaintiff have offered no proof of any agreement by Hanson or Aultman to do anything to cause injury to Moore, other than their own speculation. Plaintiffs have made only conclusory claims and unsubstantiated assertions to show that Hanson or Aultman were part of any conspiracy, or that they acquiesced in, or covered up, any improper conduct.

Accordingly, Hanson and Aultman's motion is GRANTED as to the § 1983 conspiracy claim, and that claim is DISMISSED WITH PREJUDICE.

### f.    Qualified Immunity

Hanson and Aultman have invoked the qualified immunity defense to Plaintiffs' § 1983 claims. As noted above, Plaintiffs agree that neither Hanson nor Aultman themselves personally applied force to Moore.  Plaintiffs contend, however, that they are liable for use of force due to failure to train, and due to their alleged acquiescence and ratification of the alleged conspiracy.

Plaintiffs first argue that Hanson and Aultman are private correctional officers, and, for that reason alone, are not entitled to assert qualified immunity, citing *Richardson v. McKnight*, 521 U.S. 399 (1997).  However, the Court has addressed that argument in its Ruling on the Motion for Summary Judgment filed by Defendants Alton Hale, William Mitchell, and Danielle Walker [Doc. No. 222]. For the same reasons set forth in that Ruling, the Court finds that the mere fact that Hanson and Aultman are private correctional officers does not operate to deprive them of qualified immunity.

The next issue is whether Hanson and Aultman are entitled to qualified immunity under the facts and circumstances of this case.   The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Even if a plaintiff proves that his constitutional rights have been violated, a police officer or other public employee sued in his individual capacity may be entitled to application of the defense of qualified immunity.  "Qualified immunity . . . 'is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Sorey v. Kellett*, 849 F.2d 960, 961 (5th Cir. 1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816 (1985)).  When an officer argues that he is entitled to qualified immunity from suit, we first view the evidence "in the light most favorable to the party asserting the injury" and decide if "the facts alleged show the officer's conduct violated a

constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that view reveals no constitutional violation, there is no claim. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003).

An officer need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *see also Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."), abrogated on other grounds, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).

The first prong of qualified immunity requires Plaintiffs to show a genuine factual dispute about whether Defendants used excessive force. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). In evaluating that claim, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). We focus on the prison official's "subjective intent" and determine it "by reference to the well-known *Hudson* factors." *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016). They are "(1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need

and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." *Bourne*, 921 F.3d at 491 (cleaned up). The Court must accept Plaintiffs' "version of the disputed facts as true" and determine whether they "constitute[d] a violation of a constitutional right." *Carroll v. Ellington*, 800 F.3d 154, 169 (5ᵗʰ Cir. 2015).

As noted above, Plaintiffs agree that neither Hanson nor Aultman themselves personally applied force to Moore. Plaintiffs contend, however, that they are liable for use of force due to failure to train, and due to their alleged acquiescence and ratification of the alleged conspiracy. The Court has previously found in this Ruling that Hanson and Aultman have no supervisory liability for failure to train, and that there is no evidence that they participated in any alleged conspiracy, provided inadequate medical care, failed to intervene, or failed to properly classify. Based on those findings, the Court finds that Plaintiffs have not satisfied the first prong of the analysis, that Hanson or Aultman violated Moore's constitutional rights.

With regard to the second prong of the analysis, the Court finds that, based upon all of the testimony and evidence, any actions or inactions performed by Hanson and Aultman would not have been known to be unconstitutional by all reasonable supervisors.

Accordingly, Hanson and Aultman's motion is additionally GRANTED on the basis of qualified immunity, and all claims against them are DISMISSED WITH PREJUDICE.

Hanson and Aultman contend that all § 1983 claims made against them should be dismissed, with prejudice, pursuant to the "good faith" defense. They assert that in *Bryan v. Jones*, 530 F.3d 1210 (5ᵗʰ Cir. 1976), the Fifth Circuit, *en banc*, held that the good faith defense was available to shield a sheriff from liability for a Fourth Amendment claim pursuant to *Monroe v.*

42

*Pape*, 365 U.S. 167 (1961). They further assert that the distinction between "qualified immunity" and the "good faith defense" was recognized in *Richardson* v. *McKnight*, 521 U.S. 399 (1997), wherein the Court held that private prison guards were not entitled to qualified immunity, but the Court specifically noted that the opinion did not address the availability of the good faith defense as to those private prison guards, and no view was expressed on that issue.

