## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

**ERIE MOORE, JR., ET AL.**          **CIVIL ACTION NO. 3:16-CV-01007**

**VERSUS**                           **JUDGE TERRY A. DOUGHTY**

**LASALLE CORRECTIONS, INC.,**       **MAG. JUDGE KAREN L. HAYES**
**ET AL.**

### RULING

Pending here is a Motion for Summary Judgment filed by Defendants Reginald Curley ("Curley"), Reginald Williams ("Williams"), Gerald Hardwell ("Hardwell"), Duan Rosenthal ("Rosenthal"), and Jeremy Runner ("Runner") (collectively "Correctional Officer Defendants") [Doc. No. 241]. Plaintiffs have filed an opposition. [Doc. No. 301]. Defendants have filed a reply to the opposition [Doc. No. 338].

Defendants seek the dismissal of all of Plaintiffs' claims against them, both in their official capacities and in their individual capacities. [Doc. No. 241]. Plaintiffs concede in their opposition that all claims against Defendants in their official capacities should be dismissed. [Doc. No. 301, p. 15]. Plaintiffs further concede that Rosenthal was not present during the use of force or denial of inadequate medical care to Moore on October 13, 2015, which occurred after 6 p.m. when his shift ended; however, Plaintiffs contend Rosenthal earlier used excessive force in the form of spray. [Id.]

For the following reasons, the pending Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.      FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.  RCC is owned and operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Erie Moore, Sr. ("Moore") was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died shortly after the altercation.  Moore was forcibly removed from the holding cell where the altercation occurred, and subsequently became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including the five Correctional Officer Defendants. [Doc. No. 1].   On December 5, 2017, an Amended Complaint was filed which added new Defendants and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

In a separate Ruling, the Court has granted Defendants summary judgment on Plaintiffs' claims that Defendants' use of excessive force caused the death of Moore.  The Court has dismissed those claims with prejudice.  [Ruling on MSJ No. 245].  Plaintiffs' claims against Defendants for Moore's less-than-lethal injuries are the subject of the pending motion.

A.      **Factual Background**

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Officer Tommy Crowson for disturbing the peace.

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued, and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSO Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C/O") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurs at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went directly to the cell to see what was going on.  When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell.

Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say. Runner said he would go find the lieutenant, and he turned to leave. As Runner was walking away, he felt that something was not right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack. Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help. White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC officer(s) that forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at approximately 6:30 p.m., but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C/O Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a

result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore, and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras.  He was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106]. As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor.  [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

Foster was working the night shift, from 6:00 p.m. to 6:00 a.m. and was in charge of the kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with Reginald Curley. [*Id*., p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright

and Tolbird and showed them the video recordings from the security camera in LD-7, which showed the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time, and RCC staff did not indicate to the OPSO Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as it was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point, and Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the

6

case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to the purported crime scene to investigate further. [*Id*.]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition that the call for him to head to RCC to pick up Moore and bring him to OCC was made at approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go

to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to

relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield

walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and

others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at

pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-

16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore

up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130;

C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-

6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield

Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

　　　Holyfield did not observe any signs of injury to Moore at that time. [Holyfield

Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No.

156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse

Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at

pp. 46-47, 63]. C.O. Runner also recalled that Moore had a bump on his forehead during the time

he was in LD-7 and that it might have been a result of Moore's banging his head on the door to

the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110,

115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7.

[Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

　　　When it came time to move Moore, officers picked Moore up by the arms and legs to

carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35;

Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down

because he was a large, heavy man and it was an easier way to carry him.  [Holyfield Deposition,

Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene, however, testified at their depositions that they did not see Moore get dropped as he was carried from the four-way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel removed him from the unit and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No. 256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33]. Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23;

Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed

the shift supervisor on scene that Moore showed signs of having a head injury and needed to be

taken to the hospital. [*Id*., at p. 22].

Murphy and Wells took Moore to Conway. Medical personnel treating Moore at Conway

performed a CT scan and other tests and determined that Moore had suffered a fractured skull.

[Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31].

Medical personnel also indicated that Moore had suffered a midline shift in his brain due to

bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc.

No. 256-17, at p.31-32]   At 12:29 a.m. on October 14, Moore was transported by air evacuation

helicopter to LSU Health Center in Shreveport for additional care that could not be provided at

Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at

pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the

medical care providers indicated that Moore was likely brain dead, and a decision would have to

be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p.

60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's

Office, to make. The investigation materials were then turned over to the DA's Office, which

declined prosecution of Moore in connection with the death of White, so as to allow the Moore

family to make that decision regarding life support. [*Id*.]. On or about November 14, Erie Moore,

Sr., died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that

Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri

O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow

that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs sued numerous members of the RCC staff, the owners of RCC, and the City of Monroe, among others that have already been dismissed prior to this point in the litigation. They sued the Correctional Officer Defendants, alleging various claims under federal and state law.

### B.    Deposition of Reginald Curley

Curley was employed at RCC through the end of July 2017. (Deposition of Reginald Curley, Doc. No. 241-4, p. 8). Prior to working at RCC, Curley worked at the East Carroll Detention Center and Riverbend Detention Center. Curley first worked at RCC from November 2011-October 2013. [*Id.*, pp. 11-12]. When Curley returned to work for RCC in 2015, he underwent on-the-job training from Hardwell. [*Id.*, p. 33]. His other training at RCC included Prison Rape Elimination Act ("PREA") by Antonio Turner on March 30, 2017. [*Id.*, p. 16]. Curley also attended use of force training and suicide prevention on March 30, 2017. [*Id.*, p.18]. Curley was shown a sign in sheet that he signed that he was trained on November 14, 2016, in use of force at RCC but he did not remember that training. [*Id.*, p. 19-20]. Curley returned to work at RCC, on his second stint, in February of 2015. Curley was Peace Officer Standard Training ("POST") certified while working at RCC, which training included defensive tactics. [*Id.*, p. 23]. After he came back to work at RCC in 2015, he did a week of training. [*Id.*, pp. 112-113].

On October 13, 2015 Curley looked into LD-7 and saw White laying down, flopping and shaking, but did not see any blood. [*Id.*, p. 99]. He does not know how White or Moore got to LD-7. He only remembers seeing both of them in LD-7. [*Id.*, p. 41]. He never entered LD-7 to assist

11

in the extraction of White. [*Id.*, p. 95]. After White was extracted from LD-7, Lt. Hardwell told Curley to go to booking and call 911. [*Id.*, p. 45]. After making the call to 911, Curley returned to the hallway in front of LD-7. When he arrived, Hardwell was in the hallway with White. [*Id.*, pp. 46-47]. He was not present in the hallway when Moore was taken out of LD-7 and he has not known of and does not recall offenders ever being taken to the Four-Way for the purpose of interrogation. [*Id.*, pp. 61-62]. After his audio statement to the OPSO detectives was played, Curley's memory was refreshed, and he recalled that he went through the Four-Way and saw Moore. [*Id.*, p. 66]. On the way back through the Four-Way, he saw an OCC deputy with Moore, who was laying on his back. He also recalls people from the OCC coming to get Moore. [*Id.*, pp. 66-67].

### C.    Deposition of Jeremy Runner

Runner was employed at RCC from January 2015 through December 2015. [Deposition of Jeremy Runner, Doc. No. 241-5, p. 8]. His immediate supervisor was Hardwell. Before coming to work at RCC, he had graduated from Grambling State University with a Bachelor's degree in Criminal Justice in 2014. [*Id.*, p. 12]. After becoming employed at RCC, he was trained in corrections at the Morehouse Parish Sheriff's Office. [*Id.*, pp. 14-15]. His training included suicide prevention, defensive tactics, and CPR training. [*Id.*, p. 18]. Also, at RCC, he received on the job training. He does not recall the topics of his RCC classroom training but does remember that he received it. [*Id.*, pp. 19-20]. He was also trained on RCC policies. Runner testified that "they always was big on the policy. . .they're just going to keep putting it in your brain about the policy, how to follow the policies". [*Id.*, p. 21].

On a normal shift, Runner would arrive at RCC at 5:45 p.m. and would attend a briefing, which typically lasted 10 minutes. Runner would then begin his shift work at 6:00 p.m. [*Id.*, pp.

