# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**ERIE MOORE, JR., ET AL.**         **CIVIL ACTION NO. 3:16-CV-01007**

**VERSUS**         **JUDGE TERRY A. DOUGHTY**

**LASALLE CORRECTIONS, INC.,**         **MAG. JUDGE KAREN L. HAYES**
**ET AL.**

## RULING

Pending here is a Motion for Summary Judgment filed by Defendants Archie Altman; Sgt. Roy Brown; Reginald Curley; Jody Foster; Alton Hale; Warden Ray Hanson; Sgt. Gerald Hardwell; Sgt. Kenneth Hart; William Mitchell; Sgt. Duan Rosenthal; Jeremy Runner; Danielle Walker; Sgt. Reginald Williams; LaSalle Management Co., LLC; Richwood Correctional Center, LLC; Roderick Douglas; Christopher Loring; Tommy Crowson; and City of Monroe (collectively "Defendants") [Doc. No. 245].    Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") have filed an opposition. [Doc. No. 303].  Defendants have filed a reply to the opposition [Doc. No. 339].

Plaintiffs have brought several claims under 42 USC § 1983 as well as Louisiana state law concerning the alleged tortious acts of Defendants which they argue caused the death of their father, Erie Moore, Sr. ("Moore"). While each of those causes of action is different, they all share a common element: medical causation. Defendants contend they are entitled to judgment as a matter of law on Plaintiffs' claims for the death of Moore due to excessive force because Plaintiffs are unable to prove that Defendants' actions or omissions caused his death.[1]  Plaintiffs respond that each Defendant was as much at fault as the others for the death of their father and all are liable.

---

1 Defendants do not seek summary judgment as to the less than fatal injuries to Moore.

For the following reasons, the Court GRANTS the pending Motion for Summary Judgment.

## I.      FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.   RCC is owned and operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White died shortly after the altercation.  Moore was forcibly removed from the holding cell after the altercation occurred.  Soon thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants. [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

### A.      Factual Background

On October 11, 2015, Louisiana State Trooper Jason Hanemann ("Trooper Hanemann") was pulled over by Moore.  [Doc. No. 140, ¶ 7]. Moore informed Trooper Hanemann that Moore

was going to force a police officer to shoot him and that Moore wanted to be in front of the TV when the police officer shot him. Trooper Hanemann believed Moore was attempting to force him into a confrontation. Trooper Hanemann did not detain Moore.

On the morning of October 12, 2015, while on duty, at approximately 6:15 am, Officer Crowson went to Donut Palace in Monroe, Louisiana, to get something to eat. [Crowson Deposition, Doc. No. 224-3, pp 9-10, 54]. As he walked just inside the front door, Officer Crowson observed a man – later identified as Moore – at the front counter "hollering and screaming and cursing." [*Id*., pp. 11-12]. Officer Crowson observed Moore "ra[nting] and raving" and waving his arms. [*Id*., pp. 12-14]. Officer Crowson thought that Moore was "upset" at the employee behind the counter; the employee, in turn, seemed nervous and scared. [*Id*., pp. 12-13, 22-23]. Officer Crowson also observed other patrons leaving the business. [*Id*., pp. 13, 45-46].

When Officer Crowson entered, Moore turned from the counter towards the door and saw him. [*Id*., pp. 13-14]. Moore then approached him and closed the gap between the two of them to two to three feet. [*Id*., p. 15]. While approaching him, Moore hollered curse words at Officer Crowson, continued "ra[nting] and raving," and informed Officer Crowson that he knew the mayor. [*Id*., pp. 14-16]. Officer Crowson confronted Moore and told Moore that he needed to "calm down." [*Id*., pp. 13-15]. Officer Crowson's directive had no apparent effect. [*Id*., p. 14].

After the directive was ignored, Officer Crowson placed Moore under arrest for disturbing the peace, turned Moore around, and handcuffed him behind his back. [*Id*., p. 15]. Moore was advised of his rights but refused to explain his actions. [*Id*., pp. 27, 33].

After arresting Moore, Officer Crowson began the process of moving Moore to his patrol unit for transport. Moore provided some resistance as he led Moore outside, which Officer

Crowson described as having to "coax" Moore while Moore was "slightly" pulling on him. [*Id*, pp. 18-19].

