UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ERIE MOORE, JR., ET AL.                          CIVIL ACTION NO. 3:16-CV-01007

VERSUS                                           JUDGE TERRY A. DOUGHTY

LASALLE CORRECTIONS, INC.,                       MAG. JUDGE KAREN L. HAYES
ET AL.

RULING

Pending here is a Motion for Summary Judgment filed by Defendant City of Monroe (the "City") seeking dismissal of Plaintiffs' claims against it. [Doc. No. 247]. Plaintiffs filed an opposition [Doc. No. 296]. The City filed a reply to the opposition [Doc. No. 323].

For the following reasons, the City's Motion for Summary Judgment [Doc. No. 247] is GRANTED.

I.      FACTS AND PROCEDURAL HISTORY

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana. RCC is owned and operated by Defendants LaSalle Management Co., LLC ("LaSalle"), and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Erie Moore, Sr. ("Moore"), was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015. The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White"). White died within a few hours of the altercation. Moore was forcibly removed from the holding cell where the altercation occurred. Shortly thereafter, Moore became

unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants, including the City [Doc. No. 1].  On December 5, 2017, an Amended Complaint was filed which added new Defendants and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

In a separate Ruling, the Court has granted Defendants summary judgment on Plaintiffs' claims that Defendants' use of excessive force caused the death of Moore.  The Court has dismissed those claims with prejudice.  [Ruling on MSJ No. 245].  Plaintiffs' claims against Defendants, including the City, for Moore's less-than-lethal injuries remain pending.

A.     **Factual Background**

1.     **The City and RCC**

a.     **Contractual Relationship**

Since 1989, Louisiana has permitted state and local governmental subdivisions to contract with private prison contractors "for the financing, acquiring, designing, leasing, constructing, and operating of facilities." LA. REV. STAT. 39:1800.4; *see also*, LA. LEGIS. ACTS 1989, No. 360, § 1, eff. June 28, 1989. The MPD closed its jail in 2001, and, in that same year, the City entered into an agreement with Richwood for housing, confinement, and detention services. [RCC Agreement, Doc. No. 247-3]. RCC continuously handled the City's detention services from 2001 to 2019, when the City's relationship with RCC ended.

### b.      The Arrangement under Chief Holmes' tenure

In 2011, Quentin Holmes ("Chief Holmes") became the Chief of Police for the MPD. [Chief Holmes Deposition, Doc. No. 247-4, p. 13]. Chief Holmes did not review the agreement between the City and RCC, but he did review the arrangement between the City and RCC to see if there could be any improvements made from an "efficiency" and "operational standpoint." [*Id.*, pp. 32-33]. During his tenure as Chief, he met with the Warden of RCC a few times to discuss operational issues. [*Id.*, pp. 39-40]. Chief Holmes did not recall getting any direct reports about the operations of RCC, but he does recall communications about changes in rates for housing prisoners. [*Id.*, 40]. Chief Holmes described his relationship with RCC officials as "a good professional working relationship" and emphasized that he had no "major" issues that were ever brought to his attention. [*Id.*, p. 40].

Concerning incidents at RCC, Chief Holmes was unaware, in his entire career, of another inmate dying or suffering a serious injury at RCC. [*Id.*, p. 43]. Chief Holmes never received any complaints about the operations of RCC from inmates, former inmates, their family members, the City Council, or anyone in the Mayor's office, except for the occasional inmate who complained about the food. [*Id.*, p. 82-83]. While he was Chief of Police, Holmes was never notified about any issues with RCC taking City arrestees. [*Id.*, p. 98]. Chief Holmes left MPD in 2017.

### 2.      Events Preceding the arrest of Erie Moore

Plaintiffs allege that on October 11, 2015, Moore encountered Louisiana State Trooper Jason Hanneman ("Trooper Hanneman"). [Third Amended Complaint, Doc. No. 140, ¶ 7]. After the encounter, Trooper Hanneman telephoned the Monroe Police Department's non-emergency line, which was answered by MPD dispatcher Hannah Shrader ("Shrader"). [Dispatch Recording, Doc. No. 247-5; Hannah Shrader Deposition, Doc. No. 247-6, p. 21]. Trooper Hanneman asked

Shrader if she had any information on Erie Moore in her system, including whether Moore had a history of mental illness. [Doc. No. 247-5]. Trooper Hanneman informed Shrader that Moore had pulled Trooper Hanneman over and that he thought Moore was "crazy." [*Id*.].  After checking all the available records, Shrader informed Trooper Hanneman that the only records MPD had concerning Moore related to a domestic matter, traffic violations, and an issue with a pawn shop. [*Id*.]. After relaying this information, Trooper Hanneman thanked Shrader and ended the call.

Shrader did not input any information into MPD's computer systems related to Trooper Hanneman's call. [Shrader Deposition, Doc. No. 247-6, p. 21]. Shrader explained that she did not do so because it was not customary to enter information into the system that was not related to a call for assistance or an emergent issue. [*Id*., pp. 19-23]. Shrader did not enter Trooper Hanneman's call because he was not reporting a crime, did not request the assistance of MPD, and was merely seeking information about a person. [*Id*.].

Later that evening, a law enforcement officer safety alert was sent out by a third-party agency. [Officer Safety Alert, Doc. No. 247-7]. The alert described the encounter between Moore and Trooper Hanneman. The alert stated that Moore informed the Trooper that Moore was "going to force a police officer to shoot him," "that [Moore] wanted to be in front of the TV when the Trooper shot him," and that the Trooper "believed Moore was attempting to force him into a confrontation." [*Id*.].

Although the City is uncertain of the time it received the alert or where it came from, MPD records show that a bulletin containing the alert was sent out electronically by the on-duty dispatchers between 7:47 and 7:58 p.m. [MPD Logs, Doc. No. 247-8, pp. 3-33]. The dispatch was sent electronically to the in-unit computers of each on-duty patrol officer. Also, at roughly 10:04

p.m., the following message, related to the officer safety alert, was sent to on-duty officers through their in-unit computers:

> Per Sgt. Passman, in reference to the LSP trooper being followed on 10/11/15, if you are being followed by a vehicle, do not stop. Clear the channel, continue to drive, and wait for several units to stop the suspect vehicle. Once the suspect car is stopped, do not stop your unit directly in front of the suspect vehicle.

