**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

**ERIE MOORE, JR., ET AL.**                    **CIVIL ACTION NO. 3:16-CV-01007**

**VERSUS**                    **JUDGE TERRY A. DOUGHTY**

**LASALLE CORRECTIONS, INC.,**            **MAG. JUDGE KAREN L. HAYES**
**ET AL.**

**RULING**

Pending here is a Motion for Summary Judgment filed by Defendants Ouachita Parish Sheriff Jay Russell ("Sheriff Russell"), and his Deputy Sheriffs Donald Murphy ("Murphy") and Chase Wells ("Wells") (collectively, the "Sheriff Defendants"), seeking the dismissal of all of Plaintiffs' claims against them.  [Doc. No. 256].   Plaintiffs have filed an opposition [Doc. No. 304].  Defendants have filed a reply to the opposition [Doc. No. 326].

For the following reasons, the Court GRANTS the Motion for Summary Judgment [Doc. No. 256].

**I.      FACTS AND PROCEDURAL HISTORY**

This lawsuit follows the death of two detainees at the Richwood Correctional Center ("RCC"), a private detention center located in Ouachita Parish, Louisiana.  RCC is owned and operated by LaSalle Management Company, LLC ("LaSalle") and/or Richwood Correctional Center, LLC ("Richwood"), related private entities.

At the time of the incident, Moore was being detained at RCC after having been arrested by Monroe Police Department ("MPD") Lieutenant (then-Corporal) Tommy Crowson ("Officer Crowson") for disturbing the peace on October 12, 2015.  The next day, October 13, 2015, Moore was involved in an altercation with another detainee, Vernon White ("White").  White

died shortly after the altercation.  Moore was forcibly removed from the holding cell after the altercation occurred.  Soon thereafter, Moore became unconscious. He died on November 14, 2015, without ever having regained consciousness.

Plaintiffs Erie Moore, Jr., Tiffany Robinson, and Tamara Robinson (collectively "Plaintiffs") are the children and heirs of Moore. In their original Complaint, filed July 8, 2016, Plaintiffs alleged that the death of their father was caused by multiple Defendants [Doc. No. 1]. On December 5, 2017, an Amended Complaint was filed, which added new Defendants including the Sheriff Defendants, and continued the previous allegations. [Doc. No. 63]. On April 11, 2019, the Third Amended Complaint was filed, which added more Defendants to the suit, repeated many of the original claims, and made new claims. [Doc. No. 140].

With regard to the Sheriff Defendants, Plaintiffs assert claims under federal law and state law alleging that Murphy and Wells used excessive force against Moore and failed to provide him adequate medical care, that Murphy and Wells conspired with others to violate Moore's constitutional rights, and that Sheriff Russell is liable on the basis of *respondeat superior*.

The Sheriff Defendants seek the dismissal of all of Plaintiffs' claims against them.  They contend that the uncontested material facts lead to the conclusion that they did not violate any constitutional right of Moore, they are not liable under state law for their actions, and they did not engage in any civil conspiracy with respect to Moore. The motion is full briefed, and the Court is prepared to rule.

## I.    FACTS AND PROCEDURAL HISTORY

Moore at the time of the incident was being detained at RCC after having been arrested by Monroe Police Officer Tommy Crowson for disturbing the peace.

During the booking process at RCC, Moore was uncooperative and acting irrationally, so

he was eventually placed in Lockdown Cell 7 ("LD-7"). [Third Amended Complaint, Doc. No. 140, at pp. 10-11. ¶10; Deposition of RCC Lieutenant Gerald Hardwell, Doc. No. 256-4, at pp. 47-49; Deposition of RCC Corrections Officer ("C/O") Roy Brown, Doc. No. 256-5, at pp.76-77]. It was observed that Moore was acting irrationally or erratic during the time he spent in LD-7. [Doc. No. 140, at pp. 10-12, ¶¶ 10, 13; Doc. No. 256-4, at pp.50-51, 55, 60-61]. Another detainee, Vernon White ("White"), was placed in LD-7 with Moore. [Doc. No. 140, at p. 11, ¶11].

Moore's irrational behavior continued and, ultimately, he and White were involved in an altercation in which White was shoved into a corner just out of range of the camera monitoring LD-7, as shown in surveillance video. [Deposition of OPSO Deputy Nathaniel Lambright, Doc. No. 256-11, at p. 34; Deposition of OPSP Investigator Johnny Holyfield, Jr., Doc. No. 256-9 at p. 92; Deposition of RCC Corrections Officer ("C/O") Jeremy Runner, Doc. No. 256-7 at p. 78]. This occurs at approximately 5:20 p.m. [Unusual Occurrence Report prepared by RCC Asst. Warden Aultman, Doc. No. 256-12].

A few minutes later, Runner looked at the video screen and observed only Moore in LD-7.  Moore was sitting on an empty bed rack from which he had knocked off the mattress.  Two dinner trays had been delivered to the cell, but Moore was eating from both trays.  Runner went directly to the cell to see what was going on.  When he arrived at the cell, Moore was standing directly in front of the small window on the cell door, blocking Runner's view into the cell.  Moore stated he wanted to see the lieutenant.  Runner asked why, but Moore refused to say.  Runner said he would go find the lieutenant and he turned to leave. As Runner was walking away, he felt that something wasn't right, so he went back to the cell door and looked in the window.  Moore was no longer standing in front of the window but had returned to his rack.

3

Runner then saw White on the floor underneath the camera, shaking as if he were having a

seizure.  [Runner Deposition, Doc. No. 256-7, pp. 78-82].

