

# Transcript of the Testimony of
# **Rodney Cooper**

**Date:** February 12, 2020

**Case:** Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al

Pilant Court Reporting
Phone: (800) 841-6863
Fax: (877) 474-5268
Email: deponotice@pilant.com
Internet: www.pilant.com

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ERIE MOORE, JR., TAMARA            CIVIL ACTION NO. 3:16-CV-01007
GREEN AND TIFFANY ROBINSON


VERSUS                             JUDGE TERRY DOUGHTY


LASALLE CORRECTIONS, INC.,
ET AL                              MAG. JUDGE KAREN L. HAYES



**************************************************

30(b)(6) DEPOSITION OF

LASALLE MANAGEMENT COMPANY, LLC,
THROUGH ITS DESIGNATED REPRESENTATIVE,
RODNEY COOPER

**************************************************


TAKEN ON FEBRUARY 12, 2020

COMMENCING AT 11:17 A.M.

AT THE OFFICE OF
PROVOSTY, SADLER & DELAUNAY, APC
934 THIRD STREET, SUITE 800
ALEXANDRIA, LOUISIANA


BY:   SONDRA JOINER, CCR

 

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 2

**A P P E A R A N C E S**

FOR THE PLAINTIFFS, ERIE MOORE, JR., TAMARA GREEN
AND TIFFANY ROBINSON

      MR. NELSON W. CAMERON
      ATTORNEY AT LAW
      675 JORDAN STREET
      SHREVEPORT, LOUISIANA 71101
      eganspk@bellsouth.net

FOR THE DEFENDANTS, LASALLE MANAGEMENT, ET AL

      MR. H. BRADFORD CALVIT
      PROVOSTY, SADLER & DELAUNAY, APC
      934 THIRD STREET, SUITE 800
      ALEXANDRIA, LOUISIANA 71301
      bcalvit@provosty.com

FOR THE DEFENDANT, CITY OF MONROE

      MR. BRANDON W. CREEKBAUM (BY TELEPHONE)
      ASSISTANT CITY ATTORNEY
      CITY OF MONROE
      400 LEA JOYNER MEMORIAL EXPRESSWAY
      MONROE, LOUISIANA 71201
      brandon.creekbaum@ci.monroe.la.us

ALSO PRESENT: Mr. Ellis Ray Hanson, Jr.

COURT REPORTER: SONDRA JOINER, CCR #21003

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 3

**TABLE OF CONTENTS**

**APPEARANCES** ................................................... **2**

**STIPULATION** ................................................... **4**

**EXAMINATION BY MR. CAMERON** . . . . . . . . 5-125, 128-130, 131-132

**EXAMINATION BY MR. CALVIT** ................................. 126-127

**EXAMINATION BY MR. CREEKBAUM** ............................. 130-131

**CERTIFICATE** ............................................. 138-139

REFERENCED EXHIBITS FROM ELLIS RAY HANSON, JR.

02/12/20 DEPOSITION:

    #81 - Policy . . . . . . . . . . . . . . . . . . . .57, 58

    #30b-3 - DPS&C Department Regulations................... 128

EXHIBITS:

    #30b-4 - List of Exhibits Submitted

        at the 30(b)(6) Deposition ................ 135

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

S T I P U L A T I O N

It is stipulated by and between counsel for plaintiff and counsel for defendant that the 30(b)(6) deposition of LASALLE MANAGEMENT COMPANY, LLC, THROUGH ITS DESIGNATED REPRESENTATIVE, RODNEY COOPER, is being taken pursuant to notice and agreement of counsel for all uses and purposes in accordance with the Federal Rules of Civil Procedure, at the request of PLAINTIFFS before SONDRA JOINER, Certified Court Reporter, February 12, 2020, at the office of Provosty, Sadler & deLaunay, APC, Alexandria, Louisiana.

The parties hereto waive all formalities in connection with the taking of said deposition except the swearing of the witness and the reduction of questions and answers to typewritten form.

It shall not be necessary for counsel to enter objections except as to the form of the question and responsiveness of the answer at the time of the taking of said deposition, all parties reserving the right to make such objections at the time said deposition or any part thereof may be offered in evidence with the same right as if the testimony had been taken and given in Open Court.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 5

RODNEY COOPER, DESIGNATED REPRESENTATIVE
OF LASALLE MANAGEMENT COMPANY, LLC, 192 BASTILLE
LANE, RUSTON, LOUISIANA 71270, AFTER BEING DULY
SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

[BY MR. CAMERON:]

Q.    As you know, sir, my name is Nelson Cameron
      and I represent the family of Erie Moore, Sr.
      I'm here to take your deposition as a legal
      representative of LaSalle Management Company
      under Rule 30(b)(6).  If I ask you a question
      and you don't understand what it is I'm
      trying to ask you, please ask me to repeat or
      rephrase or explain the question to the point
      you feel comfortable responding under oath,
      okay?

A.    Okay.

Q.    We are here in a deposition and you're under
      oath, so you understand that your testimony
      is just like you were in a court of law?  You
      understand that?

A.    Yes.

Q.    And I'd ask you to verbalize all of your
      answers, so, you know, you're not using body
      language or nonverbal responses, okay?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 6

A.    Yes.

Q.    And if you answer a question, I have to assume that you understood it.  Is that fair enough?

A.    Yes.

Q.    And we'll try not to interrupt each other, you know, because some of these questions may get kind of long.  So please don't interrupt me and I'll try not to interrupt your answer, okay?

A.    Okay.

Q.    All right.  You understand you are here as the representative of LaSalle Management Company?

A.    Yes.

Q.    You understand that your answers are binding on LaSalle Management Company?

A.    Yes.

Q.    What did you do -- well, first, let's get your name on the record.

A.    Rodney Cooper.

Q.    Rodney Cooper.  Do you have a job title?

A.    Executive director.

Q.    Okay.  And that's executive director of LaSalle Management Company?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

A.   Yes.

Q.   All right.  And just give us your professional address, your business address.

A.   The business address would be 192 Bastille Lane.  I'm there four days a week.

Q.   Where are you the other day or days of the week?

A.   I live in Huntsville, Texas.

Q.   All right.  And when did you first assume the position of executive director?

A.   It would have been in 2016.  I'm going to say around June or July.

Q.   What does an executive director do?

A.   Just oversee the folks at the business office and make sure they're given the support needed to facilities.  And then Johnny Creed would have worked for me and Jay Eason who is over on the non-Louisiana facilities.

Q.   Jay Eason is over Texas?

A.   Texas.

Q.   And then Creed over Louisiana facilities?

A.   Yes.

Q.   All right.  What is, in general, your background?

A.   I went to work for the Department of

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 8

Corrections in Texas when I was going to college, and ended up spending thirty years and retired as deputy director over the Department of Corrections.

Q. When did you retire?

A. October of 2009.

Q. And did you work anywhere between October 2009 and...

A. No.

Q. ...June or July of 2019 -- I mean 2016?

BY MR. CALVIT:

I'm sorry, 2016.

A. I mean, well, I came to work for LaSalle when I retired in October of 2009.

[BY MR. CAMERON:]

Q. Oh, okay. In what capacity did you work for LaSalle?

A. When I was hired, I really didn't have a title, but because I came from a deputy director job, I was hired and they said, we want you to help out in Texas and we'll let you decide where you need to -- what you think you need to do, where we need the help, and so that's -- I didn't really have a title.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 9

Q.    Okay.  So you started working for LaSalle Management Company October 2009 and you were working in Ruston, Louisiana at that time?

A.    No.

Q.    No?

A.    No, sir, I was only in Texas.  I did not work in Louisiana.

Q.    So where in Texas were you working in October of 2009?

A.    Well, you know, I told you I lived in Huntsville, so I didn't really have an office.  We did have an office in Dripping Springs, which is outside of Austin.  And so I would go by that office sometimes in my traveling around, but mostly I would say either from my home or from my vehicle.

Q.    And what type of things were you doing for LaSalle in Texas?

A.    I would just help market or look for opportunities.  They had one employee over there at that time, Chris Bell, who had retired from the Department of Corrections, and so anything Chris needed me to help him do.  But, you know, at the time I only had two facilities in Texas, so...

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 10

Q.      All right.   Have you ever given a 30(b)(6)
deposition before?

A.      I don't know if that's what it was called.
I've been the State's representative in
depositions in court.   So I assume it's
similar or...

Q.      I don't know.

A.      I don't know what they call it.   That's all
attorney talk to me, but I've been the
State's representative.

Q.      Since you have been employed with LaSalle
Management Company, have you given a
deposition?

A.      I don't recall.   I don't recall giving any.

Q.      So what did you do to prepare yourself for
today?

A.      Met with my attorney.

Q.      Did you do any independent research or
investigation of any kind?

A.      No.

Q.      I see you have a large binder full of
materials in front of you.   Did you review...

A.      These are my...

Q.      ...those...

A.      I'm sorry.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 11

BY MR. CALVIT:

Let him finish the

question.

A.       I'm sorry.

[BY MR. CAMERON:]

Q.       Did you review those documents?

A.       Yes.

Q.       Can we get a little bit of an idea of what it
is you've got in there?

A.       I have a copy of Johnny Creed's deposition
and a copy of Warden Hanson's deposition.

BY MR. CALVIT:

And I think...

A.       Oh, and Kevin Sumrall's, and whatever
attachments I guess to...

[BY MR. CAMERON:]

Q.       Oh, and all the attachments to those
depositions.  Any other documents?

A.       This document is a document concerning a use
of force dated October 30th, 2016, which is
the one that you were talking to Warden
Hanson about earlier with the...

Q.       OC spray?

A.       ...regulations, I believe.

Q.       All right.  Any particular policies or --

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 12

yes, any particular policies that you
reviewed?

　　　　BY MR. CALVIT:

　　　　　Also, look on the left.

　　　　Didn't you look at...

A.　　Oh.  Yes, I was shown and looked over this.
There's a contract with the City of Monroe.
Of course, the notice, the 30(6)(b) notice.

　　　　BY MR. CALVIT:

　　　　　Let me see.

[BY MR. CAMERON:]

Q.　　And that's 30(b)(6) we're talking about.

A.　　Okay.  And then this one is between the Town
of Richwood...

Q.　　Let me see.  I'm going to say on the record
that the document you handed to me is Bates
stamped RCC Contract 1.

A.　　Okay.  And here's one that's stamped
Contracts 10.

Q.　　Uh-huh.

A.　　And Contracts 13.  And that's all I recall.

Q.　　All right.  The first topic on the notice of
deposition is -- let me read it.  That might
help.  It may be a little bit different than
what I've got.  Operational oversight of

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 13

correctional and jail facilities owned, managed, or operated by LaSalle or its subsidiaries in the State of Louisiana. Do you have some personal knowledge of that topic?

A.  Yes.

Q.  And did you speak to any other individuals about that topic other than your attorney I'm talking about?

A.  No.

Q.  Besides the documents that you have declared here today, did you review any documents that might be relevant to that topic, the number one topic?

A.  Not that I'm aware of.

Q.  You are familiar with the organizational structure of LaSalle Management Company?

A.  I am.

Q.  So who -- okay. I know you're executive director and you explained a little bit about that to me. What authority, if any, do you have, for example, on hiring, firing, that kind of thing within the LaSalle Management Company?

A.  What authority do I have?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 14

Q.    Right.

A.    I guess, I mean I have the authority to hire or fire whoever I want to, I guess.

Q.    All right.  I'm just trying to get an idea of, you know, where you are on the ladder, so to speak.  Who do you report to?

A.    Well, I work for the family.

Q.    And when we say the word family...

A.    But I don't really report to them, so I don't...

Q.    So your boss, so to speak, you say is the family, is that correct?

A.    I mean I don't report to them.  I don't want to mis-convey that.  The ownership.

Q.    Who hired you?

A.    Billy McConnell and Pat Temple.

Q.    And do you -- well, maybe report is not really the right word, but do you have some interaction with them on a regular basis?

A.    I see -- you know, Mr. Temple died a little over a year ago, but I mean, of course, I would see them, but when I was hired, what they told me when I came to work for them, it's part of the reason I came to work for them, is they said we don't -- we know about

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 15

construction and we hire people that know about operating facilities and we leave them alone and let them do their job.  And, you know, they said obviously with your thirty years and all the positions you've been in, we feel like you'd be a good person to hire, and so -- and that's the way it's been. They've not ever tried to tell me what to do or what not to do, but allowed me to do what I felt was best.

Q.    So when you were hired in June/July 2016, was there any kind of particular event...

BY MR. CALVIT:

Objection.

BY MR. CAMERON:

What?

BY MR. CALVIT:

He was hired in 2009.

BY MR. CAMERON:

Oh, okay, yeah.

BY MR. CALVIT:

He was given another job in 2016.

BY MR. CAMERON:

I'm sorry.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 16

A.      I wasn't hired then.  I was just promoted as you call it then.

[BY MR. CAMERON:]

Q.       Okay.  Let me rephrase the question.  So when you became the executive director in June/July of 2016, was there any particular event that you were made aware of that drove that decision to hire you as executive director?

