UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

* * * * * * * * * * * * * * * * * * * *

ERIE MOORE, JR., TAMARA GREEN
AND TIFFANY ROBINSON

VERSUS                    CIVIL ACTION NO. 3:16-CV-01007

LASALLE CORRECTIONS, INC.,
ET AL.

* * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF

JOHNNY M. CREED, JR.

October 11, 2018

* * * * * * * * * * * * * * * * * * * * *

Taken At The Office Of:

Duke Copeland Reporters, LLC
111 Hudson Lane, Suite A
Monroe, Louisiana 71201

* * * * * * * * * * * * * * * * * * * * *

Reported By:

MARGARET ANN COPELAND
CERTIFIED COURT REPORTER
CERTIFICATE NO. 92160
PARISH OF OUACHITA
STATE OF LOUISIANA

### Duke Copeland Court Reporters

P.O. Box 4177, Monroe, LA 71211     Tel. 318-387-2889  Fax 318-387-32711

APPEARANCES:


                              FOR ERIE MOORE, JR., TAMARA GREEN AND
                              TIFFANY ROBINSON:

                                   MR. NELSON W. CAMERON
                                   ATTORNEY AT LAW
                                   675 Jordan Street
                                   Shreveport, Louisiana 71101



                              FOR LASALLE MANAGEMENT, INC., ET AL:

                                   PROVOSTY, SADLER, DELAUNAY,
                                      FIORENZA & SOBEL
                                   Post Office Box 1791
                                   Alexandria, Louisiana 71309-1791
                                   appearing herein by and through
                                   Mr. H. Bradford Calvit



                              FOR RODERICK DESEAN DOUGLAS:

     VIA TELEPHONE:           PETTIETTE, ARMAND, DUNKELMAN,
                                      WOODLEY, BYRD AND CROMWELL
                                   Post Office Box 1786
                                   Shreveport, Louisiana 71166-1786
                                   appearing herein by and through
                                   Mr. Edwin H. Byrd, III



                              FOR CHRISTOPHER LORING:

                                   MR. LAVALLE B. SALOMON
                                   ATTORNEY AT LAW
                                   700 North 2nd Street
                                   Monroe, Louisiana 71201

APPEARANCES:

FOR CITY OF MONROE AND OFFICER TOMMY CROWSON:

    MR. BRANDON CREEKBAUM
    ASSISTANT MONROE CITY ATTORNEY
    Post Office Box 123
    Monroe, Louisiana 71203

FOR OUACHITA PARISH SHERIFF, ET AL:

WAIVED               USRY AND WEEKS
APPEARANCE:          1615 Poydras Street, Suite 1250
                     New Orleans, Louisiana 70112
                     appearing herein by and through
                     Mr. Thomas Allen Usry

INDEX OF EXHIBITS

Page No.

144 - Email with attachments...................... 32

7 - Richwood Correctional Center - Policy

     and Procedures............................. 76

84 - 1/1/2009 Field Operations Monitoring

     Serious Unusual Occurrence Review Panel...... 88

75 - Minimum Jail Standards...................... 98

**Duke Copeland Court Reporters**

<u>STIPULATIONS</u>

It is stipulated and agreed between counsel that this deposition of JOHNNY M. CREED, JR., is taken pursuant to Notice by counsel for the plaintiffs, and may be used for all purposes permitted by the <u>Louisiana Code of Civil Procedure</u>. All objections, except as to the form of the question and the responsiveness of the answer, are reserved until such time as the deposition is offered and introduced into evidence.

* * * * * * * * * * * * * * * * * * *

The witness, JOHNNY M. CREED, JR., was advised of his right to read and sign this deposition, and he elected to exercise that right.

JOHNNY M. CREED, JR., being first duly sworn, testified as follows:

MR. CAMERON:  Mr. Creed, my name is Nelson Cameron.  We met just before the deposition. As you know, I represent the family of Erie Moore, Sr.  I'm just going to ask you a few questions, a little bit about your background, and what you may know or may not know about what happened out there at Richwood.  If I ask you a question you don't understand what it is I'm trying to ask you, just ask me to rephrase it or explain the question to you, so you understand it.  Okay?

WITNESS:  Okay.

MR. CAMERON:  And verbalize all of your answers, please.

MR. CALVIT:  And just for record, I think earlier we had mentioned that Mr. Creed has a hearing impairment, and so I've asked him anytime he can't hear or doesn't understand the full question, to ask you to repeat it or rephrase it.

MR. CAMERON:  Sure.  Yeah.  What will you do if you can't hear my question?

WITNESS:  Ask you to repeat it.

MR. CAMERON: Yes, sir. Thank you. If you don't, like I said, understand the question, just ask me to rephrase or explain it to you. And please verbalize all of your answers. You're doing well so far, and please don't interrupt me while I'm asking my question, and I won't interrupt your answer. Okay?

WITNESS: Deal.

MR. CAMERON: All right. And you understand that as an obligation to tell the truth, you're not to leave out truthful information from your answer. You understand that?

WITNESS: Yes, sir.

MR. CAMERON: All right. If you do respond to a question, I have to assume that you've understood the question. Is that fair enough?

WITNESS: Yes, sir.

MR. CAMERON: All right.

EXAMINATION BY MR. CAMERON:

Q   Please give me your full, legal name.

A   Johnny M. Creed, Jr.

Q   All right. And what does that M stand for?

A   It's just an initial.

Q   There's no name that goes with it?

A   No name goes with it. It's just an M.

Q    Hadn't have heard that one before, but okay.

A    That's all I can give you.

Q    What's your current residential address?

A    2354 Highway 550, Spearsville, Louisiana 71277.

Q    All right, sir.  And your date of birth?

A    12/11/52.

MR. CALVIT:  I'm sorry.  I just got a text from Allen Usry.  He's going to be here at 1:30.

MR. CAMERON:  All right.

COURT REPORTER:  Yes, sir.

MR. CAMERON:  So, I assume he's waiving his appearing for this?  We'll have to assume that, since he says he's not going to be here until 1:30.

Q    Okay.  Where is your current place of employment?

A    I'm retired.

Q    All right.  When was the last time that you were employed?

A    When was what?

Q    The last time that you were employed.

A    I've been retired since November the 1st of 2017.

Q    All right.  And where did you retire from?

A    LaSalle Management.

Q    When were you first employed with LaSalle

Management?

A    When was what?

Q    When did you start?

A    Oh.   September 1, 2007.

Q    And were you working for LaSalle Management at that time?

A    Yeah.  I began working for them on that day.

Q    Between September 1, 2007 and November 1, 2017, have you worked for any other entity--any other organization?

A    I retired from the State of Louisiana in July. Now, I was actually on a leave for six months.

Q    Okay.  We'll get in to all of that.  What I'm asking you is, during the time you worked for LaSalle Management, between September 1, 2007 and November 1, 2017, did you work for any other--

A    No.

Q    --company or organization?

A    No.

Q    Were you paid by any other company or organization--

A    No.

Q    --between those two dates, just for earned income?

A    No.

Q    Okay.  I know you are retired.  You might've gotten payments from DOC or whatever.

A    No.

Q    I wasn't asking about that.  All right.  So, before September 1, 2007, when you began working for LaSalle Management, who were you working for?

A    Louisiana Department of Public Safety and Corrections.

Q    And what was your last position held with Louisiana Department of--

A    Chief of operations.

Q    Chief of operations?  Okay.  And when did you first become chief of operations?

A    Chief of operations was in--that's when Blanco became--  It was in 2004 when Blanco became governor.

Q    And prior to being chief of operations, what was your position?

A    Assistant secretary for the DPS and C.

Q    Were you assistant secretary over any particular area?

A    I was initially appointed for adult services.  Then those duties expanded to--I oversaw juvenile and, of course, there was other things I picked up, you know, when--in there, you don't--that don't have it's own department name, you know, and all of those responsibilities and stuff.  Adult services was pretty much going to carry everything.

Q    All right.  Okay.  What period of time were you

assistant secretary?

A    From 1993 until 2004, when I assumed the role of chief of operations.

Q    And prior to being assistant secretary DPSC, what was your position?

A    I was employed at Wade Correction Center in Homer, Louisiana.

Q    What position did you hold there?

A    Well, my last position there was chief of security, lieutenant colonel.

Q    Did you work with Mr. Hanson, who was the warden at Richwood?

A    At Wade.  Yes.

Q    And at Wade, did you work with Antonio Turner?

A    I worked with Antonio.  I remember him.  I mean, he worked for me.  I mean, I was the chief of operations, you know, and I don't recall exactly what his role was.

Q    Okay.  Let me rephrase that.  At David Wade, did you work with Antonio Turner?

A    Yes.

Q    And what position did he hold, and what position did you hold at the time?

A    I held several positions at Wade.  I mean, I went in--I was a--I went in at ground level and promoted through the ranks, you know.

Q    Were you ever warden at David Wade?

A    I was warden on paper, but not--I never acted in the actual capacity.

Q    Getting back to Antonio Turner though and Hanson, were you their superiors?

A    Yes.

Q    And how about Archie Altman, did you work with him at David Wade?

A    Same thing as Turner and Hanson.

Q    All right.  Okay.  You say on paper you were a warden, but you did not act as a warden?

A    That's a--

Q    Kind of explain that for me.

A    It's kind of a weird situation when all that was-- When I appointed assistant secretary, I went from my position to Baton Rouge on what was known as a senior executive loan, which allowed me in the event--  That job it was a political appointment, you know.  Eventually I went out of that job, and I went back there.  I had job security I could go back to.

Q    Got you.  So, the highest position you had at David Wade was chief of security?

A    Right.

Q    On the premises.

A    And I, you know, sort of had type capacity rank.

Q    When did you start working at David Wade?

A    January of 1981.

Q    And before working at David Wade, did you have any other correctional experience?

A    Before 1981?

Q    Yes, sir.

A    No.  Well, let me back up.  I did.  I worked at LTI Monroe for a short while before I transferred over there.

Q    All right.  And tell me what you did there.

A    Sir?

Q    What did you do there?

A    I was just a correctional officer.

Q    And when you began working at David Wade, did you go in as a correctional officer?

A    Correctional officer.

Q    And like you said, you worked your way up the ranks?

A    Right.

Q    Now, going to LaSalle Management, you were hired there as director of operations.  Is that correct?

A    Chief of operations.

Q    Chief of operations.  Excuse me.  All right.  You ever held the title of director of operations?

A    There is a title.  I had the designation of chief of operations, and there was a director of operations that's

listed on the website, you know, but I didn't worry about anybody but mine.

Q    What were you duties as chief of operations for LaSalle Management?

A    Just primarily was somebody to come to with a question and then my--  Most of my actual time was spent with consulting with sheriffs and things like that and filling beds.

Q    What do you mean by filling beds?

A    Getting inmates from--DOC inmates that was sent up by the courts to the DOC, you know, where you had--and just-- and find them--finding them out there, you know, and bringing them in to our beds.

Q    So, you were kind of like selling beds--selling your beds in your facilities?

A    Kind of what now?

Q    Selling your beds in your facilities?

