UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION


ERIE MOORE, JR., ET AL,              :   DOCKET NO. 3:16CV01007
              PLAINTIFF,
                                     :
VERSUS                                   October 10, 2025
                                     :

LaSALLE CORRECTIONS, INC., ET AL., :
              DEFENDANTS                  Monroe, Louisiana
_____
            REPORTER'S OFFICIAL TRANSCRIPT OF THE
        TRIAL TESTIMONY OF WILLIAM K. MCCONNELL
        BEFORE THE HONORABLE TERRY A. DOUGHTY
          UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS: MR. OMAR G. QURESHI
                    MR. MAX A. SCHOENING
                    QURESHI LAW FIRM
                    700 South Flower Street, Suite 1000
                    Los Angeles, California

                    MR. NELSON CAMERON
                    ATTORNEY AT LAW
                    675 Jordan Street
                    Shreveport, Louisiana


FOR THE DEFENDANTS: MR. H. BRADFORD CALVIT
LASALLE MANAGEMENT, MR. ELI JULES MEAUX
ET AL              MR. JOHN D. RYLAND
                    PROVOSTY SADLER, ET AL
                    4615 Parliament Drive, Suite 200
                    Alexandria, Louisiana

                    DEBBIE LOWERY, RPR, CCR
                  Federal official Court Reporter
                   201 Jackson Street, Suite 312
                    Monroe, Louisiana 71201


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

```
APPEARANCES CONTINUED:

FOR THE DEFENDANTS:    MS. DEIDRE C. MCGLINCHEY
LASALLE MANAGEMENT     MR. BRANDON B. BROWN
CO., LLC, ET AL        MCGLINCHEY STAFFORD
                       450 Laurel Street, Suite 1500
                       Baton Rouge, Louisiana


FOR THE DEFENDANTS:    MR. BRANDON WADE CREEKBAUM
CITY OF MONROE         CITY OF MONROE
                       2811 Kilpatrick Boulevard
                       Monroe, Louisiana


FOR THE DEFENDANT:     MR. LAVALLE B. SALOMON
CHRISTOPHER LORING     700 North 2nd Street
                       Monroe, Louisiana
```

P-R-O-C-E-E-D-I-N-G-S

THE COURT:  Okay.  Call your next witness, please.

MR. QURESHI:  Plaintiffs call William McConnell.

COURT CLERK:  Come around here and be sworn.  Raise your right hand.

WILLIAM KENNER MCCONNELL, WITNESS FOR THE PLAINTIFFS, SWORN

THE WITNESS:  I would affirm that.

COURT CLERK:  Have a seat.  Be sure to speak into the microphone.  It does move.

THE COURT:  All right.  Proceed when ready.

DIRECT EXAMINATION

BY MR. QURESHI:

Q.    Hi, Mr. McConnell.  How are you?

A.    Doing great as you can imagine.

Q.    Super great, I know.  What is your full name?

A.    William Kenner McConnell.

Q.    All right.  Mr. McConnell, what line of work are you in?

A.    I have a variety of things I do.  77 years old come this Sunday, so I would say I do a lot of overseeing of different businesses.

Q.    Lots of businesses?

A.    Some people would say a lot.  I love it.

Q.    And is one of your businesses involved with corrections?

A.    It is.

Q.    But that's not your only line of business?

A.   No.

Q.   Okay.  And, sir, what organizations do you have that -- first of all, in the world of corrections, what do you do?

A.   We -- I have been founder of a company that provides both services and structures for jails and prisons in multiple sites.

Q.   All right.  Okay.  Let's break that down.  What do you mean by "services," sir?

A.   The LLC's all provide security services pretty much. Like, Richwood Correctional Center, LLC provides correctional services for the Richwood Correctional Center.  Our company -- our construction company, BAS Construction, named after my three children. --

        MR. CALVIT:  It's not relevant, Your Honor.  A construction company is not relevant.

        THE COURT:  Okay.  Yeah, I agree.  Sustained on that. I assume you asked about the corrections.  Yeah, he didn't ask that question, but it's not.

(By Mr. Qureshi)

Q.   Okay.  So, sir, you have many companies, lots of LLC's. Right?

A.   That's correct.

Q.   One of the LLC's you talked about there was Richwood Correctional Center.  Correct?

A.   That's correct.

Q.    Is that the only jail, detention facility or prison that you operate?

MR. CALVIT:  Objection, relevance.  We're here about one, LaSalle Management.

THE COURT:  Yeah, sustained.  I think that was my ruling on issue with -- you can certainly ask about LaSalle.

MR. QURESHI:  Your Honor, issue is with respect to Single Enterprise Theory, having many different LLCs ascribed to them.  I mean, it's literally an element of the Louisiana Single Enterprise Theory Test.

