**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **ERIE MOORE, JR., ET AL.** | **CIVIL ACTION NO.: 3:16-CV-01007** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LASALLE CORRECTIONS, INC., ET AL.** | **MAG. JUDGE KAYLA D. McCLUSKY** |

**PLAINTIFFS' OPPOSITION TO LASALLE DEFENDANTS' RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO**
**FED. R. CIV. P. 50(b)**

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................1

III.    LEGAL STANDARD............................................................................................5

IV.     ARGUMENT.........................................................................................................6

        A.      The Fifth Circuit Decision Supports, Not Undermines, The *Monell*
                And Punitive Damages Verdict ..................................................................6

        B.      Wrongful-Death Liability Must Stand: Only Negligence, Not A
                Constitutional Violation, Is Required .......................................................11

        C.      The Punitive Damages Award Is Constitutional............................................13

        D.      The Evidence Is Sufficient To Establish *Monell* Liability...........................14

                1.      Custom .............................................................................................14

                2.      Knowledge .......................................................................................21

                3.      Moving Force....................................................................................22

        E.      The Evidence of the Individual Defendants' Liability Is More Than
                Sufficient.................................................................................................26

                1.      Hardwell...........................................................................................27

                2.      Runner..............................................................................................28

                3.      Williams...........................................................................................29

                4.      Negligence .......................................................................................30

        F.      There Is No Basis to Disturb The Judgment Against LaSalle
                Management Company .............................................................................32

V.      CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamkavicius v. Islamic Republic of Iran*,
No. CV 23-3571 (ABJ), 2025 WL 2159537 (D.D.C. July 30, 2025) ............................... 13

*Alvarez v. City of Brownsville*,
904 F.3d 382 (5th Cir. 2018) ................................................................................. 12

*Barnes v. City of El Paso*,
677 F. Supp. 3d 594 (W.D. Tex. 2023) ................................................................ 10

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997) ............................................................................................... 10

*Bordanaro v. McLeod*,
871 F.2d 1151 (1st Cir. 1989) ............................................................................... 17

*Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*,
No. CV 17-0491, 2020 WL 3188991 (E.D. La. June 15, 2020) ........................... 6

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) ................................................................................................. 7

*Daniels v. Williams*,
474 U.S. 327 (1986) ............................................................................................... 12

*Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*,
153 F.3d 211 (5th Cir. 1998) ............................................................................... 11

*Doe v. Parauka*,
714 So. 2d 701 (La. 1998) ..................................................................................... 33

*Joseph ex rel. Est. of Joseph v. Bartlett*,
981 F.3d 319 (5th Cir. 2020) ............................................................................... 30

*Graham v. Connor*,
490 U.S. 386 (1989) ............................................................................................... 10

*Grandstaff v. City of Borger*,
767 F.2d 161 (5th Cir. 1985) ................................................................. 16, 17, 21

*Grayson v. R.B. Ammon & Assocs., Inc.*,
778 So.2d 1 (La. Ct. App. 1st Cir. 2000) ............................................................ 34

*Harmon v. Collier*,
158 F.4th 595 (5th Cir. 2025) ............................................................................. 12

ii

*Holmes v. Reddoch*,
117 F.4th 309 (5th Cir. 2024) ...................................................................... 5, 6, 22, 29

*James v. Harris Cnty.*,
577 F.3d 612 (5th Cir. 2009) ........................................................................... 10

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*,
379 F.3d 293 (5th Cir. 2004) ........................................................................... 10

*Jones v. Gusman*,
515 F. Supp. 3d 520 (E.D. La. 2021) ............................................................... 11

*Katz v. McCarthy*,
No. 2:21-CV-00132, 2025 WL 1920424 (W.D. La. July 10, 2025) .................... 1

*Lewis v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
134 F.4th 286 (5th Cir. 2025) ....................................................................... 5, 24

*Lincoln v. Case*,
340 F.3d 283 (5th Cir. 2003) ......................................................................... 6, 14

*Montano v. Orange Cnty.*,
842 F.3d 865 (5th Cir. 2016) ........................................................................... 12

*Moore v. LaSalle Mgmt. Co., L.L.C.*,
41 F.4th 493 (5th Cir. 2022) ......................................................................*passim*

*Phillips ex rel. Phillips v. Monroe Cnty.*,
311 F.3d 369 (5th Cir. 2002) ........................................................................... 12

*Sanchez v. Young Cnty.*,
956 F.3d 785 (5th Cir. 2020) ........................................................................... 17

*Shepherd v. Dallas Cnty.*,
591 F.3d 445 (5th Cir. 2009) .......................................................................... 8, 19

*Slade v. City of Marshall*,
814 F.3d 263 (5th Cir. 2016) ........................................................................... 12

*Smith v. Wade*,
461 U.S. 30 (1983) .......................................................................................... 13

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ........................................................................................ 14

*Waganfeald v. Gusman*,
674 F.3d 475 (5th Cir. 2012) ............................................................................. 6

**Statutes**

La. Civ. Code art. 2320 .................................................................................... 33

**Other Authorities**

Fed. R. Evid. 401 ........................................................................................................... 17

Fed. R. Civ. P. 8 ............................................................................................................. 34

## I.    INTRODUCTION

Defendants fundamentally misunderstand the jury verdict they attack. In various arguments, Defendants insist that none of them can be liable for the wrongful death of Erie Moore, Sr., because their *unconstitutional* excessive force did not kill him. The jury, however, found under *state law* that it was Defendants' *negligence* that caused Moore's death. Defendants have no basis to attack that conclusion. They barely even try: They devote just two pages to the argument and ignore the most damning evidence against them.

Defendants' attacks on the *Monell* verdict and the individual officers' constitutional liability are just as baseless. Virtually every legal argument Defendants make has been rejected by the Fifth Circuit, this Court, or both. And on the evidence, this Court had it exactly right when it denied Defendants' Rule 50(a) motion: The trial record—including extensive video evidence and Defendants' own admissions—is sufficient to support liability across the board. Indeed, the abuse Defendants inflicted on Moore was so pervasive and so persistent that nearly every one of the jury's findings can rest on one of several independent grounds. The evidence supporting the jury's verdict is simply overwhelming, and Defendants come nowhere close to upending it.

## II.    BACKGROUND

Because "[t]he Court and this case are old friends now," *Katz v. McCarthy*, No. 2:21-CV-00132, 2025 WL 1920424, at *1 (W.D. La. July 10, 2025), Plaintiffs provide here only a brief timeline of Defendants' abuse of Moore, with additional facts (including those bearing on the *Monell* claims) detailed in the argument section.

From Moore's first moments at Richwood Correctional Center until he was carried out fatally injured, Defendants subjected him to a series of unlawful uses of force and shocking negligence. Moore was booked into Richwood on the morning of October 12, 2015, after he was arrested on a misdemeanor charge for being too loud in a donut shop. VII Tr. 1746:19-24,

1

1748:2. Despite being compliant and non-threatening, a major at Richwood chemically sprayed Moore twice while he was handcuffed in the booking area. Pls.' Exs. 753, 754, 755; III Tr. 673-76.[1]

Just before 10 p.m. that evening, Defendant Gerald Hardwell, the night-shift supervisor, sprayed Moore twice in the face while Moore was calm and contained in a lockdown cell, merely for being loud and putting his hand on the top of the cell door, because that was what Hardwell understood to be Richwood policy and practice. Pls.' Exs. 761, 762; II Tr. 587:10-591:24. Moments later, guards under Hardwell's command took Moore to the ground by his head and kicked him, even though Moore was calm and not resisting. Pls.' Ex. 763; II Tr. 594:6-19.

At 10:30 p.m. that same night, October 12, Richwood staff put Vernon White and Moore in the same lockdown cell, even though other cells were available and guards knew White had assaulted another detainee. Pls.' Ex. 764; II Tr. 581:18-582:1. White had arrived at Richwood two days earlier and had been having a rough go of it so far: He had two episodes of apparently involuntary convulsing, Pls.' Exs. 751, 758; unprovoked he punched another cellmate who then lifted White up and slammed him down hard on the ground, II Tr. 569:7-17; and he was twice chemically sprayed by Hardwell, II Tr. 569:21-22.

Overnight, Defendants Hardwell and Runner threatened unprovoked uses of force against Moore. Pls.' Exs. 767, 768.

In the morning of October 13, when guards came to take White to visit the nurse, a guard (Duane Rosenthal) chemically sprayed Moore twice in the face—a use of force even Rosenthal admitted was not justified. Pls.' Ex. 770; III Tr. 665:16-666:2, 669:2-4, 670:9-11. White was in poor shape when he returned from the nurse: He was splayed out on his back

---

[1] Except where otherwise noted, all references to Plaintiffs' Exhibits are to videos.

motionless, and the assistant warden had to drag him across the cell floor by his leg. Pls.' Ex. 773; VIII Tr. 1963:4-19; II Tr. 442:1-6; 540:16-23.

