UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

ERIE MOORE, JR. ET AL.                    CASE NO.  3:16-CV-01007

VERSUS                                    JUDGE TERRY A. DOUGHTY

LASALLE CORRECTIONS L L C ET AL    MAG. JUDGE KAYLA D. MCCLUSKY

MEMORANDUM ORDER

Before the Court are two post-trial Motions filed by Defendants, Gerald Hardwell ("Hardwell"), Jeremy Runner ("Runner"), Reginald Williams ("Williams") (collectively, "Individual Defendants"), LaSalle Management Co., LLC. ("LaSalle"), and Richwood Correctional Center, LLC. ("Richwood"), (collectively referred to as "Defendants") [Doc. Nos. 704, 705]. LaSalle and Richwood are collectively referred to as "Corporate Defendants."

The first Motion filed by Defendants is a Renewed Motion for Judgment as a Matter of Law ("Rule 50(b) Motion") [Doc. No. 704]. Pursuant to the joint stipulation [Doc. Nos. 701, 702], Defendants filed a Supplemental Memorandum [Doc. No. 719] in Support of the Rule 50(b) Motion. Plaintiffs, Tamara Green, Erie Moore, Jr., Tiffany Robinson (collectively, "Plaintiffs") filed an opposition [Doc. No. 723]. Defendants filed a reply [Doc. No. 729].

The second Motion is a Federal Rule of Civil Procedure Rule 59 Motion ("Rule 59 Motion") [Doc. No. 705]. Pursuant to the joint stipulation [Doc. No. 716], Defendants filed a Supplemental Memorandum [Doc. No. 720] in support of the Rule

59 Motion. Plaintiffs filed an opposition [Doc. No. 724] and Defendants filed a reply [Doc. No. 730]. Also before the Court is a Motion to Stay [Doc. No. 733] filed by Defendants. Plaintiffs opposed the Motion [Doc. No. 735] and Defendants filed a reply [Doc. No. 736].

For the reasons stated below, Defendants' Rule 50(b) Motion [Doc. No. 704] is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Rule 59 Motion [Doc. No. 705] is **GRANTED IN PART** and **DENIED IN PART**. The Motion to Stay [Doc. No. 733] is **DENIED AS MOOT**.

## I.    BACKGROUND

As the Court and all parties are well-acquainted with the facts of this case, Plaintiffs assert claims under both federal and state law arising from the death of their father, Erie Moore, Sr. ("Moore"), at Richwood. A jury trial was held from October 6, 2025, through October 21, 2025.[1] The jury found:

1.  Individual Defendants were negligent and that negligence was a substantial factor in causing injuries to Moore. Moreover, for at least one of the Individual Defendants, his negligence was a substantial factor in causing Moore's death;

2.  Individual Defendants committed a battery upon Moore, but this battery was not a substantial factor in causing Moore's death;

3.  That Corporate Defendants were a single integrated enterprise, that a LaSalle employee was negligent during the course and scope of his employment with LaSalle, and that negligence was a substantial factor in causing both injuries and death to Moore;

4.  That a LaSalle employee committed a battery upon Moore Sr., was in the course and scope of employment with LaSalle, but that the battery was not a substantial factor in causing Moore's death;

---

[1] [Doc. No. 664].

5. That Individual Defendants used excessive force on Moore, which caused Moore's harm, but said excessive force was not a substantial factor in causing Moore's death;

6. That there was a custom or practice of using the four-way and chemical spray to punish detainees at Richwood;

7. That Warden Ray Hanson was a policymaker for Corporate Defendants and knew or should have known of the custom or practice of using the four-way to punish detainees, and Ray Hanson was deliberately indifferent to said custom or practice;

8. That the custom or practice of using the four-way and chemical spray to punish prisoners was the moving force leading to the use of excessive force against Moore, but that said custom or practice was not a substantial factor in the death of Moore; and

9. That Defendants acted with actual malice or reckless indifference to the rights or safety of others.

As to the state claims, the jury allocated the following percentages of fault to the parties: Richwood 30%, LaSalle 45%, Runner 3%, Hardwell 6%, Williams 4%, Moore 2%, Monroe City 10%[2], for a total of 100%.[3]

For damages, the jury awarded a total of $1.5 million in pre-death damages to Moore for the mental, physical, and emotional pain and suffering he endured.[4]

The jury awarded $6 million each (a total of $18 million) to Plaintiffs in wrongful death damages, including grief and anguish, loss of love, affection, and companionship.[5]

On October 20, 2025, the jury issued a verdict determining that Defendants had acted with actual malice or reckless indifference to the rights or safety of others,

---

[2] The parties and percentages of fault were handwritten in by the jury even though there were no state claims against the City of Monroe.

[3] [Doc. No. 664, p. 12].

[4] [Id. at p. 8].

[5] [Id. at pp. 8–9].

and it reconvened on October 21, 2025, to consider the issue of punitive damages.[6] On October 21, 2025, the jury awarded punitive damages against Corporate Defendants in the amount of $23.25 million.[7] Therefore, the total damages awarded by the jury were $42.75 million.

In Defendants' post-trial Motions, Defendants make several arguments. First, Defendants assert that the verdict holding Corporate Defendants liable for *Monell* claims should be set aside because the Court previously granted a motion for summary judgment in favor of Warden Ray Hanson ("Warden Hanson"), which has become final, and Corporate Defendants cannot be held responsible for any actions or inaction due to Warden Hanson as policymaker.[8] Second, Defendants argue that neither the Individual Defendants nor the Corporate Defendants can be held liable for the wrongful death of Moore under 42 U.S.C. § 1983 or under *Monell* since the jury found that these claims were not a substantial factor in causing Moore's death.[9] Defendants further contend that the trial evidence, standing alone, was insufficient to establish *Monell* liability and likewise inadequate to support the jury's findings that Individual Defendants were negligent or engaged in excessive force or battery.[10] Additionally, Defendants contend that the general damage awards for the survival and/or wrongful death claims are excessive and warrant remittitur.[11] Moreover, Defendants argue that the $23.25 million punitive damage award is constitutionally

---

[6] [Doc. No. 661].
[7] [Doc. No. 670].
[8] [Doc. No. 704-2, p. 7].
[9] [Id. at p. 12].
[10] [Id. at p. 16].
[11] [Id. at p. 19]; [Doc. No. 705-2, p. 9].

excessive and should be reduced.[12] Finally, Defendants contend that a new trial is warranted because a jury instruction error permitted the jury to hold Corporate Defendants liable under *Monell* based on the actions of Warden Hanson, who had already been cleared by a prior ruling.[13]

The issues have been briefed, and the Court is prepared to rule.

## II.   LAW & ANALYSIS

### A.   Rule 50(b) Motion

Defendants' first move for a renewed judgment as a matter of law.[14] Judgment as a matter of law under Rule 50 is warranted only where "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes reasonable jurors could not arrive at a contrary verdict." *Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 248–49 (5th Cir. 2005) (quoting *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997)) (citing FED. R. CIV. P. 50(a)). Stated differently, "[a] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Heck v. Triche*, 775 F.3d 265, 273 (5th Cir. 2014) (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)). Thus, to prevail on a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of [its] claim." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011)). "'Substantial

---

[12] [Doc. No. 704-2, p. 20].
[13] [Doc. No. 705, p. 8].
[14] [Doc. No. 704].

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017)).

"[W]hen evaluating the sufficiency of the evidence, [courts] view all evidence and draw all reasonable inferences in the light most favorable to the verdict." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005). However, "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" remain within the province of the jury. *Kelso v. Butler*, 899 F.3d 420, 425 (5th Cir. 2018) (quoting *Hurst v. Lee Cty., Miss.*,764 F.3d 480, 483 (5th Cir. 2014)).

Rule 50(b) further provides that a party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b).

Again, Defendants here make several arguments in the Rule 50 Motion. First, since a motion for summary judgment[15] was granted in favor of Warden Hanson, the jury's verdict—finding him deliberately indifferent—conflicts with the Fifth Circuit's mandate, which bars relitigation of the issue of his alleged deliberate indifference.[16] Second, because the mandate determined that Warden Hanson was not deliberately indifferent, corporate liability cannot attach to Corporate Defendants under *Monell*, which requires the involvement of a policymaker.[17] Third, only Louisiana state law

---

[15] [Doc. No. 357].
[16] [Doc. No. 704-2, p. 7].
[17] [Id. at p. 12].

negligence—not federal constitutional law—governs the wrongful death of Moore, thereby, precluding *Monell* liability against Corporate Defendants for Moore's death.[18] Fourth, because the jury found only negligence as the cause of Moore's death, punitive damages cannot be awarded on that basis.[19] Fifth, beyond the four "threshold legal defects" alleged by Defendants, they assert the trial evidence, standing alone, was insufficient to establish *Monell* liability against Corporate Defendants.[20] Moreover, the trial evidence was insufficient to support the jury's findings against Individual Defendants.[21] Lastly, the trial evidence was insufficient to establish that Corporate Defendants were a "single business enterprise."[22]

### 1.    Wrongful Death Damages

Defendants essentially contend that the wrongful death finding rests solely on Louisiana state law negligence and is not attributable to any federal claims.[23] The Court agrees. The jury found that the Individual Defendants were negligent and that negligence was a substantial factor in causing injury to Moore.[24] The jury further found that for at least one of the Individual Defendants, negligence occurred and that their negligence was a substantial factor in causing Moore's death.[25] The jury also determined that Individual Defendants committed battery against Moore and

---

[18] [Id. at p. 16].
[19] [Id.].
[20] [Id. at pp. 8, 14].
[21] [Id. at p. 26].
[22] [Id. at p. 31].
[23] [Id. at p. 27].
[24] [Doc. No. 664, p. 2],
[25] [Id.].

employed excessive force.[26] However, the jury determined that the battery and excessive force were not substantial factors in causing Moore's death.[27]

Additionally, the jury concluded that any injuries to Moore resulting from a practice or custom of using the four-way and chemical spray to punish detainees were not a substantial factor in causing Moore's death.[28] Accordingly, the Court finds that the jury attributed Moore's wrongful death solely to Louisiana state law negligence, not to any federal constitutional violation. As a result, Corporate Defendants cannot be held liable under *Monell* for Moore's death.