Although Hanson and Aultman do not provide a precise definition of the good faith defense, they assert they are entitled to invoke the good faith defense because there is no evidence to show they acted with malice. The Court finds that they have not established that good-faith, standing alone, is an adequate defense to a damage claim for deprivation of rights under § 1983. Accordingly, Hanson and Aultman's motion is DENIED as to the good faith defense.

### g. Good Faith Defense

Hanson and Aultman also contend that all § 1983 claims made against them should be dismissed, with prejudice, pursuant to the "good faith" defense. They assert that in *Bryan v. Jones*, 530 F.3d 1210 (5th Cir. 1976), the Fifth Circuit, *en banc*, held that the good faith defense was available to shield a sheriff from liability for a Fourth Amendment claim pursuant to *Monroe v. Pape*, 365 U.S. 167 (1961). However, because the Court has found that Hanson and Aultman are entitled to qualified immunity, the motion as to this claim is DENIED AS MOOT.

### h. Punitive Damages

Hanson and Aultman seek summary judgment dismissing Plaintiffs' claims for punitive damages under federal law or state law. However, because the Court has found that Hanson and Aultman are entitled to qualified immunity, the motion as to this claim is likewise DENIED AS MOOT.

### 2.      Defendants LaSalle and Richwood

a.      Direct § 1983 Claims

Plaintiffs allege that LaSalle and Richwood are liable under § 1983 for the violation of Moore's rights.   In order to establish this liability, Plaintiffs must show that a policy, practice or custom caused those acts. Such a showing requires proof that (l) the policies, practices or customs at RCC were inadequate, (2) that someone employed by LaSalle or Richwood were deliberately indifferent in adopting the policies, procedures, or customs, and (3) the inadequate policies, procedures or customs directly caused Moore's injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-89 (1989). Plaintiffs must prove that the claimed act or failure to act amounted to deliberate indifference to Moore's rights. Furthermore, LaSalle or Richwood can be liable under § 1983 only where its policies are the moving force behind the constitutional violation. *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Direct liability inures only when the execution of LaSalle or Richwood's policy or custom caused the injury. *Monell*, *supra*. Furthermore, LaSalle and Richwood may not be held liable for the acts of employees under a theory of *respondeat superior. Monell*, supra. Neither LaSalle nor Richwood can be vicariously liable for the actions of their employees under § 1983. *Baker v. Putnal*, 75 F.3d 190 (5th Cir.1996).

In summary, in order to hold LaSalle or Richwood liable under § 1983 for a civil rights violation, Plaintiffs must provide proof that an official policy or custom of LaSalle or Richwood "was a cause in fact of the deprivation of rights inflicted." *Spiller v. City of Texas City, Police Dep't.*, 130 F.3d 162, 167 (5th Cir.1997) (*quoting Leffall v. Dallas Indep. Sch. Dist*., 28 F.3d 521, 525 (5th Cir.1994)).

To satisfy the cause-in-fact requirement, Plaintiffs must show that "the custom or policy served as the moving force behind the [constitutional] violation" at issue, *Meadowbriar Home* for *Children, Inc., v. Gunn*, 91 F.3d521, 533 (5th Cir.1996), or that the injuries resulted from the execution of LaSalle's or Richwood's official policy or custom. *Fraire v. Arlington*, 957 F.2d 1268, 1277 (5th Cir.1992); *Spiller*, 130 F.3d at 167. "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Id*. (*See also Piotrowski v. Cit yof Houston*, 237 F.3d 567, 579 (5th Cir.2001)).