26-27]. The briefing would cover what happened on the previous shift, what to look for and how to go about performing his duties. The briefing would be performed by his lieutenant. [*Id.*, pp. 27-28]. While employed at RCC, he went through refresher training on searches. [*Id.*, pp. 38-39]. Runner attended a 90-hour POST corrections class at the Morehouse Parish Sheriff's Office in June 2015. He was also POST certified with a firearm. [*Id.*, pp. 143-145]. He attended PREA and CPR training in March 2015. [*Id.*, p. 145]. He attended classroom training at RCC. [*Id.*, p. 146]. Runner's on-the-job training at RCC was received from two or three instructors, including Lt. Hardwell. His on-the-job training taught him how to do the things required for his job. [*Id.*, p. 147]. Runner is POST-certified from the training he received at Morehouse Parish Sheriff's Office. [*Id.*, p. 147].

Runner reported to RCC on October 13, 2015, and would have been briefed at 5:45 p.m. After leaving the briefing, he clocked in and walked to Control Room 5-6 to place his meal inside the refrigerator. Upon arriving in Control Room 5-6, he asked "How are those guys doing" referring to the inmates in LD-7. [*Id.*, p. 72]. Runner then looked at the video screen and saw only Moore in LD-7. [*Id.*, pp. 71-72].

Runner describes what happens next as:

> Q.   So we're going back to the second night and you've gone into the control room, put your lunch up, saw the camera and you proceed to where? Where do you go from there?
>
> A.   I looked on the camera, I only see guy, Mr. Moore, sitting on the empty rack which he had knocked his mattress on the floor. And I see him eating two trays which they had just got—I guess got their dinner trays or whatever. And I see him eating both of them. And so I go down straight to that cell and I tried, you know, to check and see what's going on. And Mr. Moore was in the front of the--the window, which is not that big. You know, it's a little bitty, small window or whatever. So he's in front of it and he say he wants to see—in a calm matter--manner he wants to see the lieutenant. And

13

I asked him what for. And he said, "I just want to talk to the lieutenant." So I said, "Okay. Let me get him right quick." And as I walked off something in my mind said, "Go back to that unit--that cell." So I go back to the cell, look in it. Mr. Moore, he's not in front of the window anymore, he's sitting on the rack. And that's when I spot Mr. White.

Q      And how long were you gone between the two times here that you went to the window?

A      Oh, that wasn't-- About five seconds.

Q      Allright. So once you see the—And where is it you see White at?

A      On the—On the floor underneath the camera.

Q      Uh-huh (yes). Allright. And who is it that you notified, if anybody?

A      I notified the sergeant and he notified--When I notified him, he notified the lieutenant and all available.

Q      Okay. How much time passed between the time you notified the sergeant until some other officers come to the door?

A      It wasn't long at all. I-- At least a second or two.

Q      Okay. And what time is it that you first called for the sergeant?

A      Soon as I saw-- Soon as I saw Mr. White. At first I thought he was having a seizure because he was shaking on the—on the ground. I thought it was a seizure. And I notified 3 and 4 control to notify the sergeant and lieutenant to lockdown--What it was? 7? Come to the cell."

[*Id*., pp. 78-80].

Next, Runner waited for other C.O.s to get to LD-7 to extract White from the cell because Moore was still acting in an aggressive manner. [*Id*., pp. 81-82]. The following exchange explains what happened next:

14

Q Okay. And-- Okay. So the--Vern---Mr. White's body is lying on the far side of the cell between the toilet and the wall? Is that correct?

A Uh-huh (yes).

Q Yes?

 MR. CALVIT: Yes or no.

A In between-- Yes, sir.

Q And Mr. Moore, he's over to the right near the bunk?
A By the door.

Q Oh, he's right by the door?

 A Yes.

 Q All right. And that's where he's defecating at?

 A Yes.

Q Allright. So this first time y'all make entry into the cell, to lock down 7, who--who actually goes inside the cell?

A We all–

Q. Everyone who's there?

A Yes.

Q Okay. And what happens inside the cell when y'all go in?

A We gave Mr. Moore commands to get down on the floor or whatever or be in a cooperative mode.

Q Uh-huh (yes).

A And Mr. Moore didn't reply to it. He came out with threatening comments.

Q What comments did he make?

A       Mr. Moore stated, "Don't--don't touch him. He's mine."And he just didn't comply to the commands that we was giving him.

Q       Uh-huh (yes). And-- And what happened in connection with that? Anything else happen inside the cell when y'all went in this first time?

A       Well, when he came—When he was aggressive I did passively push Mr. Moore, which he just fell. And—Because he--he was--he had gotten Maced or whatever. And so after that–

Q        He got Maced?

A       Yes.

Q       When was he Maced?

A       When he wasn't following the commands.

Q       While he's—While he's defecating, he was Maced?

A       Yes.

[*Id*., pp. 83-84]

At the time he pushed Moore with one hand, Moore was squatting on the floor but was making threatening comments and was about to stand up. Moore was a threat because he was aggressive and was about to charge Runner. [*Id*., pp. 86-87]. White had to be extracted from LD-7 for medical treatment. [*Id*., p. 93].

Sometime later on October 13, 2015, Runner was in the hall when Moore was extracted from LD-7. [*Id*., p.97]. After Moore was extracted Runner attempted to carry Moore to the Four-Way when he slipped and fell, which caused him to drop Moore. [*Id*., p. 105]. The C.O.s were moving Moore away from the chemical agent that had been sprayed into LD-7 and had spread into the hall. [*Id*., pp. 105-106]. Runner saw Moore in the Four-Way, when Moore was sitting with his

back against the wall and his legs were out in front of him. [*Id*., p. 113]. Runner also passed through the Four-Way at a time when Moore was asleep, which was the last time he saw him. [*Id*., p. 113].

### D.      Deposition of Gerald Hardwell

Hardwell made captain at RCC in January of 2017. Prior to that he was a lieutenant. Before that he was a sergeant in work release, beginning in late 2010. He started at RCC as a C.O. [Deposition of Gerald Hardwell, Doc. No. 241-6, pp. 8, 11]. Prior to working at RCC, Hardwell had been employed at Winn Correctional Center ("WCC") where he received four (4) weeks of training which included defensive tactics. [*Id*., pp. 12-14]. Hardwell was POST certified after completing the four (4) week class at WCC. [*Id*., p.  40]. Hardwell was shown and recognized forms that documented that he had attended a five (5) day on-the-job training program at RCC. [*Id*., p. 18]. Hardwell was shown a training attendance log for suicide watch and agreed that he had received that training. Hardwell was shown a log that showed that on February 11, 2015, he was trained on PREA. [*Id*., p. 20]. He also was shown a training attendance log that showed that he had received use of force training on March 3, 2015. [*Id*., p. 21]. Hardwell went through 40-hour refresher training every February, during which he went over PREA, use of force and CPR. [*Id*., pp 45-46]. The 40-hour annual training at RCC is attended by all C.O.s, lieutenants, sergeants, and captains. [*Id*., p. 46]. Cell extraction is also included in the use of force training. [*Id*., p. 47]. He was trained in force and excessive force in the February 2017 use of force training sessions. [*Id*., p. 127]. Hardwell recalled that he attended about 11 hours of the 40 hours of retraining in February of 2017. [*Id*., p. 165].

Hardwell first saw Moore at RCC around 7:00 p.m. on Monday, October 12, 2015, Moore's first day at RCC. Hardwell recalled that Moore said, "I'm Erie Moore" and "I'm a f-ing guy." [*Id*., pp. 12-13]. Hardwell was told by Lt. Loring that Moore was in LD-7 because he would not

cooperate in booking. [*Id*., p. 49]. Hardwell also recalled that Loring said that Moore was being aggressive with them and "just didn't wanna be booked in."  Hardwell understood that Moore "just didn't want to cooperate with any questions." [*Id*., p. 49]. Loring also told him that Moore had gone directly from booking to lockdown. [*Id*., p. 50].