At the vehicle, Officer Crowson searched Moore incident to arrest and located Moore's driver's license, which he used when he called dispatch. [*Id*., pp. 20-21]. Moore was placed in the patrol unit, and Officer Crowson secured Moore's vehicle. [*Id*., pp. 20-22]. Officer Crowson then returned to the store to interview the employee, who provided his account of the event. [*Id*., pp. 22-23, 25-26].

At some point, while already in custody, Moore told Officer Crowson that Officer Crowson "was going to kill him." [*Id*., pp. 32, 51]. Moore made the latter statement only once, and Crowson did not engage him about it. [*Id*., pp. 32-34, 44, 51].

Upon arrival at RCC, Officer Crowson took Moore to booking to be processed into the facility. [*Id*., p. 31].  Officer Crowson testified that he informed the booking officer that he was charging Moore "with disturbing the peace, loud and profane, for him disturbing the peace and cussing." [*Id*., pp. 32-33].

Shortly after Moore's arrival, Nurse William Mitchell, LPN, ("Mitchell"), the on-staff nurse at RCC, assessed Moore. [Mitchell Deposition, Doc. No. 224-7, pp. 2-5, 6-8]. Mitchell believed that Moore was "intoxicated," [*Id*., pp. 7, 9]; specifically, Mitchell believed that Moore was "either drunk or on something," meaning that his behavior was "chemically induced." [*Id*., p. 10-11].

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-

77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61].

Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].  Moore's irrational behavior continued and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSP Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C/O") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurred at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went directly to the cell to see what was going on.  When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell.  Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say.  Runner said he would go find the lieutenant and he turned to leave. As Runner was walking away, he felt that something wasn't right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack.  Runner then saw White on the floor underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

Runner then summoned help.  Just after 6 p.m., White was extracted from the cell after Moore was subdued by the application of pepper spray and physical force applied by RCC

5

officer(s), including an alleged closed-hand strike by Defendant Runner, who forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100].

White's injuries appeared to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital by ambulance for medical treatment at about 6:30 p.m., but he later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC C/O Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was removed, Moore was extracted from LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4, at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of the cell and forcefully taken down to the floor by Defendant Hardwell in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras, where he was placed on the floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106].

As Moore was being carried from the hall to the Four-Way, however, one of the RCC

6

officers stumbled, and Moore's head again hit the floor.  [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43].

Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed an altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time and RCC staff did not indicate to the OPSO

Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as it was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id.* When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the investigation because it was then considered a homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point and Lambright assisted as instructed. *Id.* Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id.*, at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at

8

pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to the purported crime scene to investigate further. [*Id.*]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition that the call for him to head to RCC to pick up Moore and bring him to OCC was made at approximately 8:50 p.m. [*Id.*] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield

Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at pp. 46-47, 63]. C/O Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35; Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene,

10

however, testified at deposition that they did not see Moore get dropped as he was carried from the Four-Way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel removed him from the unit and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No. 256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33]. Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23; Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed the shift supervisor on scene that Moore showed signs of having a head injury and needed to be taken to the hospital. [*Id.*, at p. 22].

Murphy and Wells took Moore to Conway. Medical personnel treating Moore at Conway performed a CT scan and other tests and determined that Moore had suffered a fractured skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31]. Medical personnel also indicated that Moore had suffered a midline shift in his brain due to bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31-32]   At 12:29 a.m. on the 14th, Moore was transported by air evacuation

helicopter to LSU Health Center in Shreveport for additional care that could not be provided at Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the medical care providers indicated that Moore was likely brain dead and a decision would have to be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the District Attorney's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id.*]. On or about November 14, Erie Moore, Sr. died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

### B.    Deposition of Dr. Teri O'Neal

Dr. Teri O'Neal ("Dr. O'Neal"), Ouachita Parish Coroner at the time, testified at her deposition that Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. She testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

### C.    Deposition of John Owings, M.D.

Dr. John Owings ["Dr. Owings"] was deposed on September 18, 2019.  Dr. Owings treated Moore but had no specific recollection of it. [Dr. John Owings Deposition, Doc. No. 246-

4, p. 11]. He also reviewed Moore's pertinent X-rays to formulate his opinion. [*Id*., p. 12]. He produced a report for Plaintiffs. [*Id*., p. 14]. He was asked to review Moore's records and his recollection of treating Moore and issue an opinion, "as to the survivability of Mr. Moore's head injury, as to the chronicity of his head injury, and as to what mechanism of injury might have caused his head injury." [*Id*., p. 15].