[*Id.*, pp. 34-37].  As Communications Supervisor Sandra Walker ("Walker") explained at her deposition, only those officers who were on duty at the time with their computer on would have access to messages that were sent. [Sandra Walker Deposition, Doc. No. 247-9, pp. 8, 14-16].

After an alert is sent out, communications officers may place it in the briefing book for the patrol-supervisors next shift. [*Id.*, p. 10, 17; Shrader Deposition, Doc. No. 247-6, pp. 35-36]. The City asserts that it does not know whether the alert was placed in the briefing book, but if it was, patrol supervisors have discretion to determine what information patrol officers need to be briefed on. [Mary Tellis Deposition, Doc. No. 247-10, pp. 11-12]. The City asserts that the officer safety alert was probably not communicated to the October 12, 2015, morning shift – either because it was not placed in the briefing book or a supervisor determined it did not warrant briefing – because Officer Crowson, who worked that shift, did not receive any information concerning Erie Moore. [Officer Crowson Deposition, Doc. No. 247-11, pp. 48, 56-59, 86-87].

### 3.    Erie Moore's Arrest

On the morning of October 12, 2015, while on duty, at approximately 6:15 a.m., Officer Crowson went to Donut Palace in Monroe, Louisiana, to get something to eat. [Crowson Deposition, Doc. No. 224-3, pp 9-10, 54]. Officer Crowson parked directly in front of the building and proceeded inside. [*Id.*, p. 11].

As he walked just inside the front door, Officer Crowson observed a man – later identified as Moore – at the front counter "hollering and screaming and cursing." [*Id.*, pp. 11-12]. Officer Crowson observed Moore "ra[nting] and raving" and waving his arms. [*Id.*, pp. 12-14]. Officer Crowson thought that Moore was "upset" at the employee behind the counter; the employee, in turn, seemed nervous and scared. [*Id.*, pp. 12-13, 22-23]. Officer Crowson also observed other patrons leaving the business. [*Id.*, pp. 13, 45-46].

When Officer Crowson entered, Moore turned from the counter towards the door and saw him. [*Id.*, pp. 13-14]. Moore then approached him and closed the gap between the two of them to two to three feet. [*Id.*, p. 15]. While approaching him, Moore hollered curse words at Officer Crowson, continued "ra[nting] and raving," and informed Officer Crowson that he knew the mayor. [*Id.*, pp. 14-16]. Officer Crowson confronted Moore and told Moore that he needed to "calm down." [*Id.*, pp. 13-15]. Officer Crowson's directive had no apparent effect. [*Id.*, p. 14]. After the directive was ignored, Officer Crowson placed Moore under arrest, turned Moore around, and handcuffed him behind his back. [*Id.*, p. 15]. Moore was advised of his rights but refused to explain his actions. [*Id.*, p. 27].

Moore did not resist being handcuffed, and Officer Crowson did not have to use force to effect the arrest. [*Id.*, pp. 16, 48]. Officer Crowson testified that he believed that arresting Moore was necessary to prevent further incident in the Donut Palace, [*Id.*, pp. 54-55], but that he never felt personally threatened by Moore. [*Id.*, p. 40].

Officer Crowson arrested Moore for disturbing the peace. [*Id.*, p. 33]. After arresting Moore, Officer Crowson began the process of moving Moore to his patrol unit for transport. Moore provided some resistance as he led Moore outside, which Officer Crowson described as having to "coax" Moore while Moore was "slightly" pulling on him. [*Id*, pp. 18-19].

6

Moore continued to shout on the way to the car, [*Id.*], and at some point, while already in custody, *Moore told Officer Crowson that Officer Crowson "was going to kill him."* [*Id.*, pp. 16, 30]. Moore made the latter statement only once, and Officer Crowson did not engage him about it. [*Id.*, pp. 16-18, 27, 30].

At the vehicle, Officer Crowson searched Moore incident to arrest and located Moore's driver's license, which he used when he called dispatch. [*Id.*, pp. 20-21]. Moore was placed in the patrol unit, and Officer Crowson secured Moore's vehicle. [*Id.*, pp. 20-22]. Officer Crowson then returned to the store to interview the employee, who provided his account of the event. [*Id.*, pp. 22-23, 25-26].

Officer Crowson testified that he did not believe that Moore was engaging in any suicidal behavior, had mental health issues, or that Moore was trying to get Officer Crowson to harm him. [*Id.*, pp. 30, 39]. Officer Crowson did not believe this was an "unusual" encounter. [*Id.*, p. 26]. Officer Crowson testified that he believed that Moore's singular statement that Officer Crowson would "kill him" was not "abnormal" because Officer Crowson has previously encountered African-American males who believe that Caucasian police officers intend to harm them. [*Id.*, p. 33]. Officer Crowson suspected that it was possible that Moore was intoxicated, but he admitted he was unable to detect the odor of any alcoholic beverages due to sinus issues. [*Id.*, pp. 19-20].

After arresting Moore, Officer Crowson notified dispatch of the arrest. [*Id.*, pp. 28-29]. Officer Crowson was not alerted to any outstanding issues concerning Moore by dispatch, so he began the process of taking him to RCC for booking. Sandra Walker testified that she was the dispatcher who spoke to Officer Crowson following Moore's arrest and that she did not inform him of Moore or the alert because she had no knowledge of either.  [Walker Deposition, Doc. No. 247-9, pp. 23-24, 26-27].  Officer Crowson does not recall Moore saying anything in the patrol car

on the way to RCC, and Moore did not do anything unusual in the backseat while being transported. [Officer Crowson Deposition, Doc. No. 224-3, p. 18].