      Runner then summoned help.  Just after 6 p.m., White was extracted from the cell after

Moore was subdued by the application of pepper spray and physical force applied by RCC

officer(s) that forced Moore to the floor. [Third Amended Complaint, Doc. No. 140, at pp. 13-14,

¶¶19-20; Hardwell Deposition, Doc. No. 256-4, at pp.63-75; Runner Deposition, Doc. No. 256-

7,at pp. 78-93; Holyfield Deposition, Doc. No. 256-9, at pp. 15-16; Deposition excerpts of RCC

Warden Ray Hanson, Doc. No. 256-13, at pp. 94-95, 97-98, 99-100]. White's injuries appeared

to be quite serious and possibly life-threatening. [Runner Deposition, Doc. No. 256-7, at pp.138-

143]. White was taken to a hospital by ambulance for medical treatment at 6:30 or so, but he

later died from his injuries. [Third Amended Complaint, Doc. No. 140, at p.14, ¶21; Deposition

excerpts of RCC C/O Reginald Curley, Doc. No. 256-14, at pp. 45-49]

      After White was taken to the hospital, Moore was extracted from LD-7. [Third Amended

Complaint, Doc. No. 140, at p. 14, ¶ 21]. In order to subdue Moore, RCC officers again applied

pepper spray and used physical force. [*Id*., at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4,

at pp. 63-68; Runner Deposition, Doc. No. 256-7 at pp. 83-84, 97-100]. Moore was carried out of

the cell and forced to the floor by RCC officers in the hallway outside of LD-7. [Third Amended

Complaint, Doc. No. 140, at p. 14, ¶ 21; Hardwell Deposition, Doc. No. 256-4 at pp.69-78;

Hansen Deposition, Doc. No. 256-13, at pp. 102-103]. Moore's head allegedly hit the floor as a

result of this maneuver. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 21]. Handcuffs

and leg restraints were applied to Moore and he was moved to the "Four-Way," an interlock area

between hallways of RCC which is not monitored by video cameras, where he was placed on the

floor laying on his back. [Hardwell Deposition, Doc. No. 256-4, at pp. 78-80; Runner

Deposition, Doc. No. 256-7, at pp. 99,104-106]. As Moore was being carried from the hall to the Four-Way, however, one of the RCC officers stumbled, and Moore's head again hit the floor. [Third Amended Complaint, Doc. No. 140, at p. 14, ¶ 22; Hardwell Deposition, Doc. No. 256-4, at pp. 81-83; Holyfield Deposition, Doc. No. 256-9, at pp. 13-15].

     RCC contacted the Ouachita Parish Sheriff's Office to report the incident as a battery during a fight among inmates. [Deposition of OPSO Lieutenant Robert Tolbird, Doc. No. 256-8, at p. 14]. OPSO investigator Nathaniel Lambright is logged as arriving at RCC at 7:32 p.m. [Lambright Deposition, Doc. No. 256-11, at pp. 14, 43; Tolbird Deposition, Doc. No. 256- 8, at p. 21]. Lambright's supervisor, OPSO Lieutenant Tolbird. arrived at RCC shortly after Lambright. [Tolbird Deposition, Doc. No. 256-8, at pp. 19-21; Holyfield Deposition, Doc. No. 256-9, at p. 54; Lambright Deposition, Doc. No. 256-11, at pp. 18, 43]. Upon arrival at RCC, Lambright learned that White had succumbed to the injuries he suffered in the altercation with Moore. [Lambright Deposition, Doc. No. 256-11, at p.21]. RCC Warden Aultman met Lambright and Tolbird and showed them the video recordings from the security camera in LD-7, which showed the altercation between Moore and White. [Tolbird Deposition, Doc. No. 256-8, at pp. 14-15, 45-47; Lambright Deposition, Doc. No. 256-11, at pp. 34-36, 40, 44-45].

     When Investigator Lambright and Lt. Tolbird saw Moore after viewing the video, he was on his back in the Four-Way area of RCC, appeared to be sleeping, and was snoring loudly. [Lambright Deposition, Doc. No. 256-11, at pp. 15-16, 47; Tolbird Deposition, Doc. No. 256-8, at p. 15-17, 38-39; Aultman Deposition, Doc. No. 256-15, at p. 61]. Moore did not appear to be in distress. [Holyfield Deposition, Doc. No. 256-9, at pp. 15-18; Tolbird Deposition, Doc. No. 256-8, at p. 16; Aultman Deposition, Doc. No. 256-15, at p. 62]. Neither Lambright nor Tolbird observed any apparent injuries to Moore at the time and RCC staff did not indicate to the OPSO

Investigators that Moore required any medical attention at that time. [Tolbird Deposition, Doc. No. 256-8, at pp.24-26, 41, 51, 53-55; Lambright Deposition, Doc. No. 256-11 at pp. 17-18, 20, 22-23, 31].

Lambright and Tolbird were shown to LD-7. The area had been cleaned prior to their arrival; therefore, the cell showed no signs of the altercation between Moore and White when Lambright and Tolbird saw it. [Tolbird Deposition, Doc. No. 256-8, at pp.17-19; Holyfield Deposition, Doc. No. 256-9, at pp. 17-18; Lambright Deposition, Doc. No. 256-11, at pp. 20-21, 41, 46-47]. The OPSO Investigators nevertheless secured the scene as is was, and then continued the investigation into the battery of White, which by then had morphed into an investigation into White's death. *Id*. When OPSO Investigators Holyfield, Boney, and Holloway arrived at RCC, they took over the investigation because it was then considered a homicide investigation. [Tolbird Deposition, Doc. No. 256-8, at p. 48; Lambright Deposition, Doc. No. 256-11, at p. 42]. The investigation continued from that point and Lambright assisted as instructed. *Id*. Holyfield was designated as the lead investigator on the case, and the others were to assist as needed. [Tolbird Deposition, Doc. No. 256-8, at. p. 48].