A.      No.  The company was growing, you know, business was growing, and so Pat and Billy just said, you know, we've got you -- because after 2009, after I'd been there a while, and I don't remember the date, they asked me if I would be over all the employees outside of Louisiana, and so I did that.

        And then in 2016 is when they said we'd really like for you to come be over the whole thing, but, you know, we feel like that has to be in the corporate office, not from your house in Texas.  Which made sense, which I agreed with.  I said I don't see how I could do that without being at the corporate office.  And so that's when we made the agreement that if I would come do that, I

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 17

could come over on Monday morning and I could go back on Thursday evening because my wife, you know, she didn't want to move. We've got grand-kids in Huntsville and that area and all, so she didn't want to come relocate.

Q. All right. Were there any tasks or items of interest that were pending when you became executive director that you had to address sooner rather than later?

A. I don't recall any particular task. I had the feeling just that Johnny Creed might not be staying around a lot longer. I think, you know, the feeling was that when Johnny was hired, he probably said I'll come and I'll stay so many years and then, you know, so I think that the feeling was that Johnny might not be there a whole lot longer and so they were going to be without somebody in that role.

Q. So eventually he did leave and...

A. He did.

Q. ...and he was replaced, right?

A. I did not replace him initially.

Q. Initially?

A. I didn't replace him because I didn't know

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 18

the wardens in Louisiana like I knew the wardens everywhere else, and it just was a better chance for me to get to know them.

Q.    Did you eventually replace Mr. Creed?

A.    I did.

Q.    And when was he replaced approximately?

A.    Oh, probably four or five months ago.  Might have been little longer than that, but...

Q.    All right.  So at the headquarters of LaSalle Management Company, and I'll use that word headquarters because I really don't have another term to put on it, but if you think of something else I can call it, let me know.  But it's in Ruston, right?

A.    Yes, sir.

Q.    And there in Ruston at the headquarters, you have an office there, right?

A.    I do.

Q.    And I would assume that Mr. Creed, he -- did he have an office there?

A.    He did.

Q.    And this fellow from Texas, did he have an...

A.    No.

Q.    ...office there?  No?

A.    No.

PILANT
COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 19

BY MR. CALVIT:

Let him finish the question.  When she goes to type this up tomorrow night at midnight...

BY DEPONENT:

I'm sorry.  I'm trying not to -- I'm trying to wait on you.  I'm sorry.

BY MR. CALVIT:

...she might have some issues.

BY MR. CAMERON:

That's okay.

BY DEPONENT:

I'm sorry.

BY MR. CAMERON:

Yeah, we all anticipate sometimes knowing the answer and we know what he's asking.

BY DEPONENT:

I'm sorry.

[BY MR. CAMERON:]

Q.    Anyway, so we had Johnny Creek there.  Kevin

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 20

Sumrall, does he have an office there as well?

A.     Kevin had an office for a while and didn't have an office for a while I mean because he had moved over to a warehouse where there were some offices, and then he is now back over in that building.

Q.     Now, did he report directly to you or did he go through Creed?

A.     Neither one of us.

Q.     Who did he report to?

A.     He was working in the -- when I came over here, Kevin was -- I'm trying to remember.  I think Kevin was handling the phone, inmate phone...

Q.     What do you mean by handling...

A.     ...side of it?

Q.     ...through a receptionist or...

A.     No, no, no.  I'm talking about that portion of the business.

Q.     I'm not familiar with that business.

A.     He didn't -- he wasn't in the operational parts of the facilities at all, so -- and then Kevin was -- I mentioned the warehouse. Kevin was doing inmate commissary business

(800) 841-6863            PILANT            www.pilant.com
                     COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 21

and he was overseeing the warehouses and the stock and moving in and out of stuff. So Kevin did not work for me.

Q.   Was he an employee of the company?

A.   Yes.

Q.   Who else would have been officing out of the headquarters there?

A.   All of the accounting, all of the HR, all of the payroll.

Q.   Is that separate from accounting, payroll?

A.   (No oral response.)

Q.   Okay.

         BY MR. CALVIT:

             That's a yes or a no?

A.   Yes.

[BY MR. CAMERON:]

Q.   Yes. Thank you.

A.   We had M&T Properties. We had BAS Construction. Some of the other family members that worked with the company.

Q.   Can you give me an example of who you're talking about there?

A.   Billy has two sons, Clay and Wesley, and Pat has a son and son-in-law, Ryan and Patrick.

Q.   While we're talking about the family here

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 22

just real quick, I don't want to get into any great detail about it, but what kind of things do they do for LaSalle Management Company?

A.      So Clay hosts people at the duck camp.  Clay is mostly the duck man.  That's what I would call him.  Wesley does a lot of real estate transactions.  Ryan coordinates our legal business, so in other words...

BY MR. CALVIT:

        Object.  Ryan's an attorney.

BY MR. CAMERON:

        Oh, he's the attorney, okay.

BY MR. CALVIT:

        I don't know what all he may be saying, but...

BY MR. CAMERON:

        Sure, I understand.

BY MR. CALVIT:

        ...he's an attorney for the group.

BY MR. CAMERON:

        I understand.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 23

A.      I mean he would make sure and call Brad
        and...

                BY MR. CALVIT:

                    That's enough.

A.      Okay.

[BY MR. CAMERON:]

Q.       Yeah.  That's all supposed to be confidential
        and all.

A.      Okay.  I'm sorry.

Q.      That's okay.

A.      And Patrick -- I mentioned the phone,...

Q.      Right.

A.      ...inmate phone company.

Q.      Oh, yeah.  Okay.

A.      Patrick oversees that operation.

Q.      All right.  So, so far at headquarters we're
        talking about you being there, and at the
        time you began as executive director, Creed
        had an office there, and then we had payroll,
        we had Kevin Sumrall, human resources,
        accounting, M&T Properties, and a
        construction...

A.      (No oral response.)

                BY MR. CALVIT:

                    Yes or no?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 24

Q.      ...aspect?

A.      Yes.

Q.      Okay.  So anything else that I'm missing here
        that was operating out of the headquarters?

A.      I can't think of anything else.

Q.      And the headquarters -- you only had one
        official address in Ruston?  In other words,
        there wasn't a branch office some place or...

            BY MR. CALVIT:

                Well, he had mentioned
                the warehouse having some
                office role.

            BY MR. CAMERON:

                Oh, that's true.

A.      And I mentioned like Dripping Springs office.

[BY MR. CAMERON:]

Q.      Who?

            BY MR. CALVIT:

                Dripping Springs, Texas.

A.      Texas.

[BY MR. CAMERON:]

Q.      Oh, sure.  Right.

A.      I mentioned that earlier.

Q.      Right, okay.  And that's where the Texas
        fellow stayed at that you had mentioned

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 25

earlier that was kind of an executive director over there?

A.     Yes.  We have like seven or eight employees over there.

BY MR. CALVIT:

I think he's restricting his questions at least initially to 2015-2016.

BY MR. CAMERON:

Yeah.

BY DEPONENT:

Okay.

BY MR. CALVIT:

Because you mentioned that there was one employee then and now...

BY MR. CAMERON:

Now there is...

BY MR. CALVIT:

...I think you mentioned there's more.

BY DEPONENT:

Yes.

BY MR. CAMERON:

Right, okay.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 26

BY DEPONENT:

From 2016, there's more.

[BY MR. CAMERON:]

Q.      Yeah, okay.  All righty.  Now, you as the
executive director, I know you -- did you
spend all of your time when you were in
Louisiana at Ruston or did you do other
things as well?  Go other places, I mean.

A.      I would go other places.

Q.      What kind of places would you go to?

A.      Maybe an ACA convention, maybe a Texas
Correction Association, I'm on the Texas Jail
Association board, travel and meet with
sheriff's, ICE staff, U.S. Marshals staff.
So I'm not, I'm surely not in Ruston every
week all week.

Q.      So you do move about some?

A.      Yes.

Q.      And did you have any individuals when you
first began working as executive director who
would assist you in any of your tasks?  That
could be anyone from an administrative
assistant to some other staff member.

A.      I already mentioned Johnny worked...

Q.      Yes, sir.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 27

A.      ...for me.

Q.      Right.

A.      But we didn't have an admin assistant or anything.  We had a lady who -- Lexi would help with maybe determining food costs through working with the accountants or something like that, but work release, she'd keep up with the numbers.

Q.      And today it's no different, it's still the same?

A.      Yes.

Q.      Does LaSalle Management Company have any form of internal affairs investigation department or division?

A.      No, sir.

Q.      Does LaSalle Management Company, does it have any way of, I guess, inspecting or -- let me rephrase.  Does LaSalle Management Company have a practice of inspecting any of the facilities that LaSalle Management owns or operates?

A.      We are inspected by a lot of different groups.

Q.      What groups are they inspected by?

A.      In Louisiana, Basic Jail Guidelines is the

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 28

biggest one, but we also have Nakamoto Group, which is a group that's contracted for any time you have any federal detainees.

Q.   What is it called now, Naka...

A.   Nakamoto is the name of the company.

Q.   How do you spell that?

A.   N-A-K-A-M-O-T-O, I believe, Nakamoto.

Q.   And what does that company do?

A.    They inspect any time you have ICE detainees.

Q.   Oh, I see, okay.  And when did LaSalle Management begin maintaining ICE detainees?

A.   Around probably July of last year.

            BY MR.  CALVIT:

                Are you speaking of Louisiana or Texas?

A.   In Louisiana.  Now, Texas has been a long time.

[BY MR.  CAMERON:]

Q.   Do you as the executive director -- and I'm talking about starting in 2016 when you first became executive director, did you require any kind of regular meetings with wardens of any of the facilities?

A.   I did not have any regular meetings with the wardens.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 29

Q.    Do you know if Mr. Creed was directed to do that?

A.    He was not directed to do that.  I know every now and then Johnny would meet with the wardens.

Q.    Did Creed ever provide you any followup reports about, you know, this is how many prisoners we have at this facility, we have this many at that facility, anything along that line?  Like population counts?

A.    Sure, we had a population count.

            BY MR. CALVIT:

                  He asked you if Johnny gave you that?

A.    No, Johnny didn't give me that.

[BY MR. CAMERON:]

Q.    How did you get a population count?

A.    They had an IT person that set up a sheet so the wardens could put in every day.  So we could look and tell if, you know, the population all of a sudden went up a hundred or down a hundred or something like that.  But Johnny didn't give me that.

Q.    Did anyone with -- either Johnny Creed or some other facility, like a warden or

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 30

Q.    assistant warden, provide any regular information about use of force?

A.    No.

Q.    And let me make sure I understand so far. When you became executive director, you did not have any regular ongoing contacts with a warden or an assistant warden of a facility? Am I saying that right?

A.    I guess I just want to be clear what your question is.  Did I see the wardens from time to time, yes.  Did I have regular contact with the wardens, I would say no.

Q.    And I might be repeating myself here, and I'm sorry if I'm am, but it's your understanding as well that Johnny Creed did not have any regular contact with wardens or assistant wardens of any particular facilities?

A.    Again, I would have to ask you what you define by regular.  I mean Johnny would, you know, travel around the state and Johnny might be going to see the sheriff in, you know, a certain parish, and if he went to go see that sheriff, he's probably going to invite the warden to come with them to go eat lunch.  So is that regular contact, I don't

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 31

know.

Q.    Well, regular contact would be contact made, say, once every three weeks, once every four weeks, once every quarter, something regular, ongoing, planned contact?

A.    I don't think Johnny had any planned contact.

Q.    Now, tell me if I'm right here.  As far as LaSalle Management Company in the State of Louisiana, the organizational structure is you had the headquarters in Ruston, and branching off from there, we have various different correctional facilities?  Would that be a correct chain of command?

A.    That would be the right structure, I guess. You have your facility in Ruston, your facility in Dripping Springs, and then you have the various facilities scattered out throughout Texas and Louisiana.

Q.    As the executive director, do you review from time to time the disciplinary process at any of the facilities that are owned or operated by LaSalle Management?

A.    No.  I know that, you know, that the policies have to meet, for example, Basic Jail Guidelines in Louisiana.  For DOC inmates in

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 32

a facility where we're housing, say, things that follow Texas Jail Commission, then you've got to make sure they meet theirs. If you're under a different client, you might have to meet theirs.

Q. And the human resource part of the functions at the headquarters, does that include any of this discipline of correctional officers?

A. No. They would be responsible to make sure we're following the laws. I mean, you know, our HR director would make sure we're following state and federal guidelines and laws. And if they had reason to believe there was any time we weren't, it would be brought to my attention and we'd see. But I can't recall a time when they've come and said we're violating the law.

Q. So is it your understanding then that the LaSalle Management Company HR would ensure that laws involving equal opportunity, for example, are followed? Is that what you're talking about?

A. Yes.

Q. You're talking about like race, sex, age discrimination, that kind of thing?

 

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 33

A.      Yes.

Q.       But HR does not investigate use of force and
determine whether a correctional officer
violated a facility's rules?

A.      No.

Q.       What input do you have as executive director
into the training of correctional officers?

A.      I don't get involved in that.  I let the
wardens figure that out depending on what,
again, what's required, what's the
requirement of the state or what's the
requirement of the feds or...