A    No.  I wouldn't call it selling my beds.  It was just a matter of we had empty beds.  If we had empty beds, we wanted them filled, you know, because, you know, we were paid for those--  If there was an inmate in that bed, you know.

Q    Your job was to go out and find inmates to fill the empty beds you had?

A    Yeah.

Q    Is that correct?

MR. CALVIT:  You need to say yes or no.  Say yes or no.  You were nodding.

A    Oh.  Yes.  Yes.  Yeah.

MR. CALVIT:  And let him finish his question.

WITNESS:  Okay.

MR. CALVIT:  It makes it cleaner when she goes to type it up.  When you get the idea of where he's going, you jump in.  Well, let him go ahead and finish the idea before you jump in.  Okay?

MR. CAMERON:  That's good advice.  Thank you.

Q    Okay.  Any other things you did for LaSalle Management, other than you said consulting with sheriffs and filling beds, anything else that you did?

A    Well, I'm sure over the years.  I mean, it was--I may have--  Well, I attended functions, you know, as a representative of the company, you know, things like that.

Q    You indicated that you were somebody that would answer questions.  Tell me a little bit more about that.

A    If a warden at one of our facilities had a particular, you know, he stumbled upon, you know, run in to something, you know, he hadn't handled before or something like that, he might call me for some direction or advice or something like that.

Q    Okay.  Did you hire any people, any slots, any

**Duke Copeland Court Reporters**

positions?

A   I did not hire or fire anybody with LaSalle.  I mean, at the--where Hanson was concerned, I think Hanson--you know, there were three or four of them, you know, that I had worked with in the past when we had openings at the warden's level, I may have made a recommendation, you know, that they be hired, but I had no hiring or firing really authority just within me.  It was all cleared above me.

Q   Did you have any authority to impose discipline or recommend discipline?

A   That was the warden's job.  I mean, that--

Q   Okay.  Who was your boss?

A   William McConell.

Q   Is he the person who hired you?

A   Yes.

Q   Where was your office at?

A   Sir?

Q   Where was your office?  Where was your job station or your duty stationed?

A   Ruston.

Q   Is that on the Bastille Road location.

A   Bastille.  Yeah.  I don't remember what the number is.  Bastille Lane, something like that.

Q   So, you're saying you were chief of operations. What facilities did you have any kind of connection to, as

chief of operations?

A    What facilities I had connections to?

Q    Right.  That might be a bad way of putting it.  Let me see.  I know there are some other facilities besides Richwood that is in the LaSalle Management portfolio.  Don't you have Bayou Correctional and LaSalle Correctional and some of these other facilities?

MR. CALVIT:  Answer yes or no, sir.

A    Yes.  Yes.

Q    So, you'd be trying to fill beds in all of these other facilities?

A    Right.

Q    Did you have any duties to inspect or monitor any of the facilities?

A    Yeah.  I had to--if you said monitor, I mean always--it was always--I made periodic visits, you know, to each of the facilities, you know.

Q    And what would you be doing in these visits?

A    Checking for bed space was the first thing on the line.  Just maybe casually, you know, asking, you know, was there any, you know, anything I can assist with, you know, with anything they--situations they was having with the main office or anything like that, you know, with the buying groceries, you know, stuff like that.

Q    Did you ever sign off on any reports of any kind?

A    Not on no regular basis, I never signed off on any reports.

Q    But on an irregular basis, any reports you signed off on?

A    You talking about from an incident--from a prison or from an office?

Q    Either way.  I mean, I'm just asking you.  Do you put your name and your signature on some kind of report that's going to be sent to either McConell--

A    If I had a--

Q    Let me finish my question.

A    Okay.

Q    --that's going to be sent to McConell or to any other organization, like DOC or somebody like that?

A    To another--to a sheriff or something, I might send a letter or something like that.  I'd sign off on that.

Q    But you're saying, not reports.

A    I didn't look at it as a report.  Most of those were like just letters and things like that, you know.

Q    Just give me an example of what the subject matter would be of these letters.

A    Well, like Union Parish, you know, we had--we had inmates that worked on work release up there at a site in Union Parish, and Union Parish facility also had inmates that worked at that same site, you know.  And keeping those

numbers, and at one point, you know, we were asked to take that operation and all of that.  I looked at it, you know, and didn't see it to be feasible, so I sent them a report--I mean, a letter, you know, acknowledging such.

Q    Looking at Richwood Correctional Center, did you have a closer connection to that facility, you know, because Hanson is working there, Turner is working there, Altman is working there, y'all had worked together at David Wade.  So, I'm just wondering if you had some closer connection that facility than the other ones.

MR. CALVIT:  Nelson, part of what he does is he lip reads a little bit, and if you ask questions with your hand kind of covering your mouth, he sometimes struggles to piece it all together.

MR. CAMERON:  Okay.

MR. CALVIT:  And I'm not getting on you, I'm just--

MR. CAMERON:  No.  No.  That's perfectly okay.  If you need me to do something to help understand what I'm saying, just let me know.  That's fine.

Q    So, the question being because of your connections that you had at David Wade with Hanson, Altman, and Antonio, and they worked at Richwood, I was wondering if you had some

closer connection to that facility than you did, say, to all of the other ones?

A    No.  I mean, not in the respect of favorites or anything like that, because I had--there were other guys that I had worked with too, you know.  It was all--  I didn't--I didn't spend any more time there or visit there any more than I did to any of the rest of them.

Q    Did you have any responsibilities to--  I know you told me about the beds, but how about staffing at the facilities.  Did you make sure that the facilities had adequate staffing?

A    No.  That was the warden.  That's the warden's responsibility.

Q    And were you involved in any of the inspections?  The inspectors from DOC would come in and inspect the facilities, would you assist them or communicate with them any?

A    No, sir.  Probably I made a--probably I made an effort to stay away because of my prior role in headquarters, you know, with DOC, you know, and I didn't want to feel, you know, where I was looking over shoulders.  I mean, I made a special point, you know, not to be there when they came in.

Q    In your time with the department of corrections, were you ever an inspector yourself?

MR. CALVIT: Object to the form itself.  Are

you talking about basic jail guidelines inspector?

MR. CAMERON:  Right.  Basic jail guidelines inspector.

A    I went out.  We had--each region of the state has-- like this eleven or twelve parish region area up here has a-- it has a jail monitor, they call it.  Each--you have those different regions in the state that has that.  I may have-- when I--I'm talking now when I was with the state.  Okay.  I may have went out, you know, just as an observer.  I didn't actually participate in the inspection, because I mean I had to keep a--

Q    In your time at DOC, did you ever participate as an inspector at any facility?

A    Yes.  I participated.  I didn't participate with a form, you know, checking off things.  I went with the team that was inspecting and all of that.  I may have reviewed their reports, you know, as I--when they were completed. Now, I was an ACA auditor, American Correctional Association, but I didn't make no inspections in Louisiana.  That was just a rule.  I mean, you could not inspect in your home state, you know.

Q    What time period were you an ACA auditor?

A    Sir?

Q    What time period were you an ACA auditor?

A    I think from 1995 until 2001, somewhere around there.

Q    And what states did you go to to inspect?

A    I went to Michigan, Florida, Kansas, Massachusetts. I think that's probably about all I know.

Q    So, in your time as the chief of operations for LaSalle Management, how much of your time would you spend at the office, rather than out in the field?

A    Probably-- I don't know.  Probably, I would say, thirty percent my-- Out of a hundred, okay.  Thirty percent probably office time.  I probably spent most of my time just in parishes that we didn't have no business in with sheriffs, you know.  I was trying to get inmates, you know, from them. That was probably, I'm going to say, forty percent.  And then, the rest of the time was probably visits, you know, within to the facilities.

Q    In what parishes would you be visiting trying to get business?

A    Any one of the sixty-four in Louisiana.

Q    All right.  Okay.

A    I may get a call, okay.  It may--I may--the visit might be started off with a phone call.  I heard, you know, that a certain parish had inmates, something or other.  I'd get up in the morning, you know, and take off.

Q    As far as the wardens of the facility, would you

have any input in to hiring or firing wardens?

A    Hiring and firing wardens themselves?

Q    Yes, sir.

A    Yeah.

Q    Okay.  Any other positions?  Assistant wardens, would you have any say so on who gets hired for that?

A    I left that to the warden, because he's the one that has to work with him.

Q    All right.  Now, did you sign a contract of employment with LaSalle Management?

A    No.

Q    Were you provided a job description?

A    No.

Q    Do you know whether you had the authority to fire, say, a line officer at a facility that you got information about?

A    I never asked.  I mean, it was a--because I mean it was just something I seen as a warden's responsibility, you know.  I mean--

Q    As far as the staffing levels at any given facility, you said that's left to the warden?

A    Yes.

Q    Who sets the budget for the warden?

MR. CALVIT:  And if you don't know, that's fine.  Don't guess.  If you're guessing, tell

**Duke Copeland Court Reporters**

him.

A    I don't really know.

Q    Okay.

A    It wasn't me.

Q    Okay.  All right.  Was there anybody that you're aware of there at the home office who would set the budget for any given facility?

A    Yeah.  The business office who the wardens work through on all.  I mean--

MR. CALVIT:  If you're guessing, you're guessing.  If that's what you think or that's what you know, just tell him.

MR. CAMERON:  I really don't want you coaching the witness, but I mean I understand what you're saying, and that's good, you know, but we need to keep away from coaching.

MR. CALVIT:  That's fine.

Q    Okay.  So, there's a business manager, and you think they're the ones that handle the money.  Is that what you're understanding?

A    Yeah.  I wasn't the business manager, so I didn't.

Q    Okay.  Did you have any authority regarding the rates of pay for any of the employees at any of the facilities?

A    I left that--  Again, that was, you know, a

warden's responsibility.

Q    And how about training.  Who has authority about what level of training new hires are provided?

A    The level of training for officers?

Q    Newly hired correctional officers.  That's right.

A    That was determined by the basic jail guidelines.

Q    And what's your understanding of what training is required of, say, correctional officers hired at Richwood Correctional Facility?  Do you know what that level is, at least back during the time that you were working at LaSalle Management?

A    That post corrections course.  I mean, as far as I--that's the last I know.  But like I said, that's determined--  It's the same thing for every jail in the state that houses state inmates.

Q    Have you ever worked in a jail?

A    No.

Q    You've worked in prisons?

A    Yep.

Q    There is a fairly big difference, is there not, between prisons and jails.  Right?

        MR. CALVIT:  Object to the form of the
        question.  Vague and ambiguous.  Answer it if
        you can.

Q    Yeah.  You may get an objection from time to time from Mr. Calvit.  He likes to object a lot to questions.

MR. CALVIT:  I object to that characterization.

MR. CREEKBAUM:  That objection comes from me too.

Q    But until you're told not to answer a question, you're required to answer the question, if you understand it.  Okay.  And you can ask me to explain a question if you don't understand something.  So, as far as jails and prisons, there are some significant differences between how they operate.  Right?

MR. CALVIT:  Re-urge my objection.  Answer it, if you can.

A    Okay.  The difference--  Yes.  There's a difference.

Q    The biggest difference is the jail is getting people straight off the street--

A    Right.