MR. CALVIT:  It's not relevant.  The defendants in the case are LaSalle Management Company; and whether there's a captive -- whatever the theory is, between they and Richwood. Thank you, ma'am.

THE COURT:  Yeah, I think it would have to be between -- it's basically alleging LaSalle and Richwood are, but not -- not other companies.  So I'm going to sustain that because it may get into the areas that I prohibited being disclosed at this time.

MR. QURESHI:  Well, Your Honor, I understand that. The issue here is that LaSalle Management Company, having multiple jail LLC's is -- or detention center LLC's is relevant to whether or not it's a single enterprise when you have a bunch of fractured LLCs.  That's literally one of the Louisiana elements.  So we would have to be able to --

MR. CREEKBAUM:  Your Honor, you sustained the objection.  And the further argument is bleeding over into testimony by the attorney.  And so the objection was sustained, and I think that's in accordance with your order, your order earlier in this case.

THE COURT:  I want to make sure I've got it right. What I don't understand, I guess, is what you're asking because my understanding is what you're alleging is a relationship between LaSalle and Richwood.

MR. QURESHI:  Yes, sir.

THE COURT:  I don't know about any other -- no other companies are at issue, that I'm aware of.

MR. QURESHI:  Your Honor, one of the tests is to see if something is a single enterprise, you look at the parent enterprise; and then you see if it has many -- like, many fractured sub, like, companies underneath it.  And then that's one of the ways to tell that something is a single enterprise flowing down from the top.

I mean, I'm happy to take a break to show research.  But --

MR. CALVIT:  Judge, you've ruled.

THE COURT:  Okay.  Yeah, I think it's getting into a prohibited area.  And I understand, which you certainly have the right to allege the theory, but the allegations were between LaSalle and Richwood.  So I don't see these other

companies being relevant.  Sustained.

MR. QURESHI:  Well, what about companies that LaSalle owns, LaSalle Management Company owns?

THE COURT:  Well, if they are dealing with Richwood.

MR. QURESHI:  Oh, okay.

THE COURT:  Other than that.  I don't know about the other ones.

MR. QURESHI:  Your Honor, just note our objection as well because that's --

THE COURT:  Yeah, I will note, yeah, sure.

MR. QURESHI:  Understood.  Thank you.

THE COURT:  Okay.

(By Mr. Qureshi)

Q.   Okay.  Sir, so I want to talk about LaSalle Management Company, LLC.

A.   Okay.

Q.   What's the point of that company?

A.   It serves as a back office for Richwood Correctional Center.  For instance, Richwood Correctional Center does their payroll at the site of Richwood Correctional Center.  And Richwood Correctional, LLC's employees then send that payroll into LaSalle Management.  And LaSalle Management actually issues the payroll checks or the direct deposits for those employees of Richwood Correctional Center.  That's an example.

We also -- Richwood Correctional Center sends invoices

that they've approved on -- at this facility into LaSalle Correction -- into LaSalle Management Company, LLC.  And those employees then pay those bills.  That's just two examples of serving what I call a back office.  LaSalle Management has different owners than Richwood Correctional Center.

Q.    Now, sir, when you're talking about LaSalle Management having different owners than Richwood Correctional Center, do you mean LLC owners?

A.    Yes, and also people.

MR. QURESHI:  So what I think would be useful now, sir, is I'm going to show you -- just for the witness, please. I'm going to show him an exhibit or two exhibits actually.

Q.    Okay.  Sir, just to you and the lawyers I'm going to show you a couple documents.  And the print is a little small there. Take a look at both.  One is Exhibit 348.  On the right side is Exhibit 351, and I'm going to take them one at a time.

Tell me if you recognize the document that's Exhibit 348.

A.    Which one do you want me to look at first?

Q.    348, sir.  It's on your left side.

A.    Okay.  I see the document.

Q.    Do you recognize this document?

A.    Not really.  But, I mean, I see a lot of documents like that, so I'm okay with it.

Q.    Yeah.  Well, let me -- there's a couple of evidentiary or foundation things, so I can ask a couple questions.

A.    I'm sorry, I couldn't understand you.

Q.    There's a couple evidence questions I can ask to help clear this up.  All right?

So, first of all, on Exhibit 348, do you recognize the business name?

A.    Yes.

Q.    You do, sir?  And, sir, where it says "registered agent," do you recognize that person's name?

A.    Yes, that would be my name.

Q.    Sir, under "officers," do you recognize that name?

A.    Yes.

Q.    Okay.  And, sir, do you understand that -- do you know what LaSalle Management Company, LLC is?

A.    Yes.

Q.    Okay.  And is that headquartered in Ruston?

A.    Yes.

Q.    Is that active with the Louisiana Secretary of State?

A.    Say that again.

Q.    Is that active with the Louisiana Secretary of State?

A.    Yes.

MR. QURESHI:  Okay.  Plaintiffs move Exhibit 348 into evidence.