During the early evening of October 13, White and Moore had an altercation in the lockdown cell. Pls.' Ex. 774. When Defendant Runner went to check on them, he saw White having what looked like a seizure. III Tr. 879:10-24. Defendants Hardwell, Runner, and Williams, along with another guard (Loring), went to remove White from the cell. Pls.' Ex. 775; II Tr. 599:8-19. When Moore was off to the side and squatting, Loring chemically sprayed him in the face. Pls.' Ex. 775; III Tr. 881:13-882:18. Immediately after, Runner ran up to Moore and struck him in the head, knocking Moore to the ground. Pls.' Ex. 775, at 6:08:23-27. Guards removed White, who later died, and left Moore, who had asthma, in the choking chemical air. Pls.' Ex. 775; III Tr. 885:16-886:3; V Tr. 1338:17-18; VI Tr. 1447:5-8.

About an hour later, Hardwell entered Moore's cell and sprayed him in the face while he sat on his bed. Pls.' Ex. 778. Shortly after, Hardwell returned to the cell with Defendants Williams and Runner, and another guard. Although Moore was leaning against the bunk with his back to officers and was not resisting, the officers made no attempt to handcuff him—they didn't even consider it. II Tr. 619-622; V Tr. 1133:11-13. Instead, Hardwell grabbed Moore from behind, lifted him in the air, and slammed him head-first to the ground. Pls.' Exs. 780, 781; II Tr. 613:6-7; 621:23-622:13. Defendant Williams punched Moore after he landed out in the hallway and then Hardwell kneeled on top of him. Pls.' Ex. 780. Then they handcuffed Moore, who was face-down and motionless on the ground. Pls.' Exs. 781, 782. No one checked if Moore was alright and no one summoned aid. II Tr. 624:25-625:2, 633:18-20; VIII Tr. 1971:23-1972:3 And no one went to get the available wheelchair or stretcher. II Tr. 633:25-634:6; VIII Tr. 1971:17-1972:5. Instead, Hardwell ordered Runner and Williams to pick Moore up by his feet and handcuffed hands and carry him to the Four-Way—a camera-free area that

3

was used to interrogate and punish detainees. II Tr. 634:7-11, 637:7-9; V Tr. 1257:23-1258:1, 1258:12-15, 1259:14-1261:25.

The guards struggled to carry the large and limp Moore. Pls.' Ex. 782. Runner slipped and dropped Moore on the back right side of his head, Pls.' Ex. 782, where medical personnel later discovered a fatal subdural hematoma. IV Tr. 1070-75; 954-56.

Defendants then dumped Moore in the Four-Way, where they continued to use force against him, even though he was handcuffed and in and out of consciousness. The nurse, for instance, saw the guards do a "football style dog pile on top of Mr. Moore." III Tr. 921:9-10. Moore was also chemically sprayed. *Infra* 23-24. None of the individual Defendants (or anyone else) called for medical care for Moore. *E.g.*, III Tr. 838-839, 901:17-18, 917-918, 929-930, 983; IV Tr. 1004:3-17; V Tr. 1147:18-20. It was only when personnel from the sheriff's office arrived that Moore, who was unresponsive by this point, was transported to the Ouachita Correctional Center and then the hospital; he died a month later from his head injury. III Tr. 781:7-24, 787:6-25, 809:15-25; Doc. 673-10 (Pls.' Ex. 96) (death certificate).

Moore's children then brought this suit against individual officers and the two entities that, effectively as one, operate the detention center—Richwood Correctional Center, LLC, and LaSalle Management Company, LLC. Doc. 140. Following an initial round of summary judgment, the Fifth Circuit ordered that the case proceed to trial on Plaintiffs' claims (among others) that the individual Defendants committed unconstitutional excessive force, battery, and negligence that both injured and killed Moore, that the organizational defendants were vicariously liable for those state-law violations, and that the organizational defendants were directly liable under *Monell* (including for punitive damages) for fatal and non-fatal excessive force due to their custom of "us[ing] the Four-Way to punish detainees out of view of cameras, and for chemical spray to be used to punish restrained prisoners." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 501-02 & n.2, 509, 514 (5th Cir. 2022).

4

After trial, the jury entered a verdict for Plaintiffs, finding that Defendants Hardwell, Runner, Williams, Richwood, and LaSalle violated Moore's rights in multiple ways:

- As to the individual Defendants, the jury found them liable for unconstitutional excessive force, battery, and negligence that injured Moore, as well as negligence that caused Moore's death. Doc. 664, at 1-2, 4.

- As for the organizational defendants, the jury found Richwood and LaSalle liable under *Monell* for excessive force that injured but did not kill Moore and was caused by a custom of excessive force that was known to their final policymaker, Warden Hanson. *Id.* at 5-6. Richwood was made liable for all the individual Defendants' state-law violations, based on the Court's ruling that as a matter of law they were all at least Richwood employees acting in the course and scope of their employment. IX Tr. 2504:16-20 The jury also found LaSalle vicariously liable for the negligence of an employee that caused Moore's death. Doc. 664, at 2-3. The jury found, too, that LaSalle and Richwood constitute a single enterprise under Louisiana law, making them liable for each other's wrongs in this case. *Id.* at 2.

The jury also awarded $1.5 million in survival damages for Moore's pre-death suffering, $6 million in wrongful-death damages for each of Moore's three children, and $23.25 million in punitive damages against LaSalle and Richwood. *Id.*, at 7-8; Doc. 670.

## III.    LEGAL STANDARD

"When, as here, a case is tried by jury, [the] standard of review with respect to the jury's verdict is especially deferential." *Lewis v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 134 F.4th 286, 291 (5th Cir. 2025) (internal quotation marks omitted). "A district court must deny a motion for judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Holmes v. Reddoch*, 117 F.4th 309, 315 (5th Cir. 2024) (internal

quotation marks omitted). "The court must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury. Additionally, in conducting such a review, [the court] credit[s] the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* (internal quotation marks and citation omitted).

## IV.    ARGUMENT

### A.    The Fifth Circuit Decision Supports, Not Undermines, The *Monell* And Punitive Damages Verdict.

Defendants' principal contention—that the Fifth Circuit's mandate in this case forecloses *Monell* liability and punitive damages (Motion 3-10[2])—is waived and meritless.

To begin, "when a party fails to raise an issue in a Rule 50(a) motion, it waives the right to raise that issue in a Rule 50(b) motion." *Waganfeald v. Gusman*, 674 F.3d 475, 481 n.14 (5th Cir. 2012); *accord Lincoln v. Case*, 340 F.3d 283, 290 & n.4 (5th Cir. 2003); *see Cajun Servs. Unlimited, LLC v. Benton Energy Serv. Co.*, No. CV 17-0491, 2020 WL 3188991, at *15 (E.D. La. June 15, 2020) ("When a party's argument – even regarding the same claim – differs in its Rule 50(b) motion from that it made in its Rule 50(a) motion, however, the Fifth Circuit has held such an argument waived."). Defendants did not make in their Rule 50(a) motion the argument they now make—that *Monell* liability and punitive damages are unavailable as a matter of law because the Fifth Circuit revived the *Monell* claims without reviving any individual "deliberate indifference" claims against Warden Hanson. Motion 4-5. Richwood and LaSalle did not make that argument in their oral Rule 50(a) motion. *See* VI Tr. 1581-1627; *compare id.* at 1675:14-23 (arguing that the jury cannot base state-law vicarious liability

---

[2] All references to Defendants' Motion herein refer to "LaSalle Defendants' Supplemental Memorandum in Support of Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b)," Doc. 719.

against LaSalle and Richwood on Duane Rosenthal's conduct because he was dismissed at summary judgment and that was not appealed), *with* Motion 15 n.4 (identifying arguments Defendants made in Rule 50(a) motion and omitting this argument). Neither did the City of Monroe, whose *Monell* arguments these Defendants adopted. VI Tr. 1523-1545, 1565-78 (Monroe argument); *id.* at 1545-46 (Defendants' adoption). Defendants likewise did not make this argument after the close of all evidence. IX Tr. 2505:4-8 (Defendants "reurge [their] 50(a) motion in its entirety"). So, Defendants waived the argument.

On the merits, Defendants get the Fifth Circuit's ruling exactly backwards. Far from foreclosing liability, the Fifth Circuit expressly held that Plaintiffs' *Monell* claims must proceed to trial and are eligible for punitive damages based on Warden Hanson's role as final policymaker. *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 512 (5th Cir. 2022) ("Plaintiffs have raised fact disputes on the Corporate Defendants' and City's direct liability under *Monell.* Therefore, we … REVERSE on *Monell* liability."); *id.* at 510 (holding that the parties do not dispute that Hanson was the final policymaker and "a reasonable jury could conclude that Hanson" had actual or constructive knowledge of the unconstitutional custom); *id.* at 513-14 ("A reasonable jury could also conclude on this record that Plaintiffs are entitled to punitive damages against the Corporate Defendants" because there is "a fact dispute over whether Hanson acted criminally indifferent toward illegal customs.").

This Court has repeatedly relied on the Fifth Circuit's ruling to reject the same reasoning Defendants advance here. Specifically, the Court held that "Plaintiffs can still assert *Monell* liability for a constitutional violation based on Warden Hanson, as the policymaker, even though he has been dismissed." Order, Doc. 531, at 6; *see id.* at 5-8; *see also* Order, Doc. 478, at 15 (rejecting Defendants' argument at summary judgment, because "[i]t has never been the rule that to be liable under *Monell*, the final policymaker (here, Hanson) must also be individually liable").