Furthermore, the Court agrees with Defendants that punitive damages are unavailable as a result of wrongful death. Because the jury found Moore's death was caused solely by Louisiana state law negligence, no punitive damages can be awarded against Corporate Defendants for Moore's death, as punitive damages apply only to federal, not state, law claims. La. Civ. Code art. 3546 (2025). While the Court agrees with Defendants in part, it addresses the remittitur of these awards below. *See infra* pp. 39–46.

### 2.    Sufficiency of the Evidence of a Single Business Enterprise

The jury also determined that Corporate Defendants constituted a single integrated enterprise.[29] Defendants contend that the evidence was insufficient to

---

[26] [Id. at p. 4].
[27] [Id. at p. 5].
[28] [Id. at p. 7].
[29] [Id. at p. 3].

support this finding.[30] The Court, however, disagrees. The jury was instructed on the elements of a single integrated enterprise as follows:

> Plaintiffs allege that LaSalle Management Company, LLC and Richwood Correctional Center, LLC should be treated as a single business enterprise. In deciding whether LaSalle Management Company, LLC and Richwood Correctional Center, LLC, are a single business enterprise, you may consider the totality of circumstances. These include, but are limited, to the following factors, none of which necessarily gets more weight than any other:
> (1) common ownership;
> (2) common directors or officers;
> (3) unified administrative control;
> (4) common business purpose;
> (5) centralized accounting;
> (6) shared employees;
> (7) common offices; and
> (8) one corporation exerting control over another's daily operations.[31]

First, Defendants argue that the single business enterprise theory was not pleaded, thereby unfairly prejudicing LaSalle by depriving it of notice and the opportunity to respond to those allegations.[32] The Court addresses this argument first.

In the pretrial order dated June 9, 2025, Plaintiffs asserted that LaSalle exercised control over Richwood's employees, that Johnny Creed ("Creed"), LaSalle's Chief Operations Manager, directly supervised Warden Hanson, and that LaSalle managed Richwood's human resources, payroll, financial support, and overall operations.[33] Further, Plaintiffs stated that the Corporate Defendants operate as a

---

[30] [Doc. No. 704-2, p. 30].
[31] [Doc. No. 662, p. 23].
[32] [Doc. No. 704-2, p. 31].
[33] [Doc. No. 498, p. 28].

single integrated enterprise and that the Individual Defendants functioned as joint employees of these entities.[34] Defendants denied that contention and stated that the Corporate Defendants were separate entities.[35] Defendants also argued that the single enterprise theory was not included in the pleadings and improperly attempted to broaden the scope of the case.[36]

The single integrated enterprise issue was further briefed by both Defendants[37] and Plaintiffs.[38] On July 18, 2025, the Court ruled that Plaintiffs' allegations of liability and joint liability against Corporate Defendants provided sufficient notice to LaSalle regarding the single integrated enterprise theory.[39] The Court found Rule 8(a)(2) of the Federal Rules of Civil Procedure generally required only a plausible "short and plain" statement of the claim, not an exposition of Plaintiffs' legal argument.[40] See 5 C. Wright & A. Miller, Federal Practice & Procedure § 1219, pp. 277-278 (3d ed. 2004 and Supp. 2010).Therefore, LaSalle received adequate notice of Plaintiffs' single integrated enterprise claims. Even if that were insufficient, LaSalle was specifically informed of the single enterprise theory on June 9, 2025, in a pretrial order, filed nearly four months before trial, ensuring that Corporate Defendants were not prejudiced in preparing their defense.[41] So, that argument fails.

---

[34] [Id. at 37].
[35] [Id. at p. 38].
[36]  [Id.].
[37] [Doc. No. 497, p. 18].
[38] [Doc. No. 499, pp. 5–9].
[39] [Doc. No. 531, p. 4].
[40] [Id. at p. 5].
[41] [Doc. No. 499].

Defendants next argue that the trial evidence was not sufficient to establish that Corporate Defendants were a "single integrated enterprise," which requires a "clear and convincing" evidence standard.[42] Under Louisiana law, the single integrated enterprise doctrine is a theory for imposing liability where two or more business entities act as one integrated enterprise. *Brown v. ANA Ins. Grp.*, 949 So. 2d 1265, 1266 n.2 (La. 2008).

Louisiana courts consider numerous factors when determining whether multiple entities constitute a single business enterprise, including: (1) common ownership; (2) common directors or officers; (3) unified administrative control; (4) common business purpose; (5) centralized accounting; (6) shared employees; (7) common officers; and (8) one corporation exercising control over another's daily operations. *Grayson v. R.B. Ammon & Assocs., Inc.*, 99-2597 (La. App. 1 Cir. 11/02/00), 778 So. 2d 1, 14–15. No single factor is dispositive, and courts examine the totality of the circumstances to determine whether the entities operate as a single business enterprise. *Id.*

The Court evaluates the following evidence in light most favorable to Plaintiffs. First, Assistant Warden Antonio Turner ("Turner"), who was employed by Richwood from 2014 to 2017, testified that he was supervised by Warden Hanson and that Warden Hanson was supervised by Creed, who worked for LaSalle.[43] Turner also testified that he was paid by LaSalle, although he worked for Richwood.[44] Moreover,

---

[42] [Doc. No. 704-2, p. 32].
[43] [Doc. No. 707, p. 65].
[44] [Id.].

Christopher Loring ("Loring") testified he was an employee of both Richwood and LaSalle and testified he believed Richwood was part of LaSalle.[45] Monroe City Police Chief Quinton Holmes ("Chief Holmes") identified the contract between Richwood and the City of Monroe to hold a pretrial detainee for misdemeanor crimes.[46] Chief Holmes testified that William K. McConnell ("McConnell") (of LaSalle) signed the contract on behalf of Richwood.[47] Further, Warden Hanson testified that he was the Warden of Richwood in 2015 and was hired by Creed.[48] Warden Hanson testified that Creed had the power to hire and fire him.[49] Warden Hanson further testified that he met McConnell, one of the owners of LaSalle, while working at Richwood.[50]

At trial, McConnell identified himself as an owner of LaSalle and that LaSalle served as a "back office" for Richwood, by issuing payroll checks for Richwood and paying invoices for Richwood.[51] McConnell is also a registered agent for Corporate Defendants.[52] McConnell further testified that Creed worked for LaSalle and had oversight over Warden Hanson.[53] And Rodney Cooper, who was also employed by LaSalle, had supervision over Creed.[54] McConnell further identified a contract between Corporate Defendants.[55] On page four of the contract, McConnell did not dispute that the contract says LaSalle has all-inclusive authority over and the ability

---

[45] [Doc. No. 708, pp. 181, 182].
[46] [Doc. No. 709, pp. 151, 152, 169, 170].
[47] [Id. at p. 153].
[48] [Doc. No. 710, p. 194].
[49] [Id. at p. 46].
[50] [Id. at p. 45].
[51] [Id. at pp. 42, 177].
[52] [Id. at p. 179].
[53] [Id. at p. 185].
[54] [Id. p. 187].
[55] [Doc. No. 379].

to supervise and direct the actions of all Richwood employees.[56] And that LaSalle hired Warden Hanson to do such things.[57] Patrick Temple signed the contract on behalf of LaSalle, and McConnell signed it on behalf of Richwood.[58] McConnell relied upon Creed and Cooper to determine the proper procedure for handling incidents at Richwood.[59]

Lee Thomason, a certified public accountant, testified that when a W-2 for Richwood was received, it was forwarded to them by an accountant from LaSalle Management.[60] Creed testified via deposition that he was hired as Chief of Operations at LaSalle in 2004 and that his boss was McConnell.[61] Creed was sent all documentation of incidents regarding the case at hand on October 13, 2015, but testified that he likely forwarded the documents to the attorney.[62] Creed also went to Richwood the night of the incident.[63] Cooper testified, via deposition, that he worked for LaSalle and has been LaSalle's Executive Director since 2016.[64] Cooper oversees the people in LaSalle's business office and oversees Creed for Louisiana facilities.[65] Cooper stated that LaSalle's headquarters does not review discipline issues with Correctional Officers and that LaSalle leaves all operational decisions to the facility's Warden.[66] Additionally, Corporate Defendants maintain identical office addresses at

---

[56] [Doc. No. 710, p. 191].
[57] [Id.].
[58] [Id. at p. 190].
[59] [Id. at p. 199].
[60] [Doc. No. 711, p. 113].
[61] [Doc. No. 672-1, pp. 4, 10].
[62] [Id. at p. 18].
[63] [Id. at p. 21].
[64] [Doc. No. 672-3, pp. 1–2].
[65] [Id. at p. 2].
[66] [Doc. No. 673-3, p. 25].