Consequently, the unconstitutional conduct must be directly attributable to LaSalle or Richwood through some sort of official action or imprimatur; isolated, unconstitutional actions by employees will almost never trigger liability. *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir.1984), cert. denied, 472 U.S. 1016 (1985); *McKee v. City of Rockwell*, 877 F.2d 409, 415 (5th Cir.1989), cert. denied, 493 U.S. 1023 (1990); *Piotrowski*, *supra*. Further, isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy as required for municipal § 1983 liability. *Bennett*, 728 F.2d at p. 768. A municipal policy cannot ordinarily be implied from a single constitutional violation. *Piotrowski, supra.*

LaSalle and Richwood asset that a thorough review of the evidence discloses no proof that LaSalle's or Richwood's policies or procedures were inadequate, that LaSalle or Richwood was deliberately indifferent in adopting the policies or procedures, or that any policies or procedures of LaSalle or Richwood directly caused Moore's injury. In other words, they assert that Plaintiffs have no testimony or evidence that would tend to establish any fact or element required to prove a § 1983 claim against LaSalle or Richwood. They further argue that Plaintiffs have made vague and over-broad allegations that the policies, practices, procedures, and training were inadequate, but

those allegations are imprecise and do not detail how the policies, practices and procedures or training caused the death of Moore.

i.      Training

Plaintiffs contend that LaSalle and Richwood failed to provide sufficient training for its C.O.s in defensive tactics and in cell extraction.  LaSalle and Richwood respond that RCC employees were adequately trained in corrections. In addition, it was the policy at RCC that all employees attend annual re-training. Some employees came from employment with the DOC or other corrections facility and the training afforded those employees at their prior places of employment were also considered to be part of the training history of each. Also, new hires were provided with on the job training into the specific tasks expected of them at RCC. New hires were sent through a POST school to become certified.

The Court has thoroughly addressed this issue above and has found that Defendants hired experienced C.O.s officers and provided extensive training for them. This training was in compliance with the BJG. Thus, Plaintiffs have failed to establish that the training policies, practices, or customs at RCC were inadequate.

Additionally, Plaintiffs have failed to establish that someone employed by LaSalle or Richwood was deliberately indifferent in adopting the training policies.  Finally, Plaintiffs have failed to establish that the allegedly inadequate training policies, procedures, or customs directly caused Moore's injury.  Moore had just been involved in a violent altercation with White in which White received fatal injuries, Moore threatened the C.O.s, and Moore refused to obey their repeated commands when they attempted to rescue the fatally injured White.

ii.        Policies and Procedures

Plaintiffs contend that LaSalle and Richwood had a routine policy of using the Four-Way to punish offenders and a routine policy of using chemical spray on prisoners who were handcuffed and not presenting a threat of any kind.  However, the only evidence they produce that this was a routine policy rather than one or two isolated incidents is the Declaration of a former employee which cannot establish or raise an issue that Moore was punished in the Four-Way because she had no personal knowledge of Moore's incident. [Yolanda Jackson Declaration, Doc. No. 296-3]. LaSalle or Richwood can be liable under § 1983 only where its policies are the moving force behind the constitutional violation.  LaSalle and Richwood dispute Plaintiffs' allegations and further contend that there were written policies and procedures in place at RCC, including the use of force policy, which were in compliance with the BJG.  RCC also had in place written orders which described various responsibilities of C.O.s.

The Court finds that Plaintiffs have failed to carry their burden of establishing that (l) the policies, practices or customs at RCC were inadequate, (2) that someone employed by LaSalle or Richwood were deliberately indifferent in adopting the policies, procedures, or customs, and (3) the inadequate policies, procedures or customs directly caused any injury to Moore.

iii.        Medical Procedures

Plaintiffs also allege that LaSalle and Richwood provided insufficient medical procedures, including mental health reviews to detainees upon booking. Once again, Plaintiffs' evidence is lacking.

Defendants have established that the RCC medical staff includes 4 LPNs. Also, a Nurse Practitioner would attend at RCC, as needed, and would routinely come to RCC every Wednesday. The LPNs saw and assessed pre-trial detainees during booking. LPNs also assessed pre-trial

detainees anytime it was reported they has been injured and after any use of pepper spray. LPNs at RCC also examine pre-trial detainees during the course of their detention if force, including pepper spray, had been applied.