During the course of his shift on October 12, 2015, Hardwell talked to Moore and was told by Moore that Moore used to work in a paper mill. Moore seemed to be normal when he was talking about the paper mill. [*Id*., p. 51]. He also recalled Moore hollering and beating on his cell door. [*Id*., p. 50]. On that first night, he talked to Moore on two or three occasions and told him to stop beating on the door. [*Id*., p. 55]. The last occasion he spoke with Moore was when they talked about the paper mill. After that Moore calmed down and went to sleep. [*Id*., p. 55]. During the course of his visits with Moore, he recalls seeing that Moore had a knot on the top of the right side of his head. [*Id*., p. 56].

When Hardwell came on duty on October 13, 2015, Loring told him that they had to pepper spray Moore during Loring's shift. [*Id*., p. 57]. Loring also told him that Moore had been cutting up during the day and to keep an eye on him. [*Id*., p. 60]. Hardwell's first physical contact with Moore on October 13, 2015, was when Moore was being extracted from LD-7. [*Id*., p. 63]. When Hardwell first attempted to make entry to extract Moore, he was sitting on the bed.  Hardwell gave verbal instructions to Moore including: "come on out of here, Moore, turn around, you know our procedures." Moore responded and told Hardwell "F... me, to get out of the cell, you know." Then he got up, and it looked as though Moore was going to charge, so Hardwell and the C.O.s backed out of LD-7 and closed the door. He also saw that Moore had his fists balled up. Moore also said "fuck - - Fya'll". [*Id*., p. 64].

In response to Moore's actions and statements, he sprayed Moore with a chemical agent and then exited the cell. [*Id.*, p. 65]. When Moore was sprayed it did not appear to do anything to him. [*Id.*, p. 68]. After getting gas masks, a plan was made to reenter the cell. Pursuant to the plan, Runner opened the door, Hardwell went first, while Williams was next. When Hardwell entered LD-7, Moore's back was turned, so he grabbed Moore, took him from the cell and took him to the floor. [*Id.*, p. 69]. He did not handcuff Moore in the cell because of Moore's size and strength. [*Id.*, pp. 69-70]. It is Hardwell's practice to only handcuff inside a cell if the inmate is cooperative and complying with verbal instruction. [*Id.*, pp. 70-71].

Since Moore refused to comply with verbal instruction to turn around and get on the floor, Hardwell decided to extract Moore. Instead of following Hardwell's orders, which were given 3 to 5 times, Moore just stood there with his hands balled up into fists. [*Id.*, pp. 72-74]. Because Moore failed to comply, Hardwell entered LD-7 and wrapped his arms around Moore's waist, carried him out, and took him to the floor. Even after going to the floor, Moore continued to resist. [*Id.*, pp. 74-78]. Once the handcuffs were put on and Moore was flat on his stomach on the floor, Moore started cussing but then apologized. [*Id.*, pp. 79-80]. Just before he was handcuffed, Moore stated, "Ya'll mother F'ers don't come in here." [*Id.*, p. 80].

He saw Moore sometime later in the Four-Way while waiting for the OPSO to come get Moore. When Hardwell saw him, Moore was conscious, and on his knees, saying that he was sorry. [*Id.*, pp. 85-87]. When the OPSO deputies came and got Moore, Moore was snoring and asleep on the floor. [*Id.*, p. 87]. He never saw anyone punch, kick, hit, or strike Moore. [*Id.*, p. 89].

When the OPSO deputies arrived to take him to OCC, he saw Moore's eyes open. [*Id.*, p. 92]. At this time Hardwell, Curley, Williams, and two or three OPSO deputies were in the Four-Way. Hardwell helped carry Moore into the OPSO vehicle. [*Id.*, p. 97]. Moore was not bleeding

when he was put in the OPSO vehicle. The only injuries he saw was the small knot to the head he previously described. [*Id.*, p. 100].

### E.    Deposition of Duan Rosenthal

While working at RCC, Rosenthal attended PREA training. [Deposition of Duan Rosenthal, Doc. No. 241-15, p. 31]. Rosenthal received correctional training, which included defensive tactics, while employed at Concordia Correction Center and at RCC. [*Id.*, pp. 34-35]. Rosenthal received use of force training on March 3, 2015. [*Id.*, p. 36]. When he attended his training at Concordia Correction Center, he was graded and tested. [*Id.*, p. 37]. Rosenthal has seen the Use of Force Policy at RCC in a training class, and he recognized it at his deposition. [*Id.*, pp. 67-68]. Rosenthal was trained in the specifics of the Use of Force Policy. [*Id.*, p.70]. Rosenthal was also training in CPR, first aid, suicide prevention, and weapons (including shotgun and handgun). He was also certified to use aerosol chemical agent. [*Id.*, pp. 81-82].

October 13, 2015, Rosenthal worked the 6 a.m. to 6 p.m. shift at RCC. [*Id.*, p. 52]. At approximately 7 a.m., Rosenthal went to LD-7 to take Moore for medical attention. [*Id.*, p. 54]. While at LD-7 Moore said that "he didn't have to do s-h-i-t that you f-ing say". [*Id.*, p. 55]. After saying this, Moore began to charge towards Rosenthal. In response, Rosenthal gave a two-second burst of pepper spray to Moore. [*Id.*, p. 56]. When he arrived at LD-7 to escort Moore to the nurse's station at 7 a.m. on October 13, 2015, Moore was not initially hostile. After telling Moore "let's go see the nurse," Moore became aggressive and hostile. [*Id.*, p. 100]. At the time he used the chemical agent on Moore, Moore was attempting to come forward towards Rosenthal. [*Id.*, p. 109]. When this occurred, Moore was saying 'I ain't coming out the cell. I ain't got to do none of ya'll got to do.". [*Id.*, p. 110]. Moore also said, "The mother fucker come -- -- and come get me". [*Id.*, p.110]. Even though Rosenthal gave verbal commands to Moore, he still became aggressive, and

Rosenthal thought that Moore was going to cause harm to the C.O.s, so he sprayed Moore. [*Id*., p.
111].

On October 13, 2015, he clocked out about10:00 a.m. [*Id*., p. 98].

### F.   Deposition of Reginald Williams

Williams first began working at RCC in August of 2008. [Deposition of Reginald Williams,
Doc. No. 241-7, p. 9]. Prior to that he had been a biology teacher at Lake Providence High School
for approximately thirteen years. [Id., p. 9]. Williams has a master's degree in education and an
undergraduate degree in biology. [Id., pp. 10-11]. Upon being hired at RCC he went through POST
training at Catahoula Correctional Center. He also had on-the-job training at RCC. He has been
trained in PREA, first aid, and suicide prevention. [Id., p. 13]. He attended two training sessions
at RCC taught by Hanson on suicide prevention. [Id., pp 14-15]. He received use of force training
as a C.O. and was taught to use only the force necessary to gain control of the situation. He knows
the RCC written Use of Force Policy. [Id., p. 21]. Williams' use of force training was in house, on-
the-job training, and through POST. Williams is a POST-certified C.O. and has been trained in
defensive tactics. Williams was also trained in PREA and in use of force while employed at RCC.
[Id., p. 41].

On October 13, 2015, another C.O. told Williams that White was on the floor of LD-7
having a seizure. [Id., p. 54]. In response, Williams went and got the key to LD-7. Once the door
to LD-7 was opened to extract White, he saw White on the floor shaking or having a seizure with
blood around his mouth. [Id., pp. 55, 59]. Williams then saw Moore in LD-7, squatting down in a
different corner of the cell. [Id., p. 57]. Williams made entry into LD-7 with Runner, Curley,
Hardwell, and Loring. Upon entry, Moore was told to get down. Moore replied "I'll fuck ya'll up.
He's mine. I'm going to put something on your ass." [Id., pp.58-59]. Even though Moore made

these threats while he was squatting and defecating, Williams believed that Moore was about to jump up and attack the C.O.s. [Id., p. 178]. Williams thought that Moore needed to be put on the ground, physically, to prevent any further harm to White. Williams also wanted to get White out to safety because Moore was making threats and talking about putting something on their ass. [Id., pp. 60-61].