Dr. Owings opined that, "Moore suffered blunt force trauma to the head while at Richwood Correctional Center," but later testified that he did not know specifically when Moore suffered the blunt force trauma which caused the subdural hematoma. [*Id*., p. 22]. He testified that the subdural hematoma likely began to form between 24 and 48 hours prior to Moore's presentation at E.A. Conway hospital. [*Id*., p. 23].

Dr. Owings opined that, "Moore manifested signs of a significant head injury." [*Id*., p. 25]. Dr. Owings went on to opine that blunt force trauma resulted in the gradual development of Moore's subdural hematoma. [*Id*., p. 26]. However, Dr. Owings testified that he could not, "tell you what specific event caused his subdural hematoma," and that he, "[didn't]think anybody could put their finger on that given at least evidence that I know of that exists." [*Id*., p. 27].

Dr. Owings did not offer an opinion concerning whether any Defendant had acted negligently or improperly. [*Id*., p. 32]. Dr. Owings could not offer an opinion "from a causation time wise standpoint", "because [he didn't] know exactly when the subdural started forming[.] [*Id*., pp. 33-34].

**D.     Deposition of David Nelson, M.D.**

Dr. David Nelson ("Dr. Nelson") was deposed on October 12, 2019. Dr. Nelson was the emergency room physician on the night Moore was brought in to E.A. Conway hospital (October 13, 2015). [Dr. David Nelson Deposition, Doc. No. 246-5., p. 10]. Dr. Nelson testified that he did

not determine the location on the head where any trauma may have occurred. [*Id.*, p. 18].

Dr. Nelson would not commit to a causal relationship between any of the potential traumas and the subdural hematoma. Asked if a, "body slammed head-first onto a hard floor" could cause the injury, Dr. Nelson would only commit to, "It could be." [*Id.*, p. 19]. Asked, "If an individual is struck in the back of the head with a closed fist, is that significant enough force to cause this kind of an injury?" again Dr. Nelson would only commit to, "It could be." [*Id.*, p. 19]. Asked, "Could enough force to cause this kind of injury be applied in a situation where a person is dropped from a level of three to four feet onto a hard floor head-first?" again Dr. Nelson would only commit to, "It could be." [*Id.*, p. 19].

When Dr. Nelson was asked, "Now, the fact that someone suffers in a situation where it is a blunt force subdural hematoma, you can't offer a medical opinion as to what the specific trauma was that resulted in this subdural hematoma; is that correct?" he agreed, testifying, "That's correct." [*Id.*, p. 24].

Asked about the likely location of blunt force trauma which could have caused a subdural hematoma, Dr. Nelson testified that he would expect that a hematoma located on the right side of the head would have been caused by a blow to the right side of the head, even though he documented no physical evidence of such a blow. [*Id.*, p. 26].

Dr. Nelson had no medical opinion about where or when the blunt force trauma at issue took place. [*Id.*, p. 27]. However, Dr. Nelson opined that if Moore was acting normally five hours earlier, then the injury likely happened during that five hour period. [*Id.*, pp. 36-38].

### E.        Deposition of Eduardo Gonzalez-Toledo, M.D.

 Dr. Eduardo Gonzalez-Toledo ("Dr. Gonzalez-Toledo") was deposed on November 19, 2018. Dr. Gonzalez-Toledo treated Moore at LSU Shreveport.  He is a professor of radiology,

14

neurology, and anesthesiology at LSU Shreveport as well as the director of the neuroradiology section of the radiology department there. [Dr. Eduardo Gonzalez-Toledo Doc. No. 246-6, pp. 6-7]. His only role in Moore's treatment was reviewing diagnostic films taken while Moore was at LSU Shreveport. [*Id*., p. 8].

Dr. Gonzalez-Toledo also testified as an expert for Plaintiffs in neuroradiology and provided a report at their request. [*Id*., p. 8-9]. Dr. Gonzalez-Toledo formed his opinions based on discussions with Plaintiffs' counsel as well as a review of pertinent CT scans, medical records, and the autopsy report. [*Id*., pp. 10-12]. Dr. Gonzalez-Toledo testified about the three opinions contained in his report: (1) "the subdural hematoma was traumatically induced," (2) "the trauma was inflicted to the right rear of the head," and (3) "the precipitating cause of the subdural hematoma was inflicted 24 hours or less from the time Mr. Moore presented to the University Healthcare in Monroe," (roughly 9:50 p.m. October 13, 2015). [*Id*., p. 15].