Upon arrival at RCC, Officer Crowson took Moore to booking to be processed into the facility. [*Id*., p. 31]. Officer Crowson testified that he informed the booking officer that he was charging Moore "with disturbing the peace, loud and profane, for him disturbing the peace and cussing." [*Id*., pp. 32-33]. Crowson did not specifically inform the booking officer of Moore's singular statement that Crowson was going to "kill" Moore. [*Id*., p. 33]. Crowson also did not inform the booking officer of any perceived concerns to the health and safety of Moore because he states he did not know of any. [*Id*., pp. 32-33]. After the arrest and booking, Crowson prepared an initial report and narrative. [*Id*., pp. 24-25]; [MPD Initial Report, Doc. No. 224-4].

Shortly after Moore's arrival, Nurse William Mitchell, LPN ("Nurse Mitchell"), the on-staff nurse at RCC, assessed Erie Moore. [Mitchell Deposition, Doc. No. 224-7, pp. 2-5, 6-8]. Nurse Mitchell believed that Moore was "intoxicated" [*Id*., pp. 7, 9]; specifically, Nurse Mitchell believed that Moore was "either drunk or on something," meaning that his behavior was "chemically induced." [*Id*., p. 10-11]. Nurse Mitchell further explained that Moore seemed "intoxicated," "[n]ot crazy." [*Id*., p. 12]. Nurse Mitchell did not believe that Moore was showing any signs of mental health issues, and he did not refer Moore for a mental health evaluation. [*Id*., p. 10-11]

Officer Crowson has been employed with MPD since August 15, 1993. [Doc. No. 224-3, p. 3]. Crowson was a patrol officer for the MPD from the beginning of his career until January 2016, when he was promoted to Sergeant and began supervising patrol officers. [*Id*., pp. 3, 8]. As a patrol officer, Crowson estimated that he had roughly one hundred encounters or "stops" per week. [*Id*., p. 26].

Officer Crowson received training, just months before his encounter with Moore, concerning how to address persons with mental health issues. [*Id.*, pp. 2-7, 55-56]. Officer Crowson testified that he has encountered individuals with injuries and illnesses before; in those cases, where a need was disclosed, Officer Crowson has taken those individuals to seek treatment. [*Id.*, pp. 42-44].

### 4.    Events at RCC

During the booking process at RCC, Moore was uncooperative and acting irrationally, so he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued, and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSO Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C.O.") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurs at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two

dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went

to the cell to investigate.  When he arrived at the cell, Moore was standing directly in front of the

small window on the cell door, blocking Runner's view into the cell.  Moore stated he wanted to

see the lieutenant.  Runner asked why, but Moore refused to say.  Runner said he would go find

the lieutenant, and he turned to leave. As Runner was walking away, he felt that something was

not right, so he went back to the cell door and looked in the window.  Moore was no longer

standing in front of the window but had returned to his rack.  Runner then saw White on the floor

underneath the camera, shaking as if he were having a seizure.  [Runner Deposition, Doc. No.

256-7, pp. 78-82].

Runner then summoned help. White was extracted from the cell after RCC officers

subdued Moore by using pepper spray and physical force sufficient to force Moore to the floor.

[Third Amended Complaint, Doc. No. 140, at pp. 13-14, ¶¶19-20; Hardwell Deposition, Doc.

No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-7,at pp. 78-93; Holyfield Deposition,

Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC Warden Ray Hanson, Doc. No. 256-

13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared to be quite serious and possibly life-

threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-143]. White was taken to a hospital

by ambulance for medical treatment at approximately 6:30 p.m., but he later died from his

injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition excerpts of RCC

C.O. Reginald Curley, Doc. No. 256-14, at pp. 45-49]

After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended

Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied

pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4,

at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of

the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78; Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs and leg restraints were applied to Moore, and he was moved to the "Four-Way," an interlock area between hallways of RCC which is not monitored by video cameras. As Moore was being carried from the hall to the Four-Way, one of the RCC officers stumbled, and Moore's head again hit the floor.  [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15]. He was then placed on the floor lying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner Deposition, Doc. No. 256-7, at pp. 99,104-106

Jody Foster ("Foster"), a Correctional Officer ("O.C."), was working the night shift, from 6:00 p.m. to 6:00 a.m., and was in charge of the kitchen. [Deposition of Jody Foster, Doc. No. 219-2, p. 6-7]. He was instructed by Captain Douglas to report to the Four-Way with Reginald Curley. [*Id*., p. 21]. After he and Curley arrived at the Four-Way, he noticed other people walking through the Four-Way, but he does not know who the others were or what they were doing. He was in the Four-Way for more than an hour. [Id., p. 22].

RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No.

256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed part of the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time, and RCC staff did not indicate to the OPSO Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as it was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC,

12

they took over the homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point, and Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to Ouachita Correctional Center ("OCC") and then interview him there. [*Id*]. Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at pp. 31, 50]. This call took place at approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to LD-7 to investigate further. [*Id*.]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at his deposition that he received the call to pick up Moore at approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

13

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at pp. 46-47, 63]. C.O. Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to

carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35; Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene, however, testified at their depositions that they did not see Moore get dropped as he was carried from the Four-Way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. When OPSO personnel removed him from the unit and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. OCC Medical Officer Crecink examined

Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No. 256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33]. Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23; Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed the shift supervisor on scene that Moore showed signs of a head injury and needed to be taken to the hospital. [*Id*., at p. 22].

Murphy and Wells took Moore to LSU-E.A. Conway Medical Center ("Conway"). Medical personnel treating Moore at Conway performed a CT scan and other tests and determined that Moore had suffered a fractured skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31]. Medical personnel also indicated that Moore had suffered a midline shift in his brain due to bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31-32]   At 12:29 a.m. on October 14, Moore was transported by air evacuation helicopter to LSU Health Center in Shreveport for additional care that could not be provided at Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the medical care providers indicated that Moore was likely brain dead, and a decision would have to be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the DA's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id*.]. On or about November 14, Moore died.

16

[Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs seek to hold the City responsible for Moore's death.  Although Moore was housed at RCC at the time of his death, Plaintiffs assert that the City's allegedly unconstitutional inaction and negligence contributed to Moore's death. Plaintiffs claim that the City failed to implement adequate policies concerning information sharing; failed to supervise, train, or have adequate training policies for its employees; was responsible for the conduct of RCC and its employees; failed to properly oversee its contract for services with RCC; and that the City's employees' negligence preceding and during Moore's arrest caused or contributed to his death.