After viewing the video capture, interviewing RCC staff, and inspecting LD-7, Holyfield went to the Four-Way to speak with Moore. [Holyfield Deposition, Doc. No. 256-9 at pp. 20, 26-29]. Holyfield remembers Moore apparently sleeping while lying on his side and snoring loudly. [*Id*., at p. 30]. RCC staff indicated that Moore had been doing that for some time and that they had not tried to wake him. [*Id*]. Holyfield decided that, given Moore's previous combative nature towards RCC staff, it might be better to have Moore transported to OCC and then interview him there. [*Id*] Lt. Tolbird called OCC and asked them to send transport officers over to take Moore from RCC to OCC. [Tolbird Deposition, Doc. No. 256-8, at pp. 31, 50]. This call took place at

6

approximately 8:45 p.m. [Holyfield Deposition, Doc. No. 256-9, at pp.75-76]. Holyfield did not wait for the transport officers to arrive; instead, he went back to the purported crime scene to investigate further. [*Id*.]

OPSO Deputies Murphy and Wells, then on duty at OCC, were told to drive to RCC, collect Moore, and transport him from RCC to OCC. [Wells Deposition, Doc. No. 256-16, at p.10; Murphy Deposition, Doc. No. 256-17, at pp. 9-10]. Deputy Murphy testified at deposition that the call for him to head to RCC to pick up Moore and bring him to OCC was made at approximately 8:50 p.m. [*Id*.] Logs show the transport deputies departed OCC at 8:55 p.m. and arrived at RCC at 8:57 p.m. [Wells Deposition, Doc. No. 256-16, at p. 11; Murphy Deposition, Doc. No. 256-17, at p. 11]. RCC is adjacent to OCC, and it only takes a few minutes to drive between the two facilities. [Lambright Deposition, Doc. No. 256-11 at p. 33].

After Deputies Wells and Murphy arrived at RCC in the transport unit, they entered RCC and were directed to Holyfield, who told them that it might be best to take Moore out through the booking area instead of the administration area, which meant the transport unit would have to go to a different entrance. [Holyfield Deposition, Doc. No. 256-9, at p. 32]. Deputy Wells went to relocate the transport unit. [Wells Deposition, Doc. No. 256-16, at p. 10-11, 18]. Holyfield walked back to the Four-Way, and Moore still appeared to be sleeping and snoring.  Murphy and others witnessed the same thing in the Four-Way. [Mitchell Deposition, Doc. No. 256-6, at pp.52-56; Holyfield Deposition, Doc. No. 256-9, at pp.32-33; Wells Deposition, Doc. No. 256-16, at p. 19; Murphy Deposition, Doc. No. 256-17, at pp. 15-16]. Officers tried to wake Moore up.  Some say he *would not* wake up [Hardwell Deposition, Doc. No. 256-4, at 91-93, 129-130; C.O. Williams Deposition, Doc. No. 256-18, at pp.80-81, 83; Mitchell Deposition, Doc. No. 256-6, at pp.146-148].  Others testified they recalled Moore did not *appear* to wake up [Holyfield

Deposition, Doc. No. 256-9, at p. 34; Wells Deposition, Doc. No. 156-16, at pp. 15-16].

Holyfield did not observe any signs of injury to Moore at that time. [Holyfield Deposition, Doc. No. 256-9, at p. 36]. Neither did Wells or Murphy. [Wells Deposition, Doc. No. 156-16, at pp. 14, 19; Murphy Deposition, Doc. No. 256-17, at pp.14-15, 19]. RCC Nurse Mitchell saw abrasions and a "knot" on Moore's head. [Mitchell Deposition, Doc. No. 256-6, at pp. 46-47, 63]. C.O. Runner also recalled that Moore had a bump on his forehead during the time he was in LD-7 and that it might have been a result of Moore's banging his head on the door to the cell prior to the altercation with White. [Runner Deposition, Doc. No. 256-7, at pp. 109-110, 115, 120-122]. Captain Hardwell noticed the bump or "knot" as well when Moore was in LD-7. [Hardwell Deposition, Doc. No. 256-4, at pp. 56, 61-62; 141-144].

When it came time to move Moore, officers picked Moore up by the arms and legs to carry him to the waiting transport unit. [Holyfield Deposition, Doc. No. 256-9, at pp. 34-35; Murphy Deposition, Doc. No. 256-17, at pp. 17-18]. Moore was carried to the unit face down because he was a large, heavy man and it was an easier way to carry him. [Holyfield Deposition, Doc. No. 256-9, at p. 37; Wells Deposition, Doc. No. 156-16, at p. 12; Murphy Deposition, Doc. No. 256-17, at pp. 19-20]. Deputy Murphy remembered that he had Moore by the legs and RCC officers had Moore by the arms. [Murphy Deposition, Doc. No. 256-17, at p. 17].

Deputy Murphy did not recall dropping Moore during this trek. [Murphy Deposition, Doc. No. 256-17, at p. 17]. Nor did Williams. [Williams Deposition, Doc. No. 256-18, at pp.85-86]. Investigator Holyfield did say that he had heard from someone (he could not remember who) that Moore was dropped on the way to the unit and that his nose or forehead may have hit the ground, but he had no personal knowledge of that happening and did not witness it happening. [Holyfield Deposition, Doc. No. 256-9, at p. 37, 41, 44]. Other officers at the scene,

8

however, testified at deposition that they did not see Moore get dropped as he was carried from the four-way to the OCC transport unit. [Hansen Deposition, Doc. No. 256-14, at p. 224; Aultman Deposition, Doc. No. 256-15, at pp.55-56; Murphy Deposition, Doc. No. 256-17, at p. 33; Williams Deposition, Doc. No. 256-18, at pp.85-86; Foster Deposition, Doc. No. 256-19, at pp.25-30]. Moore did not at this time appear to be seriously injured or actively bleeding. [Foster Deposition, Doc. No. 256-19, at p. 27; Hardwell Deposition, Doc. No. 256-4, at p. 144].