Q.      Do you have knowledge of what the state
requirement is for a correctional officer as
far as training?

        BY MR. CALVIT:

                Object to the form of
            the question.  Which state?

[BY MR. CAMERON:]

Q.      Louisiana.

A.      I was going to say, I've seen it, you know.
I've read through the Basic Jail Guidelines
and I've seen the training requirements
there.

Q.      What does LaSalle Management do to make sure

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 34

that the correctional facilities under its management and control comply with the Basic Jail Guidelines?

A.    Well, the facilities are inspected, and there's a report given to the warden and they send a copy to -- they would send a copy to the headquarters just saying either you passed or you didn't pass.  If you didn't pass, of course, we'd know there's a problem.  But I don't recall since 2016 -- I've never seen a facility in Louisiana that didn't pass.

Q.    You said the facility is inspected.  And that inspection is conducted by the Department of Public Safety and Corrections?

A.    Yes, sir.

Q.    And I'm talking about the State of Louisiana, of course.

A.    Right.

Q.    The LaSalle Management Company, it does not inspect facilities that it owns or operates?

A.    I would ask that you define what you mean by inspect.  I mean if I go to a facility and I walk around, I guess you could say I'm inspecting it.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 35

Q.    Okay.

A.    If it's dirty, I'm going to...

Q.    All right.  Well, that might be it.  Maybe that's all there is, if somebody from LaSalle Management Company goes to Richwood Correctional Center and walks around, that's an inspection.  You know, let's say that's the truth.  Does LaSalle Management Company do that with correctional facilities?

A.    We expect the warden to be the one that keeps their facility, you know, meeting all those guidelines and to make sure that's done.  But if I go over there to attend a volunteer appreciation banquet and when we go in there, the place is dirty, is that an inspection?

Q.    Might be inspection for dirtiness.

A.    Yeah.

Q.    Okay.

A.    So I'm just making sure I'm clear on what you're asking me.

Q.    Well, for example, you are aware or were you aware when you became executive director that there was a contract between the City of Monroe and Richwood Correctional Center, LLC?

A.    I was not aware of that contract.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 36

Q.    All right.  When did you become aware of this contract?

A.    Whenever I met with my attorney.

Q.    And when was that approximately?

A.    A month and a half ago.

         BY MR. CALVIT:

              I don't know.  My time sheet would know.

[BY MR. CAMERON:]

Q.    The DOC inspector, whoever that might be, who is inspecting as a result of the Basic Jail Guidelines, he would, as far as you know, would not be inspecting Richwood Correctional Center to see if it is complying with a contract between it and City of Monroe, would he?

A.    I wouldn't know the answer to that.

Q.    I mean were you aware that the contract required RCC to maintain a master file of all disciplinary reports and actions taken?

A.    I was not aware of that.

Q.    It says in here supposed to maintain a master file.  To you, would a master file be something where you would have a central location for all reports?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 37

A.   You know, what I would think of when I just think of a master file on a particular inmate would be, you know, you follow that particular inmate from the time they come in until the time they go out, and it's all there.  I mean we would call that a travel card in Texas, but I don't know what they...

Q.   Well, it says here RCC shall maintain a master file of all discipline reports.  Wouldn't that mean a central location for all discipline reports?

          BY MR. CALVIT:

               Object to the form of the question.  It calls for either an intent or modification of a written contract which is the best evidence of itself.

A.    And I don't know the answer to that question.

[BY MR. CAMERON:]

Q.   Were you aware that RCC, under this contract with the City of Monroe, was to maintain a master file of all grievances?

A.   No, sir.

Q.   Were you aware that the contract between RCC

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 38

and City of Monroe, RCC was to maintain a master file of all incidents of use of force?

A.    No, sir.

Q.    Did William McConnell ever discuss with you this contract between RCC and the City of Monroe?

A.    No, sir.  And I never got any calls or complaints from the City of Monroe that we weren't doing something we should have been doing.

Q.    In your capacity as executive director, what do you consider to be your primary function?

A.    To, like I said, make sure that the corporate office is given the support needed to make the business operate so the wardens have what they need to do their job.

Q.    Do wardens from time to time make requests of you or how do you -- let me back up and ask this a different way.  How is it you learn what the wardens need?

A.    Well, let's just go back to the Basic Jail Guidelines.  If they send something that says they're not meeting something, then I would talk to the warden and figure out why aren't you meeting this.  If he says, well, I can't

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 39

buy the right clothes for this inmate because I don't know where to get them, well, I'd tell people to go help him figure out where he can get those uniforms that are required by Basic Jail Guidelines.

Q. So the way you learn about the needs out there is not the warden calling you or contacting you, but through these inspection reports?

A. Well, the same -- I mean I'm not going to say that if they didn't meet something and they didn't have the resources they needed to meet it that they might not say, hey, I can't find these clothes.  So I might hear it from the warden before I read it on, you know, or hear from Basic Jail Guidelines, but...

Q. Does LaSalle Management Company conduct any random reviews of use of force by correctional officers at the facilities it owns or operates?

A. Not that I'm aware of.

Q. Is there any effort made to review, let's say, cause of serious bodily injury to an offender or inmate, either whether it's by use of force or accident or whatever the case

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 40

might be?

BY MR. CALVIT:

Object to the form of the question.  It's vague as to who might be doing whatever it is you're seeking.

[BY MR. CAMERON:]

Q.    Do you understand the question?

A.    I think I understand your question.  Let me say this.  It's always been my feeling that getting a third party to investigate something like that takes us out of the, you know, it keeps us transparent, keeps everything out in the open, we're not hiding anything.  So the wardens turn those over to either the local sheriff -- in Texas, we turned it over to Texas Rangers and the sheriff was aware of it, of course, but we always had a third party come in and do the investigation for that so that we didn't make those determinations.

Q.    Now, the Texas Rangers or the local sheriff, they would be investigating this from a viewpoint of was there a crime involved or --

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 41

is that what they would be doing it like?

A.    Well, you said a death.  If there's a death, I mean there's always suspicion of a...

Q.    Right, yeah.  Certainly, it could be a crime. But wouldn't -- does LaSalle Management Company have an interest in knowing not only was there a crime involved, but whether a correctional officer violated a rule or some procedure that's in place?

A.    That group that comes in looks at all of that.  They don't just look at -- I mean they look at -- they have all those procedures and policies.  They look at all of that.

Q.    So do you know if the Louisiana sheriff's do that or they just investigate whether it was a crime or not?

A.    I know that I've seen a situation where a sheriff would go check something and through that investigation say this employee committed a crime by falsifying a record and so they would arrest the employee.  So I don't know if that answers your question, but that's not the crime they came out there to investigate.

Q.    Okay.  I understand.  There is also the

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 42

possibility or probability that some other employee didn't comply with rules or regulations, such as not watching the monitor or not writing down a log watch or something along that line...

A.    Sure.

Q.    ...that may not be criminal in nature, but...

A.    Sure.

Q.    ...would be a violation of company policy but still very important?

A.    And I would say that the warden would be responsible.  When they're finished, we don't get in their way, we don't try to do something ahead of their investigation, but when they're finished, then the warden should review the entire event and can determine if any other action needs to be taken from that.

Q.    Okay.  So if I'm hearing you correctly, LaSalle Management Company gives that discretion to investigate serious incidents like death or serious significant injury to the warden...

A.    That's right.

Q.    ...and allow that warden to do his job?

A.    That's right.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 43

BY MR. CALVIT:

    Or hers.

A.    Or hers.

[BY MR. CAMERON:]

Q.    Or hers, right.  I don't want to leave anybody out.

A.    That's right.

Q.    Would it be then fair to say that the warden of the facilities owned and operated by LaSalle Management Company are given wide discretion as to how to operate that facility?

A.    Yes.

Q.    And tell me if this is fair or not.  Does LaSalle -- LaSalle Management Company doesn't, you know, look over his shoulder to be sure he's doing his job right?

A.    You know, like I said, if I got a call from DOC saying we did an inspection at Warden Hanson's facility and he's not doing a good job, then I'm going to be checking into that.

Q.    Right.  So you're relying on...

A.    If he passes his inspections and everything is going well, then yes, he has...

Q.    So you rely -- or I say you.  LaSalle

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 44

Management Company relies on the inspections under the Basic Jail Guidelines to determine if the warden is doing his job?

A.    We rely on whatever group.  I named several different things, but we rely on the people that are the experts in doing those inspections.  We let them do their inspections and write their reports and...

Q.    And Nakamoto...

A.    Nakamoto.

Q.    ...Nakamoto, they only came into the picture where there is ICE detainees, right?

A.    Yes.

Q.    And that's...

        BY MR. CALVIT:

            Is it ICE or just federal?

A.    In Louisiana, they -- it's just ICE.

[BY MR. CAMERON:]

Q.    And that's been since -- in Louisiana, been since July 2020?

A.    July or August.

        BY MR. CALVIT:

            Not 2020 because that would be...

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 45

[BY MR. CAMERON:]

Q.      Oh, yeah, it would be this year, 2019.

A.      2019, yes.

Q.      That's my fault.  Sorry.  So just to clarify the record then, the inspections by Nakamoto have been going on probably since July or August 2019?

A.      Yes, sir.

Q.      All right.  Any other agencies that you're aware of that conduct inspections at any of the facilities owned or operated by LaSalle Management besides Louisiana DOC and besides Nakamoto?

A.      There's another group called ODO.  I don't know what that stands for, but they also come in behind Nakamoto and then they inspect to make sure those inspectors did a good of inspecting.  So it's a -- the deputy director from ICE told me the other day it's death by inspection.  He said we've got so many inspections on y'all, you're going to, you know...

        BY MR. CALVIT:

            And if I may, are you asking for health and fire

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 46

inspections or are you talking about security inspections?

BY MR. CAMERON:

Yeah, operational, security inspections, yeah.

BY MR. CALVIT:

Because there are health and fire and, you know...

A.     Your food service department is inspected by the health department.

BY MR. CALVIT:

And so just -- I mean I know the sense of your question is on security correctional issues, but...

BY MR. CAMERON:

Right.

BY MR. CALVIT:

...I know the fire department comes in and counts exits and all that.

BY MR. CAMERON:

Absolutely.

BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 47

So you're not asking about those?

BY MR. CAMERON:

I'm not asking about those.

BY MR. CALVIT:

Okay.  Or the food service or any of that.

[BY MR. CAMERON:]

Q.    So the ODO inspections, they likewise started July or August 2019?

A.    Yes, sir.

Q.    And there are no other inspectors other than that we've already talked about, health, fire,...

A.    Right.

Q.    ...DOC, Louisiana DOC, Nakamoto, and ODO?

A.    I can't think of any others.

Q.    All right.  Let me make sure I under -- one thing I want to make sure I understand is that whenever there is an offender who dies at a facility, is there a written policy that the reports connected with that death be transmitted to LaSalle Management Company?

A.    I'm not aware of any policy like that.

(800) 841-6863   PILANT COURT REPORTING   www.pilant.com

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 48

Q.   Likewise, I think I know what the answer is, but I've still got to ask it for the record. Likewise, there's no written policy or required practice for a facility to report to LaSalle Management Company any time an offender is transported to a hospital for medical treatment?

A.   No, sir.

Q.   Does LaSalle Management Company pay for hospital and clinic or doctor visits for an offender?

        BY MR. CALVIT:

            Object to the form of the question.  It's outside the 30(b)(6).  It's not relevant or admissible as to anything at issue.  If you can answer the question...

A.   Most of the time, let me say it that way, because we've got a lot of different facilities and a lot of places.  And I'm trying to focus mostly -- you're asking about Louisiana?

[BY MR. CAMERON:]

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 49

Q.    Yes.

A.    Most of the time outside medical treatment would not be paid for by LaSalle.  LaSalle would pay for medical treatment inside the facility, but if they go outside, to a doctor's appointment outside or something, that would be paid for by the sending jurisdiction.

Q.    Oh.  So if it was a DOC offender, the State of Louisiana would pay for it, is that correct?

A.    That's the way it usually -- whoever is the sending person would be responsible.  Just like some -- for example, if you are giving them Tylenol, then we pay for it.  If you're giving them a prescription that a doctor orders, then it's usually paid by the sending party.

Q.    Let me back up here real quick.  Let's talk about what facilities -- when you took over as executive director, what facilities LaSalle Management Company had in Louisiana. I know we had Richwood Correctional Center.

A.    Yes.  Madison, and that's, you know, there's women and men's over there, so it depends on

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 50

how you count it, but Madison, Richwood, Jackson, Winn, and I don't remember if we had Winn when I first got here or if we took Winn shortly after that, and then Catahoula, River, and LaSalle.  Is that seven?

Q.    Yeah, that's seven.  Okay.  And all of these facilities are LaSalle Management owned or operated, is that correct?

A.    Yes.

Q.    And as far as the structure is concerned, the warden at each facility, is he considered or she considered an employee of LaSalle Management Company or of a subsidiary or do you know?

A.    It depends.

Q.    It depends.  I see.

A.    For example, at Jackson, that warden is a sheriff's employee.

Q.    So are there -- at Jackson, for example, is there -- the other employees there, are they also employees of the sheriff or are they...