Q    --and prison is not getting them straight off the street.  Is that correct?

A    Yes.

Q    A jail has to accommodate situations where they may get a prisoner off the street who hasn't been treated for mental health issues or is intoxicated or high or something

like that, and a prison, typically, doesn't have that type of an issue.  Right?

A     That's my understand.  Yes.

Q     A jail has to be able to classify the prisoner coming in off the street and determine, you know, where to put that prisoner at, whereas a prison typically has already classified those individuals.

A     Yes.

Q     Is there a difference in the training for a jail correctional officer than for a prison correctional officer?

A     I really don't know.

Q     I'm just going to show you some documents here. This says, "Richwood Correctional Center."  This is a letter, Bates stamp RCC/Loring 143, and it's got a letter to Mr. Loring from Ray Hanson, and it's about some false statements or unnecessary use of force by Mr. Loring.  Now, biggest question here is not really about the substance here yet, but up here it's got your name, and it says, "Chief of operations."  Is that accurate what the letter says it designates you as?

A     Is that right up there (indicating)?

Q     Right.

A     Yeah.  That's what I told you earlier.  That's what my title is.

Q     Okay.  How often would you actually be at Richwood

Correctional Center?

A    I don't really know I, you know-- You could say often, I mean.  You know, I may go there twice this week.  It may be three weeks before, you know, I drive in there again.  Then it may be a week or two weeks that there was nothing.

Q    No regular--

A    They could see me three times in a week, maybe, you know.  There-- I just had no set--

Q    What kinds of things would cause you to go to Richwood?

A    A typical-- If I was coming back from, say, Alexandria, coming up 165 and it was 1:30 or 2 o'clock in the afternoon, and I'm coming by there, I may swing in just to stop, you know, say hello or something like that, "Anything going on?"

Q    All right.  So, sometimes you'd go there just by chance, like you said, just to make a friendly visit.  What else would take you to Richwood?

A    If they've had an escape, you know, at all, I might go.  If the escapee was still out, you know, I might--had not been captured, you know, I might go over, pick up anything, you know, that he might--you know, if it was handy for me.  If I wasn't somewhere needed in another direction, you know.

Q    Okay.  All right.  So, might go there if there has been an escape.  Any other reasons?

A    If there was a--  If he called me and said, you know, asked me could I come down, I would go.

Q    All right.  And he being the warden?

A    Yes.

Q    Okay.  Any other reasons that you might go to Richwood Correctional Center?

A    Just for need and haphazard, I guess.

Q    Now, you say you might go there if there was an escape, or would you go there if there was any other type of major incident?

A    Possibly.  Yep.  Like this incident here, you know.

Q    And we'll get to that in just a minute.  How do you normally get notice of there being a significant incident there at Richwood?

A    How would I what now?

Q    How would you be notified?  How would you find out?

A    By phone, normally.

Q    Do you ever get any reports directly from wardens about incidents?

A    Occ- -- Yeah.  Occasionally, I did.  If--reports was not something that I was a driver on, okay.  Because again, it would fall back to the warden's responsibilities and his duties in keeping records and that.

Q    Okay.  Here's a copy of an email.  It's RCC 391. I'd just ask if you recognize that.

MR. CALVIT:  His first question is, do you recognize that?

A    Do I recognize this?  I mean, it's not something that I just recall.  No.  I mean, I'm not--  It's to me.  Obviously, he sent it to me, you know.

Q    All right.  You're going to identify this as an email from Ray Hanson to you, Johnny Creed, on October the 14th, 2015?

MR. CALVIT:  Do you want me to keep this in front of him, or do you want it back?

MR. CAMERON:  No.  He can keep it.

MR. CALVIT:  Okay.

Q    Can you identify that?

A    Yeah.  It's an email from Ray Hanson to me.

Q    All right.  Now, he indicates, "Mr. Creed, I've attached all documentation regarding the Vernon White B/Eric [sic] Moore incident on 10/13/2015.  This is for your review."  The question I got for you right now is, did you review the information that he sent to you?

A    I can't say that I did.  I'm going to tell you what on this--on something like this, what I probably would've done was, when I got this, is I forwarded it right on to Ryan Horvath, who was our attorney there in the office.

Q    And where is Ron Horvath located?

MR. CALVIT:  It's Ryan Horvath.

MR. CAMERON:  Ryan?

MR. CALVIT:  All right.

Q    Does he have an office there in the same building where you have an office?

A    Yes.

Q    All right.  So, you do not believe you reviewed any of the information that was provided to you by Mr. Hanson?

A    No, sir.  I really don't.  I mean--

Q    Now, I have some documentation here that when this was sent to me in discovery, these other things were attached right behind it.  So, I don't know if this is what was in this email or not or if that was the intent when the discovery was provided, but I want to give you this and ask you, do you know what was attached to that email?

MR. CALVIT:  This is the same email.  Right?

MR. CAMERON:  Yes.

MR. CALVIT:  Yeah.  This is another copy of this (indicating)?

MR. CAMERON:  Yes.  Same email.

Q    I just want to see if that's the documentation.  As you can see, the numbers are all sequential.

A    This--  I would've, you know--

Q    You don't know what was sent?

A    I don't know.  Yeah.

Q    You have no memory of it?

A    I couldn't say I ever--  I can say with pretty much certainty that I didn't sit down and read through any kind of stack like this.  It was--  I clicked it to Horvath.

Q    All right.

A    Because that's what he's getting paid the big bucks for.

Q    Yeah.  So, you passed the buck to him?

A    Right.

Q    Okay.  All right.  So, what I'm going to do here, is I'm going to attach the batch of documents with the email on top as "Exhibit 144."

            MR. CALVIT:  Am I correct, this would be inclusive of this (indicating)?

            MR. CAMERON: Yes.  That's right.  Yeah.

            MR. CALVIT:  Okay.

Q    Once you passed this on to the attorney, Ryan, were there any discussions about this incident?

            MR. CALVIT:  Object.  Attorney client privilege, if you're talking about discussions with Ryan.  If you're talking about discussions with anybody else--  In other words, clarify your question, if you wouldn't mind.

            MR. CAMERON:  Okay.

Q    Well, okay.  So, there's an objection about

communications with Ryan.  Did you have any communication with anyone else about this incident after you got this email?

A    Nothing--  I don't recall having any conversation with anybody else on it.

Q    Is it true that you actually went to the facility, did you not, on the night of the incident?

A    Yes.

Q    Okay.  And you were requested to be there by Mr. Hanson.  Is that right?

A    Yes.

Q    Tell me what he told you when he first informed you of the incident.

A    I was in South Arkansas, just over the state line, when I received his call.  And well, to make it abundantly clear, you know, I mean, he didn't actually request that I come down.  He was informing me, you know, and all, and I informed him that I would be on my way.

Q    Yes, sir.

A    And I left and went, you know, and got there.

Q    All right.  Let's focus on my question a little bit.  What did he tell you was going on at the facility?

A    He just told me they had an incident.  Now, this is best recollection, you know, and all.  They had an incident. It was pretty severe, you know, and all.  They had called the

sheriff's office and two inmates involved, and it was two city lockups, because I can--I'm--I always cleared that up. And other than that, that was probably about it on the phone call.

Q    All right.  Do you have any idea about what time it was that you received the phone call?

A    No.  I mean, it was in the evening.

Q    All right.  And how long does it take you to get from wherever you were to the facility?

A    I'm guessing probably a little over an hour.

Q    All right.  Well, tell me what you did when you arrived at the facility.

A    I went in.  Well, when I drove up, you know, I saw the sheriff's office--I mean, sheriff's vehicle up, you know, in the front.  And when I went in, I went in to the hallway, and I saw Captain Holyfield with the sheriff's office, and then I don't recall who I saw first.  I remember Altman was there, and I remember talking--  When Hanson--  I don't remember talking to--  What I remember talking to Hanson about, I said, "Has the sheriff's office--have they assumed an investigation?"  He said, "Yes."  And I don't know.  I hung around there maybe five minutes or so, and then I left. I was there for a very short time.

Q    Okay.  While you were there, did you speak to any of the sheriff's deputies like Holyfield or any of those

folks?

A    Did what?  I'm sorry.

Q    Did you speak to any of the sheriff's deputies?

A    I spoke to Captain Holyfield.  Yeah.

Q    All right.  What do you recall him telling you about what the situation was?

A    No.  I did not talk to him about the situation at all.  Not that I recall.  I just--  I know I would have.  I know him well enough to--

Q    How do you know Holyfield?

A    Well, I mean everybody knows everybody over here, you know.

Q    Well, I know, but you're in Ruston.  So, you know everybody in Monroe?  I don't understand.

A    When it comes to sher- --you know, I can take you down to Rapides Parish down there, you know, and introduce the people, you know--the people that I've become acquainted with over the years and all.

Q    This is from you traveling from parish to parish--

A    Yeah.

Q    --for inmates to fill beds.  Is what you're talking about?

A    Right.

Q    Okay.  All right.  Let me ask you this.  In the effort to fill beds with inmates, is there any kind of, what

we call, wining and dining going on, where you, you know, solicit business for the company, you know, take them out to eat, that kind of stuff?

A    You might want to run that by again.

Q    Run that by you again?

A    Yeah.

Q    In your effort to fill your beds with prisoners, do you, from time to time, what I call wine and dine some of the folks you're trying to get inmates from, like taking them out to eat or things like that?

A    We probably had a lunch and things like that.  Did I buy lunch, you know?  No.

Q    All right.

A    Because I always felt that I had the edge if I had to convince them to let me have inmates, and then I got a free lunch too.

Q    Well, yeah.  I can imagine so.  So, there was socializing going on?  That's how you get to know some of these guys, like Holyfield or Hollyfield, whatever his name is.  Does that sound right?

A    Yeah.

Q    Okay.  All right.

(OFF RECORD INTERRUPTION.)

Q    We're back at Richwood Correctional Center.  Okay? And you being advised by Hanson and you arrived there, and

you say you only stayed there five minutes.  Is that right?

A    Well, I'm not going to say just five minutes, but it was a short time.

Q    All right.

A    I don't know what time.

Q    While you were there, did you see any video, for example?

A    Did I see who?

Q    Any video, any recording of the cell where the incident happened?

A    No.

Q    Did you go to the cell?

A    Did I what?

Q    Did you go to the cell where the incident happened?

A    Do I know where the cell was?

Q    No, sir.  I'm asking, did you go to and see the cell--

A    No.

Q    --where it happened?

A    No.

Q    Did you see either of the two inmates that were involved in the incident?

A    I do not recall seeing either one of them.

Q    And once you left the facility, where did you go?

A    Back home.

Q    All right.  And what was the next contact that you had with Mr. Hanson about the incident?

A    The next contact that I had with him?  Well, I'm--I can't actually remember, but it would be safe to say, I mean, the next day, you know.

Q    Now, this email we talked about that we marked as "Exhibit 144" is dated the next day at 12:50 p.m.  Do you think this is your next contact, or did you have some verbal communication with him?

A    I'm--I actually do not recall, but based on what I know my habits was, I'm--you know, I'm sure I called him the next morning.