THE COURT:  Any objection?

MR. CALVIT:  Oh, no, Your Honor.

THE COURT:  Let 348 be admitted.

MR. QURESHI:  We're going to do the same thing with 351.

MR. CALVIT:  I'm fine.

MR. QURESHI:  Plaintiffs also move Exhibit 351 into evidence.

THE COURT:  It's admitted also.

(By Mr. Qureshi)

Q.   All right, sir.  So, now, these are two documents next to each other.  On the left is 348.  And do you see that that is for which company?

A.   348 is for LaSalle Management and 351 is for Richwood Correctional Center, LLC.

Q.   Okay.  And these are the Secretary of State filings for the State of Louisiana.  Correct, sir?

A.   Yes.

Q.   All right.  So, now, sir, what is the address of LaSalle Management Company there on the left?

A.   Address is 192 Bastille Lane.

Q.   Okay.  And Suite 200.  Right?

A.   Say it again.

Q.   Suite 200.  Right?

A.   Suite 200, yes.

Q.   You ever been out there?

A.   Yes, sir.  I was there yesterday.

Q.   Okay.  What's going on over there at that address?

A.    Back office work for Richwood Correctional Center, and plans for future operations, payroll, human resource activities, trying to collect bills.  That's pretty much it.

Q.    Not just for Richwood Correctional Center, though, sir, also for LaSalle Management Company.  Right?

A.    Yeah.  I'm trying -- I don't think LaSalle Management Company bills anybody outside of the -- like, the facilities they support, like, Richwood Correctional Center, LLC.

Q.    Sir, do you know who Rodney Cooper is?

A.    I do.

Q.    Yeah.  He's one of the -- he used to be one of the executives at LaSalle Management Company.  Right?

A.    Yes.

Q.    Okay.  And he worked out of this same address.  Right?

A.    Actually works out of Huntsville, Texas.

Q.    He mentioned in his deposition that he came in four days a week.  Do you recall that?

A.    He comes in -- I guess time changes things.  But right now he's only coming in occasionally.  He works out of Huntsville. But when he gave his testimony or his deposition, he may have been coming in three, four days a week; but that's not the case at this point in time.

Q.    And Johnny Creed who used to be an executive with LaSalle Management Company.  Correct?

A.    Yes.

Q.    He used to work out of this office too.  Right?

A.    Yes.

Q.    So folks who worked at LaSalle Management Company worked out of this office.  Right?

A.    Yes.

Q.    Okay.  So when you look over to the right on Exhibit 351, the same domicile address is for Richwood Correctional Center. Right?

A.    Yes.

Q.    Now, let's take a look at the registered agent.  We'll start off with the LaSalle registered agent.  Who is that?

A.    William K. McConnell.

Q.    That's you?

A.    That's me.

Q.    And that's at that same address.  Right?

A.    Yes.

Q.    All right.  And if you look at the registered agent at Richwood Correctional Center, who is that?

A.    That would be William K. McConnell.  That's me.

Q.    All right.  And then the first officer listed on the left side of Exhibit 348 for LaSalle is who?

A.    McConnell Southeast Correctional, LLC.

Q.    Now, sir, I'm not a detective; but is that your company too?

        MR. CALVIT:  Objection, Your Honor, beyond the scope

of the trial, not relevant.  They're not defendants.  They're not alleged to be part of any --

THE COURT:  Okay.  I'll overrule that one because it's on there and alleging under that alter, whatever, theory.  So I'll overrule that.

(By Mr. Qureshi)

Q.   All right, sir.

A.   Would you repeat the question.

Q.   Yes, sir.  Is that one of your companies as well?

A.   When you say one of my companies, am I a part of that company?

Q.   Yes, sir.

A.   I think I am; although, with estate planning, I may no longer be, but, at one time, I was.

Q.   Okay.  Got it.  And then if you look on the right side, we've got McConnell Southeast Corrections, LLC there as well.  Right?

A.   Yes.

Q.   Okay.  And same thing with that entity.  Correct?

A.   Yes.  I'm pretty sure I don't own any of it, but I still may be listed as a member.

Q.   Okay.  And so this organization McConnell Southeast Corrections, LLC, is that above LaSalle Management Company, LLC?

MR. CALVIT:  Objection, Your Honor.  Again, I have to

reurge it.  It's not relevant and it leads to confusion of the jury because that's not a party and interest in this case.

THE COURT:  It's not, but it's relevant, so I'm going to overrule.  Go ahead.

THE WITNESS:  Ask your question again.

MR. QURESHI:  Yes, sir.

(By Mr. Qureshi)

Q.   Is LaSalle Southeast Corrections, LLC, that entity, above LaSalle Management Company, LLC?  And I can explain the term "above" if you need help.