7

As in the past, Defendants cite no contrary authority. *See id.* They rely principally on *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), where the Supreme Court held that the jury necessarily found no deprivation of the plaintiff's constitutional rights and that, without an underlying constitutional violation, there could be no *Monell* liability. (That is all the other two cases cited at Motion 7 say, too.) But that holding does not help Defendants here because the jury did find that Moore's constitutional rights were violated by at least three separate individual Defendants: Gerald Hardwell, Jeremy Runner, and Reginald Williams. *See* Judgment, Doc. 691, at 2.

Defendants ignore this Court's prior on-point rulings, repackaging their failed argument about Hanson's individual liability generally as an argument about his "deliberate indifference" specifically. "Cloaking these contentions in a new guise does not make them any more persuasive." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 456 (5th Cir. 2009). The Fifth Circuit would not have revived the *Monell* claims for trial based on Hanson as the policymaker if, as Defendants now contend, it was "legally impossible" for Hanson to be a policymaker supporting *Monell* liability. Motion 6. Nor would the Fifth Circuit have permitted the jury to award punitive *Monell* damages based on Hanson's alleged "criminal[] indifferen[ce]"—as it unambiguously did, 41 F.4th at 513-14—if, as a matter of law, Hanson was not indifferent. Simply put, the Fifth Circuit's holding, and this Court's rulings in the wake of it, are inexplicable if Defendants are correct that Hanson's prior dismissal from the case dooms *Monell* liability and punitive damages. *See* Order, Doc. 478, at 16 n.10 ("If individual-capacity liability against the final policymaker were a necessary predicate to *Monell* liability, why would the Fifth Circuit have found the latter without even mentioning the former?").

Defendants also mischaracterize the procedural history. In the summary-judgment ruling on which Defendants rely, this Court dismissed the *individual-capacity* claims against Hanson for his failure to train corrections officers and for his failure to provide medical care to

8

Moore, on the ground that Hanson was not deliberately indifferent in that training or care. Doc. 356, at 21-33.[3] There was never a claim against Hanson in his individual capacity for deliberate indifference to a policy or custom of excessive force; that isn't a legally cognizable claim in the first place.

For *Monell* liability purposes, it is irrelevant that Plaintiffs decided not to appeal the dismissal of the individual claims against Hanson given that they did appeal this Court's dismissal of the *Monell* claims against Richwood and LaSalle. *See* Doc. 356, at 47 (dismissing Plaintiffs' *Monell* claims against LaSalle and Richwood for their "policy of using the Four-Way to punish offenders and a routine policy of using chemical spray on prisoners" who posed no risk, holding that none of *Monell*'s elements were met); 5th Cir. Opening Br. 8-9 (presenting issues); *id.* 30, 120 (identifying ruling at Doc. 356 as subject of appeal); *id.* at 84-102 (briefing the issue); *contra* Motion 4 ("Plaintiffs … did not challenge any part of Doc. 356[.]").[4] The Fifth Circuit indisputably reversed the *Monell* dismissal, holding that there was sufficient evidence for each *Monell* element: (1) "it was customary for guards to use the Four-Way to punish detainees out of view of cameras, and for chemical spray to be used to punish restrained prisoners," (2) Warden Hanson (as the final policymaker) "actually or constructively knew" about this custom, and (3) this custom was the moving force behind the violation of Moore's constitutional rights. *Moore*, 41 F.4th at 509-12. In other words, the Fifth Circuit sided with Plaintiffs "three for three," Order, Doc. 478, at 14, and remanded for the *Monell* claims to go to trial based on Hanson's role as policymaker.

The lack of a reference to "deliberate indifference" in the Fifth Circuit's *Monell* holding did not somehow render the remand for trial on the *Monell* claims futile, as Defendants would

---

[3] The Court also dismissed classification and conspiracy claims against Hanson. Doc. 356, at 35, 39.

[4] There was a separate summary judgment ruling on the *Monell* claims for wrongful death that was based on causation, Doc. 360, which Plaintiffs also appealed.

have it. Moton 8-9. For one, that would be an utterly irrational result. For another, the Fifth Circuit held that a jury could find that "Hanson acted *criminally* indifferent toward illegal customs that exposed his prisoners to an unnecessary risk of injury," thus justifying punitive damages against the corporate defendants. *Moore*, 41 F.4th at 513-14 (emphasis added). It necessarily follows that a jury could also find he was merely *deliberately* indifferent, as the jury indeed did. Verdict, Doc. 664, at 6; *see* Defs.' Rule 59 Motion, Doc. 720, at 18 (acknowledging that deliberate indifference is a lower standard than the indifference required for punitive damages).

What is more, deliberate indifference is not a necessary element of the *Monell* custom that ultimately succeeded at trial. *Contra* Motion 6-9. When the alleged municipal custom itself violates federal law—as does the policy of using force in the Four-Way and chemical spray to punish detainees—there is no need to further show that the policymaker was deliberately indifferent. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("It is clear … that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) ("The official policy itself must be unconstitutional or, if not, must have been adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result." (internal quotation marks omitted)); *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) ("For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers 'with deliberate indifference as to its known or obvious consequences[.]'" (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997))); *see also Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 612 (W.D. Tex. 2023) (similar). That is presumably why the Fifth Circuit did not identify deliberate

10

indifference as an element of the *Monell* claim here. Tellingly, Defendants also do not address deliberate indifference in their attack on the sufficiency of the *Monell* evidence, effecting yet another waiver. *See* Motion 18-19; *see Jones v. Gusman*, 515 F. Supp. 3d 520, 539 (E.D. La. 2021) ("[A]s we should all know, an argument made for the first time in a reply brief is, in this circuit, waived.").

In nevertheless insisting on a deliberate indifference requirement, Defendants rely on cases involving different kinds of *Monell* claims—claims of liability *by omission*, which do require deliberate indifference, such as a failure to train or supervise (the cases cited at Motion 6), or the failure to adopt a policy (*e.g.*, *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 217 (5th Cir. 1998), cited at Motion 6 n.3). Defendants rely, too, on inapposite cases where, unlike excessive force claims, the underlying constitutional violation requires deliberate indifference, like an individual-capacity claim for failure to protect (the cases cited at Motion 6 n.3).

In short, Defendants did not preserve the argument that the dismissal of individual-capacity claims against Warden Hanson precludes a finding of deliberate indifference and thus *Monell* liability against the organizational Defendants, that argument is directly at odds with the Fifth Circuit's express holding in the earlier appeal and this Court's subsequent rulings, and it is substantively wrong. Because the jury was allowed to adjudicate Plaintiffs' *Monell* claims and found them well founded, the verdict does not "impermissibly impose respondeat superior liability." *Contra* Motion 9-10.

### B.    Wrongful-Death Liability Must Stand: Only Negligence, Not A Constitutional Violation, Is Required.

There is no merit to Defendants' next two, related arguments, that "any judgment for wrongful-death damages is legally impossible and must be vacated as a matter of law" because the jury found that Defendants' violations of Moore's *constitutional* rights did not cause his death. Motion 10-11; *see* Motion 13 ("[B]ecause the jury found that no custom was a

'substantial factor' in Moore's death, one cannot, as a matter of law, be the 'moving force.' Without 'moving force' causation, there is no *Monell* liability for the death.").[5]

The jury based its award of wrongful-death damages on Plaintiffs' successful *state-law* claim for negligence. It specifically found that at least one LaSalle employee acting within the course and scope of his employment was negligent under Louisiana law and that the negligence was a substantial factor in Moore's death. Doc. 691, at 1-2 (judgment); Doc. 664, at 3 (verdict form). So it is entirely irrelevant to wrongful-death liability that the jury additionally found that Defendants' *constitutional* violations (and state-law battery) caused injury to Moore but not ultimately his death. As discussed below, the jury could fairly have found that dropping Moore on his head en route to the Four-Way was negligent—but not a use of force or battery—and caused his death.

The cases on which Defendants rely (at Motion 11-12) are not to the contrary. Those cases do not, and could not, hold that a plaintiff seeking wrongful-death damages for negligence under state law must separately show that a constitutional violation also caused the decedent's death. Three of them—*Moore*, 41 F.4th at 504, *Phillips ex rel. Phillips v. Monroe Cnty.*, 311 F.3d 369, 374 (5th Cir. 2002), and *Slade v. City of Marshall*, 814 F.3d 263, 264-65 (5th Cir. 2016)—merely explain that a plaintiff must show that a constitutional violation caused death in order to recover wrongful-death damages *for that constitutional violation*. The two other cases—*Daniels v. Williams*, 474 U.S. 327, 328 (1986), and *Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (en banc)—are also inapposite; they simply say that negligence alone does not make out a constitutional violation. But, of course, negligence does make out a

---

[5] To the extent Defendants argue the verdicts were inconsistent, this argument is waived, because it asserts that the jury's findings are inconsistent, but Defendants did not raise this objection while the jury was empaneled. *Montano v. Orange Cnty.*, 842 F.3d 865, 881-82 (5th Cir. 2016). This waiver rule applies because the verdict here was general, not special: The jury itself applied the law to the facts; the verdict form did *not* set forth only "questions concerning specific factual issues" to which the "trial court then applies the law." *Harmon v. Collier*, 158 F.4th 595, 619-20 (5th Cir. 2025) (citation omitted).

claim for negligence. And the jury here found that Defendants' negligence caused Moore's death. Because Defendants supply no grounds to disturb that verdict, wrongful-death liability and damages must stand. *See infra* 30-32 (discussing sufficiency of the negligence evidence).