192 Bastille Lane, Suite No. 200, Ruston, Louisiana, and common ownership as WMC Enterprises, LLC, is listed as a member of both LaSalle and Richwood.[67]

After considering the above evidence and testimony in reviewing the evidence in the light most favorable to Plaintiffs, there was sufficient evidence for the jury to have found Corporate Defendants were a single integrated enterprise. There was evidence of unified administrative control, common business purpose, centralized accounting, shared employees, and the ability to exert control by LaSalle over Richwood's operation. See *Grayson,* 99-2597, 778 So. 2d at 14–15.

Accordingly, Defendants' argument on this issue fails.

### 3. Sufficiency of Evidence as to Hardwell, Runner, and Williams

Defendants next argue that the evidence was not sufficient for liability against Individual Defendants.[68] Not so. The jury found that Individual Defendants were negligent, committed a battery upon Moore, and used excessive force on Moore.[69] The jury also found that the Individual Defendants acted with actual malice or reckless indifference to the rights and safety of others concerning excessive force.[70] The Court evaluates the following evidence in a light most favorable to Plaintiffs.

Hardwell testified that on October 13, 2015, he did not know that the use of force policy at Richwood was that guards must not repeatedly chemical spray inmates in a short period of time.[71] Hardwell testified he decided to put both Moore and

---

[67] [Doc. Nos. 673-3, p. 2]; [Doc. No. 710, p. 42].
[68] [Doc. No. 704-2, p. 20].
[69] [Doc. No. 664, pp. 2, 3, 5].
[70] [Id. at p. 11].
[71] [Doc. No. 707, p. 220].

Vernon White ("White") in the same detention cell.[72] Hardwell recognized himself in Video Exhibit 759, showing White punching another detainee before being moved to Moore's cell.[73] Hardwell identified himself in two more videos shown to the jury (Video Exhibits 761 and 762) as he chemically sprayed Moore twice within a three-minute span.[74] Hardwell also participated in Moore's removal from Lockdown 7.[75] Hardwell additionally testified he did not see a guard kick Moore when Moore had been taken down to the ground, although it was clearly visible on the video (Video Exhibit 763).[76]

Additionally, the Unusual Occurrence Report did not mention that Moore was chemically sprayed two times or that Moore was kicked by a correctional officer.[77] When Hardwell, Runner, Williams, and Christopher Loring removed White from Moore's cell, Hardwell did not see Runner strike Moore on the head, although he admitted the Video Exhibit 775 showed just that.[78] Hardwell further admitted that Video Exhibit 778 showed that he lunged at Moore and chemically sprayed him.[79] Hardwell also testified that he told the Ouachita Parish Sheriff's Office that "Moore jumped up and ran at us" before he moved Moore.[80] However, Video Exhibit 778 does not show this.[81]   Hardwell further admitted that Video Exhibit 778 showed him

---

[72] [Id. at p. 239].
[73] [Id. at p. 225].
[74] [Id. at pp. 225–226].
[75] [Id.].
[76] [Id. at p. 251].
[77] [Doc. No. 676-1].
[78] [Doc. No. 707, p. 257].
[79] [Id. at p. 264].
[80] [Id. at p. 267].
[81] [Id.].

grabbing Moore from behind and lifting Moore in the air, and taking Moore to the floor.[82] Hardwell then had Runner and Williams take Moore to the four-way instead of medical.[83]

While Moore was being carried by Runner and Williams, Runner slipped and dropped Moore to the floor.[84] Video Exhibit 783 shows Moore hitting his head on the concrete floor. Hardwell later filed a report on Moore's extraction from Lockdown 7, but acknowledged that he omitted key details—namely, that he had slammed Moore to the ground, restrained him with his knee, and that Runner slipped, causing Moore to be dropped while being escorted to the four-way.[85] Hardwell was never disciplined as a result of this incident or given any negative feedback.[86] Further, Sheryl Downs, who was an employee at Richwood in 2015, testified that when Moore was originally booked at Richwood, Moore told her he had been pepper-sprayed, and she saw evidence of the pepper spray residue on Moore's shirt.[87]

Plaintiffs' witness, Kenneth M. Sanders ("Sanders"), who testified as an expert in the use of force and peace officer standards and training, stated that the actions of Individual Defendants (as shown in the Video Exhibits 761, 763, 770, 775, 778, 780, and 783), were inconsistent with Peace Officer Standards Training and what is taught in the use of force training.[88] The actions Sanders testified as inconsistent with use of force training included: chemical spraying Moore when there was no

---

[82] [Id. at p. 269].
[83] [Id. at p. 279].
[84] [Id. at p. 290].
[85] [Doc. No. 673-23].
[86] [Doc. No. 707, p. 301].
[87] [Doc. No. 708, p. 24].
[88] [Id. at p. 69].

immediate threat, hitting Moore in the head, the take-down of Moore in Lockdown 7, and carrying a handcuffed Moore from Lockdown 7 to the four-way.[89]

Ouachita Parish Investigator, Donald Murphy ("Murphy"), testified to seeing Moore lying on the floor in the four-way. Murphy testified that Moore was handcuffed, had shackles on his feet, and was unresponsive.[90] However, he heard Moore making a snoring noise.[91] Guards at Richwood tried to wake Moore up, but were unable to do so, and Moore was then carried out.[92] Officer Daryl Wells ("Wells"), who was working at Ouachita Correctional Center ("OCC") in October 2015, went with Murphy to pick up Moore at Richwood.[93] Wells testified that Moore's pants were saturated with pepper spray.[94] Deputy Nathaniel Lambright ("Lambright") of the Ouachita Parish Sheriff's Office arrived in Richwood while Moore was at the four-way intersection and also observed that Moore's pants were soaked with pepper spray.[95]  OCC Officer Ethan Bonner testified that he took photographs of Moore when Moore arrived at OCC, which showed Moore with his eyes closed while bleeding from his head.[96] Webb Cresink ("Cresink"), an emergency medical technician at OCC, evaluated Moore when he arrived at OCC.[97] Cresink noticed numerous abrasions and bruises on Moore's face

---

[89] [Id. at p. 122].
[90] [Id. at p. 128].
[91] [Id.].
[92] [Id. at pp. 128, 134].
[93] [Id. at p. 156].
[94] [Id. at p. 157].
[95] [Doc. No. 672-6, p. 19].
[96] [Doc. No. 708, p.143]; [Doc. No. 673-2, 673-3].
[97] [Id. at p. 152].

and a small amount of blood. Cresink was unable to get a response from Moore, so he advised that Moore be taken immediately to the hospital for a possible head injury.[98]

Loring testified that when Moore was booked into Richwood on October 12, 2025, Moore was chemically sprayed twice.[99] Loring further testified that Hardwell, Williams, and Runner removed Moore from Lockdown 7 after White had been removed.[100] Loring saw Moore in the four-way after he had been lying on his side, handcuffed, partially awake and partially asleep.[101]

Runner testified that he went into Lockdown 7 to remove Moore on October 13, 2015, and watched Hardwell hit Moore on the shoulder and then take Moore to the ground.[102] Runner said he and Williams picked Moore up off the ground to take Moore to the four-way.[103] Moore was heavy, and Runner testified he slipped and dropped Moore.[104] Although he wrote a report after the extraction of Moore, he did not put in his report that he slipped and dropped Moore.[105]

Williams was a sergeant at Richwood who was working the night of October 12 through October 13, 2015.[106] Williams testified he went into Lockdown 7 to help extract Moore from his cell, although it was Hardwell who carried him out.[107] Williams admitted to grabbing Moore's arms but denied punching Moore.[108] Williams

---

[98] [Id. at pp. 153–155].
[99] [Id. at p. 179].
[100] [Id.].
[101] [Id. at p. 182].
[102] [Id. at p. 234].
[103] [Id. at p. 241].
[104] [Id. at p. 240].
[105] [Id. at p. 243].
[106] [Doc. No. 710, p. 9].
[107] [Id. at p. 11].
[108] [Id. at p. 12].

also testified that both he and Runner were carrying Moore to the four-way when Runner tripped and dropped Moore.[109] William also admitted that his report (Exhibit 325) did not mention that he and Runner carried Moore or that Runner dropped Moore.[110]

Reginald Curley ("Curley") testified that he was on Video Exhibit 785 heading toward the four-way carrying an item that looked like a gas mask.[111]

Jody Foster ("Foster") was a guard working in the kitchen of Richwood on October 13, 2015.[112] He identified himself on Video Exhibit 784 walking into the four-way.[113] While in the four-way, Foster testified he saw Moore on the floor, lying on his back, and appeared to be sleeping or unconscious.[114] Foster testified Moore was there for more than an hour, and he saw that Moore had urinated on himself.[115]

Nurse William Mitchell was a licensed practice nurse who was employed at Richwood in October 2015.[116] He heard a commotion when Moore was brought in, and he walked into the four-way to see what was going on.[117] Nurse Mitchell testified that Loring, Hardwell, Curley, and Runner were "dogpiled" on top of Moore in the four-way.[118] He performed a "sternum rub" to see if Moore was conscious.[119]

---

[109] [Id.].
[110] [Id. at p. 14].
[111] [Doc. No. 709, p. 40].
[112] [Id. at p. 65].
[113] [Id. at p. 66].
[114] [Id. at p. 68].
[115] [Id. at p. 69].
[116] [Doc. No. 708, p. 257].
[117] [Id. at p. 263].
[118] [Id. at p. 266].
[119] [Id. at p. 271].