With specific regard to Moore, Nurse William Mitchell examined him several times on October 12 and 13, 2015.  Prior to working at RCC as an LPN, Mitchell worked at several hospitals/clinics as an LPN. [Sealed Deposition of William Mitchell, Doc. No. 223, pp. 7-9 and 11-15]. In 2005 he received his degree in practical nursing from what was then known as the Louisiana Technical College-Ruston Campus, now known as Delta Community College. He has been an LPN ever since. [*Id*., p. 17].

Mitchell's first recollection of Moore [on October 12, 2015] was when he saw Moore sitting on a bench in booking, directly across the hall from his medical office. [*Id*., pp. 21-22]. While Moore was seated on the bench, Mitchell was asked by a C/O to take a look at him. [*Id*., p. 22]. In response to the request, Mitchell examined Moore while he was seated on the bench. [*Id*., p. 24]. Mitchell would have checked to see whether Moore was a diabetic, if his heart was racing, if he had high blood pressure and the like. He would also have checked to see if Moore was agitated or non-compliant. [*Id*., pp. 24-25]. Mitchell recalls that Moore cussed him while being assessed. [*Id*., p. 27]. Mitchell thought Moore was intoxicated because of his behavior. He told the C/O's his findings. [*Id*., pp. 34-35]. Before Moore was taken to a lock down cell, Mitchell told the C/O's that he would check on Moore later on because he was not getting anywhere with Moore at that time. [*Id*., pp. 27-28]. This was done to give Moore some time to become cooperative.

He recalls trying to speak with Moore later on but does not remember the number of times. [*Id*., p. 29]. Mitchell specifically recalls seeing Moore again at the Nurse's Station and offering to rinse Moore's eyes after he had been pepper sprayed. [*Id*., p. 30]. Moore refused Mitchell's

assistance and cursed Mitchell again. [*Id*., p. 31]. Moore also told Mitchell that he was from Mer Rouge, Louisiana, during two different assessments. [*Id*., p. 32].

Later, while in his office (near the Four-Way), he heard a commotion. Because of the commotion, Mitchell walked about eight feet to the door of the Four-Way and peeped in and saw that several C/O's were trying to get Moore under control, who was actively resisting. Mitchell saw that Moore was agitated, irate, and fighting. [*Id*., p. 36]. He saw Loring, Hardwell, Curley, and Runner in the Four-Way with Moore. [*Id*., p. 37]. When the C/O's were trying to control Moore, he did not see any hands, arms or legs swinging at Moore. Moore was not being punched, kicked or struck in any manner. [*Id*., p.40]. Mitchell then returned to his medical office to work on his paperwork. [*Id*., pp. 38 and 42]. After hearing the initial commotion in the Four-Way way he did not hear any other commotion. [*Id*., p. 59]. Mitchell was still at work because he needed to do medical intake on five-to-ten DOC inmates who had been received at RCC late in the day. [*Id*., pp. 105-106].

Sometime later, he went back to the Four-Way to assess Moore. [*Id*., p. 43]. On this occasion Moore's hands were handcuffed behind his back and he was sitting up against a wall. [*Id*., p. 43]. Next, he spoke to Moore and noticed that Moore was tired and kind of "out of it." He asked Moore "what's up, how are you, you alright," but did not get a definite affirmative or negative answer from Moore. [*Id*., pp. 44-45]. Moore did say that he was sore. He observed a red knot in the middle of Moore's forehead that was about the size of a vanilla wafer. [*Id*., p. 46]. The next time he saw Moore in the Four-Way, Curley and Blackman were there with Moore. [*Id*., p. 47]. He observed Moore for a couple of minutes and saw that Moore was alert and conscious. [*Id*., p.49]. Mitchell returned to the Four-Way to check on Moore less than thirty minutes later and saw Moore lying on his back on the floor, asleep and snoring. [*Id*., pp. 52-54]. There were no other

injuries on Moore other than the knot on his forehead and some marks on Moore's wrists from his handcuffs. On this last visit he stayed for a couple of minutes and watched Moore. [*Id*., p. 54]. Mitchell thinks that he saw Moore still sleeping when the OPSO came to get him. [*Id*., p. 55].