He saw Runner push Moore to the ground. [Id., p. 61]. He saw that Moore's hands were balled up and were moving. [Id., p. 62]. He never saw Runner's hand balled up or in a fist. [Id., p. 63]. Later, Williams returned to LD-7 to help extract Moore. [Id., p. 76]. Williams went to the door of LD-7, opened the flap, and told Moore to get against the wall of the cell, so he could be restrained. Moore stated "get the fuck away from my door. I'll fuck you up." Moore also made several other threats. [Id., p. 72]. Both Williams and Hardwell gave Moore verbal orders to get against the wall but Moore kept repeating his threats. [Id., p. 72]. After Moore failed to comply with repeated verbal instruction, Hardwell sprayed Moore and entry was made. [Id., p. 73]. Williams saw Hardwell grab Moore around the waist while Williams tried to grab Moore's legs, but Moore continued to struggle and resist. Once Williams managed to grab Moore's legs and Hardwell held the upper half of his body, Moore was carried out of LD-7 [Id., pp 74- 75]. While Moore was being carried out of LD-7 Moore was struggling, shaking, and wiggling. Because of Moore's movements, he lost his grip, and Hardwell and Moore fell to the floor. [Id., p. 76]. While on the floor, Moore was not struck by the C.O.s. [Id., p. 77].

After Moore was restrained, Williams again picked up Moore's legs while someone else had picked up Moore's top half. The plan was to carry Moore to the Four-Way, but the C.O. who was carrying the top half of Moore fell. [Id., p. 78]. Once they reached the Four-Way with Moore,

Moore continued to cuss. After a while Moore fell asleep and started snoring. [Id., p. 79]. He checked on Moore in the Four-Way every few minutes. [Id., p. 79].

Once the OPSO deputies arrived, he helped carry Moore to the OPSO vehicle. During the carry, Moore was kicking and wiggling. Moore also kicked the side of the door from the inside once the door was closed. [Id., p. 80]. Prior to carrying Moore to the car, he was given verbal commands to get up, but he would not; he just flopped. [Id., p. 80]. Moore was not trying to get up or stand up. [Id., p. 81].

He recalls Nurse Mitchell looking at Moore while he was in the Four-Way. [Id., p. 83]. He saw a mark on Moore's head that looked like it came from pressing his head against the little bar in a cell door, but he did not see a knot. [Id., p. 112]. He never saw Moore bleeding from any wounds and never saw Moore in the condition depicted in the photographs of Moore taken at OCC. [Id., p. 115].

### G.    Plaintiffs' Assertions Against Defendants

Plaintiffs are pursuing the following claims against the Correction Officer Defendants:

1.    Defendants engaged in excessive force that was maliciously applied;

2.    Defendants, except for Rosenthal, acted with deliberate disregard for Moore's right to adequate medical care;

3.    Defendants, except for Rosenthal, knew that Moore's rights were violated when Runner struck Moore with a closed fist, Hardwell struck Moore's head down against the tile floor, RCC C.O.s assaulted Moore in the Four-Way, and Rosenthal, Hardwell, and Runner used excessive pepper spray;

4.    Hardwell failed to properly classify Moore;

5.    Defendants conspired in aiding and abetting in a team cooperative effort to injure Moore;

23

6.       Defendants were inadequately trained, as well as inadequate supervised, by Hardwell;

7.       Defendants are not entitled to qualified immunity nor the good faith defense;

8.       Defendants' actions are sufficient for Plaintiffs to obtain a punitive damage award; and

9.       Defendants failed to provide adequate medical care, in violation of Louisiana law.

**H.    Defendants' Motion for Summary Judgment**

Defendants seek the dismissal of all claims against them.  Specifically, they seek summary judgment as to the following claims and issues:

1.       Conspiracy claim under § 1983

2.       Use of Excessive Force

3.       Inadequate Medical Care

4.       Failure to Intervene (Bystander Liability)

5.       Classification

6.       Failure to Train and Implement Policies

7.       Good Faith

8.       Qualified Immunity

9.       Punitive Damages

10.      State Law Medical Care Claim

Essentially, Defendants contend that the string of events at issue in this suit began when Runner discovered White severely injured in LD-7. Runner then notified his supervisors and other C.O.s. Because of the reasonable belief that White was in need of immediate medical care, the C.O.s quickly planned an entry into LD-7 to rescue White. During the execution of the plan, all of

the C.O.s, except Runner, focused their attention on the victim. Runner focused his attention on the person believed to be the aggressor, Moore, and placed himself between Moore and White and the other C.O.s. After observing Moore's actions and hearing his comments, Runner believed that Moore was going to attack Runner or the others in LD-7. It was also reasonable to conclude that the other C.O.s and White were also in danger if Moore made it past Runner. Runner, seeking to stop the eminent attack, contends that he applied reasonable force to Moore, which stopped Moore from advancing towards Runner, the other C.O.s or White. Defendants further contend that the intervention of Runner allowed the C.O.s to quickly and safely remove White from LD-7 for medical care and treatment.

Defendants additionally assert that, after White was removed from RCC and sent for emergency care and treatment, it was decided that Moore needed to be extracted from LD-7. Moore was repeatedly given instructions and had the opportunity to comply with the instructions which would have led to Moore being removed from LD-7 without any force being used. After it became apparent that Moore was not going to comply with verbal instructions, a chemical agent was deployed into LD-7 in yet another attempt to gain compliance. Once again, Moore refused to comply with instructions. Because verbal commands and chemical agents were not successful in gaining compliance from Moore, it was decided that entry would be made into LD-7 and that Moore would be extracted.

Defendants state that Hardwell, relying upon a technique that he had used successfully in the past to gain compliance over resistive inmates, began to remove Moore from LD-7. In response to Moore's continued resistance, coupled with Hardwell's movements, Moore and Hardwell went to the floor just outside of LD-7. Upon Moore reaching the floor, he continued to refuse instruction and struggled against the C.O.s. Finally, the C.O.s gained control, handcuffed Moore, and began

to carry Moore from the hallway in front of LD-7. But, due to Moore's resistance and the movement of the C.O.s, Moore again ended up on the floor. Moore was then carried to the Four-Way, to await the arrival of OPSO transportation deputies from the Ouachita Correctional Center.

Defendants further assert that Plaintiffs' arguments on liability begin with the death of Moore on November 14, 2015. From that death, Plaintiffs attempt to work backwards to lay the blame for the death upon any Defendant, through a variety of claims, many of which are contradictory and are based on allegations of "fact" which have no support in evidence or are contradicted by other "facts" asserted by Plaintiffs. All of Plaintiffs' arguments of conspiracies, cause of death, excessive force, the deliberate intention to kill or injure Moore, are all without any basis in fact or law.  Instead, the admissible facts, together with the appropriate jurisprudence, show no Defendant violated Moore's constitutional rights or caused or contributed to his death. Furthermore, no Defendant was negligent, and no Defendant failed to provide adequate medical care. Also, all Defendants are entitled to the good faith defense or qualified immunity. Defendants conclude, accordingly, that all claims and causes of action made against all Defendants should be dismissed, with full prejudice.

Plaintiffs agree that official capacity claims against individual officers is redundant and agree to dismiss those claims, reserving official capacity claims against LaSalle Management Company, LLC, and Richwood Correctional Center, LLC. Plaintiffs further agree that Defendant Rosenthal was not present during the use of force or denial of inadequate medical care to Moore on October 13, 2015, which occurred after 6 p.m., when Rosenthal's shift ended. Plaintiffs do contend, however, that Rosenthal used excessive force in the form of spray. Plaintiffs' agreement stops there.

The motion is fully briefed, and the Court is prepared to rule.

## II.      LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

**B.      Analysis**

**1.      Conspiracy**

Plaintiffs assert a conspiracy claim under § 1983.    In order to prevail on a § 1983 conspiracy claim, the Plaintiffs must establish (a) the existence of a conspiracy involving state action; and (b) a deprivation of civil rights and furtherance of the conspiracy by a party to the conspiracy. *Streetman v. Jordan*, 918 F.2d 555, 557 (5th Cir. 1990); *Williams v. Castro*, No. SA-06-CA-1002, 2008 WL 4450314 (W.D. Tex. Sept. 29, 2008). Furthermore, a civil rights conspiracy is only actionable if an actual violation of § 1983 resulted from it. See *Williams*, 2008 WL 4450314, at *3;  *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).