Dr. Gonzalez-Toledo further testified that the trauma which caused the injury likely came from the front or back right side of Moore's skull. [*Id*., pp. 17-18]. He testified that Moore suffered a midline shift of his brain, which led Dr. Gonzalez-Toledo to conclude that the hematoma was traumatically induced and came from the right side of Moore's head. [*Id*., pp. 18-19].

Other than his opinion that the precipitating cause of the subdural hematoma occurred within 24 hours of Moore's arrival at EA Conway, Dr. Gonzalez-Toledo offered no opinion as to the causation of the injury.

### F.    Deposition of Frank Peretti, M.D.

Dr. Frank Peretti ("Dr. Peretti") was deposed on August 10, 2018. Dr. Peretti is the associate medical examiner and forensic pathologist who performed Moore's autopsy. [Dr. Frank

Peretti Deposition, Doc. No. 246-7, pp. 10, 12]. Along with performing Moore's autopsy, Dr. Peretti was tasked with producing an autopsy report, with the cause of death, along with a toxicology. [*Id.*, p. 13]. Typically, as was the case here, Dr. Peretti was provided with the coroner's investigative report prior to performing an autopsy. [*Id.*, p. 14].

Dr. Peretti's autopsy of Moore produced a report with multiple findings. [Autopsy Report, Doc. No. 246-7, p. 72]. The first finding was blunt force trauma to the head. [Doc. No. 246-7, p 16]. Dr. Peretti was not able to determine what instrument or object caused the blunt force trauma. [Id., p. 17]. Dr. Peretti's next finding was of a subdural hematoma on the right side. [Id.]. Dr. Peretti testified that the right side hematoma indicates that the trauma at issue likely occurred on the right side of Moore's head, though trauma to the front or back of the head could also have caused it. [Id., pp. 19-20].

Dr. Peretti was asked if he could tell in the autopsy when the trauma occurred but was only able to say that it was a "relatively fresh subdural hematoma." [Id., pp. 24-25]. He testified that his autopsy findings would be consistent with blunt force trauma as far back as October 11, 2015, prior to Moore's detention at RCC. [Id., pp. 25-26]. When asked more directly whether he could determine the timing of the blunt force trauma from the autopsy, Dr. Peretti admitted that he could not. [Id., p. 26].

Dr. Peretti discussed the midline shift he found, describing it as the brain shifting left or right in the skull due to swelling. [Id., p. 27]. Dr. Peretti was asked about the lack of subgaleal or temporalis muscle contusions shown in his report, and he testified that the subgaleal muscles are under the scalp, while the temporalis muscle is above the ear, and that neither showed trauma. [Id., pp. 30-31]. He continued, testifying that he did not see an impact point or any external injuries to the scalp. [Id.] Based on his findings, Dr. Peretti listed Moore's cause of death as

16

pneumonia complications and blunt force head injuries.  [Id., p. 33].

Questioned by Plaintiffs' counsel about potential causes of the hematoma, specifically impact on a flat surface or with a closed fist strike, Dr. Peretti would only grant that these were possible causes. [Id., pp. 46-47]. Even after being shown pictures of Moore from October 13, 2015, Dr. Peretti could not commit to an impact site which was the source of the hematoma. [Id., pp. 47-48].

Later asked if he could, "determine where the source of the bleeding, of the subdural hematoma is?" Dr. Peretti responded that, "[t]he only thing [he could] say is the right cerebral hemisphere, the dura under there. I can't tell you exactly where, because like I told you, the blood is going to start to spread out, so you can't see where." [Id., p. 56]). Upon final questioning by Plaintiffs' counsel, Dr. Peretti was asked repeated questions about the likelihood that impact with a floor caused the blunt force trauma, and still he was only willing to testify that such an impact was a likely cause after explicitly being asked to assume that no other potential causes existed. [Id., pp. 66-67].

### B.    Defendants' Motion for Summary Judgment

The parties agree that Moore died as a result of a subdural hematoma.  Plaintiffs have brought claims under 42 USC § 1983 as well as Louisiana state law alleging that Defendants' tortious acts caused the subdural hematoma and the subsequent death of their father.