The City contends that Plaintiffs' claims against it should be dismissed with prejudice.  The City asserts that Plaintiffs cannot show that any policy, or the lack of any policy, was the moving force behind any alleged constitutional violation, nor can they show that the City was deliberately indifferent to Moore's rights. As to the state-law claims, the City asserts that Plaintiffs cannot show that the City was negligent or breached any duties.

The motion is fully briefed, and the Court is prepared to rule.

## II.     LAW AND ANALYSIS

### A.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B.     Municipality Liability under 42 U.S.C. § 1983

Plaintiffs seek to impose liability on the City under 42 U.S.C. § 1983.  "A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60, (2011) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978)).  Municipalities are only liable for their "own illegal acts"; they are not vicariously liable for their employee's actions. *Id.* (citations omitted).  Plaintiffs must show that a government policy or custom caused the alleged constitutional deprivation. *Monell,* 436 U.S. at 694; *Board of Cnty. Comm'nrs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000).  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. . . .[A] municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.

A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369.

> It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the [governmental entity]. The plaintiff must also demonstrate that, through its deliberate conduct, the [governmental entity] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the . . . action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the . . .  action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404.

"Proof of [governmental] liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (There must be "proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom.").

> The "official policy" requirement may be met in at least three different ways: [*Bryan County,* 520 U.S. ] at 406–08. . .. (1) "[W]hen the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Id.* at 417 . . . (Souter, J., dissenting). . . ; (2) Where no "official policy" was announced or promulgated but the action of the policymaker itself violated a constitutional right. *Bryan County*, 520 U.S. at 417–18, 117 S.Ct. 1382 (Souter, J., dissenting). . .; and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." [*City of*] Canton [*v. Harris*], 489 U.S. [378, 390 1989] . . . ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom'... actionable under § 1983.").

*Burge*, 187 F.3d at 471. "The 'moving force' inquiry requires a plaintiff to make two showings: causation and culpability." *Mason*, 806 F.3d at 280 (*citing Bryan Cnty*, 520 U.S. 397, 404, (1997)). This inquiry imposes a causation standard higher than "but for" causation. *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).

"To establish municipal liability in an episodic-act case, a plaintiff must show '(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with

subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'" *Garza v. City of Donna*, 922 F.3d 626, 632–34 (5th Cir.), *cert. denied sub nom, Garza v. City of Donna, Texas*, 140 S. Ct. 651 (2019) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

A plaintiff may also seek to prove liability by showing the failure to adopt a municipal policy. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir.1992). To prevail on such a claim requires showing that the policymaker's failure to adopt a precaution is an "intentional choice, not merely an unintentionally negligent oversight." *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)).

### 1.      Information sharing, inadequate medical care

Plaintiffs contend that the City violated Moore's constitutional right to adequate medical care because of the lack of information sharing in two respects.  First, Plaintiffs assert that the City had no practice or policy to require personnel on duty at the time an arrest is made to inform the arresting officer of any mental health or medical health information that is within their possession, such as the officer safety alert.  Instead, according to Plaintiffs, the City elected to establish a policy or practice that those officers not on duty at the time are only notified of an officer safety alert if their patrol supervisor decides he wants to inform that shift of the bulletin. Plaintiffs state that this lapse led to Officer Crowson not being informed of the officer safety alert about Moore's interaction with Trooper Hanneman.

Second, Plaintiffs assert that the City had no practice or policy to require arresting officers to report or share suicidal behavior or ideations to the booking officer. Although Officer Crowson was not aware of the officer safety alert, Plaintiffs assert that Moore had made a "suicidal gesture" when Moore told Officer Crowson that Officer Crowson "was going to kill him."

Plaintiffs argue that the City thus had a constitutionally deficient "policy" or "practice" of not sharing medical information with officers and booking personnel. Plaintiffs contend that a policy, practice, or custom that permits discretion to ignore a serious health condition is obviously in reckless disregard for the right of a pre-trial detainee to receive medical care. Plaintiffs further argue that an officer should not have any discretion in whether to report or share information regarding suicidal behavior because suicide is a serious mental health issue in jails where it is the leading cause of death, and because no one should take a suicidal gesture or ideation lightly.

Finally, Plaintiffs assert that this failure to provide adequate medical care caused harm to Moore because it led to the use of excessive force on him. Plaintiffs state that, had Officer Crowson taken Moore to a hospital or shared the information with the RCC booking officer, then he would not have been placed in a cell with White or any other inmate. Further, since the RCC use of force policy requires that before force is used on a mentally ill inmate, mental health personnel must be called to the scene, Moore likely would not have been subjected to excessive force, according to Plaintiffs.

The City responds that Plaintiffs largely ignore that there was no basis for Dispatcher Shrader to record or log the Trooper's call. The City further argues that officers on duty at the time of the safety alert were notified about it. The City asserts that Plaintiffs' argument, at bottom, is that the City should have continued to share the information in the alert with officers *ad*

*infinitum,* an unreasonable requirement. Therefore, the City did not act unconstitutionally in this case.

The City additionally asserts that this case involves a single incident – not a pattern or practice of alleged unlawful behavior. Although Plaintiffs argue that the City disregarded the rights of arrestees to medical care by not having policies in place specifically governing medical information, Plaintiffs have not offered any evidence that the City deliberately adopted an unconstitutional course of action or ignored any serious need.

The City also contends that the officer safety alert was sent for the safety of officers that might meet Moore – not to document the existence of Moore's alleged mental health issues.  The officers who were on duty at the time of the alert (i.e., those who were out in the field at the time Moore was allegedly pulling over officers) were sent a notice and instructions about the alert. The dispatchers would have made the alert available for the next patrol shift in the briefing book, and the patrol shift supervisor would have reviewed the information in the book to determine what information needs to be given to the oncoming shift.  The City asserts that the constitution does not require more, and that it is certainly not clear that the City "deliberately disregarded the need for additional policies, training, and procedures," *Burge v. Par. of St. Tammany*, 187 F.3d 452, 473 (5th Cir. 1999), or that the City "intentionally" chose not to adopt a policy, *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir.1992).