Moore was placed in the rear seat area of the OPSO transport unit, with officers assisting by pulling Moore into the unit from the opposite side. [Holyfield Deposition, Doc. No. 256-9, at p. 39; Wells Deposition, Doc. No. 256-16, at p. 22; Murphy Deposition, Doc. No. 256-17, at pp.18-19; Hardwell Deposition, Doc. No. 256-4, at pp.96-99]. Because he did not see Moore wake up when carried to the OPSO transport unit, Holyfield told Wells and Murphy to make sure that Moore received a medical evaluation when they got to OCC. [Holyfield Deposition, Doc. No. 256-9, at p. 103-104; Wells Deposition, Doc. No. 256-16, at p. 19]. Murphy and Wells were not at RCC very long, just long enough to retrieve Moore, transfer him to the transport unit, and obtain further orders with respect to Moore. [*Id*., at pp.17-19].

The unit transporting Moore arrived back at OCC at 9:27 p.m. [Wells Deposition, Doc. No. 256-16, at p. 17; Murphy Deposition, Doc. No. 256-17, at p. 21-22]. Once they had arrived at OCC, Wells and Murphy assisted in getting Moore out of the transport unit and onto a flat cart used to ease the transfer because of Moore's passive resistance and his size. [Wells Deposition, Doc. No. 256-16, at pp. 21, 29; Murphy Deposition, Doc. No. 256-17, at p. 22; OPSO Deputy Ethan Bonner Deposition, Doc. No. 256-20, at pp. 26-27; OPSO Deputy Tommie Ervin, Jr., Deposition, Doc. No. 256-21, at pp.20-21; OCC Medical Officer Webb Crecink ("Crecink") Deposition, Doc. No. 256-22, at p. 27-28]. When OPSO personnel removed him from the unit

and placed him on the cart, deputies noticed there was some bleeding from Moore's head and mouth. [Wells Deposition, Doc. No. 256-16, at pp. 20, 23-27; Murphy Deposition, Doc. No. 256-17, at pp. 22-24, 26-27]. Before that, deputies "had no clue [Moore]was injured." [Wells Deposition, Doc. No. 256-16, at p. 24; Murphy Deposition, Doc. No. 256-17, at p. 23-24]. RCC staff had not given any indication that Moore had suffered any kind of injury. [Wells Deposition, Doc. No. 256-16, at p. 26; Murphy Deposition, Doc. No. 256-17, at p. 24].

OCC Medical Officer Crecink examined Moore to assess his condition before OCC could accept custody. [Wells Deposition, Doc. No. 256-16, at pp. 22, 26-27; Crecink Deposition, Doc. No. 256-22, at pp. 12-15, 21-26, 32-33]. Photographs of Moore were taken by OCC staff. [Murphy Deposition, Doc. No. 256-17, at p.23; Crecink Deposition, Doc. No. 256-22, at p. 16-21]. Following the examination, Crecink informed the shift supervisor on scene that Moore showed signs of having a head injury and needed to be taken to the hospital. [*Id.*, at p. 22].

Murphy and Wells left with Moore from OCC and headed to Conway at 9:33 p.m. [Wells Deposition, Doc. No. 256-16, at pp. 27-28; Murphy Deposition, Doc. No. 256-17, at p. 27-28]. This hospital is not far from OCC. [Wells Deposition, Doc. No. 256-16, at p. 36]. It was thought that the two-minute OPSO transport would be quicker than waiting for an ambulance. [Murphy Deposition, Doc. No. 256-17, at p. 28]. OPSO personnel called ahead to advise that Moore was being brought there for treatment, and, assistance would be needed in moving him from the unit into the treatment area. [*Id.*, at p. 28; Crecink Deposition, Doc. No. 256-22, at p.29]. Hospital personnel thus were waiting outside when the deputies pulled up to the ER around 9:35 p.m. [Murphy Deposition, Doc. No. 256-17, at p.27-28]. Moore was transferred to a gurney without incident. [*Id.*, at pp. 28-29]. Deputies Murphy and Wells remained at the hospital with Moore while he was evaluated by hospital staff. [*Id.*, at p. 30].

10

In the meantime, Investigator Lambright was instructed to proceed to OCC to try to speak to Moore but was diverted to E.A. Conway Hospital when it was learned that Moore had been taken there for medical evaluation at the insistence of OPSO medical personnel upon Moore's arrival at OCC. [Lambright Deposition, Doc. No. 256-11, at pp. 22-23,25-26]. Deputy Lambright was told that OCC personnel had determined that Moore may have suffered a severe head injury and that Moore was being transported to E.A. Conway for evaluation. [*Id*., at p. 27].

Medical personnel treating Moore at Conway performed a CT scan and other tests and determined that Moore had suffered a fractured skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31]. Medical personnel also indicated that Moore had suffered a midline shift in his brain due to bleeding in his skull. [Wells Deposition, Doc. No. 256-16, at pp.32-33; Murphy Deposition, Doc. No. 256-17, at p.31-32]   At 12:29 a.m. on the 14th, Moore was transported by air evacuation helicopter to LSU Health Center in Shreveport for additional care that could not be provided at Conway. [Wells Deposition, Doc. No. 256-16, at p.30; Murphy Deposition, Doc. No. 256-17, at pp. 34-35; Tolbird Deposition, Doc. No. 256-8, at pp. 22-23].