A.    (No oral response.)

Q.    They are?

A.    They are.

        BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 51

                    You need to answer out

                loud.

A.      Yes, they are.

[BY MR. CAMERON:]

Q.      So at this particular location, where does
        LaSalle come into play?

A.      We still manage the facility, but the
        employees are sheriff's employees.  We
        reimburse the sheriff for the cost of those
        employees.

Q.      How does LaSalle manage Jackson when all of
        the employees are -- when all the people who
        work there are employees of the sheriff?

A.      Well, the warden there is still responsible
        just like he would be otherwise.  That
        doesn't mean the sheriff...

Q.      Who is he responsible to?

A.      He's responsible to us and the sheriff.

Q.      I'm confused.

A.      I get confused sometimes too.  I mean we, you
        know, the warden is responsible for the daily
        operation of the facility, and so the
        contract is that those would be sheriff's
        employees and we would reimburse the sheriff
        for the costs of those employees.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 52

Q.    Who does this -- the warden of Jackson Parish, who does he -- who can tell him what to do?

A.    Well, the sheriff could, but I don't know -- I can't tell you how much the sheriff really -- I don't think the sheriff gets real involved in that.  He lets the warden run the facility.

Q.    Would the warden at Jackson Parish, does he report to the new LaSalle Management employee who took Creed's place?

A.    Yes, same way Warden Hanson would have.

Q.     But y'all -- I say y'all.  LaSalle Management manages the payroll there at Jackson Parish?

A.    We reimburse the sheriff for the payroll there.

Q.     All right.  Any other facilities that operate like Jackson Parish?

A.    I'm trying to think.  I don't -- I think the rest of them are...

           BY MR. CALVIT:

                 Are you talking about now or in 2015 or in 2016?

A.    Because we...

[BY MR. CAMERON:]

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 53

Q.    Let me just rephrase.  At any point in time
since you've been the executive director,
have any of the other facilities operated
like Jackson Parish?

A.    Yes.

Q.    Which ones?

A.    LaSalle and Catahoula  I would say have
operated that same way.

        BY MR. CALVIT:

            You're speaking of...

A.    Not necessarily...

        BY MR. CALVIT:

            ...LaSalle Correctional
        Center in...

A.    LaSalle Correctional Center in Olla.

        BY MR. CALVIT:

            Right.

[BY MR. CAMERON:]

Q.    Has LaSalle Management released or stopped
operating any facilities since you became
executive director?

A.    Not in Louisiana that I...

        BY MR. CALVIT:

            What about Claiborne?

A.    That was before I came.

(800) 841-6863                PILANT                www.pilant.com
                          COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 54

BY MR. CALVIT:

    Okay.

A.    I mean not before I came to work, but before I came over here.  And I think you asked since I became executive director,...

[BY MR. CAMERON:]

Q.    Uh-huh.

A.    ...and that one was already...

BY MR. CALVIT:

    Okay.

[BY MR. CAMERON:]

Q.    Does LaSalle Management Company require any Louisiana facilities to be certified like by the ACA or some other organization like that?

A.    No, sir.

Q.    Does LaSalle Management Company have any policy or practice regarding the discipline of correctional officers?  And I want to talk about the time frame since you've been executive director.

A.    Every facility, you know, would have a unit policy about discipline of employees.  And I think the Richwood one was in one of these exhibits.

Q.    Yeah.  We got the personnel manual.  Are you

(800) 841-6863    PILANT COURT REPORTING    www.pilant.com

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 55

Q.   familiar with it for RCC?

A.   I'm not really familiar with that one for RCC.

Q.   All right.  Would it be fair to say that personnel at the headquarters of LaSalle Management Company do not review discipline issued to correctional officers?

A.   We do not.

Q.   You leave that up to the warden to issue whatever discipline he feels is reasonable and necessary?

A.   Yes.

Q.   And I apologize.  If I've already asked you this, I apologize, but I want to know, does LaSalle -- let me rephrase.  At any point in time that you're aware of, did LaSalle Management Company ever have any kind of, let's see, internal affairs investigation or department?

A.   No, sir.

       BY MR. CALVIT:

            Let's go off the record for a second.

       BY MR. CAMERON:

            Sure.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 56

OFF RECORD

[BY MR. CAMERON:]

Q.    Does LaSalle Management Company have a uniform use of force policy that's applicable at all the correctional and jail facilities that it operates?

A.    No, sir.

Q.    Each facility is allowed to develop and implement its own use of force policy?

A.    Well, again, it would be -- for example, in Texas, it's going to fit the Texas Jail Commission requirements.  So they don't just go out there and just say, well, you know, hey, let's just make this up for our use of force policy.  They're all going to look a lot alike, but it's not developed from the corporate office as you asked.

Q.    And that would be the same for a disciplinary policy, there's not a uniform disciplinary policy that if you look at one institution, you're going to see the same exact thing at another facility?

A.    Not at this time, no, sir.

Q.    And that would be the same like with this personnel manual, the one at Jackson

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 57

Parish...

A.    Right.

Q.    ...may be quite different than this one?

A.    I wouldn't expect it to be a lot different than that one, but I -- I mean they're all going to probably hit on the same areas and talk about the same things and be very similar, but I'm just saying I'm not familiar with particularly Richwood's, but...

Q.    Right.  As executive director, have you ever reviewed the use of force policy, "Exhibit 81", for Richwood Correctional Center?

A.    I have not.

            BY MR. CALVIT:

                    And to the extent it may have been attached to a deposition and you thumbed through it.

A.    I've looked at this.

            BY MR. CAMERON:

                    Well, right.

A.    Yes.

            BY MR. CALVIT:

                    But you're talking about outside preparation?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 58

[BY MR. CAMERON:]

Q.    Outside of your preparation for this deposition, have you ever reviewed "Exhibit 81"?

A.    No, sir.

Q.    Have you ever made any -- let me rephrase. Have you or anyone on your behalf ever made a systematic review of the use of force policies at the various institutions that LaSalle Management Company owns and operates?

A.    No, sir.

Q.    One of the items on the notice of deposition is knowledge and actions of LaSalle Management Company regarding the deaths of Vernon White and/or Erie Moore.  What did you do to prepare yourself to be able to answer questions about that?

A.    You know, I've looked through the stuff I told you that I looked through before we came here, and I know what knowledge I have about it, so...

Q.    But it's true that you were not employed by LaSalle Management Company in Louisiana in October/November of 2015?

A.    That's right.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 59

Q.   And you were working in -- but you were working for LaSalle Management Company then, but you were in Texas?

A.   Yes.

Q.   Did you obtain any knowledge about those incidents in Texas?

A.   I don't remember having knowledge of them in Texas.  I remember Ray saying something about them later.

Q.   Where and when was that?

A.   I don't remember.

Q.   Do you remember where you were at when Ray...

A.   I don't...

Q.   ...said something about it?

A.   I don't remember.

Q.   In preparation for your deposition today on this particular subject, did you talk to anyone, like with William McConnell or any of the Temple family about knowledge or actions of LaSalle Management Company regarding the deaths of Vernon White and Erie Moore?

A.   No.

Q.   So the only knowledge that you have would come from the depositions and materials that you brought here today, is that right?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 60

A.    Yes, other than, like I said, I heard about it after the fact.  And that was probably -- and I don't know where and I don't remember, but -- I'm trying to think about that, but just Ray saying one time -- I think I was telling him about some things we had had happened and he had just mentioned that that turned out to be an incident with two inmates in a cell together, but I don't remember details of it.

BY MR. CALVIT:

And then for completeness of the record, there have been twenty-nine depositions taken of current and former employees.  To the extent those employees explained what they saw and heard, that would be knowledge of LaSalle.  We have three boxes of discovery responses that we have provided over the past three or four years.  Each

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

and every one of those documents would also be a portion of LaSalle's knowledge.  And so to the extent we need to show the extent of LaSalle's knowledge, I can either attach a copy of every one of the exhibits that would also include LaSalle's knowledge, or we can make reference to them and I'll provide a list to attach as LaSalle's 30(b)(6) responses relative to what LaSalle knows concerning the incident.  And don't forget the video.  I know there's a hard drive of terabytes of video.

BY MR. CAMERON:

Well, if you would like to attach a list, that would be good.

BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 62

                    Sure.
                BY MR.  CAMERON:
                    I'm not saying that's a
                sufficient  answer, but...
                BY MR.  CALVIT:
                    Well, sure, I know.

[BY MR.  CAMERON:]

Q.      But, sir, as far as what LaSalle knew, let me
        ask you this.  Who, as an employee of LaSalle
        Management Company, first became aware of the
        death of Vernon White?

A.      You know, I guess what I would say is I know
        that the warden was made aware of it.  I know
        that Johnny testified in his...

                BY MR.  CALVIT:
                    Johnny Creed.

A.      ...Johnny Creed in his deposition, and so I
        know that, you know, LaSalle had knowledge
        through what the warden and through what
        Johnny have already testified to.

[BY MR.  CAMERON:]

Q.      Anyone else besides Johnny Creed and Ray
        Hanson become aware of the death of Vernon
        White, say, during the time frame of
        October/November  2015?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 63

A.    I don't know exactly how that process would have worked because I don't believe that he died at the facility.  So a lot of times, you know, that takes a while for that information to get back, and I don't know who it would have gotten back direct to because I haven't read all the other depositions, but I'm sure it's somewhere in there.

BY MR. CALVIT:

And also, you looked at Kevin Sumrall's deposition and he offered some testimony about...

A.    That's right.

BY MR. CALVIT:

...what he knew and when he may have known.

A.    That's right.

[BY MR. CAMERON:]

Q.    Well, I need to be able to get an answer.  I mean...

BY MR. CALVIT:

Sure.

Q.    ...I don't know if...

A.    I just don't know specifically who was the

Q. first to know about the death of Vernon White.

Q. Well, I'm beyond first to know.  I just want to know who -- let's say during the year, remaining year of 2015, this happened October 13, 2015, who during that year with LaSalle Management Company became aware of the death of Vernon White?

A. I couldn't answer everybody.

Q. Have you been told -- let me rephrase.  Did LaSalle Management Company conduct an investigation into the cause of death of Vernon White?

A. No, because there had been one done by the sheriff's office.  Now, did the warden do any investigation after that, I think Ray has already testified to that, but when you say LaSalle Management, I'm not sure who you're referring to.

Q. Anybody employed or...

A. Nobody from the corporate office would have went over there and did an investigation after the sheriff's office had done theirs, no.

Q. Isn't that a standard practice in law

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 65

enforcement corrections if you have a death, that you go in and do an investigation to see what went wrong, see if anybody violated policies or practices?

A.    Well, it depends on, you know, you talked about a state agency might have an internal affairs division because it's a state agency and the legislature might require that.  A private company, we use a third party outside group to come do that, just like the sheriff's office, Texas Rangers, just as I told you.  So we have no reason to believe they're not doing a good investigation.

Q.    Well, would they look into such things as, well, the person who was monitoring the monitor at the time really didn't have very good vision and maybe that's a...

A    Most of the time...

Q.    ...problem with the company?

A.    ...they would, yes.  Texas Rangers are extremely thorough.

Q.    How about reviewing decisions to place a violent inmate or an inmate who had just experienced violence into a cell with another inmate who is acting erratically, would that

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 66

be something you would expect a third party sheriff to come in and look at?

A.    I would expect them to look at -- if they're coming in to investigate a death, I would expect them to look at everything from the time those people showed up at the facility until the time they went out of the facility and all the processes and procedures that took place leading up to.

Q.    Would you expect a third party like a sheriff who is investigating a homicide to report directly to the warden its findings?

A.    I would.

Q.    And if the...

A.    Unless the warden was suspected of being...

Q.    Implicated, right.

A.    I mean that's the only time I can remember where that somebody would say, look, we didn't go to the warden because we think the warden is...

Q.    Yeah, he's involved.

A.    ...involved in this, and I wouldn't expect them to.  But otherwise, they know the warden's responsible for the facility, and so they're typically going to report that as

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 67

soon as they discover it to the warden.

Q.    Were you aware in the case of the deaths of Vernon White and/or Erie Moore that the alleged crime scene had been cleaned before investigators came?

A.    I read that in here.

Q.    You would expect that the sheriff would report something like that to the warden?

A.    I would expect that if the sheriff felt like that was a problem, they would report it.  If they didn't feel like that was a problem, then I don't expect they would report it. And I say that because in all my years of correctional experience, I've seen it done both ways.

I've seen it where a crime scene has been preserved and we've been faulted for not doing something quicker, and I've seen it where it's not been preserved, but they have the equipment and availability to go back in and, you know, tell what happened in there anyway even if you clean the cell.  I've seen them go back in there and determine where any speck of blood was in that whole cell, even if you had completely cleaned that cell.  So

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 68

I've seen it both ways.

In this case, I don't know what the sheriff's investigator felt as far as whether they felt that was a problem or not a problem.  I do know that when I read it, you had blood and feces and chemical agents in there, and that in itself is a problem.

Q.   But if the sheriff did feel like it was a problem and didn't report it to the warden, how would LaSalle Management Company ever come to know, unless they did their own investigation, whether there was some kind of a problem like that at RCC?