Q    All right.  Did you ever get an understanding of what happened at Richwood Correctional Center that--

A    After the--  Yeah.

Q    Okay.  You were going to say after the what, after--

A    Well, it was after I called them the next day.

Q    Okay.  That next day, what was your understanding of what happened?

A    That two inmates in a cell involved in a fight, and one literally beat the other one to death.

Q    Okay.  And did you get an understanding of how that happened--how that happened there or how could it happen?

MR. CALVIT:  Do you understand his question?

Ask him, if you don't understand the question.

A    I understand the question.  I mean, how it could happen, I mean, you got two inmates in a cell.  They obviously had a difference of opinion of something.

Q    Well, the inmates in the cell are supposed to be supervised.  Right?

A    Yes.

Q    And one of the responsibilities of the correctional facility is to protect inmates from one another at times.  Right?

A    Right.

Q    Yeah.  So, how is it that the Richwood Correctional Facility was not able to intervene in this fight to stop it before it got to the point that someone died?

MR. CALVIT:  Objection.  Calls for speculation.  Lack of personal knowledge.

A    In a prison setting, you have any number of inmates, anywhere from, you know, ten to thousand, you know.  And this is something that happens every day, and in all of my years, I--I'm--I do not recall a correctional officer actually being right there when the first lick was passed to get stamped right between them.

Q    Okay.  In this particular cell, did you know it was monitored by video?

A    I probably did.  I know there were some of them.

Q   Did anyone suggest to you that the one inmate did not beat the inmate to death but that the inmate who died had a seizure?

A   Did anybody suggest that to me?

Q   Right.

A   No.

Q   Did anybody indicate to you that this inmate who died had had multiple seizures before this?

A   No.

Q   And the one inmate, as you say, who allegedly beat the other inmate--

MR. CALVIT:  That's not what he said.

MR. CAMERON:  Okay.

MR. CALVIT:  If you're going to--

MR. CAMERON:  Well, I thought he said one beat the other to death.

MR. CALVIT:  I think he said literally beat the other to death.

MR. CAMERON:  Yeah.  Oh.

MR. CALVIT:  He didn't say allegedly.

Q   Yeah.  Well, okay.  That's an objection without basis, but anyway.  So, the one inmate who was supposed to beat the other inmate, what happened to him?  Do you know?

A   One inmate beat the other inmate, and what happened then?

Q    What happened to the one who beat--supposedly beat the other one to death?  What happened to him, Mr. Moore?

A    I wasn't there.

Q    Okay.  Did anybody report to you anything that Mr. Moore, who is supposed to be one who beat Mr. White to death, that Mr. Moore suffered a head injury?

A    I don't know what kind of injuries he suffered.

Q    All right.  Did anyone suggest to you, at any point in time, that the other inmate, I'm talking about Mr. Moore, that's the one that supposedly beat this Mr. White to death, that Mr. Moore had died from injuries suffered at Richwood Correctional Center?

A    I knew Moore, at some point after that, they took him to the hospital, and then I was informed--I don't know if it was like a couple of days later or sometime, that he died, you know.

Q    Okay.  And did anyone indicate to you or tell you how he suffered the injuries that he died from?

A    I don't recall that.

Q    As the director of operations--

MR. CALVIT:  Chief of operations.

MR. CAMERON:  Excuse me.

Q    --chief of operations, do you have any authority to initiate investigations of unusual occurrences?

A    We weren't an investigative company agency or

anything.  I mean, the only instructions I gave on that particular incident, you know, when all--that was the evening when it happened, when I went there and left, the only thing I recall telling Warden Hanson when I left, you know, just be sure, you know, you got all of your reports together and all, which was--  That was all.  A typical comment I would've made to any warden on any incident, you know.

Q    So, you had no authority to require any kind of internal investigation of any unusual occurrences?

A    No.  The sheriff's department had already had it.

Q    Okay.  I need to ask you the question and get you to answer my question.  Okay?

A    Okay.

Q    My question is, did you have any authority to institute an investigation in to any unusual occurrences at any of the facilities that you were the chief of operations over?

A    That's--  My authority would've went, as far as the investigations go, to advise the warden to have the sheriff's office come in, you know, if an investigation was needed on something.

Q    Would you like to know if one of the correctional officers--one or more of the correctional officers at Richwood Correction Center injured Mr. Moore and caused his death?  Would that be important to know?

A        Rephrase your question now.

Q        Would it be important for you to know if correctional officers at Richwood Correctional Center caused the death of an inmate?

A        I suppose it would.

Q        Maybe it would be and maybe it wouldn't be is what you're telling me?

A        I'm saying--I mean, I never got that information. So--

Q        Now, did anybody at Richwood Correctional Center ever tell you that there was some breakdown in the surveillance of the cell that the two inmates were in?

A        No.

Q        Anyone ever suggest to you that the person who is watching the monitors of that cell had poor vision?

A        No.  But they wouldn't have been suggested--  That would've--  Again, you're talking about warden responsibilities going on.

Q        Now, I know Mr. Hanson, he sent you the email we identified and possibly some reports.  Okay?  Did you ever receive any other material from Mr. Hanson, besides possibly what was attached to the email?

A        On this incident?

Q        Yes.

A        I don't recall any.  No.

Q    You never saw any video of any of what happened?

A    I never looked at any video on that.  No.

Q    Did you listen to any audio recordings of any witness statements?

A    No.

Q    Do you recall if you received any audio recordings of any witness statements?

A    I don't recall receiving any audio, video, or any of that.

Q    Did Mr. Hanson ever suggest to you that one or more Richwood employees should be disciplined as a result of what happened that night, October 13th?

A    Did Mr. Hanson report this to me?

Q    No, sir.  I'm asking did Mr. Hanson suggest to you that some of the employees need to be disciplined for what happened in lockdown seven on October the 13th?

A    Mr. Hanson would've had to took that initiative on his own.

MR. CALVIT:  The question is a little different.  He's asking if--  Go ahead and repeat it.  Answer his question specifically. If you have to explain it, then explain it.

Q    Yeah.  I'm just asking, did Mr. Hanson ever suggest to you that employees at Richwood need to be disciplined?

A    No.

Q    I mean, you got involved in discipline before of other employees.  Didn't you?

A    Did I what?

Q    Haven't you involved in discipline of other employees at Richwood Correctional Center?

A    At the warden's level--assistant warden's level.

Q    All right.  But nobody below that?

A    Not the wardens.

Q    Okay.  You were involved or got a report of some sort about Antonio Turner.  Did you not?

A    Did I receive a report, you're saying?

Q    Yes, sir.

A    Yeah.  The warden reported some action on Antonio Turner.  Yeah.

Q    All right.  And what did you do with that report?

MR. CALVIT:  Object to the form of the question.  I'm not sure that y'all are talking about the same report.

MR. CAMERON:  Right.

MR. CALVIT:  If you have a report--

MR. CAMERON:  Yeah.

Q    Hanson sent you a letter about Mr. Turner.  Right?

A    I don't recall, I mean, exactly a letter or nothing, you know.

Q    All right.  Can you tell me why Mr. Hanson might be

communicating with you about Antonio Turner?

MR. CALVIT:  Object to the form of the question.  Calls for speculation about Hanson's state of mind.

Q    Do you know?

A    Hanson talked to me.  We talked about Antonio Turner.  I--I do recall discussions.

Q    Did you make any decisions about Antonio Turner's employment?

A    No.  That wouldn't have been my decision.

Q    Did you request Mr. Hanson to report to you about Antonio Turner?

A    I don't recall making a request.

Q    We'll have to find the letter.  Let's see.  Let me ask you this.  Do you know a person by the name of Francis Tiley, who was an HR specialist?

A    I'm sorry.  I didn't--

Q    Do you know a person by the name of Francis Tiley, T-I-L-E-Y, human resource specialist, who worked for LaSalle Management?

A    I know the name.  I'm not real familiar with her.

Q    All right.  We may have to go off the record and find it.

(OFF RECORD.)

EXAMINATION BY MR. CAMERON, (continuing):

Q    You don't have any clear memory right now of being involved any in the termination of Antonio Turner?

A    I just recall, you know, Antonio having some problems, and the warden, you know, did what he had to do on all of that.

Q    Do you recall one of the allegations against Mr. Turner was use of force?

A    I'm sorry?

Q    Do you recall one of the allegations against Mr. Turner was that he used excessive force?

A    I--you know, I don't know.  For some reason, I thought his problems had to do with a female with the--

Q    Well, there was a female involved.  Yes.

A    All right.

Q    There was some chemical spray of an inmate.  Do you recall that?

A    It was what?

Q    A chemical spray of an inmate who made some inappropriate comments towards a female guard.  Does that refresh your memory any?

A    I remember the female.  I just don't remember the--

Q    The facts?

A    I just don't--I don't remember the chemical spray.

Q    Do you recall any kind of conversation you might have had with Warden Hanson about Mr. Turner's employment,

besides what you just told me, such as, "We need to terminate him," or "He needs to be suspended," or whatever the case might be.

A    I don't recall any specific conversation.  I can-- the conversation he had, I just--I know I would've told Warden Hanson, you know, "You make the decision.  Do what you got to do," you know.

Q    As far as Mr. McConell, have you ever spoken to him about any of the expenses of the operation of any facility?

A    There have been occasional, you know--that we talked about cost and things like--like food cost and things like that, you know--

Q    All right.

A    --that he might've asked me to check on or something like that, you know.

Q    Did you provide to him, Mr. McConell, any suggestion or directions on how to save money at facilities?

A    No.  I can't--you know, that--I mean, it wasn't part of, you know, what was expected of me.  Uh-uh (no).

Q    How do you know that?

A    Well, I mean, he had a business office, you know, that did--there were other people that handled the purchasing or ordering and stuff like that.  I just--

Q    You and Mr. McConell ever talk about staffing levels at facilities?

A    I don't recall any specific conversations, but I mean, it would've been--again, that's basic jail guideline, you know.  It has to be staffed according, you know, for the--to meet the guidelines.

Q    Does a facility have to be staffed according to the number of beds in the facility or according to the number of beds that are filled?

A    The--the basic jail guidelines, it's adequate staff, you know, has to be, you know, there.  Now, when they make their inspections, they look at the log books, things like that, and make that determination if the facility has adequate staff.

Q    Are you aware of any ratios that facility should have, as far as ratio of staff to number of inmates?

A    Not at the jail level.  At the state facilities, I was familiar with the--

Q    What were those?

MR. CALVIT:  At what time?  Object to the form of the question.

MR. CAMERON:  Well, I'll ask him about that later.  Okay.  Just let me ask the questions.

MR. CALVIT:  I object to the form of the question.  It's vague and over broad.  He was in corrections for almost forty years.

MR. CAMERON:  Okay.  We'll get to all of

that.

Q   All right.  So, what were the ratios that you knew?

A   I don't remember the specific numbers and all of that, but I knew, you know, there was ratios that we use.

Q   Okay.

A   And you had different--in the state facilities, you know, the layout was different, so it may be different--one over here was different than one over here, you know.

Q   Yes, sir.  Okay.  Where did these ratios come from?  Was there like a book, a manual of some sort, to tell you what the ratio should be?