A.   Go ahead and do that for me.

Q.   Sure.  So LaSalle Management Company, LLC manages Richwood Correctional Center, LLC, among other companies, surely?

A.   It handles the back -- the back office.  It -- I don't know that I would say it manages it.  The warden is the one that does the management is what I would say.

Q.   The warden does the management.  Right, sir?

A.   Yeah, the warden at Richwood Correctional Center.

Q.   Sir, in 2015, the supervisor for Warden Hanson at Richwood Correctional Center was Johnny Creed --

A.   Yes.

Q.   -- who worked at LaSalle Management.  Right?

A.   That is accurate.

Q.   So fair to say that LaSalle Management manages the manager?

A.    He had oversight responsibility.

Q.    So somebody at LaSalle had oversight responsibility over someone at Richwood.  Yeah?

A.    Yes.

Q.    So now do you understand what I mean by being above -- an entity being above another entity?  So, for example, if, for example, Warden Ray Hanson told you what to do, I'd say he was above you.  Does that make sense?

A.    Yes.

Q.    That's not how it works.  Right?  Your company, LaSalle Management Company and Johnny Creed, for example, were over Warden Ray Hanson.  So that's what I mean by a company being above another company.  Do you understand what I'm saying?

A.    Okay.

Q.    Okay.  So now I'm asking, now that we've clarified that point, LaSalle Southeast Corrections, LLC, is that company above LaSalle Management Company, LLC?

A.    Well, they're both LLC's.  They have similar ownership.

MR. QURESHI:  And, sir, if you could just pull that mic.  It just curved a little off your mouth.  If you could just pull it a little towards you.  Great.  Perfect.

MR. CALVIT:  Your Honor, I think this is getting into a legal opinion as to which LLC's.  Each one of them may have contracts.  Each one of them may have --

THE COURT:  Well, he can ask him -- you know, ask

about did Johnny Creed have oversight responsibilities of Ray Hanson and he answered that.  Now, the question is is one over the other, if you can define "over."  So what's the -- is that the question on the table?

MR. QURESHI:  Yes, sir.

MR. CALVIT:  He's talking about corporations -- excuse me, LLCs being officers and whether an LLC that's an officer is somehow over another LLC which is not appropriate for this witness.  It's a legal question.

The law says what the responsibilities are.

THE COURT:  I think you can ask, you know, who Johnny Creed worked for and what Johnny Creed had responsibility over.

MR. CALVIT:  He's already done that.

THE COURT:  I don't think he asked who he worked for.

MR. CALVIT:  Yeah.

THE COURT:  Johnny Creed does that.  So I'll allow him to do that.

(By Mr. Qureshi:

Q.   And, to the Judge's point, can you clarify again who Johnny Creed worked for?

A.   If I recall, Johnny Creed worked for LaSalle Management Company.

Q.   Okay.  Got it.  And, back in 2015, who supervised Johnny Creed?

A.   I think Rodney Cooper.

Q.    Okay.  And who supervised Rodney -- Rodney Cooper was also at LaSalle Management Company, LLC?

A.    I think he worked for LaSalle Southwest.

Q.    Okay.  So there's a LaSalle Southeast and a LaSalle Southwest.  Correct?

A.    Yes.

Q.    Any other LaSalles up there?

        MR. CALVIT:  Objection.  Relevance.

        THE COURT:  Overruled.

A.    There's certainly LaSalle Southeast.  I think there's a LaSalle Management, LaSalle Southwest.  There's a LaSalle Correctional Center, LLC.

Q.    And, sir, why all these LLCs, if you know?

        MR. CALVIT:  Objection, relevance, Your Honor.  We're talking about two companies and the relationship.  We're well afield -- well past any relevance.

        THE COURT:  Okay.  All right.  I'm going to sustain that objection because I think that's going a little beyond and getting into some areas that I prohibited.  So go ahead.

(By Mr. Qureshi)

Q.    Sir, I know that you have other businesses, first of all.  Okay.  I'm not going to talk about your other businesses right now.  I just want to talk about your corrections businesses.  And, look, I can't -- I'm having a hard time parsing together all of these LLCs you've got.  Okay.

But, sir, have you -- have your corrections businesses, including LaSalle Management Company, LLC, a defendant in this case, been under investigation by the United States --

MR. CALVIT:  Objection, relevance.  It's not relevant.

THE COURT:  Sustained.

MR. CALVIT:  It's prejudicial.

THE COURT:  Yeah, sustained.

(By Mr. Qureshi)

Q.   How about the Department of Homeland Security?

MR. CALVIT:  Objection.

MR. CREEKBAUM:  Objection, Your Honor, side bar.

THE COURT:  Yeah, anything about that question is going to be sustained --

MR. CALVIT:  Your Honor, --

THE COURT:  -- so don't ask it anymore.

MR. CALVIT:  He's asking questions.

THE COURT:   I know.  I've stopped it.