### C.    The Punitive Damages Award Is Constitutional.

Neither of Defendants' attacks on the punitive damages award succeeds.

First, Defendants note that "[p]unitive damages under § 1983 require proof that the defendant's conduct violated federally protected rights." Motion 13. But Defendants *did* violate federally protected rights, namely, Moore's right to be free from excessive force. Doc. 691, at 2-3. As Defendants own authority shows, a constitutional violation need not lead to death to warrant punitive damages. *Smith v. Wade*, 461 U.S. 30, 32 (1983) (victim was abused but not killed).

Second, Defendants are wrong that the punitive-to-compensatory ratio violates due process. For one, the jury's wrongful-death verdict should *not* be vacated, as explained above. That means that the punitive-to-compensatory ratio is virtually 1:1, which even Defendants concede is constitutional. Motion 14; Defs.' Rule 59 Motion 20. Specifically, the ratio of punitive damages ($23.25 million) compared to $19.5 million in compensatory damages ($18 million in wrongful death plus $1.5 million in pre-death damages) is 1.19:1. That ratio is even closer to 1:1 when pre-judgment interest on the compensatory damages is included. *See Adamkavicius v. Islamic Republic of Iran*, No. CV 23-3571 (ABJ), 2025 WL 2159537, at *32 (D.D.C. July 30, 2025) ("Punitive damages based on compensatory damages are calculated by reference to the entire compensatory award, including prejudgment interest." (internal quotation marks omitted)).

Separately, the jury's punitive damages award is constitutional even if this Court takes the $1.5 million pre-death damages as the basis for determining the ratio. There is no "'bright-line ratio which a punitive damages award cannot exceed,'" and the Fifth Circuit has expressly

13

"disagree[d]" that "any ratio of compensatory damages to punitive damages greater than 10:1 *requires* remittitur." *Lincoln v. Case*, 340 F.3d 283, 293 (5th Cir. 2003) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)); *see also* Pls.' Rule 59 Opposition 21-22 (elaborating). Instead, the court must look at "[t]he precise award in any case," assessed in light of "the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425. As Plaintiffs' Opposition to the Rule 59 motion details, overwhelming evidence of Defendants' reprehensibility, the substantial actual and potential harm, and the need to deter all support the punitive damages award, even if it yields a ratio of 15:1 with the survival damages award.

## D.    The Evidence Is Sufficient To Establish *Monell* Liability.

There is ample evidence to support the jury's *Monell* verdict. *Contra* Motion 15-21. This Court already held as much, when it denied Defendants' Rule 50(a) Motion following hours of argument and careful consideration. *See* VII Tr. 1689:15-91:21. Defendants give no reason this Court should reconsider its ruling.

### 1.    Custom

This Court had it exactly right when it rejected Defendants' earlier attack on Plaintiffs' custom evidence: "The Fifth Circuit has already said" that the evidence Plaintiffs marshalled at trial is "enough." VII Tr. 1691:2-3 (denying Rule 50(a) motion).

According to the Fifth Circuit, the following evidence is sufficient to establish an unconstitutional custom of using the Four-Way to punish detainees: (1) testimony that the Four-Way was regularly used to punish detainees; (2) testimony that the Four-Way was used to interrogate detainees; and (3) sworn evidence from a Defendant that, in 2016, multiple guards used the camera-free Four-Way to abuse multiple restrained detainees. *Moore*, 41 F. 4th at 509-510; *see* VII Tr. 1691:2-11 (Court making similar point). That evidence and more was presented at trial.

14

First, Willy Woodard, who was a "trustee" responsible for cleaning the jail and spent ninth months of 2015 incarcerated at Richwood Correctional Center, testified that he "knew" guards had punched people in the Four-Way, because he was "right there" and heard them doing it "all the time." V Tr. 1257:23-1258:1, 1258:12-15, 1259:14-1261:25. Woodard also testified that "more than once" he had "see[n] guards using mace on people who were handcuffed in the four-way." V Tr. 1257:11-15. Per Woodard, guards "know there's no camera" in the Four-Way and that it was "a blind spot," V Tr. 1259:6-8—a point Defendant Runner confirmed. III Tr. 900:17-18 (Runner testifying that "we're on camera, so I will not punch an inmate"). Karen Wilson, a Richwood guard, corroborated Woodard's account of persistent abuse in camera-free areas of the facility, testifying that she knew about areas of the jail where, between 2016 and 2018, guards (including supervisors) would "pull the inmates out of the dorms" into "a little sally port" between halls, where they would "jack them up in there, beat them up," and that she had witnessed such beatings. Doc. 672-2, at 70:9-18, 73:14-19, 74:10-75:8, 80:12-81:2. Defendants call these "[v]ague frequency characterizations" that "are categorically insufficient as a matter of law," Motion 17, but the Fifth Circuit similarly relied on an individual's testimony that abuse happened "[o]n many occasions" in holding there was sufficient evidence to try the *Monell* claim. *Moore*, 41 F. 4th at 510 (describing evidence of the chemical-spray custom).

Second, as the Fifth Circuit referenced, there was testimony that Assistant Warden Aultman used the Four-Way to interrogate detainees. Indeed, Aultman was going to use the Four-Way to interrogate Moore. *See* II Tr. 633:7-11 (Defendant Hardwell admitting that he ordered Moore to be taken to the camera-free four-way so that Assistant Warden Aultman could question Moore); II Tr. 606:2-21 (similar); *see also* Doc. 673-17, at 1 (Pls.' Ex. 275) (Loring guilty plea averring that officers took detainees to the Four-Way in 2016 when they "refused to answer the officers' questions"); VIII Tr. 2021:4-6, 19-20 (Warden Hanson testifying

15

regarding the same incident that the detainees were taken to the Four-Way to be "questioned" as part of an "investigation").

Third, the jury heard the very evidence of the 2016 Four-Way abuse the Fifth Circuit referenced in its opinion. In a sworn guilty plea admitted into evidence, Defendant Loring admitted that several Richwood officers repeatedly chemically sprayed five restrained inmates in the eyes and face, even though they were "compliant[] and not posing a physical threat to anyone." Doc. 673-17, at 1 (Pls.' Ex. 275); III Tr. 853:2-5 (admitting plea into evidence). Warden Hanson confirmed that the five guards chemically sprayed the handcuffed, kneeling detainees in the Four-Way. VIII Tr. 2031:24-2032:3, 2033:12-24, 2036:14-16. Accordingly, Plaintiffs were three for three in presenting evidence sufficient to establish an unconstitutional custom of using the Four-Way to punish detainees.

Plaintiffs went above and beyond what the Fifth Circuit concluded was adequate by also showing Defendants' failure to investigate or take any responsive action to Moore's death, which is further evidence of the existence of the custom of excessive force. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). "If what the officers did and failed to do … was not acceptable to the [policymaker], changes would have been made." *Id.* (quoted by *Moore*, 41 F.4th at 510 n.56). But changes were not made; indeed, no one at LaSalle or Richwood—including Warden Hanson—reprimanded the guards or even investigated Moore's death. II Tr. 645:2-23; 468:25-469:9, 471:22-24. That is true even though Warden Hanson and LaSalle's Chief of Operations (among others) watched video of the brutal extraction of Moore. II Tr. 465:15-23 (Turner testimony). Instead, the wardens told the Defendants they "did a good job" and to "just keep working towards doing a great job." Doc. 673-32, at 177:2-5 (Pls.' Ex. 806) (Defendant Runner's deposition testimony); III Tr. 904:6-905:14 (reading deposition). Because the Moore "episode of such dangerous recklessness obtained so little attention and

16

action by the [Defendants'] policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done" at Richwood. *Grandstaff*, 767 F.2d at 171.

The lack of accountability for the abuse and death of Moore was the rule, not the exception, at Richwood. During his 13 years at Richwood, chief of security and assistant warden Archie Aultman, whose responsibilities included conducting use of force trainings, never once counselled a correctional officer about using too much force or disciplined anyone. II Tr. 513:20-514:1, 515:14-16, 527:6-9, 530:24-531:2. Yet there was a clear need to counsel and discipline, given the pervasive abuse Woodard, Jackson, and Wilson testified about, *supra*, and the custom at Richwood of using excessive force to punish detainees, Doc. 691, at 2. "When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy." *Sanchez v. Young Cnty.*, 956 F.3d 785, 793 (5th Cir. 2020); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right" (quoted by *Moore*, 41 F.4th at 510 n.56).