Ouachita Parish Sheriff's Office Investigator Johnny Holyfield testified that when he arrived at the four-way, Moore would not wake up, and Moore's body was completely limp.[120] This resulted in Sheriff's Office Deputies and Richwood officers carrying Moore out of the four-way.[121]

Yolanda Jackson ("Jackson") originally worked in booking and was later moved to the control room at Richwood.[122] From 2012 to 2015, Jackson testified that using pepper spray on handcuffed prisoners was a regular practice at Richwood.[123] She testified that it usually occurred one or two times per shift.[124]

Lavette Watson worked at Richwood as a booking officer in October 2015.[125] She testified that when Moore was originally booked on October 12, 2015, Moore smelled like pepper spray, but she never saw anyone use pepper spray on Moore.[126]

Willy Woodard ("Woodard") was incarcerated at Richwood in 2015.[127] He became a trustee, and his job was to clean out the lockdown cells and halls.[128] On October 13, 2015, at approximately 7:18 a.m. (after both White and Moore had been removed from Lockdown 7), Woodard cleaned up Lockdown 7.[129] Woodard testified that when cleaning up the cell, he wiped mace off the wall and could smell mace in the cell.[130] Woodard also testified that while at Richwood, he observed guards using

---

[120] [Doc. No. 711, p. 78].
[121] [Id. at p. 79].
[122] [Doc. No. 672-5, p. 8].
[123] [Id. at p. 11].
[124] [Id. at p. 14].
[125] [Doc. No. 712, p. 104].
[126] [Id. at p. 118].
[127] [Doc. No. 710, p. 128].
[128] [Id. at p. 130].
[129] [Id. at p. 131].
[130] [Id.].

chemical spray on prisoners who were handcuffed in the four-way.[131]  He stated that inmates were screaming and that, although he did not personally see the physical blows, there were reports and audible indications that individuals were being punched.[132]

Dr. Teri O'Neal ("Dr. O'Neal"), the coroner of Ouachita Parish, testified that Moore died as a result of a subdural hematoma, which was caused by blunt force trauma. Dr. O'Neal testified that it could have been the result of a fall to the floor.[133]

Dr. Eduardo Gonzalez-Toledo, a radiologist who specializes in interpreting images from the brain and spine, testified as an expert in neurology.[134] He testified that trauma to Moore's head caused a subdural hematoma in the area of the right back side of Moore's head.[135] He also testified that due to the freshness of the blood, the hematoma had occurred within five hours of the time he arrived at E.A. Conway.[136]

Dr. David Nelson, the emergency room physician who was working in the emergency room on the night of the incident, testified that Moore was brought into the emergency room by stretcher.[137] He went on to say that Moore was comatose and not moving.[138] He noted bruising on the right cheek and left lower cheek.[139] A computed tomography scan showed a two-centimeter right lateral subdural

---

[131] [Id. at p. 135].
[132] [Id.].
[133] [Doc. No. 709, p. 20].
[134] [Id. at p. 115].
[135] [Id. at p. 131].
[136] [Id. at p. 137].
[137] [Doc. No. 711, p. 45].
[138] [Id. at p. 46].
[139] [Id.].

hematoma.[140] He testified he believed the hematoma had developed in the past few hours.[141]

In addition, numerous videos played by Plaintiffs supported the jury's verdict, which found Individual Defendants liable for excessive force, battery, and negligence. For example, Video Exhibit 761 shows Moore in Lockdown 7 being pepper sprayed at 7:46 p.m. on October 12th, 2015.[142] Video Exhibit 762 depicts Moore in Lockdown 7 being pepper sprayed at 7:49 p.m. on October 13, 2015.[143] Video Exhibit 763 shows the removal of White from Lockdown 7 and supports Plaintiffs' claims that Moore was struck in the head, thrown to the ground, and kicked while down, as a reasonable jury could draw such inferences from the footage.[144]

Video Exhibit 775 shows Hardwell, Runner, Loring, and Williams removing White from Lockdown 7.[145] Video Exhibits 778 and 779 depict Individual Defendants removing Moore from Lockdown 7 and support Plaintiffs' assertions that Hardwell used pepper spray on Moore, forced him to the ground, and placed his knee on him.[146]

Video Exhibits 780 and 781 show Moore's extraction from Lockdown 7 and depict Hardwell grabbing Moore from behind, lifting him into the air, and slamming him to the ground.[147]  Video Exhibit 783 shows the hallway outside Lockdown 7, where Moore is seen being thrown to the floor by Hardwell.[148] It also shows Williams

---

[140] [Id. at p. 53].
[141] [Id. at p. 55].
[142] [Doc. No. 673-8].
[143] [Id].
[144] [Id.].
[145] [Id.].
[146] [Id.].
[147] [Id.].
[148] [Id.].

and Runner pick up and carry Moore.[149] In the video, Runner slips while carrying

Moore, resulting in Moore being dropped on the right side of his head.[150]

After considering the above evidence and testimony in reviewing the evidence

in the light most favorable to Plaintiffs, there was sufficient evidence for the jury to

find Individual Defendants liable for excessive force, battery, and negligence.

### 4.    Sufficiency of Evidence to Establish *Monell* Liability

Defendants argue that there was not sufficient evidence to establish *Monell*

liability against Corporate Defendants because Plaintiffs failed to establish a

policymaker, an unconstitutional policy or custom, knowledge, or "moving force

causation."[151]

The jury found there was a custom or practice of using the four-way and

chemical spray to punish detainees at Richwood.[152] The jury further found Warden

Hanson was a policymaker for Corporate Defendants.[153] Moreover, it was the jury's

verdict that Warden Hanson knew or should have known about a custom or practice

of using the four-way and chemical spray to punish detainees.[154] In Jury

Interrogatory 18 and 19, the jury found Warden Hanson was deliberately indifferent

to a practice or custom of using the four-way and chemical spray to punish detainees,

which was the "moving force" behind the violation of Moore's constitutional rights.[155]

However, the jury found the custom or practice was not a substantial factor in causing

---

[149] [Id.].
[150] [Id.].
[151] [Doc. No. 704-2, p. 15].
[152] [Doc. No. 664, p. 6].
[153] [Id.].
[154] [Id.].
[155] [Id. at p. 7].

Moore's death.[156] Because the jury also found that the Individual Defendants committed battery and used excessive force against Moore, imposing *Monell* liability on the Corporate Defendants requires proof that this conduct was linked to a policy or custom of using the four-way and chemical spray to punish detainees. Accordingly, to establish *Monell* liability against the Corporate Defendants, the practice of using the four-way and chemical spray to punish detainees must have been the moving force behind the battery and excessive force. At trial, the following evidence was presented demonstrating the harm Moore suffered as a result of that practice.

Assistant Warden Archie Aultman ("Warden Aultman") testified that at the time of the Moore incident in October of 2015, the four-way did not have cameras.[157] He further testified that he recognized himself in Video Exhibit 786 as headed to the four-way after Moore had been taken there.[158] Hardwell testified that he had not had defensive tactics training in over five years at the time the Moore incident occurred.[159] Therefore, he did not know that the Richwood's use of force policy prohibits using several rounds of chemical spray on an inmate in a short period of time.[160] Hardwell identified himself as chemically spraying Moore in the face once at 9:46 p.m. and again at 9:49 p.m. on October 12, 2015.[161] Hardwell's use of chemical spray twice in Video Exhibits 761 and 762 was not mentioned in Hardwell's Unusual Occurrence Report.[162] Hardwell further testified that the reason Moore was removed from

---

[156] [Id.
[157] [Doc. No. 707, p. 155].
[158] [Id. at p. 200].
[159] [Id. at p. 216].
[160] [Id. at p. 220].
[161] [Id. at p. 242].
[162] [Id. at p. 252].

Lockdown 7 was so that Warden Aultman could question Moore.[163] Hardwell admitted to chemically spraying Moore in the face with chemical spray before removing Moore from Lockdown 7.[164] Hardwell testified that Moore got to the four-way at 7:05 p.m. on October 13, 2015, and stayed there until the Ouachita Parish deputies arrived.[165]

As stated above, Plaintiffs' expert, Sanders, testified that in the videos he viewed, Sanders believed the many chemical sprays Moore endured were not consistent with Richwood's use of force training because there were no immediate threats.[166] Wells was working at OCC in October of 2015 when he went to Richwood to pick up Moore.[167] Wells and Lambright testified that when he took Moore to OCC, Moore's pants were saturated with pepper spray.[168] Additionally, Loring testified that Moore was taken to the four-way after Moore's extraction from Lockdown 7 and that there were no cameras in the four-way.[169] Runner testified that he slipped and dropped Moore in the hallway outside Lockdown 7 while transporting him to the four-way, after which Moore was placed on the floor.[170] Runner also testified that there were no cameras inside the four-way.[171]

---

[163] [Id. at p. 262].
[164] [Id. at p. 264].
[165] [Id. at p. 273].
[166] [Doc. No. 708, p. 69].
[167] [Id. at p. 156-157].
[168] [Id. at p. 157]; [Doc. No. 672-6, p. 19].
[169] [Doc. No. 708, pp. 181–182].
[170] [Id. at p. 240].
[171] [Id. at p. 246].