On the last occasion that Mitchell assessed Moore in the Four-Way, he used a sternal rub on Moore and got "kind of a grimace and a grunt" from Moore. He just thought Moore was sleeping. [*Id*., p. 147-148]. After he did the sternal rub, he was told that OCC was on the way to get Moore. [*Id*., p. 148]. Moore was never bleeding at any time. [*Id*., p. 63].

This testimony establishes that LaSalle and Richwood provided adequate medical care for Moore.   In summary, Plaintiffs have failed to carry their burden of proving that (l) the policies, practices or customs at RCC with regard to medical care were inadequate, (2) that someone employed by LaSalle or Richwood were deliberately indifferent in adopting the policies, procedures, or customs, and (3) the inadequate policies, procedures or customs directly caused Moore's injury.

Additionally, the Supreme Court has not recognized a constitutional right to mental health screening at intake. *Taylor v. Barkes*, 575 U.S. 822 (2015). The Fifth Circuit has rejected such a right.  *Burns v. Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) (rejecting the proposition that "the right of detainees to adequate medical care includes an absolute right to psychological screening."); *see also Evans v. City of Marlin, Tex*., 986 F.2d 104, 108 (5th Cir. 1993)(holding that "the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation.") . Plaintiffs do not cite any cases establishing a right to medical screening.

Accordingly, LaSalle and Richwood's motion is GRANTED, and Plaintiff's direct § 1983 claims against them are DISMISSED WITH PREJUDICE.

### b.    Punitive Damages

Punitive damages may be awarded in § 1983 cases "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Reckless indifference has been described by the Supreme Court as "'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (citation omitted). "[U]nlike compensatory damages, punitive damages are never available as a matter of right, no matter how egregious the defendant's conduct may be." *Hale v. Fish*, 899 F.2d 390, 404 (5th Cir. 1990). An "award of punitive damages is a harsh remedy and normally is not favored by law" and its goal "is to punish as well as to deter the commission of similar offenses in the future." *Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir. 1985).

Here, Plaintiffs have produced no facts that would permit a reasonable jury to infer the level of "evil intent" or recklessness necessary to support a claim of punitive damages against LaSalle or Richwood.

Accordingly, LaSalle and Richwood's motion is GRANTED, and Plaintiffs claims against them for punitive damages under federal law are DISMISSED WITH PREJUDICE.

Additionally, punitive damages are not awardable under Louisiana state law unless expressly authorized by statute, citing *Ross v. Conoco, Inc.*, 2002-0299 (La. 10/15/02), 828 So. 2d 546, 555. LaSalle and Richwood argue that, here, no statute allows the award of punitive damages for the death of Moore. Plaintiffs have not cited a Louisiana statute providing for punitive damages under these facts.

51

Accordingly, LaSalle and Richwood's motion is GRANTED, and Plaintiffs' claims against them for punitive damages under state law are DISMISSED WITH PREJUDICE.

### c.     State Law Claims

The Third Amended Complaint asserts that LaSalle and Richwood are vicariously responsible under Louisiana state law for the death of Moore.  LaSalle and Richwood move for summary judgment dismissing these claims on the sole basis that all Defendants for whom either company could be vicariously responsible under state law have filed motions for summary judgment on all claims against them.  Thus, once all claims are dismissed against all individual Defendants, there will be no claims remaining for which either company could be vicariously liable.  LaSalle and Richwood conclude all vicarious liability claims against them based on state law should be dismissed.

The Court has filed Rulings on the individual Defendants' motions for summary judgment. Some were granted; others were not.  Accordingly, to the extent the Court has dismissed state law claims against individual Defendants for whom LaSalle and Richwood were alleged to have been vicariously responsible, LaSalle and Richwood's motion is GRANTED, and those claims against LaSalle and Richwood based on vicarious liability are DISMISSED WITH PREJUDICE.  To the extent the Court has not dismissed state law claims against individual Defendants for whom LaSalle and Richwood were alleged to be vicariously responsible, the motion is DENIED.

## III.     CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. No. 237] is GRANTED IN PART and DENIED IN PART.

MONROE, LOUISIANA, this 30th day of October, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**