Plaintiffs assert that Defendants were involved in a conspiracy or team effort, and aided and abetted one another, in an agreement to injure Moore.  Plaintiffs claim that there was a conspiracy that included the plan for the rescue of White from LD-7, for the extraction of Moore, and for the drop of Moore on the floor in the hallway in front of LD-7.

Plaintiffs additionally assert that their conspiracy allegations are supported by evidence that Defendants acquiesced in the use of force by others. An agreement to harm an inmate can be supported from acquiescence by those who were present during the use of force. A showing of acquiescence by fellow officers who witnessed the beating of an arrestee is sufficient to show a conspiracy. *See Hafner v. Brown*, 983 F.2d 570, 578 (4th Cir. 1992) ("[A]cquiescence can amount to a conspiracy agreement where, as here, one police officer watches an open breach of the law and does nothing to seek its prevention.").  Plaintiffs state that the other Defendants present in LD-7 acquiesced at the time Runner struck Moore in the back of the head.   They also state that the other Defendants present in the hallway acquiesced when Hardwell threw Moore onto the floor.

Plaintiffs also argue that there was a beating administered by a group of C.O.'s while Moore was in the Four-Way, which was followed by a cover-up. As evidence of this alleged conspiracy, Plaintiffs have produced the declaration and deposition testimony of John Badger ("Badger"), a former RCC employee. Badger began working at RCC in 2017, well after this incident, and was later terminated. However, according to Badger, Foster recounted the incident to him. Badger testified:

> He [Foster] told me exactly. They was beating a man. It was four -- he said there was four of them beating him, and they beat him death, he said, and they laughed and talked about it, and they, you know, did things and how they was going to protect one another in court.

[Badger Deposition, Doc. No. 336-1, p. 3]

Badger further testified that Foster told him that "they" kicked "him." [*Id.*] Later in the deposition, Badger stated that Foster said that he stopped "them" from beating Moore, but then "they finished him." [*Id.*, p. 4].

Defendants respond that Badger did not implicate them by name at any point in his testimony. [Doc. No. 298-10]. Defendants further respond that every witness who testified denied any injury was inflicted on Moore in the Four-Way.

Defendants additionally assert that the medical records concerning Moore's care and treatment at University Health-Monroe ("UHM"), also known as E.A. Conway Hospital, do not support Plaintiffs allegation of a beating in the Four-Way. Moore was admitted to UHM on October 13, 2015 at 21:35 hours. [Excerpts UHM records, Doc. No. 338-1, p. 3]. The note showing the physical exam results, together with the diagram of Moore's injuries, details three points of injury on Moore's body. One point of injury was to the right side of his nose, which was labeled as a traumatic contusion. The second recorded injury was an abrasion over Moore's mouth. The final point of injury was a contusion on Moore's left forearm. No other marks were found. [*Id.*, pp.

4-5]. The findings from a CT scan performed on Moore at the hospital found no acute fracture and no traumatic malalignment in the cervical spine. The CT scan revealed no acute fracture. Moore's globes (eye sockets) were intact and there was no intraorbital hematoma. [*Id*.]. The notes also record that Moore's pupils were equal, round, and reactive to light, that his trachea was normal and his neck was supple. [*Id*.].

Moore was next transported to University Health-Shreveport ("UHS") where he was again examined by healthcare professionals. The UHS records confirm that Moore was suffering from neurologic injury on October 14, 2015, and that he arrived at 5:36 a.m. Moore again underwent a physical examination at UHS which noted Moore's "right eye blood shot." It was also noted that Moore was normocephalic, without obvious abnormality and was atraumatic. There was no evidence of trauma to Moore's neck, chest, abdomen, or pelvis. It was further noted that there was no evidence of trauma to the abdomen or pelvis. There was also no evidence of trauma to the musculoskeletal system or to Moore's extremities. Also, no deformities to the extremities were found. [Excerpts of UHS records, Doc. No. 338-2].  A drug screen showed the presence of PCP. [*Id*.].

Thus, according to Defendants, the thorough examinations conducted on Moore at both UHM and UHS do not support Plaintiffs' contention that Moore was subjected to a "beating" and kicked by Foster as well as four to seven unnamed C.O.s while laying handcuffed and defenseless in the Four-Way.

The only evidence of such a beating offered by Plaintiffs is the testimony of Badger, and Badger named only Foster.  Although that testimony is sufficient to create a genuine issue of fact as to Foster's motion for summary judgment, it is not sufficient to create a genuine issue of fact with regard to these Defendants.

In summary, Plaintiffs contend that a conspiracy to harm Moore is established by their allegations of acquiesce, the admissions of the officers that they worked together to enter LD-7 to rescue the fatally-injured White, the admissions of the officers that they worked together to extract Moore, and speculation that officers wanted to shut up Moore and they could do that in the Four-Way. Plaintiffs further assert that these Defendants — Hardwell, Runner, Curley, Williams, and Rosenthal — along with other Defendant RCC Officers were involved in the conspiracy. Plaintiffs further speculate that these Defendants purposefully delayed or denied Moore medical care to prevent physicians and nurses finding the extent of Moore's injuries.  Plaintiffs conclude all Defendants are equally liable for the injuries sustained by Moore, regardless of whether those injuries were inflicted by chemical spray, closed fist strikes to the body, kicks, jabs, strikes to the head, drops, or head-first body slams.

The Court is mindful that, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000). However, the Court is also mindful that conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the nonmovant's burden. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir. 1996). If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992).

Here, Plaintiffs have failed to present specific evidence to show that any of these Defendants participated in any alleged conspiracy to harm Moore. Plaintiff have offered no proof of any agreement by anyone to do anything to cause injury to Moore, other than their own speculation. Plaintiffs have made only conclusory claims and unsubstantiated assertions to show that Defendants were part of any conspiracy.

Accordingly, Defendants' motion is GRANTED as to the § 1983 conspiracy claim.

### 2.     Use of Excessive Force

As indicated above, the Court has granted Defendants summary judgment on Plaintiff's claims that Defendants' use of excessive force caused the death of Moore and has dismissed those claims with prejudice.  [Ruling on MSJ No. 245].  However, Plaintiffs' claims against Defendants for Moore's less-than-lethal injuries remain pending.

Excessive force claims brought by someone like Plaintiffs, on behalf of Moore, who was not convicted of criminal activity prior to his death, are analyzed under the Fourth Amendment, which requires the plaintiff to only prove injury suffered as a result of a use of force that was objectively unreasonable. *See Graham v. Connor,* 490 U.S. 386 (1989); *see also Kingsley v. Hendrickson,* ___ U.S. ___, 135 S.Ct. 2466, 2472-73, 192 L.Ed.2d 416 (2015); *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996).

However, a review of the allegations of the Third Amended Complaint, together with the deposition testimony of Curley, Williams, Hardwell, Rosenthal, and Runner, establishes that only Rosenthal, Hardwell, and Runner played any role in the use of force against Moore. Accordingly, all use of force claims made against Curley and Williams are DISMISSED WITH PREJUDICE.

Based upon the pleadings and the deposition testimony, it appears that Plaintiffs are alleging the following uses of force:

1.     Rosenthal's pepper spray of Moore on the morning of October 13, 2015;

2.     Runner's shove or strike to Moore's neck or head during White's extraction;

3.     Hardwell's pepper spray of Moore during Moore's extraction from LD-7; and

      4.      Hardwell's extraction of Moore from LD-7 for transport to OCC.

The inquiry into whether force was reasonable is solely objective. *Kingsley* 135 S.Ct. at 2473. The considerations used to determine the reasonableness of the force used are:

      1.      The relationship between the need for the use of force and the amount of force used;

      2.      The extent of any injuries;

      3.      Any effort made by the officer to temper or to limit the amount of force;

      4.      The severity of the security problem at issue;

      5.      The threat reasonably perceived by the officers; and

      6.      Whether the Plaintiff was actively resisting.

*Kingsley*, 135 S. Ct. at 2473.