Defendants contend they are entitled to judgment as a matter of law with regard to Plaintiff's excessive force claim because Plaintiffs lack the medical evidence necessary to determine which potential impact caused the injury which led to Moore's death. Defendants assert that Plaintiffs' burden of proof includes an implicit requirement that they not only prove what act caused the subdural hematoma, but who caused the subdural hematoma.  Plaintiffs

17

respond that the medical evidence and evidence of a conspiracy are more than enough for a jury

to find that Defendants employed the force that caused Moore's death.

The motion is fully briefed, and the Court is prepared to rule.

## II.   LAW AND ANALYSIS

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment,

identifying each claim or defense--or the part of each claim or defense--on which summary

judgment is sought. The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The moving party bears the initial burden of informing the court of the basis for its motion by

identifying portions of the record which highlight the absence of genuine issues of material fact.

*Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A

party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to

particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or

nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if

the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.

*Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving

party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache*

*Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the

Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in

its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with

conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

**B.   Analysis**

**1.   42 USC § 1983 Claims**

**a.   Individual Defendants**

Plaintiffs bring federal claims under 42 U.S.C. § 1983, seeking damages for the alleged violation of Moore's constitutional rights. Section 1983 provides for the recovery of damages when a person is deprived on his or her constitutional rights by a person acting under color of state law. See *Davidson v. Cannon*, 474 U.S. 344 (1986); and *Daniels v. Williams*, 474 U.S. 327 (1986). Allegations of mere negligence will not suffice to make a claim under § 1983. *Id.*

"To prevail on a Section 1983 claim, Plaintiffs 'must show (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor.'" *Bedingfield v. Deen,* 2011 WL3206872, *14 (W.D. La. 7/27/11). "[T]he plaintiff must establish a direct causal connection between the matter occurring under color of state law and the alleged constitutional violation." *Givs v. Cityof Eunice*, 512 F. Supp. 2d 522, 542 (W. D. La.5/21/07). "[The specific parameters of liability for civil rights violations are matters of federal common law, 'as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil. . . cause is held." *Perry v. City of Bossier City*, 2019 WL1782482, *3 (W.D. La. 4/23/19).

Specifically regarding medical causation, the court in *Perry* found that, "to survive summary judgment when alleging causation of an injury or condition outside of common knowledge, a § 1983 plaintiff in Louisiana must produce competent medical evidence that, when

combined with other direct and circumstantial evidence, allows a jury to rationally infer that the defendant's conduct caused the injury or condition." *Id.* at *4.

Defendants contend there are several potential acts which could have caused the subdural hematoma which resulted in Moore's death, including:

    (1)    any blunt force trauma he may have suffered prior to his booking into RCC;

    (2)    any blunt force trauma he may have suffered during his altercation with Vernon White in LD-7;

    (3)    Runner's alleged closed hand strike;

    (4)    Hardwell's takedown;

    (5)    his drop by officers in the hallway outside LD-7; and

    (6)    his alleged drop while being taken out of the Four-Way.

[Doc. 140, ¶29].

In addition, there have been allegations that Moore beat his head against the cell door. Defendants assert that the burden of proof is upon Plaintiffs to show which of these incidents was the factual cause of Moore's subdural hematoma and they must do so based upon the expert medical evidence available. Defendants further assert Plaintiffs will be unable to meet this burden of proof.

With regard to the first possible cause, trauma Moore may have suffered prior to being booked into RCC, Defendants point to the allegations in the Third Amended Complaint that Moore acted strangely in his interactions with State Trooper Hanneman on October 11, 2015, by following the trooper, by stopping behind him, and by making threats and seemingly suicidal comments. [Doc. No. 140, ¶7]. Moore was later arrested by Monroe Police Officer Crowson in part for acting erratically in public. [Id., ¶8]. Moore continued acting erratically after his arrival at RCC,

preventing booking and intake from being completed. [Id., ¶ 10].  Defendants argue that such behavior lends support to potential unknown causes of the subdural hematoma prior to his arrest by Officer Crowson and unrelated to any Defendant.

Additionally, Defendants cite Dr. Owings' testimony that the onset of the subdural hematoma was likely 24-48 hours prior to Moore's arrival at EA Conway. [Doc. No. 246-4, p. 23]. According to Plaintiffs' Third Amended Complaint, Moore was arrested at approximately 6:15 a.m. on October 12, 2015. [Doc.140, ¶8]. He was presented to EA Conway sometime after the incident on October 13, 2015, less than 48 hours from the time of his arrest. Based on Dr. Owings' testimony, Defendants assert that it is possible that Moore suffered blunt force trauma prior to his arrest and booking into RCC, causing the subdural hematoma at issue.