The City argues that Plaintiffs improperly rely on a general statement by their expert, that "[g]ood law enforcement practice is to make officers aware of the information that will be needed during their tour of duty, especially any relevant broadcasts or alerts during times that such officers might not have been on duty." [Kenny Sanders Declaration, Doc. 296-2, p. 106].  However, the City asserts that this general proposition begs more questions: Who determines what information

23

officers will need during their tour of duty? Who determines whether a broadcast or alert is relevant? What level of detail must be passed along? The City asserts that Plaintiffs do not offer an answer to any of these questions and fail to recognize that even their own expert's formulation allows discretion.

Finally, with regard to Plaintiffs' claim that the City does not have a policy of providing information concerning mental health information on arrestees, the City asserts that it is not a repository for mental health information and the officer safety alert did not provide mental health information. City officials are trained to provide all information necessary in connection with an arrest, including medical information if they are aware of it; further, it was certainly not "obvious that the likely consequences of not adopting [Plaintiffs'] policy [would] be a deprivation of constitutional rights." *Rhyne*, 973 F.2d at 392.

The Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial that the City's policies and procedures constituted deliberate indifference to Moore's rights. Plaintiffs have presented no evidence that any alleged violation of Moore's constitutional rights "resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Garza*, at 634. "Deliberate indifference is an extremely high standard to meet." *Domino*, at 756.

The testimony shows that dispatchers do record all information that involves a request for assistance (but not mere inquiries by outside agencies), that they put information in a briefing book for patrol supervisors to review, and the patrol supervisors exercise discretion to determine what their patrol officers must know before beginning a shift. Additionally, officers do share information with booking officers at the time an inmate is booked, as Officer Crowson did. That the City may or may not have an explicit policy governing the specific types of information that

must be shared is of little consequence, because there is no requirement for such a policy (and it wasn't "obvious" that such was required), and there is no evidence that the failure to adopt a policy for information sharing would likely lead to constitutional violations or that it is linked to the alleged constitutional violations in this case. *See e.g., Alvarez v. City of Brownsville*, 904 F.3d 382, 391-92 (5th Cir. 2018), *cert. denied sub nom. Alvarez v. City of Brownsville, Tex.*, 139 S. Ct. 2690 (2019) (general policy of non-disclosure was not deliberately indifferent because it was not "obvious" to the policymaker that the constitutional violation was a "highly predictable consequence" of the policy).

There has been no assertion that any alleged deficiencies in the City's information sharing practices has led to any other incidents or mishaps. This case involves a single incident – not a pattern or practice of alleged unlawful behavior. While Plaintiffs argue that the City disregarded the rights of arrestees to medical care by not having policies in place specifically governing medical information, they have not offered any evidence that the City deliberately adopted an unconstitutional course of action or ignored any serious need.

Accordingly, the City's motion is GRANTED, and Plaintiffs' § 1983 claim for inadequate medical care based on inadequate information sharing policies is DISMISSED WITH PREJUDICE.

### 2. Delegation of policymaking authority to RCC

Plaintiffs contend that the City "had a non-delegable duty to supervise, train, have adequate policies, classify and monitor individual defendants so that inmates are provided a safe environment and are not subjected to the use of force." [Third Amended Complaint, Doc. No. 140, ¶ 41]. Plaintiffs assert that the City is, therefore, vicariously liable for all unconstitutional practices at RCC.  Plaintiffs argue that, by virtue of the contract signed by the City and RCC, the City

delegated all operational responsibility for the jail to RCC, including making policy and the establishment of practices. Included within that delegation was policy making authority and the authority to establish or tolerate practices in the jail. Plaintiffs assert that the City permitted RCC to operate as it pleased; therefore, knowledge by City policymakers of unconstitutional practices at RCC is not required.

The RCC policies and practices that Plaintiffs contend the City is liable for include a failure to train, the unlawful use of chemical spray, the use of the Four-Way as a place to administer punishment, and the lack of mental health screening for MPD arrestees.

The City argues in its motion that, to establish municipal liability for any alleged constitutional violations, Plaintiffs must overcome *Monell*, which provides that municipalities can only be held liable for their own unconstitutional acts, not those of its employees or contractors. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) ("[*Monell's*] requirement[s] [were] intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.") The City asserts that Plaintiffs must not only show a constitutional violation occurred, but they must also show some official policy, practice, or custom of the municipality that was the moving force behind the alleged violation. *Ancata*, 769 F.2d at 705, n. 8. Plaintiffs also must show the policy or practice – or lack thereof – was maintained with deliberate indifference. *Garza*, 922 F.3d at 632–34.

The City contends that, for the same reasons set forth in the motions for summary judgment filed by the other Defendants, there was no underlying constitutional violation.  The City further contends that Plaintiffs cannot show that any "policy, practice, or custom" by RCC was the moving force behind the alleged constitutional violations. The City asserts that RCC trains its employees;

has in place numerous policies and procedures governing a wide variety of prison-related topics, including the areas complained of here; and RCC did not fail to adopt any policy or course of action with deliberate indifference. The City adopts the RCC Defendants' arguments in their own motions for summary judgment concerning their training, policies, and procedures.

Finally, the City contends that the City itself did not act unconstitutionally. The City's agreement with RCC required RCC to "operate, manage, supervise and maintain the facility and provide for the secure custody, care, and safekeeping of inmates of the City at the facility in accordance with state and local law, including the standards promulgated by the Louisiana Basic Jail Guidelines and th[e] Agreement...." [RCC Agreement, Doc. No. 247-3, Art. 3]; see also La. R.S. 39:1800.4. The City states the agreement robustly provides for inmate safety and medical care, amongst numerous other items. The agreement expressly states that "R.C.C. shall operate and maintain the facility in accordance with all applicable provisions of the Louisiana Basic Jail Guidelines rules and regulations." [*Id.*, Art. 3, § 3.02]; see also [Id., Art. 3, § 3.20 (requiring use of force policies consistent with Basic Jail Guidelines)].While some policy and procedures are to be developed by RCC under the agreement, the City's policy, evidenced through its agreement with RCC, was that, at a minimum, City inmates would receive the same or greater care and protection than that provided by the Louisiana Basic Jail Guidelines. The City argues, therefore, it was not "deliberately indifferent" to the rights of inmates housed at RCC – it expressly contracted to provide inmates with safety and care and set minimum applicable standards/guidelines that governed the care of those inmates.