Subsequent to Moore's transfer to Shreveport and the examinations conducted there, the medical care providers indicated that Moore was likely brain dead and a decision would have to be made as to whether to discontinue life support. [Holyfield Deposition, Doc. No. 256-9, at p. 60]. Investigators believed that this was a decision for the Moore family, and not the Sheriff's Office, to make. The investigation materials were then turned over to the DA's Office, which declined prosecution of Moore in connection with the death of White, so as to allow the Moore family to make that decision regarding life support. [*Id*.]. On or about November 14, Erie Moore, Sr. died. [Third Amended Complaint, Doc. No. 140, at p. 9, ¶ 6; p. 16, ¶ 26].

11

Dr. Teri O'Neal, Ouachita Parish Coroner at the time, testified at her deposition that Moore died of complications from a subdural hematoma caused by blunt force trauma. [Dr. Teri O'Neal Deposition, Doc. No. 256-26, p. 2]. Dr. O'Neal indicated that it was likely that the blow that caused the fatal injury was inflicted to the right side of Moore's head. [*Id.*, pp. 5-6]. She also testified that none of the external injuries seen on Moore's head appeared to be related to the fatal "severe underlying head injury." [*Id.*, pp. 5-8]. The Coroner testified that "a pretty significant amount of force," is needed to cause a subdural hematoma. [Id., p. 18].

Plaintiffs sued numerous members of the RCC staff, the owners of RCC, and the City of Monroe, among others that have already been dismissed prior to this point in the litigation. They also sued the Sheriff Defendants, alleging various claims under federal and state law.

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if

the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

"[This court] resolve[s] factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."... "[This court] will not assume 'in the absence of any proof ... that the nonmoving party could or would prove the necessary facts,' and will grant summary judgment 'in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357-358 (5th Cir. 2017) (citations omitted).

### B.    The Federal Claims

#### 1.    Section 1983 Claims

Plaintiffs bring federal claims under 42 U.S.C. § 1983, seeking damages for the alleged violation of Moore's constitutional rights. Section 1983 provides for the recovery of damages when a person is deprived on his or her constitutional rights by a person acting under color of state law. See *Davidson v. Cannon*, 474 U.S. 344 (1986); and *Daniels v. Williams*, 474 U.S. 327 (1986).

Allegations of mere negligence will not suffice to make a claim under § 1983. *Id.*

Suits under § 1983 may be directed against government officials in either their "official" or "personal" capacities. See *Hafer v. Melo*, 502 U.S. 21 (1991); and *Kentucky v. Graham*, 473 U.S. 159 (1985).

Plaintiffs conceded in their opposition that all official capacity claims against the Sheriff Defendants should be dismissed. [Doc. No. 304, p. 13]. Plaintiffs further state they have no evidence of an unconstitutional policy or practice of Sheriff Russell which was a moving force of any constitutional violation. [Id.].   Therefore, all official capacity claims against the Sheriff Defendants are DISMISSED WITH PREJUDICE.

"Personal capacity" suits are viable against state actors whose acts result in a constitutional deprivation. "Personal capacity suits... seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, '[o]n the merits to establish personal liability in a § 1983 action, it is enough to show that the official acting under color of state law caused the deprivation of a federal right.'" *Hafer*, 502 U.S. at 25; citing *Kentucky v. Graham*, 473 U.S. at 166. To be held liable under § 1983 in a personal capacity, therefore, a government official "must either be personally involved in the acts causing the deprivation of a person's constitutional rights or there must be a causal connection between an act of the [official] and the constitutional violation sought to be redressed. *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983).

### a.    Excessive Force

Plaintiffs contend that the Sheriff Defendants used excessive force on Moore.  Excessive force claims brought by someone, like Plaintiffs on behalf of Moore, who has not been convicted of criminal activity, are analyzed under the Fourth Amendment, which requires the plaintiff to only prove injury suffered as a result of a use of force that was objectively unreasonable. *See Graham*

14

*v. Connor,* 490 U.S. 386 (1989); *see also Kingsley v. Hendrickson,* ___ U.S. ___, 135 S.Ct.2466, 2472-73, 192 L.Ed.2d 416 (2015); and *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996). This standard is an objective one, which should not be applied mechanically, but rather one which turns on the "facts and circumstances of each particular case ... from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. (internal citations omitted).

Plaintiffs rely on circumstantial evidence to show that Wells and Murphy used excessive force. Plaintiffs in a Section 1983 case are permitted to show causation through circumstantial evidence. General tort principles are applied. In the case of *Naquin v. Marquette Casualty Company* (1963) 244 La. 569, 153 So.2d 395 at 397, the Supreme Court of Louisiana said:

> Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation.

*Id*.  Plaintiffs assert that Moore had no visible injuries other than a possible knot on his forehead when placed into the custody of Wells and Murphy at the RCC, but that when Moore arrived at the OCC a few minutes later, he had blood on his face and exhibited facial and head injuries. Plaintiffs also refer to photographs taken days later that they claim show additional injuries. Plaintiffs contend that this evidence creates a reasonable inference that one or both of the transport deputies used excessive force against Moore.

The Sheriff Defendants respond that  Plaintiffs' conjecture is not a reasonable inference from the full set of known facts and circumstances developed in the extensive discovery which shows that Moore, over many hours, was involved in a series of physical encounters with his

cellmate(s) and RCC staff; that he was knocked to the floor face-first, dropped face-down, tackled to the floor face-first, and placed in restraints while lying face-down on the floor; all before any Sheriff's deputy was called to or arrived at RCC to investigate the apparent homicide of Moore's cellmate, White.