A.   I mean I guess if you're saying the professional agency that investigated didn't share with us, then we've got a problem if the professional, you know, group doesn't tell us, but I've never seen where a group like that comes in and doesn't share what they find.  And I guess I would also say in all my years as a warden, I've never had a group not share with me what they found.

Q.   Do you have any information that Warden Hanson knew that that cell had been cleaned and he was already aware of that?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 69

A.      That it...

Q.      He was already aware that the cell had been cleaned?

A.      I don't have any information that would tell me that he knew.  I don't know when exactly he knew that it had been cleaned.

Q.       Now, going to Erie Moore, Sr., the event that led to his death happened the same day, October 13th, 2015, but...

            BY MR. CALVIT:

                Object to the form of question.  That is not a fact.  If you want to say a hypothet, that's fine, but that's not a fact.  It's not proven.  It's not a fact in evidence, so it's an allegation that you've made.

          BY MR. CAMERON:

                Sure.  There's evidence from not only opinions of highly educated and qualified physicians, but be that as it may.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 70

[BY MR. CAMERON:]

Q.    Events that led to Mr. Moore's death happened on October the 13th, 2015, but he didn't pass away until November the 14th of 2015.  Are you aware of who with LaSalle Management Company became aware of his death first?

A.    I'm not aware who became aware first.  I don't know.

Q.    Are you aware of -- besides Johnny Creed who may have been aware of Mr. Moore's death with LaSalle Management Company?

A.    I'm trying to make sure and answer your question...

Q.    Sure.

A.    ...the best I can, and I would say that any time there's an inmate death at a facility, it's usually going to be in the news, it's usually going to be on the, you know, I mean so everybody becomes aware of it.

Q.    Okay.  Well, I'm not talking about just like a media, watching TV, and that's how you find out about it, but you get some kind of official word this person died and that type of thing.

A.    I don't remember from the deposition.  I

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 71

would suspect Ray would have probably been the first one that knew.

Q.    So you did not conduct any kind of inquiry in your capacity as the 30(b)(6) representative into the knowledge about the death of either one of these individuals?

A.    No, sir.

Q.    Were you made aware that as a 30(b)(6) representative that you were required to obtain knowledge about these things, about these issues that are listed in the notice of deposition?

        BY MR. CALVIT:

                Object to the form of the question.  You're asking about attorney-client communications.  He will not speak about our discussions.

[BY MR. CAMERON:]

Q.    Did you become aware in any fashion about what your obligations were as a 30(b)(6) representative?

        BY MR. CALVIT:

                Object to the form of

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 72

the question.  That's still seeking attorney-client communications.

BY MR. CAMERON:

No, I'm not trying...

BY MR. CALVIT:

Yes, it is.

BY MR. CAMERON:

...to ask him what you told him.

BY MR. CALVIT:

No, he's not going to answer anything that would have came from me.

[BY MR. CAMERON:]

Q.    Are you aware -- let me rephrase.  Did LaSalle Management Company become aware that the Ouachita Parish Coroner designated the death of Erie Moore, Sr. as a homicide?

A.    I'm aware of that now.  I don't know when I became aware of that.

Q.    Okay, but I'm wondering about -- okay.  Who with LaSalle Management Company became aware in 2015 that the Ouachita Parish Coroner designated Mr. Moore's death as a homicide?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 73

A.    I couldn't tell you everybody that became
      aware of that.
Q.    Is there any written policy of LaSalle
      Management Company of what action to take if
      an inmate dies as a result of a homicide?
A.    There is no policy that dictates what action
      to take.  Every situation is different.
Q.    Does LaSalle Management Company have its own
      set of, you know, like a personnel manual?
      Does it have a personnel manual?
A.    We do have a personnel manual.
Q.    Does LaSalle Management Company have any kind
      of policies or procedures, like a book of
      some sort or a manual?
A.    It's like I was telling you earlier, because
      we have so many different things, we have
      different policies and procedures that apply
      at different places.
Q.    Give me an example of what you're talking
      about.
A.    So if you are housing -- let's say, we
      operate a facility that's all a hundred
      percent ICE.  So you have certain policies
      and procedures that apply to that particular
      group.  If you're housing DOC offenders, you

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 74

have certain things that apply that you have to do for DOC offenders in Louisiana that may be different from DOC offenders in Texas, that may be different from DOC offenders in Georgia.  So those would not be the same.  Do I wish they were all identical?  It would make it easier for me.

Q.   Okay.  So my question is, does LaSalle Management Company itself have its own set of policies or procedures that apply to LaSalle Management Company?

A.   I'm not -- I guess I'm not clear enough on what you're calling their own set.  If we have a set at Richwood, is that our set or is that not our set?  I don't know what you consider our set.  Our employees are following it.

Q.   I would consider a set of policies and procedures for LaSalle Management Company that has emblazoned on the...

A.   Yeah.

Q.   ...the top of it, LaSalle Management Company Policies and Procedures.

A.   Then I would say the answer is no to that.

Q.   Do you have at your office at headquarters

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 75

Q.   your own set of policies and procedures that have been issued at each of the facilities that LaSalle Management Company owns or operates?

A.   No, sir.

Q.   Do you have any of them?

A.   Probably.

Q.   Can you tell me which ones you have?

A.   I cannot.

Q.   Is there -- I know we live in the day of the Intranet, so...

A.   Right.

Q.   ...is there some way you can get on your laptop or a desktop and punch in a few numbers and then access a facility's policies and procedures?

A.   No, sir.  We would like to be at that point, but we're not there yet.

Q.   Going back to the death of Erie Moore, Sr., can you tell me who at LaSalle Management Company learned that the death of Erie Moore, Sr. was a result of blunt force trauma to the head?

A.   Can you repeat the first part of that?

Q.   Sure.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 76

A.    Did you say can you tell me who?

Q.    Right.  Can you tell me who at LaSalle
Management Company became aware that the
death of Erie Moore, Sr. was a result of
blunt force trauma to the head?  And I'm
talking like during this 2015 time frame.

A.    I would say Johnny Creed.

Q.    Johnny Creed, okay.  Anybody else that you're
aware of?

A.    Not anybody else I'm aware of.

Q.    Are you -- I want to say you, but I have to
say LaSalle.  Did LaSalle Management Company
notify the City of Monroe of this injury to
Mr. Moore?

A.    I don't know that LaSalle Management Company
notified them.

Q.    Do you know if Richwood Correctional Center
did?

A.    I would have to look back through the
warden's deposition.  I don't recall reading
about that.

Q.    Now I want to switch to the subject of the
October/November 2016 use of spray on the
inmates in the foyer.  Do you know what
incident I'm talking about?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 77

A.      Yes.

Q.      Who with LaSalle Management Company first became aware of that incident?

A.      I believe I would say Johnny Creed, but I'm not positive about that.  I know I became aware of it.

Q.      And how did you become aware?

A.      I talked to Warden Hanson.

Q.      Under what circumstances did you speak to Warden Hanson about that incident?

A.      I was -- I don't remember whether I called Ray or he called me.  I was just talking to Ray and he said, I've got reason to believe we may have a problem with some employees that may have done something that should not have been done and I'm checking into it.  And I just said, good.

Q.      And at that point in time, you were the executive director?

A.      Yes.

Q.      And did you give Mr. Hanson any advice or suggestions, recommendations?

A.      No.  I just told him I was glad that he was checking into it, you know.  I mean he knew -- they knew -- I would hope all of them know

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 78

that my advice to them is always be transparent and always follow the law and don't do anything outside of that.  And if we've got an employee that's not doing what they're supposed to be doing, we need to take the appropriate action, and it sounded to me like Ray was on track to do that.

Q.   There wasn't any kind of written policy or established practice that required Ray Hanson to call you and...

A.   No.

Q.   ...talk to you about that incident?

A.   No.

Q.   Now, do you understand that the spray incident that Ray Hanson called you about took place in a place called the foyer or the four way?  Are you aware of that?

A.   That's what I read in here.

Q.   Have you ever been to RCC?

A.   I've been through there, but I'm not sure I'm familiar with that terminology for that location.

Q.   Did you also learn at this point in time that the four way or the foyer was used as a place where correctional officers could talk in

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 79

private or interact in private with offenders?

A.    I'm not aware of that.  I know that that's a pretty busy location.  And I suspect that's why it's called a four way because there's things going four different directions from there, so it's kind of like a center.  So no, I was not aware that was a place.

Q.    Warden Hanson never shared with you that there was a practice of officers using that area to...

A.    I don't...

Q.    ...to go into...

A.    ...recall Ray ever -- I mean he probably shared with me later that's where or I read that's where they took them.

Q.    In your capacity as the 30(b)(6) representative for LaSalle Management Company, are you aware of any of this information that you just told me about being shared with other members of LaSalle Management Company?

        BY MR. CALVIT:

            The information that you -- being shared, could

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 80

you...

BY MR. CAMERON:

I'll rephrase.

BY MR. CALVIT:

Yeah.  Thank you because you asked a couple of questions.  I apologize.

[BY MR. CAMERON:]

Q.      As the 30(b)(6) representative for LaSalle Management Company, are you aware if the incident involving these correctional officers in October/November 2016 at the four way was shared with other employees of LaSalle Management?

A.      You know, I can't remember.  I couldn't tell you specifically, you know, what happened, but I would just say if there was a reason for me to believe that we may show up on the news or in the news because of something some employee did or didn't do, then that might be something I would say to others at the corporate office, if y'all see this, we had an employee that did or didn't do this, or we suspect this, so -- but I don't recall going specifically and saying anything to anybody

(800) 841-6863                                          www.pilant.com

PILANT
COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 81

about this situation other than I do recall Ray telling me that he was checking into it. And then I remember him telling me that he found that it took place and he was turning it over to, I believe, the sheriff's office and then eventually the FBI got it.

Q.   All right.  And I was going to follow up with that.  So he calls you one time and says this happened and I'm looking into it, then he calls you another time saying I've looked into it and it happened and I'm turning it over to the authorities.  Is that the...

A.   The way I remember it is once he got to the point where he was pretty sure it happened, he turned it over to the authorities because, again, if our wardens go too far in something like that, it looks like they're maybe trying to cover for somebody.  And this was a situation that could have been very racially motivated and we didn't want any indication of, you know, I know that that was Ray's concern was to get it turned over to some outside group to come investigate it and leave it as transparent as possible.

Q.   How much time do you recollect passing

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 82

between the time he first told you about it and the time he said I'm turning it over to law enforcement?

A. I would say within a few days. I know sometimes one will be at work and then they're not at work for a few days and sometimes it takes a little bit to get the right people back where you can make that determination, whether...

Q. Did Mr. Hanson describe to you what efforts he did make to verify, you know, that the incident did happen?

A. I don't remember him specifically going through those.

Q. Was there any remedial efforts made to ensure that this type of incident would not happen again?

BY MR. CALVIT:

And you're speaking of the October incident?

BY MR. CAMERON:

Yes, the October/November 2016 incident.

A. When you say that an incident won't happen

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 83

again, you're talking about humans,
employees, thousands of them, thousands of
places.  I mean I wish there was a way I
could say if something bad happened that we
could make sure that it won't happen again,
but in my forty years now, I've never found a
way to do that.

[BY MR. CAMERON:]

Q.    Well, let's say in this particular incident,
were you aware that this was a room that had
no security cameras, no video cameras in it
at the time the spray happened?

A.    Only after being told that, and so I would
expect the warden to try to remedy that
situation.

Q.    So one thing that may have taken place to not
necessarily, because like you say, we can't
prevent everything, but we can take steps to
make the likelihood less that it would
happen.

A.    Right.

Q.    By putting cameras in that room.  So do you
recall that happening?

A.    I recall that being an issue, you know, but
again, if you have an incident that happens

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 84

somewhere that hasn't been a problem before and it happens one time, you have to weigh out what all would you have to do to make sure that it never happens again.  I mean...

Q.    Now, would that be something that you would have to approve of, to using the money to put the cameras in that room?

A.    No, sir.

Q.    That would be something Ray Hanson could make that decision?

A.    That would be a decision Ray could make.  I'm not going to say Ray wouldn't say something to Johnny.  If it was going to be, you know, a hundred thousand dollars, he might say...

Q.    Well, I was about to ask, is there a limit? I mean does he have a threshold...

A.    There is not a written limit.  I'm just saying if I know Johnny, when I was in Johnny's role in Texas, if one of them was fixing to do something that was a whole lot of money, I might want them to -- I would want them to say something because they might talk to a fellow warden who had an issue that had found a way to solve that problem.  Why reinvent the wheel?  Talk to each other and

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 85

see what happened.

Q.     As executive director, did you have any responsibility to the owners that, you know, you're going to have at least X percent of profit coming off of a particular facility, and if we lose that, we're not, you know, it's not a good thing, anything like that?

BY MR. CALVIT:

Object to the form of the question.  It's outside the 30(b)(6).  No finances to be discussed.

[BY MR. CAMERON:]

Q.     You can still answer the question.

BY MR. CALVIT:

Hang on a second.  The judge's -- let me check the judge's ruling.

BY MR. CAMERON:

That was on the punitive damage part though.  I'm not going into financial net worth.