A   It--it's on, you know, all the state facilities are accredited in the ACA, American Correctional Association has.  They set the standards.  They have a standard, you know, on all of that, you know, guard to inmate, you know, ratio.

Q   All right.  And I know you're retired now, but are you doing any kind of consulting work at all?

A   I don't do nothing.

Q   Nothing but fishing and hunting?

A   That's-- You got it.  And trap.

Q   All right. And trap? Okay.  All right.  So, the last time that you even saw any of these kind of ratios that you are speaking of would've been while you worked for DOC or while you worked for LaSalle Management?

A   That would've been DOC.

Q    All right.  But those ratios, as far you know, they still existed, even while you worked for LaSalle Management? In other words, if you went to ACA, you could've found those ratios?

A    I'm sorry.  I don't follow your question here.

Q    Okay.  The ratios you spoke of, you said those existed during a time that you worked for DOC, and I guess you're talking about the times you inspected facilities outside the State of Louisiana for ACA.  Right?

A    Right.

Q    Okay.  so, during the times you're working for LaSalle Management, as far as you know, those ratios still existed out there, but they're with ACA?

A    Yeah.

Q    Did any of those standards apply to any of the facilities under your direction?

A    No.  Because none of them were ACA accredited.

Q    Okay.  So, if they're not ACA accredited, y'all don't have to worry about those standards.  Is that right?

A    That's right.

Q    Did you ever have any conversations with William McConell about the death of Vernon White or the circumstances that led to his death?

A    I don't recall any conversation, other than I may have been the one that told him, you know, that he was

deceased or something when I was told, you know.

Q   You had no specific recollection of that?

A   I can't remember having a specific conversation about it.

Q   All right.  And same question, did you ever talk to William McConell about the death of Erie Moore?

A   Same.  It would've been the same.

Q   You don't know whether you did or not.  Right?

A   No.  Right.

Q   All right.  Do you know if William McConell had any kind of correctional experience, prior to getting in to the private correctional business?

A   Do I know if William McConell had correctional experience?

Q   Right.

A   I don't know.

Q   Has he ever mentioned anything like that to you?

A   I never asked him, I mean, if he had correctional experience.

Q   He's never mentioned, "Hey.  I used to work in a jail before," or "I used to be a correctional officer."

A   Well, I'm answering your question, did I know if he had any?

Q   Yeah.

A   No.  I don't know.  I never had that–

Q    Okay.  Let me rephrase the question.

A    I never asked him.

Q    Did he ever express to you that he had some--

A    He never told me he had.

Q    All right.  Do you have any kind of benefits you're still getting from any of the organizations of LaSalle Management or any of the entities controlled by William McConell?

A    Do I have any benefits from--

Q    Yes, sir.  Like retirement benefits, 401K, anything such as that?

A    No.

Q    So, the only retirement benefits you're receiving now are from the State of Louisiana?

A    All of my retirement is from the state.

Q    When was the last time you spoke or communicated with William McConell?

A    Yesterday.

Q    And what was that about?

A    Judge Cavanaugh.

Q    Okay.  And y'all talk often, you and Mr. McConell?

A    Yesterday was the first time I've talked to him in, I mean, months.

Q    Okay.

A    I don't-

Q     So, what happened yesterday that caused y'all to talk?

A     Sir?

Q     What brought you two together yesterday?

A     I came down to visit him.

        MR. CALVIT:  Him, being his attorney.

Q     Right.  Mr. Calvit?  Came down here to Monroe, you're talking about?

A     I came to Ruston.

Q     To Ruston?  Okay.  All right.  And was Mr. Calvit present during the time you were talking to Mr. McConell?

A     No.  I don't remember.  I remember walking out and walking in--  He wasn't standing there when we was--

Q     All right.  Okay.  So, tell me, besides talking about Judge Cavanaugh, what else did y'all talk about?

A     What's her name, Dr. Ford?

Q     Okay.  Dr. Ford?  All right.

A     He said something about President Trump's tweets or something or other, you know.  I didn't--

Q     All right.  Did y'all discuss anything about this case?

A     No.

Q     Discuss anything about your appearance here to be deposed today?

A     We talked about Judge Cavanaugh and a little bit

about Dr. Ford, tweets and all, and he told me about his brother in law, Pat Temple.

Q    I'm asking you a straight forward question.  I want a straight forward answer.  Did you two discuss your testimony that you were going to be giving here today or the deposition?

A    No.

Q    Okay.  Thank you.

MR. CALVIT:  Is that straight forward enough?

MR. CAMERON:  Yes.

MR. CALVIT:  Okay.  Thank you.

MR. CAMERON:  That's good.

MR. CALVIT:  Just answer the question asked.  He didn't ask about Pat Temple.

Q    Have you ever heard of an organization or company called Correct Commissary?

A    Have I heard of it?

Q    Yes, sir.

A    Yes.  That's a--

Q    What do you know about that company?

A    Very little.  I know it's a commissary company that Kevin Summeral got in charge of.

Q    And who is Kevin Summeral?

A    He works for LaSalle.

Q    Is Mr. McConell an officer of that company?

A    I'm sorry?

Q    Mr. McConell is an officer of Correct Commissary?

A    I don't know.

Q    And does Correct Commissary provide services to any of the facilities that you were over as the operations chief?

A    I don't know that either.

Q    You ever heard of a company WMC Enterprises?

A    No.

Q    Now, I showed you a letter earlier about Loring. It's page 143, and it's got your name up there, Johnny Creed, chief of operations, but it's under Richwood Correctional Center, LLC.  Were you ever paid by Richwood Correctional, LLC?

A    Was I paid?  No.

Q    No?  Do you know if Ray Hanson is an officer of Richwood Correctional Center, LLC?

A    Is Ray Hanson an officer?

Q    Yeah.

A    I don't know anything about that.  I wouldn't know anything about that.

Q    And you're not an officer or shareholder of Richwood Correctional Center, LLC?

A    No.

Q    Do you hold any shares in any companies owned or operated by William McConell?

A   No.

Q   I'm going to say the name of some facilities and ask if these or the facilities that you were the chief of operations over.  Okay?

MR. CALVIT:  In 2015, or at what time?

MR. CAMERON:  During the time that he was chief of operations.

MR. CALVIT:  Okay.

MR. CAMERON:  All right.

Q   Okay.  So, LaSalle Management Company, LLC, were you chief of operations over that company?

A   That's who I worked for, LaSalle Management.

Q   All right.  How about Winn Correctional Center? Were you director of operations over that facility?

A   Yes.

Q   How about Bayou Correctional, LLC, were you director of operations?

A   No.

MR. CALVIT:  It's chief of operations.

MR. CAMERON:  Chief.  Okay.

MR. CALVIT:  I mean, I realize it's just a slip of the tongue.  It may be significant at some point.

MR. CAMERON:  Okay.

Q   How about Catahoula Correctional Center?

A    Yes.

Q    LaSalle Correctional Center?

A    Yes.

Q    Concordia Consulting Company, do you know anything about that?

A    I don't know anything about that Concordia Consulting.

Q    River Correctional Center?

A    Yes.

Q    Where is it located?

A    River?  I think Concordia Parish.

Q    Okay.  Madison Correctional Center?

A    Yeah.

Q    Any other facilities that you were chief of operations over?

A    No.

Q    Is it your understanding that under the basic jail guidelines that a correctional officer who works, say, at Richwood Correctional Center, newly hired, has to have forty hours of training before they can have contact with an inmate?

A    I'm not familiar with that part of it.

Q    What are you familiar with?

A    I just know that they have to have, according to the basic jail guidelines, they have to have training in the

first year of employment.

Q    So, it's your understanding that you can hire somebody off the street, and they can go right to work without having any formal training?

A    That-- Yep.

Q    Okay. Have you ever heard anyone from Richwood Correctional Center to complain about a high turnover rate?

A    Not-- Nobody would've talked to me but the warden. Now, there's times when there may have been a time or two. Now, I do recall, you know, you have certain times of the year when people drop off the work force, so to the speak, you know, and you have peak times, you know, like after Christmas, first of the year, you know, and all. Sometimes that's a-- But other than that, I mean, there's been a-- never been discussed with me about, you know, just drastic shortages or anything like that.

Q    Has Ray Hanson ever said anything to you like, "We can't keep people here. They need to have some benefits," or something like that?

A    No. The only thing he ever discussed with me was something like--and this is like in tax time, you know, people will quit when they get their check, you know, from the income tax check, and he complained about that a little bit, you know. He said, "We've had four that quit" or something like that.

Q    And that's simply because they got an income tax check, they quit?

A    Yes, sir.

Q    Now, as far as a line officer is concerned, the correctional officer, is that person--does he get any kind of like raises on an annual basis, cost of living raises, anything like that?

A    I don't know.

Q    Okay.  While you were chief of operations for LaSalle Management, did you have any contact at all with any people from DOC?

A    Oh, yeah.

Q    In what regards would you have contact with DOC?

A    Well, I mean, I work with a lot of people, you know, and all.  I mean, it may be just a casual, you know, just--you know, "How you doing?" you know, "What you doing?" stuff like that.

Q    All right.  I'm not talking about casual contacts but business related contacts with DOC.  Did you have any of those?

A    I didn't talk business with the--after I left DOC and all, I didn't talk business with them--with anybody, because nobody was wanting to talk business.

Q    You had no business related contact with DOC once you left?

A    No.

Q    And you're not aware of any post certification for jailer training.  Is that accurate?

A    Am I aware of certification for jailers?

Q    Right.

A    No.  Not--

Q    Did you have any obligations or duties to ensure that RCC, Richwood Correctional Center, met the terms of the contract it had with the City of Monroe to provide jail services?

A    I--I'm not familiar with any contract, you know, that they had with Monroe.

Q    You never have seen--  I'm going to show you Exhibit 77.  I'll represent to you that this is one of the contracts Richwood had with the City of Monroe.  Just asking if you've ever seen this before.

A    I've never seen it.  Uh-uh (no).

Q    So, that's a no?

A    Sir?

Q    You went uh-uh (no).  You've got to verbalize your answer.  You said no?

A    No.  Right.  No.

Q    Did you have any knowledge under the contract that RCC was required to keep a master file on all use of force reports?

A    Again, you're talking about with the City of Monroe?

Q    Yes.

A    No, sir.

Q    Do you know who with LaSalle Management or RCC was charged with the responsibility of making sure that RCC complied with the contract?

A    No, sir.  I don't.

Q    Do you know if the DOC, when it did it's basic jail guideline inspections of RCC, that it also would inspect the jail itself--the jail operations?

A    Yes, sir.  They would.

Q    All right.  And do you know the name of the person that worked for DOC who did that inspection?

A    Kayla Gandy was one, but I think she retired, and I don't know--I don't know who took her place.

Q    Was LaSalle Management--

A    I'm sorry.  Let me back up.  Kayla Carpenter, that's her name.  She used to be a Gandy.

Q    Thank you.  Do you know what company or organization operated Richwood Correctional Center?

A    I'm sorry.  I didn't get the last part of your--

Q    Sure.  What company operated Richwood Correctional Center?

A    I'm not sure I follow you.  What company operated?