MR. CALVIT:  Thank you, Judge.

MR. QURESHI:  Let's switch back to the Elmo but just for the witness, please.

(By Mr. Qureshi)

Q.   Okay.  I'm going to show you, sir, Exhibit 379.  And I'm sure on this one you've signed a lot of these documents.  Okay? But take your time to acclimate yourself and I can flip through

any pages you want.  I'm just going to show you page 1, if that's all right.  And then I think what might be easiest is if I show you the last page to re-acquaint yourself.  But you tell me.  I'll flip to any page you want.

And I'll tell you what my purpose here is, I'm trying to see if you recognize this document.  So help me -- help me help you.

A.    That's my writing, so, obviously, I'm familiar -- I've seen this document at some point.  I don't really recall the specifics but just because I'm 77 years old and this document was signed in 2005, so, it's 20 years ago 25, 20, so --

Q.    Understood.  Understood, sir.  And so, here, you recognize the entities listed here.  Right?

A.    Yes.

Q.    These are your entities.  Correct?

A.    Yes.

Q.    All right.  So do you recognize this document, then, given all of that context?

A.    Yeah.

MR. QURESHI:  Okay.  I'd like to move Exhibit 379 into evidence.

MR. CALVIT:  No objection.

MR. CREEKBAUM:  No objection.

THE COURT:  379 is admitted.

(By Mr. Qureshi)

Q.   All right, sir.  Can you tell me what this document is?

A.   It says the document is a -- I guess, a contract maybe between Richwood Correctional Center, LLC, and the owners and LaSalle Management Company, LLC, represented by Patrick H. Temple.

Q.   Okay.  Got it.  So we'll get into that in a sec.  So here's Richwood Correctional Center, LLC.  And it's going to be referred to as the owner.  Do you see that?

A.   Yes.  Richwood Correctional Center is the owner of Richwood Correctional Center.

Q.   Okay.  And then you see underneath it, it says LaSalle Management Company, LLC, which is referred to as the agent. Correct?

A.   Yes.  Patrick Temple is the agent for --

Q.   Okay.  So we are going to be able to -- because this contract is going to start using the term owner and agent.  So owner means RCC for the purposes of this contract; agent means LaSalle Management Company.

A.   Okay.

Q.   Fair enough?

A.   Fair enough.

Q.   We're going to go to page 4 of that document 379-4.  And, again, owner means RCC; agent means LMC.  So let's remember as we go through this, agent means LaSalle.

A.   Okay.

Q.    Agent equals LaSalle.  Okay.  So here in this paragraph, zoom in for us, it says, "So as to maintain and affirm agent," and, again, agent means LaSalle.  Right?

A.    Uh, huh.

Q.    Okay.  We'll just write that up here.  It says, "LaSalle all-inclusive authority over, and has ability to supervise and direct the actions, supervise and direct the actions of all such employees.  Owners agree to direct all instructions to the management concerning operations of the project through the offices of the agent."  And the agent, again, is LaSalle.  Right?

A.    Okay.

Q.    Okay.  So, sir, I want to break down that sentence.  Okay?  And so here it says, "LaSalle's all-inclusive authority over."  So does that mean LaSalle had all-inclusive authority over Richwood Correctional Center?

MR. CALVIT:  Objection, Your Honor.  It's four corners of the document.  The document speaks for itself.

THE COURT:  He can say what it says.  But I think when we start asking him what does it -- you can ask him to read it what it says.

MR. QURESHI:  Okay.  And, Your Honor, I'm just trying to make sure that --

THE COURT:  Right.

MR. QURESHI:  This is his document, his handwriting.

THE COURT:  But if it goes into, like, what's the legal result of this, whatever, that's beyond.  But, you know, what it says -- what you're asking is clear.  So I'll just clarify that.  That's what --

MR. QURESHI:  Sorry, Your Honor.

THE COURT:  Go ahead.

MR. QURESHI:  One last thing is the four corners of the document is not a cognizable objection.

THE COURT:  Not what?

MR. QURESHI:  It's not a cognizable objection.  That's not a thing.

THE COURT:  Well, I can say a legal -- having a legal -- legal opinion on it would be.  So I think that's what it would be if you ask him what --

(By Mr. Qureshi)

Q.   So I'm asking you, sir, are you a lawyer?

A.   I have a law degree.

Q.   Forget about all that.  Okay.  Forget all your legal training.  I'm talking, as a contract signatory, what's your understanding of the contract you signed?  Is that fair enough?

MR. CALVIT:  Did he ask him what his understanding of the contract was?

THE COURT:  Yep.

MR. CALVIT:  Objection.  Contract speaks for itself.  No, objection, contract speaks for itself.  It was signed 20

years ago.  To ask this man to interpret that contract is not relevant, not admissible.

MR. QURESHI:  Your Honor, if not him, then who?  He's the signatory to the contract.