Additional corroboration of the unconstitutional custom comes from Defendants' training deficiencies. Evidence that LaSalle's management never conducted inspections of Richwood, Doc. 627-1, at 33-35 (Cooper trial deposition), Richwood's warden was never certified in the minimum training standards for correctional officers in Louisiana (POST), V Tr. 1184:25-1185:3; VIII Tr. 2028:4-6, the assistant warden in charge of training never supervised subordinates to make sure they complied with their POST training, II Tr. 528:6-10, and guards did not receive training on defensive tactics, III Tr. 559:22-560:5 (Hardwell), all has a "tendency to make [it] ... more ... probable" that an unconstitutional custom of excessive force existed at the facility. Fed. R. Evid. 401.

17

While the Court held that Plaintiffs could not base *Monell* liability solely on a failure to train, VII Tr. 1691:22-1692:9 (Rule 50(a) ruling), this evidence of inadequate training is still relevant to whether Defendants had a custom of excessive force. That conclusion follows from the Fifth Circuit's holding in this case, as the magistrate judge explained. Mem. Ruling, Doc. 423, at 21-22; *see* Order, Doc. 531, at 11-12 (acknowledging the point). After all, the Fifth Circuit stated that it need not "reach Plaintiffs' alternative, failure-to-train argument" because it found sufficient evidence of a custom of excessive force. *Moore*, 41 F.4th at 510 & n.51. This ruling by the Fifth Circuit makes sense only if failure to train is "one side of the same coin as the chemical spray and beatings" custom, such that evidence of the former can help establish the latter. Doc. 423, at 21.

In the face of all this, Defendants nevertheless insist that the evidence of an unconstitutional custom falls short. They are wrong. They point to differences in the summary judgment and trial records. But no rule requires the parties to rely on the same evidence in both proceedings. What matters is that Plaintiffs at trial made the same showing the Fifth Circuit relied on earlier, even if Plaintiffs sometimes used different witnesses to do so.

Defendants also complain that Plaintiffs failed to identify enough similar, specific incidents of prior misconduct. Motion 16-17, 18. But the Fifth Circuit rejected that same argument last time around, explaining, "we have held that plaintiffs need not provide specific examples … to meet the condition or practice element." *Moore*, 41 F.4th at 509 (internal quotation marks omitted). Defendants' reliance on the *dissent* in *Moore* to counter this point gives away the game. Motion 15-16, 16-17 (citing *Moore* dissent and the cases that dissent cited). Anyway, the other incidents witnesses described *were* sufficient. *Supra* 15-16.

Finally, Defendants contend (at 18) that evidence post-dating Moore's death in 2015 is irrelevant. Again, the Fifth Circuit implicitly rejected that argument when it expressly relied on the 2016 Four-Way incident. *Moore*, 41 F.4th at 509-10; *see* VI Tr. 1569:5-8 (Court: "Didn't

18

the Fifth Circuit … say in this case that it was a pattern for a custom by use of the chemical pepper spray in the four-way [if] it happened a year later? Mr. Creekbaum: Yeah."); *see also Shepherd*, 591 F.3d at 457 (report cataloging incidents post-dating plaintiff's abuse was relevant to *Monell* claim).

Defendants' motion, then, should be denied. Indeed, even if this Court were to agree with Defendants and conclude, incorrectly, that there is insufficient evidence of a custom of using chemical spray and other force *in* the Four-Way to punish detainees, it would still not be appropriate to grant judgment as a matter of law to Defendants, for it was legal error for this Court to exclude from the *Monell* custom unjustified chemical spraying *outside* the Four-Way. As Plaintiffs argued throughout pre-trial and trial proceedings, "[t]he Fifth Circuit is abundantly clear it's either punishment in the four-way or chemical spray. The chemical spray does not have to be in the four-way." I Tr. 284-85; *see, e.g.*, Doc. 643; II Tr. 357-358; VI Tr. 1520, 1563 (making the argument). Indeed, the Fifth Circuit expressly held that "a reasonable jury could conclude a custom existed to use the Four-Way *and* chemical spray to punish prisoners." *Moore*, 41 F.4th at 510 (emphasis added); *id.* at 509 ("[I]t was customary for guards to use the Four-Way to punish detainees out of view of cameras, and for chemical spray to be used to punish restrained prisoners"). This Court acknowledged as much, before ultimately limiting the *Monell* excessive-force custom to the Four-Way. *Compare* Order, Doc. 356, at 47 (recognizing that "Plaintiffs contend that LaSalle and Richwood had a routine policy of using the Four-Way to punish offenders and a routine policy of using chemical spray on prisoners who were handcuffed and not presenting a threat of any kind"), *and* Order, Doc. 531, at 11 (characterizing the "custom or practice of excessive force by using the Four Way/chemical spray" (citing *Moore*, 41 F.4th at 510)), *with* VIII Tr. 2181:22-25 (Court stating, "we differ on what … you say the custom was. But I ended up saying it was the use of force in the four-

19

way"); VIII Tr. 2225:19-23 (Court confirming that it ruled that the "policy or practice is limited to what occurred in the four-way").

There is more than sufficient evidence of a custom of unjustified chemical spraying at Richwood, both in and outside the Four-Way. In addition to the evidence of excessive chemical spraying in the Four-Way already described (*supra* 15-16), this evidence includes: (1) former Richwood guard Yolanda Jackson's testimony that she saw guards use chemical spray on handcuffed people once or twice *each shift* over the four years (2012-2015) she worked in booking at Richwood, Doc. 672-5, at 11:14-14:9; (2) Trustee Woodard's testimony that he cleaned chemical sprays off the walls of the cells "every day," V Tr. 1253:22-24; (3) multiple instances of unjustified chemical spraying of both Moore and another detainee (Vernon White) by several officers over two days, *e.g.*, Pls.' Exs. 753, 754, 755; III Tr. 673-76 (evidence that Major Tubbs chemically sprayed a handcuffed and compliant Moore twice on October 12 outside booking); Pls.' Ex. 770 (video from 7:10am on October 13 of officer Rosenthal chemically spraying Moore twice and White once); III Tr. 665:16-666:2, 669:2-4, 670:9-11 (Rosenthal admitting that his use of spray was unjustified); *infra* 27 (detailing Hardwell spray on October 13); and (4) Defendant Hardwell's testimony that, on October 12, he twice sprayed Moore simply for being loud or putting his hand on top of the cell door, because his superiors had trained him to do that and he was following the established customs, practices, and policies of the jail, Pls.' Exs. 761, 762; II Tr. 587:10-591:24. *See generally Moore*, 41 F.4th at 510 (custom of "us[ing] chemical spray to punish" could be established by evidence that guards did so on many occasions). Indeed, this evidence of widespread unjustified spraying outside of the Four-Way makes it more probable that guards also unconstitutionally sprayed detainees inside the Four-Way—if they were willing to do it on camera, they would certainly do it off camera, too.

20

### 2. Knowledge

There was also sufficient evidence of *Monell*'s second element: Warden Hanson's actual or constructive knowledge of the unconstitutional custom. Once again, the Fifth Circuit's decision is dispositive: The Fifth Circuit held that, because "some record evidence suggests that guards sprayed Moore with pepper spray and beat him in the Four-Way as punishment," but "Hanson took no disciplinary action against anyone involved," "a reasonable jury could find … that Hanson actually knew that guards used the Four-Way and pepper spray to punish prisoners." *Moore*, 41 F.4th at 510-11; *see Grandstaff*, 767 F.2d at 171 ("The disposition of the policymaker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error."). That is exactly what the trial evidence showed: Guards sprayed Moore and beat him in the Four-Way, *infra* 23-25, and Hanson did nothing in response—no reprimand, no discharge, not even an investigation, *supra* 16-17. It did not matter to the Fifth Circuit that Hanson never admitted that "he was informed [of] or authorized such conduct." Motion 18. His conduct (or lack thereof) speaks for itself.

Because this evidence makes out *actual* knowledge, and because either actual *or* constructive knowledge suffices, *Moore*, 41 F.4th at 510, the jury's finding on Hanson's knowledge must stand, notwithstanding Defendants' argument that Plaintiffs' evidence of *constructive* knowledge differed from summary judgment to trial. Motion 18 (comparing Yolanda Jackson's declaration with trial testimony).

At any rate, there is also "sufficient [trial] evidence that [Warden Hanson] should have known" about the abuse in the Four-Way, i.e. constructive knowledge. VII Tr. 1691:17-19 (50(a) ruling). As discussed, there was ample evidence of "widespread and persistent use of the Four-Way and pepper spray to punish prisoners." *Moore*, 41 F.4th at 511. Indeed, Trustee Woodard was aware of this practice from simply walking the halls of Richwood. Richwood

guard Karen Wilson also knew of abuse in camera-free areas of Richwood from working there, further confirming that Hanson, the Warden, should have known, too.

Finally, the jury was not required to believe that Hanson "never allowed any excessive force to be used in the Four-Way" simply because he fired officers in 2016 for abusing individuals in the Four-Way. Motion 18-19; *see Holmes*, 117 F.4th at 315 (court must "disregard all evidence favorable to the moving party that the jury is not required to believe"). At best, that argument goes—and only tenuously at that—to Hanson's *actual* knowledge of the unconstitutional custom, not his constructive knowledge, which independently supports the jury's finding. But even as to actual knowledge, the jury was not required to believe that Hanson's response in 2016 proved he had no actual knowledge of the custom in 2015. Rather, a reasonable jury could conclude that Hanson was motivated to take corrective action in 2016, not because this was the first he was learning of abuse in the Four-Way, but because by this point, the abuse had gotten so out of hand that he could no longer brush it under the rug.