And to reiterate, Nurse Mitchell testified that he heard the correctional officers bring Moore into the four-way.[172] He heard a "commotion" and went into the four-way to see what was going on. Nurse Mitchell testified there were four men "dogpiled" on Moore in the four-way.[173] Curley testified he was carrying something that looked like a gas mask when he was walking toward the four-way.[174] Foster, the guard working at Richwood on October 13, 2015, and supervising cooks, saw Moore on the floor in the four-way.[175] Foster identified himself walking in the four-way on Video Exhibit 784.[176] Foster testified that Moore was lying on his back, restrained, and appeared to be sleeping or unconscious.[177] Foster testified that Moore lay in the four-way for more than one hour and appeared to be asleep and urinating on himself.[178]

Jackson was employed at Richwood in booking and later in the control room at Richwood.[179] She testified that at Richwood, the use of pepper spray on handcuffed prisoners was a regular practice and that she witnessed it from 2012 to 2015, and it generally occurred one to two times per shift.[180] She also verified there were no cameras in the four-way.[181] Williams, who worked the night shift at Richwood the night of the incident, escorted Moore into the four-way.[182] Williams identified himself in Video Exhibit 704 wearing a gas mask during the transport of Moore into the four-

---

[172] [Id. at p. 263].
[173] [Id. at p. 266].
[174] [Id. at p. 40].
[175] [Id. at pp. 65–66].
[176] [Id. at p. 66].
[177] [Id. at p. 68].
[178] [Id. at p. 69].
[179] [Doc. No. 672-5, p. 8].
[180] [Id. at pp. 11, 14].
[181] [Id. at p. 51].
[182] [Doc. No. 710, p. 9].

way.[183] Woodard, the incarcerated trustee on the night of the incident, testified he had seen guards using pepper spray on prisoners who were handcuffed in the four-way.[184] He could hear the guards using pepper spray on prisoners who were screaming and hollering, and he could also hear prisoners being punched.[185] Warden Hanson testified about an incident at Richwood on October 15, 2016, involving the four-way, where several guards were arrested for chemically spraying handcuffed prisoners in that area.[186] Loring further testified that he pleaded guilty to falsifying his report regarding the incident, which involved multiple Richwood guards spraying handcuffed prisoners with pepper spray in the four-way during interrogations.[187] Although this occurred after the incident at issue, it nevertheless helps corroborate the existence of a custom or practice at Richwood.

In light of the evidence summarized above, the jury had a sufficient basis to find *Monell* liability on the part of the Corporate Defendants. The record supported a finding that a practice or custom existed at Richwood of using the four-way and chemical spray to punish prisoners.

Accordingly, Defendants' arguments challenging the sufficiency of the evidence supporting *Monell* liability are unavailing.

> **5.      Whether a Previous Motion for Summary Judgment in Favor of Warden Hanson was a Violation of the Fifth Circuit's Mandate**

---

[183] [Id. at p. 13].
[184] [Id. at p. 135].
[185] [Id.].
[186] [Doc. No. 712, p. 137].
[187] [Doc. No. 708, p. 200].

The jury found that a custom or practice existed at Richwood of using the four-way and chemical spray to punish detainees.[188] It also determined that Warden Hanson was a policymaker for the Corporate Defendants.[189] Finally, the jury concluded that Warden Hanson knew or should have known of the custom or practice involving the use of the four-way and chemical spray for punishment, and that he was deliberately indifferent to this unconstitutional policy or practice.[190]

Defendants maintain that the Corporate Defendants' *Monell* liability is invalid as a matter of law because it violates the Fifth Circuit's mandate.[191] Moreover, Defendants contend that while the Fifth Circuit considered other rulings, it did not address Warden Hanson's motion for summary judgment, and, therefore, the jury should not have been permitted to consider Warden Hanson's conduct because his favorable summary judgment ruling was finalized.[192]

In response to Defendants' arguments, Plaintiffs assert (1) this argument has been waived; and (2) the Fifth Circuit decision expressly held these *Monell* claims must proceed to trial.[193] At the time Warden Hanson filed his motion, Warden Hanson was alleged to have been individually liable.

In Warden Hanson's motion for summary judgment, he sought judgment on claims that he was individually liable for failure to train, failure to provide medical care, failure to intervene, classification, conspiracy, and punitive damages.[194]

---

[188] [Doc. No. 664, p. 6].
[189] [Id.].
[190] [Id. at pp. 6–7].
[191] [Doc. No. 704-2, p. 3].
[192] [Id. at p. 11].
[193] [Doc. No. 723, p. 11].
[194] [Doc. No. 237].

Notably, the summary judgment was not based upon Warden Hanson's knowledge and/or deliberate indifference toward the custom of using the four-way and chemical spray to punish detainees.[195] This Court granted Warden Hanson's motion on his *individual liability* on the claims of failure to train, failure to provide medical care, failure to intervene, classification, conspiracy, and punitive damages.[196]

On June 22, 2022, the Fifth Circuit issued its decision on several of this Court's prior rulings. *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493 (5th Cir. 2022). The Court affirmed in part, reversed in part, and remanded the case, but it did not address the summary judgment granted in favor of Warden Hanson. *Id.* However, it did consider the *Monell* claims, concluding that a genuine issue of material fact existed because a reasonable juror could find from the record that it was customary for prison guards to use chemical spray to punish detainees and to discipline them outside the view of cameras. *Id.* at 509–10.

At that time, the Fifth Circuit determined that genuine issues of fact existed regarding both Warden Hanson's knowledge of the alleged unconstitutional custom and the existence of such a custom. *Id.* at 510. The Court was aware that summary judgment had been granted in Warden Hanson's favor, as reflected in the record. *Id.* at 512. If the Fifth Circuit had determined that Warden Hanson's conduct could not be considered by a jury in assessing whether he knew or should have known of the alleged custom, it would not have remanded that issue for trial. In addition, and to reiterate, Warden Hanson's motion for summary judgment addressed only the claims

---

[195] [Id.].
[196] [Doc. No. 357].

against him in his *individual capacity*, not his role as a policymaker for the Corporate

Defendants under *Monell*. Accordingly, the jury's findings regarding Warden Hanson

did not contravene the Fifth Circuit's mandate, which contemplated that these issues

would be resolved at trial.

Moreover, Plaintiffs further contend that Defendants waived this claim by

failing to raise the specific issue in their Rule 50(a) motion at trial.[197] *See Waganfeald

v. Gusman*, 674 F.3d 475, 481 n.14 (5th Cir. 2012). This Court agrees. Although the

Court has addressed the merits regarding the prior summary judgment, Defendants

did not include this argument in their Rule 50(a) motion and therefore waived it.

### 6. Whether the Punitive Damage Award is Constitutionally Infirm

Defendants' final argument in their Rule 50(b) Motion is that the $23.25

million punitive damages award is unconstitutional because the only conduct found

to be a substantial factor in Moore's death was negligence under Louisiana state

law.[198]

Because Defendants, in their Rule 59 Motion, argue that the $23.25 million

punitive damages award is constitutionally excessive, the Court will address that

argument in its ruling on the Motion. *See infra*, pp. 46–52.

### B. Rule 59 Motion

Rule 59(a) provides a district court discretion to grant a new trial "on all or

some of the issues . . . after a jury trial, for any reason for which a new trial has

---

[197] [Doc. No. 723, p. 11].
[198] [Doc. No. 704-2, p. 19].

heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a); *see also Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) ("[t]he decision to grant or deny a motion for new trial . . . rests in the sound discretion of the trial judge"). While the rule does not specify the grounds necessary for granting a new trial, the Fifth Circuit has instructed that "[a] new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). A district court may also grant a new trial when the jury's verdict is logically inconsistent if, after viewing the evidence in the light most favorable to a finding of consistency, reconciliation is impossible. *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 343 (5th Cir. 2001); *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978).

When a movant argues that insufficient evidence supports the verdict, the district court should deny the motion "unless the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (quoting *Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1227 (5th Cir. 1986)); *see also Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) ("New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great —not merely the greater—weight of the evidence.") (citation modified). In contrast to the standard applicable to a Rule 50 motion, "[a] verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial

evidence to support it," and a district court may weigh the evidence when resolving whether a new trial should be granted on this ground. *Shows*, 671 F.2d at 930.