The core judicial inquiry with regard to a claim of excessive force is whether the force is applied in a good faith effort to maintain and restore discipline, or maliciously and sadistically to cause harm. See *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *Hudson v. McMillan*, 503 U.S. 1, 6-7 (1990). A *de minimis* injury is sufficient to sustain a claim of excessive force only if it is the product of the malicious and sadistic use of force. *Wilkins*, 559 U.S. at 37-38.

Defendants contend that the deposition testimony, together with a review of the video of the entry into LD-7 and extraction of Moore's victim, White, reveal the following:

      1.      All C.O.s believed that White was injured and in need of medical care;

      2.      Moore was given strong, repetitive verbal commands prior to the use of the  pepper spray;

      3.      Moore refused to comply with the strong, repetitive verbal commands;

        4.       Pepper spray was administered in order to allow entry into LD-7 and the extraction of White;

        5.       Moore inhaled pepper spray; and

        6.       The C.O.s inhaled pepper spray.

Similarly, at the time Moore was extracted in order to take him to OCC, the following was reasonably believed by the C.O.s.:

        1.       White was severely injured;

        2.       Moore was responsible for the injuries to White;

        3.       Moore was the only other person in LD-7;

        4.       Moore was given strong, repetitive verbal commands to face the wall and be prepared to be handcuffed;

        5.       Moore refused to comply with the strong, repetitive verbal commands;

        6.       Pepper spray was reintroduced into LD-7;

        7.       Moore inhaled pepper spray; and

        8.       Some of the C.O.s inhaled pepper spray.

The Court will first consider Plaintiffs' excessive use of force claims as to the pepper spray incidents, and then consider the remaining use of force claims.

### a.     Pepper Spray

Citing *Abdullah v. The State of Texas,* No. A-18-CA-1076-LY, 2019 WL981942 (W.D. Tex. Feb. 27, 2019), Defendants contend that Plaintiffs have no claim for the use of pepper spray under the facts and circumstances of this case. In *Abdullah*, a pre-trial detainee was pepper sprayed in order to gain compliance and effect control. The pre-trial detainee alleged that he was the victim of excessive force when he received one application of pepper spray in response to the detainee kicking a door after he had been warned to stop. The magistrate judge reviewed the factual

allegations, applied the teachings of *Kingsley*, *supra*, and observed that a *de minimis* injury is sufficient to sustain a claim of excessive force only if it is the product of the malicious and sadistic use of force, citing *Wilkins*, 559 U.S. at 37-38. The magistrate judge noted that the detainee admitted that pepper spray was used in response to him kicking the door after he had been warned to stop. It was also found that the detainee alleged no injury with respect to the use of pepper spray. Accordingly, the magistrate judge determined that the detainee had not alleged a violation of his constitutional rights and dismissed the claims.

Citing *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975), and *McCoy v. Alamu,* 950 F.3d 226, (5th Cir. 2020), Plaintiffs assert that officials may use chemical spray only where reasonably necessary to prevent riots or escapes or to subdue recalcitrant prisoners.  They state Moore was not committing riotous acts or attempting to escape. Plaintiffs admit Moore may have been recalcitrant, but they argue that the amount of pepper spray used was excessive.

The Court finds that, here, the video and the deposition testimony of the C.O.s show that each application of pepper spray to Moore came only after Moore had repeatedly refused to follow repeated verbal instruction while also presenting a threat of harm to all present. The application of pepper spray by Rosenthal early in the day occurred, according to Rosenthal, when he was attempting to take Moore to receive medical care.  Moore became threatening and charged toward Rosenthal. This application of pepper spray was performed in a good faith effort to gain control and prevent Moore from causing any harm to anyone.  Plaintiffs have produced no evidence to dispute Rosenthal's account of this earlier event.

With regard to the later applications of pepper spray, Plaintiffs ignore the fact that Moore had just inflicted fatal injuries to White in a beating, and, that Moore still posed a deadly threat to

the Defendant C.O.'s.  Moore was verbally threatening the officers and ignoring their repeated demands.

Applying the *Kingsley* factors to the use of the pepper spray, the Court finds that the amount of force used was proportional to the need for the use of force.  The video evidence does not show that Moore was injured by the use of the pepper spray.  Defendants attempted to temper or limit the amount of force necessary by giving Moore repeated verbal commands and warnings.  Moore posed a very severe security problem by virtue of his threatening language, his attempts to assault the C.O.s, and his deadly assault of White.  Defendants accurately perceived the deadly threat presented by Moore.  Finally, Moore was actively resisting Defendants' verbal commands.

Additionally, Plaintiffs have produced no proof or summary judgment evidence that the use of the pepper spray was in any way malicious, sadistic, or an attempt to cause Moore harm.

Accordingly, Defendants' motion on the excessive use of force claims for the use of pepper spray is GRANTED, and these claims are DISMISSED WITH PREJUDICE.

### b.    Remaining Excessive Use of Force Claims

Defendants contend that they are entitled to judgment as a matter of law dismissing the remaining excessive use of force claims, i.e., that Runner struck Moore in the head/neck, that Hardwell slammed Moore head-first to the floor, and that Runner dropped Moore.  Defendants contend that none of these actions rises to the level of excessive force.

Plaintiffs respond that, even rejecting the idea that Runner's and Hardwell's force was not deadly, it was still objectively unreasonable, and, force that is objectively unreasonable is excessive. Citing *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018), Plaintiffs argue that, if a jury were to find that Moore was not actively resisting, then any physical force like the strike

36

to the head or the slam and hard drop to the floor was excessive.  The Fifth Circuit in *Darden* stated:

> We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest. *See Ramirez v. Martinez*, 716 F.3d 369, 377–78 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).

*Darden*, 880 F.3d at 731.

Plaintiffs contend that there were no circumstances warranting the force used in this case. Plaintiffs assert that Moore was not resisting or threatening; he had no weapon; there was no threat to the safety of Runner, Hardwell, or a third party; and Moore was not attempting to escape. Plaintiffs further assert that Moore did not advance upon Runner and Hardwell; instead, it was Runner and Hardwell who advanced on Moore. They state that Moore was squatting and apparently defecating, in a vulnerable position, when Runner swung his fist striking Moore in the back of the head, and, that Moore was standing still and leaning on his bunk with his back to the cell door when Hardwell entered, grabbed him from behind in a bear hug, took him into the hallway, and slammed him onto the floor. Plaintiffs assert that there is no evidence of Moore doing anything that was objectively threatening.

Defendants respond that the testimony and evidence show that before entry was made, Moore refused to comply with verbal instruction and continued to make threats to both the C.O.s and White. Runner, observing what both he and other C.O.s perceived to be a threat of harm, acted to protect White and the other C.O.s from Moore by using a single push or shove. After White was removed from LD-7, Moore remained inside. While he was no longer a danger to White, he remained a dangerous man. Moore was next removed from LD-7 because LD-7 had been contaminated by blood, feces, food, trash and pepper spray, and the need to secure Moore for his

move to OCC by deputies for the Sheriff. Defendants conclude that, far from being an innocent man being set upon by C.O.s for no reason, Moore was a threat to everyone because of his unprovoked attack on White, his continuing threats, and his refusal to comply with verbal commands and pepper spray.

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, in *Scott*, the Supreme Court held that because the nonmovant's version of events was "so utterly discredited" by a videotape "that no reasonable jury could have believed him," the court of appeals "should have viewed the facts in the light depicted by the videotape." *Id.* at 380–81. Yet the standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account. *See Ramirez*, 716 F.3d at 374. Here, the videos do not meet that difficult standard.

The Court has viewed the summary judgment evidence, including the video evidence, and finds that Defendants have not carried their burden of showing there are no genuine issues of material fact that Defendants did not use excessive force on Moore. The videos do not show clearly whether it was Runner's arm or his hand that struck Moore, and, if it was his hand, whether it was closed into a fist. Likewise, the videos do not show clearly whether Moore was "slammed" to the floor, and if so, whether he was slammed head-first. The video evidence does not rule out that his

shoulder struck the floor first.  The videos do not depict clearly the extent to which Moore was resisting.