With regard to the second possible cause, the altercation with White, Defendants point to Plaintiffs' allegations in their Third Amended Complaint that an altercation occurred between Moore and White on October 13, 2015. [Doc. No. 140 ¶ 44].   It is possible that Moore was struck by White during that altercation, or at some other unknown time. According to Dr. Nelson's testimony, a closed fist "could be" enough force to cause the subdural hematoma and one could easily imagine such a strike occurring during an altercation. [Doc. No. 246-5, p. 19].

With regard to the third possible cause, Defendants contend that Runner's alleged closed hand strike was not a likely cause of the injury.  Dr. O'Neal was shown video of the strike and asked to form the necessary causal connection but would not. Instead, Dr. O'Neal would only testify that, "Probably the hand striking the head would not be sufficient force to cause [a subdural hematoma]." [Doc. No. 246-5, p. 97].

With regard to the fourth possible cause, Hardwell's take-down, Defendants assert that Dr. O'Neal was also shown video of Hardwell's takedown and asked for an opinion on causation, but

again could only testify that it was possible, because she could not see from the video how hard Moore's head hit the floor. [*Id.*, p. 93].

With regard to the fifth possible cause, the drop by the officers in the hallway outside LD-7, Defendants state that Dr. O'Neal was also shown video of the drop and stated that there was a possibility that it was a cause of the subdural hematoma. [*Id.*, p. 94].

With regard to the sixth possible cause, the alleged drop while being taken out of the Four-Way, Defendants state that no medical testimony was elicited specifically about that alleged drop but testimony allowing for the possibility that a drop could result in a subdural hematoma would logically extend to that instance as well, if it occurred.

Defendants argue that the medical testimony does not establish what act caused the subdural hematoma or even when it was caused. Dr. Owings testified that he could not, "tell you what specific event caused his subdural hematoma," and that he, "[didn't] think anybody could put their finger on that given at least evidence that I know of that exists." [Doc. No. 246-4, p. 27]. Dr. Owings could not offer an opinion "from a causation time wise standpoint", "because [he didn't] know exactly when the subdural started forming[.]" [*Id.*, pp. 33-34]. The best he could do on the causation question was testify that a hypothetical incident at 7:00 p.m. could be the cause. [Id., p. 43].

Additionally, Dr. Nelson was not able to offer an opinion regarding causation. He was asked, "Now, the fact that someone suffers in a situation where it is a blunt force subdural hematoma, you can't offer a medical opinion as to what the specific trauma was that resulted in this subdural hematoma; is that correct?" He agreed, testifying, "That's correct." [Doc. No. 246-5, p. 24]. Similarly, Dr. Gonzalez-Toledo offered only general information concerning the window of time that the causative act may have occurred but could not be any more specific about causation

than that the precipitating incident likely occurred within 24 hours of Moore's arrival at EA Conway. [Doc. No. 246-6, p. 15]. Dr. Frank Peretti was repeatedly asked for an opinion on causation but, like Dr. O'Neal, would only commit to "possibilities" or to causation in hypothetical scenarios. [Doc. No. 246-7].

In sum, according to Defendants, none of the medical testimony which Plaintiffs must use to prove medical causation offers a definitive opinion about medical causation. This is because none of those experts testified that a specific cause was more likely than not the cause of the subdural hematoma. Defendants argue that all the Plaintiffs have are a handful of physicians willing to say "maybe" about the various known potential causes.

Plaintiffs respond that no potential cause of Moore's fatal injury exists outside of the actions of the Defendants. Additionally, they assert that causation has been established circumstantially. Finally, Plaintiffs argue that where multiple tortfeasors concurrently cause an injury, each can be held liable for the entire injury, and the burden shifts to each tortfeasor to exculpate himself.

The Court finds that Plaintiffs are incorrect in their assertion that the medical evidence shows that nothing could have caused the subdural hematoma other than the actions of Defendants. The medical evidence does not establish when the subdural hematoma was inflicted, or by whom. "A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence." *Pepitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002). None of the doctors who Plaintiffs rely upon could testify more likely than not that any single act caused the subdural hematoma. On the issue of the causal blow, all were "perfectly equivocal," providing no support for Plaintiffs' allegations.