The City concludes that there was no policy, practice, or custom, or lack thereof, by the City that led to a constitutional violation. Thus, the claims against the City should be dismissed as to Plaintiffs' non-delegation theory.

The Court has found, in a separate Ruling on the Motion for Summary Judgment filed by Warden Hanson, Assistant Warden Aultman, LaSalle, and Richwood [Doc. No. 237], that LaSalle and Richwood are not liable under § 1983 for the violation of Moore's rights, under *Monell.* It necessarily follows that, even if the City is a proper policy maker for the actions of LaSalle and/or Richwood, the City has no liability for those alleged violations under Plaintiffs' non-delegation theory.

In separate Rulings, the Court has also concluded as follows:

### *Inadequate training*

In the Ruling on the Motion for Summary Judgment filed by Warden Hanson, Assistant Warden Aultman, LaSalle, and Richwood [Doc. No. 237], the Court found that RCC employees were adequately trained in corrections. In addition, the Court found that it was the policy at RCC that all employees attend annual re-training. Some employees came from employment with the DOC or other corrections facility and the training afforded those employees at their prior places of employment were also considered to be part of the training history of each. Also, new hires were provided with on the job training into the specific tasks expected of them at RCC. New hires were sent through a POST school to become certified.

The Court concluded that LaSalle and Richwood hired experienced C.O.s officers and provided extensive training for them. This training was in compliance with the BJG. Thus, the Court found that Plaintiffs failed to establish that the training policies, practices, or customs at RCC were inadequate.

Additionally, the Court found that Plaintiffs failed to establish that someone employed by LaSalle or Richwood was deliberately indifferent in adopting the training policies. Finally, the Court found that Plaintiff failed to establish that the allegedly inadequate training policies,

procedures, or customs directly caused Moore's injury.  Moore had just been involved in a violent

altercation with White in which White received fatal injuries, Moore threatened the C.O.s, and

Moore refused to obey their repeated commands when they attempted to rescue the fatally injured

White.

### *Chemical spraying and Use of the Four-Way*

In the separate Ruling on LaSalle and Richwood's Motion for Summary Judgment [Doc.

No. 237], the Court addressed the use of chemical spraying and the Four-Ways, finding that

Plaintiffs failed to carry their burden of establishing that (l) the policies, practices or customs at

RCC were inadequate, (2) that someone employed by LaSalle or Richwood were deliberately

indifferent in adopting the policies, procedures, or customs, and (3) the inadequate policies,

procedures or customs directly caused any injury to Moore.

Additionally, the Court has addressed the issue of whether the use of the chemical spray

on Moore constituted excessive force in its separate Ruling on the Motion for Summary Judgment

[Doc. No. 241] filed by the Correctional Officer Defendants.  There, the Court found that the

amount of force used with regard to the chemical spray was proportional to the need for the use of

force, and therefore did not constitute the use of excessive force.

### *Mental health screening*

The Court has addressed the issue of mental health screening in its separate Ruling on

LaSalle and Richwood's Motion for Summary Judgment [Doc. No. 237].  There the Court found

that there was not any unconstitutional policy or practice applied to Moore. Moore was examined

by RCC's staff nurse shortly after his arrival. The staff nurse believed that Moore was

"intoxicated," not "crazy." [Doc. 224-7, William Mitchell Depo., pp. 96-99, 128-129, 150].

Nurse Mitchell's first recollection of Moore [on October 12, 2015] was when he saw Moore sitting on a bench in booking, directly across the hall from his medical office. [*Id*., pp. 21-22]. While Moore was seated on the bench, Mitchell was asked by a C/O to take a look at him. [*Id*., p. 22]. In response to the request, Mitchell examined Moore while he was seated on the bench. [*Id*., p. 24]. Mitchell would have checked to see whether Moore was a diabetic, if his heart was racing, if he had high blood pressure and the like. He would also have checked to see if Moore was agitated or non-compliant. [*Id*., pp. 24-25]. Mitchell recalls that Moore cussed him while being assessed. [*Id*., p. 27]. Mitchell thought Moore was intoxicated because of his behavior. He told the C/O's his findings. [*Id*., pp. 34-35]. Before Moore was taken to a lock down cell, Mitchell told the C/O's that he would check on Moore later on because he was not getting anywhere with Moore at that time. [*Id*., pp. 27-28]. This was done to give Moore some time to become cooperative.

Mitchell recalls trying to speak with Moore later on, but does not remember the number of times. [*Id*., p. 29]. Mitchell specifically recalls seeing Moore again at the Nurse's Station and offering to rinse Moore's eyes after he had been pepper sprayed. [*Id*., p. 30]. Moore refused Mitchell's assistance and cursed Mitchell again. [*Id*., p. 31].

The Court finds that, whatever practice may have existed, Moore was examined at the facility. Therefore, Plaintiffs cannot establish a claim for the denial of screening here.

Additionally, the Supreme Court has not recognized a constitutional right to mental health screening at intake. *Taylor v. Barkes*, 575 U.S. 822 (2015). The Fifth Circuit has rejected such a right.  *Burns v. Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) (rejecting the proposition that "the right of detainees to adequate medical care includes an absolute right to psychological screening."); *see also Evans v. City of Marlin, Tex*., 986 F.2d 104, 108 (5th Cir. 1993)(holding that "the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise

to the level of a constitutional violation.") . Plaintiffs do not cite any cases establishing a right to
medical screening.

Accordingly, for the above reasons, the City's motion is GRANTED, and Plaintiffs' claims
against the City based on delegation of policymaking authority to RCC are DISMISSED WITH
PREJUDICE.

### C.    Louisiana State Law Claims

Plaintiffs seek to hold the City vicariously liable under Louisiana state law for the actions
of MPD dispatchers, the alleged negligence of Officer Crowson, and the alleged negligence of
RCC under the non-delegable duty theory.