They further assert that it is not rational or reasonable to infer from the established facts that the relatively minor abrasion and bleeding noticed at OCC were caused by two transport deputies who were not aware of any of this history when they transported Moore to OCC for medical evaluation preliminary to the booking process, and then on to the hospital when the seriousness of Moore's internal head injury was suspected by OCC medical staff.   The Sheriff Defendants argue that summary judgment in their favor should, therefore, be granted because Plaintiffs' theory is factually implausible and legally deficient.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. An inference as to a material fact "may be drawn in favor of the nonmoving party only if it is 'rational' or 'reasonable' and otherwise permissible under the governing substantive law. ..." *T.W. Elec. Serv., Inc. v. Pac. Elec. Cont'rs Ass'n*, 809 F.2d 626, 630-32 (9th Cir. 1987) (citations omitted). The *T.W. Electric* decision explained that "there must be some limit on the extent of the inferences that maybe drawn in the nonmoving party's favor from whatever 'specific facts' it sets forth; if not, Rule 56(e)'s requirement of 'specific facts' would be entirely gutted." *Id*.

> The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, maybe drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the factfinder to resolve at trial.

16

*Id*

Thus, when the nonmoving party seeks to have the court recognize an inference to defeat summary judgment, the inference must be reasonably supported by the evidence. *See Lozada v. Hobby Lobby Stores, Inc*., 702 F. App'x 904, 917 (11th Cir. 2017). If the facts and circumstances could not "reasonably give rise to the [sought after] inference," the court need not give the suggested inference any weight. *Id*.; *see also Lee v. Bevington*, 647 F.App'x 275, 281–82, (4th Cir. 2016) (if inferences sought by the nonmoving party are "unsupported by the record and based entirely on speculation," the inferences cannot defeat otherwise uncontested contrary facts on summary judgment); *citing Local Union 7107 v. Clinchfield Coal Co*., 124 F.3d 639, 640 (4th Cir.1997) ("Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment.").

The Court finds that Plaintiffs have failed to create a genuine issue of material fact that the Sheriff Defendants used excessive force on Moore. It is uncontradicted that the deputies testified and stated under oath that there was no incident during the transport and that no physical force except that necessary to carry Moore to and from the unit and to place him in and remove him from the unit was used. Likewise, there are no facts or circumstances to suggest that Wells or Murphy had any grudge to satisfy, any motivation to injure Moore, or any propensity to use excessive force that might underpin the Plaintiffs' conjecture.

Lt. Holyfield testified that the reason he ordered that Moore be moved from RCC to OCC was in part so that he could be checked out by medical staff prior to booking. [Doc. No. 291-8 at page 55-58]. It is uncontested that Wells and Murphy were the ones who brought Moore to the hospital for medical evaluation and treatment within about thirty minutes after arrival at RCC and less than five minutes after Crecink's evaluation suggested a serious injury to Moore.

17

The uncontested facts presented with the Sheriff Defendants' Motion show that even if it is assumed that Moore suffered some injury during the transport, there is no proof nor any inference that could reasonably be drawn to establish that either Wells or Murphy used any force against Moore other than that necessary to effect the transport.

Therefore, Plaintiffs' argument has no merit.

### b.    Manner of transportation

Plaintiffs assert a cause of action under Section 1983 for failure to provide medical care due to the manner of transportation utilized by the Sheriff Defendants. They contend Murphy and Wells should have recognized that Moore was unconscious lying in the Four-Way and therefore in need of immediate medical attention.  They also object to the way Moore was carried by his arms and legs to the transport vehicle.  Plaintiffs contend that Moore should have been transported in an ambulance or medical unit and not in the back seat of a transport unit handcuffed with no seat belt. They further object to the way Moore was carried into the OCC foyer and then back to the transport unit.

In support of their assertions, Plaintiffs offer the opinion of their Corrections Expert Kenny Sanders, who opines that the manner of carrying Moore to the patrol car, manner of transportation to OCC and manner of carrying Moore at OCC, and then transit to LSU Conway was grossly unreasonable. [Doc. No. 295-2].

The Sheriff Defendants move for summary judgment on Plaintiffs' Section 1983 claim of failure to provide medical care, and have pled the defense of qualified immunity.  The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)); *Bush v. Strain*, 513 F.3d 492, 500 (5th Cir. 2008); *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 488 (5th Cir. 2001). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and, protects all but the plainly incompetent or those who knowingly violate the law." *Thompson v. Mercer,* 762 F.3d 433, 436–37 (5th Cir. 2014).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). Once an official pleads the defense of qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id*.; *see also Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014). Thus, "[t]he plaintiff bears the burden of negating qualified immunity ... but all inferences are drawn in his favor." *Brown*, 623 F.3d at 253. A plaintiff cannot meet this burden by resting on the pleadings; instead, a plaintiff must demonstrate genuine issues of material fact regarding the reasonableness of a defendant's conduct. *Bazan*, 246 F.3d at 490.

There are two well-established steps in the qualified immunity analysis: a court decides "(1) whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right; and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). The court applies "current law to the first step and the law at the time of the incident to the second step." *Bush*, 513 F.3d at 500 (internal quotations and citation omitted). Nonetheless, a government official's acts are not objectively unreasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights. *Carroll*, 800 F.3d at 169. Finally, a district court

has discretion to address the prongs of qualified immunity in any order. *Pearson*, 555 U.S. at 236;

*Brown*, 623 F.3d at 253 ("A court may rely on either prong of the defense in its analysis.").

"[P]retrial detainees have a constitutional right, under the Due Process Clause of the

Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference

on the part of the confining officials." *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001)

(*citing Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Deliberate indifference means that: "(1) the

official was aware of facts from which an inference of substantial risk of serious harm could be

drawn; (2) the official actually drew that inference; and (3) the official's response indicates the

official subjectively intended that harm to occur." *Id*. at 458–59. "[A]ctual knowledge is critical to

the inquiry. A state actor's failure to alleviate 'a significant risk that he should have perceived but

did not' ... does not rise to the level of deliberate indifference." *McClendon v. City of Columbia,*

305 F.3d 314, 326 n.8 (5th Cir. 2002) (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Thus, deliberate indifference "cannot be inferred merely from a negligent or even a grossly

negligent response to a substantial risk of serious harm," *Upshur Cty.*, 245 F.3d at 459; it is a

"stringent standard of fault." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410

(1997). Moreover, "[a] serious medical need is one for which treatment has been recommended or

for which the need is so apparent that even laymen would recognize that care is required." *Gobert

v. Caldwell,* 463 F.3d 339, 345 n. 12 (5th Cir. 2006).