BY MR. CALVIT:

But I'm going to look at

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

the -- she had some language about what can't be spoken of.

BY MR. CAMERON:

Oh, he did, the judge, Judge Doughty did.

BY MR. CALVIT:

Yeah.

BY MR. CAMERON:

Well, the only reason I'm even venturing into this is this idea of spending money to ameliorate or remediate, you know, policies or practices.

BY MR. CALVIT:

Hang on a second.  It is further ordered -- this is document 197.  It's Judge Doughty's ruling of December 19, 2019.  It is further ordered that LaSalle's motion for protective order [document

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 87

number 174] is hereby granted.  The deposition of LaSalle pursuant to 30(b)(6) is limited to the extent that no information, facts, or evidence concerning LaSalle's net worth or other financial matters may be discovered.

BY MR. CAMERON:

So based on that, you're going to instruct him not to answer?

BY MR. CALVIT:

What's the question again?

BY MR. CAMERON:

I was asking if he was ever instructed by the owners of LaSalle Management Company that it was required he have a certain percentage of profit coming from each facility.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 88

BY MR. CALVIT:

Based on this, I'm going to instruct him not to answer.

BY MR. CAMERON:

We'll reserve.

BY MR. CALVIT:

Sure.

[BY MR. CAMERON:]

Q.    Have you, sir, been made aware of any of the Louisiana Department of Public Safety and Corrections regulations?  Specifically, there's one here that's called monitoring activity reports/unusual occurrence reports. Are you...

A.    I...

Q.    You can look at it.

A.    I'm sure I've seen that.  Yeah, I think I've seen that.

Q.    Are you familiar with it?

A.    No, I'm not real familiar with it because the wardens over here that have dealt with DOC, they would be the ones that would be more familiar with it.

Q.    Are you aware that LaSalle Management Company

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 89

may be required to report certain incidents to the Department of Corrections, incidents such as death, significant injury?

A.    I guess I need to clarify your question.  Are we talking about DOC inmates or are we talking about city inmates?

Q.    Let's talk about DOC inmates.

A.    Okay.  With DOC inmates, you do report inmate deaths.

Q.    And how about city jail inmates?

A.    City jail inmates I don't believe there's any requirement that does that.  It's the same thing in Texas.  It's -- the jail world is totally different.  I mean the city deal is totally different from DOC.

Q.    All right.  A jail inmate comes off of the street and he can be in any condition, whatever, but usually if you have a transfer from another DOC facility, they're going to be...

A.    Well, and they're usually in and out.  City is in and out.

Q.    Right.

A.    A lot of people, large volume.  DOC not so much.  So the regulations don't apply

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 90

typically to both.  That's why I'm trying to make sure I understand which one you're asking me about.

Q.    And why would you, as the executive director, believe that the Basic Jail Guidelines would apply to a Monroe city jail inmate?

A.    I'm not going to say they would, but I'm going to say the questions you've asked me so far about who would come in and inspect, and so, you know, we had a lot of DOC inmates there.

Q.    Do you know what training LaSalle Management Company requires of its employees, correctional employees?

A.    What training?

Q.    Yes.

A.    It depends on the requirements of the state or the user group.  Like I say, if it's ICE, there may be certain requirements that are not required by Louisiana DOC.

Q.    What efforts does LaSalle Management Company make to ensure and confirm that the facility is training the officers correctly?

A.    Again, I would tell you that with those groups that come in and audit us, if

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 91

employees are not being trained properly in some area, that's going to come up in an audit and then, of course, we're going to expect the warden to fix it.

Q.   So basically to make sure that the facility is complying with the Basic Jail Guidelines, the training, the use of force, that kind of thing, you're going to rely on the DOC inspectors, is that correct?

A.   I'm going to rely on them to come in -- I believe in all their checklists, that's part of it, to see if the employees are getting the training and attending.  The same thing, Nakamoto.  The same thing, ODO, they look at employee training.  Texas Jail Commission, they look at employee training.

Q.   Okay.  I'm going to ask you this next series of questions and I think I know what the answer is, but I'm going to ask them for the record.

A.   Okay.

Q.   How does LaSalle Management Company ensure and confirm that required training is conducted within the first year of employment?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 92

A.    Again, that's not an easy question.  We let each facility make sure that their employees are getting trained according to whatever regulations they're under.  In Texas -- and I know you're not asking me some questions about Texas, but I'm just trying to give you a good answer, a good example, if they don't get the stuff entered in the computer within that year, it kicks back and says this employee can no longer work at this facility because the training didn't get done within the year.  I don't think Louisiana's system is quite that sophisticated yet, but still when they come to inspect, they would probably say let me see all your training records.  And they'd pull that and they'd go down each employee and they'd see whether the training records indicated they'd had it, and if not, same thing.  So they do look at the training records and the wardens have to make sure that the staff are keeping good training records to prove that the employees got the training that they're required to have according to the guidelines.

Q.    How often does the Louisiana DOC conduct

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 93

inspections?

A.    I believe yearly in Louisiana.  Maybe twice a year.  I'm not -- I can't remember.  I'm getting them mixed up with some of the others.

Q.    And so how does LaSalle Management Company ensure and confirm that all annual in-service training is conducted?

A.    We expect the wardens to make sure that gets done.

Q.    So again, just like we talked about before, you're relying on the warden to make sure the training is done and that all the proper procedures are followed, is that right?

A.    Yes.  There's no way we could go out and see if every employee went through a training, be at every facility and check every -- that would take a whole lot of people to do that.

Q.    How does LaSalle Management Company monitor use of force incidents in local facilities and take corrective action when needed?

A.    Again, we expect our management team, the warden and assistant wardens to review those use of forces when they occur and take the proper measures to -- I forgot how you worded

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 94

it, but if there's something not being done right or an employee is not following those procedures, then we would expect them to address that and correct it.

BY MR. CALVIT:

And who would be them?

A.     The warden and assistant wardens.

BY MR. CALVIT:

Thank you.

A.     The management team is what I'm saying.  The major may be in it.  I mean, again, as long as none of that team was in the use of force.

[BY MR. CAMERON:]

Q.     Does LaSalle Management Company conduct any kind of risk assessment or risk management based on previous use of force incidents and take corrective action?

A.     It depends on the facility and who the contract is with.  We have some facilities that we have a risk manager person on the payroll that goes around and looks at that.

Q.     What facilities do you have risk managers in?

A.     I would have to go through and figure -- it would be like Alvarado because it's a hundred percent ICE facility and that's part of the

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 95

standard.  Probably Johnson County because it's -- it was large ICE.  So again, it depends on the user group and what the requirements are with that particular user group.

Q.    Do you have any such facilities in the State of Louisiana where you have a risk manager?

A.    Now that we have ICE detainees.

Q.    But before that, you did not?

A.    But before that, it was not a requirement.

Q.    Oh, I see.  So that's a requirement with the federal contract that you have a risk management assessment?

A.    In most of them.  It can be a dual responsibility, but you have to have a person that's identified as risk manager.

Q.    Does LaSalle Management Company review the kinds of training that the correctional officers are receiving to see if there's something more needed?

A.    You know, I can give you an example, again, in Texas.  Texas Commission on Law Enforcement Officer Standards did an audit.  Found at one facility that they didn't like the way the training was being conducted by

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 96

the training instructor and we ended up getting a different instructor.  Because it was already laid out what they should be doing and if they do what they should be doing, it's going to be good training.  In this case, the person wasn't doing it that way and so we said, okay, we're replacing that.  You know, which again, the warden was the one on top of that right away as soon as he got that report from that commission.

Q.    Well, I've noticed in some of the materials that the -- some of these correctional officers do not receive annual refresher training in defensive tactics, for example.  Has LaSalle Management ever looked at that to see if, perhaps, well, maybe we do need to give them some defensive tactics training?

A.    LaSalle Management would love to give...

        BY MR. CALVIT:

            Just answer the question first...

A.    Oh.

        BY MR. CALVIT:

            ...and then editorialize.

 

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 97

A.      Okay.

          BY MR. CALVIT:

              His question was has it
          ever happened.

A.      No.

[BY MR. CAMERON:]

Q.      Going back to the chain of command -- or not
        the chain of command -- yeah, the chain of
        command who offices there at the
        headquarters, you had indicated that there
        was something called M&T Properties, is that
        correct?

A.      (No oral response.)

Q.      Yes?

A.      (No oral response.)

Q.      That's a yes?

A.      That's a yes.  I'm sorry.

Q.      Okay.

A.      I'm sorry.  Yes.

Q.      That's all right.

A.       I didn't know if you were finished with your
        question.

Q.      Right, I understand.  So what function does
        M&T Properties serve in the correctional
        context?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 98

A.     None.

Q.     What function does it perform?

          BY MR. CALVIT:

               Object to the form of

          the question.  It's outside

          the 30(b)(6) notice.

[BY MR. CAMERON:]

Q.     Let me ask you this.  I'll just do it a
       little bit different.  As the executive
       director of LaSalle Management Company, do
       you have any supervisory responsibilities
       over M&T Properties?

A.     No, sir.

Q.     So it's an independent company?

A.     It is, yes.

Q.     Another entity that you talked about or
       listed here is a construction company of some
       sort.  What's the name of it again?

A.     BAS.

Q.     BAS.  Does it perform any correctional
       functions?

          BY DEPONENT:

               Can I give a little

          history here?

          BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 99

                    Just answer the question
                first.  If you have to
                explain it, explain it.
                Correctional  functions.

A.      No.

[BY MR. CAMERON:]

Q.      Does it in any way support the purpose of
        LaSalle Management Company?

A.      I would say we're looking at building a
        facility in Arkansas.  BAS may be the ones
        that build it.

Q.      Okay.

A.      Does that support the correctional function?
        I guess, they're building the facility.
        They've built most facilities in Louisiana,
        so I'm not sure I understand...

Q.      Right.

A.      ...your question.

            BY MR. CALVIT:

                When you say they,
                you're talking about BAS?

A.      I'm talking about BAS.  So I'm not sure...

[BY MR. CAMERON:]

Q.      Yeah.  So BAS Construction supports the
        function of LaSalle Management Company by

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 100

constructing the facilities that it operates?

A.    If they get the contract, but they do a lot of construction of things that have nothing to do with the correction industry.  So they may build a bank, they may build a church, they may build a...

Q.    Who knows.

A.    Whatever they bid on and get awarded the bid.

Q.    I understand.  And going back to M&T Properties, do they in part serve some support to LaSalle Management Company in obtaining sites for facilities to build?

A.    No, sir.

Q.    No, okay.  Are you aware of anyone with LaSalle Management Company who has changed a facility's policies or practices?  No?

A.    I'm trying...

Q.    Oh, I'm sorry.

A.    I'm just trying to think about that, but that's a pretty broad question.

Q.    Sure.

A.    I can't think of a policy or practice that's been changed.

Q.    Does LaSalle Management Company provide any kind of psychological assessment of any of

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 101

the correctional officers that work at any of the facilities?

A.    LaSalle Management does not.

Q.    Who does?

A.    We have contracts sometime with a psychiatrist, psychologist, whatever, to do a preemployment review of somebody.

Q.    Okay.  I'm going to show you -- this is a document that's been produced in the case. It is the Department of Regulations C5-001, and I'm turning to page RCC/DOC LJF141.  And this regulation seems to require a monthly report regarding activity data for category A incidents, category B incidents, and so forth down the line.  I just wonder if you have any knowledge of that practice?

A.    No.

Q.    LaSalle Management Company does not receive monthly summary report of activities and unusual occurrences from the facilities it owns or operates, is that...

A.    No.

        BY MR. CALVIT:

            Did you get that no?

        BY COURT REPORTER:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 102

                    Yes, sir.

            BY MR. CALVIT:

                    Thank you.

[BY MR. CAMERON:]

Q.      Does LaSalle Management receive an annual
        report regarding activities at the facilities
        it owns or operates?  And I'm talking about
        the activities -- the kind of activities I'm
        talking about are the same ones that we had
        on RCC/DOC LJF141 and 142.

A.      I'm not aware of any annual.  The BJG
        inspections have a lot of information on
        them.

Q.      Does LaSalle Management Company ever meet
        with the inspectors from DOC?

A.      No, sir.

Q.      I'm going to show you this one page, it's
        Bates stamped RCC/DOC LJF14, and this talks
        about -- it's a sheet that refers the reader
        to something called the incident management
        team or office.

A.      Incident management director.

Q.      Director, right.  Does LaSalle Management
        Company have a corresponding or similar type
        position within its company?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 103

A.      No, sir.  I've never seen this.  It's talking about work release offenders, so I don't -- I mentioned to you earlier Lexi kept up with work release.  So I don't know if she did that or not.  I would suspect the units did whatever had to be done with work release.

Q.      Since you've been executive director of LaSalle Management Company, have you had any meetings at all with any of the DOC officials?

A.      Yes.

Q.      What kind of things do y'all meet about?

A.      We met with them when we were talking about switching over to ICE and it was going to, you know, put them in a possible bind for having to find locations for the DOC inmates.  We met with them when we talked about Winn and taking over the Winn operation from the other company that used to have it.  We've met with them on treatment programs that we provide for inmates and -- DOC inmates that our company pays for.  We met with them one time when we were trying to set up a four year college program for the women over at Madison.  That's about the four times I can

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 104

remember actually meeting with like Secretary
Leblanc or Seth Smith.