LaSalle Management, that would be the only thing I would know.

Q    All right.  Going back to the incident we're here about, you know, that caused Mr. Moore's death, do you know if the Department of Corrections did any kind of investigation in to that?

A    No.  They would've had no reason to.

Q    Is the only time you spoke to any representative of the Ouachita Parish Sheriff's Office about Mr. White or Mr. Moore was at Richwood Correctional Center?

A    The evening that I went there and Captain Holyfield--  Yeah.

Q    You had no other communication with Ouachita Sheriff's Office--

A    No, sir.  No.

Q    --after that?

A    No.

           MR. CALVIT:  About the incident?

Q    Yeah.  About the incident.  Right.  That's correct.  Thank you.  Did you ever hear anything, such as a Lieutenant Hardwell body slammed Mr. Moore down on to the floor of hallway B after Hardwell took him out of lockdown seven?

A    No.

Q    Did you ever learn or hear that Mr. Moore was hit in the head by a correctional officer by the name of Jeremy

Runner?

A    No.

Q    Did you ever hear or learn that while Mr. Moore was being carried from the hallway to the foreway, what they call the foreway, that he was dropped in his head?

A    No.

Q    Have you ever been contacted by anyone in the U.S. Attorney's Office or the U.S. Department of Justice about any operations at Richwood Correctional Center?

A    No.

Q    Does LaSalle Management have an internal affairs department?

A    No.

Q    Has that ever been suggested or discussed?

A    Has it what?

Q    Has it ever been suggested or discussed that LaSalle Management needs an internal affairs department?

A    Not to my knowledge.

Q    All right.  When I say internal affairs, you know what I'm talking about.  Right?

A    Yes, sir.

Q    That would be a department or a group of people who would investigate correctional officers for a violation of rights or policies or procedures, that kind of thing.

A    Yes, sir.  I'm familiar with it.

Q    All right.  As far as the placement of cameras on the premises at Richwood Correctional Center, that is a decision that is left to the warden?

A    Correct.  Yes, sir.

Q    Okay.  Were you ever advised that additional security cameras were placed in an area called the foreway or foyer?

A    I don't recall that specifically.  No.

Q    All right.  Did you ever become aware of an incident that happened, I believe it was late October of 2016 or early November of 2016, where a group of correctional officers were using spray on some inmates in an area called the foreway or foyer?

A    I recall the incident where officers used some spray.  Yeah.

Q    And how did you become aware of that?

A    I was informed by the warden.

Q    All right.  Did he provide you any documentation in connection with that?

A    Verbal.

MR. CALVIT:  The question was documentation.

Q    Yeah.  All right.  No documentation?

A    No.  I don't recall any written documentation.

Q    I showed you a letter again--a letter to Loring saying that he was involved in unnecessary use of force on

five DOC inmates.  The letter is dated November 4, 2016, Bates stamp RCC/Loring 143.  Had you ever seen, for example, this letter, before today?

A    I didn't get all of your question right there.

Q    Okay.  Had you ever seen this letter before now?

A    No.  I've never seen this until today.

Q    Okay.  Did you see any reports or incident reports regarding that situation?

A    No.

Q    The only information that you've received about the situation regarding Loring and Douglas and several other officers about this incident was directly--verbally from Mr. Hanson?

A    Right.

Q    I take it you, going back again to the Moore and White incident, the one we're here about, you did not provide any kind of a statement to the sheriff's office.  Did you?

A    I didn't provide any statements to the sheriff's office.  No.

Q    Are you familiar with the use of force policy that was in effect at Richwood Correctional Center?

A    I'm familiar they have one, but--

Q    Are you familiar with the DOC use of force policy that was in effect back then?

A    Yeah.  I was familiar with DOC's use of force

policy.

Q    Now, talking about deadly force, the policy does not describe deadly force in terms of the instrument that is used.  Right?

MR. CALVIT:  Object to the form of the question.

A    Deadly force?  Now, you're saying deadly force?

Q    Yes, sir.

MR. CALVIT:  Hold a second.  Object to the form of the question.  You've mentioned two policies, DOC policies and then Richwood policies.

MR. CAMERON:  The only one that he's familiar with that I know of is the DOC policy.

MR. CALVIT:  Well, then that's fine.

MR. CAMERON:  Right.

MR. CALVIT:  He's only asking you about DOC policies.

MR. CAMERON:  Okay.  Right.

A    We're talking DOC.  Right?

Q    Yes, sir.  All right.  And the DOC policy, the use of the force policy, where it talks about deadly force, it doesn't describe deadly force in terms of the kind of instrument that is used to cause the force.  Right?  In other words--

A     To the best of my recollection, you've got to take in to consideration, you know, it's been over--

Q     Yes, sir.

A     --eleven years.

Q     Right.  Right.  In other words, the policy doesn't say something like, "Deadly force is a firearm or a knife."

A     I don't recall it saying that.

Q     Okay.  Well, this (indicating) is a copy I'm presenting to you of page 3 of department regulation, number CO2006, dated 26th of March, 2004, Bates stamp RCC/DOCFO1130.  Okay.  And it says that, "Deadly force is force that's capable of causing death or serious physical injury."  Right?

A     That's what it says.  Right.

Q     Yeah.  Okay.  And so, a bat could be--

A     A what?

Q     A bat.

A     Yeah.

Q     A bat could be used as deadly force.  Right?

A     Yes, sir.

Q     Slamming somebody's head up against a wall could be use of deadly force, if enough force is used.  Right?

A     Are you saying somebody's head could be--

Q     Against a wall, a concrete wall--

A     Okay.

Q     --or concrete floor.  It could be an instrument

that could cause deadly force.

A    That's right.  It could.

Q    And use of deadly force is a last resort.  Is it not?

A    Yes.

Q    And the only time that a correctional officer should be able to use deadly force is if his life is threatened or the serious bodily harm or that of another person?

A    Correct.

Q    Going back to the incident involving Loring and those officers in the foreway where they used a chemical spray on the prisoners, have you ever heard that room, the foreway, had been used to interrogate prisoners or to--yeah-- to interrogate prisoners?

A    I'm not familiar.  Nobody has told me that it was used for specifically that.  No.

Q    Hanson did not report to you that he had questioned officers about the use of that room and why they were in that particular room?

A    Not that I recall.

Q    Did Hanson ever indicate to you that room has no cameras in it, or at the time had no cameras in it?

A    No.

Q    He ever report to you that they installed new

cameras and put those in that room?

A    I'm sorry?

Q    Did they ever tell you they installed new security cameras and put cameras in that particular room?

A    I don't recall, you know, the--being told that. No.

Q    Did you ever speak to any of the officers involved in the use of the chemical spray?

A    No.

Q    Did you ever advise Mr. Hanson that the chemical spray policy needed to be changed?

MR. CALVIT:  Relative to the incident or in history?  Object to the form of the question.

MR. CAMERON:  In history.  Anytime.

A    I don't.  Not that I recall.

Q    Do you recall any kind of a change in policy at RCC that only shift supervisors were to carry the chemical spray?

A    That's--again, that's something that the warden, you know, would make a determination on, you know.

Q    And did you ever hear that another aspect of the chemical spray policy had been changed and that the containers of the chemical spray were weighed before and after a shift to see if the spray had been used?

A    Yes.  I'm familiar with the--that procedure being done, not for Richwood or wherever.  That's something that

goes all the way back to my DOC time, you know.

Q    So, that was a practice at David Wade Correction Center, to weigh the chemical spray cans?

A    In DOC facilities, to my knowledge, that was a procedure that was used.

Q    Just for the record, what is your highest level of education?

A    I'm sorry?

Q    What is your highest level of education?

A    My highest level of education?

Q    Yes, sir.

A    I've got a high school education, and I've got a, of course, in service training, you know, with DOC and the justice department, and stuff like that.

Q    As far as formal education, your highest level is high school?

A    High school.  Yeah.

Q    All right.  During the time that you were the chief of operations for LaSalle Management, outside of your Louisiana driver's license, not counting your hunting license, not counting your fishing license, do you hold any other licenses?

A    What is my what now?

Q    While you were chief of operations, what licenses did you have?  I know you had a Louisiana driver's license.

Right?

A    Right.

Q    Okay.  You may have had a hunting and fishing license.

A    Of course.

Q    Okay.  Any other licenses that you had?

A    I got a marriage license one time.

Q    Yeah.  There you go.  That's a good one.  I hadn't heard that one before.  Okay.  Any others?

A    That's the extent of it for me.

Q    All right.  Let's see.  While you were chief of operations for LaSalle Management, were you certified by ACA or anybody like that?

A    As an ACA officer?  Yes.  I had--it wasn't a license.  It was just a little ID card, more or less, you know, for going in to the prisons and out of state, you know.

Q    Yes, sir.  During the time you were chief of operations for LaSalle Management, were you an ACA auditor?

A    No.

Q    During the time that you were chief of operations, were you certified by any organization in some field of corrections?

A    I don't think so.  They--  I had let, you know, the one--pretty much all of my memberships and everything, you know, I let expire.

Q    Let's talk about that a little bit.  I know you must've been a member of ACA at one point in time.  What other correctional organizations were you a member of or have been in your career?

A    The-- It was something about the national jail-- international jail or something or other like that.  I don't know.  I was a member of that for a few years.  I didn't participate in it or nothing.  It was just a membership because I was suggested to that.  I was an NIC.  That's National Institute of Corrections, which is an arm off the justice department.  I--I participated in some of their-- whatever you call it, conferences and stuff.

Q    I don't mean to interrupt you.  Any other organizations?

A    That--I'm not going to say there wasn't.  I just don't remember.  They were so much.

Q    Well, while you were chief of operations of LaSalle Management, did you receive any periodicals, magazines, email newsletters?

A    From ACA until I let my membership expire, and I don't recall exactly when that was, but--

Q    Was that while you were working for LaSalle, or was it--

A    It expired while I was working for LaSalle.  Right.

Q    Have you ever testified in court before?

A    Testified in court?

Q    Yes, sir.

A    Three or four times I did.

Q    Okay.  Any of those times while you were working for LaSalle Management?

A    No.

Q    You've given other depositions before.  Right?

A    Yes.

Q    Have you ever given a deposition while employed with LaSalle Management?

A    One time.

Q    And what was that about?

A    It was an employment thing.  I don't know.

Q    An employment case?

A    Yeah.

Q    Okay.  Who was the employee that filed a suit?

A    Well, she--  Really, I mean, she wasn't even a-- Well, the name was--what was it--Goree--Goree, Marilyn-- Marilyn Goree.

Q    Marilyn Glory?

A    Yeah.

Q    Can you spell the last name for me?

A    This is a guess now.  G-O-R-E-E.

Q    Okay.  And who was she employed by?

A    She was employed with Lincoln Parish.

Q    Lincoln Parish Sheriff or police jury or you don't know?

A    I don't know if it was a sheriff.  I don't know if it was a jail commission.  I don't know if it was a police jury.  I don't know what it was, but it was some of that.

Q    Okay.  What was your role?  Why were you deposed, do you know?

A    I was chief of operations for LaSalle at the time.