MR. CALVIT:  There's no interpretation needed.  It speaks for itself, four corners of the document.

THE COURT:  You can certainly ask him what LaSalle did and what they -- what they did, you know.  It says they can operate, how did they -- you know, things like that.  But I think -- I think you are getting into his legal interpretation of it, a little beyond.  But you certainly can ask him about what they did, you know, things like that under this.

(By Mr. Qureshi)

Q.   All right, sir.  Per this, as lawyers, so those are your guys, so don't blame me.  But here it says LaSalle's all -- well, we've interpreted agent to mean LaSalle here, all-inclusive authority over his ability to supervise and direct the actions of all such employees."

Sir, did LaSalle in practice supervise and direct the actions of Richwood's employees?

A.   Actually what LaSalle did was hired a -- saw that a warden was hired, and then those responsibilities became that of the warden.  And the warden was an employee of LaSalle -- of Richwood Correctional Center, LLC.

Q.   And, so, remind me again, who supervised the warden and

let's use actual people's names here in 2015.

A.   Johnny Creed at the time of the incident.

Q.   And Creed was LaSalle.  Right?

A.   Yes.

Q.   And then who supervised Creed?  Cooper?  Right?

A.   I think so.

Q.   Cooper was LaSalle.  Right?

A.   Cooper was actually Southwest Correctional.

Q.   Southwest Correctional.  Okay.  Fair enough.  We'll just clarify that.  So Cooper, Southwest Correctional; not Southeast Correctional.  Right?

A.   No.

Q.   Creed was at LaSalle Management.  And then the warden was at Richwood.  Right?

A.   Richwood Correctional Center, LLC.

Q.   So this agreement says all-inclusive authority to supervise the actions of all such employees.  And it looks like LaSalle Management, LLC is over the warden.  Would you agree with me on that?

          MR. CALVIT:  He's asking him to interpret the contract.  He's explained how it worked.  But now he's asking him to interpret the contract which is legal and/or jure.

          THE COURT:  It's kind of a play on words, but I think, you know, he can ask him and did ask him whether LaSalle manages the employees or, you know, per that language in the

contract.  And he said that they hired a warden who was hired by LaSalle.

So, you know, the word "over," I think is what's getting everybody on that.  That's what turns it, I think, into becoming a legal issue.  So I think you just stick to the -- what they did I think is fine.  But if he starts having to interpret the legal -- even though he's a lawyer, you know, he's not tendered as an expert to interpret that contract.

MR. QURESHI:  Understood, Your Honor.  I'll use the term "supervise" --

THE COURT:  Yeah, that's fine.

MR. QURESHI:  -- instead of "over."  So somebody supervises somebody below them in the order chart.  Okay.

(By Mr. Qureshi)

Q.   So, anyway, Creed supervised -- Creed at LaSalle Management supervises the warden.  Right?  So he supervised him.  And Cooper supervises Creed.  And I understand that Cooper is LaSalle Southwest Corrections.  But can you just give us the name of the human being who supervises Cooper or who supervised Cooper in 2015?

A.   I guess he would be reporting to the organization, the owners.

Q.   The owners of the organization?

A.   Uh, huh.

Q.   And who would that be, sir?

MR. CALVIT: Objection, not relevant. The owners are not relevant. The corporation is the one that's sued.

THE COURT: I think it's relevant so you can ask.

(By Mr. Qureshi)

Q. Go ahead, sir.

A. The owners would be the members of the LLC.

Q. Okay. And that's of Southwest Corrections, LLC?

A. I don't want to tell you wrong, but I think that would be a correct statement.

Q. Okay. And who was that?

A. It would primarily be people in our family.

Q. Okay. And who is "our"?

A. My family.

Q. Your family?

A. Well, my dad's family. He's dead now. But I have a sister that her husband was my business partner for 35 years

MR. CALVIT: Judge, none of this is relevant.

THE COURT: He's answered the question, so overruled.

(By Mr. Qureshi)

Q. Yeah. Just go on, sir.

A. He passed away in 1971. And then my sister passed away last year because of Alzheimer's, brutal disease. I've seen what happens.

Q. I'm so sorry to hear that.

A. But, you know, sad thing. And so the -- their children

are the ones, and then my children.

Q.    Understood, sir.  And so, just to be clear here, when you say "our families," you mean the McConnell families and the Temple family?

A.    There are other people invested as well.

Q.    Okay.  Got it.  So now I want to go to the last page of this document which is where the signatures are.

A.    Okay.

Q.    So, sir, here, who signed for Richwood Correctional Center?

A.    I did.

Q.    Okay.  That's you.  And who signed for LaSalle Management Company, LLC?

A.    Patrick H. Temple.

Q.    That would be your business partner, isn't it?

A.    That would be my business partner.

Q.    So you guys are just -- I mean, is this, like, -- why are you having this contract?  Like, you guys are business partners in the same business.  So why are you signing on behalf of two different entities here?