### 3.    Moving Force

There was ample evidence to establish the third *Monell* element: moving force. Per the Fifth Circuit, this is an easy call: Because there was sufficient evidence that Moore was "beaten in the Four-Way and excessively pepper-sprayed" by Defendants, "the policy or custom of using the Four-Way and pepper spray to punish prisoners" was the "moving force of the deprivation that Moore endured." *Moore*, 41 F.4th at 511-12.

In arguing to the contrary, Defendants again confuse the issues. Under three separate headings, they argue they cannot be liable under *Monell* because the jury found the unconstitutional custom did not cause Moore's *death*. Motion 19-21. But that just means Defendants are not liable under *Monell* for Moore's wrongful death, which is not the issue. Defendants' argument does nothing to disprove that Defendants remain liable under *Monell* for *injuring* Moore and the survival and punitive damages that follow from that liability. Just

because the jury apparently found that by the time Moore entered the Four-Way, he was already going to die from having been negligently dropped on his head, does not mean that the unconstitutional custom did not also cause him additional pain and suffering when guards continued to abuse him in the Four-Way.

Next, Defendants argue that "there was insufficient evidence to support any finding that a pepper-spray-misuse policy existed." Motion 19. This is not an argument about moving force, it is an argument about the existence of a custom, and it fails for the reasons stated above.

Defendants also contend there is a "mismatch" between the custom and Moore's case, because the custom is chemically spraying "handcuffed" persons "but Moore was not sprayed while handcuffed." Motion 19-20. He was, rather, "unrestrained" and "resisting," they claim. Motion 20. But the custom alleged and proven is the use of chemical spray "to punish" detainees—that is, spraying detainees that did not need to be subdued, whether that is because they were compliant, handcuffed, or otherwise restrained. *Moore*, 41 F.4th at 509, 510-11; Doc. 662, at 21 (jury instructions). Anyway, the Defendants themselves testified that Moore was handcuffed in the Four-Way. V Tr. 1146:17-18 (Williams testifying that Moore was handcuffed in Four-Way); IV Tr. 1002:4-5 (Foster testifying that Moore was in restraints in Four-Way).; *see also* II Tr. 545:5-11 (Assistant Warden Aultman testifying that Moore was handcuffed in the Four-Way); VI Tr. 1463:13-17 (detective saying the same). So there is no "disconnect." Motion 19.

If Defendants mean to argue that Moore was not chemically sprayed while he was in the Four-Way (where he was handcuffed), the evidence says otherwise. *See* Motion 19 (citing spraying incidents before Moore was put in the Four-Way). There is no video footage from the Four-Way—that is why the guards took Moore there, after all. But there is ample circumstantial evidence that guards chemically sprayed Moore in the Four-Way, which is sufficient to support the jury's verdict. *See* Doc. 662, at 7 (jury instruction stating, "the law makes no distinction

between direct and circumstantial evidence"). When Moore left the Four-Way, his pants were soaked and he reeked of pepper spray, even though no footage of the earlier chemical sprays show Moore being sprayed in the pants area. Doc. 672-6, at 19:8-20:11 (Lambright deposition read at trial); III Tr. 810:3-10, 811:10-13 (sheriff's deputy testifying that Moore's pants were "saturated" and "wet" with pepper spray). Video did, however, shows guards entering and exiting the Four-Way wearing or carrying gas masks and/or covering their faces while Moore was there. Pls.' Ex. 704 7:07:51-54, 7:13:33-36; V Tr. 1141:6-15 (Williams); Pls.' Ex. 785; IV Tr. 970:21-971:7, 972:17, 974:9-10 (Curley admitting the object in his hand in video appears to be a gas mask). And as one Defendant testified, "[i]f there's mace or something being sprayed, some type of chemical being sprayed, they usually put on gas masks." IV Tr. 974:2-4 (Curley). Richwood's booking officer Lavette Watson also smelled pepper spray when she opened the door to the Four-Way and encountered Moore there. VIII Tr. 2002:24-2003:2. All of this supports a reasonable inference that the guards chemically sprayed Moore in the Four-Way. *See Lewis*, 134 F.4th at 293 (court must draw "all reasonable inferences … in the light most favorable to" Plaintiffs).

Defendants' attack fails for yet another, more fundamental reason. Defendants overlook that there is a separate, independent basis to uphold *Monell* liability: their use of *non*-chemical force in the Four-Way. As this Court pointed out in its Rule 50(a) ruling, if Moore "was punished … or if he was beaten up, or if he was dog piled, … if the plaintiffs can prove that, then I think they can prove that was a moving force" for *Monell*. VII Tr. 1694:11-15.

The jury could find that Moore was "dog piled" in the Four-Way. Nurse Mitchell admitted that he saw guards do a "football style dog pile on top of Mr. Moore" while he was handcuffed in the Four Way. III Tr. 920:23-921:13 (Mitchell testimony); VII Tr. 1818:18-21, 1820:24-1821:4 (same); *see also* III Tr. 921:20-922:3 (Mitchell testifying that Defendants Hardwell and Runner were among the guards Mitchell saw in the Four-Way). Additional

24

circumstantial evidence shows Moore was physically abused in the Four-Way: There was testimony that Moore was at least partially conscious when he entered the Four-Way but was unconscious when was carried out, *e.g.*, V Tr. 1137:7-8 (Williams testified that when he took Moore to the Four-Way he "was still awake"); III Tr. 781:7-24 (sheriff's deputy testifying that Moore was unresponsive when he retrieved him from the Four-Way); when Moore was taken from the Four-Way he had numerous abrasions and bruises on his face, blood coming from an apparent busted lip, and blood on his forehead and top front part of his head, III Tr. 805:13-18; Doc. 673-2, 673-3, 673-4 (Pls.' Exs. 12-14)[6] and Defendants lied in their reports about what they did to Moore, including even that they took him to the Four-Way, giving rise to a fair inference that Defendants were covering up abuse, Doc. 673-23, 673-25 (Pls.' Exs. 324, 326); II Tr. 636:7-15; VI Add. Tr. 14-17 (revealing Hardwell lied to detective); III Tr. 896:10-897:22; V Tr. 1136:19-1137:13; VIII Tr. 1973:4-10. On top of all that, Defendant Williams punched Moore en route to the Four-Way. *Infra* 29.

If, despite all this evidence, the Court nonetheless believes the jury could not reasonably conclude that Moore was abused in the Four-Way, either through unjustified physical or chemical force, the Court still may not grant Defendants' judgment as a matter of law on the *Monell* claims. That is because Defendants Hardwell and Williams used excessive force when they chemically sprayed, body slammed, and punched Moore during his extraction from the cell around 7 p.m., and the reason they extracted him was to take him to the Four-Way to punish him there. In this way, the custom of punishing detainees in the Four Way caused—and was

---

[6] These injuries to the front of Moore's face are different than the injuries to the back and right side of Moore's head that correspond to earlier strikes. VI Tr. 1441:9-11 (treating physician testifying to injury on right side of brain); Doc. 594-3, at 20:18-25 (deposition testimony admitted at trial from medical examiner that blow to the right side likely caused Moore's right-sided hematoma); *see* Pls.' Ex. 783 (video showing Runner and Williams dropped Moore on the back right side of his head). And these injuries did not come from the sheriff's deputies, as they did not cause Moore any injury from the time they picked him up at Richwood. III Tr. 791:16-23.

the moving force for—Defendants to use excessive force against Moore while they were literally moving him. This Court's prior ruling, rejecting this theory, was legal error. *See* VII Tr. 1693-97, 1705 (Rule 50(a) ruling rejecting this theory).

### E.    The Evidence of the Individual Defendants' Liability Is More Than Sufficient.

There is sufficient—and indeed, overwhelming—evidence that the individual Defendants Hardwell, Runner, and Williams committed unconstitutional excessive force, battery, and negligence that injured Moore before his death, and also committed negligence under state law that caused Moore's death. *Contra* Motion 21-25. Because this is a question of the individuals' liability, and not *Monell* liability, the incidents giving rise to individual liability need not have occurred in the Four-Way (although the Four-Way conduct also independently supports liability).[7]

Once more, Defendants' leading argument is waived and unavailing. They claim there is "an internal tension" in the jury's finding that, on the one hand, the individual Defendants committed battery, excessive force, and negligence that did not cause death and, on the other hand, that Defendants committed negligence that did cause Moore's death. Motion 21. But Defendants did not raise this inconsistency objection before the jury was released, so it is waived. *Supra* 12 n.5 (citing case law). Regardless, there is no inconsistency. As we explain below, the individual Defendants committed multiple acts of wrongdoing, some of which caused non-fatal injuries (or injuries after Moore had already been fatally injured) and some of which caused death.