Moreover, the Seventh Amendment requires district courts "to make a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all possible." *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1040 (5th Cir. 1982) (citations omitted). Courts "therefore must attempt to reconcile the jury's findings, by exegesis, if necessary, before [they] are free to disregard the jury's verdict and [order a] new trial." *Id.* (internal quotation marks and citations omitted). A new trial is warranted only if there is "no view of the case which makes the jury's answers consistent and that the inconsistency is such that the special verdict will support neither the judgment entered . . . nor any other judgment." *Id.* (citation modified). Per Rule 59, the trial judge is permitted to weigh the evidence, assess witness credibility, and exercise independent judgment as a "thirteenth juror." *United States v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971). If the court concludes that the verdict is against the great weight of the evidence, a new trial should be granted even though there is substantial evidence to support the jury's findings. *Shows*, 671 F.2d at 930. Rule 59 provides a broader scope for relief: a new trial should be granted if the verdict is "against the great weight of the evidence," if the damages are excessive, or if the trial was otherwise unfair to the moving party. *Smith,* 773 F.2d at 613.

Defendants make the following arguments in their Motion:

    A. Incorporation of its Rule 50 arguments;
    B. Jury Instruction Error Regarding Monell Liability Due to Actions of Warden Hanson;

> C. Remittitur of excessive wrongful death general damages is warranted;
>
> D. The $23.25 million punitive damages award is constitutionally excessive and shall be vacated or remitted. [199]

Each argument is addressed separately below.

### 1.    Incorporation of Rule 50(b) Arguments

Defendants incorporate by reference the arguments raised in their Rule 50(b) Motion, contending that the evidence was legally insufficient to sustain the jury's verdict on the § 1983 claims because the jury's findings are contrary to the "clear weight of the evidence."[200]

Similarly, as Defendants incorporate their Rule 50 arguments, the Court likewise incorporates the evidence and findings discussed in its analysis of the Rule 50(b) Motion. *See supra* pp. 7–30.

As stated above, the standard is different with respect to a Rule 59 motion. The verdict would have to be against the "great weight of the evidence." *Pryor,* 138 F.3d at 1026. Based on the evidence discussed above, the jury's findings are not against the great weight of the evidence. The record contains substantial evidence supporting the conclusion that the Individual Defendants used excessive force and committed battery against Moore. It also contains substantial evidence that the Corporate Defendants operated as a single integrated enterprise and that an unconstitutional custom existed sufficient to support *Monell* liability against them. Consequently, this argument fails.

---

[199] [Doc. No. 705-2, p. 3].
[200] [Id. at p. 8].

### 2.    Jury Instruction Error

In this argument, Defendants again contend—albeit in a different form—that the summary judgment finding that Warden Hanson was not personally liable precludes any *Monell* liability against the Corporate Defendants.[201] Defendants specifically contend that the Court denied their requested jury instruction, stating that the Corporate Defendants could not be held liable based on the conduct of individuals already found not to have committed constitutional violations, and instead provided an instruction and verdict form that permitted the jury to reconsider Warden Hanson's liability.[202] As previously explained in the ruling on the Rule 50(b) Motion, the motion for summary judgment in favor of Warden Hanson addressed only his personal liability under the asserted theories of liability and did not encompass any *Monell* theory. For this reason, as well as the reasons supporting *Monell* liability against the Corporate Defendants, the requested jury instruction was improper and correctly denied. *See supra* pp. 27–30.

Because the summary judgment ruling in favor of Warden Hanson did not rest on *Monell* liability, giving the proposed instruction would have risked misleading and confusing the jury. This argument also does not succeed.

### 3.    Remittitur of General Damages

The jury awarded pre-death damages of $1.5 million for mental, physical, and emotional pain and suffering caused to Moore by Defendant's wrongful conduct.[203]

---

[201] [Id.].

[202] [Id. at p. 9].

[203] [Doc. No. 664, p. 8].

The jury awarded wrongful death damages of $6 million to each of Moore's three children for a total award of $18 million dollars.[204] Defendants argue that this high compensatory damages award "represents a verdict that is so out of proportion to the evidence is so beyond typical awards in this jurisdiction that it shocks the judicial conscience."[205]

A jury's award is not to be disturbed unless it is "entirely disproportionate to the injury sustained." *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1426 (5th Cir. 1988) (quoting *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983)). When the jury's award exceeds the bounds of reasonable recovery, the Court of Appeals must "suggest a remittitur or direct the district court to do so." *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir. 1985). The size of the remittitur is determined in accordance with the Fifth Circuit's "maximum recovery rule." *Caldarera*, 705 F.2d at 784.

To be subject to remittitur, the verdict has to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to." *Caldarera*, 705 F.2d at 784. While a district court "is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, '[i]f the judge is not satisfied with the verdict of the jury, he has the right—and

---

[204] [Id. at pp. 8-9].
[205] [Doc. No. 705-2, p. 9].

indeed the duty—to set aside the verdict and order a new trial.'" *Smith*, 773 F.2d at 613.

In determining whether remittitur or a new trial for excessive damages should be awarded, the Fifth Circuit uses the "maximum recovery rule," which permits a verdict of 150% of the highest inflation-adjusted recovery in an analogous published decision. *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019).

This is not a diversity case; it is a federal question case that includes state-law claims under supplemental jurisdiction.  In a diversity jurisdiction case, however, the court must "use state law to determine whether the damages are excessive but retain a role for the maximum recovery rule in setting any remittitur." *Longoria*, 932 F.3d at 360. Under the maximum recovery rule, the court will uphold a damages award whether the damage amount is proportionate to at least one factually similar, published case. *Echeverry v. Jazz Casino Co., LLC*, 988 F.3d 221, 236 (5th Cir. 2021). The Fifth Circuit states that it refuses "to overturn jury awards that are within 150% of the highest award in a factually similar case." *Id.* at 237. Under Louisiana state law, the discretion vested in the trier of fact is "great," but even so, a court should rarely disturb an award of general damages. *Reck v. Stevens*, 373 So. 2d 498, 401 (La. 1979). "Prior awards do not alone determine the award in a case under review. But, they do provide an objective reference for determining the highest or lowest award that is not "greatly disproportionate" to past awards. That is, the award that is reasonable given the particular injury to the particular plaintiff under the particular

circumstances." *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC,* 400 So. 3d 918, 919 (La. 2025).

"The elements of damages for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses, and future expenses." *Hill v. Shelter Mut. Ins. Co.,* 935 So. 2d 691, 695 (La. 2006). Remittitur can be ordered in two ways. In the first, the plaintiff is offered a choice—accept the remittitur or a new trial will be ordered. In the second, remittitur is ordered without offering the plaintiffs a new trial. This method is only permissible, without running afoul of the Seventh Amendment, where it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there. *Structural Metals, Inc. v. S & C Elec. Co.,* 590 Fed. App'x. 298, 302 (5th Cir. 2014).

### a.    Survival Action Award

The jury awarded $1.5 million in damages for Moore's mental, physical, and emotional pain and suffering resulting from Defendants' wrongful conduct prior to his death.[206] The jury further found that the only legal theory constituting a substantial factor in causing Moore's death was negligence under Louisiana state law.[207] None of the federal claims was found to be a substantial factor in causing his death, though they were found to have caused pre-death damages. The pre-death damages included the federal claims of battery and excessive force, along with the Louisiana state law negligence.

---

[206] [Doc. No. 664, p. 8].
[207] [Id. at pp. 2–7].

The jury additionally found Defendants acted with actual malice or reckless indifference to the rights or safety of others.[208] Several pre-death incidents were alleged by Plaintiffs to have been excessive force, battery and/or negligence. They included:

1. Moore was being chemically sprayed when being booked;[209]
2. Moore being chemically sprayed while yelling in his cell;[210]
3. Runner striking Moore in the head and knocking him to the floor during the removal of White;[211]
4. Hardwell chemically sprays Moore in the face while removing Moore;[212]
5. Hardwell lifts Moore up and slamming More headfirst to the ground in the hallway;[213]
6. Williams punched Moore when he landed on the ground;[214]
7. Hardwell kneeling on Moore's upper body for at least 10 seconds;[215]
8. Runner slipping and dropping Moore headfirst to the hallway floor;[216]
9. Moore being chemically sprayed while in the four-way;[217]
10. Moore being dog-piled in the four way;[218]
11. After Moore was hospitalized, he lay in bed for a month before he died.[219]

---

[208] [Id. at pp. 10–11].
[209] [Doc. No. 712, p. 118].
[210] [Doc. No. 673-38, Vídeo Exhibits 761, 762].
[211] [Id., Video Exhibit 775].
[212] [Id., Video Exhibit 778].
[213] [Id.].
[214] [Doc. No. 710, p. 9].
[215] [Doc. No. 673-38, Vídeo Exhibit 778].
[216] [Id., Video Exhibit 783].
[217] [Doc. No. 672-6, p. 19].
[218] [Doc. No. 708, p. 266].
[219] [Doc. No. 710, p. 229].

The Court looks for whether the record reveals any competent substantial evidence fairly tending to support the verdict, even if different inferences and conclusions might be supported by the evidence. *Stewart v. Thigpen*, 730 F.2d 1002, 1007 (5th Cir. 1984).

Clearly, the award for pre-death damages is high, but it does not warrant remittitur under either federal or Louisiana law.  Plaintiffs rely on a comparable case, *Montano v. Orange Cnty., Texas*, 842 F.3d 865 (5th Cir. 2016), in which a $1.5 million verdict was affirmed for four days of unconstitutional conditions of confinement. The victim similarly died while in custody, but the constitutional violation was found not to have caused his death. *Id.* at 883. Furthermore, there was also uncertainty regarding whether the inmate was conscious during his confinement. *Id.* at 880.