Based on the record, a jury could decide these factual issues either way.  Accordingly, Defendants' motion is DENIED as to the issue of whether Defendants Rosenthal, Hardwell, and Runner used excessive force with regard to his less-than-lethal injuries.

### 3.     Inadequate Medical Care

Defendants contend that Plaintiffs in this matter cannot show that they were aware of facts from which the inference could be drawn that a substantial risk of serious harm to Moore existed, that anyone subjectively drew the inference that the risk existed, and then disregarded that risk.

Plaintiffs respond that Defendants knew they had struck or injured Moore's head, rendering him unconscious, yet they did not notify a health care provider about his condition.  Plaintiffs further assert that the risk to Moore's health was excessive and obvious.

"[T]he State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm during their confinement ...." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (*en banc*). In this circuit, post *Hare*,"[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d at 456, 462 (5th Cir. 2015). "A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Id.*, at 463 (*quoting Hare*, 74 F.3d at 644). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Estate of Henson,* 795 F.3d at 463 (*quoting Hare*, 74 F.3d at 452).

Since there are no allegations in Plaintiffs' Complaints attacking the way in which healthcare was provided at RCC, nor are there any allegations that the inadequate treatment was a result of a pattern of acts or omissions sufficiently extended or pervasive, this claim is an episodic-acts-omissions claim. *Estate of Henson*, 795 F.3d at 463. To prevail on the episodic-acts-omissions claim, Plaintiffs must produce evidence of deliberate indifference by Curley, Williams, Hardwell, Rosental, and Runner. *Estate of Henson*, 795 F.3d at 463-64. Plaintiffs must prove that these Defendants either refused to provide treatment to Moore, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct evincing a wanton disregard for a serious medical need. *Fortune v. McGee*, 606 F. App'x 741, 743 (5th Cir. 2015) (*per curiam*).

Additionally, any supervisors, such as Hardwell, are liable "only if there was 'personal involvement in the constitutional deprivation, or ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Fortune*, 606 F. App'x. at 743 (internal citations omitted).

The facts in *Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019), are similar to those in the instant case.  In *Cleveland*, the inmate was seen, on multiple occasions, by a nurse who was never aware that the decedent was suffering from a life-threatening medical condition. Even though the detainee ultimately died from the lack of medical care, it was held that the nurse did not violate the deceased detainee's constitutional rights to adequate medical care. Likewise, here, Moore was seen on multiple occasions by Mitchell, the nurse.  There is no evidence that any Defendant was deliberately indifferent to a known risk. If each failed to act, a constitutional violation can only be found when that failure to act is accompanied by the knowledge of a significant risk of harm. *Farmer v. Brennan*, 511 U.S. 825 (1994). To the extent Plaintiffs are asserting inadequate medical care as to Curley, Williams, Hardwell, Rosenthal, and Runner, such a claim fails because none

40

were assigned to provide medical care, had authority to provide medical care, or had any knowledge that Moore was in need of medical care, and failed to provide it. In other words, there is no proof of deliberate indifference to a substantial risk of serious harm, that Curley, Williams, Hardwell, Rosenthal, and Runner drew that inference, and then disregarded it.  Further, Plaintiffs have not shown that Hardwell was personally involved in the alleged constitutional deprivation or that a sufficient causal connection exists between the supervisor's alleged wrongful conduct and the constitutional violation

Accordingly, Defendants' motion is GRANTED as to the failure to provide medical care, and those claims are DISMISSED WITH PREJUDICE.

### 4.      Failure to Intervene (Bystander Liability)

Defendants assert that Plaintiffs have made vague allegations that Defendants should have intervened to protect Moore from excessive force administered by other Defendants. Citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), Defendants contend that, for an officer to be liable as a bystander, he must have been present for the underlying constitutional violation, knew that a fellow officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm, and chose not to act. Mere presence at the scene of an incident is not enough. In order to be held liable as a bystander, the officer must have had time to appreciate the offending officer's use of excessive force and intervene. *Nowell v. Acadian Ambulance Service*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001). Defendants assert that the deposition testimony and video evidence show that no C.O appreciated that any use of force was excessive or had time and an opportunity to intervene.

Plaintiffs did not address Defendants' arguments in their opposition.

The Court agrees with Defendants.  The video evidence shows that no Defendant who was present during the rescue of White, the extraction of Moore, and the carrying of Moore down the hall, was in a position to know about any impending action, perceive the impending action as a violation of Moore's rights, or to take an action to prevent the claimed violation.  Accordingly, Defendants' motion is GRANTED as to the failure to intervene/bystander liability issue, and those claims are DISMISSED WITH PREJUDICE.

### 5.        Classification

Defendants contend that they are entitled to judgment as a matter of law on Plaintiffs' claims that Moore was either never classified or was improperly classified, and, that this failure somehow caused or contributed to Moore's death.  Citing *Wilson v. Budney*, 976 F.2d 957 (5th Cir. 1992) and *Neals v. Norwood*, 59 F.3d 530 (5th Cir. 1995),  Defendants assert that it is well-settled that a prison inmate does not have a protectable liberty or property interest in custodial classifications and an inmate's disagreement with his classification is insufficient to establish a constitutional violation. Defendants argue that Moore was a pre-trial detainee who was housed with a second pre-trial detainee, and, therefore, Plaintiffs have no claim for the failure to provide Moore different housing based upon classification.

Plaintiffs respond that Defendants Loring and Hardwell should have placed Moore in a one-person cell, and that the cell assignment and housing arrangement was negligent. Plaintiffs contend that Loring and Hardwell, as shift supervisors, were responsible for cell assignments. Plaintiffs argue that, due to the number of times Moore was sprayed, the supervisors should have concluded Moore had serious mental health issues. Because Moore was not properly classified and housed, he was exposed to continuing violence from White, according to Plaintiffs.

Defendants reply that the only persons Plaintiffs allege failed to classify or place Moore in appropriate housing are Loring and Hardwell, and, therefore, all such claims made against any other Defendants should be dismissed, with full prejudice.

Turning to the claims made against Hardwell, Defendants reply that Plaintiffs are speculating that he should have concluded Moore had serious mental health issues and that Moore would have ended up being housed somewhere other than LD-7. Defendants argue, however, that Hardwell also knew that Moore had been seen, on several occasions, by Nurse Mitchell, who did not find that Moore was in need of any mental or medical health care. Accordingly, there is no claim against Hardwell for failing to "classify."

The Court agrees with Defendants. The relevant time period for Hardwell to have observed and taken action is the time between Moore's booking at RCC and his being placed in LD-7 with White. Although Hardwell may have been aware of Moore's behavior during this period which precipitated the initial pepper spray incident (which occurred prior to the altercation with White), he was also entitled to rely on Nurse Mitchell's judgment. Therefore, Defendants' motion is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 6.     Failure to Train and Implement Policies

Defendants assert that, although Plaintiffs vaguely claim that they failed to train and implement policies, there is no proof or evidence that any of them were responsible for setting training policies or any other policy. Furthermore, there is no proof of deliberate indifference.

Plaintiffs do not address this issue in their opposition.

In order to establish a failure to train claim (which is most often made against a municipality) Plaintiffs must establish that someone was on actual or constructive notice that a particular omission in the training program caused employees to violate an inmate's constitutional

rights. Similarly, in order to establish policy liability (which is typically sought against a municipality), deliberate indifference must also be shown. See *Snyder v. Trepagnier*, 142 F.3d 791,798 (5th Cir. 1998); *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001); *Riggons v. City of Indianola, Mississippi*, 196 F. Sup. 3d 681 (N.D. Miss. July 25, 2016).

The Court has not been made aware of any proof or evidence that Defendants had any responsibility for setting training or policy, or that Defendants were deliberately indifferent. Accordingly, Defendants' motion is GRANTED and any claims made by Plaintiffs against Defendants for the failure to provide training or policy are DISMISSED WITH PREJUDICE.