Taken as a whole, the medical evidence allows for a 48-hour window for a potential injury to have occurred prior to Moore's arrival at E.A. Conway hospital. The injury is just as likely to have been inflicted before Moore was brought to the RCC for booking.  The Court notes that the stop by the state trooper occurred outside the 48-hour window before Moore arrived at E.A. Conway hospital.  However, Moore was acting erratically from the time he was observed by Officer Crowson in the donut shop, which was in the 48-hour window.

It is also just as likely that it was inflicted during the physical altercation between Moore and White which resulted in White's death.  It is just as likely to have been inflicted when the officer slipped and fell while carrying Moore in the hallway outside of LD-7.  A review of the video evidence indicates that Moore's head struck the floor with some force, and that the officer did not intentionally drop Moore.  As indicated above, allegations of mere negligence will not suffice to make a claim under § 1983.

The medical testimony available is simply inadequate to show what blow or injury caused the subdural hematoma.

Plaintiffs next argue that the general rule is that expert testimony is not necessary to prove causation "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation," citing *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35 (1962) (quotation marks omitted) and *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010).

They argue that the medical evidence, together with evidence of a *conspiracy* among all of these Defendants to harm Moore, is sufficient circumstantial evidence for a jury to find that Defendants employed the force that caused Moore's death.

24

Plaintiffs in a Section 1983 case are permitted to show causation through circumstantial evidence. General tort principles are applied. In the case of *Naquin v. Marquette Casualty Company* (1963) 244 La. 569, 153 So.2d 395 at 397, the Supreme Court of Louisiana said:

> Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation.

Additionally, a § 1983 conspiracy can furnish the conceptual spring for imputing liability from one to another. *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984).

Plaintiffs assert that these Defendants were involved in a conspiracy or team effort, or aided and abetted one another, in an agreement to injure Moore. Plaintiffs claim that there was a conspiracy that included the plan for the rescue of White from LD-7, the extraction of Moore and the drop of Moore on the floor in the hallway in front of LD-7. Plaintiffs also assert that there was a beating administered by a group of COs while Moore was in the Four-Way, which was followed by a cover-up.

However, Plaintiffs have produced no evidence to show that these Defendants acted together to drop Moore, take Moore to the ground, or shove Moore. Each of the actions was done by an individual Defendant. The fact that a few officers developed a plan before going into LD-7 to rescue White does not establish a conspiracy. Plaintiffs allege there was a group effort to harm Moore, but they produce no evidence that would establish any such group effort. Plaintiffs have produced little more than conclusory allegations in support of their allegations of a conspiracy.

Even if Plaintiffs' evidence of a conspiracy is considered in the light most favorable to them, Plaintiffs still have not produced sufficient evidence to exclude other reasonable hypotheses

with a fair amount of certainty.  In other words, Plaintiff's evidence is still simply inadequate to show what blow or injury caused the subdural hematoma.

Additionally, Plaintiffs have not shown that they should be allowed to combine an alleged civil rights violation (such as an unconstitutionally excessive use of force) with a merely negligent act (such as accidentally dropping a person being carried) to establish a conspiracy or concurrent causation.

Lastly, Plaintiffs argue that multiple tortfeasors who concurrently cause an indivisible injury are jointly and severally liable, and each can be held liable for the entire injury.  They assert that it is not essential that all persons who concurrently caused the harm be joined as defendants. Restatement (Second) of Torts § 433A, comment I, § 433B, comments c and d, and §§ 879–82. *See Edmonds v. Compagnie GeneraleTransatlantique*, 443 U.S. 256, 260 n. 7 and 8 (1979) ("This latter rule is in accord with the common law, which allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident.); *Bell v. Mickelsen*, 710 F.2d 611, 619 (10th Cir. 1983) (applying Wyoming law); Prosser and Keeton on Torts, § 47, p. 328 and § 52, pp. 347–48.

Plaintiffs argue that, consequently, a tortfeasor who cannot prove the extent to which the harm resulted from other concurrent causes is liable for the entire harm. Subsection (2) of § 433B states the burden of proof also shifts to the defendant in the case of concurrent causes: "Where the tortuous conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."

Thus, according to Plaintiffs, Defendants bear the burden of proving that they did not cause the injury at issue.

Defendants respond that the case law cited by Plaintiffs suggests that while concurrent causation may apply in a § 1983 action, Plaintiffs must show that the individuals whose actions were substantial causes must have "functioned as a unit" during the incident. See *Simpson v. Hines*, 903 F. 2d 400, 403 (5th Cir. 1990). Defendants assert that no such concerted action occurred outside of the general concept that all individuals were corrections officers attempting to maintain control after a violent incident.