#### 1.    MPD Dispatchers

Plaintiffs assert that other city employees not named as Defendants acted below the
standard of care, and that the City is vicariously liable for their actions. They specifically refer to
the dispatcher, Shrader, and her supervisors, whom they contend established the practice
concerning officer safety bulletins.

Plaintiffs contend that the practice was only to provide this information to officers on duty
at the moment the bulletin is received by the MPD. Plaintiffs assert that, had this information been
provided, a reasonable officer would have taken Moore to a hospital, as is the customary practice
when an arrestee has a medical need. Plaintiffs state that Officer Crowson testified that when
arrestees have mental issues, they are taken to EA Conway (LSU Conway) and not to jail.
[Crowson Deposition, Doc. No. 224-3, pp. 42-44].

Plaintiffs contends that the City was negligent in its exchange of information about
potentially suicidal persons, and, when Crowson called in for a license check for Moore, he was
not informed of the contents of the officer safety alert. Therefore, according to Plaintiffs, the

dispatcher violated procedural standards.

The City responds that, although Plaintiffs claim that City dispatchers and supervisors were negligent in failing to relay Moore's medical information to Officer Crowson, they do not cite any state-law authority that requires a dispatcher or supervisor to provide certain information during arrest or during pre-shift briefing. Further, the officer safety alert did not provide medical information or request that medical information be disseminated; the alert was to protect the officers. Defendants assert that Plaintiffs have produced nothing to show that any dispatcher or supervisor breached any applicable standard of care.

The City contends further, that Plaintiffs' argument that one dispatcher violated "protocol" by not telling Crowson about the alert when he called in for a warrant check is unfounded, because there is no evidence that the dispatcher knew of the alert. In fact, the dispatcher, Walker, testified she had no knowledge of the alert. [Doc. 247-9, p. 13].

Finally, the City argues that it was not foreseeable to these dispatchers and supervisors that any harm to Moore would happen or that they caused or contributed to his death. Plaintiffs claim a conspiracy by RCC employees to intentionally harm Moore, and no City employee could or should have foreseen that.

Any duty/breach claim is subject to Louisiana's traditional duty/risk analysis. *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008). The duty-risk analysis requires a plaintiff to satisfy five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id.* (*citing Lemann v. Essen Lane Daiquiris, Inc*., 923 So.2d 627, 633 (La. 2006)).

The Court finds that Plaintiffs have failed to cite any case law or statutory authority establishing a duty to broadcast officer alerts to all officers (including those who are off duty, on vacation, out on sick leave, etc.). Assuming there is a duty to broadcast alerts to patrol officers, the City satisfied that duty when it sent the alert to all patrol officers on duty at the time it was put out; there is no obligation to continue to broadcast an alert *ad infinitum*. Additionally, the officer safety alert was for the benefit and protection of police officers, and Moore does not fall into the class of persons to whom the duty (broadcasting officer safety alerts) was designed to benefit. Finally, Plaintiffs cannot establish that any alleged failure by Officer Crowson to receive the alert was the cause-in-fact of Plaintiffs' harm because Officer Crowson testified that he would not have acted any differently had he heard it. [Crowson Deposition, Doc. No. 224, pp. 6-7].

Plaintiffs have not established negligence on the part of the City or its employees as to this claim.

### 2.      Officer Crowson

Plaintiffs bring a negligence claim under Louisiana state law that Officer Crowson was at fault under Louisiana Civil Code art. 2315 for (1) failing to provide medical care and (2) failing to inform the RCC booking officer of Moore's suicidal gesture.  Plaintiffs further claim that the acts of Officer Crowson create vicarious liability for the City, under Louisiana Civil Code art. 2320.

In a separate Ruling on Officer Crowson's Motion for Summary Judgment [Doc. No. 222], the Court dismissed all state law claims against him.  It follows that the City can have no vicarious liability for his actions.

33

### 3.      Vicarious liability for acts of RCC

Plaintiffs assert that the City had a non-delegable duty to Moore because it contracted with RCC to house its city misdemeanor prisoners. As such, the City had a non-delegable duty to not commit acts of cruel and unusual punishment and to protect against excessive use of force and to provide medical care. Plaintiffs argue that, if a non-delegable duty exists, then the entity that owes the non-delegable duty is vicariously liable for any injury arising from the use of force.

In support of their position, Plaintiffs cite *Miller v. Martin*, 838 So.2d 761 (La. 2003), where the Louisiana Supreme Court stated:

> For the following reasons, we find that when the Department is awarded legal custody of a child, the law imposes upon the Department a duty of care and protection of that child. Further, we find that the Department's custodial duty is non-delegable. Therefore, we conclude that when a child is abused by foster parents, the Department may be held vicariously liable for the abuse.

*Id.*, at 761

Plaintiffs argue that Moore was in the same class as the children in *Miller;* that Moore was dependent upon the City, RCC and Crowson for any medical or mental health care he required; and that the constitutional duty to provide medical care to prisoners is analogized to the statutory duty in favor of children cited in *Miller*.

Plaintiffs further assert that, under less onerous circumstances, Louisiana courts found multiple areas of the law where a non-delegable duty exists that creates vicarious liability, including *McLin v. Breaux*, 950 So.2d 711 (La. App., 1st Cir. 2006) (non-delegable duty on surgeon to remove all sponges used in surgery from a patient's body); *Jackson v. CSX Transp.*, Inc., 712 So.2d 514 (La. App. 1997) (non-delegable duty to provide safe place to work); *Nutt v. City of Gretna*, 788 So.2d 617 (La. App.5th Cir. 2001) (duty to install highway signage under La. R.S. 48:193 is non-delegable); and *Thibodeaux v. Comeaux*, 69 So.3d 674, 680 (La. App.3rd Cir.

2011) (State has non-delegable duty to maintain highway shoulders reasonably safe.).  Plaintiffs conclude that a governmental entity such as the City cannot simply walk away from a jail operation without still having obligations to the prisoners.

The City argues that the cases relied upon by Plaintiffs and the policy reasons applicable in those cases do not establish the existence of a non-delegable duty in this case. In *Miller*, *supra*, the Louisiana Supreme Court held that "when the Department [of Social Services] is awarded legal custody of a child, the law imposes upon the Department a duty of care and protection of that child," which is "non-delegable." *Martin*, 830 So.2d at 762. In *Martin*, two minors who were placed in the care of the Department of Social Services ("DSS") by a court were allegedly sexually and physically abused by their foster parents, with whom DSS contracted for the care of the children. *Id*. The statute authorizing such placements specifically stated that DSS was to "[a]dminister and supervise all public child welfare activities relating to children who are dependent, neglected, delinquent, or have physical, intellectual, or mental disabilities" and to "contract with private individuals to hold their homes open for and to care for children in need of temporary or long time foster care and provide such other services for children as may be authorized by law." *Id*. at 767; *see also*, LA. REV. STAT. 46:51(8). The same statute also ordered DSS to "administer" several other functions related to childcare and to "establish" rules 17 concerning childcare. LA. REV. STAT. 46:51(7)-(15). In finding that a non-delegable duty existed, the Louisiana Supreme Court relied on those statutory requirements and a prior case, *Vonner v. State Through Dep't of Pub. Welfare*, 273 So. 2d 252 (La. 1973), to find that that nothing in the law allowed DSS, by contract, "to delegate its custodial duties to foster parents." *Martin*, 830 So.2d at 767. Finally, the Louisiana Supreme Court focused on an additional policy reason for its

conclusion: once the state obtains "custody" of a "vulnerable" child, the "the state cannot delegate its custodial duty to another." *Id.*

The City contends the facts and circumstances of this case are much different from those in *Miller*. Here, the law expressly allows a delegation of authority and only restricts the delegation of a few powers. *See* LA. REV. STAT. 39:1800.4 and 1800.5. Nothing in the Louisiana Corrections Private Management Act ("LCPMA") requires the City to "administer," "supervise," or oversee the operations of a private prison. *See* LA. REV. STAT. 39:1800.4(G) ("authoriz[ing]," but not requiring, oversight by local government subdivision).

The City further contends that in numerous cases, courts have recognized that, under state law, it is the custodial entity, not the arresting entity, that bears responsibility for those in its custody. *See Griffin v. Foti*, 523 So. 2d 935 (La. App. 4 Cir. 1988), *writ denied*, 531 So. 2d 272 (La. 1988) (city not liable for conditions of parish prison where law imposed affirmative obligations on sheriff for the keeping of prisoners); *see also Picard v. Gusman*, No. CIV.A. 12-1966, 2012 WL 6504772, at *2–3 (E.D. La. Nov. 26, 2012), report and recommendation adopted, No. CIV.A. 12-1966, 2012 WL 6504528 (E.D. La. Dec. 13, 2012) (city not liable for actions in parish jail); *Wesley v. LaSalle Mgmt. Co., L.L.C.*, No. 1:16-CV-01479, 2020 WL 598507, at *4, n. 3 (W.D. La. Feb. 6, 2020) (no evidence that DOC retained responsibility for medical care over DOC inmate housed in private prison under LCPMA).

The City submits that adult arrestees are not in the same category as "vulnerable" children. The City further submits that the remaining cases cited by Plaintiffs bear no resemblance to the case here and are inapposite. The City states that, of course, a doctor who is performing surgery cannot walk away from the surgery before ensuring it is complete. An employer, akin to a custodian under caselaw (and like RCC in this case), cannot walk away from its obligation to

ensure that its employees have some protection, especially in the prison context. And the Department of Transportation and Development's non-delegable duty to ensure that highway works are performed satisfactorily are for the benefit of the general public, not someone in the DOTD's custody. The City argues that these cases have no bearing here and should be disregarded.

Finally, the City argues that the general rule is that a principal is not liable for the actions of an independent contractor. *Thompson v. Winn-Dixie Montgomery, Inc*., 2015-0477 (La. 10/14/15), 181 So. 3d 656, 665. While there is an exception to the general rule that allows imputed liability when a principal reserves the right to supervise the work, [*Id*.], the agreement between RCC and the City contains no such reservation, and state law does not impose a supervisory obligation.

The Court finds that Plaintiffs have failed to establish that the City had a non-delegable duty to Moore because it contracted with RCC to house its city misdemeanor prisoners. The principal case relied on by Plaintiffs, *Miller*, involved vastly different facts and circumstances than are present here.

Plaintiffs do not point to any established history of liability of anyone other than those who have actual custody of the inmate, and, as a matter of pure policy, it would make little sense for an arresting agency to remain liable for the acts of the custodial entity under existing state law.

The LCPMA expressly allows local government subdivisions to delegate the authority to house and care for inmates to private prison contractors. LA. REV. STAT. 39:1800.4. The delegation of authority is broad, and allows contracting prisons to provide for security, allow work opportunities, impose discipline, and "provide proper food, clothing, housing, and medical care." LA. REV. STAT. 39:1800.4(D). The Legislature allowed this delegation because it was important to have "adequate and modern prison facilities" that are "efficient and cost-effective." LA. REV. STAT.

39:1800.2. In fact, Louisiana law prohibits the delegation of only limited duties to private prisons: calculating inmate release and parole eligibility; calculating and awarding sentencing credits; approval of furlough and work release; approval of work that gives wage or sentencing credits; and granting, work release; approval of work that gives wage or sentencing credits; and granting, denying or revoking credits. La. R.S. 39:1800.5. If the Legislature wanted to bar local government subdivisions from delegating other duties, it could have said so. Plaintiffs' non-delegation claims fail under this statutory authority.

Accordingly, the City's motion is GRANTED, and Plaintiffs' claims under Louisiana state law are DISMISSED WITH PREJUDICE. [1]

## III.    CONCLUSION

For the reasons set forth above, the City's Motion for Summary Judgment [Doc. No. 247] is GRANTED.   Plaintiffs' claims against the City are DISMISSED WITH PREJUDICE in their entirety.

MONROE, LOUISIANA, this 30th day of October, 2020.

**TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE**

---

1 Given the Court's rulings, there is no need to reach the City's argument on limitation of liability under LA. REV. STAT. 13:5106.

38