Because the Court may address the prongs of qualified immunity in any order, *Pearson*,

555 U.S. at 236, the Court starts with the second prong—that is, whether the Sheriff Defendants

acted objectively unreasonably in the context of clearly established law by their alleged failure to

provide medical care to Moore or in the manner of transportation they used. *See Carroll*, 800 F.3d

at 169; *see also Johnson v. Osborne*, 41 F. 3d 662, 1994 WL 684640, at *2 (5th Cir. Nov. 16,

1994) (stating that the second prong of qualified immunity in the context of a claim for failure to provide medical care "is whether the denial of medical care was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees" (internal quotations and citation omitted)).

The Court finds that the Sheriff Defendants acted objectively reasonably, and are therefore entitled to qualified immunity on the Section 1983 denial of medical care claim.  Even assessing the summary judgment evidence in the light most favorable to Plaintiffs and drawing all reasonable inference in their favor, Plaintiffs have not demonstrated a genuine fact issue that Murphy or Wells were deliberately indifferent to Moore's medical needs. At most, Plaintiffs' summary judgment evidence suggests that they perhaps should have known or been aware that Moore needed immediate medical treatment or that they should have known or been aware that the manner or method of transportation they choose was grossly negligent.  But this is not enough to meet the "stringent" standard of deliberate indifference, for such a showing requires facts that support that the defendants in question had both *actual knowledge* about substantial risks of serious harm to the individual, and the *subjective intent* to cause that harm to occur. See *McClendon*, 305 F.3d at 326 n.8; *Upshur Cty.*, 245 F.3d at 458–59. Plaintiffs have not proffered sufficient facts or evidence that the deputies had actual knowledge that Moore was in need of medical care, nor that they subjectively intended Moore to suffer grave injury or die.

To the contrary, the evidence shows that once OCC staff realized that there was a serious medical issue with Moore, Murphy and Wells transported Moore to Conway immediately.  Far from deliberate indifference, their conduct shows that they had no subjective intent for harm to occur to Moore, and that they reacted and responded promptly. Therefore, because even a state actor's "failure to alleviate 'a significant risk that he should have perceived but did not'" is not

sufficient to rise to the level of deliberate indifference, *McClendon*, 305 F.3d at 326 n.8 (quoting *Farmer*, 511 U.S. at 837), Plaintiffs have not met their burden to raise a genuine dispute of material fact as to the objective reasonableness of the deputies' conduct sufficient to overcome qualified immunity.

Based on these decisions and the uncontested material facts, Deputies Wells and Murphy are thus entitled to qualified immunity and a summary judgment of dismissal of the Section 1983 claims brought against them.

### c.     Sheriff Russell

Even assuming arguendo that Murphy and Wells are not entitled to summary judgment on Plaintiffs' Section 1983 claims, Plaintiffs have failed to establish a genuine issue of fact as to Sheriff Russell.   The Third Amended Complaint contains no allegations of fact that would implicate Sheriff Russell in any constitutional claim for any alleged use of force against Moore. He is not alleged to have had a physical encounter with Moore. It is not alleged that the Sheriff was physically present at any of the locations referenced in the Third Amended Complaint during the time frame at issue. By Affidavit, Sheriff Russell confirms that he "had no physical or other contact with Mr. Erie Moore, Sr. on the evening of November 13, 2015, or at any other time, and was never to his knowledge in the physical presence of Mr. Moore at any time." [Affidavit of Ouachita Parish Sheriff Jay Russell, Doc. No. 256-23].

Under § 1983, there can be no vicarious liability imposed on a Sheriff simply as the employer of his deputies. *See Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988). Since it is uncontested that Sheriff Russell was not in the presence of Moore at any time or at any location involved in the underlying incidents and has no recollection of encountering Moore, he cannot be found to have personally been involved in the incidents giving rise to this lawsuit.

22

Sheriff Russell's Affidavit also confirms that he was not aware of Moore's situation until after Moore had been brought to the hospital for medical evaluation and treatment, and, he had no conversations about alleged use of force against Moore until sometime after that. [*Id.*]. Plaintiffs have produced no summary judgment evidence to support a conclusion that Sheriff Russell knew about any conduct attributed to his deputies and "facilitated or approved, condoned or turned a blind eye for fear of what he might see." *See Sanders v. English*, 950 F.2d 1152, 1160 (5th Cir. 1992). Consequently, there can be no personal capacity claim made out against him on supervisory liability grounds. The uncontested material facts demonstrate that Sheriff Russell was not personally involved in any of the alleged events of which Plaintiffs complain. The §1983 Personal Capacity claims against Sheriff Russell, therefore, must be dismissed as a matter of law.

### d.    Conspiracy

Plaintiffs argue that, "this case can not be understood any other way but that Defendants . . . were involved in a conspiracy or team effort or aided and abetted one another in an agreement to injure" Moore.  [Doc. No. 304, pp. 17-18].  Plaintiffs assert that since Moore was allegedly injured while in the custody of Wells and Murphy, they must have acquiesced in all previous uses of force and they also acted to inflict additional injuries.

To state a claim for conspiracy to deprive an individual of a constitutional right in violation of § 1983, Plaintiff must allege that defendants (1) "acted jointly in concert" and (2) performed an overt act (3) "in furtherance of the conspiracy" that (4) resulted in the deprivation of a constitutional right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir.1996) (*citing Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)).

Federal Rule56(e) has been interpreted to dictate "that a party cannot rest on the allegations [of a conspiracy] contained in his complaint in opposition to a properly supported summary

judgment motion made against him." *First Nat. Bank of Ariz. v. Cities Serv. Co*., 88 S. Ct. at 1592-1593. If there is an "absence of probative force" for the conspiracy allegations when summary judgment is sought, the opposition can be read as effectively resting on the allegations found in the complaint, which are insufficient to defeat a properly supported summary judgment motion. *Id*. The Supreme Court has held that a party alleging a conspiracy cannot defeat a properly supported summary judgment motion in the "absence of any significant probative evidence tending to support the complaint." *Id*.

The Sheriff Defendants established by affidavit that they were not part of, and were not aware of, any alleged conspiracy to do harm to Moore. Further, Plaintiffs admit in their "denial" of proposed uncontested fact number 89 that they "have no evidence of Wells or Murphy acting in explicit cooperation with RCC officers to do Moore harm." [Doc. No. 304-1, p. 31].

Plaintiffs rely on the same circumstantial evidence they contend shows that Murphy and Wells used excessive force on Moore to show that they participated in an alleged conspiracy. They accuse Murphy and Wells of acting together with the other Defendants. They accuse Murphy and Wells of being aware of the use of excess force by other Defendants, and they argue Murphy and Wells acquiesced in the use of that force. They accuse Murphy and Wells of aiding and abetting the other Defendants. However, they present no actual proof to support their accusations. They present no actual proof to show that Murphy and Wells entered into a conspiracy in the brief period of time they were at the RCC.

The uncontested material facts show that the Sheriff's Office responded to a call from RCC concerning the alleged battery of White by Moore. Moore was to be brought to OCC as part of that investigation, when his possible serious medical condition was discovered, and he was taken to a hospital for evaluation and treatment.

24

The Sheriff Defendants are therefore entitled to summary judgment dismissing all of Plaintiffs' federal claims against them, with prejudice.

### C.      STATE LAW CLAIMS

Plaintiffs argue that the same evidence that supports their federal law claims also supports their state law claims.

#### 1.      Excessive force

Plaintiffs argue that, according to Louisiana law, the use of excessive force constitutes a battery. They cite, generally, *Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506, 511 (La. App., 1 Cir., 1985) ("Although Branighan acted under color of legal authority in assisting in plaintiff's arrest, he used excessive force in restraining the prisoner in violation of LSA-C.Cr.P. art. 220 by unnecessarily choking plaintiff. Such excessive force transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages. *Kyle v. City of New Orleans*, 353 So.2d 969 (La.1977); *Norrell v. City of Monroe*, No. 11-41192 703 F.3d at 762–63 (2012).   Plaintiffs conclude that Wells and Murphy are therefore liable under state law as well.

However, as indicated above, the Court has found that Plaintiffs have presented no evidence that Wells and Murphy used excessive force; therefore, their state law claim fails as well.

#### 2.      Failure to provide medical care

Plaintiffs argue that, for the same reasons they cited for the Section 1983 action, the Sheriff Defendants are liable for the failure to provide Moore with reasonable medical care under state law. Plaintiffs assert, as the Louisiana Supreme Court stated in *Landry v. E. Baton Rouge Parish Sheriff's Office*, 168 So.3d378,81 (La. 2015) at page 382: "The confining authority's duty of care to the inmate is fundamental and rooted not only in tort but also in constitutional law." Thus,

according to Plaintiffs, a state law tort claim lies here as well.

Again, the Court has found that Plaintiffs have not produced evidence that the Sheriff Defendants failed to provide reasonable medical care for Moore.  Therefore, Plaintiff's claim has no merit.

### 3.      Conspiracy

Plaintiffs assert a conspiracy claim under state law.  The Louisiana Civil Code provides that "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. C.C. art. 2324. Under Louisiana law, however, to establish a conspiracy claim, "a plaintiff must prove that an agreement existed to commit an illegal or tortious act; the act was actually committed and resulted in plaintiff's injury; and there was an agreement as to the outcome or result." *See Jeff Mercer, LLC v. State DOTD*, 222 So. 3d1017, 1024 (La. App. 2 Cir. 6/7/17) ("Conspiracy by itself is not an actionable claim under Louisiana Law") (citations omitted). Solidary liability under Louisiana law results for alleged conspirators only where the object of the conspiracy was to cause the harmful overt acts to take place. *See Mercer, supra* ("To establish a conspiracy... the plaintiff must establish a meeting of the minds or collusion between the parties for the purposes of committing an illegal or tortious act.").

The Sheriff Defendants have established by affidavit that they were not part of, and were not aware of, any alleged conspiracy to do harm to Moore.  Further, as indicated above, the uncontested facts demonstrate that the Sheriff Defendants were not aware of any agreement to do Moore any harm and thus cannot be said to have acted in furtherance of any such agreement, despite the Plaintiffs' conjecture.

The extensive record of written discovery and deposition testimony is devoid of any testimony or evidence suggesting that either Wells or Murphy engaged in any use of force that was

objectively unreasonable or excessive, or that they were deliberately indifferent to Moore's medical needs. Nor is there any evidence to support the conspiracy theory advanced by the Plaintiffs. The uncontested facts support summary judgment in favor of the Sheriff Defendants on all federal and state claims.

## III.    CONCLUSION

For the reasons set forth above, the Sheriff Defendants' Motion for Summary Judgment [Doc. No. 256] is GRANTED.  Plaintiffs' claims are DISMISSED WITH PREJUDICE in their entirety.

MONROE, LOUISIANA, this 30th day of October, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**