Q.    And those were all face-to-face meetings?

A.    Yes.

Q.    How about like telephone conference calls or
telephone calls with representatives of DOC,
have you had any of those?

A.    No.  We have a meeting scheduled with them
over at the women's facility at Madison to
talk about some of the programs.

Q.    When you were first made executive director,
did you go through any kind of an orientation
program of any kind to kind of learn a little
bit about the Louisiana way of doing things?

A.    No.  It was really me talking with Johnny to
get the ideas of the difference between --
and Johnny and I had talked prior to that.  I
was in the role in Texas, he was over here.
We'd talk about differences.

Q.    Well, for example, some of these DOC
regulations, did you like have someone that
went over them with you or...

A.    Johnny explained the basic jail guidelines
and how they come and inspect and that kind
of thing to me.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 105

Q.    I'm getting close to being done.  I just want to kind of look over some of my notes here.

BY MR. CALVIT:

You mind taking a break?

BY MR. CAMERON:

That will be fine.

OFF RECORD

[BY MR. CAMERON:]

Q.    Has LaSalle Management Company ever discussed conducting its own inspections of its facilities rather than relying on DOC?

A.    We've discussed it.

Q.    Tell me what you've discussed.

A.    I mean we've discussed, you know, it would be nice to have enough people that you could have a team to go do some of that.  Mostly on the Texas side that we've discussed that.

Q.    How about on the Louisiana side, has that been discussed?

A.    I mean I'm just saying we didn't -- when we talked, we just had discussion globally, so...

Q.    Right.

A.    So if you're saying did we ever discuss it, we have discussed it.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 106

Q.    Discussed it, okay.  Has it been discussed
seriously or considered seriously?

A.    Well, I mean I would, I would say anytime
we're discussing something like that, we're
serious about it.  It's just, you know, some
things come to fruition and some things
don't.

Q.    Has LaSalle Management Company taken any
steps toward conducting its own inspections
here in Louisiana?

A.    What we've done in Louisiana is we have some
employees with the ICE now that -- so we
might have a person from Catahoula that will
go help do some pre-inspection stuff at
River.  So that's a first step.

Q.    All right.  Well, let's talk about pre ICE,
before ICE, before...

A.    No.

Q.    ...July/August 2019.  Was there any steps
taken by LaSalle Management Company to
conduct its own inspections?

A.    No.

Q.    And a step could be...

        BY MR. CALVIT:

            You keep saying no and

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 107

                              you keep talking.  Are you

                              getting the nos?

                         BY COURT REPORTER:

                              I am.

                         BY MR. CALVIT:

                              Okay.  Thank you.

[BY MR. CAMERON:]

Q.    And a step could be such as, you know, conducting a study or someone writing a memo about it or anything such as that.

A.    I mean because I would answer partly in saying in Louisiana, and I'm sure you know this, but the State of Louisiana pays what, twenty-four dollars a day to house a detainee.  So there's a lot of things you'd like to do, but you can't do them because the State doesn't -- they just don't pay.  I mean I hear that from everybody, not just LaSalle. I hear that from everybody in Louisiana is that we would love to have this, we would love to do this like they do in Texas or like they do in wherever, but we can't.

Q.    Just wouldn't be profitable to do it?

A.    No.

                         BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 108

That goes back to the prohibition.  It says nothing about -- no information or facts net worth or other financial matters.  I object and instruct the witness not to answer.

BY MR. CAMERON:

Well, he's talked about -- okay.

[BY MR. CAMERON:]

Q.     The State of Louisiana is just not paying enough to do that is what you're saying, right?

A.     I'm just saying it hasn't, yes, it hasn't been done in Louisiana.

Q.     Does LaSalle Management Company agree that it's a good correctional practice to isolate violent inmates from nonviolent inmates?

A.     Again, I can't answer that with a yes or no because if you look at all the studies and all the things in practice, there's a lot of people that will go against isolating anybody by theirself.  They do not like anybody to be

(800) 841-6863                                    www.pilant.com

PILANT
COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 109

in a cell by theirself because of the mental stress they claim that it puts them through.

On the other hand, some of us -- I can't speak for Ray, but some of us correctional people that have been in the facilities, if we could isolate every single person to themself, it seems like that would keep them from fighting or having any problems.  But again, not feasible, you can't do that.

Q.   So is it LaSalle Management Company's position that housing violent, known violent inmates with other known violent inmates is a good correctional practice?

A.   Who's violent, who's not violent?  What makes a person violent or not violent?

Q.   Say you have an inmate within the last four hours has attacked another inmate and caused injuries.

BY MR. CALVIT:

Objection.  This is well outside the 30(b)(6) notice.

[BY MR. CAMERON:]

Q.   Let's just say this.  For whatever reason, the jail determines that inmate is violent.

(800) 841-6863                                    www.pilant.com

PILANT
COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 110

Is it a good correctional practice to house that person in a two cell -- two person cell with another violent inmate?

BY MR. CALVIT:

Objection.  Outside the 30(b)(6).  Calls for speculation.  If you can answer the question, go ahead.

A.    Yeah, I really can't.  I mean the wardens have to make decisions on how they house people based on the best information they have.  The guy who is violent against me as a correctional officer may not be violent against you as another inmate.  At the same time, a guy that's violent against you as another inmate may not be violent against me as a correctional officer.  It depends on why they were violent and who they were violent with.  He might have been violent with his cousin who, in prison terms, snitched off on him and that's why he's in jail, but that doesn't mean he's violent against anybody else in the jail.  So it's not easy to sit there and armchair quarterback those

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 111

decisions unless you know all the details.

Q.      Does LaSalle Management Company contend that it's a good correctional practice to keep violent inmates segregated from other inmates?

          BY MR. CALVIT:

                    Object to the form of the question.  It's outside 30(b)(6) and he's already explained the facts and circumstances that would be considered to those kinds of decisions.  Object to the form of the question.  It's repetitive.  Outside the 30(b)(6).

[BY MR. CAMERON:]

Q.      You can still answer.

A.      My answer would be the same.

Q.       Does LaSalle Management Company agree that it's a good correctional practice to recognize the signs of mental health problems among inmates and utilize resources available in the community and in the jail?

          BY MR. CALVIT:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 112

Object to the form of
the question.  Re-urge
everything I just said.

A.      I would say yes.

[BY MR. CAMERON:]

Q.      Does LaSalle Management Company believe that
in common correctional training, a closed
fist strike to the head is a final target
area?

BY MR. CALVIT:

Object to the form of
the question.  It's well
outside the 30(b)(6).  It's
also assuming facts not in
evidence and calls for
speculation.

BY MR. CAMERON:

I disagree.  One of the
primary areas is use of
force.

A.      I would say on that one I didn't really
understand what you were trying to ask me.

[BY MR. CAMERON:]

Q.      I'll repeat.  Does LaSalle Management Company
believe that in common police or correctional

(800) 841-6863              PILANT              www.pilant.com
                       COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 113

Q. training a closed fist strike to the head is taught as a final target area?

A. I would say LaSalle Management Company doesn't try to decide what are good use of force practices.  Those are already defined.  And just like here with DOC, they've got good definitions on use of force practices and training, so we don't try to go in and change that.  LaSalle's position would be no use of force is the best use of force.

Q. Now, is it accurate to say that LaSalle Management Company does not require teaching of defensive tactics of its correctional officers?

A. Repeat, does LaSalle Management...

Q. Is it true that LaSalle Management Company does not require the teaching of defensive tactics to its correctional officers that work at its facilities?

A. I would say that's not true.

Q. That's not true, okay.

A. Not true.  There are places where we do require defensive tactics to be taught.  Again, it depends on the requirements of the location.  So there's many places we teach

(800) 841-6863          PILANT
COURT REPORTING          www.pilant.com

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 114

defensive tactics.

Q.    So talking about before July/August 2019, would it be true that LaSalle Management Company does not require its correctional officers to learn defensive tactics?

A.    I would still have to answer that that's not true.  LaSalle Management doesn't say we're not going to allow you to teach employees defensive tactics.  The wardens would be required to follow what's necessary.  And we want employees to get whatever training they can get to help them do their job, but I -- you're making it sound in the question like we're against defensive tactics, and I would have to disagree with that.

Q.    Does LaSalle Management Company require the teaching of defensive tactics?

A.    In some places and in some places, no.

Q.    Just whatever the local rule requires?

A.    Whatever the rule would require.

Q.    Does LaSalle Management Company contend that a practice of closed fist strikes to the head is considered deadly force?

A.    Again, LaSalle Management doesn't make that determination.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 115

Q.    LaSalle Management Company doesn't have any policies or practices regarding whether correctional officers are taught defensive tactics, is that right?

A.    You know, I keep -- I'm trying to answer your questions honestly and you're wording them where if I answer them -- if we do it over here and we don't do it over here and I answer it here, then I've answered it wrong somewhere.

Q.    I don't understand your answer.

A.    Well, I don't understand your question.

Q.    Okay.  Is it true that -- okay.  Let me rephrase.  This will be easy to answer.

A.    Okay.

Q.    Does LaSalle Management Company have any written policy that requires or suggests the teaching of defensive tactics to correctional officers?

A.    You know, again, I'm going to have to say that in some places it is in there that employees have to have defensive tactics.  So we don't have one standard rule book that goes out and says don't teach employees defensive tactics or you're not required to

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 116

teach employees defensive tactics.  So that's the best answer I can give you, the way that you're wording the question.

Q.   A minute ago we went through a series of questions and I think we finally got down to the point that LaSalle Management Company doesn't have its own policies or procedures, written policies or procedures except for maybe personnel?

A.   It doesn't have, like you said, one set that has a LaSalle deal that goes out to every place.  As I explained to you, they're all -- so if that's what you're referring to in all these questions, then I can answer that.  But we have a lot of places where employees are taught defensive tactics.

Q.   And LaSalle Management Company does not require or suggest that correctional officers that work at its facilities receive annual refresher training in defensive tactics?

A.   Same thing again.  We do require it where it's required.  We don't require it where it's not required.

Q.   Okay.  So you're relying on maybe the Basic Jail Guidelines or some other external

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 117

standard as to what your company does or doesn't do?

A.    Yes.

Q.    In the same vein, does LaSalle Management Company require its facilities to maintain a certain level of medical transport devices, like a stretcher, a wheelchair, that type of thing?

A.    Depends on the facility and what the facility's mission is.  If we have facilities where we have handicapped inmates that we're moving around, we would have wheelchairs to move them around.  If we're at facilities where we don't have handicapped inmates, we're not going to have wheelchairs around. We're not going to require them to have them there.  So that's a very broad question.  And you're saying do we require?

Q.    Uh-huh.

A.    So I would say we would tell the wardens to have whatever they need to meet the mission of the facility.

Q.    Things such as a back board or a stretcher might be, would you agree, might be used regardless if you have a handicapped inmate

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 118

or not?

A.    Could be, yes.

            BY MR. CALVIT:

                Object to the form of
            the question.  There's
            nothing about medical in
            the -- medical relative to
            implements in the 30(b)(6).
            Object.  It's outside the
            scope.

            BY MR. CAMERON:

                Well, I disagree.  I
            think it's relevant to use
            of force, but anyway.

[BY MR. CAMERON:]

Q.    Does LaSalle Management Company have any kind
      of written policies or is there a practice
      that facilities are to have a certain amount
      of first-aid equipment or, like I was talking
      about before, the stretchers, the back
      support?

A.    I would say just like, you know, back here
      when I looked at -- and I don't remember
      which one it is, but one of these has the use
      of force guidelines and it has certain

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 119

equipment that you would have and so they would be required to have that equipment that it's saying is needed there.  And I believe a first-aid kit would be on every facility.

Q.   But beyond the first-aid kit, anything else that LaSalle Management requires?

A.   Well, there's a lot of things that, you know, that we would have there, but again, I think you're asking me do we put out something in writing that says you're required to have specifically A, B, C, D, E.  We don't do that from the corporate office.  That comes in other procedures and all that come to the wardens and they would have them.

Q.   You're aware of the American Correctional Association?

A.   I am.

Q.   Does LaSalle Management Company require any of its facilities in Louisiana to follow those standards?

A.   No.

Q.   And why is that?

A.   My personal opinion is the ACA is just a way to get a lot of money out of different groups for -- so they can come say that they

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 120

inspected you.  And with all the inspections we already have, why just add one more to it?  That was my opinion before I ever came to work for LaSalle and that's still my opinion about ACA.

Q.   Have there been any serious discussions or steps taken by LaSalle Management Company to adopt ACA standards?

A.   We've discussed it and I've given my opinion.  You know, I've been in facilities that are ACA accredited that are not one bit better than facilities that are not, but if you pay them enough money, they'll get you past ACA accreditation.  I mean I hate to say that, but that's just been my experience, and so...

Q.   Going back to the incident Ray Hanson told you about in October/November 2016 where the spray was used in the four way, did you ever learn that Mr. Hanson found out that there was a standard practice to use OC spray for minor inmate violations?

A.   Could you repeat that part?

Q.   Sure.  During your discussions with Ray Hanson about the October/November 2016 spray incident, did you learn that there was --

(800) 841-6863    www.pilant.com

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 121

that he had found that there was a standard practice to use OC spray for minor inmate violations?

A.   I don't recall that.

Q.   Was there any kind of practice before the ICE detainees came in -- I'll rephrase it.  Has there ever been a practice with the LaSalle Management Company to have inner facility transfers where you might transfer a correctional officer from one facility, like Jackson Parish, to the LaSalle facility, anything such as that?

A.   I don't recall ever there being a policy.  If there was an employee that asked a warden, hey, can I try to go to work at Madison because I'm moving over there, we sure wouldn't be opposed to it if it's a good employee.

Q.   With Kevin Sumrall, he provides commissary services to all the facilities?

          BY MR. CALVIT:

               Object to the form of the question.  He doesn't provide anything.  There are companies that do that

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 122

and he has some involvement.

[BY MR. CAMERON:]

Q.    Is Kevin Sumrall involved in providing commissary services to all the facilities?

A.    Kevin was overseeing that operation at one time, and it was commissary not just to our facilities but other places as well.  He doesn't do that anymore.

Q.    At that time whenever Sumrall was doing that, was he working for LaSalle Management Company or another company?

        BY MR.  CALVIT:
            Object to the form of the question.  It's outside the 30(b)(6).  It's not relevant nor reasonably calculated to lead to relevant admissible evidence.

        BY MR.  CAMERON:
            Well, it goes to topic one.

A.    I guess the best answer I can give you is I don't know.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 123

[BY MR. CAMERON:]

Q.    But anyway, it was uniform services to all the different facilities?  What I mean by uniform, commissary services?

A.    Well, no, sir, it really wasn't to all.  It was to some.  Some facilities had a different commissary provider, so I couldn't name off to you exactly which ones he did which, but it was to several, maybe most.

Q.    I'm going to show you a document here.  It's called Correction Services Employee Manual dated November 29, 2016.  And the only question I've got for you -- one is, have you ever seen this before?

A.    No.

Q.    Do you have any idea if this manual in any way pertains to any of the employees that work at the facilities owned or operated by LaSalle Management Company?

A.    I don't think so.  I would say this is a DOC policy that pertains to their employees at their facilities.

        BY MR. CAMERON:

            Just for the record, the document I referred to has

 

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 124

fifty-eight pages.  I'm not going to mark it as an exhibit.

[BY MR. CAMERON:]

Q.    I'm getting close to wrapping this up.  From what I've heard from you, would it be accurate to say that LaSalle Management Company leaves all the operational decisions of a facility to the warden?

A.    Yes, sir.

Q.    And he has full authority of LaSalle Management Company on operating the facility?

A.    The warden is responsible for the day-to-day operations of the facility, yes, sir.

Q.    And he, the warden, is left to confirm conformance to whatever standards apply to his facility?

A.    That is correct.

Q.    Do you from time to time, as executive director, get requests from wardens that I need more men or women, need more personnel to operate, or do they pretty much seem to be pretty satisfied with the level of staffing they have?

A.    I can't remember -- I was trying to remember

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 125

if I've ever had one -- I've had a warden that's told me that they've hired somebody, you know, like I needed a captain on this shift, so I hired one.  But I don't recall -- I'm trying to think if I've ever had one call me and say...

Q.    I need more slots?

A.    Yes, more slots.  That's usually pretty established based on, you know -- now again, when we went to ICE, we brought on a lot more slots because it was required.

Q.    Okay.  Well, those I think are all the questions I have.   Did you understand the questions that you answered?

A.    Yes, sir, I think.

Q.    Well, any one in particular that you have...

A.    Well, we had a moment there on some of them.

Q.    Okay.

A.    I'm still...

Q.    I think we got through it though.

          BY MR. CALVIT:

               I want to take a quick break.  I think I have one area to venture into and we'll come right back in

(800) 841-6863                    www.pilant.com

PILANT
COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 126

just a couple of seconds.

Let's step outside.

BY MR. CREEKBAUM:

I don't have any
questions at this time, but
if Brad goes into an area
that makes me want to ask
some questions, I'll
reserve my right to that.

BY MR. CAMERON:

Okay.

OFF RECORD

EXAMINATION

[BY MR. CALVIT:]

Q.    Mr. Cooper, you've been questioned extensively about training and LaSalle requirements, etcetera.  Is there any training standards that are required through the Peace Officer Standards and Training Council for basic corrections?

A.    In Louisiana, yes.

Q.    Okay.  Sitting here today, do you know what the training standards were in 2015?

A.    I do not.

Q.    But if they were required, then that's what

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 127

LaSalle wanted, whatever the POST standards were in 2015 or whenever these people were hired?

BY MR. CAMERON:

I just want to object to the form.

A.      Yes, sir.

BY MR. CALVIT:

Sure, yeah.

[BY MR. CALVIT:]

Q.      True or not true?

A.      Yes, sir.  And that's what I was trying to say is whatever is required is what we did.

Q.      Yeah.

A.      Whatever was required by that.

Q.      But as far as LaSalle Management Company, LLC knowing whether POST training in 2015 taught straight arm bar takedowns or leg sweeps or hypoglossal pressure point control techniques, do you know any of that?

A.      I do not know.

Q.      Okay.  That's it.

BY MR. CAMERON:

I just have one final thing here.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 128

**EXAMINATION**

[BY MR. CAMERON:]

Q.   I just have one final thing here.  In the course of your employment as the executive director and working here in Louisiana, have you reviewed any of these policies that apply to local jail facilities that's marked -- this exhibit that's marked as "30b-3"?

A.   Well, this lists Basic Jail Guidelines as one of them on here and I think I've already, you know, testified that I have been through -- reviewed the Basic Jail Guidelines.  And some of the Basic Jail Guidelines have some of these subsets in them, sexual assault, sexual misconduct, searches of offenders, visitation, some of that.  So all of these I would -- I couldn't tell you yes, that I've seen all of these.  I've seen some of these.

Q.   And when you see them, are you -- do you have a particular question in your mind you're trying to answer and you look it up or are you reviewing the entire policy to learn it?

A.   It could be both.  I mean most of it would be just for my knowledge of what it is.  If somebody asks me a question that I thought,

(800) 841-6863            PILANT            www.pilant.com
                      COURT REPORTING

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 129

well, let me go look that up, let me go find that and research that, it could be both.  I could be going for a specific deal or I could just be looking for my knowledge.

BY MR. CREEKBAUM:

Nelson, when you're done, I have just two quick followups, so...

BY MR. CAMERON:

Okay.

BY MR. CREEKBAUM:

...let me know when you're ready for me to begin.

[BY MR. CAMERON:]

Q.    And I don't know if -- I can't remember right now whether we talked very much about this one about the activity reports/unusual occurrence reports.  Are you familiar with this policy?  It's listed on here.

A.    I'm not really familiar with that one.  I saw that one, and that pertains to DOC inmates.

Q.    And you're not -- I think we went over it, but you're not familiar with the monthly reports and things such as that...

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 130

A.      Right.

Q.      ...that DOC requires?

A.      Right.

BY MR. CAMERON:

All right.  I'll tender.

EXAMINATION

[BY MR. CREEKBAUM:]

Q.      Mr. Cooper, my name is Brandon Creekbaum. I'm the assistant city attorney for the City of Monroe, and I'm representing the City of Monroe and Tommy Crowson in this matter.  I haven't spoken much today, so I'd be shocked if you still remembered that I was here, but I'll try to make this very brief.

A.      Okay.

Q.      From LaSalle Management's perspective, was RCC in compliance with the Basic Jail Guidelines in 2015?

A.      Yes, sir.

Q.      In 2015 or -- well, let's keep it a couple of years before.  The period from 2013 to 2015, was LaSalle aware of any significant deficiencies noted by the State or any inspectors with connection to the Basic Jail Guidelines?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 131

A.      I am not aware of any.

Q.      Okay.   And LaSalle certainly didn't inform the City of Monroe of any deficient findings, to your knowledge, did they?

            BY MR. CALVIT:

                And, Brandon, I'm going to go ahead and interject that's outside the 30(b)(6).   If he has knowledge of that, he can answer.

            BY MR. CREEKBAUM:

                Okay.

A.      I'm not aware of any.

            BY MR. CREEKBAUM:

                All right.   That's all I have.   Thank you.

            BY MR. CAMERON:

                I just have one followup.

                        EXAMINATION

[BY MR. CAMERON:]

Q.      Mr. Cooper, how are you able to determine if RCC was in compliance with the Basic Jail Guidelines in the year 2015?

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 132

A.    Only because when I talked to Johnny when I came over here and when he was showing me about that Basic Jail Guidelines inspection, what they do and kind of what they write, and I asked him had they had any that had failed an inspection.  Because in Texas, we had Texas Jail Commission and there were times when they would take you out of compliance for a short period of time.  And Johnny told me no, there's not been any, so that's how I based my comment.

BY MR. CAMERON:

All right.  Do you have anything else?

BY MR. CALVIT:

No, I'm good.

BY MR. CAMERON:

Okay.  I just want to -- I don't know if I need to formalize an objection now to some of the answers apparently that Mr. Cooper, as well knowledgeable as he is, apparently wasn't prepared adequately I think

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

in some of the areas, particularly regarding knowledge of LaSalle Management Company's awareness of the deaths of Mr. Moore and Mr. White and the facts of the coroner's designation of Moore's death as a homicide and things such as that.  And there probably -- there were some other areas here I believe that he wasn't adequately prepared in, but I can -- we can do it in a motion perhaps if we need to, but I just want to put something on the record now.

BY MR. CALVIT:

However you want to handle it's fine.  If you can release the witnesses, they've got to try to beat the storms back.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 134

BY MR. CAMERON:

Sure.  I don't have any further questions of them.

BY MR. CALVIT:

Okay.

BY MR. CAMERON:

Now, you indicated also, Brad, is you're going to make a list of some...

BY MR. CALVIT:

Yeah.

BY MR. CAMERON:

...things that...

BY MR. CALVIT:

I wanted to get a list done and it didn't happen. I have them physically here.  I think there's twenty-nine depositions and all the discovery responses and...

BY MR. CAMERON:

Right.

BY MR. CALVIT:

...that would be

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 135

responsive to some of the topic areas.

BY MR. CAMERON:

Well, do you want to make that an exhibit, like "30b-4"...

BY MR. CALVIT:

That's fine.

BY MR. CAMERON:

...and then you can transmit it to the court reporter...

BY MR. CALVIT:

Yeah.

BY MR. CAMERON:

...and we can attach it?

BY MR. CALVIT:

Yeah.

BY MR. CAMERON:

All right.

BY MR. CALVIT:

So y'all are released. Do you have anything else you want on the record?

BY MR. CAMERON:

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 136

                    I think that's it.
          BY COURT REPORTER:
                    Reading and signing?
          BY MR. CALVIT:
                    Gentlemen, you have the
          right to read and sign.  I
          recommend that we waive
          that.  Typically read and
          sign is if you're an expert
          and you're throwing out
          multi syllable words of a
          technical nature like a
          doctor or an engineer.  I
          would recommend under those
          circumstances that we'd
          read and sign.
          BY MR. COOPER:
                    I defer to you.
          BY MR. CALVIT:
                    All right.  Ray?
          BY MR. HANSON:
                    Yes, sir, whatever you
          want.
          BY MR. CALVIT:
                    We'll waive.

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 137

BY MR. CAMERON:

All righty.

BY MR. CALVIT:

Thank you.  Y'all be
safe going back.

BY MR. CREEKBAUM:

Thanks, gentlemen.  All
y'all be careful in this
weather.  Have a good day.

DEPOSITION CONCLUDED 2:00 P.M.

READING AND SIGNING WAIVED

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 138

**CERTIFICATE**

**STATE OF LOUISIANA**

**PARISH OF RAPIDES**

**I, SONDRA JOINER, Certified Court Reporter, #21003, in and for the State of Louisiana, do hereby certify as follows:**

**THAT as the officer before whom this testimony was taken, I do hereby certify that RODNEY COOPER, DESIGNATED REPRESENTATIVE OF LASALLE MANAGEMENT COMPANY, LLC, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinabove set forth in the foregoing pages;**

**THAT this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;**

**THAT the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the Board, and that I am informed about the complete**

(800) 841-6863    **PILANT**    www.pilant.com
**COURT REPORTING**

Erie Moore, Jr., et al v. LaSalle Corrections, Inc., et al
Rodney Cooper

Page 139

arrangement, financial or otherwise, with the person or entity making arrangements for deposition services;

THAT I have acted in compliance with the prohibition on contractual relationships as defined by Louisiana Code of Civil Procedure, Article 1434, and in rules and advisory opinions of the Board;

THAT I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, and

That I am not related to any of the parties in this suit, am not of counsel for any of them, and have no financial interest in the outcome hereof.

IN WITNESS WHEREOF, I have hereunto affixed my signature this 28th day of February, 2020.

_____

SONDRA JOINER, CCR #21003