Q    Okay.  What was her complaint?  She was trying to get a job with LaSalle and couldn't get a job, or what was the complaint?

A    That they let her go.

Q    They, being Lincoln--

A    The sheriff or the police.  Yeah.

Q    Okay.  And what was your involvement in that?

A    I'm still wondering that until today, but I sat for seven hours.

Q    Okay.  So, was she working at a facility owned or operated by LaSalle Management?

A    She--she had worked in Lincoln Parish.

Q    All right.  Any other depositions you've given while you were an employee of LaSalle Management?

A    No.

Q    Have you ever testified in any capacity as an expert?

A    No.

Q    Have you ever written an expert report?

A    No.

Q    And in preparation, I know you said you went over to Ruston to help prepare for your deposition here today. Did you review any papers or documents during your preparation?

A    No, sir.

Q    All right.  I need to take a short break.

(OFF RECORD.)

EXAMINATION BY MR. CAMERON, (continuing):

Q    Mr. Creed, I want to show you this document.  It says "Offender Handbook" on it, "Richwood Correctional Center."  It's got your name down here (indicating) as chief of operations, and then, Ray Hanson.  I ask if you've ever seen this before.

A    I've seen it.  Yeah.

Q    Okay.  Did you participate any in--

A    No.

Q    --drafting this?

MR. CALVIT:  Let him finish the question.

Q    Yeah.  Did you participate any in drafting this document?

A    No.

Q    All right.  I want to show you what's been

previously marked as "Exhibit 7."  This is the use of force policy and procedure for Richwood Correctional Center, asking if you're familiar with this document.

A    Did I have any--

MR. CALVIT:  No.  He's asking if you're familiar with that specific document.

Q    Right.

A    No.  I couldn't tell you I've even seen that one before.

Q    You did not review this document before it was put in place?

A    I'm sorry?

Q    You did not review this document before it was placed in to effect?

A    No.

Q    Let's go ahead and attach that.  During that time you were chief of operations for LaSalle Management, did you ever have business contact with Ses Smith, who is the chief of operations of Adult Services for DOC?

A    Yeah.

Q    Those were business related contacts?

A    I'm sorry?

Q    Were they business related contacts?

A    Oh.  I'm sure they were.

Q    Okay.  What subjects would y'all discuss?

A     About inmates.  I mean, inmate beds and stuff like that, you know.

Q     Same kind of thing you'd talk to sheriffs about?

A     Yeah.

Q     All right.  Let's see.  Now, going back to Antonio Turner a little bit.  Were you aware that he did training at Richwood Correctional Center?

A     Was I aware that he received any?

Q     No.  That he gave training, that he was an instructor.

A     No, sir.  No.  I can't specifically relate any training to him.

Q     Are you aware of what kinds or types of documents a correctional officer at Richwood Correctional Center is required to maintain?

A     No.

Q     Were you, while you were chief of operations, aware of the kinds of documents that a correctional officer would have to maintain?

A     No.

Q     During that time that you were director of operations, did you socialize any with Mr. Hanson, the warden?  You two go fishing or hunting together, anything like that?

A     We didn't do no hunting and fishing.  We might've--

it would be some--maybe work related events, you know, employee appreciation or something like that.  And occasionally, well, you know, I might come over.  We might go to a lunch or something.

Q    How about any other employee at Richwood Correctional Center, anybody there that you would hunt, fish with, socialize with?

A    I didn't fraternize with the employees.  I mean, it was just a--it was my own rule.

Q    Going back to the event regarding the two inmates who allegedly had a fight, did you hear anything about that before the sheriff's office arrived, someone had cleaned the cell out with bleach?

A    No, sir.

Q    In your experience in corrections, would it be important not to clean a cell out where a fight had occurred and there might be evidence inside that cell?

A    Yes, sir.

Q    And wouldn't you expect Archie Altman to know that as well?

A    I'm sorry?

Q    Wouldn't you expect Archie Altman to know that as well?

MR. SALOMON:  I'm going to object to that.

How would he know what someone else should

know?

Q   Wouldn't you?

MR. CAMERON:  No.  I'm asking for his expectations.  He knows what his expectations are.

MR. SALOMON:  Well, I expect Christmas to come, but that doesn't mean--

Q   So, would you expect Archie Altman to know that as well?

A   Yeah.

Q   As the director of operations, you did not set the standard for qualifications of the people who work in the various facilities?

A   I'm sorry.  I didn't--

Q   Yeah.  As a director of operations, is it correct to say you did not set the standards for the qualifications for the people who worked at the facility?

A   That's correct.

Q   You left it up to each individual warden to set those standards?

A   That's correct.

Q   Besides the wardens of the facilities, were there any other persons who reported to you directly?

A   One girl in the Ruston office.

Q   You had an assistant?

A    She was a--I want to say she was a records classification/work release review.

Q    Okay.

A    Don't ask for an explanation.

Q    So, what would she do now?  I know you said she worked with the work release people.

A    She found--she determined if these inmates were eligible for work release.

Q    All right.  Would she give you reports of any kind?

A    No.  She worked with the--she was a person I could ask how many work release beds were filled or empty.  She worked directly with the facilities and the warden, so to speak.

Q    Would it be accurate to say that you, as the chief of operations, supervised the wardens?

A    To an extent.

Q    And you were their direct boss.  Right?

A    They were--  Yes.  I mean, if they--I mean, I was-- I was the call person.

Q    Okay.  Now, going back to this person we just talked about, the records classification person, did you supervise that person?

A    Did what?

Q    Did you supervise that person?

A    Yes.

Q    Okay.  So, when you say she did some work regarding records classification, what are we talking about there?  Is that separate from the work release, or is that a totally different thing she was doing?

A    When I said classification and records and stuff like that, she looked at these inmates to determine with a classification and their records and all for work release purposes.

Q    And on time computation, that's something that DOC did all of that.  Right?

A    She had nothing to do with time comp.

Q    Yeah.  DOC did that?

A    DOC does it.

Q    Okay.  Besides Mr. Moore and Mr. White, who died from events that happened at Richwood Correctional Center, are you aware of any other inmates that LaSalle Management had custody of who died in custody?

MR. CALVIT:  Object to the form of the question.  It's compound, calls for speculation, lack of personal knowledge.  There has been no testimony--there's no evidence LaSalle Management ever had custody of any inmate ever, anywhere.

MR. CAMERON:  Oh.  Got you.

MR. CALVIT:  Yeah.  So, object to the form of

the question.  Calls for speculation, lack of personal knowledge, no facts in evidence.

MR. CAMERON:  All right.

MR. CALVIT:  It's compound.

Q    All right.  Do you understand the question?

A    I got lost in there.

Q    Yeah.  I can understand why.  I'm just asking, besides Mr. Moore and Mr. White, who died while in custody at RCC, do you know of any other inmates who were in the custody of LaSalle Management or any of their facilities, who died?

A    Yeah.

Q    Okay.  I mean, are we talking about old age type stuff, suicides, what are we talking about?

A    Health, I mean--

Q    Just health issues?

A    --any number of reasons.

Q    Are you aware of any inmates who have died while in the custody of LaSalle Management or at any of the facilities run by LaSalle Management who died as a result of some act of a correctional officer?

A    No.

Q    Are you aware if LaSalle Management requires every facility under it's control to investigate circumstances of death of an inmate?

A    It would only be in specific circumstances, you

know, the investigation, you know, and all.  If it was a health, you know, a poor health inmate, you know, who died, you know, no investigation would be called.

Q   But you'd have to find out first if it was poor health or not.  Right?

A   I'm sorry?

Q   You'd have to find out if it's poor health first, before you decide not to investigate?

A   Right.

Q   Right.  Okay.  The question being, there's no direction from LaSalle Management to the facilities that if you have a death, we need to investigate the circumstances.  Nothing like that?

A   No.

Q   No?  All right.  Are there any standing policies issued by LaSalle Management that are uniform to all the facilities that LaSalle owns or operates?

A   Run that--run that one again.

Q   Sure.  I just wondered if there are--  Are there any policies that LaSalle Management has issued that it requires all the facilities to follow?

A   I'm not familiar with any, if there are.

Q   I'm just using this as an example.  I don't know if this is accurate or not, but it's possible--just saying it's possible, we could look at the use of force policy at

Richwood Correctional Center and it be different in some ways than the one at Bayou Correctional Center?

A    Probably not.

Q    Probably not?  Why is that?

A    Use of force is going to be use of force in all.  I mean, it's--  And again, I'm going to have to refer you back to the basic jail guidelines, because that's part of the standards, you know--I mean, the policy has to be approved by them.

Q    All right.  So, the basic jail guidelines, all of the facilities have to follow that?

A    That's the driving force if they have state inmates.

Q    And like I said, you're familiar with the basic jail guidelines.  Right?

A    Yes.

Q    I have to look back to my notes.  You left November of last year--you left LaSalle Management.  At the point in time you left LaSalle Management, are you aware if the City of Monroe and LaSalle Management were negotiating any changes to the contract?

A    I didn't--I had no role in any negotiations with the--

Q    At the point in time you left in November 1, 2017, were you aware if the City of Monroe was going to withdraw

the jail--it's jail operations from RCC?

A   No.

Q   You had no knowledge that was going to happen or might happen?

A   No.

Q   No?

A   I don't.

Q   Okay.  Did anybody ever suggest to you, or did you ever discuss with anyone about changing your title to be a more accurate description of your responsibilities?

A   Run that by again.

Q   Sure.  Just wondering if anybody had ever suggested to you or you brought it up that perhaps chief of operations may not be an accurate title for you?

A   No.

Q   You thought it was a title that accurately described your position?

A   That's the one they give me, so it'll work.

Q   Okay.  During the time that you worked for LaSalle Management, did you ever directly discipline an employee?

A   No.

Q   Did you ever conduct any kind of performance evaluation of any employee?

A   A lady at my office.

Q   Okay.  All right.  Anybody else?

A    No.

Q    Did you ever issue any kind of an evaluation for the operation of any facility under your command?

A    No.

Q    So, did you ever have any formal sit down meetings with wardens one on one telling them, "This is what you're doing good, maybe we need to improve in this area"?

A    I always complimented them as much as I could on different things, you know, is all.

Q    Yes, sir.

MR. CALVIT:  He said, "Complimented."

MR. CAMERON:  Yeah.  I heard that.

A    The appearance of the facility, you know, stuff like that, you know.

Q    Did you ever transmit any suggestions for improvements at any of the facilities?

A    I'm sure I did.  I mean--but I mean they would ask, you know, sometimes.

Q    Would this be all verbal, or was anything--

A    Verbal.

Q    All right.  In your correctional experience, how would you normally deal with two known violent inmates?  Would you put them in a two person cell together, or would you separate them?

MR. CALVIT:  Object to the form of the

question.  Calls for speculation, insufficient facts to provide an answer.

A    How would I deal with two violent persons?

Q    Yes.

A    If I knew that going in, you know and all, I'm probably going to house them separate.

Q    Let me show you "Exhibit 84."  This is a DOC regulation.  It talks about serious unusual recurrence review panel.

A    Am I familiar with this, you said?

Q    I haven't asked you a question.

MR. CALVIT:  He's showing it to you.

Q    Yes.  I'm asking, are you familiar with this policy?

A    Yeah.

Q    All right.  Is this a policy that the facilities with LaSalle Management, would they follow this?

A    Not this policy.

Q    Do they have one that's similar to it, at least at the time that you were chief?

MR. CREEKBAUM:  I'm sorry.  Did you ask if that was a policy of LaSalle Management or a policy of Richwood?

A    The policy that LaSalle would follow would mirror this.

Q    Okay.  All right.  And what is this policy addressing?

A    It's what?

Q    What does it address?  Why is this policy exist?

MR. CALVIT:  Object to the form of the question.  Calls for speculation.

A    Why the policy exists?

Q    Yeah.  What's the policy about?

A    Serious unusual occurrences, you know, and critical incidents, gun shots, life threatening injuries, serious unusual occurrences.

Q    And what does this policy require?

A    What does it require?

Q    Right.

MR. CALVIT:  Are you asking him to read it and repeat it?  Is that what you're asking him?

MR. CAMERON:  I'm just asking a question pretty clear.

MR. SALOMON:  I object.  The document speaks for itself.

MR. CALVIT:  It speaks for itself.  Yeah.

Q    Does this policy require that after a serious or unusual occurrence that the occurrence be reviewed by staff and investigated?

MR. SALOMON:  Is there a specific paragraph

you are referencing that he can look at?  It might be helpful.

MR. CALVIT:  If you find the section, read it to him.  He's asking you, does it say that, and if you can find it, find it.

A    Okay.  This is a DOC policy?

Q    Yes, sir.  The question being, it is accurate to say this DOC policy requires an administrator review to be conducted by a panel to identify issues of concern relative to serious and unusual occurrences.

A    For a warden.

MR. CALVIT:  He's asking if that policy issued by the state has those words in it or words similar to that.  He's not asking anything else yet.

WITNESS:  This is the state's.

MR. CALVIT:  I'm saying.  He's just asking if the words he's described are in there, yes or no?

A    Yes.

Q    Okay.  And does LaSalle Management or any of it's facilities have any similar kind of policy?

A    No.  Not that I'm aware of.

Q    All right.  We can just attach that to the deposition, "Exhibit 84."  Was there any discussion that

you're aware of within LaSalle Management that the facilities that operate should be certified by the ACA?

A    Is there any discussions that--for LaSalle Management that the facilities--

Q    Let me ask it again.  Are you aware of any discussions within LaSalle Management that the facilities it operates should be certified by the ACA?

A    Certified by DOC?

MR. CALVIT:  No.  He's saying ACA.

Q    I'm saying ACA, American Correctional Association.

A    No.  There was no discussion.

Q    All right.  All of the DOC facilities are accredited by ACA.  Right?

A    That's right.

Q    Okay.  But there was no suggestion or discussion within LaSalle Management, because we have DOC inmates here, we should be likewise accredited by ACA?

A    No discussion with me.

Q    All right.  You never suggested it to anyone.  Did you?

A    No.

Q    Okay.  And no one from DOC suggested that LaSalle Management's facility should be accredited by ACA?

A    I'm sorry?

Q    Is it true that no one from DOC suggested to you or

someone else in LaSalle Management that your facility should be accredited by ACA?

A    Not to my knowledge.

Q    All right.  In your correctional experience, say you got a two man cell, and you've got two men in there, and you observe an emergency happening, whether it's a fight or whatever it is, is it incumbent upon the correctional officers to intervene, to stop that?

A    Yep.

Q    Can a correctional officer be disciplined for failing to obtain medical care for an obvious and serious medical condition of an inmate?

A    That's possible.

Q    It just depends on the circumstances.  Right?

A    Right.

Q    During the time that you were chief of operations, was Richwood Correctional Center ever operating under a consent decree--any kind of consent decree?

A    None--none of LaSalle's facilities ever operated under a consent decree.

Q    And I think I may have asked this, but when you were working for DOC, you accompanied some auditors who inspected jails.  Is that accurate to say, or did I get that wrong?

A    I'm sorry now.

Q    While you worked for DOC--

A    DOC.

Q    --I thought you had indicated you accompanied, you went with, some auditors to jails to inspect them.  Is that accurate?

A    From time to time, I would, you know.

Q    And what was the purpose of you going with the auditors?

A    Just--just to go to--I mean, show my interest, you know, just--  This is a working relationship with the sheriff and that.

Q    So, I mean, you didn't actually participate in the audit itself?

A    No.

Q    All right.  When is it you received your post certification?

A    When did I receive my post?  I never had post certification.

Q    All right.  So, you're not post certified in corrections?

A    No.

Q    Never have been?

A    Nope.

Q    Do you ever receive copies of any write ups of employees, or did you while you were chief, I'm talking

about?

A    No.

Q    Do you know if Richwood Correctional Center has ever had to double bunk inmates?  I'm talking about the Monroe City Jail inmates.

A    You said do I know if they ever double bunk?

Q    Right.

A    I'm quite certain they have.

Q    Okay.  Why do you say that?

A    What?

Q    Why do you say that?

A    Well, I mean, they use bunk beds.  I mean, it's, you know--

Q    Okay.  I'm not talking the same language here.  Do you ever know that any cells at Richwood Correctional Center have been housing inmates more than the capacity that it allows for?  In other words, if you have a two man cell, you might have three men in there or four men in there?

A    No.

Q    Do you know if the various facilities that you supervise, do they all have like a progressive discipline policy?

A    As far as I know, they all still do.

Q    All right.  Are they all the same kind of progressive discipline policy?

A    You're talking about inmate discipline.  Right?

Q    No, sir.  Okay.  I miscommunicated again.  I'm sorry.  Are you aware that as far as employees at the facilities, correctional centers, was there a progressive discipline policy for the employees?

A    Yeah.

Q    And do you know if each facility had the same progressive discipline policy, or do they have variations among the facilities?

A    I'm certain they're going to be all identical.

Q    Why would you be certain they're all identical?

A    Why would what?

Q    Why would you be certain they'd all be identical?

A    They've got the same set of rules.

Q    Okay.  Where did those rules come form?

A    They were in place when I came to work with LaSalle.  I don't know.  I couldn't answer that.

Q    And the rules you're referencing, this is like the employee handbook rules?  Is that what you're talking about?

A    Yeah.

Q    Okay.  All right.  This is a copy of the basic jail guidelines right here, and I'm looking at Section 2 I-A-003 where it says, "Sufficient Staff."  Do you see that?

A    Uh-huh (yes).

          MR. CALVIT:  It's a yes or a no?

Q    Okay.

MR. CALVIT:  Johnny, you need to say yes or no.

Q    Yeah.

A    Yes.

Q    All right.  This says, "There's a requirement there's a written document describing the facilities organization and staffing plan."  Did you do anything to make sure like Richwood Correctional Facility had such a plan?

A    I don't do anything.  Again, we're talking the warden's responsibilities here.

Q    Okay.  All right.  Then the guideline also says, "This should include an organizational chart, a group of similar functions services and activities."  And it also says, "Each facility meets minimum security staffing requirements, which reflect good correctional practice."  Can you tell me if there's a ratio or what is considered to be minimum security staffing requirements, at least back during the time that you were the chief?

A    Well, if you have a facility that holds a hundred inmates, you know, you don't need a hundred guards.

MR. CALVIT:  He's asking you if you know the numbers.

WITNESS:  Huh?

MR. CALVIT:  He's asking you if know the

numbers.

A    I don't know.  There is no numbers attached, you know, or anything.

Q    What does it mean when it says, "Minimum security staffing requirements"?

MR. CALVIT:  Object to the form of the question.  Calls for speculation.  Document speaks for itself.

Q    What is your understanding of what the guidelines say when it says, "Meets minimum security staffing requirements"?

A    A--a minimum security of--  I'm just trying to get it where I can--  You know, if--if twenty-five is the minimum number that it takes to--then twenty-five is what the records should reflect.

Q    Who is it that determines what is the minimum security staffing requirement?

A    Who is what now?

Q    Who determines that?  Who determines what is the minimum security staffing requirement?

A    That's going to be the jail monitors, who are doing the inspection for the basic jail guideline process.

Q    All right.  Now, at Richwood Correctional Facility, we had Monroe Police Department arrestees housed there in the jail area, then you had DOC inmates there as well.  My

question to you right now is, are you aware of do the same correctional officers supervise the jail inmates as well as the DOC inmates?

A    Yes.

Q    All right.  I'm going to show you "Exhibit 75," and it's entitled "Minimum Jail Standards" and ask if you're familiar with that.

MR. CALVIT:  You've got a question on the table.  He asked you to review that, and I think he asked you if you're familiar with that.

A    No.

Q    You've never heard of the minimum jail standards?

A    Not--  I've never seen that.

Q    No.  My question isn't--  I know you've never seen the exhibit, but I'm asking you if you're familiar with the commission of law enforcement and the administration of criminal justice?

A    No.

Q    You're not familiar with the minimum jail standards as expressed by that commission?

A    Not what you just described.  No.

MR. SOLOMON:  Are we attaching that as an exhibit?

Q    Yes.  I'll attach it.  All right.  Did you

understand the questions that you answered here today?

A   Sir?

Q   That one I will repeat.  Did you understand the questions that you answered today?

A   Well, I'm not going to say I do.

Q   Okay.  All right.  Did you get a fair opportunity to understand the questions?

A   I understand.

Q   Did you get a fair opportunity to answer the questions?

A   You know, I guess you done the best you could in making me with my hard hearing and everything, so--

Q   Well, I never heard you ask me to repeat a question.

A   Well, there was a couple.

Q   Yeah.  And I repeated the ones you asked.  Okay.

A   Yeah.

Q   Okay.  So, have you heard all the questions?

A   Yeah.  We never did get back to those licenses though.  I'm still trying to connect that dot here.

Q   All the questions you had answered, you had heard before you answered them?

A   I did.

Q   All right.  Okay.  I don't have any other questions.  I'll tender.  Anybody got any questions?

MR. CREEKBAUM:  Nothing from me.

MR. CALVIT:  Mr. Byrd?

MR. BYRD:  I've got nothing.  Thank you.

MR. CALVIT:  And we'll reserve reading and signing.

DEPOSITION CONCLUDED.

STATE OF LOUISIANA

PARISH OF OUACHITA

    I, MARGARET ANN COPELAND, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that JOHNNY M. CREED, JR., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as set forth in the foregoing deposition, pages 1 through 100, at the Office of Duke Copeland Reporters, LLC, 111 Hudson Lane, Suite A, Monroe, Louisiana 71201, on the 11th day of October, 2018, commencing at 10:43 a.m. and concluding at 12:31 p.m.; that this testimony was reported by me in the electronic reporting method, was prepared and transcribed under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein nor am I otherwise interested in the outcome of this matter.

    This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

    Monroe, Louisiana, this 5th day of November, 2018.

_____
MARGARET ANN COPELAND, CCR

**DUKE COPELAND COURT REPORTERS**

P. O. Box 4177, Monroe, LA 71211      Tel. 318-387-2889  Fax 318-387-3271      **101**