A.    I would suspect that was either a recommendation or a requirement of maybe a lending institution or -- I really don't remember, to tell you the truth.

Q.    But, sir, you know, you could have equally signed for LaSalle Management Company, LLC on a contract.  Right?

A.    I've signed contracts for LaSalle Management, yes.

Q.    And Mr. Temple, vice versa, you guys could have signed on whichever of these entities you felt like.  Right?

A.    I don't recall him signing it.  But he probably could have.  If he would have asked me, I certainly would have been okay.

Q.    Okay.  So, sir, the last thing I want to talk -- Thank you.  This is very helpful.  So the last thing I want to talk to you about is how supervision works in your correction setting.  Anything else I don't care, just talking about corrections.  Okay?

A.    Okay.

Q.    So with respect -- not that I don't care.  You know, but I'm just saying not relevant for our purposes now.  Okay?

So in the corrections business, do -- does the ownership -- like, you, yourself, and the late Mr. Temple, did you guys provide any, like, guidance or instruction to the people running the detention facilities?

A.    We hired people with that expertise.

Q.    Okay.  And so you just trusted the people with that expertise to do a good job.  Right?

A.    We did.

Q.    And how did you make sure they were doing a good job?

A.    Based on feedback from our customers.

Q.    And who are your customers?

A.   Louisiana Department of Corrections.

Q.   Cities?  States?

A.   Cities, states, yeah, parishes in Louisiana.  They probably don't have those in California, but we've got them here in Louisiana.

Q.   Yeah, we just have counties over there.  Okay.  So cities and states, those are the clients.  And ultimately -- so usually jails, prisons, detention centers are run by the government.  Right?

          MR. CALVIT:  Objection, relevance.

A.   In Louisiana, it's about half and half I think.

Q.   Okay.  And so your businesses -- so if you felt like operating a private jail, you would need to get the government's approval.  Right?

A.   I did, yes.

Q.   You had to get the government to approve?

A.   We did.

Q.   And so you're sort of stepping in for the government wherever you take over that contract.  Right?

          MR. CREEKBAUM:  Objection, Your Honor.  It's calling for a legal conclusion.

          THE COURT:  I agree.  I think it's -- I sustain.

(By Mr. Qureshi)

Q.   Okay.  Now, sir, let's say -- you know, have you contracted with plenty of cities?  States?  Parishes?

MR. CALVIT:  Objection, relevance.

A.   Yes.

MR. CALVIT:  The ones at issue now are the ones with the City of Monroe.

THE COURT:  I agree, but I'll let him ask that general question and go to specifics.

(By Mr. Qureshi)

Q.   And to provide correction centers.  Correct?

A.   Say it again.

Q.   And to provide correction centers, like, jails?

A.   Yes.

Q.   So you've done plenty of these contracts?  You're no amateur to this?

A.   Learn every day, but I've done several contracts, yes.

Q.   Understood.  Now, is it your understanding that when you take on the responsibility -- first of all, do you appreciate that, when your companies take on this responsibility to have a jail, that that is an important responsibility?

A.   We take it very seriously.

Q.   Okay.  Because what's at stake is people's, you know, well-being.  Right?

A.   Correct.

Q.   Health and wellness.  Right?

A.   Right.

Q.   Physical safety.  Right?

A.    Right.

Q.    Okay.  And, sir, is it important to make sure that the people working under you -- I understand you're a businessman; you have a lot of businesses.  But the people working underneath you, is it important to make sure that they're doing a good job at safely providing services?

A.    Yes.

Q.    And let's say the city or the state isn't paying close attention to one of your facilities.  Right?

        MR. CREEKBAUM:  Objection, Your Honor.  He can't speculate about what the other entities may or may not be doing.

        THE COURT:  All right.  I think you can ask a general question, but I'm not sure where you're going with it.  As of right now, it's not objectionable.

(By Mr. Qureshi)

Q.    Let's say one of the cities or states you partner -- who gives you a contract to operate a jail, for example, isn't providing a lot of strict oversight over you -- over your companies, right?  Hypothetical, I'm not saying that this is true, I'm saying hypothetical.

        MR. CALVIT:  He's not entitled to ask a hypothetical question of a fact witness.  I object.

        THE COURT:  Yeah, I sustain that.

(By Mr. Qureshi)

Q.    But, sir, it's important not just that you -- you tell me if it's true, okay, do you think it's important that you meet just not whatever minimum requirements there are but that you actually do a good job for the detainees that you house?

MR. CALVIT:  Objection, Your Honor.  It's a mixed fact and law question.  The standards are the standards.  It's also vague.

THE COURT:  Sustained.

THE WITNESS:  I'll say this --

THE COURT:  Hang on.  I sustained it.  So you don't have to answer.

MR. CALVIT:  It's an objection, you don't have to answer.  Thank you.

(By Mr. Qureshi)

Q.    All right.  Sir, the last thing I wanted to talk to you about is your expectations for your employees.  Right?  Do you have expectations for your employees or can they do whatever they want?

A.    No, I have very high expectations.

Q.    Okay.  And is your expectation for your employees that they take human lives very seriously?

A.    Yes, absolutely.

Q.    Okay.  So if they find out that someone may have died at one of your facilities, they better figure out why?

MR. CALVIT:  Objection, Your Honor.  He's now delving

into the operational decisions made by wardens and lieutenants. Objection, not appropriate.

THE COURT:  I think that's a proper question so I'm going to overrule that.

(By Mr. Qureshi)

Q.   Go ahead, sir.

A.   I would certainly want to know about that incident if it occurred, yes, if that's what you're asking.  That's a fair answer.

Q.   And, sir, one moment.  We've got one more document and then we'll be all done.  Thank you so much for your time.

Okay.  So with respect -- so I represent Erie Moore.  Have you ever heard of him?

A.   Yes.

Q.   And how did you become familiar with Erie Moore, or how did you learn about him?

A.   I'm sure I got a notice phone call from probably Mr. Creed or Mr. Cooper about an incident that occurred at Richwood Correctional Center.

Q.   Around the same time that it occurred?

A.   Yeah, I would say within hours probably.

Q.   And so people reach out to you -- so Mr. Creed or Mr. Cooper, you're saying, would have reached out to you about this incident.  Correct?

A.   Yes.

Q.    Okay.  And, sir, did they in fact reach out to you about this incident?

A.    Say that again.

Q.    They did actually reach out to you about this incident. Right?

A.    They did actually?

Q.    They did actually reach out to you about this particular incident?

A.    Yes.  Yes.

Q.    And you learned about it the next day?

A.    Soon after.  I don't remember if it was the next day or, you know, maybe the same day.  I don't remember.

Q.    And did you learn that Mr. Moore was seriously injured?

A.    Yes.

Q.    Did you learn that Mr. White had died at that time?

A.    Yes.

Q.    Okay.  And, upon learning that, did you order anyone in your organization to conduct an investigation?

A.    I didn't have to.  They were already dealing with the law enforcement agencies to do that very thing.

Q.    So, sir, I understand that law enforcement agency might have been doing an investigation.  That's one thing.  But what about your actual companies?  Companies?

A.    I would rely on Rodney Cooper and Johnny Creed as to the right procedure for them to follow in a situation like that.  A

lot of times -- and I'll just stop right there.

Q.   Yeah.  And, so, in that situation, you're not getting too granular with the instructions?  You're just going to trust Johnny Creed and Rodney Cooper to do the right thing.  Right?

A.   I wish they were here -- one of them has got 40 something years in corrections.  He had 32,000 people that he supervised and 156,000 inmates under his direct control.  Rodney Cooper would know what to do way better than Billy McConnell.  So that's who I relied on.

Johnny Creed, on the other hand, second in charge in the Department of Corrections for operations reporting to Richard Stalder for 20, 30 years and worked for us for ten years. Probably the most well-respected person in -- that Louisiana has ever had as the director of corrections, was -- headed up the ACA.  Johnny Creed was his right-hand man.

So if he could count on Johnny Creed, I felt I could.  And then if you add Rodney Cooper on top of that, I felt very comfortable -- still feel very comfortable with Rodney Cooper in the leadership position he's in.

Q.   Okay.  And so do you know how to run a jail?

A.   Not really.

Q.   A detention center?

A.   I'm sorry?

Q.   A detention center?

A.   No.

Q.   How about a prison?

A.   No.

Q.   So you just need to make sure that -- you're just hoping your guys, Johnny Creed and Rodney Cooper, do a good job?

A.   Yes.

Q.   And if they don't do a good job, that means LaSalle Management Company did not do a good job?

MR. CALVIT:  Objection, Your Honor.  Legal argument, goes to the heart of the case.

THE COURT:  Sustained.

MR. QURESHI:  Well, I really appreciate your time. Thank you so much.  That's all the questions I have.

THE WITNESS:  Thank you, sir.

MR. CALVIT:  No questions.

MR. CREEKBAUM:  No questions from the city.

MR. SALOMON:  No questions, Your Honor.

MR. CALVIT:  Is he released?

THE COURT:  Yes.

MR. CALVIT:  Thank you, Judge.

THE COURT:  Thank you.

(Witness excused) (End of excerpt)

CERTIFICATE

I, Debbie Lowery, Certified Court Reporter, do certify that the foregoing is, to the best of my ability and understanding, a true and correct transcript from the proceedings of this matter.

_____

/s/Debbie Lowery

10/11/2025