---

[7] Defendants present these arguments as solely arguments against the individual Defendants' liability, *not* the corporate Defendants' liability. *E.g.*, Motion 21 (arguing "the liability of the individual Defendants [for] the $1.5 million survival award … should not stand"); Motion 25 ("For the foregoing reasons, Defendants Hardwell, Runner, and Williams request that the Court grant judgment as a matter of law in their favor on the excessive force and battery claims, and grant judgment in their favor as a matter of law or, in the alternative, a new trial on the negligence-causation finding.").

For the same reason, the individual Defendants' argument (at 24-25) against wrongful-death liability for any constitutional violations is misguided. The judgment does not hold them so liable. Rather, it holds them liable for survival damages caused by their constitutional (and state-law) violations, that is, for pain and suffering Moore experienced up until his death due to their excessive force, but not including his death. Doc. 691, at 2, 5.[8] It is undisputed that "Moore's survivors do not have to show that the Individual Defendants caused his death to recover for excessive force." *Moore*, 41 F.4th at 505.

The jury's judgment is well founded as to each of three individual Defendants:

### 1. Hardwell

Beginning with Hardwell, he committed several acts of excessive force and battery against Moore, including when he removed Moore from the lockdown cell to take him to the Four-Way for questioning. II Tr. 606:2-21 (Hardwell testimony). First, Hardwell entered the cell, where Moore was in his bunk, and chemically sprayed Moore in the face, in violation of POST training. Pls.' Ex. 778 (video); III Tr. 742:4-7 (Plaintiffs' expert). Hardwell, who had two guards with him, did not attempt to handcuff Moore. II Tr. 608:23-609:7 (Hardwell testimony). And Hardwell admitted that he lied to sheriff's deputies about why he sprayed Moore: Hardwell told deputies that he had chemically sprayed Moore because Moore "ran at" him, which "was not true"; in reality, Hardwell "sprayed him when he was sitting down covering his own head because he did not want to be pepper sprayed." II Tr. 611:1-15.

Moments later, Hardwell again committed an act of excessive force and battery, while Moore was still "slightly blinded" by the chemical spray, had his back to officers, and was not making threatening movements. II Tr. 619:20-620:5 (Hardwell testimony); *see* V Tr. 1133:11-

---

[8] This is the result of the parties' stipulation that Plaintiffs will not collect damages against Hardwell, Runner, and Williams for their violations of state law, only their violations of federal law. Order, Doc. 689, at 3-4. The corporate defendants, however, remain on the hook for wrongful-death damages under a theory of vicarious liability so long as any employee of LaSalle or Richwood committed negligence that caused death, as the jury found.

13 (Williams testimony, similar). Hardwell did not even consider handcuffing Moore. II Tr. 621:1-9. Instead, Hardwell grabbed Moore from behind, lifted him in the air, and "slammed" him head-first to the ground in the hallway. Pls.' Exs. 780, 781 (video); II Tr. 613:6-7; 621:23-622:13. By Hardwell's own admission, Moore was not physically resisting—or even being "passive aggressive"—when Hardwell picked him up and slammed him on his head. II Tr. 622:2-15; *see* III Tr. 743:20-24; 747:18 (expert testimony that the use of force violated POST training, as Moore posed "no threat the officers").

Hardwell again committed excessive force and battery when he kneeled on Moore, Pls.' Ex. 780, and then dog-piled him in the Four-Way, when Moore was handcuffed and in and out of consciousness. *Supra* 24-25.

### 2. Runner

The jury could reasonably conclude that Defendant Runner committed excessive force against Moore when he punched Moore, just after 6pm on October 13, following the altercation between Moore and White. When Runner entered the cell, he was accompanied by three other guards, and Moore was on the side of the cell in a vulnerable position—he had his pants off and was squatting to defecate. Pls.' Ex. 775 (video); III Tr. 881:13-882:18 (Runner testimony). Although Moore was not making any movements toward anyone, another guard (Loring) sprayed Moore in the face. III Tr. 882:19-25. Runner knew how painful the spray must have been for Moore, but nevertheless Runner went straight up to Moore, cocked his right arm back, and struck Moore in the head, knocking him to the ground. Pls.' Ex. 775; III Tr. 883:14-884:16 (Runner testimony). Moore was still squatting and posing no threat to the officers when Runner struck him. III Tr. 738:1-739:20 (expert testifying Moore was "no threat" and Runner's strike was inconsistent with training).

28

Like Hardwell, Runner committed an additional act of committed excessive force and battery when he dog-piled Moore in the Four-Way, when Moore was handcuffed and in and out of consciousness.

### 3.    Williams

The jury could reasonably conclude that Defendant Williams committed excessive force and battery against Moore just after 7pm on October 13, when, as video shows, Williams helped Hardwell lift Moore up before Hardwell slammed Moore down. Pls.' Ex. 780 (video inside cell); Pls.' Ex. 781 (video outside cell); V Tr. 1133:11-19 (Williams admitting he helped Hardwell lift Moore out of the cell); *see supra* 28 (explaining why this use of force was unjustified). Additionally, Williams punched Moore when he was on the ground after the slam, even though Moore was not, and had not been, resisting. Pls.' Ex. 780. Williams denies that he punched Moore; he claimed he was only trying to grab Moore's arm. V Tr. 1134:2-9; VIII Tr. 1941:3-4 (cited at Motion 21-22). But the jury was free to believe the video evidence over Williams. *See Holmes*, 117 F.4th at 315 (court must "disregard all evidence favorable to the moving party that the jury is not required to believe").

To all of this, Defendants nonetheless insist the three guards were justified as a matter of law in all instances because of "Moore's violent battery of White, his verbal threats to the officers, or the biohazard conditions in the cell." Motion 23. But the jury heard and rejected all those arguments. The reasonableness of force under the totality of the circumstances is a "necessarily fact-intensive and case-specific inquiry," *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (quotation marks omitted), quintessentially within the province of the jury. Defendants fail to cite a single case to support overriding the jury's findings about the unreasonableness of the force as a matter of law. In any case, Defendants' justification for the force is weak. Even if the jury did believe Moore battered White, many of the acts of excessive force discussed above occurred more than an hour later, when Moore was

29

not resisting or engaged in any violence. The only evidence of supposed verbal threats came from the Defendants, whom the jury did not need to believe, especially given the evidence that they had repeatedly lied in their reports and to police and their repeated impeachment at trial. To top it off, the biohazard argument is nonsensical: Because it was *Defendants* who left Moore in his cell with feces and chemical spray for an hour, that "biohazard" to him in a locked cell could not have justified further chemical spray and excessive force against him.

### 4. Negligence

There is no basis to disturb the jury's finding that the negligence of Hardwell, Runner, and/or Williams caused Moore's death. Doc. 664, at 1 (finding all three negligent); *id.* (finding that the negligence of at least one of them was a substantial factor in causing Moore's death); Doc. 691, at 1 (summarizing these finding). As this Court recognized, there were several acts the jury could base that finding on, including "body slamming him and picking him up, carrying him, dropping him, all that, whatever happened in the four-way that could be proven, all that, there's enough negligence." VII Tr. 1701:13-16.

The carry and drop on the way to the Four-Way alone is enough. Moments before Defendants dropped Moore on his head, Hardwell had chemically sprayed an unresisting Moore in the face and Hardwell and Williams had lifted Moore up and slammed him head-first into the ground, with Williams further pummelling him. *Supra* 28-29. At this point, Moore lay handcuffed and motionless, face down on the ground in the hallway. Pls.' Ex. 782. No one checked if there was something wrong with Moore, and they chose not to seek medical help. II Tr. 624:25-625:2, 633:18-20 (Hardwell testimony); VIII Tr. 1971:23-1972:3 (Williams testimony). Basic POST training protocol—and simple common sense—called for guards to stabilize Moore and move him only with a backboard or wheelchair. III Tr. 756:24-757:1 (expert testimony), 890:4-17 (Runner testimony); VIII Tr. 1971:11-13. Defendants knew there was a stretcher and wheelchair available but did not use them. II Tr. 633:25-634:3; VIII Tr.

1971:17-1972:5. Instead, Hardwell told Runner and Williams to carry Moore by his legs and handcuffed hands. II Tr. 634:7-11. Struggling to carry the large and limp Moore, Runner slipped and dropped Moore on the back right side of his head. Pls.' Ex. 783; V Tr. 1134:22-25 (Williams testimony). Richwood staff still did not call for a nurse or paramedics; instead, Defendants dumped Moore in the Four-Way. III Tr. 901:15-18 (Runner testimony).

The jury could fairly conclude that was negligent, and also that this negligence caused Moore's death. Trauma to the back right of Moore's head caused a subdural hematoma. IV Tr. 1068:20-1069:11, 1070:9-12. The trauma occurred within the time frame when Runner and Williams dropped Moore on his head. VI Tr. 1442:15-17; IV Tr. 1070:25-1071:3; 1074:24-1075:4. And the subdural hematoma caused Moore's death. IV Tr. 954:17-956:2; Doc. 673-10 (Pls.' Ex. 96) (death certificate stating that Moore died from "head injuries received while in jail" on October 13, 2015 at the address for Richwood Correctional Center); Motion 20 (conceding that "Moore died from a subdural hematoma caused by head trauma").

Defendants ignore all this evidence. And they do not contest its significance. They do not, for instance, argue that officers did not owe a duty of care to Moore, or that they did not breach that duty in trying to carry Moore by his handcuffs when he was in such a poor state and there were safer alternatives available. Instead, Defendants argue that an "internal inconsistency in the verdict undermines the negligence-causation finding to the extent it rests on the use of force." Motion 23. According to Defendants, the verdict is inconsistent because the carry and drop was a use of force, but the jury found that Defendants' excessive use of force did not cause Moore's death.

As before, this argument about an inconsistent verdict is waived because Defendants did not raise it before the jury was released. And as before, there is no inconsistency in the verdict. The jury could have based its conclusion that the individual Defendants committed non-fatal excessive force on any one of several incidents separate and apart from the carry and

31

drop, such as Hardwell's chemical spray and body slam during the extraction, or the abuse in the Four-Way. That is, the jury did not necessarily find that the carry and drop was a use of excessive force or battery that caused only injury, not death. Indeed, the jury heard evidence that the carry and drop was not a use of force at all. III Tr. 756:15 (Hanson testimony).

Finally, even if the individual Defendants were not liable for any fatal negligence, LaSalle and Richwood would still be liable for Moore's death, because that liability can, *but need not*, rest on any of their negligence. That is because, in addition to finding that Hardwell, Runner, and Williams were negligent, Doc. 664, at 1, the jury also found that "the negligence of one or more of the employees of LaSalle Management Company" was "a substantial factor in causing" Moore's death, *id.* at 3. Plaintiffs presented ample evidence that other LaSalle employees, including LaSalle executives Rodney Cooper and Johnny Creed, were negligent in ways that were a substantial factor in Moore's death, VI Tr. 1663-64; X Tr. 2549, and Defendants do not argue to the contrary.

### F.     There Is No Basis To Disturb The Judgment Against LaSalle Management Company.

For several reasons, Defendants are wrong that LaSalle "should not have been held in judgment" at all because LaSalle and Richwood "did not operate as a single business enterprise as a matter of law." Motion 25.

First, LaSalle is liable for Moore's wrongful death and pre-death injuries *even if* LaSalle and Richwood are not a single enterprise. *See* IX Tr. 2422:4-:13, 2445:13-2446:5, 2247:21-2248:15. LaSalle's liability independently rests on LaSalle's vicarious liability for its employees' torts under state law and LaSalle's own *Monell* liability. Breaking that down, for wrongful death, (1) the jury found that a "LaSalle Management Company, LLC employee" acting in the course of his employment committed negligence that caused Moore's death, Doc. 664, at 2-3; (2) there was ample evidence for the jury to conclude that everyone working at the Richwood facility, including but not limited to Hardwell, Williams, and Runner, were LaSalle

32

employees[9]; and (3) it is undisputed that LaSalle is vicariously liable for the negligence of its employees acting in the course and scope of their employment.[10] For pre-death injuries, there are two separate bases for LaSalle's liability, apart from the single enterprise theory: (1) the jury concluded that at least one LaSalle employee committed injury-causing battery and negligence in the course and scope of his employment for LaSalle, Doc. 664, at 3-4 for which LaSalle is variously liable, and (2) LaSalle is directly liable under *Monell* because the jury held that Warden Hanson was the policymaker for LaSalle, Doc. 664 at 5-6. None of those findings—which cover the full extent of LaSalle's liability—required the jury to conclude that LaSalle and Richwood were a single integrated enterprise under Louisiana law.

In any event, the jury did conclude that LaSalle and Richwood are a single enterprise and there is no basis to disturb that conclusion.

Defendants are wrong to say the single-enterprise theory was never pleaded. This Court already held that it was, Doc. 531, at 4-5, and Defendants offer no argument as to why that ruling is wrong. Nor could they. Rule 8 requires only "a short and plain statement of the claim," Fed. R. Civ. P. 8, and the Third Amended Complaint is replete with allegations jointly against Richwood and LaSalle, alleging just the kind of joint employment and integration of operations that make out a single enterprise. *E.g.*, Doc. 140, at ¶¶ 5(a)-(m), 9.

---

[9] For Hardwell, see Doc. 673-16 (Pls.' Ex. 261) (written computer policy), Doc. 673-13 (Pls.' Ex. 240) (Personnel Status Change Report), and II Tr. 642:16-19 (Hardwell testimony). For Williams, see Doc. 673-12 (Pls.' Ex. 228) (Confidentiality and Security Policy and Agreement) and V Tr. 1150:11-17 (Williams testimony). For Hanson, see V Tr. 1159:22-25 (Hanson testimony). Defendant Loring stipulated he was an employee of LaSalle at the time of the incident, Doc. 673-29 (Pls.' Ex. 803) (stipulation), and Defendants offered no reason why his employment status would be any different from the other guards at the facility. LaSalle issued payroll checks or direct deposits to personnel working at the Richwood facility. V Tr. 1300:2-4.

[10] Under Louisiana law, "[a]n individual may simultaneously be the employee of more than one employer for the purposes of vicarious liability under La. Civ. Code art. 2320." *Doe v. Parauka*, 714 So. 2d 701, 704 n.4 (La. 1998).

The evidence at trial substantiated those allegations, providing the jury with more than enough evidence to find LaSalle and Richwood were effectively one entity. A determination of single business enterprise is based on the totality of circumstances, and may rest on some combination of: (1) common ownership; (2) common directors or officers; (3) unified administrative control; (4) common business purpose; (5) centralized accounting; (6) shared employees; (7) common offices; and (8) one corporation exerting control over another's daily operations. *Grayson v. R.B. Ammon & Assocs., Inc.*, 778 So. 2d 1, 14-15 (La. Ct. App. 1st Cir. 2000); *see* Doc. 662, at 23 (jury instruction).

Satisfying these criteria, the evidence here shows that LaSalle and Richwood have the same domicile, mailing address, and registered agent, William McConnell, Doc. 673-26, 673-27 (Pls.' Exs. 348, 351) (state reports); they have a common officer, McConnell Southeast Corrections, LLC, which is associated with William McConnell, who is the owner of LaSalle, V Tr. 1164:3-8, 1302:18-1303:2; William McConnell signed contracts on behalf of LaSalle and Richwood, including a contract that granted LaSalle "all inclusive authority over and [the] ability to supervise and direct the actions of all" employees at Richwood Correctional Center, who are "hired, paid, supervised, and discharged through" LaSalle at its "sole discretion and authority," Doc. 673-28, at 4, 12 (Pls.' Exs. 379) (contract); V Tr. 1319:14-16; the Chief of Operations for LaSalle, Johnny Creed, understood that LaSalle operates Richwood, and he directly supervised Hanson, the warden of Richwood, Doc. 627-1, at 62:23-63:2; V Tr. 1160:10-14; Hanson, along with the other Richwood staff, were employees of LaSalle, V Tr. 1159:22-25; II Tr. 409:16-23; *supra* 33 & n.9; and LaSalle and Richwood use the same accounting firm, which receives Richwood's W-2s from LaSalle, VI Tr. 1500:7-15. Tellingly, Loring, the only individual Defendant who did not share counsel with LaSalle, stipulated that he was an employee of both LaSalle and Richwood. Doc. 673-29 (Pls.' Ex. 803).

34

This evidence plainly goes beyond "only one superficial factor (common branding on forms)." Motion 27; *see* VII Tr. 1702:13-15 (Court rejecting Defendants' Rule 50(a) motion because, among other evidence, "Johnny Creed of LaSalle wa[s] a direct supervisor of Ray Hanson who was the policymaker, but also a warden of Richwood").

Finally, Defendants argue that the evidence of single integrated enterprise does not rise to the level of "clear and convincing." Motion 26. But Defendants cannot complain about that now: The jury was not instructed on that higher burden of proof, Doc. 662, at 23, because Defendants never asked that they be so instructed. Up until now, Defendants argued only that there should be no instruction *at all* on single enterprise because (they say) it was not pleaded; Defendants did not object to the form of the instruction itself. *See* Doc. 597, at 69; Doc. 497, at 13; VIII Tr. 2238:14-2241:3; IX Tr. 2311:14-25. Regardless, the evidence of a single integrated enterprise is clear and convincing.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion under Rule 50(b) for judgment as a matter of law should be denied.

Respectfully Submitted,

*Max A. Schoening*

Max A. Schoening (Temp No. 01283)
Omar G. Qureshi (Temp No. 918456)
QURESHI LAW PC
700 Flower Street, Suite 1000
Los Angeles, California 90017
(213) 786-3478

Nelson W. Cameron (No. 01283)
NELSON CAMERON LAW OFFICES
675 Jordan Street
Shreveport, Louisiana 71101
(318) 226-0111

Rachel G. Shalev (*pro hac vice* pending)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5033

Rachael Jensen (*pro hac vice* pending)
ORRICK, HERRINGTON & SUTCLIFFE LLP
200 West 6th Street, Suite 2250
Austin, Texas 78701
(512) 582-6950

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2026, a copy of this pleading was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.


*/s/ Max A. Schoening*
Max A. Schoening