The $1.5 million award in *Montano* matches the amount awarded in this case. Applying an inflation adjustment and the Fifth Circuit's maximum recovery rule (150% of the inflation-adjusted figure), an award exceeding $1.5 million would still be upheld.

Therefore, this Court finds the pre-death damage award within the maximum recovery rule, and Defendants' motion for new trial and/or remittitur on the pre-death damages cannot succeed.

### b.     Wrongful Death Award

The jury awarded each of Moore's three children $6 million for wrongful death damages, totaling $18 million.[220] The jury found that the only theory that was a substantial factor in causing Moore's death was the Louisiana state law negligence.[221]

In a diversity case, the Court must use state law to determine whether the damages are excessive and the "maximum recovery rule" in setting remittitur. *Echeverry*, 998 F.3d at 236. However, this is not a diversity case; it is a federal question case that includes state-law claims under supplemental jurisdiction. The Court will therefore look to analogous federal and state cases to assess whether the damages are excessive and will apply the "maximum recovery rule" in determining any remittitur. Under both the federal and the Louisiana state standard, this Court finds the wrongful death damages are excessive, and that remittitur is required.

Defendants argue that high-water mark case for wrongful death damages to adult children is *Stauder v. Shell Oil Co.*, 409 So. 3d 1 (La. App. 4 Cir. 06/03/24).[222] Plaintiffs do not contest this point and cite no cases involving a higher award. Instead, they argue that the close relationship between Moore and his three children supports the jury's verdict.[223]

This Court finds *Stauder* to be a comparable case. In that matter, the court upheld awards of $2.75 million to each of the decedent's two adult daughters. *Id.* The decedent's death was attributed to asbestos exposure at the defendant's facility, which led to a prolonged illness. *Id.* One daughter, Shelly, lived in a separate house

---

[220] [Doc. No. 664, p. 8–9].
[221] [Id. at p. 4].
[222] [Doc. No. 705-2, p. 15].
[223] [Doc. No. 724, p. 12].

on the same property as her father for approximately five or six years, saw him daily, regularly shared meals with him, took him to the emergency room when he first lost consciousness due to breathing difficulties, and continued to struggle significantly after his death. *Id.* at 2. The other daughter, Jill, lived near her father and spent time with him every day, spoke with him frequently by phone, and shared Sunday dinner with him each week. She was also a registered nurse who helped care for him and was present at the time of his death. Jill further testified that she developed an especially close bond with her father following the loss of her brother. *Id.*

In this case, all three of Moore's children testified at trial. Tiffany Robinson ("Tiffany"), Moore's oldest daughter, has a son, Desiya, who was six years old at the time of Moore's death.[224] Moore occasionally picked Desiya up from school and taught him how to play piano.[225] Tiffany testified that she spoke with her father frequently, and his last call to her came while she was in Chicago on October 10, 2015.[226] She later learned that Moore had been arrested, involved in an altercation, and airlifted to Shreveport.[227] When she arrived at the hospital, she was unable to see him for several days; when she finally did, he was on life support, and doctors told her that "it [didn't] look good."[228] On November 12, 2015, Tiffany's aunt called, urging her to come to the hospital because Moore was coding.[229] She testified that she misses

---

[224] [Doc. No. 710, p. 152].
[225] [Id. at p. 153].
[226] [Id. at p. 157].
[227] [Id. at p. 159].
[228] [Id. at p. 160].
[229] [Id. at p. 162].

Moore, describing him as her hero and as a caring and generous person.[230] Plaintiffs also introduced a video of Moore singing (Exhibit P-303).

Erie Moore, Jr. ("Erie"), Moore's son, was three or four years old when his parents divorced, and, thereafter, he lived primarily with his mother, seeing Moore every other weekend.[231] He maintained a strong relationship with his father through high school and college while both resided in Monroe, Louisiana.[232] After Erie began working at Chase Bank, the two frequently met for lunch.[233] In January 2013, Erie relocated to Fort Worth, Texas, to accept a position with Mercedes-Benz Financial Services.[234] Following the move, he spoke with Moore by phone every other day and returned to Louisiana to visit approximately every six weeks.[235] Moore also regularly sent him videos.[236] Their last conversation occurred on the Sunday before Moore's arrest.[237] Later that week, Erie's sister, Tiffany, contacted him to ask if he had heard from Moore as she had been unable to reach him.[238] Erie subsequently learned that Moore had been arrested, injured in jail, and airlifted to Shreveport, Louisiana.[239] At the time, Erie was in El Paso, Texas, for work; he flew to the Dallas–Fort Worth area, rented a car, and drove to the hospital where Moore was being treated.[240] He was

---

[230] [Id. at p. 164].
[231] [Id. at p. 215].
[232] [Id. at p. 217].
[233] [Id.].
[234] [Id. at p. 218].
[235] [Id. at p. 220].
[236] [Id. at p. 221].
[237] [Id. at p. 222].
[238] [Id. at p. 223].
[239] [Id.].
[240] [Id.].

never able to speak with his father again.[241] Erie traveled to Monroe to obtain approval from the Ouachita Sheriff's Office so that he and his sisters could visit Moore.[242] When he was finally able to see him, Moore was on a breathing machine and unresponsive.[243] Erie visited the hospital daily as Moore's condition continued to decline.[244] Moore died on November 14, 2015, and his funeral was held on November 21, 2015. Erie's son, Erie Moore III, was born on November 21, 2015, the same day Moore was buried.[245] Erie testified that he has struggled with depression in the years since Moore's death and has questioned whether moving to Texas was the right decision.[246]

Tamara Green ("Tamara"), the last of Moore's children, has two children of her own, now 18 and 24 years old.[247] Although Tamara was primarily raised by her mother, she shared many childhood experiences with Moore.[248] Following her parents' divorce, she did not see him for a period of time, but later reestablished a close relationship and spoke with him frequently.[249] Tamara moved from Baton Rouge, Louisiana, to Texas between 2014 and 2015, prior to Moore's death.[250] Whether in Baton Rouge or Texas, she visited Moore during holidays and other trips home and maintained regular phone contact with him.[251] Moore also shared a

---

[241] [Id. at p. 228].
[242] [Id. at p. 227].
[243] [Id. at p. 229].
[244] [Id.].
[245] [Id. at p. 233].
[246] [Id. at p. 234].
[247] [Doc. No. 717, p. 44].
[248] [Id. at p. 45].
[249] [Id. at p. 47].
[250] [Id.].
[251] [Id. at p. 48].

particularly close bond with Tamara's daughter, who was tall and struggled with her size; Moore was the only person who could meaningfully reassure her about it and encouraged her to view it as an advantage.[252] Tamara's daughter later went on to be named player of the year in both basketball and volleyball.[253] Tamara testified that she never had the opportunity to share this achievement with Moore.[254]

The Moore children and the *Stauder* sisters each shared close relationships with their parents and were clearly affected by their parents' deaths. However, there are notable distinctions between the *Stauder* sisters and Moore's three children. The *Stauder* sisters saw their father more frequently and experienced a longer period during which he was ill, allowing for a more extended anticipatory grieving process. Their loss was also accompanied by more extensive documentation of traumatic grief, including evidence of significant mental health decline, one sister's inability to attend trial due to grief, and the other sister's relocation to New Zealand as a result of the loss. In contrast, Moore's circumstances included the additional consideration that he was likely to be arrested for the second-degree murder of White and to face a substantial period of incarceration, if not life imprisonment; Johnny Holyfield testified that the video depicted Moore repeatedly stomping White to death and that, had White survived, Moore would likely have been arrested for second-degree murder.[255] Thus, as Defendants correctly note, second-degree murder in Louisiana carries a mandatory sentence of life imprisonment without the benefit of parole,

---

[252] [Id.].
[253] [Id. at p. 49].
[254] [Id. at p. 52].
[255] [Doc. No. 717, p. 3]

probation, or suspension of sentence. La. R.S. 14:30.1(B). Even a conviction for manslaughter carries a maximum sentence of 40 years. La. R.S. 14:31(B). Accordingly, the level of society and companionship available to Moore's children would have likely been substantially different from that provided by a parent who would otherwise be present in the home and available for daily interaction, support, and guidance, like the father in *Stauder*.

After considering the testimony Moore's children, the facts of the *Stauder* case, and relevant Louisiana and federal precedent involving wrongful death damages for adult children not residing with the decedent, the Court concludes that an award of six million dollars to each child "shocks the judicial conscience," is "so large as to be contrary to right reason," is "so exaggerated as to indicate bias, passion, and prejudice," and exceeds what claimants are entitled to. *Caldarera*, 705 F.2d at 784. In comparing the awards in the *Stauder* case, the Court finds that the *Stauder* sisters presented a more substantial claim, and that the $2.75 million awarded to each of them was supported by a greater showing of damages than that presented by Moore's children. Additionally, the Court has not identified, nor have Plaintiffs cited, any state or federal authority supporting an award of the magnitude returned by the jury. Nonetheless, the Court finds that damages should be awarded as the Moore children testified credibly and established a close relationship with Moore.

### c.     Conclusion of Remittitur

The Court begins by comparing the award here with that in *Stauder* because it is the most analogous published decision of the relevant jurisdiction (Louisiana). *Longoria*, 932 F.3d at 365; *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 299 (5th

Cir.), *cert. denied*, 145 S. Ct. 168 (2024). Based on the above-described similarities with *Stauder*, the Court finds an award of $2 million for each of Moore's children is the highest amount that could be awarded. Next, and still in accordance with the "maximum recovery rule," the $2 million award for each should be adjusted for inflation. *Stauder* was published in 2024. *Stauder*, 409 So. 3d at 1. Adjusted for inflation, $2 million award in October 2024 (date of *Stauder*'s publication) is equal to $2,053,588.63 in November 2025.[256] But "[t]o avoid substituting [its] judgment for that of the jury," the Court then multiplies $2,053,588.63 by 150%, *Harris*, 92 F.4th at 301, resulting in $3,080,382.945 of compensatory damages.

Therefore, this Court **GRANTS** Defendants' Motion for Remittitur and finds each Plaintiff is entitled to $3,080,382.95.

### 4. Constitutionality of the Punitive Damages Award

In its final claim, Defendants argue that the $23.25 million punitive damage award is constitutionally excessive.[257] The jury found Defendants acted with actual malice or reckless indifference to the rights or safety of others and awarded a $23.25 million award in punitive damages against Corporate Defendants.[258]

### a. Standard of Review

---

[256] While the *Harris* formula dictates to use the month of when the jury returned its verdict, the CPI does not have inflation data for October 2025, the month of the jury returned a verdict in this action, due to a lapse in appropriations. As the verdict was handed down on October 21, 2025, the Court uses the inflation data of November 2025 for its calculation of the adjusted amount for inflation. U.S. Bureau of Labor Statistics, *CPI Inflation Calculator* (last visited May 4, 2026), https://www.bls.gov/data/inflation_calculator.htm; s*ee also Harris*, 92 F.4th at 301.
[257] [Doc. No. 705-2, p. 17].
[258] [Doc. No. 664, pp. 10–11]; [Doc. No. 670].

The Due Process Clause of the Fourteenth Amendment prohibits states from imposing "grossly excessive" punishment on the tortfeasor. States have flexibility in awarding punitive damages, and only when the award can be categorized as "grossly excessive" in relation to the state's interests does it enter the zone of arbitrariness that violates Due Process. *BMW of N. Am., Inc., v. Gore*, 517 U.S. 559, 562–64 (1996). The constitutional line separating permissible awards of punitive damages from those that are excessive is not marked by a simple mathematical formula. *Id.* A defendant's similar acts, independent from the acts upon which liability was premised, must not serve as the basis for punitive damages. *Id.* at 442. "For purposes of determining whether an award of punitive damages is excessive, an award that exceeds a single-digit ratio between punitive and compensatory damages may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

"In practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." *Id.* at 410. In awarding punitive damages, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426. A defendant's financial status cannot be used to justify a punitive damages award that would otherwise violate the Constitution. *Id.* 426–27. The three guideposts to consider in assessing punitive damages are: "(1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the actual or

potential harm suffered by the plaintiff and the punitive damage award, and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

### b.    Analysis

In this case, the jury awarded $1.5 million in pre-death damages, $18 million in wrongful death damages, collectively, and $23.25 million in punitive damages against Corporate Defendants. Defendants argue that the $23.25 million punitive damage award is constitutionally excessive.[259]

In 1996, the Supreme Court of the United States found that a punitive award of $2 million was excessive in light of a compensatory damage award of $4000. *Gore*, 517 U.S. at 583. The Court noted a five-hundred-to-one ratio between the punitive damage award and the actual harm. *Id.* at 560. In addition to the high ratio, the Court also looked at the degree of reprehensibility of the defendant's conduct and compared the punitive damages awarded with the civil or criminal awards that could be imposed for comparable conduct. *Id.* at 575. The Court found that the punitive damage award violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and remanded the case. *Id.* at 586.

Seven years later, in *State Farm Automobile v. Campbell*, the Supreme Court of the United States again addressed whether punitive damages violated due process. 538 U.S. 408. As a result of State Farm's bad faith in failing to settle a claim against Campbell, State Farm's insured, the jury awarded a total of $2.6 million in

---

[259] [Doc. No. 705-2, p. 22].

compensatory damage and $145 million in punitive damages. *Id.* at 415. The Court again held that the award of punitive damages violated due process. *Id.* at 429. The Court again evaluated the "guidepost," (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages (the ratio); and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized and imposed in comparable cases. *Id.* at 418.

Like in *State Farm* and *Gore*, the Court examines the three guideposts to determine whether the punitive damage award is excessive. But before addressing these guideposts, the Court must determine what conduct the punitive damages are being compared with. Defendants maintain that since the jury only found Moore's death was caused by Louisiana state law negligence, the conduct that resulted in Moore's death cannot be considered in awarding punitive damages.[260] The Court agrees.

The jury determined that only negligence was a substantial factor in causing Moore's death—not excessive force or battery.[261]  As a result, the Plaintiffs can seek punitive damages only if there is a federal constitutional violation. Negligence alone does not qualify as a constitutional violation. In *State Farm v. Campbell*, the Court cautioned that the conduct that the defendant is being punished for by punitive damages "must have a nexus to the specific harm suffered by the plaintiff." 538 U.S. at 422. Damages based on negligence are not connected to those for battery or

---

[260] [Doc. No. 705-2, p. 24].
[261] [Doc. No. 664, p. 4].

excessive force. Only the conduct underlying the jury's award of pre-death damages may be considered when evaluating punitive damages. Accordingly, the $18 million wrongful death award—based on negligence—cannot be considered in determining punitive damages, since the jury found that Moore's death was caused solely by negligence. However, the Defendants' conduct showing excessive force or battery may be considered.

### i.    Reprehensibility of Defendants' Conduct

"To determine a defendant's reprehensibility—the most important indicium of a punitive damages award's reasonableness—a court must consider whether: the harm was physical rather than economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77). Applying this standard to whether the conduct was reprehensible, the unconstitutional use of excessive force and battery satisfies that requirement. Mere negligence does not. The reprehensible nature of the conduct is further supported by testimony describing multiple instances in which Moore was chemically sprayed, struck, thrown to the ground, and dogpiled. *See supra* pp. 19, 22. Accordingly, the conduct giving rise to the excessive force and battery damages meets the standard for reprehensibility.

### ii.    Ratio to Actual Harm

The second guidepost for determining whether punitive damages are constitutionally excessive is the ratio between punitive damages and the plaintiff's

actual harm. As noted above, the conduct for which Defendants are being punished must bear a nexus to the specific harm suffered. And although the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," the Court has also stated:

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23–24. We cited that 4–to–1 ratio again in *Gore*. 517 U.S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.*, at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.*, at 582, or, in this case, of 145 to 1.

*State Farm*, 538 U.S. at 424–25.

As explained above, the proper benchmark is the $1.5 million award for pre-death damages, because the $18 million awarded on the wrongful-death claims arises under Louisiana state law rather than 42 U.S.C. § 1983 and therefore cannot independently sustain federal punitive liability. Using that comparator, the ratio between the $1.5 million compensatory award and the $23.25 million punitive damages award is 15.5 to 1.

### iii. Difference Between Punitive Damage and Civil Penalties

Neither Defendants nor Plaintiffs have offered a sufficiently comparable example of civil penalties. Defendants contend that, as a general matter, federal criminal fines are capped at $250,000 for individuals and $500,000 for organizations under 18 U.S.C. § 3571. However, there is no comparable statutory cap on damages awarded against individuals or entities in § 1983 actions. *Kleppinger v. Tex. Dep't of Trans.*, No. 10-CV-124, 2012 WL 12893653, at *7 (S.D. Tex. Aug. 10, 2012).

### c. Conclusion

Even though the Defendants' conduct was reprehensible, the Court finds the jury's award of $23.25 million for punitive damages to be constitutionally excessive. In light of the ratio of 15.5 to 1 of pre-death damages to punitive damages, the highest amount of punitive damages that can constitutionally be awarded is an award of $6 million, a 4 to 1 ratio. Thus, the Court reduces the punitive damage award from $23.25 million to $6 million.

## III. CONCLUSION

In accordance with the ruling herein,

**IT IS ORDERED** that Defendants' Rule 50(b) Motion [Doc. No. 704] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Rule 50(b) Motion is **GRANTED** as to any punitive damages awarded under state law claims for the death of Moore, as such damages apply to federal, not state claims. It is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendants' Rule 59 Motion [Doc. No. 705] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Motion is **GRANTED** as to remittitur for wrongful death damages and punitive damage award and each Plaintiff is entitled to $3,080,382.95 for wrongful death damages and a total of $6 million in punitive damages. It is **DENIED** as to all other issues.

**IT IS FURTHER ORDERED** that Plaintiffs notify the Court within twenty-one (21) days of this ruling, whether Plaintiffs accept the remittitur of general damages, and/or punitive damages by entering their decision into the record.

**IT IS FURTHER ORDERED** that should the Plaintiffs decide not to accept the remittitur of general damages and/or punitive damages, Plaintiffs will be entitled to a new trial on damages alone.

**IT IS FURTHER ORDERED** that the Motion to Stay [Doc. No. 733] is **DENIED AS MOOT**.

MONROE, LOUISIANA, this 7th day of May 2026.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE

Page **53** of **53**