### 7.    Good Faith Defense

Defendants contend that all § 1983 claims made against them should be dismissed, with prejudice, pursuant to the "good faith" defense.  They assert that in *Bryan v. Jones*, 530 F.3d 1210 (5th Cir. 1976), the Fifth Circuit, *en banc*, held that the good faith defense was available to shield a sheriff from liability for a Fourth Amendment claim pursuant to *Monroe v. Pape*, 365 U.S. 167 (1961).  They further assert that the distinction between "qualified immunity" and the "good faith defense" was recognized in *Richardson* v. *McKnight*, 521 U.S. 399 (1997), wherein the Court held that private prison guards were not entitled to qualified immunity, but the Court specifically noted that the opinion did not address the availability of the good faith defense as to those private prison guards, and no view was expressed on that issue.

Although Defendants do not provide a precise definition of the good faith defense, they assert they are entitled to invoke the good faith defense because there is no evidence to show they acted with malice.  The Court finds that these Defendants have not established that good-faith, standing alone, is an adequate defense to a damage claim for deprivation of rights under § 1983. Accordingly, Defendants' motion is DENIED as to the good faith defense.

### 8.     Qualified Immunity

Defendants have also invoked the qualified immunity defense to Plaintiffs' § 1983 claims.

Plaintiffs argue that Defendants are private correctional officers, and, for that reason alone, are not entitled to assert qualified immunity, citing *Richardson v. McKnight*, 521 U.S. 399 (1997). However, the Court has addressed that argument in its Ruling on the Motion for Summary Judgment filed by Defendants Alton Hale, William Mitchell, and Danielle Walker [Doc. No. 222]. For the same reasons set forth in that Ruling, the Court finds that the mere fact that Defendants are private correctional officers does not operate to deprive them of qualified immunity.

The next issue is whether Defendants are entitled to qualified immunity under the facts and circumstances of this case.   The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Even if a plaintiff proves that his constitutional rights have been violated, a police officer or other public employee sued in his individual capacity may be entitled to application of the defense of qualified immunity.  "Qualified immunity . . . 'is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Sorey v. Kellett*, 849 F.2d 960, 961 (5th Cir. 1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816 (1985)).  When an officer argues that he is entitled to qualified immunity from suit, we first view the evidence "in the light most favorable to the party

asserting the injury" and decide if "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that view reveals no constitutional violation, there is no claim. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003).

An officer need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *see also Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."), abrogated on other grounds, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).

The first prong of qualified immunity requires Plaintiffs to show a genuine factual dispute about whether Defendants used excessive force. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). In evaluating that claim, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). We focus on the prison official's "subjective intent" and determine it "by reference to the well-known *Hudson* factors." *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016). They are "(1) the extent of the

injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." *Bourne*, 921 F.3d at 491 (cleaned up). The Court must accept Plaintiffs' "version of the disputed facts as true" and determine whether they "constitute[d] a violation of a constitutional right." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015).

On the record before the Court, there are genuine disputes of material fact as to the degree to which Moore was actively resisting and as to whether the force Defendants used was clearly excessive and clearly unreasonable. "Officers may consider a suspect's refusal to comply with instructions ... in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville*, 567 F.3d at 167. "However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

As indicated above, the Court has viewed the summary judgment evidence, including the video evidence, and finds that the videos do not show clearly whether it was Runner's arm or his hand that struck Moore, and, if it was his hand, whether it was closed into a fist. Likewise, the videos do not show clearly whether Moore was "slammed" to the floor, and if so, whether he was slammed head-first. The video evidence does not rule out that his shoulder struck the floor first. Based on the record, a jury could decide these factual issues either way. Accordingly, because a reasonable jury could conclude that Defendants' use of force was excessive, Plaintiffs have met the burden at the first prong.

The remaining prong requires Plaintiffs to show that the relevant right was clearly established. Moore's right to be free from such force was clearly established at the time of

Defendants' alleged misconduct. The law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting. *See Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *Newman*, 703 F.3d at 763; *Bush*, 513 F.3d at 502; *see also Graham*, 490 U.S. at 396, 109 S. Ct. 1865.  Moreover, at the time of the alleged misconduct, it was clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force. *See Newman*, 703 F.3d at 762–63; *Bush*, 513 F.3d at 501–02.

The Court finds that a reasonable jury could conclude that Defendants used excessive force, in violation of Moore's clearly established constitutional rights.  Accordingly, Defendants' motion is DENIED as to qualified immunity.

### 9.    Punitive Damages

Defendants seek judgment as a matter of law holding that they are not liable for punitive damages under either federal or state law.   Punitive damages may be awarded in § 1983 cases "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Reckless indifference has been described by the Supreme Court as "'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (citation omitted). "[U]nlike compensatory damages, punitive damages are never available as a matter of right, no matter how egregious the defendant's conduct may be." *Hale v. Fish*, 899 F.2d 390, 404 (5th Cir. 1990). An "award of punitive damages is a harsh remedy and normally is not favored by law" and its goal "is to punish as well as to deter the commission of similar offenses in the future." *Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir. 1985).

48

Although in many instances a factual dispute as to a constitutional violation will preclude summary judgment on punitive damages, it will not when there is no material question of fact as to the reckless nature of the defendant's conduct.  See *Heaney v. Roberts*, 836 F.3d 795, 803 (5th Cir. 2017) (("While evaluations of motive and intent are generally inappropriate on a motion for summary judgment, we have recognized an exception to this rule where a plaintiff fails to produce evidence raising a material question of fact regarding aggravating circumstances or the reckless or callous nature of the defendant's actions." (internal citation omitted) (quoting *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)).

Here, Plaintiffs show no facts demonstrating evil intent or reckless or callous indifference. The Court is persuaded that, while the evidence could allow a reasonable jury to infer the necessary subjective intent to support a constitutional violation, it will not permit a reasonable jury to infer the level of "evil intent" or recklessness necessary to support a claim of punitive damages.

Accordingly, Defendants' motion is GRANTED as to Plaintiffs' claims for punitive damages under federal law, and those claims are DISMISSED WITH PREJUDICE.

Defendants next argue that punitive damages are not awardable under Louisiana state law unless expressly authorized by statute, citing *Ross v. Conoco, Inc.*, 2002-0299 (La. 10/15/02), 828 So. 2d 546, 555. They argue that, here, no statute allows the award of punitive damages for the death of Moore.  Plaintiffs do not dispute Defendants' arguments in their opposition, nor do they cite a Louisiana statute providing for punitive damages under these facts.

Accordingly, the Court GRANTS Defendants' motion as to Plaintiffs' claims for punitive damages under state law, and those claims are DISMISSED WITH PREJUDICE.

### 10.    State Law Medical Care Claim

Defendants contend that Plaintiffs did not assert a claim under state law against them for failure to provide medical care, that there is no testimony or evidence to support the claim that they saw Moore being unresponsive and obviously suffering from a serious medical condition while in the Four-Way, and that there is no testimony or evidence to show that they knew that Moore had a serious medical condition that required transportation to a hospital. They, therefore, ask for judgment as a matter of law on this issue.

In Louisiana, prison authorities owe a duty to provide an inmate with reasonable medical care. *Harper v. Goodwin*, 41053 (La. App. 2ndCir. 5/17/06), 930 So.2d 1160; *Robertson v. Stalder*, 1998-0558 (La. App. 1st Cir. 4/1/99), 734 So.2d 810; *Roy v. Phelps*, 488 So.2d 468 (La. App. 3rd Cir.1986). In the State Law section of the Third Amended Complaint, Plaintiffs allege that the Defendants "observed Moore in the four way when he was unresponsive and obviously suffering from a serious medical condition but failed to provide transport to the hospital." [Doc. No. 140, p. 26]. However, there is no testimony or evidence that Curley, Williams, Hardwell, Rosenthal, and Runner knew that Moore had a serious medical condition that required immediate transportation to a hospital. Additionally, they knew that Nurse Mitchell was attending and evaluating Moore. Finally, Moore was taken to a hospital by the Sheriff Defendants. Accordingly, Defendants' Motion for Summary Judgment as to any claim asserted by Plaintiffs for failing to provide medical care under state law is GRANTED, and this claim is DISMISSED WITH PREJUDICE..

## III.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. No. 241] is GRANTED IN PART and DENIED IN PART.

MONROE, LOUISIANA, this 30th day of October, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**