The Court agrees there is no evidence that Defendants or any other potential actors functioned as a unit. Runner went into LD-7 and made contact with Moore. Hardwell later entered and extracted Moore from the cell, during the course of which both went to the floor. Runner and another officer later attempted to move Moore, slipping and dropping him. OPSO officers later allegedly dropped Moore while moving him to their patrol car. Additionally, injury before arrival and injury by White cannot be excluded though those are potentially concurrent causes. These potential causes do not form a single "unit" of action.

Further, the Louisiana Supreme Court set forth the proper inquiry for causation for instances where there are multiple causes in *Bonin V. Ferrellgas, Inc*., 877 So.2d 89 (La. 2004). The Court stated:

> Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis.
> . . .
> Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. In this case, more than one party's conduct allegedly caused the fire, i.e., Ferrellgas, Empiregas, and Lanclos. In

> considering the substantial factor test, this Court has stated that
> cause-in-fact clearly exists when the plaintiff's harm would not have
> occurred absent the specific defendant's conduct. *Perkins [v.
> Entergy Corp. 792 So.2d 606 (La. 3/23/01)], supra* at 612 (citing
> *Graves v. Page,* 96-2201 (La.11/7/97), 703 So. 566, 570). This
> Court has considered "whether each of the multiple causes played
> so important a role in producing the result that responsibility should
> be imposed upon each item of conduct, even if it cannot be said
> definitively that the harm would not have occurred 'but for' each
> individual cause." *Perkins, supra* at 612 (citing *Graves, supra* )

[*Id.*, at 95] Here, as indicated above, Plaintiffs have produced no evidence that any Defendant

played so important a role in producing Moore's death that responsibility should be imposed upon

him.

The Court is mindful that, "the court must draw all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

*v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, (2000). The Court is also mindful that

conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the

nonmovant's burden. *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir. 1996). If the

nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary

judgment is appropriate. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992). Plaintiffs have

produced nothing more than conclusory claims and unsubstantiated assertions to show that

Defendants caused the subdural hematoma which resulted in Moore's death.

For these reasons, Plaintiffs' claims under § 1983 against the individual Defendants for the

death of Moore as a result of excessive force should be dismissed for their failure to establish

medical causation

### b.    *Monell* Claims

As discussed above, the medical personnel who have been deposed could not commit to a

causal link between any individual act and Moore's fatal injury. Further, the remaining evidence

28

is insufficient, when combined with the medical testimony, to allow an inference of causation. Without the ability to prove that a specific incident medically caused the subdural hematoma, Plaintiffs will necessarily be unable to show that a policy or custom of LaSalle or RCC caused the hematoma. Accordingly, Plaintiffs' *Monell* claims under § 1983 for the death of Moore due to excessive force should also be dismissed for their failure to establish medical causation.

### c.   Failure to Provide Medical Care, Lost Chance of Survival

The Court does not construe Defendants' motion as seeking summary judgment on the issue of whether any inadequate medical care issue caused Moore's death. The Court further does not construe Defendant's motion as seeking summary judgment as to any loss of chance of survival claim. However, Plaintiffs referenced both issues in their opposition, and Defendants responded to Plaintiffs' arguments in their reply.   Because Defendants did not seek summary judgment on either issue in their motion, the Court does not address those issues in this Ruling.

### 2.   State Law Claims

Defendants seek judgment as a matter of law on the issue of causation as to Plaintiffs' state law claims with regard to excessive force and Moore's death. They assert that causation is also necessary to any successful claim under Louisiana law, which employs a duty/risk analysis to determine liability for all state law causes of action brought by Plaintiffs.

In support of their positions as to the state law claims, both Plaintiffs and Defendants offer the identical arguments they made with regard to the federal claims. Accordingly, for the reasons set forth above, the Court grants Defendants' motion with regard to Plaintiffs' state law claims for excessive force and the death of Moore.

**III.    CONCLUSION**

For the reasons set forth above, the Court GRANTS the pending Motion for Summary Judgment [Doc. No. 245].  Plaintiffs' claims against Defendants for the death of Moore due to excessive force are DISMISSED WITH PREJUDICE in their entirety.   Plaintiffs' claims against Defendants for any injuries to Moore that were less than lethal remain pending.

MONROE, LOUISIANA, this 30th day of October, 2020.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE